IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
        Plaintiff


    v.                    CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
            Defendants



HEARING ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND
FIRST AMENDED COMPLAINT



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, January 12, 2006.



APPEARANCES:
        CALEB L. NICHOLS, Esquire, appearing on behalf
        of the Plaintiff.

        MARK J. KUHAR, Esquire, appearing on behalf of
        Defendants Crawford Central School District,

et al.

RICHARD S. McEWEN, Esquire, appearing on behalf
of Defendant Crawford Central Education
Association.


Ronald J. Bench, RMR - Official Court Reporter


2


1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 1:30 p.m., on

4   Thursday, January 12, 2006, in Courtroom C.)

5

6          THE COURT:  All right.  We have for consideration

7   first today the plaintiff's motion for leave to amend the first

8   amended complaint.  I've read the briefs.  This is, of course,

9   opposed.  I think it makes more sense, in terms of the

10   argument, to do it this way.  Rather than hear from the movant

11   first as to why the amendment should be permitted, I think I'm

12   going to hear from defense counsel who oppose it, as to why

13   they opposed it, then I'm going to let Mr. Nichols respond to

14  that.  All right.

15       MR. McEWEN:  May it please the court, your Honor, my

16  name is Richard McEwen, I'm here on behalf of the Crawford

17  Central Education Association and the Pennsylvania State

18  Education Association.

19       THE COURT:  Let me start out if I could just ask you

20  a couple of preliminary questions.  Having read your brief, it

21  appears to me that your argument is essentially, one, your

22  argument in opposition to the proposed amendment is one of

23  futility.  In that regard I think your first argument is that

24  as a per diem substitute teacher, she was not a member of the

25  bargaining unit and was not entitled to be a member of the

3

1  bargaining unit, and you cited a board decision to that effect?

2       MR. McEWEN:  That's correct, your Honor.

3       THE COURT:  How well-settled is that law, that per

4  diem substitute teachers are as a matter of law casual

5  employees and, therefore, may not partake a full membership

6  status in the unit?

7       MR. McEWEN:  Well, I know I first came to the PSEA

8  as an attorney in 2000, and one of the first tasks of the long

9  time Uniserve representative gave me was to try to find a way

10  to get day-to-day substitutes eligible for membership in the

11  bargaining unit.  And we've never been able to do it.  So I

12  think it's fairly well established.

13        THE COURT:  Now, I take it, then, that your position

14  is that if she was not, nor was she entitled to be a member of

15  the bargaining unit, then the union, the local union not only

16  had no obligation to grieve on her behalf, but it had no

17  capabilities to do so?

18        MR. McEWEN:  Exactly correct, your Honor.

19        THE COURT:  Talk to me about -- corollary to that I

20  understand is that you contend that even if she were a member,

21  there is no such thing as a breach of contract action and that

22  it would be a duty of breach of fair representation, if

23  anything, and your position is that the statute would have run

24  on that, is that correct?

25        MR. McEWEN:  That's correct.  At least as to the

4

1  initial claim, the basis, my understanding is the fundamental

2  basis of the plaintiff's claim is an assignment that she was

3  given in November, December of 2002. Where a permanent teacher

4  went on extended medical leave and she was tapped to initially

5  replace her. The teacher's leave I think was extended after,

6  when her recovery took longer than had originally planned.

7  Apparently, at that point the district decided to go a

8  different way in how that position was going to be filled and

9  removed the plaintiff from that position. She contends that

10  that was wrongly done. But it was -- the evidence so far

11  reveals it was about a month long, four to six week stay that

12  she had there, and that's the longest consecutive assignment

13  she's had with the district. And so that's simply not long

14  enough to change her, the nature of her assignment from

15  anything but a per diem substitute.

16      THE COURT: Now, in addition to the contract claim,

17  which we've just discussed, there is, of course there's a 1983

18  claim which I don't think will take up much of your time, but

19  there's also a 1981 claim. And articulate for me and,

20  essentially, I gather it's a variant of a disparate treatment

21  claim; what is your position on the 1981 claim?

22      MR. McEWEN: My under understanding of the claim --

23      THE COURT: Let me rephrase it, let me ask a better

24  question, then you can respond to it.  Hypothetically and I say

25  hypothetically, would a plaintiff state a colorable claim if it

5

1  was this.  That notwithstanding the fact that she was not a

2  member, if you will, of the bargaining unit, that as a matter

3  of custom or practice the union had routinely grieved matters

4  on behalf of people who did not have full membership,

5  part-timers, and the record reflected that they only did so on

6  behalf of non-minority people, would that facially state a

7  claim?

8       MR. McEWEN:  Let me see if I can remember all the

9  parts of that your, Honor.

10       THE COURT:  Because part of your objection to the

11  1981 claim isn't that as an entity you couldn't be liable under

12  1981, it seemed to be you attacked the pleading as

13  insufficient?

14       MR. McEWEN:  I think under the facts of this, I

15  don't believe we could ever be held liable.  Certainly there

16  might be some hypothetical --

17       THE COURT:  Why aren't you liable as pled here?

18          MR. McEWEN:  Because the claim had to do with --

19  well, two things.  The failure of the district to hire the

20  plaintiff for a full-time position.  And under Pennsylvania

21  labor law, our rights as an association are much more

22  restrictive than they are under federal private labor laws.

23          THE COURT:  Well, you can't hire and you can't fire?

24          MR. McEWEN:  Exactly.  The school district by law

25  has the exclusive managerial discretion to make those

6

1  decisions.  Not only do we play no role in it practically,

2  legally we have no ability to play any role in that decision.

3  So, in terms of any discrimination on the hiring, I don't see

4  any way in which the association could be liable.

5          THE COURT:  I'm going to let Mr. Nichols speak for

6  himself on the point presently, but I don't read Mr. Nichols as

7  complaining that the union was directly responsible either for

8  the termination or the failure to hire.  As I read the claim,

9  it is that she was damaged or potentially damaged because there

10  is no guarantee when you grieve something, that it's ever going

11  to be successful anyways.  But I gather that the essence of the

12  claim is that she feels she was discriminated against based

13  upon the union's failure to have provided her legal

14  representation so as to have objected to the various job

15  actions taken concerning it, I think that's the essence of the

16  claim?

17      MR. McEWEN:  Yes, your Honor.  But I think it goes

18  back to this whole kind of impossibility, is one aspect of it.

19  The second aspect derives from the fact that she was a

20  substitute and not a member of the bargaining unit.  When you

21  look closely at the exhibits that the plaintiff has provided,

22  she provides an application for membership in the union.  That

23  clearly shows that she applied to be a substitute member.

24  That's what she is qualified to be, that's what she was.

25  Substitute members pay $40 a year in dues.  On the same form it

7

1  clearly shows that.

2      THE COURT:  What does that get you, so to speak?

3      MR. McEWEN:  That's something I wanted to address

4  with the court.  The brief tends to suggest that this was some

5  fictious or we took her money and didn't do anything for her.

6   What the $40 does primarily and that's where some of these

7   issues get muddied because it depends on how you define legal

8   service, this does qualify her for certain legal services.

9   What this does is essentially provides liability insurance for

10  her.  So if there's a situation in the classroom, in the

11  furtherance of her duties that if there was a negligent claim

12  that had been filed against her or something like that, it

13  would provide representation in that.  That is handled through

14  an insurance company, it's not something that I, a staff

15  attorney with PSEA, would have any involvement in it

16  personally.  That's the primary benefit of that.  That's

17  reflected in the fact that you're also qualified for

18  publications and a couple other perks along those lines.

19        THE COURT:  The legal services policy manual for

20  legal services, do you have that handy?

21        MR. McEWEN:  Yes.

22        THE COURT:  Pertinently, where in that document does

23  it speak to this issue?

24        MR. McEWEN:  It speaks to it in a couple of places.

25  There's at least two legal services policies that have been

1  provided.  I think the first one -- it's Exhibit 4 with the

2  motion, Exhibit 8 with the plaintiff's brief.  And it's a copy

3  actually of a pamphlet that's distributed to the members.  But

4  the first thing on it here is eligibility.  "In order to be

5  eligible for PSEA legal assistance, a person must meet the

6  following three eligibility requirements."  Active, reserve or

7  life membership in PSEA at the time that a request is made or

8  during the preceding year or at the time the events that are

9  stated.  You clearly needed to be an active, reserve or life

10  member.  Those are different categories than a substitute

11  member.  An active member is essentially a full-time employee

12  member.  And reserve membership is designed for if a full-time

13  employee is dismissed from employment and we are in the process

14  of grieving that, they can get a reduced reserve membership,

15  that it continues to entitle them to representation.  It

16  recognizes the fact that they're not currently employed.  A

17  life membership is an option for active members.  They can

18  basically pay up front and become a life member.  Those are the

19  three circumstances that the legal services policy, where it

20  applies.  That's our other part of the argument, that her

21   status as a substitute not only affects her membership in the

22   bargaining unit and her rights under the CCEA bylaws, but it

23   also directly affects her right to any legal services provided

24   by PSEA.  Clearly, in order to be eligible under the policy,

25   you have to be an active member, and she wasn't.  She never

                                    9

1   alleged that she was and she doesn't qualify to be one.  That's

2   really the reason that services weren't presented to her.  And,

3   moreover, if you read the policy carefully, and really that's a

4   little more obvious under the other version of the policy

5   that's been submitted as Exhibit 7 of the brief, it also

6   reasserts the eligibility requirements there, it talks about

7   appropriate membership in the PSEA.  If you look at the

8   footnote on the bottom of that page, it defines appropriate

9   membership as active membership, basically.  So it's consistent

10   with the other pamphlet.  But if you go further on here,

11   there's a separate section regarding policy for handling civil

12   rights and discrimination cases, on page 78 of the policy.  But

13   even an active member who applies for legal assistance for a

14   civil rights discrimination case is not guaranteed to obtain

15  that.  It clearly spells out here that they need to apply for

16  it.  They are interviewed by a staff attorney, who assesses

17  whether a recommendation should be made to have the claim

18  pursued.  Ultimately, the PSEA's general counsel reviews the

19  recommendation, and it states quite clearly, PSEA general

20  counsel should then decide whether to approve or deny the

21  application.  So even if the plaintiff was an active member and

22  had asked for this, she is not necessarily guaranteed to

23  receive these benefits.  It's clearly at the option of the

24  association.

25          THE COURT:  All right, thank you, Mr. McEwen, I have


                            10


1  your point.  All right, Mr. Nichols, do you want to come on up.

2  Mr. Nichols, let's begin our discussion and talk a little bit

3  about who had the power to do what.  As I understand it, the

4  essence of your lawsuit is your client would have been, she had

5  been serving as a part-time per diem substitute teacher, but

6  there came a time, I believe, was in January of 2003 when she

7  was terminated?

8          MR. NICHOLS:  2002, judge.

9         THE COURT:  2002?

10         MR. NICHOLS:  November, 2002.

11         THE COURT:  Excuse me.  In any event and then that

12  forms part of your claim?

13         MR. NICHOLS:  That's part of it, not all of it.

14         THE COURT:  That's just what I said, I said that's

15  part of your claim.  And then the rest of your claim rests on

16  she apparently reapplied?

17         MR. NICHOLS:  In 2004.

18         THE COURT:  Yes.  And did not get the position.

19  Now, the union had no ability to hire her, did they?

20         MR. NICHOLS:  Well, we have never contended that.

21         THE COURT:  That's not the essence of your claim

22  against the union?

23         MR. NICHOLS:  That's right.

24         THE COURT:  Now, how do you respond to Mr. McEwen's

25  position, concerning which there appears to be some support,


11


1  that as a casual employee, as a matter of law your client was

2  not and was not entitled to be a member of the bargaining unit?

3          MR. NICHOLS:  Judge, our position is based on a more

4    narrow basis.

5          THE COURT:  I'm going to let you tell me, but

6    respond first to this casual employee argument because it seems

7    to me, unless I have completely missed my legal boat, that if

8    he's right about that, that's the ball game?

9          MR. NICHOLS:  I don't think that he's right about

10   that.  Because for these following reasons.  When she became a

11   member of the union, I believe February 5, 2004, upon the

12   payment of her dues, she was entitled to certain professional

13   services.  The entitlement to those professional services were

14   not conditioned on the further requirement that she was also a

15   member -- a member of the collective bargaining unit.

16         THE COURT:  Could I ask you this.  As of February of

17   2004, the timeframe you're talking about when she had reapplied

18   and was turned down, what is it your position the union should

19   have done for her that they didn't do for her that you are

20   claiming damages as a result of?

21         MR. NICHOLS:  Okay.  Being a member of the union and

22   in September of 2004 she approached the president of the union,

23   Mr. Hootman, and the vice president of the local union --

24         THE COURT:  I know the factual background, I am

25  trying to shorten this up.  What is it that you claim that the

12

1   union should have done for her that they didn't do for her?

2          MR. NICHOLS:  One, they should have initiated an

3   investigation, it seems to me, an investigation.

4          THE COURT:  Into what?

5          MR. NICHOLS:  An inquiry as to why she had been

6   discriminated against.

7          THE COURT:  Then what should they have done?

8          MR. NICHOLS:  And then they should have followed

9   their procedures in what they have set down, in terms of how

10   you handle a civil rights claim.  I have that in Exhibit 7.

11          THE COURT:  What I'm having trouble with and perhaps

12   the problem is all mine, but even with respect to -- even if

13   she was a full member of the bargaining unit and as a result of

14   which entitled to have a grievance picked up by the union and

15   prosecuted by the union, isn't it true that even for a

16   full-time member, an active member of the union, the union

17   always retains discretion as to which grievance or grievances

18   they will pursue, there's nothing mandatory at all, isn't that

19  true?

20      MR. NICHOLS:  That is not the issue.

21      THE COURT:  Yes, it is the issue.  Because if they

22  weren't obligated to grieve this on your client's behalf, what

23  are we talking about?

24      MR. NICHOLS:  We're talking about being able to

25  provide professional services to her on the basis of equality.


13


1       THE COURT:  Can you point out to me anywhere in the

2   agreement, if you will, whereby the union was contractually

3   obligated to pursue any grievance on behalf of any claimant?

4       MR. NICHOLS:  I would point you, judge, to the

5   Exhibit 7.

6       THE COURT:  What would that be, Mr. Nichols, I can't

7   remember my name let alone a number?

8       MR. NICHOLS:  I have a copy here.

9       THE COURT:  All right.  All right, Mr. Nichols.

10      MR. NICHOLS:  Let me be clear on the question you

11  asked me, judge.  You asked me, as I understand --

12      THE COURT:  Let me make clear to you what I'm

13   asking.  Where does it say in the contract that the union is

14   obligated to grieve every grievance; in other words, where does

15   the contract suggest or directly imply that the union does not

16   retain discretion as to which grievances they will pursue --

17   that's my question?

18        MR. NICHOLS:  I don't think that the contract

19   commits itself in every instance to grieve, but nor did I

20   allege that as a violation as part of the complaint.

21        THE COURT:  What, in a nutshell, did the union do

22   which you find is federally actionable?

23        MR. NICHOLS:  All right.  One, first of all, I say

24   this.  She was a member of the union by virtue of the payment

25   of dues when she went to the officials in September of 2004.


                              14


1   And before that she set forth her claim I'm being discriminated

2   against.  I applied for several jobs --

3        THE COURT:  What did they -- I am desperately trying

4   to make sure I understand your theory here, I'm giving you and

5   your client every benefit of the doubt.  My question to you is

6   what was it that the union didn't do which you believe was

7   discriminatory and, therefore, supports a federal cause of

8   action; that's the narrow question, don't wander off that path?

9       MR. NICHOLS:  I believe I will answer that, judge.

10      THE COURT:  I'm pretty good at picking up when

11  people are answering my questions and when they're not, I'm

12  going to give you a chance, go ahead?

13      MR. NICHOLS:  Being a member of the union, there was

14  a contractual relationship between her and the union.  Section

15  1981 requires that there be a contractual relationship.  Two,

16  Section 1981 also requires that it be racially motivated.  Ms.

17  Wagner is here today, she is Asian by race, Filipino by

18  national origin.

19      THE COURT:  Okay.

20      MR. NICHOLS:  We've satisfied that requirement.

21  When she went to Mr. Hootman and the officials and asked for

22  help, which they made absolutely clear at deposition testimony

23  to back this up, they sat on their hands.  I then met with

24  their counsel, regional counsel, Mr. Jones, two months later,

25  which I also can document, I submitted to you a copy.

15

1          THE COURT:  When you say they sat on their hands,

2   what does that mean, what didn't they do that you think they

3   should have done?

4          MR. NICHOLS:  They should have at least initiated an

5   investigation.  They should have at least tried to follow, made

6   an attempt, a boni fide attempt to follow the procedures which

7   they set down on paper.

8          THE COURT:  Who by the way -- this just popped into

9   my head.  Mr. Jones is counsel for the PSEA, is he not?

10          MR. NICHOLS:  Yes, sir.

11          THE COURT:  Did you go to Mr. Jones at a time when

12   you were suing the PSEA and ask Mr. Jones for funding to supply

13   an expert so that that expert could shoot the PSEA in the foot,

14   did you do that?

15          MR. NICHOLS:  No, I did not.  As I recall the

16   incident, Mr. Jones and I met for lunch.  I said, I didn't call

17   him Mr. Jones, I think he --

18          THE COURT:  I don't care, you know that's not the

19   upshot of my question.

20          MR. NICHOLS:  Let me explain it more clearly then.

21   I said look, you read the case -- will you join with us, join

22   with us in helping to bringing this case to a just conclusion,

23   my client wants a job, and I think she's been treated unfairly.

24   You have the response in the letter exhibit to you.  He said

25   no.  I'm simply saying today that the union, by virtue of the


16


1   union being named as a defendant, did not absolve them of their

2   constitutional obligation under Section 1981.  If anything, by

3   their attorney's objecting, rejecting, really confirmed the

4   wrongness of their position at that time, which they continue

5   to pursue.  You asked me, let me explain, please, judge.

6        THE COURT:  No, you be quiet.

7        MR. NICHOLS:  All right.

8        THE COURT:  Did you ask Mr. Jones for money from the

9   PSEA to fund an expert?

10       MR. NICHOLS:  I don't recall that.  That's been,

11   that was November -- 2004, two months subsequent to our filing

12   the lawsuit.  I don't recall -- asking him for money.

13       THE COURT:  Because wouldn't that be, if true, it

14   strikes me as the functional equivalent of putting a gun to

15   someone's head and then asking the intended victim to buy the

16  bullets?

17         MR. NICHOLS:  Not at all.  Because I met him in an

18  effort really to resolve the case, to help us resolve the case.

19  It's just our position counsel meet all the time.  At the same

20  time we go down the road to try to reach a settlement, I'm

21  always taking steps to litigate.  It's litigation, is that

22  wrong?

23         THE COURT:  There's nothing wrong in trying to reach

24  a settlement.  As a matter of fact, presently I'm going to try

25  to assist both sides in doing that.  That's always a good


                                    17


1  thing.  Now, what bothers me, among other things, about the

2  proposed amendment here is these are two entirely different

3  cases.  You have one perfectly, when I say good case, I mean

4  adequately pled case, against the employer.  From whom, if

5  you're right, either by way of verdict or by way of settlement,

6  you can get some kind of relief.  But this other case you have

7  over here against the union, an entity that is incapable of

8  hiring or for that matter firing, it is a breach of a duty of

9  fair representation case, if anything.  So you have two

10  completely nonparallel cases that you're trying to cram into

11  one lawsuit, aren't you?

12          MR. NICHOLS:  Judge, I respect that and I think I

13  understand what you're saying.  I would ask that you would

14  allow me to respond to that.

15          THE COURT:  Yes, that's why I asked the question,

16  sure.

17          MR. NICHOLS:  All right.  With respect to the action

18  that we brought against the school district, all right, now you

19  have to understand from the vantage point of Ms. Wagner, she

20  had applied for several jobs over the span of three or four

21  years.  Now, she went to the school district asking for help

22  and they had agreements -- that they did not follow.  She goes

23  to the union and they said no, you're not a member of the

24  collective bargaining, where in the world does she go.  And

25  she's an aggrieved person, that's what happened.  Those are the


                                18


1  facts, all right.  So what I'm saying, when I got the case, I

2  said wait a minute, first of all, under Section 1981, it says

3  that minorities have a right to contract for services in this

4    country under the same basic equality as white folks, that's

5    what it says.  I didn't make that up, that's what it says.

6            THE COURT:  You're preaching to the choir, Mr.

7    Nichols.

8            MR. NICHOLS:  I'm simply trying to state the case.

9            THE COURT:  When I say you're preaching to the

10   choir, that legal point is so well-established and so

11   irrefutably true, it's true, but a legal proposition has to

12   apply to a certain set of facts.

13           MR. NICHOLS:  Let me give you that.  So in

14   researching this case, I came across the Selinsgrove case.  And

15   that was a case in which two teachers, white teachers, brought

16   an action, they were fired, first of all.  They were day-to-day

17   substitutes, just as Ms. Wagner.  They were at-will employees.

18   And they went to the school district saying we have not been

19   treated fairly.  The PSEA lawyer and the staff -- you have the

20   exhibit there, I provided that to you, they said we'll

21   represent you.  They never questioned, okay, are you a

22   day-to-day substitute.  You are an at-will employee.  Uh-huh,

23   they did it.  The only difference between the facts of that

24   case and Ms. Wagner's is she is of Asian minority.  And these

25   are two white teachers, they came to the rescue.

19

1          THE COURT:  What are their names again?

2          MR. NICHOLS:  The Selinsgrove case.  I'll get you a

3    copy of it.

4          THE COURT:  Do you know their names, Mr. McEwen?

5          MR. NICHOLS:  It's Exhibit 11.

6          MR. McEWEN:  Mrs. Beaney and Mrs. Lininger.

7          THE COURT:  Who are these people, were they

8    teachers --

9          MR. NICHOLS:  May I show you a copy, judge?

10         THE COURT:  Sure.  Was this a situation where the

11   union fought the good fight on behalf --

12         MR. NICHOLS:  Of PSEA.

13         THE COURT:  Were these individuals full-time members

14   of the bargaining unit?

15         MR. NICHOLS:  They were day-to-day.

16         THE COURT:  Were they per diem substitutes?

17         MR. NICHOLS:  Per diem.  That's what the article

18   says.

19         MR. McEWEN:  Your Honor, I have the arbitration

20  decision, I brought that for your review.

21      THE COURT:  Well, what were they?

22      MR. McEWEN:  They were full-time employees.  On page

23  three of the decision, it says full-time teachers who

24  participated in the alternative education program.  The issue

25  was the district tried to hire them at less than bargaining

20

1  unit members.  They were treated as full-time employees but not

2  bargaining unit members.  That was the basis for our grievance,

3  they were full-time, we believed they should have been

4  bargaining unit members.  In fact, the arbitrator ultimately

5  agreed with us.  But there's nothing in here that they were not

6  day-to-day per diem substitutes.  They weren't substitutes of

7  any kind, they worked 180 days.  Even if there wasn't work

8  available in their regular assignments, the district kept

9  assigning them to do something else.  That's the only part as

10  to a substitute in the case.

11      THE COURT:  Mr. Nichols, let me ask you this

12  question, I'm going to really try to make it short and to the

13  point.  I've read your proposed second amended complaint a

14 couple of times actually. You do not allege in your amended

15 complaint, do you, because if you do I didn't see it, but I

16 want to give you a chance to correct me. I do not see where

17 you allege that non-minority per diem substitute teachers, who

18 performed the same function as your client, were routinely

19 provided legal assistance by the union; whereas, minority per

20 diem substitute teachers, such as your client, were not --

21 that's not in your complaint?

22          MR. NICHOLS: Allow me, judge.

23          THE COURT: Sir, you allow me. It's a very simple

24 question, is that in your complaint?

25          MR. NICHOLS: I want to read something very specific

21

1 in response to your question. That's what I'm turning to.

2          THE COURT: All right.

3          MR. NICHOLS: I have here --

4          THE COURT: Read slowly, though, and be so kind to

5 speak into the mike.

6          MR. NICHOLS: What is pertinent under the seventh

7 claim for relief of the second proposed amendment of the second

8   amended complaint, paragraphs 55 and 56.  And paragraph 55

9   states as follows:  "The Crawford Central Education

10  Association, PSEA and the NEA breached the contractual

11  relationship that existed between them and the plaintiff by

12  virtue of her union membership.  In failing to represent

13  plaintiff in her quest to make and enforce her constitutional

14  rights to contract with the Crawford Central School District

15  and others, unfettered by racial and national origin

16  discrimination, the CCEA, PSEA and NEA, engaged in prohibited

17  discriminatory animus against the plaintiff on the basis of

18  national origin and race."  Paragraph 56 continues:  "The CCEA,

19  PSEA and NEA have consciously and purposely discriminated in

20  providing professional support services to white union members

21  but refused to provide such services to minority union

22  members."  End of paragraph 56.

23        THE COURT:  All right.  I have your point, thank

24  you, you can sit down, sir.

25        MR. NICHOLS:  Thank you, your Honor.


22


1         THE COURT:  This is an order.

2              ORDER

3          Presently pending before the court is a motion for

4    leave to amend the first amended complaint filed by the

5    plaintiff.  The decision whether to grant or deny a motion for

6    leave to amend is within the sound discretion of the district

7    court.  Zenith_Radio_Corp._v._Hazeltine_Research,_Inc., 401

8    U.S. 321.  While as a general proposition amendments should be

9    freely granted, there are certain factors that militate against

10   granting leave to amend, which would include "undue delay, bad

11   faith or dilatory motive on the part of the movant, repeated

12   failure to cure deficiencies by amendments previously allowed,

13   undue prejudice to the opposing party by virtue of allowance of

14   the amendment and futility of amendment ..."  Foman_v._Davis,

15   371 U.S. 178, (1962).

16          In the present case, the plaintiff seeks to amend

17   the complaint to add a claim against the CCEA, PSEA and the

18   NEA.  Essentially, the essence of the plaintiff's claim against

19   these entities seems to be that the plaintiff's civil rights

20   were violated by virtue of the failure of the defendant union

21   to have provided legal representation in filing a grievance

22  with respect to various job-related actions taken against her

23  by the Crawford County School District.  For the reasons that I

24  will discuss more fully below, I will not permit the amendment.

25         First, on this record it is undisputed that the


23


1   plaintiff at all material times was a per diem substitute

2   teacher.  As such, she functioned as a casual employee and,

3   therefore, was not, as Pennsylvania case law and board law has

4   interpreted, entitled to membership status in the bargaining

5   unit.  See Bristol_Township_School_District, 12 Pa.P.E.R. 342

6   (P.D.&O. 1981), affirmed 13 Pa.P.E.R. (F.O. 1982).  And

7   Erie_County_Area_Vocational-Technical_School_v._Pennsylvania

8   Labor_Relations_Board, 417 A.2d 796 (1980).  In short, then,

9   not only was there no obligation on the part of the union to

10  file a grievance, there was in fact no legal ability to do so.

11         I also note, parenthetically, that even if the

12  plaintiff had been a member of the bargaining unit and

13  therefore entitled to the full panoply of rights thereunder, at

14  all material times the union would have retained unfettered

15  discretion as to whether to have grieved a particular matter or

16  not.

17       I also note for the record that the document styled

18  Legal Services Policy makes clear that active status is a

19  prerequisite for the receipt of legal services, such as those

20  concerning which the plaintiff complains here.

21       In addition, I note that there is no cause of action

22  for breach of contract against the union, rather the

23  appropriate remedy is by way of a breach of the duty of fair

24  representation.  See Waklet-Riker_v._Sayre_Area_Educational

25  Association, 656 A.2d 138 (1995).

24

1        Alternatively, I note that there's a 1983 claim that

2  has been asserted against the union defendants.  It is Hornbook

3  law that a prerequisite for the maintenance of a 1983 claim is

4  the presence of state action or state actors.  Neither the

5  local, the state or the national qualify as state actors,

6  therefore, that does not state a claim.

7        Beyond the futility matter, I also note

8   parenthetically, even if this amendment were potentially

9   legally viable, at this late stage into the second proposed

10  amendment of the complaint, on the eve of the close of

11  discovery, it would constitute, in my opinion, undue delay,

12  incur additional costs, and would be prejudicial, all of which

13  is yet another reason for denying the amendment.  The motion is

14  denied.

15          (Whereupon, at 2:15 p.m., the proceedings recessed

16  in Courtroom C; and at 2:25 p.m., reconvened on the record in

17  Judge's Chambers as follows:)

18          THE COURT:  So I'm clear, if this case ever goes to

19  trial, one of the things you're looking for is you want your

20  client to be reinstated, right?

21          MR. NICHOLS:  That's right.

22          THE COURT:  That's one thing you're looking for.

23  What else would you be looking for?

24          MR. NICHOLS:  Back pay.

25          THE COURT:  What else would you be looking for?


                                25


1           MR. NICHOLS:  Pretty much what I said in the latest

2   submission to you, and that was it should be consummated under

3   the auspices of the court, by that I mean a consent agreement.

4   All embodied in a consent agreement

5        THE COURT:  Would your client be looking for

6   non-economic damages for emotional upset and that type of

7   thing?

8        MR. NICHOLS:  We're malleable and flexible.

9        THE COURT:  Not for today's purposes, forget we're

10  talking about the settlement, I'm saying if it goes to trial,

11  if it was submitted to a fact finder, would you be asking for

12  damages for non-economic damages, pain and suffering,

13  humiliation, things like that?

14       MR. NICHOLS:  Not necessarily.  That is why we asked

15  for a bench trial.  I've discussed this with my client, it's my

16  understanding that those types of damages, if we would request

17  them, would require something other than a bench trial.

18       THE COURT:  So to be clear about it, then, you're

19  willing to forego any type of damages for which you would be

20  entitled to a jury trial and proceed only by seeking relief

21  that would be available from a judge?

22       MR. NICHOLS:  From a judge.

23          THE COURT:  Is that correct?

24          MR. NICHOLS:  Let me clarify -- you're right, judge,

25   except one thing.  My understanding -- to be clear.  As to the


                                26


1   relief available from a judge, includes reinstatement and back

2   pay.  My understanding is back pay is an equitable remedy.

3          THE COURT:  Okay, I'm glad we did that exercise.

4   Did you have something you wanted to say on the point?

5          MR. KUHAR:  I was just wondering if that was a

6   formal -- was that an expression of what he would do, has he

7   just waived it?

8          THE COURT:  As far as I'm concerned -- and you've

9   discussed this with your client?

10          MR. NICHOLS:  I've discussed it with my client.

11          THE COURT:  So there is no future question about it,

12   that represents, in my view, a present waiver of any of those

13   other damages.  You understand that you're locked into this

14   now, don't you?

15          MR. NICHOLS:  On those conditions.

16          THE COURT:  Just what you said?

17          MR. NICHOLS:  My understanding of what I said, what

18   I represented, my understanding of the one, what the judge has

19   the authority to do is determine on the equity side of the

20   case.

21          THE COURT:  Remember this, I won't permit you to

22   change your tune later on and seek other type of damages, do

23   you understand that?

24          MR. NICHOLS:  Right.  And that is conditioned on a

25   bench trial request?


27


1          THE COURT:  Right.

2          MR. NICHOLS:  Okay.

3          THE COURT:  Let's go back off the record here.

4          (Discussion held off the record.)

5          THE COURT:  Back on the record.  If there's a 1983

6   claim, you're entitled to a jury trial on the 1983 claim -- but

7   you're just looking for equitable relief?

8          MR. NICHOLS:  Yes, equitable relief.  There is a

9   1983 claim, along long with a 1981 claim, right.

10          MR. KUHAR:  Your Honor, if I may ask for

11    clarification.  The only relief that you seek is equitable

12    relief, which has already been defined to include back pay and

13    reinstatement or instatement, whatever we want to call it,

14    regardless of what actions are under 1981, 1983 or Title VII,

15    that's what we're facing, that's the maximum exposure, do I

16    understand that correctly?

17          MR. NICHOLS:  Yes.

18          (Discussion held off the record.)

19          THE COURT:  Your attorney has indicated he wants to

20    go non-jury and has relinquished any type of claim for which

21    there would have been entitlement to a jury.  He wants to go

22    non-jury, your remedies would be reinstatement and back pay.

23    He told me he has discussed this with you and you're agreeable

24    to it, is that right?

25          THE PLAINTIFF:  Yes, that's correct.


                                    28


1           THE COURT:  All right, we're off the record.

2           (Discussion held off the record.)

3           (Back on the record at 4:25 p.m.)

4           THE COURT:  All right, the parties have informed me

5  that they have reached a settlement in this case; subject only

6  to formal approval by the School Board.  But it's my

7  understanding that the Superintendent has been in touch with

8  the School Board president and has every reason to believe

9  these terms and conditions are acceptable.  That having been

10  said, Mr. Kuhar, I'm going to have you run through all the

11  material terms and conditions.  And then I'm going to turn over

12  to Mr. Nichols here and confirm that that is acceptable to his

13  client and his understanding of the agreement.  Go ahead.

14       MR. KUHAR:  Thank you, your Honor.  That Ms. Wagner

15  would satisfy a development plan, which would include her

16  attendance at an APL training program, which is a standard

17  requirement of new teachers and current teachers.  It would

18  involve four days of training, the cost of which would be paid

19  for by the district.

20       She would then immediately thereafter begin

21  approximately two months of teaching employment in our

22  after-school program, for which she would be paid the standard

23  rate, which is approximately $20 per hour.  She would work

24  approximately one-and-a-half hours per day, Monday through

25  Friday, consistent with the other people in the program.

29

1          Again, after approximately two months of that type

2    of employment, she would then be given the first available

3    long-term substitute position for which she is qualified.

4    Which would be a minimum of 90 days.  So she would be paid as a

5    long-term sub as the first step in this contract.  Thereafter,

6    she would be awarded the first position, regular full-time

7    position for which she is qualified.

8          The district would retain its rights to supervise

9    and direct Ms. Wagner comparable to those that it has regarding

10   any other school employee, consistent with its duties under the

11   School Code.

12         Ms. Wagner would execute a global release in favor

13   of the defendants and the district, effective through the date

14   of its execution.  There would be no admission of liability, in

15   fact it would state there is no admission of liability.

16         The district's insurer would pay $10,000 towards

17   attorney's fees on behalf of Ms. Wagner.

18         This would be subject to formal approval by a

19   majority of the School Board directors at its next occurring

20   meeting at which it could do so.

21          THE COURT:  Finally, let me just add that in the

22  event of a claimed breach of the settlement agreement, the

23  plaintiff would, of course, be permitted to return to court

24  here and sue on the settlement agreement if that ever became

25  necessary.  But I certainly do not anticipate that eventuality.


                                30


1  All right, as far as I'm concerned, save the formality of the

2  Board's vote -- which is when again?

3          MR. KUHAR:  Monday evening.

4          THE COURT:  It certainly looks like this case is

5  settled.  Mr. Nichols, having heard all the terms and

6  conditions, on behalf of your client are those acceptable?

7          MR. NICHOLS:  Just one question, I was not clear.

8  That is the duration of the development period, what is the

9  duration of that?

10          MR. KUHAR:  The development plan involved this APL

11  program, which is four days in duration.  And it involved

12  approximately two months of her teaching in this after-school

13  program.

14          THE COURT:  Then are all the terms and conditions

15  acceptable?

16         MR. NICHOLS:  They are acceptable based upon my

17  discussions with my clients, Mr. and Mrs. Wagner.

18         THE COURT:  Then as far as I'm concerned, the case

19  is settled.

20

21         (Whereupon, at 4:30 p.m., the proceedings were

22  concluded.)

23

24                     - - -

25


                              31


1              C E R T I F I C A T E
               _ _ _ _ _ _ _ _ _ _ _

2

3

4      I, Ronald J. Bench, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8

9

10 _____

11 Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25