IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
          Plaintiff


     v.                    CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
          Defendants


EVIDENTIARY HEARING ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT



        Proceedings held before the HONORABLE

        SEAN J. McLAUGHLIN, U.S. District Judge,

        in Courtroom C, U.S. Courthouse, Erie,

        Pennsylvania, on Monday, March 27, 2006.




APPEARANCES:
          EDITH BENSON, Esquire, appearing on behalf of
          the Plaintiff.

          CALEB L. NICHOLS, Esquire, appearing on behalf
          of the Plaintiff.

          MARK J. KUHAR, Esquire, appearing on behalf of

Defendants Crawford Central School District, et al.

RICHARD S. McEWEN, Esquire, appearing on behalf of Defendant The Crawford Central Education Association.

Ronald J. Bench, RMR - Official Court Reporter

2

1                 I N D E X

2

3    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFF:

5  Rowena Wagner            6    29    --      --

6

7  FOR THE DEFENSE:

8  Caleb Nichols            --    35    --      --

9

10                   - - -

11

12    EXHIBITS:            IDENTIFIED    ADMITTED

13  FOR THE PLAINTIFF:

14  Plaintiff's Exhibit No. 1           11        11

15  Plaintiff's Exhibit No. 2           18        18

16  Plaintiff's Exhibit No. 3           19        19

17

18  FOR THE DEFENSE:

19  Defendant's Exhibit No. 1           32        37

20  Defendant's Exhibit No. 3           47        48

21

22

23

24              - - -

25


                              3


1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 1:55 p.m., on

4  Monday, March 27, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time that we have set for an

7  evidentiary hearing on the defendants' petition to enforce the

8   settlement in this case. That according to the defendant, was

9   entered into subsequent to a settlement conference on January

10  12, 2006. And just so the record is clear, I, of course,

11  determined back on February 8th, when the true nature of the

12  dispute was revealed to me, that the appropriate way to resolve

13  this is through an evidentiary hearing. Of course, the narrow

14  legal issue here, because Pennsylvania law requires expressed

15  authority on behalf of an attorney in order to settle a case,

16  expressed authority from the client. The narrow legal issue

17  here, as this has been teed up, it seems to me, is whether as a

18  matter of fact Mr. Nichols was authorized to settle the case

19  under the terms and conditions set forth on the record on

20  January 12, 2006. That's number one.

21        And, number two, having looked at the law, it is my

22  opinion that in a case where a plaintiff challenges his or her

23  counsel's authority to have entered into a settlement on his or

24  her behalf, the burden rests with the plaintiff to demonstrate

25  that the lawyer was not in fact authorized to take the action

4

1   that he or she did. Now, that having been said, I see someone

2  new with you at counsel table, Mr. Nichols?

3        MR. NICHOLS:  That's right, your Honor, I'd like to

4  take this opportunity to introduce co-counsel in this case, Ms.

5  Edith Benson.  She's admitted to practice before the court.

6        THE COURT:  I apologize, was it Ms. Benson?

7        MR. NICHOLS:  Edith Benson.

8        THE COURT:  Will you be so kind as to come up to the

9  podium for a second.  Have you entered an appearance in this

10  case?

11        MS. BENSON:  I have, your Honor, I believe that

12  appearance was entered on or about March the 8th, I believe, I

13  can check the record, but I did enter my appearance.

14        THE COURT:  Okay.  Where are you from?

15        MS. BENSON:  Well, I'm originally from South

16  Carolina, but I've actually practiced in northwestern

17  Pennsylvania for about 17 years or so.  Erie, mainly in

18  Meadville.  I started out as an attorney with Legal Services.

19  And so I've been with Legal Services for sometime, and I've

20  been on my own since about 2003.

21        THE COURT:  In any event, you're admitted to

22  practice in the Western District?

23        MS. BENSON:  I am.

24          THE COURT:  So you are here really, just to put a

25   finer point on it, you are here because this is going to be an


                              5


1   evidentiary hearing, is that right?

2          MS. BENSON:  That's right.

3          THE COURT:  May I presume that in your capacity as

4   counsel for Ms. Wagner, that you will be taking the lead, so to

5   speak, insofar as this evidentiary hearing is concerned?

6          MS. BENSON:  Insofar as this evidentiary hearing is

7   concerned, that's correct, your Honor.  Also depends on where

8   this matter proceeds from here, I also expect to remain

9   involved in the case.

10          THE COURT:  That would be fine.  Let me swing over

11   here to Mr. Kuhar.  Well, before I do that, who are the

12   witnesses that you intend to call today, Ms. Benson, if any?

13          MS. BENSON:  I intend calling Ms. Wagner.  At this

14   point that's all I'm planning is to call her.

15          THE COURT:  All right.  Mr. Kuhar, what do you have

16   planned for the day?

17          MR. KUHAR:  Your Honor, I plan on asking some

18  questions of Ms. Wagner and also calling Caleb Nichols as our

19  witness.

20          THE COURT:  As on cross-examination?

21          MR. KUHAR:  Yes, your Honor.

22          THE COURT:  All right.  Let's get started then.  Ms.

23  Benson, if you would, you may call your first witness or I

24  guess your only witness as it turns out.

25          MS. BENSON:  Ms. Rowena Wagner, please.


                                6


1           THE COURT:  Come on up here, ma'am, my clerk will

2   swear you in.

3           THE CLERK:  Ms. Wagner, raise your right hand.

4           ROWENA WAGNER, PLAINTIFF HEREIN, SWORN

5                  DIRECT EXAMINATION

6   BY MS. BENSON:

7   Q.   For the record, would you please state your full name and

8   your current address?

9   A.   Rowena Wagner, 166 North Franklin Street, Cochranton,

10  Pennsylvania, 16314.

11  Q.   Ms. Wagner, are you the plaintiff in Wagner versus

12   Crawford Central School District, etc.?

13   A.   That's correct.

14   Q.   Do you recall when that lawsuit was filed?

15   A.   September of 2004, I believe.

16   Q.   And do you recall the basis for that lawsuit?

17   A.   Yes.

18   Q.   What was the reason for that lawsuit?

19   A.   I filed a suit against Crawford Central School District

20   because I was wrongfully denied opportunities, employment

21   opportunities in long-term substitute teaching and permanent

22   teaching position.

23   Q.   And when did you first apply to work for Crawford Central

24   School District?

25   A.   I applied in August of 2001.

7

1   Q.   And did you apply subsequent to August of 2001?

2   A.   Yes.

3   Q.   Can you give us some idea of how many times you may have

4   sought employment at Crawford Central School District?

5   A.   I applied for a long-term substitute teaching position

6  and permanent teaching position for over one-hundred

7  applications.

8         MR. KUHAR:  Your Honor, may I have an offer of

9  proof, I thought the issue was just limited to whether or not

10  authority had been given to reach the January 12th settlement?

11        THE COURT:  I think that's right.  Ms. Benson, I

12  wasn't going to cut you off right away.  But the underlying

13  merits of this lawsuit or when it was filed or why it was filed

14  or the plaintiff's perceptions as to what did or did not

15  transpire with respect to the merits are beside the point

16  today.  It's a very narrow legal issue.  And the issue, and I'm

17  going to let you sketch around, but just to keep everybody's

18  eye on the ball, the issue here is the question of authority on

19  January 12th to have entered into the settlement agreement as

20  those terms were set forth on the record.  Okay, go ahead.

21        MS. BENSON:  I understand, your Honor.  I would just

22  like a little bit of leeway, I think that will help her

23  explain.

24        THE COURT:  That's fine, go ahead.

25        MS. BENSON:  Thank you, your Honor.

1  BY MS. BENSON:

2  Q.    Now, you said you applied over a hundred times, for what

3  position were you applying for?

4  A.    Permanent teaching position.

5  Q.    At what grade level?

6  A.    Elementary, kindergarten through 6th.

7  Q.    Now, let me bring you a little bit closer to today and

8  ask you whether or not, once this lawsuit was filed, did there

9  ever a come time when you and your attorney talked about the

10  possibility of settling this case?

11  A.    Yes.

12  Q.    Can you give us some idea when that may have occurred?

13  A.    It occurred after Mr. Kuhar had contacted Mr. Nichols, my

14  lawyer, and he expressed that Crawford Central School District

15  would like to settle this case.  That's when we talked about

16  what did I want, the terms that I wanted for the settlement.

17  That's when we came up with the December 29th letter, demand

18  letter.

19  Q.    So it's your testimony that you gave Mr. Kuhar a demand

20  letter dated December 29, '05?

21  A.   That's correct.

22        MS. BENSON:  May I approach, your Honor?

23        THE COURT:  You don't have to ask permission to do

24  that.

25        MS. BENSON:  Thank you, your Honor.


                              9


1  BY MS. BENSON:

2  Q.   Now, before this demand letter was sent, had you and Mr.

3  Nichols discussed the content of this letter?

4  A.   Yes.

5  Q.   Now, what were you seeking with regard to resolving this

6  case?

7  A.   Well, we talked about five things.  We talked about back

8  pay, employment, attorney fees and costs.  Crawford Central,

9  something that concerned the union --

10        THE COURT:  Ma'am, you're going too fast.

11        THE WITNESS:  I'm sorry.

12        THE COURT:  Just slow down a little bit.

13        THE WITNESS:  Something that talked about the union,

14  number four; and number five, consent decree.

15  BY MS. BENSON:

16  Q.   Now, with regard to this letter of December 29, '05, did

17  Mr. Nichols have the authority to send that letter?

18  A.   Yes.

19  Q.   Is that specified in this document?

20  A.   Yes.

21  Q.   Where is it specified, can you read the statement for us?

22  A.   It says "in this regard my client has authorized me to

23  propose the following."

24  Q.   With regard to back pay, what were you seeking?

25  A.   I wanted back pay --


10


1  Q.   Excuse me, what were you seeking?

2  A.   I'm seeking for back pay.  If the district had not

3  discriminated against me, I would have had seniority, the

4  benefits.

5       THE COURT:  Excuse me, just one second, I apologize

6  for interrupting you.  So the record is clear, you're asking

7  her what her back pay demand was in her December 29th letter?

8       MS. BENSON:  That's correct, your Honor.

9     THE COURT:  All right.

10  BY MS. BENSON:

11  Q.   So what were you seeking under the heading of back pay?

12  A.   I said under back pay I wanted my seniority.  I wanted to

13  have my fringe benefits.  Wages and salary.  Everything that

14  the person who is a permanent teacher would enjoy, I want that

15  because I want to be made whole.

16  Q.   From when?

17  A.   From starting in August of 2001.

18  Q.   Now, under the heading of employment, what were you

19  seeking?

20  A.   I would like a permanent teaching job suitable for my

21  certificate.  Of course, again, I want seniority, bidding

22  rights and attentive benefits.

23  Q.   Now, under the heading of attorney fees, what were you

24  seeking?

25  A.   Attorney fees and costs.  Because, again, if the district

11

1  had not discriminated against me, I wouldn't have these

2  expenses.

3   Q.   Under the heading of -- there's no heading, but number

4   five, what were you seeking?

5   A.   For number five a consent decree.

6   Q.   And why did you want a consent decree?

7   A.   Because I want the judge to monitor whatever we will talk

8   about in the settlement, I want the judge to make sure that the

9   district is in compliance.  And also -- a diversity plan that

10  facilitates diversity of the teaching staff of Crawford Central

11  School District.

12  Q.   Now, moving to January 12, '06, was this the same

13  authority Mr. Nichols had?

14  A.   That's correct.  The only authority that I had given him.

15  Q.   Was in this document dated --

16  A.   That's correct.

17       MS. BENSON:  Your Honor, we've been talking about

18  this, perhaps I should move this as Plaintiff's Exhibit No. 1.

19       THE COURT:  It's moved and it's admitted.

20       MS. BENSON:  Thank you.

21  BY MS. BENSON:

22  Q.   Now, going back to January 12, '06, do you recall that

23  day?

24  A.   Yes, I do.

25  Q.   Were you here primarily for the purpose of negotiations?


12


1  A.   No.

2  Q.   What was the purpose that day?

3  A.   The first part was whether to keep the union in the case

4  and also allowing the second amended complaint.

5  Q.   Okay.  And then what?

6  A.   The settlement conference.

7  Q.   Now, do you recall what time you arrived for the court

8  proceedings that day -- let me rephrase it, what time was the

9  first proceeding to occur?

10  A.   I believe the transcript says around 2:15.

11  Q.   Are you referring to the settlement conference or the

12  initial court proceeding?

13  A.   I would say the settlement conference.

14  Q.   Okay.  Now, can you describe for us how that settlement

15  conference, the process of the settlement conference?

16  A.   I was not always involved in the discussion.

17  Q.   You were not always --

18  A.   No, not always.

19 Q.   So when it began at approximately 2:30, where were you?

20 A.   I was sitting I guess right there on the couch at the

21 secretary's office, it's like a reception area.

22 Q.   Are you referring to off the judge's chambers?

23 A.   That's correct.

24 Q.   You were sitting out there?

25 A.   Yes.


                                13


1 Q.   Did you remain out there throughout the proceedings?

2 A.   At some point I was called in with Mr. Nichols, in the

3 conference room.

4 Q.   And was it just you and Mr. Nichols in the conference

5 room?

6 A.   And the judge and the court reporter.

7 Q.   And why were you called in?

8 A.   The judge asked me a question about giving up my rights

9 for a jury trial.

10 Q.   So you discussed a jury trial versus a bench trial?

11 A.   That's correct.

12 Q.   You talked about that?

13  A.   Yes.

14  Q.   And did you indicate a willingness to go for a bench

15  trial, as opposed to a jury trial?

16  A.   That's correct, I would like to have a bench trial

17  instead of a jury trial.

18  Q.   And was that the only thing you discussed at that time?

19  A.   I'm sorry.

20  Q.   Was that the only thing you discussed at that time?

21  A.   At some point the judge left and went to a different room

22  and talked to Mr. Dolecki and Mr. Kuhar.  And then he came

23  back, informed me that the district is offering me a job only,

24  not back pay, because I believe he said the district's

25  insurance does not cover back pay.


14


1  Q.   Did you respond to that?

2  A.   No.

3  Q.   At that point did you remain a part of the negotiation

4  process?

5  A.   Yes, we stayed in the conference room.

6  Q.   Who stayed in the conference room?

7    A.    Attorney Nichols and I stayed in the conference room.  At

8    some point Mr. Nichols called my husband to join us in the

9    conference room.  And he had talked to the judge about his

10   feelings about Crawford Central School District.

11   Q.    Now, the transcript shows that at 4:25 terms were

12   negotiated with regard to a purported settlement.  Were you

13   still at the court at that time?

14   A.    No.

15   Q.    When did you leave?

16   A.    We left approximately 3:15.

17   Q.    And why did you leave?

18   A.    My husband had to go to work at 4 o'clock, so we left at

19   3:15.  It takes 40 miles from here to Meadville and he had to

20   be at work at 4 o'clock.

21   Q.    Now, did you tell anyone you were leaving?

22   A.    I told Mr. Nichols, yes, we told the judge that it was

23   our desire to leave.  I told Mr. Nichols we have to leave.

24   Q.    Now, at the point that you left, did you say anything to

25   Mr. Nichols with regard to the negotiations?

15

1   A.   Yes.

2   Q.   What did you say to him?

3   A.   Before we left, I told Mr. Nichols to give me a couple of

4   days to think about it.

5   Q.   So when you left on January the 12th, you left having

6   asked Mr. Nichols to give you sometime to think about what?

7   A.   To think about whether to accept the employment that the

8   district was offering me.  Because I wanted back pay.

9   Q.   So at that point the only item that had been discussed is

10  whether or not back pay was available?

11  A.   Yes, and employment.

12  Q.   And employment, and that was it?

13  A.   Yes.

14  Q.   And so you left having said to Mr. Nichols you wanted

15  time to think about this?

16  A.   Yes.

17       THE COURT:  Let me interrupt just for a second, if I

18  could.  When you say you wanted time to think about this, do

19  you mean you wanted time to think about the offer that the

20  school district had made on January 12th?

21       THE WITNESS:  That's correct.

22          THE COURT:  All right.

23   BY MS. BENSON:

24   Q.    Now, from the point that you left, approximately 3:15,

25   until the time that there were terms dictated on the record at

16

1   approximately 4:25, did you speak with Mr. Nichols during that

2   time span at all?

3   A.    No, I did not.

4   Q.    When was the first time that you learned about this

5   purported agreement?

6   A.    I believe Mr. Nichols and I and my husband met and talked

7   about the agreement, in between January 12th and January 23rd.

8   Q.    So somewhere between January 12th and January 23rd?

9   A.    Yes.

10   Q.    What was your reaction to the purported terms of the

11   agreement?

12          THE COURT:  Let me interrupt you for a second, if I

13   may.  Did you meet face-to-face or was your first notice of the

14   January 12th agreement on the telephone?

15          THE WITNESS:  Face-to-face.

16        THE COURT:  And where did that take place?

17        THE WITNESS:  Where?

18        THE COURT:  Yes.

19        THE WITNESS:  At the Avalon Restaurant.

20        THE COURT:  Go ahead, Ms. Benson.

21   BY MS. BENSON:

22   Q.   What was your reaction to these reported terms?

23   A.   I was in shock.  Just like when I left January 12th, when

24   I left the judge's chambers, I was in shock because I wanted

25   back pay with the job.  And Mr. Nichols informed me about the


                              17


1   global release, which I don't really know what global release

2   meant until we finally got the transcript of that settlement

3   conference.  And I guess one of the reasons why we waited that

4   long is because we were waiting for Mr. Kuhar's draft proposal

5   agreement that he said he would give Caleb.  We waited for

6   that, so we got tired of waiting and made our own consent

7   decree.

8   Q.   So after the conference on the 12th, is your testimony

9   that it was between the 12th and closer to the 23rd that you

10  first learned about the terms of the proposed settlement?

11  A.   Yes.

12  Q.   And you testified that you were waiting for something

13  from Attorney Kuhar.  How do you know you were waiting on

14  something from him?

15  A.   Mr. Nichols informed me that Mr. Kuhar was drafting

16  documents.

17  Q.   And you referred to your own document of January 23rd,

18  what was that?

19  A.   It's I guess a consent decree.

20  Q.   And who was that prepared by?

21  A.   Prepared by Mr. Nichols.

22  Q.   Who did he give that to?

23  A.   I'd have to see the document, I'm not sure --

24  Q.   Let me show you.

25       MS. BENSON:  Your Honor, may we have this marked as


18


1  Plaintiff's Exhibit 2.

2       THE COURT:  You may.  It's identified and it's

3  admitted.

4    BY MS. BENSON:

5    Q.    If you want to take a few minutes just to look that over?

6    A.    Yes, please.

7          THE COURT:  Go ahead, Ms. Benson.

8          MS. BENSON:  Thank you.

9    BY MS. BENSON:

10   Q.    Now, with regard to Plaintiff's Exhibit No. 2, which is a

11   proposed consent decree that you and Mr. Nichols discussed this

12   matter?

13   A.    Yes.

14   Q.    What were some of the central features that you wanted in

15   this consent decree?

16   A.    Of course, employment, attorney fees and costs.  Consent

17   decree.

18   Q.    The consent decree itself?

19   A.    Yes.

20   Q.    So the court would maintain jurisdiction over this case?

21   A.    That's correct.

22   Q.    I notice that the back pay isn't in here, can you tell us

23   why?

24   A.    Yes, because during the January 12th of 2006 conference,

25   I was told that the district's insurance does not cover back

19

1  pay, that's why we didn't put in back pay.  I still want back

2  pay.

3  Q.   Let me ask you this question.  At the time of January

4  12th, did anyone tell you that the school district had the

5  capacity to address in its budget back pay?

6  A.   I had read the policy, no one really had talked to me

7  directly about this capacity.

8  Q.   I'm talking about separate and apart from the insurance

9  policy, were you ever told that the school district could look

10  at its budget and put money in its budget for back pay?

11  A.   Yes.

12  Q.   Were you told that?

13  A.   Well, no, I wasn't told that.

14  Q.   Okay.  So on the 12th you were not told that was a

15  possibility?

16  A.   No.

17  Q.   Now, you previously testified that Mr. Kuhar was supposed

18  to draft a document with regard to the conference of January

19  the 12th, I'm giving you what we have identified as Plaintiff's

20  Exhibit No. 3 --

21         THE COURT:  It's admitted.

22  BY MS. BENSON:

23  Q.   Is that familiar to you?

24  A.   Yes.

25  Q.   Have you reviewed that document?

                              20

1  A.   Yes, I have.

2  Q.   Did you review it with Attorney Nichols?

3  A.   Yes.

4  Q.   Did you review it with me?

5  A.   Yes.

6  Q.   Now, going through that document, are there items in

7  there that are objectionable or items that were excluded?

8         MR. KUHAR:  Objection, your Honor, the question

9  whether they're objectionable, I don't think that's within the

10  scope of the inquiry.

11         THE COURT:  Well, rephrase the question, Ms. Benson.

12  The issue is whether or not those were terms, not to put words

13  in your mouth, whether the terms that are set forth in the

14    proposed draft agreement that is now in front of her, were the

15    terms that she had agreed to with her lawyer.  Let me say it

16    again.  The narrow issue here is whether or not Mr. Nichols had

17    the expressed authority from his client to make the

18    representations that he did on the record to the effect that

19    the case was settled under particular terms and conditions.

20    Go ahead.

21        MS. BENSON:  Thank you, your Honor.

22    BY MS. BENSON:

23    Q.    Let me just go back.  Other than the authority set out in

24    the December 29, '05 letter from Mr. Nichols to Attorney Kuhar,

25    did you give Mr. Nichols any other authority to negotiate on

                                    21

1    your behalf?

2    A.    No, I did not.

3    Q.    The transcript indicates that in order to get employment,

4    you were to engage in a teacher development program.  Did you

5    authorize Mr. Nichols to commit you to that?

6        THE COURT:  So the record is clear, when you say the

7    transcript, you mean the transcript of the January 12, 2006,

8   that sets forth the purported terms of the settlement, is that

9   correct?

10        MS. BENSON:  That's correct.

11        THE COURT:  All right, go ahead.

12        THE WITNESS:  Please repeat that question.

13   BY MS. BENSON:

14   Q.   The transcript of January 12, '06, indicates that in

15   order to gain a permanent full-time teach teaching position,

16   you would participate in a teacher development program and that

17   would consist of, number one, something called an APL program.

18   Did you authorize Mr. Nichols to commit you to that?

19   A.   No, I did not.

20   Q.   The transcript of January the 12th, '06, indicated that

21   as part of this teaching development program, you would

22   participate for an hour-and-a-half in an after-school program.

23   Did you authorize Mr. Nichols to commit you to that?

24   A.   No, I did not.

25   Q.   The transcript of January 12th, '06, indicates that in

22

1   order to gain full-time permanent employment, you would

2  participate as a long-term substitute teacher for more than 90

3  days.  Did you authorize Mr. Nichols --

4  A.    No, I did not.

5  Q.    The transcript of January 12, '06, indicates that other

6  than a $10,000 attorney's fee, you would receive nothing else.

7  Did you authorize Mr. Nichols to do that?

8  A.    No, I did not.

9  Q.    The transcript is silent as to back pay.  Did you

10  authorize Mr. Nichols to waive back pay?

11  A.    No, I did not.

12  Q.    The transcript is silent as to seniority.  Did you

13  authorize Mr. Nichols to waive that?

14  A.    No, I did not.

15  Q.    The transcript is silent as to when the APL training

16  would begin.  Did you authorize Mr. Nichols to leave that up in

17  the air?

18  A.    No, I did not.

19  Q.    The transcript is silent as to when the after-school

20  program would begin.  Did you authorize Mr. Nichols to leave

21  that up in the air?

22  A.    No, I did not.

23  Q.    The transcript is silent as to when the long-term

24  substitute teaching would end.  Did you authorize him to leave

25  that up in the air?


23


1  A.    No, I did not.

2  Q.    The transcript is silent as to when you could expect to

3  be hired as a full-time permanent elementary school teacher.

4  Did you authorize Mr. Nichols to waive that?

5  A.    No, I did not.

6  Q.    Now, the transcript says that when it comes to the APL

7  program, that only the cost of that program would be paid by

8  the district, when you would not be paid.  Did you authorize

9  Mr. Nichols to waive your right to payment to participate in

10  the program?

11  A.    No, I did not.

12  Q.    Now, after the conference of January 12, '06, and after

13  getting a copy of the transcript of that conference, did you

14  express to Mr. Nichols your disappointment?

15  A.    Yes, I did.

16  Q.    Now, going to the proposed draft by Attorney Kuhar of

17  January 31st, is it your testimony that there's things in there

18  that you didn't agree to?

19  A.    There's a lot of things, if not all of it.  All of them,

20  I did not agree to it.

21        THE COURT:  Ms. Benson, I don't want to put words in

22  your mouth or the witness's, but for the record it would be

23  helpful if you could ask her to delineate those items in the

24  draft agreement with which she does not agree.

25        MS. BENSON:  Thank you, your Honor.


24


1  BY MS. BENSON:

2  Q.   Let's go through Plaintiff's Exhibit 3, which is the

3  draft that Mr. Kuhar has put forth, and tell us those things

4  that you find objectionable?

5  A.    May I read the part?

6  Q.   Sure, just go item by item?

7  A.    Second paragraph, it says --

8  Q.   On which page?

9  A.    I guess page two.

10  Q.    The cover letter?

11  A.    Page one, then.  "Whereas, Wagner has alleged that

12  Crawford Central School District's decision not to employ her

13  on a long-term substitute bases and/or hire her into a regular

14  full-time teaching position and/or employ her more frequently

15  on a substitute basis were unlawfully motivated as set out more

16  fully in her complaint."  When I filed this suit, I was

17  lawfully motivated, there is no way I'm going to lie that I

18  agree to this that I filed this unlawfully motivated.  I filed

19  this case on the basis of the laws of the United States of

20  America, and there's no way I'm going to agree to that.

21  Q.    Is there anything else?

22  A.    Yes, next paragraph.  "Whereas, defendants deny any

23  wrongdoing toward Wagner and maintain that its actions at issue

24  all were consistent with its policy of hiring the most

25  qualified educators and staff, regardless of their


25


1  characteristics."  Again, I'm not going to lie.  I believe that

2  the practice or the policy of hiring of the most qualified

3  educators is very inconsistent.  Because, for example, I have

4  applied for a kindergarten job at West End Elementary School.

5   Again, I was unsuccessful.  They hired somebody who is not

6   certified to teach in Pennsylvania.  And then after we caught

7   it and Mr. Nichols wrote a letter to Mr. Kuhar saying that I

8   should have had that job.  Mr. Kuhar said that she's working --

9   that she has a certification, something in that manner.  But I

10  found that out on January 30th of 2006, Mr. Dolecki had filed

11  for an emergency permit for Ms. Naomi Uy-Moore.

12  Q.    So you're using one example to say that the school

13  district is continuing a policy of discrimination against you?

14  A.    That's correct.

15  Q.    Let me take you through, go on and have you identify the

16  other packages --

17          THE COURT:  Or omissions.

18          MS. BENSON:  Yes, we'll get to the omissions.

19  BY MS. BENSON:

20  Q.    What else is there throughout the complaint, excuse me,

21  the draft document, anything else on the first page?

22  A.    "Number one, Incorporation of Preambles.  The foregoing

23  preambles are incorporated herein by reference and made part of

24  this agreement."

25          THE COURT:  Let me make a suggestion here, in terms

1   of speeding it up.  Your witness already testified to a series

2   of things to which she did not agree.  Would I be correct in

3   assuming that those would be the same things that she objects

4   to as either being not included within the settlement -- let me

5   say that again.  Would those items be the same things that she

6   either objects to as having been included in the settlement

7   agreement proposed or not included within the settlement

8   agreement?

9           MS. BENSON:  That's right, I think if you look at

10  this document -- for instance, there's several paragraphs in

11  this proposed document that clearly precludes the court from

12  maintaining jurisdiction through a consent decree.  So that's

13  just one example.  And there are other items in here.

14  Obviously not in here is back pay.  Not in here is the

15  seniority issues.  Not in here is the definitiveness with

16  regard to her being given a full-time permanent teaching

17  position.  And definitiveness with regard to other issues she

18  testified to, also.

19          THE COURT:  All right, go ahead.

20  BY MS. BENSON:

21  Q.   Now, going back to the January 12, '06 settlement

22  conference.  Do you have any idea why Mr. Nichols would say

23  that the terms stated in that conference were acceptable to

24  you?

25  A.   Could you please repeat the question.


27


1  Q.   Yes.  The transcript of January 12, '06, says, indicates

2  that --

3       THE COURT:  Why don't you read it right from the

4  transcript, why don't you read my question to Mr. Nichols and

5  Mr. Nichols' response to me.  That would be on page four of the

6  transcript of the settlement transcript.

7  BY MS. BENSON:

8  Q.   I'm reading from the transcript of the settlement

9  conference on January 12, '06.  This is the court, Judge

10  McLaughlin.  And he's turning to Mr. Nichols.

11       "THE COURT:  Then are all the terms and conditions

12  acceptable?"

13       "MR. NICHOLS:  They are acceptable based upon my

14  discussions with my clients, Mr. and Mrs. Wagner."

15    Were those terms that we talked about thoroughly

16  acceptable to you?

17  A.    No, they're not.

18  Q.    It continues on --

19        "THE COURT:  Then as far as I'm concerned, the case

20  is settled."

21    Now, in light of your earlier testimony that you had only

22  authorized Mr. Nichols to act on your behalf pursuant to this

23  letter dated December 29, '05, Plaintiff's Exhibit 1, do you

24  have any idea why Mr. Nichols would have said that the terms

25  dictated before the court was acceptable to you?


28


1  A.    I can't speak for Mr. Nichols.  The only authorization I

2  gave him was the December 29th letter.  Now, I'm not sure,

3  maybe he was pressured.  He knows that I really want a job so

4  bad, that's probably the reason why he said that.  I mean,

5  people make mistakes.  And he acknowledged that he made a

6  mistake.

7  Q.    He acknowledged to you that he had made a mistake?

8  A.    Yes.

9          THE COURT:  How much longer do you have here with

10   this witness, Ms. Benson?

11          MS. BENSON:  I think I'm getting near the end, your

12   Honor.

13          THE COURT:  All right.

14   BY MS. BENSON:

15   Q.    Now, assuming that the court finds that there is no

16   legally enforceable agreement, are you still willing to work

17   toward an acceptable negotiated settlement?

18          MR. KUHAR:  Objection, relevancy, your Honor.

19          THE COURT:  It's irrelevant.

20   BY MS. BENSON:

21   Q.    Have we clearly identified everything that you authorized

22   Mr. Nichols to seek for you?

23   A.    Yes.

24          MS. BENSON:  Your Honor, if I may just look at my

25   notes.


                                29


1          THE COURT:  Sure, no problem.

2          MS. BENSON:  I think that's it, your Honor, thank

3   you.

4          THE COURT:  All right, thank you, Ms. Benson.

5   All right, Mr. Kuhar, you can cross-examine.

6                   CROSS-EXAMINATION

7   BY MR. KUHAR:

8   Q.   Good afternoon, Ms. Wagner.

9   A.   Good afternoon.

10  Q.   As you know, I represent the school district.

11         THE COURT:  She knows that, let's go.

12  BY MR. KUHAR:

13  Q.   Early in your testimony did you indicate that you were

14  not always involved in the discussions about your case, I think

15  you said I'm not always involved in the discussions, not

16  always?

17  A.   Not always, that's correct.

18  Q.   Well, so who is involved when decisions are made about

19  your case, if not you?

20  A.   What I meant by that was when Ms. Benson asked me if I'm

21  always involved in the conference, my answer was I'm not always

22  involved in that discussion.  Because at some point -- you

23  would enter the conference room and discuss with Mr. Nichols

24  and Judge McLaughlin.  That's what I meant.  By not always

25  present in the conference room.


30


1  Q.    With respect to discussions about your case or in

2  settlement, did those ever occur between only your husband,

3  Bernie Wagner, and Caleb Nichols?

4  A.    Could you please rephrase that.

5  Q.    Yes, were there ever discussions where Attorney Nichols

6  and your husband, Bernie Wagner, were discussing your case and

7  you were not involved?

8  A.    When Mr. Wagner went in the conference room, I was

9  present.  Mr. Nichols was there and Judge McLaughlin was there.

10  Did I answer your question right?

11  Q.    To a degree.  I'm asking from the time your case began to

12  the current date, have there been times where your husband and

13  Mr. Nichols have discussed your case and you have not been

14  there?

15        MS. BENSON:  Objection, it's irrelevant, we're

16  dealing with what happened on January 12th.

17        THE COURT:  We are, perhaps more to the point, the

18  client here is Mrs. Wagner, not Mrs. Wagner's husband.  What's

19  your point?

20          MR. KUHAR:  To determine whether there was agency

21  with respect to Mr. Wagner and Mr. Nichols, whether in fact Ms.

22  Wagner ever authorized Mr. Wagner to speak on her behalf with

23  Mr. Nichols.

24          THE COURT:  All right, go ahead.

25          MS. BENSON:  Excuse me, your Honor, we're dealing


                                31


1   with what occurred on January the 12th.  Now, if he's going to

2   keep restricting his questions to --

3           THE COURT:  Now that I see both sides of it, this is

4   the way it plays out.  He's entitled to inquire, based upon

5   past practice, whether there is or not a past practice between

6   Mrs. Wagner and her husband, whether or not she had as a matter

7   of routine delegated to her husband the authority to act on her

8   behalf with respect to her dealings with Mr. Nichols; is that

9   your point?

10          MR. KUHAR:  Yes, your Honor.

11          THE COURT:  Go ahead, it's overruled.

12  BY MR. KUHAR:

13  Q.    Do you understand the question, Ms. Wagner?

14  A.    Could you please repeat the question.

15  Q.    Have there been times, from the time your complaint was

16  filed through today, have there been times where Mr. Wagner has

17  discussed your case with Mr. Nichols, Attorney Nichols, and you

18  were not there?

19  A.    You're talking about just discussions?

20  Q.    Yes.

21  A.    Yes.

22  Q.    And what types of issues were discussed?

23  A.    I'm not sure because I'm not around.

24  Q.    Have you instructed Attorney Nichols to take instructions

25  about your case generally from your husband?


32


1  A.    No.

2  Q.    So it's your testimony that Mr. Nichols never took

3  instruction from your husband regarding how your case should be

4  handled?

5  A.    That's correct.

6   Q.   I'll show you what's marked as Defense Exhibit 1, Ms.

7   Wagner, have you seen that before?

8   A.   I may have, may I read it.

9   Q.   Please.

10      THE COURT:  Go ahead, Mr. Kuhar, ask a question.

11  BY MR. KUHAR:

12  Q.   Have you seen this before, Ms. Wagner?

13  A.   I am not sure.

14  Q.   You don't know?

15  A.   I'm not sure.  I know there's one letter that was missing

16  from Mr. Nichols' files.  This might be it, I'm not so sure.

17  Q.   Do you recall reviewing a letter that I had sent to Mr.

18  Nichols in response to Plaintiff's Exhibit 1, this December

19  29th demand letter, prior to the January 12th conference; did

20  you review such a letter, that you can recall?

21  A.   Can you please repeat that, I'm sorry.

22  Q.   You answered some questions about the December 29th

23  letter that went in as Plaintiff's Exhibit 1?

24  A.   Yes.

25  Q.   Okay.  And I'm asking whether between the time that you

33

1  instructed Mr. Nichols to send that letter on your behalf --

2  which you did, right?

3  A.   Yes.

4  Q.   And January 12th, the settlement conference, do you

5  recall reviewing a letter that I had written on behalf of the

6  district in response to this letter, this 12/29 letter that Mr.

7  Nichols wrote?

8       MS. BENSON:  Objection, your Honor, it seems to

9  me --

10      THE COURT:  Let's put it this way.  Is the letter

11  that you are referring to, Mr. Kuhar, which purportedly

12  responds to the December 29th letter, the January 4, 2006

13  letter that you just put in front of her?

14      MR. KUHAR:  Yes, it is, your Honor.

15      THE COURT:  She's already testified that she doesn't

16  remember, go on to your next question.

17  BY MR. KUHAR:

18  Q.   Prior to the January 12th settlement conference, did you

19  have any knowledge that the district was refusing all of the

20  material terms in your December 29th letter?

21  A.   No.

22        MR. KUHAR:  I have no further questions.

23        THE COURT:  All right.  Anything else of this

24  witness?

25        MS. BENSON:  No, your Honor.


                            34


1        THE COURT:  Thank you very much, you can step down,

2  watch your step.  Are you ready, Mr. Kuhar?

3        MR. KUHAR:  Yes, we'd call Caleb Nichols, your

4  Honor.

5        THE COURT:  As on cross?

6        MR. KUHAR:  Yes, your Honor.

7        MS. BENSON:  I'm going to object, he still has an

8  attorney-client relationship with her, your Honor.

9        THE COURT:  Well, look it, Mrs. Wagner has the

10  burden of demonstrating that she did not authorize her attorney

11  to enter into the settlement purportedly entered into on the

12  12th.  That said, if she wants to, if this case is going to be

13  proven up, she cannot stand behind a lawyer-client privilege.

14  Explain your position a little bit more further, Ms. Benson?

15        MS. BENSON:  Well, one, I think we have demonstrated

16  through her testimony what authority she gave him.  Also, we

17  demonstrated that she was here, she left the proceedings.  That

18  those who were participating were aware that she had left, that

19  she had no communication with Mr. Nichols between an hour or

20  so.

21       THE COURT:  I completely disagree with you.  I've

22  read a number of cases in preparation for this hearing.  And

23  the way this always comes on is the client and lawyer,

24  sometimes a former lawyer, inevitably end up testifying in a

25  proceeding to enforce a settlement, in a petition to enforce a

35

1  settlement and the evidentiary hearing that grows out of it,

2  the invocation of the lawyer-client privilege, insofar as to

3  whether there was expressed authority given is inappropriate

4  because that is the very issue I have to decide to determine

5  whether or not your client will be able to unscramble this

6  settlement.  So it's overruled.  And you can call -- as a

7  matter of fact, let me just say this for the record.  At the

8  February 8th status conference that I had, Mr. Nichols spoke to

9  this very issue.  And the very issue relative to his authority,

10  indicated what his client's position was, etc.  So no, I'm

11  going to overrule the objection, you can call Mr. Nichols to

12  the stand.

13          THE CLERK:  Would you raise your right hand, Mr.

14  Nichols.

15          CALEB NICHOLS, WITNESS HEREIN, SWORN

16          (Called as on CROSS-EXAMINATION)

17  BY MR. KUHAR:

18  Q.   Mr. Nichols, is Defendant's Exhibit 1 within reach, my

19  January 4th letter?

20  A.   No, I don't have it.  Okay, I have it now.

21  Q.   Did you receive this letter from me?

22  A.   Yeah, I believe I did.  I believe I did.

23  Q.   On or about the 6th?

24  A.   On or about the 6th.

25  Q.   Did you discuss it with Ms. Wagner?


                              36


1  A.   Let's see -- as best I can recall, I may have generally

2  discussed it.  That what the district had broached to her, to

3  us, to me, of course, through me to her in terms of possible

4   settlement.

5   Q.   Where were you when the conversation took place?

6   A.   Where was I?

7   Q.   Yes.

8   A.   I think I may have been at the Avalon Hotel.  Benjamin's,

9   which is part of that, it's a restaurant.

10   Q.   Is it fair to say that that letter indicates that the

11   district opposes every material term in the December 29th

12   letter that you had sent to me?

13   A.   I'm sorry, can you restate that.  I didn't understand

14   fully your question.

15   Q.   Okay.  For brevity, I'm asking is it fair to say that I

16   indicated on behalf of the district defendants in that January

17   4th letter that we would not accept any of the material terms

18   set forth in the December 29th letter that you had sent me, is

19   that accurate?

20   A.   Well, the letter speaks for itself, Mr. Kuhar.

21   Q.   I agree that it does.  The implication of that, did you

22   discuss that with Ms. Wagner, that the district essentially was

23   disagreeing with everything you wanted, did you discuss that

24   with her?

25  A.   I generally discussed with her the response as I read it

37

1  here.  What you had said with respect to the knowledge of the

2  consent decree order.  To make it clear, I discussed that with

3  her.  And then in general terms, the other matters that were

4  contained in that letter of January 4th.

5          MR. KUHAR:  Your Honor, we offer Defendant's

6  Exhibit 1.

7          THE COURT:  It's admitted.

8          MR. KUHAR:  The settlement conference transcript was

9  referenced, but I don't know it's in, your Honor, did the

10  plaintiff put that in?

11          THE COURT:  The settlement conference transcript is

12  already part of the record, it's part of record in this case.

13          MR. KUHAR:  Very good, your Honor.

14          THE COURT:  I would like to, if possible, I'm not

15  trying to unnecessarily hurry people up, but I'd like to finish

16  the evidentiary part of this hearing today because it's my

17  intention to rule on the record because I have another issue I

18  have to take up with a lawyer who is waiting very patiently

19   there in the wings.

20       MR. KUHAR:  Understood, your Honor.

21   BY MR. KUHAR:

22   Q.   I would ask you to refer to the settlement conference of

23   January 12th, page four, you acknowledge that -- well, you were

24   here a few minutes ago, right, Mr. Nichols, when that was read

25   into the record?

38

1   A.   Yeah, I was here.

2   Q.   Okay.  I want you to tell me what discussions led up to

3   your saying that, what discussions occurred between you and Ms.

4   Wagner or Mr. Wagner on her behalf if that occurred that caused

5   you to say this into the record on January 12th?

6       THE COURT:  Mr. Kuhar, the reader of this record, if

7   it ever goes to that some day, isn't going to know what you're

8   talking about.  Why don't you just repeat -- go right to the

9   transcript, go right to the language of the transcript?

10      MR. KUHAR:  Yes, your Honor.

11   BY MR. KUHAR:

12   Q.   Mr. Nichols, do you have that handy, please turn to page

13  four?

14  A.   Okay, I'm looking at page four.

15  Q.   Okay.  I think the record will indicate that the terms of

16  the settlement were recited by me, and then beginning on page

17  two, and then following that the court asked you "then are all

18  the terms and conditions acceptable?"  Do you recall being

19  asked that question?

20  A.   Yeah, that's what the record reflects.

21  Q.   And you indicated, please read that on line 18 of page

22  four?

23  A.   The records states that I stated --

24        THE COURT:  Read it verbatim?

25        THE WITNESS:  "They are acceptable based upon my

39

1  discussions with my clients, Mr. and Mrs. Wagner."

2  BY MR. KUHAR:

3  Q.   Now, I'm asking about those discussions.  You indicated

4  that you were accepting that proposal on behalf of your

5  clients, and I want to know what discussions were you referring

6  to?

7    A.    In my own mind I made that statement, I had in mind

8    everything that had transpired from the time, really prior to

9    December 29, 2005, in which I submitted to you on behalf of Ms.

10   Wagner setting forth the manner and the terms that Ms. Wagner

11   was seeking, that she was willing to consider.  And I discussed

12   the possible settlement of the case.  And then following that,

13   of course, the letter you just showed me, which I believe is

14   January 4th, 2006, in which you stated, of course, that has

15   been covered.

16   Q.    I'm sorry, I'm not understanding you?

17   A.    The letter that you just showed me.  The letter you just

18   showed me, of January 4, 2006, and then leading up to the

19   settlement conference on January 12th.  And initially we

20   discussed Ms. Wagner giving up her right to a jury trial.

21   Q.    She agreed to that?

22   A.    And also expressed her desire for a bench trial.  I had

23   all of that in mind when I made this statement.  That was the

24   context in which I made the statement.

25          THE COURT:  Let me interrupt for a second.  Because,

40

1    Mr. Nichols, this representation was made to me.

2         THE WITNESS:  That's correct, judge.

3         THE COURT:  Now, I want to ask you, the way this

4    transcript is set up -- well, this is going to take a little

5    longer than I anticipated, but let me ask the question this

6    way, you follow it along and then you can answer it.  I started

7    out by saying, "all right the parties have informed me that

8    they have reached a settlement in this case; subject only to

9    formal approval by the School Board."  And then I said, "that

10   having been said, Mr. Kuhar, I'm going to have you run through

11   all the material terms and conditions.  And then I'm going to

12   turn over to Mr. Nichols here and confirm that that is

13   acceptable to his client and his understanding of the

14   agreement.  Go ahead."  At which point Mr. Kuhar begins to lay

15   out the material terms.  He says "that Ms. Wagner would satisfy

16   a develop plan, which include her attendance at an APL training

17   program, which is a standard requirement of new teachers and

18   current teachers.  It would involve four days of training, the

19   cost of which would be paid for by the district.  She would

20   then immediately thereafter begin approximately two months of

21   teaching employment in our after-school program, for which she

22   would be paid the standard rate, which is approximately $20 per

23  hour.  She would work approximately one-and-a-half hours per

24  day, Monday through Friday, consistent with the other people in

25  the program.  Again, after approximately two months of that

41

1  type of employment, she would then be given the first available

2  long-term substitute position for which she is qualified.

3  Which would be a minimum of 90 days.  So she would be paid as a

4  long-term sub as the first step in this contract.  Thereafter,

5  she would be awarded the first position, regular full-time

6  position for which she is qualified.  The district would retain

7  its rights to supervise and direct Ms. Wagner comparable to

8  those that it has regarding any other school employee,

9  consistent with its duties under the school code.  Ms. Wagner

10  would execute a global release in favor of the defendants and

11  the district, effective through the date of its execution.

12  There would be no admission of liability, in fact it would

13  state there is no admission of liability.  The district's

14  insurer would pay $10,000 towards attorney's fees on behalf of

15  Ms. Wagner.  This would be subject to formal approval by a

16  majority of the School Board directors at its next occurring

17  meeting at which it could do so."  Then I said, after Mr. Kuhar

18  put that on the record, "finally, let me just add that in the

19  event of a claimed breach of the settlement agreement, the

20  plaintiff would, of course, be permitted to return to court

21  here and sue on the settlement agreement if that ever became

22  necessary.  But I certainly do not anticipate that eventuality.

23  All right, as far as I'm concerned, save the formality of the

24  Board's vote -- which is when again?"

25          "MR. KUHAR:  Monday evening."


42


1          "THE COURT:  It certainly looks like this case is

2  settled.  Mr. Nichols, having heard all the terms and

3  conditions, on behalf of your client are those acceptable?"

4          "MR. NICHOLS:  Just one question, I was not clear.

5  That is the duration of the development period, what is the

6  duration of that?"

7          "MR. KUHAR:  The development plan involved this APL

8  program, which is four days in duration.  And it involved

9  approximately two months of her teaching in this after-school

10  program."

file:///A|/WAG-3-27.TXT

11          "THE COURT:  Then are all the terms and conditions

12   acceptable?"

13          "MR. NICHOLS:  They are acceptable based upon my

14   discussions with my clients, Mr. and Mrs. Wagner."

15          Now, my question to you is this.  With respect to

16   each of those terms and conditions of the settlement agreement

17   that was put on the record on January 12th, did you obtain --

18   did you seek and obtain from Ms. Wagner, your client, approval

19   with respect to each of those terms and conditions, yes or no?

20          THE WITNESS:  No, I cannot represent to you, I made

21   an honest mistake here.  And in light of the January 29, 2005

22   letter, which I drafted setting forth the demand --

23          THE COURT:  Do you mean the December 29th letter?

24          THE WITNESS:  December 29, 2005 letter.  So,

25   obviously, I made a mistake.  I did not have the authority,

43

1    I must have overstepped my authority.  That's only way I can

2    express it, I overstepped my authority.  And in what was set

3    down clearly in the December 29, 2005 letter.

4          THE COURT:  All right, go ahead, Mr. Kuhar.

5        MR. KUHAR:  Your Honor, on a conclusory basis his

6  claim that I had the authority for each of those items --

7        THE COURT:  You're the cross-examiner, go ahead.

8  BY MR. KUHAR:

9  Q.    Did you discuss any of these terms with Ms. Wagner?

10  A.    When are we talking about?

11  Q.    Prior to the time you indicated she accepted them,

12  January 12th?

13  A.    Well, let's look at the terms here, what was put in front

14  of me.  Would you be kind enough to recite particularly what

15  terms you would like me to address?

16  Q.    No, I think that would burden the record, I'd rather you

17  just look at it, if you need to jog your memory, and indicate

18  whether you got consent from Ms. Wagner with respect to the

19  terms.  We just read through it and read it in.  Page two, Mr.

20  Nichols, I can read it out loud, but you have it in front of

21  you, would you mind just trying it that way?

22  A.    Yeah, I might do that.  As to the APL program, training

23  program, no, I did not discuss any of the details with her.

24  Q.    Prior to the hearing on or about January 12th, had you

25  had discussions with her when Ms. Wagner indicated that she

44

1  would be okay with that type of a remedial plan?

2  A.    No, I hadn't discussed that in terms of the details of

3  the APL program, no.

4  Q.    The next item?

5  A.    Next item is -- the long-term substitute, 90 days -- is

6  that page three now?

7  Q.    Bottom of page two, that she would work approximately two

8  months for $20 an hour?

9  A.    Again, I hadn't discussed that in detail prior to the

10  12th.

11  Q.    What about on the 12th?

12  A.    No, when that was put on the record, they had left.  And

13  I certainly did not discuss it with them prior to that, no.

14        THE COURT:  Prior to what?

15        THE WITNESS:  Prior to -- where are we, we're on the

16  12th.

17        THE COURT:  Hang on a second.  This is where we are.

18  The question on the table, so we can get our timeframes right,

19  the important timeframe is at anytime before you made the

20  representations to me that you made on the record, did you

21  discuss those individual items with Ms. Wagner?

22      THE WITNESS:  I did not discuss them in detail.

23  I don't recall discussing them in detail prior to or on January

24  12, 2006.  I had general discussions, feedback, but not in

25  detail.

45

1  BY MR. KUHAR:

2  Q.   Mr. Nichols, Plaintiff's Exhibit 2 is the January 23rd

3  letter, do you have that up there -- the January 23rd letter

4  you wrote?

5  A.   No, I don't have that.  I don't have access to it.

6  Q.   Is it on your monitor?

7  A.   Yeah, I have it now.

8      THE COURT:  Can you see that all right, Mr. Nichols?

9      THE WITNESS:  Okay.

10  BY MR. KUHAR:

11  Q.   Do you see where I have tabbed the very first paragraph,

12  it says, "I am forwarding to you a copy" --

13  A.   Yeah.

14  Q.    "I am forwarding to you a copy of a consent decree which

15  embodies, in principle, the terms and conditions of the mutual

16  understanding that the parties reached at the settlement

17  conference on January 12, 2002." Do you see that paragraph?

18  A.    Yes, I see it.

19  Q.    You put that in that letter, right?

20  A.    Excuse me.

21  Q.    You put that in your letter after speaking with Ms.

22  Wagner about the settlement reached on January 12th, is that

23  correct?

24  A.    Well, yeah, the date shows that.

25  Q.    Ms. Wagner testified that she discussed with you all the


46


1  terms of the settlement between the 12th and the 23rd of

2  January; do you agree with that testimony?

3  A.    She said, as I understand it, I can tell you what did

4  happen, there was general discussion that occurred on January

5  12th --

6  Q.    Can you try to answer my question first.  Ms. Wagner

7  testified that she discussed the proposal that was agreed upon

8   on the 12th of January, that she discussed it with you between

9   the 12th of January and the 23rd of January, is that correct,

10   is that accurate?

11   A.   I think we did discuss that, yeah.

12   Q.   And you acknowledge that in Plaintiff's Exhibit 2, this

13   January 23rd letter, you acknowledge in there that you indicate

14   that a mutual understanding was reached at the settlement

15   conference on January 12th, correct?

16   A.   That's what the letter says.

17   Q.   Anywhere in there do you indicate we have a problem

18   because I didn't have the authority I needed?

19   A.   I don't understand your question, what are you saying,

20   what are you asking me?

21   Q.   Did you anywhere in the letter say I made a mistake, as

22   you have just testified to a few minutes ago, did you say

23   anywhere in the letter, you know what, I didn't have the

24   authority I needed to execute a settlement on the January 12th?

25   A.   I don't recall -- that letter speaks for itself, I don't

47

1   recall the letter saying anything like that.

2  Q.   Have you seen Defendant's Exhibit 3, this February 2nd

3  letter, Mr. Nichols?

4  A.   Yeah, I've seen that.

5  Q.   You wrote it, right?

6  A.   Uh-huh.

7  Q.   You sent this to Judge McLaughlin on February 2nd, right?

8  A.   That's correct.

9  Q.   The second paragraph, third sentence, first page -- are

10  you with me, Mr. Nichols?

11  A.   I see it.

12  Q.   "Because the terms," do you see that?

13  A.   Yeah, I see that.

14  Q.   Read that sentence, please?

15  A.   "Because the terms and conditions set forth in

16  defendants' draft agreement is so wildly at variance with the

17  conceptual and incomplete written understanding that was

18  discussed at the January 12th settlement conference, plaintiff

19  finds the defendants' draft agreement unacceptable, and thus,

20  refuses to sign a stipulation of dismissal."

21  Q.   So in here you're contrasting the proposed agreement I

22  sent to you with the agreement that was reached on January 12th

23  and you're saying there's a mismatch, that I didn't write it up

24  correctly, is that fair?

25  A.   The only thing I can say, I prefer to adhere to the terms

48

1  of what I state here.

2  Q.   Anywhere in the agreement do you say we didn't have an

3  agreement because I made a mistake and I didn't have the

4  authority?

5  A.   You mean in this particular document?

6  Q.   Yes, Mr. Nichols.

7  A.   What you have marked Defendant's Exhibit 3?

8  Q.   Yes.

9  A.   I think on the second page there's a recitation of the

10  reasons why I thought no agreement was entered into.

11       THE COURT:  Wait a minute, we're going to get bogged

12  down here.  And you can take as much time as you want to read

13  the letter, I'm not trying to cut you off, Mr. Nichols, but

14  it's your letter.  The question on the table is in here

15  anywhere did you raise as a reason that the settlement

16  agreement was unenforceable, the fact you didn't have authority

17  from your client, does that appear in this letter?

18          THE WITNESS:  I don't believe so.  I don't believe

19  so.

20          THE COURT:  Go on to your next question.

21          MR. KUHAR:  I'm going to refer to the status

22  conference transcript of February 8th -- we offer as

23  Defendant's Exhibit 3.

24          THE COURT:  It's admitted.

25  BY MR. KUHAR:


                              49


1  Q.    Please turn to page two, Mr. Nichols -- page two, line

2  13, Mr. Nichols, are you there?

3  A.    Yeah, I have it.

4  Q.    I'm sorry, beginning with actually line six, I'll read

5  the court's question of you.  "This is the time I set for a

6  status conference to discuss some recent correspondence that I

7  received from both sides.  The upshot apparently being, Mr.

8  Nichols, notwithstanding the fact I'm holding in my hand a

9  settlement agreement transcribed by my court reporter, that the

10  plaintiff -- it's your belief or contention that the case is

11  not settled, is that right?"  And please read your answer?

12  A.    "That is correct, your Honor."

13  Q.    And then the court says, line 14, "would you be so kind

14  as to come up to the podium.  I take it that it would be

15  accurate for me to say that the reasons that you feel the case

16  is not settled would be set forth in your correspondence to me

17  of February 2nd, is that correct?"  Your answer, please?

18  A.    "That is correct, your Honor."

19  Q.    Did you indicate, when asked what the reasons were,

20  anything about making a judgment error or not having the

21  authority to settle when you were asked that question at that

22  time?

23  A.    I'm sorry, could you rephrase the question.  I don't

24  understand your question.

25  Q.    You had sent a letter to the court, which is Defendant's


50


1  Exhibit 3, which is the February 2nd letter, we just talked

2  about that a little bit, okay?

3  A.    Right.

4  Q.    And then the court opens on February 8th by essentially

5  saying the reasons you don't think there's a settlement

6   agreement are the reasons you set forth in your February 2nd

7   letter, isn't that right?

8   A.   Well, that's what I said in my response.

9   Q.   Did you say I didn't have settlement authority?

10  A.   It doesn't appear -- it doesn't appear in the transcript,

11  obviously, I didn't say it, not in here.

12  Q.   Page nine, line 21, have you found that spot, Mr.

13  Nichols?

14  A.   Yeah, I have it.  Page nine, line 21?

15  Q.   Yes.  The court says, "sir, I want you to listen to my

16  question very carefully.  You represented to me at the

17  settlement conference that you had discussed the terms with

18  your clients and they had indicated their acceptance.  I don't

19  want to hear context."  And you go on to say -- actually, I'm

20  going to have you skip down to line 20 on page 10, where the

21  court says, "your clients were here and your clients agreed in

22  my chambers to the material terms and conditions, did they

23  not?"  And, please, your testimony, I'm sorry, your statement

24  at line 23?

25  A.   I said, "they tell me they did not.  I'm their advocate.

51

1 I can't be a witness, I'm certainly not going to be a witness

2 against my clients. That's improper."

3 Q. Okay. Why didn't you just say no, if the accurate answer

4 was you lacked the authority, why didn't you say I lacked the

5 authority, because the inference seems to be that you had the

6 authority?

7 A. That's your opinion. Let me explain to you why I

8 answered the way I did. In my own head, okay, I answered the

9 way I did in the context, as I said, there's a

10 misunderstanding, I overstepped my authority. In light of that

11 December 29, 2005 letter, where there's a clear statement of

12 what I was authorized to represent to you through the school

13 district.

14 Q. At that point your clients wanted out of the settlement?

15 A. Excuse me.

16 Q. At that point, February 8th, your clients wanted out of

17 the settlement, correct?

18 A. I think it's fair to conclude that because we were making

19 a proposal to you. I view that as really a proposal. I don't

20 know how you view it, I put forth the matter in this new

21  proposal.  I don't know how you conclude that.

22  Q.    Why would it have been adverse to your clients on

23  February 8th for you to say I didn't have the authority?

24  A.    On February 8th I didn't have the authority?

25  Q.    Right.


52


1   A.    Well, let's go back to that.  I want to be very clear on

2   why and how I responded to the court there.  What page are we

3   on, Mr. Kuhar?

4        THE COURT:  We're on page 10 and we are at line 20.

5   And your response.

6        THE WITNESS:  "Your clients were here and your

7   clients agreed in my chambers -- did they not?"  Okay, the

8   reason I responded to the court the way I did is because my

9   clients had told me they had not agreed to those terms.

10  BY MR. KUHAR:

11  Q.    Why didn't you say that?

12  A.    That's what I said.

13  Q.    Your clients --

14  A.    Line 23 is what I said, I said they tell me they did not.

15  Q.   That's what they were telling me?

16  A.   That's what they were telling me.

17  Q.   In fact, if this had been true, why didn't you just

18  say --

19       THE COURT:  This is the last time on this, Mr.

20  Kuhar, this field has been plowed down to dirt on this issue.

21  So ask him one more time, then move on to something else.

22  BY MR. KUHAR:

23  Q.   Mr. Nichols, you had the opportunity to say I lacked the

24  authority and you chose not to say that, true?

25  A.   No, the more directed response in my own mind, in my own


                          53


1  heart, I was telling the judge exactly what my clients had told

2  me.  Okay.  And that's what's reflected in the record.  That

3  was in my own mind and my own heart.

4       THE COURT:  Do you have anything else?

5       MR. KUHAR:  No, your Honor.

6       THE COURT:  Do you have anything else -- do you have

7  any questions you want to ask, Ms. Benson, I should ask you?

8       MS. BENSON:  Just give me a second, your Honor.

9      THE COURT:  I have several questions while Ms.

10   Benson is deciding if she wants to ask him anything.  Your

11   client testified here today that she did not authorize you to

12   enter into a settlement which did not include, among other

13   things, some provision for back pay and that the form of a

14   resolution would take the form of a consent decree; you heard

15   that testimony?

16      THE WITNESS:  That's right, I heard that.

17      THE COURT:  Do you agree or disagree with that?

18      THE WITNESS:  I agree with that.  May I explain,

19   judge?

20      THE COURT:  I didn't ask you a question.  I do have

21   this question for you.  And maybe I asked it in different ways,

22   I'll ask it one more time.  Why did you then tell me on the

23   record at the settlement conference, why did you make

24   representations to me that are different than the ones that

25   you're making to me here today?

54

1      THE WITNESS:  My representations at the conference,

2   let me explain.  Again, I have to say in my own mind, when I

3  made the statement in context as to what had been said going

4  back to the 29th coming forward.  While I thought I had general

5  authority, specific authority, no.  And then subsequently my

6  clients told me that I had no authority, one, to commit them to

7  those specific terms, and that I was not correct in my

8  understanding.  That is what I conveyed to the court on the

9  8th.  That is what I'm conveying today.  And if there is an

10  inconsistency because I made a honest mistake, that's all.  I'm

11  willing to take responsibility.  But like anybody, I'm human,

12  I'm fallible, I'm going to take responsibility for my mistakes.

13  I'm not infallible.

14         THE COURT:  Does that conclude the evidence from

15  your perspective, Ms. Benson?

16         MS. BENSON:  Yes.

17         THE COURT:  And yours as well?

18         MR. KUHAR:  Yes, your Honor.

19         THE COURT:  I'm going to take a short recess, come

20  back and rule on this.

21         (Recess from 3:23 p.m.; until 3:40 p.m.)

22         THE COURT:  This is an order.

23                    ORDER

24         Presently pending before the court is a petition to

25   enforce settlement agreement filed by the defendant in this

55

1   case.  The issue before me is whether an enforceable settlement

2   was reached on January 12, 2006, subsequent to a settlement

3   conference before this court.  To put a somewhat finer point on

4   it, the core issue here is whether plaintiff's counsel, Caleb

5   Nichols, had express authority to enter into the purported

6   settlement agreement whose terms were memorialized on the

7   record on January 12, 2006.

8          What I propose to do is give a brief background of

9   this matter and then set forth the applicable legal principles

10  that govern a dispute such as this.  And, finally, I'll apply

11  those legal principles in conjunction with my findings of

12  fact/conclusions of law.

13         On January 12th, after a lengthy settlement

14  conference, the court directed the stenographer to take down

15  the material terms of what the court believed at that time to

16  have been a final and binding settlement.  The exact exchange

17  which occurred on the record, as well as the material terms and

18  conditions, has already been set forth extensively on the

19   record here in connection with the evidentiary hearing.  And

20   the settlement transcript itself has been filed.  So I simply

21   incorporate, in the interest of time, by reference the complete

22   text of the settlement conference.  I should note, again, for

23   the record, however, that at the conclusion of the settlement

24   conference, the court specifically asked Mr. Nichols whether

25   the terms and conditions as set forth above were acceptable to

56

1   his clients, and Mr. Nichols indicated that they were.

2          On January 23, 2006, nearly two weeks after the

3   settlement conference, Attorney Nichols did send a draft of a

4   document styled consent decree to Mr. Kuhar and stated in his

5   cover letter that "which embodies, in principle, the terms and

6   conditions of the mutual understanding that the parties reached

7   at the settlement conference on January 12, 2006."  In the

8   course of the January 23rd letter, Mr. Nichols indicated that

9   his client insisted on various changes, including "the

10   resolution of the suit via consent decree, injunctions against

11   several district defendants.  A provision for immediate

12   employment and a regular full-time teaching position by no

file:///A|/WAG-3-27.TXT

13  later than September, 2006.  And the recoupment of costs and

14  out-of-pocket expenses associated with the lawsuit."  By

15  correspondence dated February 2, 2006, Mr. Kuhar wrote to the

16  court indicating "unfortunately, however, the parties have

17  reached an impasse and it is fair to conclude that the

18  negotiations have broken down" -- the record should reflect

19  that this is Mr. Nichols' letter to me of February 2nd.

20  "Unfortunately, however, the parties have reached an impasse

21  and it is fair to conclude that negotiations have broken down

22  and will not proceed beyond this point."  He also went on to

23  tell me in that letter "because the terms and conditions set

24  forth in defendants' draft agreement is so wildly at variance

25  with the conceptual and incomplete written understanding that

57

1  was discussed at the January 12th settlement conference,

2  plaintiff finds the defendants' draft agreement unacceptable

3  and thus, refuses to sign a stipulation of dismissal per

4  Federal Rule of Civil Procedure 41."  Thereafter, Mr. Nichols

5  listed several reasons in the letter as to why he felt the

6  January 12, 2006 settlement agreement was unenforceable.

7      Is this letter part of the record by the way?

8      MS. BENSON:  Yes, your Honor, I believe it is.

9      THE COURT:  All right.  In any event, I had

10  referenced for the record pages two through three, I

11  incorporate those herein by reference.  I will address those

12  reasons a little bit later more fully below.

13      So after reviewing Mr. Nichols' letter, I perceived

14  the need for a status conference.  So one was scheduled for

15  February the 8th, 2006.  At that status conference, plaintiff's

16  counsel for the first time raised the issue of lack of

17  authority to have entered into the settlement agreement,

18  stating that "my client said that was not their understanding,

19  therefore, I was not authorized to make that representation to

20  you."  Mr. Nichols, in the course of that February status

21  conference, also advised me that "he certainly was not going to

22  be a witness against his clients."  At this point I perceived

23  that the most appropriate vehicle for resolution of this

24  dispute was an evidentiary hearing.  Defendants subsequently

25  filed a petition to enforce a settlement, which was responded

58

file:///A|/WAG-3-27.TXT

1  to by plaintiff's counsel, and an evidentiary hearing was set

2  for today's date.

3      At this point it's important to briefly set forth

4  the principles of law which control the resolution of this

5  dispute.

6      One.  It must be said that a strong public policy

7  exists in favor of settlements.  See Pennwalt_Corp._v._Plough,

8  Inc., 676 F.2d 77-80 (3rd Cir. 1982).

9      Two.  Settlements are specifically enforceable and

10  broadly interpreted.  A settlement agreement is a contract

11  subject to the rules of contract interpretation.  Id. at 79.

12  Under Pennsylvania law "in general an attorney has no authority

13  to settle his client's case solely by virtue of his general

14  power to handle the case."  Garabedian_v._Allstates_Engineering

15  Co., 811 F.2d 802, 803 (3rd Cir. 1987).  Rather, an attorney

16  can only settle his client's case if he or she has expressed

17  actual authority to do so.  Tiernan_v._Devoe, 923 F.2d at 1035.

18      Three.  Express authority "must be the result of

19  explicit instructions regarding settlement."  Tiernan, 923 F.2d
                        _____

20  at 1033.

21        Four.  A "prerequisite for a valid agreement is that

22  the parties mutually ascend to the terms and conditions of the

23  settlement" at the time it was made.  Geiger_Associates
                        _____ _____

24  Plumbing,_Heating_&_Air_Conditioning,_Inc._v._Geiger_Services,
    _____ _____ _ ___ _____ ____ __ _____ _____

25  Inc., 1998 WL 242598 at 1, (E.D.Pa. May 14, 1998.)
    ____


                        59


1         Five.  "An agreement to settle a lawsuit voluntarily

2   entered into is binding upon the parties whether or not made in

3   the presence of the court and even in the absence of a

4   writing."  Green_v._John_H._Lewis_&_Co., 436 F.2d 389-390 (3rd
               _____ __ ____ __ _____ _ ___

5   Cir. 1970).

6         Six.  "A settlement agreement is still binding even

7   if it's clear that a party had a change of heart between the

8   time that she/he agreed to the terms of the settlement and when

9   those terms were reduced to writing."  McCune_v._First_Judicial
                                           _____ __ _____ _____

10  District_of_Pennsylvania_Probation_Department, 99 F.Supp.2d,

_____ __ _____ _____ _____

11  2000 WL 680819 at 1, (E.D.Pa. 2000).

12          Seven.  Finally, "a party to a settlement agreement

13  cannot avoid the agreement simply by arguing that she did not

14  perceive the consequences of a particular term."  American

_____

15  Health_Systems,_Inc.,_v._Liberty_Health_Systems, 1993 WL 49000

_____ _____ _____ __ _____ _____ _____

16  at 5, (E.D.Pa. 1993).

17          Returning now briefly to the specific points of

18  objection in Mr. Nichols' letter to me of February --

19  what's the date of that letter again?

20          MS. BENSON:  Your Honor, I misspoke, the letter is

21  not of record.  I thought it was.

22          THE COURT:  It's says here filed on 2/28/06.

23          MR. KUHAR:  Your Honor, I'm almost positive that

24  it's part of the petition to enforce.

25          THE COURT:  I'm sorry, the date of the letter is on

60

1  it, it's February 2nd.  It's in the petition anyways, so it's

2  part of the record.  Anyways, getting back to the points, I

3   address each of them as follows.

4        First, he says "to be legally enforceable under

5   Pennsylvania law, the settlement agreement is required to be

6   reduced to a writing and properly signed by the parties."

7   That's simply incorrect, basically and fundamentally incorrect

8   as a matter of Pennsylvania law.

9        He then says "paragraph two of page two of

10  defendants' draft agreement is objectionable because it seeks

11  dismissal of the action with prejudice, a condition which runs

12  counter to the court's declaration found in the last paragraph

13  on page three of the transcript of the settlement conference

14  held on January 12th."  There is nothing inconsistent at all.

15  I reviewed the transcript and there is nothing inconsistent

16  with the "with prejudice" designation.

17        He then goes on to object that the "draft agreement

18  is largely illusory and unenforceable because there exists no

19  definite commitment on the part of the school district as to

20  when the plaintiff will be employed as a long-term substitute."

21  I do not find the proposed agreement illusory on that basis.  I

22  find that there are sufficient facts and circumstances set

23  forth therein that it does not suffer from that deficiency.

24    The fourth objection, "the defendants' draft

25    agreement does not specify the conditions under which plaintiff


61


1    would agree to release the defendants from asserted claims and

2    it is therefore incomplete."  I disagree with that, the

3    agreement does not suffer from that deficiency.

4         The fifth objection, "the defendants' draft

5    agreement is unconscionable and violative of Pennsylvania

6    public policy to the extent that it requires plaintiff to

7    surrender her rights to sue on the basis of federal

8    anti-discrimination mandates contained in the amended and

9    second amended complaints."  With all respect, that objection

10    makes absolutely no sense to me because in any situation where

11    a release is obtained, the parties specifically agree not to

12    pursue those very claims for which a release was obtained.

13         Sixth, there is an objection that "the record was

14    incomplete for negotiating purposes because the court did not

15    yet rule on plaintiff's second amended complaint with respect

16    to first, second, third, fourth, fifth and sixth claims for

17    relief."  Once again, the fact that there were various motions

18  or pleadings that remained on the deck that were not decided is

19  in no way an impediment to a potential settlement.  Because if

20  it was, hardly anything would ever be settled or resolved until

21  the case was completely over.

22          Seventh, the plaintiff contends that it "made it

23  clear to the defendants that any settlement agreement must be

24  consummated under the auspices of the court in the form of a

25  consent decree.  Yet, the defendant's draft agreement makes no


62


1  provision for the court's signature and the execution of a

2  consent decree."  I will speak to that issue more fully in a

3  moment.

4          Eighth, "the defendants have failed to comply with

5  plaintiff's fifth request for production of documents, per a

6  subpoena issued more than 30 days ago."  That had no impact and

7  would have no legal impact on the viability of a potential

8  settlement.  That is to say whether there were discovery

9  responses that had not yet been served.

10          And, ninth, there is an objection that the draft

11  agreement does not provide for recoupment of costs and

12  expenses.

13      And, ten, there is an objection that the proposed

14  draft seeks to prohibit plaintiff from suing on the basis of

15  the underlying amended and second amended complaints, which

16  contravenes the plaintiff's right to access the court, upon a

17  breach of the settlement agreement.  That contention in and of

18  itself would not have rendered the agreement unenforceable.

19      I now turn to the central -- having disposed of most

20  of the other contentions, I now turn to the central issue in

21  this case.  Did Mr. Nichols have expressed authority to settle

22  the case under the terms set forth on the record on January

23  12th, and as subsequently reflected in the draft settlement

24  agreement forwarded by Mr. Nichols to Mr. Kuhar.

25      First, let me begin by saying that, as I did at the


63


1  outset, that in my view the burden remains on the plaintiff

2  here claiming a lack of authority on the part of her client, in

3  an attempt to demonstrate lack of expressed authority and

4  thereby unscramble the settlement.  See, for instance, Newton
                        _____

5  v._Supermarkets_General_Corp., 1989 WL 144104 (E.D.Pa. 1989 at

__ _____ _____ _____

6  page 2).  Wyndmoor_Learning_Center_v._City_of_Wilmington, 1996

_____ _____ _____ __ ____ __ _____

7  WL 117471 (E.D.Pa. 1996).  Farris_v._J.C._Penney_Company, 176

_____ __ ____ _____ _____

8  F.3d 706 (3rd Cir. 1999), at page 710.

9       Having carefully examined the exhibits in this case

10  and considered the testimony taken today at the evidentiary

11  hearing, I find the following:

12       First.  I find that Ms. Wagner's testimony that she

13  had not specifically authorized her lawyer, Mr. Nichols, to

14  enter into a settlement which did not include some provision

15  for back pay, a consent decree, and a specific timetable for

16  assuming a teaching position, among others, to be credible.

17       Second.  I attribute Mr. Nichols' failure to have

18  raised with the court earlier the issue of his exceeding his

19  authority to have been born out of a desire to see if the

20  settlement could be overturned on some grounds other than his

21  own failure in that regard.

22       Third.  Mr. Nichols testified that he lacked

23  authority to enter into the agreement under the terms stated in

24  the January 12, 2006 settlement transcript, and attributed this

25  failure to miscommunication or misunderstanding on his part.

64

1    Whatever the reason or motivation, I find on this record that

2    he did not have expressed authority to enter into the

3    settlement agreement as he represented to the court.

4         As an aside, there is perhaps no quality upon which

5    judges and lawyers place a higher premium than that of

6    trustworthiness.  The ability to take someone at their word.

7    It can frequently take years to establish and it can be lost in

8    an instant.  The petition to open the settlement is granted.

9         All right, I now turn to the gentleman who has been

10   patiently waiting there, so let's get one team off the field.

11   Before I swing off to this other issue, though, I have some

12   questions for Ms. Benson.  As this case now moves forward

13   again, either down the track toward trial or motion practice or

14   perhaps to another settlement conference, who is going to be

15   the attorney on this case?

16        MS. BENSON:  I will remain in this case and I expect

17   to play a very active role in this case.  Your Honor, I think,

18   obviously, we're taking one step at a time.

19        THE COURT:  I'm not trying to press anybody here,

20   you certainly don't have to make a decision in open court, but

21   I'm trying to understand who the players are likely going to be

22   in terms of counsel, whether Mr. Nichols is going to continue

23   and you or just you or someone else.  But, in other words, are

24   you telling me that's a decision that you and your clients will

25   be making in the immediate future?


65


1        MS. BENSON:  I think it's safe to say that we

2   haven't all sat down -- not really set down and divided

3   responsibilities and so forth.  But we'll sit down and do that

4   now.  And I expect that I will continue to play a role in this

5   case.

6        THE COURT:  That's fine.  But I need to know for

7   purposes of future scheduling, etc., who the lead counsel on

8   this case is and who I should or members of my staff through

9   correspondence should be dealing with.  I'm going to ask that

10   you advise my deputy clerk within one week as to that, all

11   right?

12        MS. BENSON:  Yes, sir.

13        THE COURT:  All right.  Do you want to come up to

14   the podium.  We have for consideration the application of

15   defendant Crawford Central Education Association's allowance

16   for attorney's fees and expenditures, essentially, incurred in

17   connection with getting out of this lawsuit, is that right?

18        MR. McEWEN:  That's correct, your Honor.

19        THE COURT:  And your position is as a prevailing

20   defendant under Section 1988 of the attorney's fees statute,

21   this is one of those rare instances in which I should assess

22   attorney's fees against the plaintiff, is that correct?

23        MR. McEWEN:  That is correct, your Honor.

24        THE COURT:  If I were to assess them, against whom

25   would I assess them, what are you asking me to do?


                              66


1         MR. McEWEN:  Well, I'm working under the assumption

2    that it would have to be assessed against the party that

3    brought the lawsuit.  Certainly some of the motivation behind

4    this motion has to deal with the way the suit was played out

5    and prosecuted.

6         THE COURT:  Well, if we get to that point, I don't

7    know that we will, I'll figure it out, but I don't want to get

8   the cart before the horse.  And I don't mean to put words in

9   your mouth, I can do this real quickly, and then you can tell

10  me if there's anything else you'd like to tell me, then I'll

11  hear from Mr. Nichols.  But is it accurate to say that your

12  position is that the claims against your client were frivolous

13  and groundless within the meaning of Third Circuit law, is that

14  essentially it?

15          MR. McEWEN:  That's true, your Honor.

16          THE COURT:  All right.  But there was an initial

17  motion to dismiss, correct?

18          MR. McEWEN:  That's correct.

19          THE COURT:  Which they survived in part, is that

20  correct?

21          MR. McEWEN:  Yes.

22          THE COURT:  Is this really one of those cases, the

23  rare case which the claims against the association were so

24  frivolous as to warrant fees or is it just one of those cases

25  where the claims, while not frivolous, were somewhat


67


1   far-fetched, like many cases are, and if I should award them in

2  this case, why wouldn't I award them in every case where a

3  defendant gets out?

4       MR. McEWEN:  Well, I think the difference here, your

5  Honor, the reason we brought this, we didn't bring this motion

6  lightly.  One of the primary bases for this may not have come

7  across entirely in the brief, was the complete lack of factual

8  support for any of the allegations that were made against the

9  association.  To the extent that -- even when the plaintiff was

10  deposed and we attempted to ask her what the reason was, why

11  she believed the association had interfered with her ability to

12  gain employment with the district, she was really unable to

13  answer, her counsel objected on the basis that the complaint

14  speaks for itself, which was one of the more far-fetched

15  objections I had ever heard --

16       THE COURT:  I'm sorry to interrupt you, but in

17  fairness to her, you wouldn't expect a client to understand the

18  legalities of what was going on?

19       MR. McEWEN:  Not necessarily, your Honor, but I

20  would expect them to have some factual basis as to why they

21  decided to sue somebody.  And she really was not able to come

22  up with that.  The closest thing, after about 10 or 11 pages of

23  transcript was that -- that she was unhappy that some

24  association members didn't take any action after she went and

25  complained.  But she went to them to complain two weeks before

68

1  she filed suit against us and nine months after the main

2  episode that prompted her lawsuit.

3       THE COURT:  So, in essence then, I think it's

4  probably important for me to hear from Mr. Nichols, I read your

5  papers, but it is that the contract claims, the 1981 claims,

6  the 1983 claims and any other claim that was asserted really

7  lacked any, was not grounded in any fact or even colorable law

8  and, therefore, you're entitled to a fee.

9       MR. McEWEN:  If I could add one more thing.  Even in

10  the response, your Honor, the plaintiff raises some allegations

11  of conspiracy, where the association was in a conspiracy with

12  the district.  These allegations periodically come up.  There

13  is no facts that are even alleged in any complaint or revealed

14  in any of the discovery that would begin to support any acts

15  based on concerted activity or conspiracy.  It's purely

16  fictional.

17          THE COURT:  What was the date again, if you can

18   remember, that I ruled on the motion, your objections to the

19   motion to amend?

20          MR. McEWEN:  Let me look that up.  You issued an

21   order closing the case on January 13th.  We had the argument on

22   January 12th, the same date as the settlement conference.

23          THE COURT:  All right, thank you.  They're trying to

24   get attorney's fees against you or your client from Crawford

25   Central, this is your opportunity to respond to that?


                                 69


1          MR. NICHOLS:  Well, very briefly, judge.  We stand

2   on my submission, a copy which I hope you received, the brief

3   that we submitted.

4          THE COURT:  I did.

5          MR. NICHOLS:  If I may, just very briefly -- in

6   summarizing that.  I'll first start off with your ruling,

7   February 25, 2005.  Where I think the union moved to be

8   dismissed, you rejected their motion to dismiss, you denied

9   their motion to dismiss.  And then over the next span of, since

10   that time, the court, while you dismissed them more recently,

11  the court I think very respectfully gave consideration to our

12  claim. I'd like to think that, as I see the case law here, all

13  the case law articulates is whether it's reasonable. Even

14  though they had lost. I think you used the correct term, if I

15  may use it again, if the court were to grant attorney's fees to

16  a defendant who feels that they have prevailed, I would just

17  say all the positions we put forward, I have set forth in the

18  brief, I think are very reasonable. We did prevail against the

19  union, but they were reasonable. There was some factual basis.

20  I think at the end of the day what is crucial here is that we

21  would ask the court to consider, as to the last statement we

22  made. And this echoes loudly and clearly throughout the case

23  law. This chilling effect, you put your finger on it just a

24  moment ago, if you ruled in this case for them, then the

25  standard becomes, what the standard becomes is for other


70


1  advocates of civil rights to enforce their civil rights, the

2  question here becomes very chilling.

3         THE COURT:  I have your point, you can take a seat.

4         MR. NICHOLS:  Thank you.

5          MR. McEWEN:  May I add one thing, your Honor?

6          THE COURT:  No.  This is an order.  Well, yes, it's

7   not my style to cut people off.

8          MR. McEWEN:  That's okay, your Honor.

9          THE COURT:  This is an order.

10                    ORDER

11          Presently pending before the court is an application

12   of defendant, Crawford Central Education Association, for

13   allowance of attorney's fees and expenses.  Essentially, the

14   union defendant contends it is entitled to attorney's fees

15   pursuant to 42 U.S.C. Section 1988 as a prevailing defendant.

16   As stated in Barnes_Foundation_v._Township_of_Lower_Merion, 242

17   F.3d 151, (3rd Cir. 2001):

18          "As the Supreme Court held in Christiansburg, while

19   prevailing plaintiffs 'should ordinarily recover an attorney's

20   fees unless special circumstances could render such an award

21   unjust,' a prevailing defendant is entitled to attorney's fees

22   only 'upon a finding that the plaintiff's action was frivolous,

23   unreasonable or without foundation.'  Nevertheless, it is not

24   necessary that the prevailing defendant establish that the

25   plaintiff had subjective bad faith in bringing the action in

71

1  order to recover attorney's fees.  Rather, the relevant

2  standard is objective."  Citing cases.

3      The question as to whether the plaintiff's

4  allegations lacked an arguable basis of law or fact -- strike

5  that.  A complaint will typically be found to be frivolous

6  where "it lacks an arguable basis either in law or in fact."

7  That's 109 Supreme Court 1827.  As Judge Brody noted in Solomen
                     _____

8  v._Redwood_Advisory_Co., 223 F.Supp.2d 681 (E.D.Pa. 2002):
   __ _____ _____ ___

9      "The Ninth Circuit, while noting the importance of a

10  'foundation in fact or law,' held that a suit is 'frivolous is

11  the results are obvious, or the arguments are wholly without

12  merit."

13      In reviewing this matter, I note that an initial

14  motion to dismiss was survived, and I incorporate herein by

15  reference as is fully set forth the argument, as well as the

16  court's order entered on January 12, 2006, wherein, I sustained

17  the Crawford's objections to the proposed amendment.  Although,

18  I found for the reasons on the record at that time that the

19   plaintiff's positions insofar as Crawford were not well-taken

20   for the reasons stated on the record, I cannot say that the

21   positions were so frivolous, unreasonable or without foundation

22   as to trigger the attorney's fees provision as articulated in

23   Christiansburg.  There is, in my view, a difference between
     _____

24   arguments that are a stretch and arguments that are patently

25   frivolous.  In this case the defendant Crawford deserved to be


                                  72


1   dismissed from the case on solid legal grounds.  But I do not

2   find that the plaintiff's positions were so extreme as to

3   justify the imposition of attorney's fees.  And they are

4   denied.

5         Now, the next thing that has to happen here is I'm

6   going to have my deputy clerk schedule a status conference in

7   this case.  But I'm just going to say this.  I am not real

8   happy about this huge waste of judicial and legal time that

9   brought us here today.  And, frankly, in almost 12 years on the

10   bench it's never happened and I find it regrettable.

11

12          (Whereupon, at 4:20 p.m., the proceedings were

13   concluded.)

14

15                    - - -

16

17

18

19

20

21

22

23

24

25


                              73


1              C E R T I F I C A T E

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25