**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROWENA WAGNER, | ) | Civil Action No. 04-264 ERIE |
| Plaintiff | ) | Judge Sean J. McLaughlin |
| | ) | |
| v. | ) | ELECTRONICALLY FILED |
| | ) | |
| CRAWFORD CENTRAL SCHOOL | ) | |
| DISTRICT, et al. | ) | |
| Defendants | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Plaintiff, Rowena Wagner, alleges in her Amended Complaint filed on
October 8, 2004 that Crawford Central School District ("District"), Crawford Central
School Board ("Board"), District Superintendent Michael Dolecki ("Dolecki") and District
Assistant Superintendent Charles Heller ("Heller") (collectively the "District Defendants")
unlawfully discriminated against her on the basis of her race (Asian) and national origin
(Filipino) in that she was not selected for employment with the District as a long-term
substitute elementary teacher[1] and/or a "permanent" full-time elementary teacher since
2002, as more fully set forth below.

On or about February 20, 2003, Plaintiff filed a complaint of discrimination
with the Pennsylvania Human Relations Commission, which was dually filed with the

---

[1]   Unless otherwise indicated, all references to "teacher" or "position" herein are to
elementary teaching positions, the only type for which Plaintiff is certified.
Ex. 4 - Plaintiff Depo. at 7-8 ("P. Depo")

Equal Employment Opportunity Commission.  C. at ¶26(h).[2]  Plaintiff claims that thereafter, through the date of the filing of her amended complaint, the District and the Board knew or should have known that she was asserting her rights under the several anti-discrimination laws discussed below.  C. at ¶18.  Plaintiff contends that the District's failure to choose her for long-term substitute and/or permanent positions following February 20, 2003 also was unlawful retaliation against her for having filed her PHRC/EEOC charge of discrimination.  Plaintiff asserts that the above-described alleged discrimination violated Title VII (first claim), Section 1981 (second claim), her rights under the 14th Amendment via Section 1983 (third claim) and the Pennsylvania Human Relations Act (fourth claim), as well as "relevant state law" regarding infliction of emotional distress or other tortious acts (fifth claim).

## II.    MATERIAL FACTS[3]

The District has employed Plaintiff as a casual "day-to-day substitute" since August 2001.  C. at ¶8.  Plaintiff began applying for permanent positions during an unspecified period in 2002.  C. at ¶15.  On approximately November 15, 2002, the District assigned Plaintiff to temporarily replace District elementary teacher Joye Pickens during Pickens' health-related leave of absence, pending its selection of a person to staff Pickens' class for the remainder of her leave, i.e. the balance of the 2002-03 school year ("Pickens Position").  C. at ¶3 and Ex. 3 - Heller Affidavit at ¶16. The District then interviewed Plaintiff and several other candidates to determine who

---

[2]    References to Plaintiff's First Amended Complaint, filed October 8, 2004, will be to "C. at ¶" and the appropriate paragraph.

[3]    For purposes of this motion only, disputed facts will be presented as contended by Plaintiff.

would fill the Pickens Position during the remainder of Pickens' absence.  The District selected a Caucasian, American-born candidate, Amy Szalewicz, to fill the Pickens Position beginning December 21, 2002.  C. at ¶12 and Ex. 3 - Heller Aff. ¶17.

   The District hires new teachers for "permanent" vacancies and long-term substitute positions through a process whereby Heller assembles an interview team comprised of himself and other administrators[4] to interview applicants for long-term substitute positions and full-time teaching positions.  During the interviews, each administrator on the interview team independently completes his/her own interview analysis form, on which multiple qualifications of candidates are evaluated, which are used to asses the strengths and weaknesses of each interviewee.  Upon completing all interviews for an available position, the interview team reviews the interview analysis forms, discusses their impressions of the applicants and determines collectively which applicants should be recommended for a position(s).  A list of suggested hirees is then compiled and forwarded to the Board, after having been reviewed and approved by the Superintendent.  Ex. 3 - Heller Aff. ¶2-6.  Although the ultimate decision rests with the Board, the Board has approved the recommendations of the interview teams for all positions known by the District Defendants to be implicated by the Complaint, including the Pickens Position.  Ex. 3 - Heller Aff. ¶¶7-9.  When they conducted interviews for the Pickens Position, the interview team's independently derived assessments of Plaintiff's interview performance resulted in scores consistently lower in categories such as

---

[4]  For elementary positions, interview committees included elementary administrators; for high school positions, high school administrators.  Ex. 3 - Heller Aff. ¶3.

"knowledge of the job" and "insight and alertness," whereas Szalewicz scored consistently higher.[5]  See Interview Analysis Forms attached to Heller Aff. as Ex. 3A.

Additionally, Heller performed a classroom observation of Plaintiff while she was substitute teaching Ms. Pickens' class during which he noted that Plaintiff had trouble keeping the students' attention in the classroom and appeared nervous in front of the students.  See Heller Observation, attached to Heller Aff. as Ex. 3C.  Heller also noted in his classroom observation that Plaintiff failed to involve a sufficient number of students during discussions to assess their understanding.  See Ex. 3C - Heller Obs. Cochranton Elementary Principal, Kurt Meader, noticed the same shortcoming during his observation of Plaintiff.  See Meader Observation, attached to Heller Aff. as Ex. 3D. Plaintiff's noted difficulties in the classroom indicated that she was not ready to manage her own class.  Ex. 3 - Heller Aff. ¶24.

Although Plaintiff may note that some regular teachers for whom she has substituted have been favorably impressed with her, those teachers have never seen Plaintiff in a classroom setting.  Instead, the teachers were impressed by things such as the neatness of their desks upon their return and the fact that their lesson plans were followed.  See Ex. 5 - Deposition of Joye Pickens ("Pickens Depo.") at 13.  The qualities that are desirable in a substitute teacher are not necessarily indicative of the required qualities of a permanent teacher.  Ex. 3 - Heller Aff. ¶23.

In addition to her strong performance during her interview, Szalewicz was chosen, in part, because she possessed more teaching experience than Plaintiff[6],

---

[5]  Szalewicz scored between 36 and 44 points out of a potential 45 points during her interview, Plaintiff scored between 26 and 30 points out of a potential 45 points during her interview with the same committee.

greater knowledge of the job and other relevant teaching characteristics which made her more desirable for the Pickens Position than Plaintiff.  Ex. 3 - Heller Aff. ¶18. Plaintiff's short-term assignment therefore ended on December 20, 2002 and she resumed her duties as a day-to-day substitute.  C. at ¶13.  Plaintiff characterizes the cessation of her temporary replacement of Pickens as a "dismissal."  C. at ¶12.  In fact, however, Plaintiff has acknowledged that it was her assumption that she would replace Pickens for Pickens' entire leave of absence and that the District had never specified any particular length of time for her assignment.  P. Depo. at 29-30.

Plaintiff also alleges that the District deviated from a customary practice when it chose Szalewicz as Pickens' long-term replacement.  C. at ¶13.  Specifically, Plaintiff contends that it was the District's practice to fill long-term, temporary teaching vacancies based solely upon the recommendation of the full-time teacher who was to be replaced.  C. at ¶13.  Yet, Plaintiff acknowledged that she has no firsthand knowledge of this alleged practice and that her only evidence of it is what she has been told by Pickens and others who were not in a position to know the District's then current practices.  Ex. 4 - Plaintiff Depo. at 36, 53, 94 ("P. Depo.").  In actuality, since Heller became primarily responsible for the process of screening and recommending long-term substitutes in February 2002, he has never selected a long-term substitute based solely on the recommendation of the teacher to be replaced.  Ex. 3 - Heller Aff. at ¶12.  Since at least November 1994, District teachers have not been permitted to select their own long-term substitutes.  Ex. 1 - Dolecki Aff. ¶2.  Permanent teachers have very seldomly

---

6    Szalewicz had taught at another school district for two years prior to being chosen for the Pickens' Position.  Ex. 2 - Heller Depo. at 103.

recommend their replacements during leaves of absence.  Ex. 1 - Dolecki Aff. ¶3 and Ex. 3 - Heller Aff. ¶11.  Recommendations by teachers, when they occur, have always been merely one factor in the District's selection of leave of absence replacements. Ex. 1 - Dolecki Aff. ¶2 and Ex. 3 - Heller Aff. ¶10.  During the relevant period, the District has required candidates for long-term substitute assignments to undergo an interview process and, often, classroom observation, except in certain specific circumstances where the District has firsthand knowledge of an applicant's teaching, i.e. the applicant has previously performed a long-term substitute position for the District.  Successful candidates are chosen based on the District's evaluation of their merits relative to the other candidates.  Ex. 3 - Heller Aff. ¶13.  The District interviewed Plaintiff for the Pickens Position, but did not hire her because Plaintiff's interview scores were lower than those of the successful candidates.  See Ex. 3A - Interview Analysis Forms.

From 2002 through 2004, Plaintiff applied unsuccessfully for more than seventy-five long-term substitute and full-time teaching positions with the District. C. at ¶15.  Plaintiff concedes that all but seven were bid upon by bargaining unit teachers with contractual entitlements to the positions.  P. Depo. at 38 and C. at ¶16.  It is unclear whether Plaintiff is alleging that the seven for which Plaintiff claims outside candidates were chosen were permanent positions or long-term substitute positions, or some combination thereof.  In fact, from January 1, 2002 through April 1, 2004, all permanent elementary positions were filled with internal bidders with contractual rights to their positions.  Ex. 3 – Heller Aff. ¶14.  Plaintiff claims that, with respect to the unidentified seven positions, she was fully qualified and met all standards established by the District.  C. at ¶15.  Because of this, and because the positions were not subject

to any contractual preference of current employees, Plaintiff believes that she was "entitled" to the positions and asks the Court to infer, without any evidence, that unlawful bias motivated the District's selection of others.

Plaintiff also generally claims that the District and the Board unfairly conducted job postings in an effort to disadvantage her in her job search and application process. C. at ¶26(e). Plaintiff does not identify the supposed unfairness with any specificity, except that on one particular occasion, Plaintiff applied for a vacant third grade teaching position at Neason Hill Elementary School, posted on November 12, 2002, only to be informed less than one month later (December 11, 2002) that the position "no longer existed." C. at ¶14. In actuality, the position had been posted in error, was rescinded and was never filled. Ex. 3 - Heller Aff. ¶15. Plaintiff acknowledges she has no evidence to the contrary. P. Depo. at 37-38.

A substitute teacher will not necessarily be hired as a permanent teacher merely by possessing a certificate and substituting day-to-day for a period of time. Ex. 3 - Heller Aff. ¶22. Plaintiff alleges that she was subjected to interviews for teaching positions and for long-term substitute positions, whereas other substitute teachers received long-term substitute contracts without such interviews. C. at ¶26(a). Plaintiff also contends that some of the applicants selected for these long-term substitute teaching positions were inexperienced and less qualified than Plaintiff. C. at ¶26(b). Plaintiff makes similar allegations regarding applicants selected for full-time positions. C. at ¶26(c). However, during her deposition, Plaintiff acknowledged that she is unaware of the relative qualifications of the successful candidates and/or how they performed when interviewed, or which candidates were interviewed. P. Depo. at 46-47.

For example, Plaintiff acknowledged that she did not know whether Szalewicz had been interviewed for the Pickens Position. P. Depo. at 63. In fact, all of the successful candidates for the positions identified by Plaintiff were interviewed, performed better during their interviews and were, therefore, deemed by the District's interview team better candidates than Plaintiff. Ex. 3 - Heller Aff. ¶27.

Plaintiff's complaint alleges that, in early 2004, the District departed from its established employment practices when it refused to allow Plaintiff to substitute for a full-time teacher for a three-week period. C. at ¶26(i). However, during discovery, Plaintiff failed to identify with any specificity which position she alleges she was wrongfully denied by the District. Although the record is unclear to which three-week assignment Plaintiff is referring, the record contains no evidence of discriminatory animus regarding any such position.

Plaintiff claims that, in September 2004, the District unlawfully rejected her application for an unspecified, unposted teaching position, which the District later filled. C. at ¶26(k). Plaintiff has not identified this position in discovery. During Plaintiff's deposition, when asked which specific jobs she thinks she should have gotten, she did not identify the September 2004 position. P. Depo. at 44-46. Again, there is no record evidence raising a genuine issue of fact regarding this vaguely alleged issue.

The District hired nine new teachers to start in August 2004 for the 2004-2005 school year, including one minority.[7] C. at ¶26(j). Plaintiff unsuccessfully interviewed for these positions in March 2004 . Plaintiff asserts that some members of

---

[7]    It is unclear whether Plaintiff's complained of, aforementioned seven "non-hires" are among these nine.

this group were less qualified than she and that the District "unjustifiably" rejected her application.  C. at ¶26(j).  However, during Plaintiff's deposition, she acknowledged that she had no knowledge of the qualifications of the candidates who were hired for the 2004-05 school year.  P. Depo. at 46-47.  The candidates chosen for these positions interviewed better than Plaintiff and/or had other qualifications Plaintiff lacked.  Plaintiff's interview scores were considerably lower than the candidates who were offered positions.  See Interview Analysis Forms attached to Heller Aff. as Ex. 3B.  Moreover, several interviewers noted that Plaintiff used poor grammar during her interview, deemed by the District to be a critical skill for an individual who will be teaching and setting an example for young children.  Ex. 3 - Heller Aff. ¶20-21.  Her deposition testimony, in which she made numerous grammatical errors, bears this same observation.[8]  As well, the Court had an opportunity to observe the pattern of similar errors during Plaintiff's testimony at the March 27, 2006 hearing on Defendants' motion to enforce settlement agreement.

       Plaintiff contends that the District hired teaching staff pursuant to an emergency permit when Plaintiff was still available as a fully qualified and properly

---

[8]   While anyone may make an occasional grammatical error during conversation and while the court reporter could have made a mistake at times, Plaintiff's deposition testimony reveals a pattern of simple grammatical errors consistent with the observations made by the administrators who interviewed her.  See Ex. 4 - Plaintiff Depo. at 18 ("that Ms. Pickens don't [sic] have the right to appoint me as her sub.") 23 ("And explain [to] me about…"); 28 ("before the observation he's been [sic] coming in and I been [sic] – I showed him the lesson plan."); 30 ("I'm not sure who inform[ed] her"); 31 ("..after she talk[ed] to me that night"); 52 "was denied of [sic] that opportunity"); 55 ("The District have of [sic] filling in long term position[s], okay, requesting a substitute teacher and then becomes [sic] a permanent teacher."); 56 ("Mr. Heller wasn't even going to consider me for [an] interview on that job…"); 95 ("…because why would I talk to her for").

certificated applicant, in violation of state regulations and policies. C. at ¶26(l). Plaintiff does not identify the position or explain how the District's doing so gives rise to a cause of action. There is no record evidence of the District's doing so. Lastly, as a result of her experiences, Plaintiff claims that the District inflicted severe emotional and psychological distress, humiliation, degradation and other pain and suffering, apparently seeking relief under Pennsylvania tort law. C. at ¶38. Plaintiff alleges no facts to support her tort claim not set forth above.

Although the Complaint names District Superintendent Michael Dolecki and District Assistant Superintendent Charles Heller as Defendants, the few references to the two, or to their positions generally, fail to allege any unlawful conduct. In the First Amended Complaint, Dolecki's name is mentioned only in the "Statement of Facts" where Plaintiff alleges that he, acting as Superintendent, notified the District's insurer of Plaintiff's discrimination claim filed with the PHRC on February 20, 2003. C. at ¶18. Other references to Dolecki essentially are general statements regarding the general responsibilities of the Superintendent and are included in the "Parties" section of the Complaint. C. at ¶¶4-5. In neither of these sections is there any allegation that Dolecki violated the law in any way. When asked during her deposition, Plaintiff denied that Dolecki had ever wronged her in any way. P. Depo. at 72. Similarly, there is no specific mention of Heller other than general statements in the "Parties" section regarding the general role of the Assistant Superintendent, and there is no allegation that Heller violated the law in any way. C. at ¶4. Further, Plaintiff indicated during her deposition that other than Heller's involvement in, and apparent vicarious responsibility for the

results of, the interview process, she had no knowledge of any wrongdoing by Heller against her.  P. Depo. at 72.

Plaintiff has waived all claims for compensatory and punitive damages. See Ex. 6 - Transcript of January 12, 2006 Oral Arg. at 25.  Therefore, any claims surviving Defendants' motion for summary judgment will be adjudicated via non-jury trial.

III.    **ARGUMENT**

A.    **Standard of Review**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The court assumes that the evidence of the non-moving party is true.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, that evidence must be sufficient for a reasonable fact-finder to conclude in the non-movant's favor; evidence that is "merely colorable" or "not significantly probative" may result in summary judgment against the non-movant. Id. at 249.

B.    **All Claims Must be Dismissed Because There is Insufficient Evidence to Support a Finding of Discrimination.**

In the first, second, third and fourth counts, Plaintiff argues that the District violated Title VII, Section 1981, her 14th Amendment equal protection rights via Section 1983 and the Pennsylvania Human Relations Act because she was "dismissed" from the Pickens Position, not hired for other long-term substitute positions and not hired to be a permanent teacher.  Claims of intentional disparate treatment under Title VII,

Section 1981, Section 1983 and the PHRA all rely upon the same basic analysis, known as the *McDonnell Douglas* test, and therefore will be examined together in this section. See, e.g., Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995) (both PHRA and Title VII claims are analyzed under *McDonnell Douglas* test); Stewart v. Rutgers, The State University, 120 F. 3d. 426 (3d Cir. 1997) (Sections 1981 and 1983 claims use *McDonnell Douglas* analysis).

### 1. *McDonnell Douglas* Test for Disparate Treatment Claims

In order to support a disparate treatment claim, a plaintiff must present evidence of four elements.  She must prove that she (1) is a member of a protected class; (2) was qualified for a position; (3) was subjected to adverse employment action [here, not chosen for a position(s)]; and that, (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position.  Sarullo v. United States Postal Service, 352 F.3d 789, 798 (3d Cir. 2003).  "The 'central focus' of the *prima facie* case 'is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' "  Id., quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).  See also O'Brien v. City of Philadelphia, 837 F. Supp. 692, 698 (1993).  ("Throughout it all, however, it must be shown that the employer bore a discriminatory animus against the employee and that this animus manifested itself in some challenged action, whether it be dismissal, failure to promote or failure to hire.")  A plaintiff must establish a causal nexus between her membership in a protected class and the decision(s) not to hire her.  Sarullo, 352 F.3d at 798.

If the plaintiff successfully proves a prima facie case, the employer must present a nondiscriminatory reason that the plaintiff was not hired. Id. at 797. Once the employer has satisfied this burden of production, the plaintiff then has the burden of persuading the fact-finder, through evidence, that the proffered nondiscriminatory reason is merely pretext and that the real motivation for the adverse action was her membership in a protected class. Id. To prove pretext, the plaintiff must show that the defendant's proffered reason is "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.' " Id. at 800, quoting Keller v. Orix Credit alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997). "At trial, the plaintiff must convince the factfinder *'both* that the reason was false, and that discrimination was the real reason.' " Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), quoting St. Mary's Honor Ctr. V. Hicks, 5069 U.S. 502 (1993) (emphasis in original). The plaintiff must show not that the illegitimate factor was the sole reason for the decision, but that it was the determinative factor, "that is, that but for the protected characteristic, the plaintiff would have been hired." Fuentes, 32 F.3d at 764.

"[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons … was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext.)" Id. at 764. Significantly, it is not enough for the plaintiff to show that "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the

employer is wise, shrewd, prudent, or competent." Id. at 765.  This is viewed as a

justifiably "difficult burden on the plaintiff."  Id.

    2.  **There is Insufficient Evidence to Support a Prima Facie Case.**

    Although there is no dispute that Plaintiff is a member of a protected class

and that adverse employment action was taken in that she was not hired for several

long-term substitute positions and nine permanent positions beginning with the start of

the 2004-2005 school year, the remaining elements of her prima facie case are lacking.

The evidence shows that the District's Administration, through its interview committees,

deemed Plaintiff not as qualified as other candidates for the few available teaching

positions for which she applied, and that, therefore, Plaintiff was not similarly situated to

the applicants who were hired.

    Plaintiff alleges that she was denied the Pickens Position plus several

unidentified long-term substitute opportunities.  Plaintiff also alleges that, beginning on

an unspecified date 2002, she began being passed-over for permanent positions.

Plaintiff believed she was entitled to the Pickens Position because of an alleged District

practice that allowed teachers to suggest and/or choose a particular substitute.

However, the record evidence establishes that although teachers may request or

suggest a particular substitute, the District does not staff long-term substitutes nor

permanent teaching positions based solely on teachers' recommendations.  During the

relevant period, the District has required candidates for long-term substitute

assignments to undergo an interview process and, often, classroom observation, except

in certain specific circumstances where the District has firsthand knowledge of an

applicant's teaching, i.e. the applicant has previously performed a long-term substitute

position for the District.  Successful candidates are chosen based on the District's

evaluation of their merits relative to the other candidates.  Ex. 3 - Heller Aff. ¶13.  The

District interviewed Plaintiff for the Pickens Position, but did not hire her because

Plaintiff's interview scores were lower than those of the successful candidates.

See Ex. 3A - Interview Analysis Forms.  Plaintiff was interviewed by a team of several

administrators and they consistently found similar weaknesses during her interview,

particularly in the categories of "insight and alertness" and "knowledge of job".  Her

scores ranged from 26-30 out of 45 potential points.  The successful candidate for the

Pickens' Position, Szalewicz, scored in the range of 36-44 out of 45 potential points.

Hence, Plaintiff and Szalewicz were not similarly situated and these are not

circumstances indicative of discrimination.

       Likewise, Plaintiff's shortcomings, revealed during her two interviews and

during observations of her while she taught, contributed to her non-selection for a

permanent position.[9]  The District interviewed Plaintiff and approximately forty other

candidates, among hundreds of applicants, in March 2004 for several available

positions.  Of those interviewed, nine were hired for the start of the 2004-2005 school

year.  Ex. 3 - Heller Aff. ¶19.  During Plaintiff's March 2004 interview, Plaintiff's scores

ranged from 16-19 out of 25 possible points.  See Ex. 3B - Interview Analysis Forms.

Her deficiencies were in the areas of "Planning/Preparation," "Classroom Environment,"

"Instructional Delivery" and "Communication Skills."  Several interviewers noted that

Plaintiff demonstrated poor grammar, a significant weakness in a candidate for a

---

[9]   The District hired no one without bidding rights for elementary positions until April
2004, thereafter to start at the beginning of the 2004-2005 school year.  Ex. 3 –
Heller Aff. ¶14.

teaching position.  As discussed previously, Plaintiff's deposition also reveals a pattern

of grammar misusage.  Conversely, those candidates who were hired presented a much

higher range of scores during the interviews and did not demonstrate grammar

misusage.  Clearly, these categories are relevant facets of her relative qualifications to

be a school teacher.  Hence, Plaintiff was not qualified for the jobs she sought for the

2004-2005 school year.

Thus, the individuals ultimately hired by the District during the years

Plaintiff has been applying were candidates with stronger interview scores, driven by

their demonstrated knowledge and qualities desirable in a teacher, something Plaintiff

simply did/does not possess.  Hence, the undisputed record demonstrates that Plaintiff

was not "similarly situated" with the successful candidates.

Moreover, classroom observations revealed Plaintiff's deficiencies in

classroom management and demeanor.  Plaintiff was observed during class by Heller

and Meader, both of whom noted that she failed to involve more than a few students

and, therefore, could not assess accurately the class's comprehension.  Heller further

noted that Plaintiff appeared to be nervous while teaching and did not maintain

adequate control of the students.  See the observations attached to Heller Aff. as

Exs. 3C and 4D.  The Administration justifiably concluded that Plaintiff needed more

experience teaching as a day-to-day substitute and was not yet ready to manage her

own class.

There is some testimony that others, such as Pickens, for whom Plaintiff

had substituted in the past, considered her to be a capable and qualified teacher.  See

Pickens Depo. at 11.  However, a fact-finder could not be persuaded by these

testimonials because none of these individuals observed Plaintiff in the classroom.
See, e.g., Pickens Depo. at 7, 24.  It was during such observations that some of
Plaintiff's weaknesses were revealed.  See Ex.'s. 3C and 3D - Observations.  Moreover,
it is the administration who assess candidates' qualifications and decide whom to hire,
not teachers or other persons.  See, e.g., Cooper v. Southern Company, 260 F.
Supp.2d 1295, 1302-03 (N.D.Ga. 2003) and Ex. 1 - Dolecki Aff. ¶4 and Ex. 3 - Heller
Aff. ¶7.  Qualities in substitutes that impress teachers may be very different from those
considered to be important by the administration.  For example, a teacher may be
impressed by Plaintiff's organizational skills and the fact that she leaves detailed notes
for the teacher after substituting.  See Pickens Depo. at 12-13.  However, the District is
understandably more concerned with Plaintiff's abilities in front of the classroom and her
ability to control the students.  See Ex. 3C -  Observation.  The fact that Plaintiff
considers herself to be qualified for the positions at issue is irrelevant.  Cooper, 260 F.
Supp.2d at 1302-03.  The relevant question is whether the District honestly and
legitimately believed that those hired were better suited for the teaching positions than
Plaintiff.  There is absolutely no record evidence upon which the fact-finder could
conclude it did not.

These are not circumstances that "raise an inference of discriminatory
action."  Rather, the circumstances indicate that the District made hiring decisions
based on the merits of the applicants.  Because the evidence indicates that the District
deemed Plaintiff to be unqualified for the positions she sought, using the same analysis
applied to other candidates, and because the circumstances do not indicate
discrimination, Plaintiff cannot support a prima facie case of disparate treatment.

**3.    There is Insufficient Evidence that the District's Sound Reasons for Refusing to Hire Plaintiff were Pretext.**

Even if the Court concludes that Plaintiff has enough evidence to establish a prima facie case, i.e. that she was similarly situated to the successful candidates, she lacks the evidence to convince a reasonable fact-finder that the District's proffered legitimate, non-discriminatory reasons for not selecting her are mere pretext or that Plaintiff was not hired due to an animus based on her race or national origin. The District Defendants have contended that the successful candidates performed notably better when interviewed and/or possessed desirable knowledge and other relevant qualities not possessed by Plaintiff. There is no evidence that these meritorious reasons were not the true reasons Plaintiff was not hired. The analysis of the record evidence in Section 2 above applies equally to this issue.

Not only does the record indicate that Plaintiff was not hired for good reasons at all times, but the record is completely devoid of any evidence showing that Plaintiff was not hired because of her race or national origin. Although Plaintiff claims that the District failed to equitably and fairly consider her application as a result of her race and national origin, there is no indication in the record that Plaintiff was treated any differently than any of the other applicants or candidates. Plaintiff was asked during her deposition whether she was aware of any reason to think that her non-selection for any positions had anything to do with her race and/or national origin and she said no. P. Depo. at 47.

There is testimony in the record by Bernard Wagner, Plaintiff's husband, regarding an allegedly racist comment made by George Wright, a board member. Mr. Wagner alleges that Wright made the remark during a meeting regarding Plaintiff's

desire to be hired by the District. Ex. 7 - Bernard Wagner Depo. at 18 ("B. Wagner Depo."). Specifically, Mr. Wagner alleges that Wright said, ". . . it's a proven fact that brown people and black people are not as smart as white people. . . ." B. Wagner Depo. at 18-19. Plaintiff testified that she never heard the remark or any such remark first-hand. P. Depo. at 55. Wright denies making such a comment and, in fact, has a history of protecting minority rights and interests. Ex. 8 - Deposition of George Wright ("Wright Depo.") at 31, 74-75. However, for purposes of this motion, it must be assumed that Mr. Wagner's account of the remark is truthful.

Regardless of whether Wright made the alleged remark, he was not responsible for the decisions not to hire Plaintiff and, therefore, the remark is irrelevant. He is only one board member and there is no showing that the other members were aware of or shared his alleged prejudice. It is the interview team that decides whom to hire and the Board has consistently adopted the team's recommendations. Ex. 3 - Heller Aff. ¶¶7-8. There has been no showing that the members of the administration were aware of or shared Wright's alleged view. Hence, even if Wright did harbor such animosities, those animosities were never given an outlet because Wright never asserted them or exercised them; he was one of several board members who routinely and collectively approved a list of teachers to be hired that was composed by the Administration. He was never asked to approve, nor given the opportunity to disapprove, the hiring of Plaintiff.

In conclusion, the record establishes that the District's decision not to hire Plaintiff for a long-term or permanent position was motivated by legitimate concerns regarding Plaintiff's qualifications relative to the hundreds of other applicants and

dozens of other interviewees, a contractual obligation to hire other teachers and other non-discriminatory reasons. Plaintiff has presented no evidence that these decisions were motivated by her race or national origin. In fact, Plaintiff acknowledges her general lack of evidence during her deposition. P. Depo. at 47. Therefore, summary judgment should be granted on all claims, in the District Defendants' favor.

**C.    To the Extent Plaintiff has Pled a Claim for Retaliation, the Evidence Does Not Support Such a Claim.**

In order to prove retaliation, a plaintiff must establish that (1) she was engaged in protected activity; (2) she was subject to adverse employment action subsequent to or contemporaneous with said activity and (3) there is a causal link between the protected activity and adverse employment action. Sarullo, 352 F.3d at 800. To survive a motion for summary judgment, the plaintiff must present evidence that would allow a reasonable fact-finder to conclude that the employer would not have taken the adverse employment action but for the plaintiff's engagement in the protected activity. Id. Here, Plaintiff would have to present proof that she would have been hired by the District (whether as a full-time teacher or as a long-term substitute for Pickens) if she had not filed a complaint against it. The analysis of the record evidence in Section 2 above applies equally to this issue.

To the extent the pleading is sufficient to be considered a retaliation claim, the evidence reveals no causal connection between the District's decisions not to hire Plaintiff as a full-time teacher, based upon those shortcomings discussed in Section B, and Plaintiff's filing of an administrative complaint or this action. As discussed above, with regard to Plaintiff's discrimination claim, the administrators recommend which candidates should be hired and the Board routinely approves the recommendation.

Although Heller was aware of the PHRC/EEOC complaint filed by Plaintiff, there is no evidence that he or the other interviewers considered this fact in determining which candidates should be offered positions.  The interview analysis forms prepared in December 2002, prior to Plaintiff filing any complaint, are consistent with those prepared in 2004 – in other words, the 2004 post-complaint forms are no worse than those prepared pre-complaint.

There is no evidence whatsoever that any of the interviewers who were responsible for recommending applicants to be hired, and who did not recommend Plaintiff, were affected by the fact that Plaintiff had filed a complaint.  Essentially, the District's articulation of its reasons for not hiring Plaintiff place the burden on Plaintiff to produce evidence of pretext.  In fact, Plaintiff acknowledged that her only reason for believing she had been retaliated against was the timing, i.e. that the District failed to hire her after she filed her PHRC/EEOC charge.  P. Depo. at 59.  The record evidence simply fails to establish that the post PHRC/EEOC non-hire decisions were motivated by retaliatory animus.  Therefore, any claim for retaliation must be dismissed.

**D.    The Evidence does not Support any Infliction of Distress or Tortious Claim under State Law.**

As for Plaintiff's emotional distress claim, there is simply no evidence in the record of anything more than the mere frustration common to any job seeker.  It has been observed that "[t]he standard for stating a claim for intentional infliction of emotional distress is very high." Dicks v. Information Technologists, Inc., 1996 WL 528890 (E.D. Pa. 1996).  In fact, it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery."  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988).

In order to state a claim for intentional infliction of emotional distress, a plaintiff must show extreme and outrageous conduct that is deliberate or reckless and causes severe emotional distress. *See, e.g.,* Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 275- 76 (3d Cir.1985).  The Third Circuit and Pennsylvania courts have taken a conservative approach toward intentional infliction of emotional distress claims. Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir.1990) ("Pennsylvania courts have applied the law cautiously.").  Examples of sufficiently horrible behavior which have given rise to a valid intentional infliction of emotional distress claim in Pennsylvania include hospital employees giving false reports so someone would be indicted for homicide, Banyas v. Lower Bucks Hospital, 293 Pa.Super. 122, 437 A.2d 1236 (1981), and a defendant hitting a child with his car then burying him on the side of the road only to be discovered by his parents months later.  Papieves v. Kelly, 437 Pa. 373, 263 A.2d 118 (1970).

The actions of the District in not hiring Plaintiff are not egregious, as is required in order to support such a claim under Pennsylvania law.  The record contains no evidence of wrongdoing by the District Defendants.  Even if the evidence could support a finding of employment discrimination, such actions do not rise to the level of outrageousness required under Pennsylvania law.

Even if she has alleged sufficiently extreme and outrageous conduct on the part of Defendants, Plaintiff's claims for intentional and/or negligent infliction of emotional distress are barred by the exclusivity provisions of the Pennsylvania Workers' Compensation Act ("WCA").  The exclusivity provision of the WCA provides in pertinent part:

> The liability of an employer under this act shall be exclusive
> and in place of any and all other liability to such employees,
> his legal representative, husband or wife, parents,
> dependents, next of kin or anyone otherwise entitled to
> damages in any action at law or otherwise on account of any
> injury or death....

77 P.S. § 481(a).

The WCA's exclusivity provision bars even a cause of action based upon an intentional tort, including a claim for intentional infliction of emotional distress. Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997) ("The exclusivity provision of [the WCA] bars claims for 'intentional and/or negligent infliction of emotional distress [arising] out of [an] employment relationship'."). *See also* Farrow v. Bell Atlantic – PA, 1996 WL 316798 (W.D. Pa. 1996), *citing* Rodgers v. Prudential Insurance Co., 803 F.Supp. 1024, 1030 (M.D.Pa.1992), *aff'd.,* 998 F.2d 1004 (3d Cir.1993) (granting motion for summary judgment on claim for intentional infliction of emotional distress); Gilmore v. Manpower, Inc., 789 F.Supp. 197, 198 (W.D.Pa.1992) (granting employer's motion for partial summary judgment on intentional infliction of emotional distress claim); Vallerey Stylianoudis v. Westinghouse Credit Corp., 785 F.Supp. 530, 532 (W.D.Pa.1992) (denying motion to amend complaint to include intentional infliction of emotional distress claim as futile); Poyser v. Newman and Company, Inc., 514 Pa. 32, 522 A.2d 548, 551 (Pa. 1987) (holding that exclusivity provision of WCA bars a common law cause of action against an employer for an intentional tort).

Perhaps most importantly, through her waiver of compensatory and punitive damages on January 12, 2006 to avoid a jury, Plaintiff thereby effectively waived all of her claims that might have otherwise existed under Pennsylvania tort law.

**E.     The Board Must be Dismissed as an Improper Party.**

      The Crawford Central School Board is not a separate entity from the

District and, therefore, is an improper and redundant party.  The actions or inactions of

the Board are the actions or inactions of the District.  Pennsylvania law does not grant

school boards an independent corporate existence.  See Glickstein v. Neshaminy

School District, 1997 WL 660636, *3-4 (E.D. Pa. 1997).  Hence, the Board is not

amenable to suit.  Id.  In general, there is an absence of authority for suing a school

board as it is not considered a political subdivision under Pa.R.Civ.P. 2102(b) and Rule

76.  Id.  To the extent there is any such authority, the District is already a defendant and

is answerable for the actions of the Board, so the Board is a redundant party.  Id. at *4.

Therefore, should any of Plaintiff's claims survive the District Defendants' motion for

summary judgment, the Board should be dismissed from this case.

**F.     Dolecki and Heller Either are not Proper Parties and There are no
Claims Listed Against Them.**

      The claims listed in Plaintiff's First Amended Complaint are all addressed

to "Defendants, Crawford Central School District and Crawford Central School Board."

None address Dolecki or Heller.  Moreover, there are no actions listed in the complaint

that are specific to Dolecki or Heller.  Therefore, as there appear to be no claims against

these two individuals, they should be dismissed as parties.

      Additionally, the evidence reveals no discriminatory action by Dolecki or

Heller.  Although they, as administrators, were responsible for submitting the list of

suggested hirees to the Board, and the Board routinely approved that list, the evidence

does not suggest that they discriminated in any way.  In fact, there is virtually no

testimony or evidence regarding Dolecki's involvement at all, much less that he wronged Plaintiff in any way.

Also, these two individuals are not Plaintiff's "employers" as is required to be liable under Title VII and PHRA. Only employers may be held liable under Title VII. Dici v. Com. of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996). It is well settled that individual employees cannot be held liable under Title VII. The United States Court of Appeals for the Third Circuit considered the issue in Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir.1996) (en banc), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997), and concluded that "Congress did not intend to hold individual employees liable under Title VII." *See also* In re Montgomery County, 215 F.3d 367, 372 (3d Cir. 2000); Chatterjee v. School Dist. of Philadelphia, 170 F.Supp.2d 509 (E.D. Pa. 2001). Heller and Dolecki are not employers, but are two administrators charged with recommending applicants to be hired by the Board.

Plaintiff's claims against Dolecki and Heller under the PHRA also should be dismissed. Generally, the PHRA is applied in accordance with Title VII. Davis v. Sheraton Society Hill Hotel, 907 F.Supp. 896, 899 n. 1 (E.D.Pa.1995). The employment discrimination provision of the PHRA declares only that "any employer" may be held liable. 43 P.S. § 955(a). However, as with Title VII, the definition of an "employer" under the PHRA should not be construed to include "employees." The term "employee" is defined separately under the PHRA. 43 P.S. § 954(b), (c). Because Dolecki and Heller are not "employers" within the meaning of the PHRA, the PHRA claim against Dolecki and Heller should be dismissed.

IV.    <u>**CONCLUSION**</u>

Defendants have articulated legitimate, non-discriminatory reasons for all of the complained of actions.  There is no evidence that Plaintiff's race, national origin or protected activities played any part in the District's decisions not to hire her for any teaching positions.  In the alternative, Messrs. Dolecki and Heller and the Crawford Central School Board should be dismissed as improper parties, and all claims under Pennsylvania tort law dismissed for failure to state a claim.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


BY:  /s/     Mark J. Kuhar
          Mark J. Kuhar, Esq.
          120 West Tenth Street
          Erie, Pennsylvania 16501-1461
          Phone:  (814) 459-2800
          Fax:  (814) 453-4530
          E-mail:  mkuhar@kmgslaw.com
          Bar No.:  PA71185

          Attorneys for Defendants,
          Crawford Central School District,
          Crawford Central School Board,
          Michael E. Dolecki, Superintendent
          and Charles E. Heller, III,
          Assistant Superintendent

# 667446