1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2              ERIE DIVISION

3   ROWENA WAGNER,                    :

4          Plaintiff,                 :

5          -VS-                       :CIVIL ACTION NO. 04-262 Erie

6   CRAWFORD CENTRAL SCHOOL           :

7   DISTRICT, et al,                  :

8          Defendants,                :

9          Deposition of **CHARLES HELLER**, taken before and

10     by Denice A. Grill, RMR, Notary Public in and for

11     the Commonwealth of Pennsylvania, on Tuesday,

12     September 27, 2005, at the Crawford Central School

13     District, 11280 Mercer Pike, Meadville, PA, 16335,

14     commencing at 10:20 a.m. and concluding at 3:55 p.m.

15   For the Plaintiff:
         Caleb Nichols, Esquire
16       P.O. Box 1585
         Erie, Pennsylvania 16507
17
18   For the Crawford County School District:
         Mark Kuhar, Esquire
         Knox, McLaughlin, Gornall & Sennett
19       120 W. 10th Street
         Erie, PA   16501
20
21   For Crawford Central Education Association/PSEA:
         Richard S. Mc Ewen, Esquire
         4250 Rt. 6N
22       Edinboro, PA   16412

23   Also Present:  Rowena & Bernard Wagner & Michael Dolecki

24          REPORTED BY:  DENICE A. GRILL, RMR
              FERGUSON & HOLDNACK REPORTING, INC.
25

2

1                            I N D E X

2    TESTIMONY OF **CHARLES HELLER:**

3         Direct Examination by Mr. Nichols . . . . . . .Pg. 4

4

5

6                            **EXHIBITS**

7    Heller Deposition          Marked for Identification

8    Exhibit No. 1                 Pg. 5

9    Exhibit No. 2                 Pg. 5

10   Exhibit No. 3                 Pg. 13

11   Exhibit No. 4                 Pg. 15

12   Exhibit No. 5                 Pg. 20

13   Exhibit No. 6                 Pg. 26

14   Exhibit No. 7                 Pg. 28

15   Exhibit No. 8                 Pg. 44

16   Exhibit No. 9                 Pg. 57

17   Exhibit No. 10                Pg. 60

18   Exhibit No. 11                Pg. 62

19   Exhibit No. 12                Pg. 62

20   Exhibit No. 13                Pg. 63

21   Exhibit No. 14                Pg. 63

22   Exhibit No. 15                Pg. 75

23   Exhibit No. 16                Pg. 82

24   Exhibit No. 17                Pg. 84

25

3

1

2                                   **EXHIBITS**

3    Heller Deposition          Marked for Identification

4    Exhibit No. 18                  Pg. 92

5    Exhibit No. 19                  Pg. 109

6    Exhibit No. 20                  Pg. 141

7    Exhibit No. 21                  Pg.141

8    Exhibit No. 22                  Pg. 141

9    Exhibit No. 23                  Pg. 148

10   Exhibit No. 24                  Pg. 148

11   Exhibit No. 25                  Pg. 157

12   Exhibit No. 26                  Pg. 158

13   Exhibit No. 27                  Pg. 160

14   Exhibit No. 28                  Pg. 161

15   Exhibit No. 29                  Pg. 165

16   Exhibit No. 30                  Pg. 175

17   Exhibit No. 31                  Pg. 177

18

19

20

21

22

23

24

25

4

1

2                    P R O C E E D I N G S

3

4        C H A R L E S   H E L L E R, first having been duly

5        sworn, testified as follows:

6

7                      DIRECT EXAMINATION

8    BY MR. NICHOLS:

9

10       Q.   Good morning, Mr. Heller.

11       A.   Morning, Mr. Nichols.

12       Q.   I'm representing Miss Rowena Wagner in this

13   lawsuit which has been styled Rowena Wagner versus Crawford

14   Central School District, et al.  I have some questions I'd

15   like to ask you today in the nature of a deposition.

16       A.   Uh-huh.

17       Q.   And we will move forward.  First, as a

18   preliminary measure I should state for the record that I

19   would ask that you verbalize all your questions in the

20   interests of assuring that the record will be clearer,

21   intelligible and legible as possible.

22       The next thing is that I would -- Should you wish to

23   go off the record at any time, let me know, I'll ask the

24   court reporter to go off the record to accommodate you.

25   Next, also I would ask that you speak as clearly as possible

5

1  so that all can hear.  And today's deposition, of course, as

2  you know at this juncture as to inquire into allegations

3  that we have made against the school district concerning

4  racial and national origin discrimination with respect to my

5  client's efforts to obtain employment with the school

6  district as a long term substitute or full-time teacher

7  during the past four, five years.

8       Your attorney, Mr. Kuhar, in the course of my

9  questioning may object.  Typically in these kinds of

10 proceedings, unless he instructs you not to answer, you

11 should -- your counsel I would expect will note his

12 objection for the record, and I hope will instruct you to

13 answer.

14      Are there any questions so far?

15      A.   No, sir.

16      Q.   Okay.  Moving forward, I should ask the court

17 reporter to note for the record that you're appearing here

18 pursuant to a subpoena that I've issued.  I would ask that

19 she mark Plaintiff Exhibit 1, please, and made a part of the

20 record.

21      Also I have noted as Exhibit 2, which I will also

22 offer for the record, is a copy of your job description as

23 Assistant Superintendent.

24           (Heller Deposition Exhibits 1 & 2 were marked.)

25      A.   Uh-huh.

6

1        Q.   How long have you been Assistant Superintendent?

2        A.   I began my employment at Crawford County School

3   District February 18th, 2002.

4        Q.   Prior to what was your occupation?

5        A.   I was a senior high school principal at

6   Titusville Area School District.

7        Q.   How long were you in that position?

8        A.   I can't remember the date that I started.  But I

9   had been employed in the Titusville School District since

10  1986.

11       Q.   Okay.  So, 1986 to -- until you came here in 2000

12  --

13       A.   2002.

14       Q.   Okay.  And then prior to 1986 you were employed

15  -- were you employed with a school?

16       A.   I was employed at Bucknell University for two

17  years, '82 through '84.  Clarion University from --

18       Q.   In what capacity at Bucknell?

19       A.   I was assistant wrestling coach at the university

20  level.

21       Q.   All right.

22       A.   And I was at Clarion University in the same

23  capacity for one year.  And then I was in Ellwood City --

24       Q.   What years are we talking about?

25       A.   '86, '85.

7

1      Q.   Which university?

2      A.   '82 through '84 at Bucknell University.

3      Q.   Okay.  And Clarion?

4      A.   '84 to '85 Clarion University.

5      Q.   All right?

6      A.   And '86 I was in a temporary position in an

7   Ellwood City School District.

8      Q.   And what did you do there?

9      A.   I was a long term sub.

10     Q.   Okay.

11     A.   And I was also the head wrestling coach.

12     Q.   And just for the record, I want to make sure the

13  chronology is correct here, prior to -- You say Clarion

14  first or Bucknell?

15     A.   Bucknell.

16     Q.   Okay, first?

17     A.   (Nodding head affirmatively.)

18     Q.   And then prior to Bucknell?

19     A.   College.

20     Q.   Where did you do your college work?

21     A.   Clarion, Clarion University.

22     Q.   And your area of concentration?

23     A.   Social studies, secondary.

24     Q.   Okay.  Did you do graduate work?

25     A.   Yes, Gannon --

8

1    Q.   Where was that, please?

2    A.   Gannon University.

3    Q.   Gannon --

4    A.   Gannon University I received my Master's.

5    Q.   In what area?

6    A.   Education.  Master's in Education.

7    Q.   Okay.  Did you have postgraduate studies?

8    A.    Yes, I did, I earned my secondary administrative

9  certificate from Youngstown State.  I also earned an

10  elementary certificate from Youngstown State.  And then I

11  earned a superintendent certificate from Youngstown State.

12  And then I completed course work in comprehensive exams

13  toward a doctorate at Pittsburgh.

14    Q.   Have you complete the doctorate?

15    A.   I have not completed my dissertation at this

16  point.

17    Q.   In what area are you pursuing the doctorate?

18    A.   In administrative studies.

19    Q.   In looking over your career, you say you taught

20  as a sub.  That was for a short time you were just a

21  temporary, right?

22    A.   Yes, yes.

23    Q.   In addition to that subbing work, where else have

24  you taught?

25    A.   I taught in Titusville.

9

1    Q.    For how long was that?

2    A.    Five years.

3    Q.    Five years in Titusville?

4    A.    Yes, sir.

5    Q.    So for how long did you sub?

6    A.    Half a year.

7    Q.    And five years in Titusville?

8    A.    Yes, sir.

9    Q.    At the secondary level?

10    A.    I taught a combination of 7th grade and 10th

11   grade students at Titusville.

12    Q.    Okay.  All right, I'm looking at the job

13   description and I notice that part of -- as part of your

14   responsibility you're in charge of several things,

15   performing several things?

16    A.    Uh-huh.

17    Q.    But there are two or three things I want to

18   direct your attention to.

19    A.    Sure.

20    Q.    And the first is I notice here, number nine, and

21   I would ask that this be marked as Exhibit 2 for the record.

22    Number nine, it says you assist in the preparation of

23   the annual budget?

24    A.    That's correct.

25    Q.    That's correct.  My question to you is as it

1   relates to the budget, what is your best estimate if you

2   know -- If you don't, you can say so -- of the budget, the

3   district's budget is devoted to the recruitment, the efforts

4   to recruit, encourage, and to diversify the teaching faculty

5   of the district?

6        A.   I don't know that question -- I don't know the

7   answer to that question.

8        Q.   You don't know?

9        A.   No.

10       Q.   Any estimate?

11       A.   No.

12       Q.   Okay.  Well in terms of your -- the time that you

13  devote to this particular effort, what would you say how

14  many hours a week you spend in this area?

15       You understand what I'm asking you?  That is in terms

16  of recruiting minorities to teach, as a professional staff

17  in the district.  And I ask that in light of number 23,

18  which says you're also in charge with recruiting minority

19  groups for professional, and paraprofessional positions.

20       A.   What --

21       Q.   Are you able to give me an estimate, and give me

22  how much time you spend either weekly, monthly, in terms of

23  carrying out these responsibilities?

24       A.   It's not something that I track daily, weekly or

25  yearly.  There's procedures in place that we utilize on a

11

1    yearly basis in terms of recruiting candidates.

2        Q.   But in terms of time committed to this type --

3    these responsibilities, what would your best estimate be?

4        A.   I can't -- I can't accurately make an estimate.

5    I don't track it.

6        Q.   Not even on a weekly basis?

7        A.   Huh-uh.

8        Q.   No?

9        A.   No.

10       Q.   What would be -- Why would it be difficult to

11   track?  You say you don't track it.  What is the difficulty

12   in not tracking?

13            MR. KUHAR:  Objection, he the didn't say there

14            was a difficulty.  If you can answer it, feel

15            free to try.

16       A.   Yeah, I never said that it was difficult.  I just

17   said I didn't track it.

18       Q.   Uh-huh.

19       A.   You know I come in every day and don't do the

20   same thing day in and day out, so you know . . .

21       Q.   My question is how much time do you devote to

22   this?

23       A.   I already answered that.

24       Q.   All right.  Also I noticed at paragraph 20,

25   paragraph 20 of Exhibit 2 you maintain a list of approved

12

1    substitute teachers.  That is also your responsibility,

2    isn't it?

3         A.   I have an updated list in my office.

4         Q.   And it's your responsibility to maintain the list

5    of substitute teachers, that is it's assigned as the

6    responsibility of the Assistant Superintendent?

7         A.   Yes.

8         Q.   That's one of your responsibilities, isn't it?

9         A.   One of my responsibilities, yes, it is.

10        Q.   All right.  As well as to which paragraph 23, the

11   job alluded is the recruit members of minority group also?

12        A.   Yes.

13        Q.   That's also a responsibility you're charged with

14   performing?

15        A.   Yes.

16        Q.   Okay.  Exhibit 2 for the record, please

17   (indicating).

18        You know Miss Wagner, don't you?

19        A.   Yes, I do.

20        Q.   Uh-huh.  You know Mr. Wagner?

21        A.   Yes, I do.

22        Q.   How did you come to know them?  How would you

23   come to know Mr. and Miss Wagner?

24        A.   I have know Mrs. Wagner because she's a

25   substitute in the Crawford Central School District.

13

1      Q.   Okay.  And she's been substituting since 2001, I

2   understand; is that correct?

3      A.   That's correct.

4      Q.   Okay.  And since that time are you aware that she

5   has made numerous applications for long term substitute -- a

6   full-time teaching position; is that correct?

7      A.   Yes, I'm aware of it.  I'm aware of it.

8      Q.   And of course, you've had an opportunity to

9   review applications; have you not?

10     A.   Yes, I have.

11     Q.   All right.  In the course of reviewing

12  applications for the different positions over the span of

13  the last four or five years, you have reviewed her

14  background in full; have you not?

15     A.   Yes.

16     Q.   And I have a portfolio here and I have a standard

17  teaching application that she has completed as well as

18  recommendations, as well as her vitae, resume, all of which

19  I'm sure you have reviewed; have you not?

20     A.   Yes, I have.

21          MR. NICHOLS:  Okay, I offer Exhibit 3 for the

22          record.

23          (Heller Deposition Exhibit 3 was marked.)

24          MR. KUHAR:  Mr. Nichols --

25          MR. NICHOLS:  Yeah.

14

1    MR. KUHAR:  Is that the same as the copies we

2    have?

3    MR. NICHOLS:  It should be.  Now my copy, it may

4    be a little more -- in terms of this particular

5    exhibit, you may not have as much as I have.

6    MR. KUHAR:  Then I don't have a correct copy.

7    MR. NICHOLS:  What do you have?

8    MR. KUHAR:  Well, I'm looking as I go here, but I

9    don't have something called portfolio.

10    MR. NICHOLS:  All right, it should reflect -- You

11    may not have that.  This cover is denominated as

12    a portfolio, and inside of it is a copy of her

13    resume.  You have a copy of her vitae, right,

14    resume; do you not?  Or do you --

15    MR. KUHAR:  I do have what -- It's not labeled as

16    one or the other, but it's a resume or a CV.

17    MR. NICHOLS:  Then what I'm saying here, between

18    the covers of this portfolio is a copy of her

19    resume, which you have.  And then there are also

20    copies of a summary report of substitute teachers

21    as well as then the letters of recommendations.

22    Those are the contents of this particular

23    document.  And as well -- which consists of

24    Exhibit 3.

25    MR. KUHAR:  Well --

15

1          MR. NICHOLS:  As well as two other documents.

2          MR. KUHAR:  Why don't Mr. McEwen and I just look

3          at that in some down time and see if we need any

4          copies be made out of that.  Is that okay?

5          MR. NICHOLS:  Sure, sure.  And just for the

6          record, in terms of the content of this document,

7          Exhibit 3, it is captioned "Standard Application

8          for Teaching Positions in Pennsylvania Public

9          Schools."  And that consists of the contents of

10         this document, Exhibit 3 that is.  Okay.

11  BY MR. NICHOLS:

12     Q.  All right, Exhibit 4, Mr. Heller, consist of

13  voluminous summaries of reports prepared by teachers for

14  whom Miss Wagner has taught.  And I offer these, in the

15  record as Exhibit 4.  This is Exhibit 4 (indicating).  I'm

16  sure you have -- you had an opportunity to review these in

17  the course of her applications?

18         (Heller Deposition Exhibit 4 was marked.)

19         MR. KUHAR:  Well, I'm going to ask the witness to

20         look at them before he answers that question.

21         MR. NICHOLS:  All right, Exhibit 4.

22         MR. KUHAR:  You want to know whether he's seen

23         every piece of paper in there?

24         MR. NICHOLS:  I'm asking if he had an opportunity

25         to review either some or all of the summary

16

1       reports that you see there.

2           MR. KUHAR:  I'm sure you've seen some.

3           THE WITNESS:  I've seen some of them.  These are

4           kept in the specific buildings in which Miss

5           Wagner substituted.  I'm --

6   BY MR. NICHOLS:

7       Q.   And in the course of reviewing her applications

8   on varied times you've seen those, you've reviewed those as

9   a part of her overall application; have you not?

10      A.   Not necessarily.

11      Q.   Have you reviewed some of them?

12      A.   I've reviewed some of them.

13      Q.   Some of them?

14      A.   Yes.

15      Q.   Okay.

16          MR. KUHAR:  Well, Mr. Nichols, the copy of

17          Exhibit 4 I have is about an eighth of an inch

18          thick.  How about you Mr. McEwen?

19          MR. MC EWEN:  Yes.

20          MR. KUHAR:  And the one you have looks about two

21          or three inches thick.

22          MR. NICHOLS:  That is correct.  And for clarity

23          purposes, purposes of clarification is that you

24          have only a partial -- a partial amount of the

25          total submission of Exhibit 4.  Those are all

1   summaries and they -- you have a part of them, of

2   what these are, okay.

3   MR. KUHAR:  Are they part of your claim?  Do you

4   intend to reserve the right to use those at

5   trial?

6   MR. NICHOLS:  Yeah, and for the purposes of

7   establishing her qualifications.

8   MR. KUHAR:  Okay, then I probably should have

9   gotten them already in your Rule 26 initial

10  disclosures.  But in any event --

11  MR. NICHOLS:  Well --

12  MR. KUHAR:  But in any event, we need them today.

13  They're --

14  MR. NICHOLS:  Well, they're available on the

15  stand.  And these were something in which the

16  employer had, okay.  These are something which

17  are already in your possession.

18  ROWENA WAGNER:  You gave this to us.

19  MR. NICHOLS:  They had them already.  You gave

20  this to us.

21  MR. KUHAR:  You're telling me all the documents

22  in Exhibit 4 you received from the district in

23  the course of this litigation?  In other words,

24  from me, personally?

25  MR. NICHOLS:  I received documents -- I received

18

1    some documents from you, and some of these.  Now

2    as to whether I received all of them from you, I

3    will not represent that to you.  The only thing I

4    can say to these, I can -- they're authentic in

5    terms of authentication --

6    MR. KUHAR:  And I did receive some from you.

7    MR. NICHOLS:  -- That you maintain, as the

8    employer maintain.  You can make copies if you

9    wish.

10   MR. KUHAR:  Yes, I --

11   MR. NICHOLS:  Therefore, if you wish to make --

12   MR. KUHAR:  Can you leave them with us, and then

13   we can see whether we think we have them all or

14   not?  And then we can arrange for Mr. McEwen to

15   do that, too.

16   MR. MC EWEN:  Okay, yes.

17   MR. NICHOLS:  For the record is Exhibit 4

18   (indicating).

19   (Off-the-record discussion.)

20   MR. NICHOLS:  Yes, it's an exhibit, I'm offering

21   it for the record as an exhibit.  You're free to

22   duplicate it, of course.

23   MR. KUHAR:  All right, we'll review it and

24   duplicate it.

25   MR. NICHOLS:  All right.

19

1        MR. KUHAR:  So maybe we can set that one aside

2        because we're going to look at these two

3        particularly afterwards.

4        MR. NICHOLS:  All right.

5        MR. KUHAR:  So let's do that, so I don't get

6        confused.  What is in Exhibit 4 that you gave us?

7        Is there any explanation you want to give us

8        regarding the ones you selected to give to Mr.

9        McEwen and me versus the ones you didn't?

10       MR. NICHOLS:  No, the same quality.

11       MR. KUHAR:  Same --

12       MR. NICHOLS:  Same content, just more of them.

13       MR. KUHAR:  Okay, I understand.  Okay.

14       MR. NICHOLS:  Okay, continuing -- Did you have

15       another question, Mr. Kuhar?

16       MR. KUHAR:  No, I don't.

17       MR. NICHOLS:  And Mr. McEwen, any questions?

18       MR. MC EWEN:  No, I think I understand.

19  BY MR. NICHOLS:

20       Q.   Okay, continuing with Exhibit 5.  Mr. Heller, I

21  have pulled aside Exhibit 5 which because is something you

22  prepared, it's a letter you prepared to Miss Wagner, and

23  it's very complimentary.  And for that reason I pulled it

24  out and noted it as Exhibit 5.  And I would like to offer

25  it, Exhibit 5 now, so if I may show it to you (indicating).

20

1    You of course recall having sent that to Miss Wagner?

2    A.    Uh-huh, yes.

3    Q.    And your sentiments express here concerning her

4    work, a lot of talk.  That's a fair statement, isn't it?

5    A.    Could you repeat that again?

6    Q.    Your statement concerning her work, your

7    sentiments expressed in the a letter of June 15th, 2005 and

8    you say at the close of the school year, you take an

9    opportunity to express your -- complimentary on the manner

10   in which you perform your duties.

11       You as the author of the letter to Miss Wagner,

12   expressing your appreciation, your recognition of her work.

13   It's fair to say you -- you are expressing your regard and

14   respect for her work during that school year as a substitute

15   teacher; is that correct?  Is that a fair statement to make?

16   A.    As a substitute teacher, that's correct

17   Q.    Okay.  Exhibit 5.

18       (Heller Deposition Exhibit 5 was marked.)

19   Q.    Also Mr. Heller, Exhibit 6 is a letter, a written

20   communication from Miss Schoonover, Brenda Schoonover.  It's

21   dated April, 2003 and it's from Miss Brenda Schoonover over

22   to Miss Harriet Powell.  Do you know these individuals?

23   A.    I know Mrs. Schoonover.

24   Q.    And who is Miss Schoonover at that -- what

25   position did she -- if any did she occupy with the school

21

1    district at that time?

2        A.   During my employment?

3        Q.   At that time, and this is April of 2003, the

4    letter is dated.

5        A.   She was principal of Second District Elementary

6    School.

7        Q.   Okay.  And Miss Powell, Harriet Powell, you know

8    her?

9        A.   I don't know her personally.

10       Q.   You don't know Miss Powell?

11       A.   I know the name, I don't know her personally.

12   She was not --

13       Q.   How do you know the name?

14            MR. KUHAR:  You have to let him finish, Mr.

15            Nichols.

16            MR. NICHOLS:  Yes.

17       A.   Because I've seen this document before.

18       Q.   Okay.  But you don't know her personally?

19       A.   No, I don't.

20       Q.   Okay.  I'm told that she was a teacher in the

21   school district.  She's now retired?

22       A.   That's correct.

23       Q.   Right.  I note that -- I've looked -- I've read,

24   reviewed the contents of the letter and particularly the --

25   that letter from -- in that part of the written

1   communication from Miss Schoonover to Miss Powell that part.

2   And Miss Schoonover you will note in that communication she

3   asks about Miss Wagner and whether Miss Powell had any

4   concerns.  Miss Wagner had worked, had done student teaching

5   I believe -- substitute -- Rowena Wagner.

6         A.   Field experience.

7         Q.   Field experience for Miss Powell and Miss

8   Schoonover is making an inquiry.  I'm asking were you aware

9   that Miss Schoonover had made inquiries to Miss Powell

10  concerning Miss Wagner's -- the quality of her work?

11        A.   No, I wasn't.

12        Q.   You were not aware of that?

13        A.   No.

14        Q.   Did Miss Schoonover, did she report to you on

15  occasion?

16        A.   She reports directly to the Superintendent, Mr.

17  Dolecki.

18        Q.   Uh-huh.  But on a day-to-day basis, does she

19  report to you?

20        A.   Yes, she does.

21        Q.   What period are we talking about?  What period?

22  I mean, in terms of temporal time, what year are we talking

23  about?  Is it 2003 did she report --

24        A.   From February 18th, 2002 until current, until she

25  retired.

23

1    Q.   February 18th, 2000 --

2    A.   2002.  When I came here as the Assistant

3  Superintendent, February 18th, 2002 until probably I'd say

4  June of 2004 when she retired.

5    Q.   Okay.

6    A.   Mrs. Schoonover.

7    Q.   And she was a principal?

8    A.   She was elementary principal, second district.

9    Q.   And she reported both to you -- Mr. Dolecki and

10  you; is that correct?

11    A.   I guess that's a fair statement.  She reports to

12  both of us.

13    Q.   For what purpose did she report to you?

14    A.   I would say it depends on the situation.

15    Q.   Well, typically I mean --

16    A.   Well, typically if -- Most often if she's having

17  a problem with students that goes beyond the principal, I

18  would deal with her.

19    Q.   Uh-huh.

20    A.   If there was some sort of problem within the

21  school on a day-to-day basis, most often I will have

22  communications with her.

23    Q.   Okay.  What about student teachers, would that be

24  a --

25        MR. KUHAR:  I'm sorry, I didn't hear that.

24

1          MR. NICHOLS:  Student teachers.

2          MR. KUHAR:  What's the question?

3   BY MR. NICHOLS:

4       Q.   Under her supervision, would that matter be

5   brought to your attention?

6       A.   Specifically student teachers?

7       Q.   Uh-huh.

8       A.   If she -- For two reasons, positively or

9   negatively, if she felt that she had a student teacher that

10  was a -- felt was doing a top notch job in her building, she

11  would convey that message to me and the other elementary

12  principals within the school district, yes.

13      Q.   What if the conversed -- What if there conversed

14  not doing a top notch --

15      A.   Most times if they're having a problem she would

16  report it first --

17      Q.   To you?

18      A.   No, to the, supervisor to that university, the

19  supervisor of that specific university.  Very seldom would I

20  get involved in a situation with student teachers where

21  there was a problem.  Almost never.

22      Q.   What about -- I thought I saw somewhere in your

23  job description you deal with student teaching; is that

24  correct?

25      A.   Assignment.

1    Q.    Assignment?

2    A.    Assignment.

3    Q.    Assignment?

4    A.    Approving assignment.

5    Q.    All right.  And what about after assignment, do

6    you have involvement after you make the assignment of

7    student teachers.

8    A.    Well --

9    Q.    I'm looking at your job description here

10    (indicating).

11    A.    Uh-huh.

12    Q.    I saw something with the assignment of student

13    teachers.  Yeah, assign, number four, paragraph four,

14    assigned student teachers to school district.

15    Does that involve any particular involvement after you

16    make the assignment of a student teachers?

17    A.    Not very often.

18    Q.    Not very often.  Yes, okay.  But you did say --

19    Now, I understand your testimony correctly here, I want to

20    understand what your testimony is.  I want to understand and

21    in this particular case, Mrs. Schoonover, as a principal --

22    MR. KUHAR:  It implicates her.

23    Q.    Mrs. Schoonover as a principal --

24    MR. KUHAR:  What about it?

25    Q.    -- Would have brought to your attention problems

26

1    that may have arisen concerning a student teacher.  That's

2    your testimony, isn't it?

3        A.    Possibly.

4        Q.    Okay.

5        A.    If it goes beyond the supervisor of that specific

6    university, it may be brought to my attention.  But to date,

7    I don't believe that I've dealt with a problem concerning a

8    student teacher that I can think of right off the top of my

9    head.

10       Q.    Okay.

11             MR. MC EWEN:  I'd just like to note, Caleb,

12             that's apparently one of the documents you

13             referenced earlier that's not in my packet.  I

14             don't have Exhibit 6.

15             MR. NICHOLS:  Which one?

16             MR. MC EWEN:  Exhibit 6, which is the letter that

17             you've been --

18             MR. NICHOLS:  Okay, it's in the record -- You

19             have an extra copy, okay.  Exhibit 6, okay.

20             MR. MC EWEN:  (Indicating) that, thank you.

21             (Off-the-record discussion.)

22             (Heller Deposition Exhibit 6 was marked.)

23             MR. NICHOLS:  We're still on the record.

24    BY MR. NICHOLS:

25       Q.    One last question on this, Mr. Heller, with

1    respect to Exhibit 6 --

2         A.   Yes.

3         Q.   One is, do you -- Are you familiar with this

4    particular written communication?  Have you seen it before?

5    Are you familiar with it?

6         A.   Yes, I've seen it before.

7         Q.   Could you explain to us the circumstances by

8    which you have seen this before?

9         A.   (No audible answer.)

10        Q.   How you are able to identify it?

11        A.   I think it was -- To be quite honest with you,

12   I'm not exactly sure how I saw this, when I saw this.  It

13   may have been from Mr. Kuhar that -- I can't tell you

14   specifically when I saw it.

15        Q.   Would it be -- If I said that you may have seen

16   it in relation to the PHRC meeting that was held in 2003

17   involving Miss Wagner's complaint, would that be a correct

18   statement?  Would that jog your memory perhaps?

19        A.   I can't say for certain that that was when it

20   was.

21        Q.   Okay.

22        A.   It may have been, but I can't say with 100

23   percent certainty that that's when I saw this.  I don't

24   remember exactly when I saw this.

25        Q.   Okay.

28

1       A.   I remember seeing it but I don't remember -- I

2   can't put a date on it.

3       Q.   I want to turn your attention, Mr. Heller, if I

4   may, to Exhibit 7 (indicating).

5       A.   Uh-huh.

6       (Heller Deposition Exhibit 7 was marked.)

7       Q.   Exhibit 7, for the record, please, you would note

8   is dated November 17th, 2002 and it's, prepared by Miss Joye

9   Pickens.  And Miss Pickens prepared this letter in

10  connection with her sabbatical leave, taking some medical

11  sabbatical and requesting that Miss Wagner replace her as a

12  substitute teacher during her absence.

13       She said she sent a copy of this letter to you.  You

14  do recall having received a copy of the letter?

15       A.   Yes, I recall.

16       Q.   All right.  And that was -- You made an agreement

17  with Miss Pickens that Miss Wagner be allowed to substitute

18  for her during her medical sabbatical?

19       A.   I made an agreement with Mrs. Pickens?

20       Q.   An understanding?

21       A.   No, I never made an agreement with Mrs. Pickens.

22       Q.   Okay.

23       A.   Ever.

24       Q.   Once you received this letter, was there a

25  conversation between you, a discussion between Miss --

29

1    between you and Miss Pickens about this matter?

2         A.   I believe I had a conversation with her on the

3    phone, but never in person.

4         Q.   What was the nature of the conversation?

5         A.   I believe that it was a conversation that we had

6    been interviewing candidates to fill her position as a

7    second district -- as a second grade teacher at Cochranton

8    Elementary School along with a few other openings that we

9    had for the remainder of the year in the school district at

10   the elementary level as well.

11        And that we would respect her recommendation but she's

12   not part of the selection process.  You know, that's pretty

13   much what the conversation consisted of.  I can't be any

14   more specific than that.

15        Q.   Is that the first time that Miss Pickens had

16   called you and talked -- communicated with you concerning a

17   replacement when she took leave, had occasion to take leave?

18        A.   I only, I believe, remember having one

19   conversation with Miss Pickens.

20        Q.   On prior leave concerning this event?

21        A.   Period, one conversation.

22        Q.   Concerning this -- We're talking about this

23   particular Exhibit 7?

24        A.   I don't remember --

25        Q.   But what is memorialized here, set down in

1   writing?

2       A.   That's correct.

3       Q.   We're talking about what's in writing?

4       A.   Yeah, one conversation.

5       Q.   So now, the method by which Miss Pickens as a

6   teacher who was about to take leave, sabbatical leave in

7   this case, it was not uncommon for her or other teachers to

8   write to you and recommend replacements or substitutes that

9   they wished to replace them during their absence, was it?

10  That was not uncommon, was it?

11      A.   I would say that it is.

12      Q.   Well, how would that be uncommon then?  What was

13  -- What was so uncommon about Mrs. Pickens's letter to you

14  --

15      A.   Would you like me to give you an example?

16      Q.   Sure.

17      A.   The second semester of the 2002-2003 school year

18  we had to fill four positions, long term positions for the

19  remainder of the year.  We had two positions -- We had the

20  Cochranton position in second grade, we had two positions at

21  west end elementary school, and we also had a position at

22  second district elementary school.  All right.

23      I did not receive any correspondence from any teachers

24  -- any of those three teachers on making a recommendation or

25  thinking that they can select who's going to fill their

31

1    position while they're on leave.  That's three -- That's 75

2    percent.

3         So I would say it would be a little bit uncommon for

4    me as the Assistant Superintendent to receive a letter like

5    this.

6         Q.   Let me refresh my memory, if you will, how long

7    have you been teaching -- I mean, have you been the

8    Assistant Superintendent here in the district?

9         A.   Since I've been in this district?

10        Q.   What's the year?  Refresh my memory, what's the

11   date, 2000 -- since?

12        A.   No, February 18th, 2002.

13        Q.   February 18th, 2002.  And since that time --

14   Since that time how many requests have you received from

15   teachers who are going to -- who have taken leave for

16   various reasons and requesting to be replaced by some

17   substitute?

18        A.   I can't give you a specific number.

19        Q.   Well, I mean a estimate?

20        A.   Several.

21        Q.   Several.  And in most cases you have -- you have

22   okayed it, right?  You approved it, isn't that so?

23        A.   No, that's false.

24        Q.   Well, why would that be false?

25        A.   Because anything that's considered a long term

32

1    substitute we have most often either at that specific time

2    conducted interviews or prior to that, maybe the start of

3    school, we've conducted interviews and we have a list of

4    candidates that we would draw from to fill those positions.

5        Q.   Yeah, but understand what I'm asking you, I'm

6    saying what about short -- Let's take first short term.

7    Well, short term leave, let's say less than a semester?

8        A.   Uh-huh.

9        Q.   In those cases a teacher writes you and say I

10   want "X" substitute to replace me?

11       A.   Let me --

12           MR. KUHAR:  Just to be clear, the testimony has

13           been the teachers don't normally do that.

14           MR. NICHOLS:  I'm trying to clarify this.

15           MR. KUHAR:  Let me finish.

16           MR. NICHOLS:  Okay.  I want to hear his

17           testimony because I want to know the matter here

18           in terms of short term.

19           THE WITNESS:  I --

20           MR. KUHAR:  My technical -- What I'm saying I'm

21           technically objecting to your question, because

22           it misstated the prior testimony of the

23           witness.

24   BY MR. NICHOLS:

25       Q.   Let's go back, Mr. Heller, short term, let's say

33

1    in short term substitute would be what period we're talking

2    about?  A semester?  Less than a semester?  What are we

3    talking about short term?

4              MR. KUHAR:  It's your question.  Define it.  A

5              minute ago you said less than a semester.  He

6              didn't use that term.

7              MR. NICHOLS:  I used that term.

8    BY MR. NICHOLS:

9         Q.   That is a correct term, isn't it, short term

10   substitute, Mr. Heller?

11        A.   Yes, you could -- We could use short term.

12             MR. NICHOLS:  All right, Mr. Kuhar?

13        Q.   See the questions, as you're the Assistant

14   Superintendent, you run the show.  I don't understand what's

15   so offensive that I can't ask you to clarify the mechanics

16   of your business.  Beside the point, I don't want to get in

17   an argument -- be argumentative.  But you run the show.

18             MR. KUHAR:  Do you have a question?

19        Q.   I'm asking you, when I say short term substitute,

20   what does that consist of?  What period of time are we

21   talking about?  A semester?  Less than a semester?

22        A.   We would consider --

23        Q.   Would you clarify?

24        A.   We would consider a short term to be less than a

25   semester.

34

1          Q.   All right.  Now, in cases where a teacher

2    contemplate going on leave for a short term, it's very

3    common that he or she, that teacher, would recommend someone

4    to replace them; is that correct?

5               MR. KUHAR:  I object to the question in that it's

6               already been asked and answered contrary to

7               the way you're presupposing it.  Go ahead and try

8               to answer the question the best you can.

9          A.   False.  False, they don't recommend to me.  Very

10   seldom.

11         Q.   Would they recommend to Mr. Dolecki?

12         A.   No.

13         Q.   To anybody else in the administration?

14         A.   I would say if they do recommend, make

15   recommendations, suggestions, give their input, it would

16   most often be the building principal in that specific

17   building.

18         Q.   And to the principal?

19         A.   That's correct.

20         Q.   And in turn the principal would relay it to you

21   or Mr. Dolecki up the chain of command?

22         A.   I can't say for sure that they relay every --

23         Q.   I'm not asking every, I'm saying though --

24              MR. KUHAR:  Can you let him finish?

25   BY MR. NICHOLS:

35

1      Q.    I'm saying though would you or Mr. Dolecki
2   receive recommendation?
3            MR. KUHAR:   Finish your answer from the last
4            question.   From those principals . . .  Finish
5            your answer from the last question, Mr. Heller.
6      A.    I would say that I don't know that we receive all
7   the input from the principals.  I can't say that for a fact.
8      Q.    All right.  But let me be clear then on the chain
9   of command here as it relates between the principals and
10  you, the Assistant Superintendent, and Mr. Dolecki, the
11  Superintendent.
12     A.    That's correct.
13     Q.    Such requests or recommendation you say would
14  filter up?
15           MR. KUHAR:   No, he didn't.
16  BY MR. NICHOLS:
17     Q.    Through the principal?  They would come -- they
18  would come to the principal you said, right?
19           They would come to the principal, that's what you
20  said, right?
21     A.    I never said they filtered up.
22     Q.    What did you say?
23     A.    I said that very seldom.  Most often I do not
24  receive recommendations, inputs, suggestions from the
25  specific teacher that goes on leave.  Most often.  Once in a

36

1    great while I do.

2        I would say most of the time if there's

3    recommendations made, it is made to the building principal

4    for where that specific teacher is working.

5        Q.   Do you know what that building -- Upon receipt

6    then that recommendation, what the building principal would

7    then do with that?  Do you know?

8        A.   I would say that what they do most often is they

9    use that in -- as part of the screening process or selection

10   process.

11       Q.   Okay.

12       A.   The input from the teacher.

13       Q.   Okay.  Now, would -- At any time after receipt of

14   the recommendation, all right, and the principal as you

15   alluded to that does the screening, the screening process

16   you say, would the principal, his or her recommendation come

17   to you or Mr. Dolecki?

18       A.   For what position?  Give me -- Give me -- Be more

19   specific.

20       Q.   Any position which a substitute would be

21   requested to stand in or fill in for a teacher who takes

22   leave?

23       A.   It comes --

24            MR. KUHAR:  Wait a minute.  Wait a minute, I

25            thought we were talking about short term

37

1           positions though.

2    BY MR. NICHOLS:

3        Q.   Let's start with short term versus long term.

4        A.   Short term, there's different situations for

5    short term.

6        Q.   All right.

7        A.   It could -- The input or the recommendation could

8    be conveyed to me alone as the Assistant Superintendent --

9        Q.   And that has happened before you say?

10       A.   It's happened.

11       Q.   How often has that happened?

12       A.   I don't know.  I don't know.  I wouldn't even

13   want to guess how many times that's happened.

14       Q.   In what form would it take?  Would it be written

15   --

16       A.   No.

17       Q.   Would it be verbal?

18       A.   It would be verbal.

19       Q.   More often than not verbal?

20       A.   Always.

21       Q.   Uh-huh.

22       A.   From the principal.

23       Q.   Yes.

24       A.   It would be always.

25           MR. KUHAR:  Continue what you were answering in

                                                            38

1              the last question though.

2        A.    And I would say that most often we function as a

3    team in the selection process.

4        Q.    Right.

5        A.    So there's more than one principal involved in

6    who is offered a position in our district.

7              MR. KUHAR:  But are you still asking him about

8              short term now?

9              MR. NICHOLS:  Yeah.

10             MR. KUHAR:  Okay.

11       A.    Yeah, that's the way it works.

12       Q.    Now what distinguishes short term sub from long

13   term?

14       A.    Well, I would consider long term something where

15   there would be board action, where the person is -- it's 90

16   plus days.  The person's paid on the first step per diem.

17       Q.    You said 90 days?

18       A.    Ninety plus.

19       Q.    Days?

20       A.    Yeah.

21       Q.    And that's considered a long term sub?

22       A.    Uh-huh, yes.

23       Q.    Does that carry with it -- does the 90 day

24   trigger bidding rights?

25       A.    No.

1    Q.   It does not?

2    A.   No.

3    Q.   What if any -- What other -- What rights does one

4    who has worked 90 days -- Substitute teacher, let's say who

5    worked 90 days, what rights accrue to him or her from the

6    vantage point of the administration?

7         I'm not asking under the collective bargaining unit,

8    the union, I'm asking the administration.  When you say you

9    work 90 days, you're a long term sub 90 days or more, you're

10   a long term sub, what rights accrue to that person?

11   A.   I don't understand your question.

12   Q.   What benefits?

13   A.   What kind of benefits?

14   Q.   I'm asking, do you know?

15   A.   Are you asking health benefits, sick days?

16   Q.   Let's list them.

17        MR. KUHAR:  Are you saying exclusive of the

18        collective bargaining agreement?

19        MR. NICHOLS:  I'm saying --

20        MR. KUHAR:  That's where all the benefits arise

21        from.

22   BY MR. NICHOLS:

23   Q.   All right, are you able to speak to that in terms

24   of the distinction between long term subs -- short term subs

25   and long term subs.  You mentioned the 90 days and after the

40

1    90 days you mentioned long term sub, right?

2        A.    That's my definition of a long term sub, yes.

3        Q.    Right, and as a consequence though, a long term

4    sub, that is having worked 90 days or more, I'm asking you

5    what benefits accrue, do you know, to one who occupies that

6    status or who has attained that status?

7        A.    As I said earlier, they're paid on the first step

8    per diem within the contract, all right, which they receive

9    all the benefits anybody has for that period of time, 90

10   days plus medical, dental, vision, sick days --

11       Q.    Retirement?

12       A.    Personal days, retirement.  But no seniority or

13   no bidding rights.

14       Q.    You say no bidding rights?

15       A.    No bidding rights, not for 90 days, no.

16       Q.    When would bidding rights kick in?

17       A.    Well, you can have bidding rights if you've been

18   hired permanently.

19       Q.    All right.

20       A.    Okay, and you have to be within a position, a

21   long term position for three semesters, and the bidding

22   process has to be going on while you're in a position,

23   maintaining a position.

24       Q.    Okay.  Is it correct to say that long term

25   substitutes have -- don't have bidding rights?

41

1        A.    Are you trying to confuse me?

2        Q.    No, I'm trying to get a clarification myself.

3        A.    All right.

4        Q.    What is the case?

5        A.    This is about the fourth time I've said this,

6   they do not have bidding rights.

7        Q.    Are they covered by the collective bargaining

8   agreement?

9        A.    In what regard?

10       Q.    In regard to benefits of bidding rights?  Are

11  they covered I should say by the collective bargaining

12  agreement, simply long term substitute?

13            MR. KUHAR:  Okay, he can try to answer this in a

14            second.  I think he's having a hard time

15            answering this because he keeps give you the same

16            answer over and over again.  Thirty seconds ago

17            he explained once somebody works 90 or more days

18            they get first step pay, broken down to a daily

19            basis and they get life insurance, dental

20            insurance and all the other benefits associated

21            with a full-time teacher.

22                So I think he's asking, what is your

23            question other than what he just told you?  What

24            is your question?

25  BY MR. NICHOLS:

42

1    Q.    My further question is beyond then at what point
2    does one qualify for bidding rights on a --
3    A.    I answered that question.
4    Q.    Could you answer it again, Mr. Heller, because
5    it's not clear to me.
6    A.    They have to be hired permanently.
7    Q.    And that means full-time?
8    A.    Full-time, permanent position.  That's different
9    than a long term position.
10    Q.    All right.  You make the distinction then --
11    A.    Where they have to be employed three semesters in
12    long term positions.  And if they are in -- If they're
13    employed the third semester and the bidding process is
14    taking place and there happens to be, you know, a vacancy
15    that they can bid on, then they can move into that position.
16    But they basically have zero seniority.  The vacancy
17    has to occur.  Nobody has been able to bid into it before,
18    they can bid into that position.  It has to be perfect
19    timing almost for that to happen.
20    Q.    Okay.  Full-time -- Full-time people have bidding
21    rights under the collective bargaining agreement?
22    A.    Uh-huh.
23    Q.    Long term substitutes do not have?
24    A.    Correct.
25    Q.    Okay.  Now --

43

1          MR. KUHAR:  Well, I object to that in that you

2          just misstated his testimony.  Once they have

3          three semesters of service a long term substitute

4          would, that was his testimony.

5          THE WITNESS:  Right.

6          MR. KUHAR:  If you want to ask him about that --

7    BY MR. NICHOLS:

8      Q.   Well, how do you -- Do you make a distinction

9    between long term substitute having three semesters and

10   full-time permanent people?  Do you make a distinction there

11   between those people for purpose of bidding rights?

12        Because as I understand your testimony you say long

13   term people -- people who are full-time, permanent, of

14   course, are covered under the collective bargaining

15   agreement for bidding rights; is that right?

16     A.   Correct.

17     Q.   And also long term substitutes who serve for

18   three semesters also have those rights; is that correct?

19   Three semesters, right.  Am I understanding you correctly?

20     A.   To a certain point they have them.

21     Q.   So then I asked you --

22     A.   They have to be working --

23     Q.   Just a moment then.

24     A.   I'm trying to clarify it so you understand.

25     Q.   All right, go ahead.  Go right ahead.

44

```
1          A.   They have been working, school has to be in
2     session in order for them to be able to bid in on a
3     position.  If the position opens up in the summertime,
4     school doesn't take place, they don't have that right.
5          See, I said about three minutes ago, it has to be
6     perfect timing in order for them to be able to bid into a
7     position as a temporary or long term employee.
8               MR. KUHAR:  Their bidding rights expire when
9               their position is over?
10              THE WITNESS:  Right.
11              MR. KUHAR:  That's what he's telling you.  I'm
12              just trying to be helpful.
13              THE WITNESS:  That's well put.
14              MR. NICHOLS:  All right, I'll come back to this,
15              okay.  Exhibit 8, please (indicating).
16              (Heller Deposition Exhibit 8 was marked.)
17    BY MR. NICHOLS:
18         Q.   Exhibit 8.  Mr. Heller, Exhibit 8 is a evaluation
19    -- One is a copy of a evaluation you did in a classroom of
20    Miss Wagner on about November -- I believe the latter part
21    of November, 2002.  And then there's also attached
22    evaluation conducted by Mr. Meader, the principal of the
23    school.
24         And to follow -- step back a moment to Miss Pickens
25    letter notifying you -- November 17 notifying you she was
```

1   taking sabbatical leave and she was wishing Miss Wagner to

2   replace her as a substitute. As I understand it, you then

3   -- Miss Wagner commence as a substitute teacher on or about

4   November 7th, 2002. And then I believe sometime the latter

5   part of November, 2002 you visit her class and you did an

6   evaluation; is that correct?

7       A.    That's false.

8       Q.    Please, correct me then.

9       A.    I did an observation.

10      Q.    An observation?

11      A.    I didn't do an evaluation.

12      Q.    An observation, okay?

13      A.    Okay, there's a difference.

14      Q.    What would be the difference?

15      A.    The difference is an evaluation is based on her

16  performance over a course of time. An observation is based

17  on that particular time period in which I did an observation

18  within her classroom.

19      Q.    Okay. So observation would be just for that

20  period. And that period -- What period are we talking about

21  -- How long a period are we talking about that you observed?

22      A.    In her classroom?

23      Q.    Yes, on that day.

24      A.    It's probably on the sheet. Probably 30, 45

25  minutes.

46

1    Q.    It's not legible.  Have you noticed it's --

2    A.    Thirty-nine minutes I was in there.

3    Q.    Thirty-nine minutes?

4    A.    Yes.

5    Q.    Is that a typical length of an observation, is

6    it, or is it typical that observation be longer or shorter?

7    A.    You want some examples?

8    Q.    Well, I -- You tell me whether 39 minutes is

9    typical?

10    A.    I did 75 observations last year.  I would say

11    that that's equal to the number of minutes that I spent in

12    most of the classrooms last year.

13    Q.    How long?

14    A.    Thirty-nine -- I said this was 39 minutes.

15    Q.    Thirty-nine?

16    A.    I would say it depends.  It depends on the class

17    if --

18    Q.    What would you say the average --

19    A.    It could be 45 minutes, it could be 30 minutes.

20    Most often it was a minimum of 30 minutes.  Sometimes it

21    might only be a 20 minute lesson, but very seldom.  It just

22    depends on what's going on in that particular class or that

23    period.  Secondaries tend to be a little bit longer than the

24    elementary.

25    Q.    Okay.

1       A.   Their class periods are a little bit longer,

2   they're dealing with older students in that they have longer

3   attention spans, so they do different things or they -- At

4   the elementary level sometimes they do, you know, a subject

5   for 30 minutes and then they shift gears and do another

6   subject in order to keep the attention and the interest and

7   that kind of thing.

8       Q.   On this observation -- You say did you an

9   observation?

10      A.   That's correct.

11      Q.   You say this was the first time?

12      A.   The first time I observed Miss Wagner.

13      Q.   Uh-huh.

14      A.   Yes.

15      Q.   And she was -- This is November, 2002.  She

16  started in the fall of 2001.  So she had been teaching for

17  the district a year at the time you conducted the

18  observation?

19      A.   Uh-huh.

20      Q.   Okay.  Now I have Exhibit 8 is your evaluation --

21  observation, the results of it?

22      A.   That's correct.

23      Q.   And also it has Mr. Meader.  It appears here you

24  gave her an unsatisfactory scoring and that Mr. Meader gave

25  her a satisfactory.  And this was within the matter of four

                                                    48

1    days difference.  He's the principal.  You're the Assistant

2    Superintendent.

3         A.    Uh-huh.

4               MR. KUHAR:  What's your question?

5    BY MR. NICHOLS:

6         Q.    I mean, the observation, is there some particular

7    -- Do you -- Doesn't it trouble you that Mr.  -- the

8    principal would come to a very different conclusion than you

9    regarding the quality of Miss Wagner's teaching?  I mean as

10   here I'm asking -- I'm offering this Exhibit.

11        A.    I'm not --

12        Q.    It's there for you.

13        A.    First of all, I'm going to go back to what I said

14   previous to this.  It's not -- It's not an evaluation.

15        Q.    It's observation?

16        A.    It's an observation.

17        Q.    Right.

18        A.    And I wouldn't determine her observation to be

19   unsatisfactory.  I think that there's some areas that I felt

20   as an observer at that specific time there was some areas

21   that needed some improvement.  That's --

22        Q.    So you really --

23        A.    I don't think you can word the unsatisfactory in

24   the evaluation -- in the observation --

25        Q.    Observation?

49

1          A.    Correct.

2          Q.    Okay.  So you're saying it was -- it was -- it

3    was satisfactory then, right?

4               MR. KUHAR:  He just testified --

5          Q.    You said it was not unsatisfactory?

6               MR. KUHAR:  He --

7          Q.    I mean, is it correct to say it was satisfactory,

8    Mr. Heller?

9          A.    Did I say that?

10         Q.    No, I'm asking you though.  You said it was not

11   unsatisfactory?

12         A.    We don't score observations.

13         Q.    Okay.

14         A.    Okay.

15         Q.    All right.

16         A.    We -- They're marked.  You can see at the top,

17   satisfactory, improvement needed, not applicable.  See

18   written below or whatever it says, see written comment.

19         Q.    Right.

20         A.    All right.  In many of -- In the areas within

21   the, I guess you could say the five domains, there are

22   satisfactory, there are a few areas that mention improvement

23   needed, there was a few that say not applicable, and there

24   was a few that have an asterisk, that say see comment below.

25         Q.    All right.

50

1          A.   All right.

2          Q.   This is illegible to me.  I have difficulty, you

3    know -- you know discerning what's here because it's black

4    and it's not clear.

5          A.   I can --

6          Q.   Would you help me?

7          A.   I can decipher it for you.

8          Q.   If you can decipher it?

9          A.   No problem.

10         Q.   In terms of your scoring, and I'm asking you to

11   really interpret your scoring, your system, what score would

12   you put here?

13         A.   I'm not using scoring.

14         Q.   How would you --

15         A.   My intent was not to score this.

16         Q.   How am I to understand the observation assess --

17         A.   The observation is to improve instruction.

18   Improving instruction is going to increase student

19   achievement.

20         Q.   Right.

21         A.   I made some suggestions and recommendations in

22   some areas that I felt needed improvement.  And that's what

23   the asterisks represent.

24         Q.   Okay.

25         A.   Okay.

51

1    Q.   Now, one last question on this document, based

2    upon your observation then, did Miss Wagner pass or fail

3    this observation?

4        A.   I told you, I didn't score it.

5        Q.   You didn't score it?

6        A.   And that was not my intent to go in there and do

7    an evaluation.

8        Q.   All right.  We'll move on.

9            MR. KUHAR:  I need a two minute break.

10           MR. NICHOLS:  All right, let's go off the record.

11           Let's take five minutes.

12           (At which time, 11:20 a.m., a recess was taken
             and the deposition resumed at 11:30 a.m.)
13

14           MR. KUHAR:  We're ready to go.

15           MR. NICHOLS:  All right, we're back on the

16           record now at 11:30 a.m., September 27th, back on

17           the record.

18   BY MR. NICHOLS:

19       Q.   Mr. Heller, continuing with a question posed to

20   you, and I have some more questions to pose to you.  Now, on

21   that particular occasion, the latter part of November, 2002

22   when you conducted an observation on Miss Wagner, did you --

23   There were other applicants for Miss Pickens position, were

24   there not?

25       A.   (Nodding head affirmatively.)

52

```
 1              MR. KUHAR:  You have to be verbal.
 2              MR. NICHOLS:  Please verbalize.
 3      A.    Yes.  I'm sorry, yeah.
 4      Q.    Did you also conduct the observation of any or
 5  all of them?
 6      A.    Out of the four candidates that we selected, I
 7  observed -- I may have observed all four of them out of the
 8  ones we selected, yes, prior to that.
 9      Q.    In a classroom setting?
10      A.    Yes, sir.
11      Q.    And Mrs. Szalewicz did you have occasion to
12  conduct an observation of her?
13      A.    I've observed her, yes.
14      Q.    She was not a substitute teacher in the system at
15  that time, she came from outside the system, didn't she?
16      A.    She had --
17      Q.    I pose that question, how would you conduct an
18  observation of her?
19      A.    I believe that that --
20      Q.    If she's not a substitute?
21      A.    I believe she may have been a substitute.  She
22  had spent a couple years prior to that at Seton --
23      Q.    Seton is not --
24      A.    It's a Catholic school in Meadville.
25      Q.    It's not part of the district --
```

53

```
 1          A.    If I remember correctly --
 2          Q.    It's not part --
 3                MR. KUHAR:  The school district has no Catholic
 4          schools?
 5                THE WITNESS:  Right.
 6    BY MR. NICHOLS:
 7          Q.    Right.  I wanted the record to reflect that, if I
 8    keep probing you for an answer.
 9          A.    I think prior to the 2000 -- I think that she had
10    spent -- I can't be specific or 100 percent sure, but I
11    think she had spent two years at Seton prior to the
12    2002-2003 school year.  And that she was not teaching at
13    Seton at the time and was substituting and was going to
14    graduate school.
15          Q.    Okay.
16          A.    That year.
17          Q.    But you did conduct an observation of her --
18          A.    I think --
19          Q.    -- For this position, for Miss Pickens's
20    position?
21          A.    For the record, I think that I did observe her.
22    We had principals in the district that had observed her.  I
23    don't observe everybody but people --
24          Q.    Now I'm asking you though, can you be sure -- are
25    you sure?
```

1        A.    I said --

2        Q.    Are you --

3        A.    If you're asking me to be sure, I said I think.

4   So I can't be sure that I did, no.

5        Q.    But you made allusion to principals having --

6   doing this function.  Is it possible that someone else, a

7   principal, could have done it?

8        A.    That's what I said, yeah, we have principals

9   within our selection committee that have observed her.

10       Q.    And your -- And your best recollection then is

11  you're not sure you, yourself, conducted an observation of

12  Miss Szalewicz, who was a candidate, applicant for Miss

13  Pickens's position?

14       You're not sure, but it's possible that a principal,

15  some principal, could have done it; is that correct?

16       A.    I know that she had been observed by some of the

17  members of our selection committee, yes.

18       Q.    And you said that you observed four applicants

19  for Miss Pickens's position, correct?

20       A.    No.  No, I didn't.

21       Q.    I thought you said four.  How many did you

22  observe then?  I asked you --

23       A.    I said that we had four positions to fill.

24       Q.    Right.

25       A.    We had four positions that we interviewed for,

55

1  okay, not any --

2      Q.   Inclusive of Miss Pickens?

3      A.   Three others, inclusive of Miss Pickens.  We had

4  Miss Pickens's position, we had Mrs. English's position, we

5  had Mrs. Sampson's position and we had Mrs. Rose's position

6  all open at the same time.

7      Q.   Okay.  And for those position, inclusive of Miss

8  Pickens's position, you interviewed -- you conducted an

9  observation of how many -- how many applicants; do you

10 recall?

11     A.   I don't remember how many applicants we

12 interviewed but we interviewed more than four.

13         MR. KUHAR:  He said observe.

14     A.   Observed?

15     Q.   Observed?

16     A.   I don't know.  I observed -- I know that I

17 observed Mr. Bazylak.  I know I observed Mrs. Shear.

18     Q.   And Miss Smalowitz (sic) --

19         ROWENA WAGNER:  Szalewicz.

20     A.   I observed her a number of times.

21     Q.   But on this occasion, for this occasion?

22     A.   I said before I don't remember --

23     Q.   You don't?

24     A.   Exactly when.

25         MR. NICHOLS:  All right, excuse me.

56

1            (Off-the-record discussion.)

2    BY MR. NICHOLS:

3        Q.    The observations -- Now I have these

4    observations.  Of course, you know, Miss Wagner.  Would you

5    have observation -- Would your observation also be

6    memorialized, be set down in writing of the other candidates

7    that you conducted, that you had --

8        A.    Yeah, usually -- Most often when I observe

9    teachers I use that form, or teaching candidates, yes.

10       Q.    Okay.  All right.  Now Exhibit 9 is an award --

11   arbitration award rendered by an arbitrator, Elliot Newman,

12   and it's dated April 7th, 1999.  And as I understand it, it

13   defines long term substitute by the 90 days consecutive

14   work.

15            MR. KUHAR:  You just have to do your best based

16            on what you remember.  We're not allowed to help

17            you.  What's the question?

18   BY MR. NICHOLS:

19       Q.    My question is, is that binding policy of the

20   district, that particular ruling?  Do you follow -- Do you

21   recognize it --

22       A.    I think that it's pretty much what I exactly

23   recited to you earlier as far as what long term subs when

24   they have bidding rights, from what I've read here, yes.

25       Q.    All right.  Okay, Exhibit 8, please for the

57

1    record.

2              MR. KUHAR:  Nine.

3              (Heller Deposition Exhibit 9 was marked.)

4         Q.   Just to step back a moment, Mr. Heller --

5         A.   Yes.

6         Q.   -- With respect to the applicants for Miss

7    Pickens position, and I understand you said there were four,

8    you interviewed -- did observations for four teachers at the

9    same time, and they were inclusive of Miss Pickens, correct?

10        A.   Four total counting herself.

11        Q.   Right.  Now you said also that you did some

12   observation, but did you also conduct interviews?

13        A.   Yes, we had interviews.

14        Q.   In some cases you didn't do observation, some

15   cases you did interviews, correct?

16        A.   Me, personally, you're talking about?

17        Q.   Well, you or someone acting for you?

18        A.   We did interviews for those four positions.

19        Q.   Uh-huh.

20        A.   Uh-huh, we conducted interviews.

21        Q.   So that didn't involve observations then?  When

22   you said conduct the interviews, that didn't involve

23   observation?  You're making a distinction between

24   observation and interviews?

25        A.   Observation and interviews, yes.

1      Q.    Would you explain for the record the distinction,

2   as you make that distinction between what constitutes an

3   observation, which Miss Wagner was subjected to vis-a-vis an

4   interview, what does that consist of?

5            MR. KUHAR:  I object to the question in that I

6            think it's vague.  If you can try to answer it,

7            go ahead.

8   BY MR. NICHOLS:

9      Q.    Well, distinguish the two, if you will?

10     A.    An observation is when somebody goes in and

11  observes a performance in the classroom.  An interview is

12  when you bring a candidate into a room very similar to this

13  and you have a group of people who are on the selection

14  committee asking the candidate questions.

15     Q.    Okay.

16     A.    That's the difference.

17     Q.    Now in Miss Wagner's case her application for

18  Miss Pickens job, she was subjected to both observation as

19  you said, which you did?

20     A.    Uh-huh.

21     Q.    As well as a interview.  There was an interview

22  process, too, wasn't there?

23     A.    Correct.

24     Q.    She went through both?

25     A.    Yes.

59

1      Q.   But that was not true of all the applicants,
2   right?

3      A.   (No audible answer.)

4      Q.   Not all the applicants went through both, both
5   herself?

6      A.   I can't say that, that's not true.  I would have
7   to say that every applicant that we interviewed also had
8   been observed by one of the members of the interview
9   committee, that's correct.

10     Q.   So your testimony is that all of the applicants
11  for Miss Pickens jobs went through both a interview process,
12  a group of people you say, as well as an observation; is
13  that your testimony?

14     A.   Yes.

15          MR. NICHOLS:  Okay, excuse me.

16          (Off-the-record discussion.)

17     Q.   Mr.  -- All right, before I -- I just want to --
18  I want to go forward with the interview process of dealing
19  with Miss Pickens.  But before I do, just one I want to
20  interpose dealing with another person.

21     All right, do you know -- You know Miss Tammy
22  Costello?

23     A.   Yes.

24     Q.   Okay.  And she's a second grade teacher, first
25  district elementary school?

60

1        A.    That's correct.

2        Q.    And did she not -- she's -- Did she go on

3    maternity leave recently?

4        A.    Yes.

5        Q.    Prior to going on maternity leave did she come to

6    you and request or -- or that Miss Wagner be allowed to

7    replace her during her absence?

8        A.    No.

9        Q.    You don't recall that?

10        A.    No, she didn't I recall that.  I never have had a

11    conversation with her where she recommended Rowena Wagner

12    for her position.

13        Q.    Are you sure of that?

14        A.    Positive.

15        Q.    Okay.  Now Exhibit 10, Exhibit 10 mark for the

16    record please.  Exhibit 10 is the defendants responses to

17    the plaintiff's first set of interrogatories and it was --

18    An answer here was shown on page seven, answer to question

19    number 20 submitted by your counsel, Mr. Kuhar.

20        A.    Uh-huh.

21        Q.    I ask that you look at it, if you will, Exhibit

22    10 (indicating).

23            (Heller Deposition Exhibit 10 was marked.)

24            MR. MC EWEN:  Mr. Nichols, you appear to have

25            given me your original.  If you have a copy I'd

61

1          be happy to swap you if you'd like to retain your

2          original.

3               MR. NICHOLS:  Let me see.

4               MR. MC EWEN:  Thank you.

5          A.   Mr. Nichols, what part of this do you want me to

6     read or all of it?

7          Q.   No, if you reviewed that, starting from per diem

8     -- starting with per diem substitutes.

9          A.   Oh.

10         Q.   That accurately reflects the policy of the

11    district --

12         A.   Uh-huh.

13         Q.   -- As it relates to defining who is a short term

14    substitute vis-a-vis a long term substitute?  This

15    accurately reflects that the school policy -- the school

16    district policy?

17         A.   Yes, yes.

18         Q.   All right.  Exhibit 10, thank you.

19         A.   Yep.

20         Q.   Moving forward Exhibit 11.  Exhibit 11 is as best

21    as I can tell is a job description for a teacher, a job

22    description for a teacher.

23         My question, Mr. Heller, is, is that the same job

24    description that's used for both full-time long term and

25    substitute teachers?  I see no distinction made there as to

62

1    the different types of teachers.  Does that reflect the same

2    job description?

3           (Heller Deposition Exhibit 11 was marked.)

4           A.    Yes.

5           Q.    Okay.  Now, is it also correct to say then that

6    the qualifications that a substitute teacher must satisfy

7    are the same ones that a long term substitute, full-time

8    teacher must meet?

9           A.    Yes.

10          Q.    The qualifications are the same; is that correct?

11          A.    Yes.

12          Q.    Okay, thank you.  Exhibit 12 for the record,

13   please.  Mr. Heller, this is a copy of the complaint that

14   was filed, administrative complaint, filed with the PHRC by

15   Miss Wagner, February 20th, 2003.  You have seen a copy of

16   the complaint?

17          (Heller Deposition Exhibit 12 was marked.)

18          A.    Yes, I have.

19          MR. KUHAR:  I don't have 12.

20          MR. MC EWEN:  Neither do I.

21          MR. NICHOLS:  Okay, that's one I have to make a

22          copy for.  It's a copy -- You probably already

23          have a copy.

24          MR. KUHAR:  If that's what it is.  I'm going to

25          look over his shoulder.  If that's what it is, we

63

1      do have the complaint.  Do you have it?

2      MR. MC EWEN:  I'm not sure, that's why I was

3      checking.

4      MR. KUHAR:  Can you turn the page there so I can

5      see that?

6      THE WITNESS:  Okay.

7      MR. KUHAR:  You can keep going.  I just wanted to

8      see that.

9      THE WITNESS:  Okay.

10     MR. KUHAR:  He's looked at it.

11     MR. NICHOLS:  Okay, all right.  Okay, thank you.

12     THE WITNESS:  Uh-huh.

13     (Heller Deposition Exhibits 13 & 14 were marked.)

14     BY MR. NICHOLS:

15     Q.   Mr. Heller, I now have two documents I'd like to

16     show you, both Exhibit 13 and Exhibit 14 together.  Exhibit

17     13 is a letter prepared by your counsel Mr. Perhacs to the

18     Pennsylvania Human Relations Commission, in particular,

19     Joseph Alder, and it's dated April 7th, 2003.

20     Exhibit 14 is defendants responses to the defendant

21     Crawford Central Education Association first set of

22     interrogatories.  And it's paragraph -- And it's by Mr.

23     Kuhar.  And I want to juxtapose those two documents, both

24     Exhibit 13 and 14 and show it to you.

25     The first question I have is this --

1           MR. KUHAR:  Are you going to give him the

2       documents?

3           MR. NICHOLS:  Just a moment, yeah.

4       Q.   And I want to show you what I'm focusing on.  On

5   page two of Exhibit 13, in his letter, Mr. Perhacs says that

6   "Although it is true that Miss Pickens apparently desired

7   the complainant to serve as her substitute, she was promptly

8   informed by the district administration that she did not

9   have the authority to hand pick her replacement and that the

10  district would follow its normal practice of soliciting

11  applications and interviewing to determine the most

12  appropriate person to serve as the long term substitute."

13  Okay.

14      Now, you have a copy.  You follow me?

15      A.   Yeah, sure.

16      Q.   Now, and we move forward to Exhibit 14, page

17  seven and I will note the answer showing there what it says,

18  "Without waiving defendants objection, the following --" And

19  I'm -- when I say following, I take it they're referring to

20  the list of individuals whose name is shown below, " -- have

21  information regarding the decision not to staff Miss

22  Pickens's position as a long term substitute basis from

23  approximately November, 2002 to June, 2003."

24      That's a manifest palpable inconsistency.  On the one

25  hand in Exhibit 13 Mr. Perhacs is saying they will fill this

65

1    position on normal practice of long term. But here he said,

2    representing here in Exhibit 14, no, it was never our

3    intention, and we have these people to vouch for that, never

4    our intention to fill Miss Pickens's position on a long term

5    basis. That's a palpable inconsistency. Why? Can you

6    explain the inconsistency.

7        A.   I don't understand your question. I don't

8    understand what you're saying.

9        Q.   You don't see the inconsistency?

10       A.   Excuse me?

11       Q.   You don't see the inconsistency between Exhibit

12   13 and 14? It's very manifest to me.

13       A.   What page on 13?

14       Q.   Page -- I was reading from page -- The second

15   page and it's the third paragraph. Third paragraph, second

16   page, Exhibit 13.

17       A.   Third page on Exhibit 13?

18       Q.   Uh-huh.

19       A.   Which paragraph?

20       Q.   The third, the last. And it continues on page

21   three.

22            MR. KUHAR: Starting on two I think.

23       A.   Starting on two.

24       Q.   Last paragraph on page two, continuing on page

25   three.

1          MR. KUHAR:  Starting with although.  He thinks

2          that's inconsistent with this (indicating).  Can

3          you ask your question again if you're done.

4          THE WITNESS:  I'm done.

5     BY MR. NICHOLS:

6          Q.  My question again is the particular statement

7     made by Mr. Perhacs on the last paragraph -- of the third

8     paragraph on Exhibit 13, page two, continuing on page three

9     is inconsistent.  It seems manifestly inconsistent with the

10    statement made on Exhibit 14, page seven, where your counsel

11    represents that it was never the intention of the

12    administration of the district to fill Miss Pickens's

13    position on a long term substitute basis.

14         That's what I'm reading word for word.

15         MR. KUHAR:  I object to the question.  First of

16         all, you're asking him about two documents

17         prepared by two different lawyers, not himself.

18         MR. NICHOLS:  Right.

19         MR. KUHAR:  And secondly, you're not reading it

20         word for word.  It does not say in there the way

21         you characterize the --

22         MR. NICHOLS:  What does it say?

23         MR. KUHAR:  It says what it says.  You're making

24         it an Exhibit.  It says what it says.

25         MR. NICHOLS:  Yeah, it says what it says, the

1                   document speaks for itself.

2                   MR. KUHAR:  Exactly.

3    BY MR. NICHOLS:

4         Q.   I'm asking you simply, it appears to me what

5    would be an apparent inconsistency, do you wish to comment

6    on it?

7         A.   I have no comment.

8         Q.   All right.  Now, also continuing on the Exhibit

9    13, I would ask that you also continue -- continuing on page

10   two.

11        A.   Okay.

12        Q.   On Exhibit 13, the second paragraph, in the

13   middle of the paragraph, Mr. Perhacs continually says "The

14   district has a collective bargaining agreement with the

15   Crawford County Education Association which requires the

16   posting of all such vacancies."

17        Now, the district has a policy that all vacancies,

18   teaching positions must be posted; is that correct?

19        A.   Correct.

20        Q.   And that that policy arises from the collective

21   bargaining agreement, doesn't it, Article 11, collective

22   bargaining agreement as I understand it require a posting of

23   the positions, the description, what must -- the content of

24   the postings, where they should be posted; is that correct?

25        A.   Yes, that's correct.

68

1      Q.    Whose staff has that function?  Who is charged

2   with the performance to ensure that vacancies are properly

3   posted with regard to the posting?

4      A.    That's my office.

5      Q.    That's your responsibility?

6      A.    My responsibility, my office responsibility to

7   create the postings and distribute them to the appropriate

8   buildings.

9      Q.    Now as I understand it then from this, your

10  lawyer Mr. Perhacs represents the policies that all

11  positions or all job categories must be posted; is that

12  correct?

13     A.    Within the collective bargaining association,

14  yes.

15     Q.    Right, right.  Now, in truth and in fact you did

16  not post all the positions, teaching positions within the

17  past four years?  In truth and in fact; is that correct?

18     A.    It depends on how you determine teaching

19  positions.

20     Q.    Well, I mean teaching.  When they're announced as

21  teaching, long term -- long term substitute, full-time

22  positions?

23     A.    We post all full-time positions.

24     Q.    Long term substitute?

25     A.    No, we don't have to.

1      Q.    But you have not posted all long term substitute

2   positions; is that correct?

3      A.    We have not.

4      Q.    But you're telling me here under oath that you

5   have posted all long term substitute teachers -- Correction,

6   all full-time teaching positions during the past four, five

7   years; is that correct?  That's what you're telling me,

8   right, for the record?

9      A.    For the record, we have attempted to post all the

10  full-time positions.  There has been an occasional oversight

11  but that has been brought to our attention by the CCEA.  And

12  I will say that all positions have been posted in the last

13  four, five years.

14     Q.    When you say oversight, what do you mean

15  oversight?  The failure to post the position not be posted;

16  is that what you're saying?

17     A.    For example, according to the contract --

18  according to the contract after August 15th we do not have

19  to post the position.  We don't have to post that position

20  right away.  But we do have to post it at some point.

21         And because, you know, it's a long year, from time to

22  time it escapes you and then you have to post the position.

23  That's the experience I've had and it's been brought to my

24  attention by the CCEA, and we've posted the position.

25  There's been some positions that were -- There were a couple

1    positions maybe that had been posted that shouldn't have

2    been posted and they, you know, had been rescinded.  You

3    know, but otherwise all of them have been posted.

4        Q.    But you use the term oversight.  By that I

5    understand there was some instances where there were no

6    posting or the posting was late; is that correct?  They were

7    not timely?

8        A.    They were timely.

9        Q.    I mean if the position has been filled, certainly

10   you can't say it's timely if the posting has been filled; is

11   that correct?

12              MR. KUHAR:  I object to the question that you're

13              suggesting that has happened.  There's been no

14              testimony that's happened.

15   BY MR. NICHOLS:

16        Q.    I'm asking has that happened in your experience?

17        A.    No.

18        Q.    When you say oversight, can you elaborate on

19   that, what you meant by oversight?  Those instances where

20   there have been oversight?

21        A.    We fill a position -- Everything has been done

22   within the contractual parameters, okay.  I told you one

23   experience that I can remember where we didn't have to post

24   the position was because it was after August 15th, but we

25   did post the position after being reminded by the CCEA.

71

1    That's the only one I can think of to date.  Otherwise,

2    they've all been posted.

3            MR. KUHAR:  Subsequently -- It didn't have to be

4            posted when it arose, but it had to be posted

5            subsequently?

6            THE WITNESS:  Within that year.

7    BY MR. NICHOLS:

8        Q.  You're talking one instance?

9        A.  That's the only instance I can think of at this

10   particular time in the last four years.

11       Q.  You're saying the union complained to you, right,

12   concerning this posting, right?

13       A.  They reminded me.

14       Q.  Was it in the nature of a complaint?

15       A.  It wasn't a complaint.  They just said, did you

16   post this position, I said I think so.  They said, well, you

17   better check and according to our records it's not

18   up-to-date.  And I checked they were right and I made a

19   mistake.

20       Q.  Did the union come to you on other occasions

21   complaining of your failure to post vacancies of teaching

22   positions?

23       A.  When I first became Assistant Superintendent in

24   February of 2002 there was a learning curve and --

25       Q.  On your part?

1        A.    On my part.

2        Q.    And you're saying you dropped the ball then?

3        A.    I never dropped the ball.  I never ever alluded

4    to that at all, dropping the ball.

5        Q.    You alluded to learning curve --

6              MR. KUHAR:  Let him finish his answer.

7              MR. NICHOLS:  Go right ahead.  Go right ahead,

8              please.

9        A.    Let's say the response time in the bidding

10   process was lagging due to being new in the position.  But I

11   never had any complaints from the union regarding that.

12   It's just something that I had to learn.  I quickly learned

13   how to do it and that was it.

14        I don't think I made any errors other than the process

15   was a little bit slow at the beginning.  But otherwise

16   everything goes, it flows.

17        Q.    Also before we leave Exhibit 13, I'm directing

18   your attention further to page three, the bottom -- the last

19   line on page three, Exhibit 13.  And notice -- If you will

20   read, please, Mr. Perhacs says the plaintiff's origin of

21   race was unknown.  Unknown to the respondent.  Of course,

22   you being the respondent, the district.

23        That's not a correct statement, is it?  You don't

24   agree with that statement, do you, even though your counsel

25   made it?

73

1          A.    Let me read it so I understand it.

2                MR. KUHAR:  He's ready.

3                MR. NICHOLS:  Yes.  Yes, Mr. Heller, we're still

4                on the record.

5                MR. KUHAR:  What's your question?

6     BY MR. NICHOLS:

7          Q.    I was asking, you don't agree with that

8     statement, do you, that Mr. Perhacs responded in the

9     district here you didn't know of Miss Wagner's national

10    origin, her race, you didn't know?

11               MR. KUHAR:  What's your question?

12         Q.    I'm asking again, you don't agree with that

13    statement, do you?

14               MR. KUHAR:  I object to the question in that

15               you're not referring to a specific point in time.

16               You want to know whether he knows?

17               MR. NICHOLS:  He can speak for himself.

18               MR. KUHAR:  I'm objecting and I'm deciding --

19               trying to decide whether to have him answer the

20               question.

21               MR. NICHOLS:  I mean, that's your prerogative,

22               counsel.

23               MR. KUHAR:  What's your question?

24    BY MR. NICHOLS:

25         Q.    Again the question is -- Have you read your

1    lawyer's -- counsel's letter, Mr. Perhacs statement that he

2    made and represented in the course of -- to the PHRC

3    concerning that -- the respondent, the district, did not

4    know Miss Wagner's race, national origin.

5        I'm asking you simply, did you agree with that

6    statement or you don't?

7            MR. KUHAR:  Did you agree with that statement or

8            you don't?

9        Q.   Do you agree with that statement, Mr. Heller?  Do

10   you or don't you agree with that statement?  Yes or no,

11   that's all.

12           MR. KUHAR:  I have the same objection regarding

13           there not being a point in time.  But try to

14           answer it best you can, if you can.

15       A.   I would have to say from the way I interpret that

16   statement I would have to say, yes, I agree with it.

17       Q.   You agree with it?

18       A.   Uh-huh.

19       Q.   Now, let me ask you to reconsider that in light

20   of this -- of which we will cover coming up, and that is on

21   the interview which you sat as a member --

22       A.   Correct.

23       Q.   Right, you evaluated Miss Wagner.  And attached

24   to the interview analysis form is some commentary that you

25   prepared I believe, I'm going to ask you to identify.  On

1    that commentary you stated that she was from the

2    Philippines.  You don't disown that, do you?

3         A.    I don't know, I would have to see it.

4         Q.    I'll show it to you (indicating).

5         A.    Okay.

6         Q.    I want to alert you in light of the fact of the

7    statement you just made and in light of your counsel, Mr.

8    Perhacs, having made that they didn't know of Miss Wagner's

9    ethnicity or race, her national origin?

10              MR. KUHAR:  He's been alerted.

11              MR. NICHOLS:  Okay.  Exhibit 13.  Exhibit 14

12              (indicating).

13              MR. KUHAR:  Those are mine.

14              MR. NICHOLS:  Those are yours?

15              MR. KUHAR:  Yes.  Moving forward, 15 rather.

16              (Heller Deposition Exhibit 15 was marked.)

17    BY MR. NICHOLS:

18         Q.    Moving forward to Exhibit 15.  Now, Mr. Heller,

19    we have pretty much crystallized the policy as it relates to

20    the fill in of long term substitute positions.  Long term

21    substitute -- Applicants for long term substitutes you say

22    as a matter of policy are subjected to a interview process;

23    is that correct?

24         A.    That's correct.

25         Q.    And applicants for long term substitute positions

1  also are subjected to observations?

2      A.   By some members of the committee, that's correct.

3      Q.   All right.  Now I'm looking at Exhibit 15.  You

4  have a copy?

5      A.   No.

6      Q.   Your counsel has a copy.

7           MR. NICHOLS:  Mr. Kuhar, will you share it with

8           him?

9           MR. KUHAR:  Sure.

10  BY MR. NICHOLS:

11     Q.   Exhibit 15, I'm -- My position is this and I'm

12  asking you, if you want to as I go down this list, if you

13  wish -- I'm asking for your justification of this.  I'm

14  saying that your theory -- your policy's theory, but you

15  have not followed your policy.

16      And I'm saying, one, with respect to Karen Jamison,

17  Exhibit 15, she was allowed to teach a full year without an

18  interview.  But Miss Wagner was subjected to an interview.

19  How can you justify that under your policy?

20     A.   I wasn't here.

21     Q.   You were not here?

22     A.   That's correct.

23     Q.   Who was here -- Who was in your position then?

24  Who?

25     A.   Mr. Dolecki was the Superintendent at the time.

77

1       Q.   Okay, Mr. Dolecki.  Hopefully we will have an

2   opportunity to speak to this.

3       Richard Arnold, do you know him?

4       A.   No.

5       Q.   He previously worked here I understand as

6   director of curriculum?

7       A.   I don't know him.

8       Q.   Notice what he says, what he will attest to.

9            MR. KUHAR:  Well, I object this isn't a statement

10           by him.  A minute ago you said you were going to

11           go down the list --

12           MR. NICHOLS:  Yeah, I'm going down the list.

13           MR. KUHAR:  If I may continue, you were going to

14           go down the list and ask Mr. Heller if a policy

15           previously described applied to these people.

16           MR. NICHOLS:  Yeah.

17           MR. KUHAR:  You're not asking him about Dr.

18           Arnold, are you, right?

19           MR. NICHOLS:  Okay, we'll move forward then.

20   BY MR. NICHOLS:

21       Q.   Miss Bainbridge, she taught -- she taught for

22   eight weeks without being certified.

23           MR. KUHAR:  What's your question?

24       Q.   My question is, is this not a deviation from your

25   policy?  Do you have a policy -- Now I understand we have

1   not talked about certification, we will take that up.  But

2   I'm asking ahead of time with respect to Miss Bainbridge

3   because she's on the list.  I'm going down the list.

4        My position is this is a deviation from your policy.

5   I'm asking you, can you justify your policy?  This, in light

6   of your policy?

7        A.   Before I answer that, I think I have a few

8   questions for you.  What year did this take place with

9   respect to Mrs. Bainbridge, number one?

10       Q.   I don't have the records.  I don't have the

11  records, Mr. Heller, you have the records.

12            MR. KUHAR:  If you're saying, you're answering by

13            saying you don't have enough information, you

14            don't know?

15            THE WITNESS:  I don't know.

16  BY MR. NICHOLS:

17       Q.   Stacie Boca, she substituted for Miss Hope on

18  maternity leave and she didn't go for an interview.  Miss

19  Wagner was required to go for an interview.  How do you

20  justify it in light of your policy?

21       A.   I don't know.  I'm not sure that I was involved

22  in that.

23       Q.   You just don't know?

24       A.   That's all I can tell you at this point.

25       Q.   Okay.

1       A.   I think you need to have time periods.

2       Q.   What about Heather Hood?

3       A.   I don't know.

4       Q.   Amy Szalewicz, you -- Of course, we just talked

5  about that?

6       A.   Uh-huh.

7       Q.   Okay, Robert Bazylak.  Okay, that's another

8  matter with Mr. Bazylak.  How about Marcie Pifer didn't go

9  for an interview?

10       A.   Marcie Pifer, I cannot respond to that, I wasn't

11  involved.

12       Q.   When you say you were not involved, are you

13  saying -- were you occupying your present position?

14       A.   I wasn't here.

15       Q.   Oh, were you not employed by the district at that

16  time?

17       A.   Correct.

18       Q.   Okay.  When these personnel transactions took

19  place?

20            MR. KUHAR:  That one.

21       Q.   You were not here?

22       A.   That one, number nine.

23       Q.   Number nine.  What about the others?

24            MR. KUHAR:  We've just gone through that.

25            MR. NICHOLS:  He said number nine.  He was

1          specific.

2               MR. KUHAR:  Because that's the one we were at.

3               MR. NICHOLS:  He was being specific.

4    BY MR. NICHOLS:

5          Q.   Let's go back then with respect to the others.

6          A.   Number one --

7               MR. NICHOLS:  He was very specific, he said

8               number nine, okay, nine.  He didn't say all of

9               them, he said nine.

10              MR. KUHAR:  Because that's the one you and he

11              were on.

12              MR. NICHOLS:  Right.

13              MR. KUHAR:  Go back through them again.

14              MR. NICHOLS:  All right.

15              MR. KUHAR:  He already told you he didn't know or

16              you told him --

17              MR. NICHOLS:  What I'm saying --

18              MR. KUHAR:  -- Or you told him to skip it.  But

19              if you want to do it again, do it again.

20   BY MR. NICHOLS:

21         Q.   I want to be clear.  I want the record to be

22   absolutely clear here is you say with respect to some of

23   these people the transaction took place, the personnel

24   transaction, you were not employed.  That's fine.  Okay.

25         And then what I'm saying with respect to these other

81

1    people, could you tell us, were you here?  And you just

2    don't know or -- Were you in your present position and you

3    just don't know and can't testify, or you were not employed,

4    you know?  And then there -- That's what I'm seeking.

5    That's what I want to go back with respect to.

6         Miss Jamison, you were employed here at the time,

7    right?  Here?

8         A.    Wrong, I wasn't.

9              MR. KUHAR:  Right.

10             THE WITNESS:  I stated that earlier.

11             MR. NICHOLS:  All right.

12             MR. KUHAR:  You told him to skip Dr. Arnold.

13   BY MR. NICHOLS:

14        Q.    Okay, and Miss Boca, Stacie Boca?

15             MR. KUHAR:  We're skipping down to Boca.

16        Q.    You were not employed?

17        A.    I don't think I was, no.  I don't remember that

18   one.

19        Q.    Heather Hood?

20        A.    I wasn't here, I wasn't employed.

21        Q.    All right.

22        A.    And then you skipped the next two.

23        Q.    Yeah, and Marcie Pifer, all right.  Exhibit 15.

24        Now Exhibit 16, for the record, please, would you take

25   a moment and look at that because that involves Miss

1   Jamison.  If you will, the last paragraph, first sentence of

2   the last paragraph.

3              (Heller Deposition Exhibit 16 was marked.)

4              MR. KUHAR:  The last sentence -- The first

5              sentence of the last paragraph?

6              MR. NICHOLS:  First sentence of the last

7              paragraph.

8              MR. KUHAR:  Okay, the person who was here before

9              him, that's what you want to ask him about?

10             MR. NICHOLS:  No, what I am asking about is this,

11             Miss Jamison.

12             MR. KUHAR:  The person who was hired before he

13             was.

14  BY MR. NICHOLS:

15      Q.   And the question here is with respect to Miss

16  Jamison, was she interviewed prior to being hired?  Notice

17  what Mr. Perhacs says that Mrs. Jamison's situation is a

18  little different.

19      You know, apparently the way I understand she was not

20  interviewed, not before she was hired, she worked a full

21  year.  That's 2001-2002 school year.

22             MR. KUHAR:  Your first question was whether he

23             knew about it.  Do you know --

24  BY MR. NICHOLS:

25      Q.   Okay, right.  Do you know about it?

83

1          A.   I'm aware of it.

2          Q.   Okay.

3          A.   But I don't know specific information regarding

4     it.

5          Q.   But as an administrator, the Assistant

6     Superintendent of this school district, your aware of the

7     policies, right?

8          A.   Procedures.

9          Q.   Right, the procedures, the policies, all right.

10         A.   They're different.

11         Q.   I won't quibble about that, all right.  Now, with

12    respect to the hiring of Miss Jamison, that is a deviation

13    from your policy, isn't it?

14              MR. KUHAR:  He's already testified he wasn't

15              here.

16         A.   I wasn't here.  I'm not going to answer -- I

17    can't answer it.

18              MR. NICHOLS:  All right, Exhibit 16.  Okay, I got

19              -- Excuse me.  Excuse me, Mark, I have one more

20              matter, I think we ought to take a break for

21              lunch, all right.  That would be all right with

22              you?  One more Exhibit I'd like to cover.

23              MR. KUHAR:  Fine

24    BY MR. NICHOLS:

25         Q.   Exhibit 17, this is with respect to Miss

84

1    Bainbridge, Exhibit 17, if you will look at it.  You might

2    want to look at it because I want to direct your attention

3    to where I have the first yellow sticker.

4          (Heller Deposition Exhibit 17 was marked.)

5    A.    Yeah.

6    Q.    No, the one inside, not the one on top.

7    A.    Okay.

8    Q.    The first yellow sticker.  And there you would

9    note the textual information material, the first two

10   paragraphs we're focusing on and the last sentence thereof,

11   the half sentence after the semicolon.  "However, if a

12   single assignment will exceed 15 consecutive days, the

13   public school entity should request an emergency permit for

14   a long term substitute."

15         My question is, it is possible therefore that for a

16   teacher who teaches by virtue of a emergency permit can

17   become a long term substitute under the policy here

18   enunciated by the Pennsylvania Department of Education, you

19   can reissue, renew -- ask for reissuance of, right?

20   A.    Right.

21   Q.    That is possible, isn't it?

22   A.    Yes.

23   Q.    Have you ever requested a reissuance of the

24   emergency permit for teachers?

25         MR. KUHAR:  Are you asking --

1          Q.   That taught in this district?

2               MR. KUHAR:  Are you asking him personally?

3          Q.   Yeah, you personally, Mr. Heller?

4          A.   Yes.

5          Q.   How often is that the occasion?

6          A.   Very seldom.

7          Q.   On that occasion -- occasions when that occurred,

8     for what length of period were these people requested -- you

9     requested the reissuance of the emergency permit?

10         A.   Usually for the remainder of the year.

11         Q.   So it could have been as long as six months -- I

12    mean a semester, perhaps even longer we're saying, right?

13         A.   Most often it's not.  I would -- It depends.

14    You'd have to give me a specific situation.

15         Q.   But you do recall having done this before you

16    said, right?

17         A.   One time.

18         Q.   One time.  How about your staff, those who acted

19    for you?

20         A.   My secretary --

21         Q.   She could have done it?

22         A.   No, not without me knowing.

23         Q.   Not without you knowing?

24         A.   She does the paperwork, yes.

25         Q.   I see.  And your boss, Mr. Dolecki, would also be

1    involved in this, wouldn't he?

2        A.    I don't think that he -- He could be, but he's

3    not.  He doesn't get involved -- At least not involved in

4    personnel very often.  Not for this kind of stuff.

5        Q.    All right.  Let's move forward to the next -- the

6    second post-it.  Okay, take a moment and read that letter,

7    please.

8        A.    Okay.

9        Q.    Isn't that a situation where Mrs. Bainbridge has

10   worked without being certified?

11       A.    Uh-huh.

12       Q.    She had worked the school year 2002-2003, without

13   -- She's gone on the list, she's been on the list but she's

14   not been certified?

15           MR. KUHAR:  What's your question?

16   BY MR. NICHOLS:

17       Q.    That's my question, that she's worked without

18   being certified; isn't that correct, Mr. Heller?

19           MR. KUHAR:  You're asking him if he knows whether

20           she has worked without being certified?

21           MR. NICHOLS:  Right.

22           MR. KUHAR:  Okay.  Can you answer that question?

23       A.    I would say that she -- My response would have to

24   be that she has worked while she is certified under

25   emergency certificate.

1      Q.   Wait a minute, say again?

2      A.   She has worked under emergency certificate, so I

3  would say she works under the certification.

4      Q.   Are you asking her -- You're telling her, you've

5  been on the list but you're not certified?

6      A.   She has to reapply is what it says.

7      Q.   You also say -- Don't you say that --

8           MR. KUHAR:  You're misreading it.  It says your

9           name was included.  It doesn't mean you have been

10          working without a certificate.

11  BY MR. NICHOLS:

12     Q.   In the second sentence you say our records do not

13  show you have a Pennsylvania teacher certification?

14     A.   What it's saying is it's just reminding her that

15  she had been working under a type 06 and reminding her if

16  she continued to substitute in the Crawford Central School

17  District that she needed to reapply.

18     Q.   It speaks for itself.  It speaks for itself.

19     A.   Exactly.

20          MR. KUHAR:  Do you want to explanation or not?

21          MR. NICHOLS:  No, the document speaks for itself,

22          counsel, thank you.

23          THE WITNESS:  Okay.

24  BY MR. NICHOLS:

25     Q.   Now the last post-it, the second paragraph -- the

1    second paragraph on the last post-it, Mr. Dolecki's letter

2    that accurately states the policy, doesn't it?

3              MR. KUHAR:  I object to the question in that you

4              don't specify in your question what policy to

5              which you're referring.

6              MR. NICHOLS:  The policy that's stated there.

7              MR. KUHAR:  I don't see a policy.  I see a

8              letter.

9              MR. NICHOLS:  Well, I'm going to take it up with

10             Mr. Dolecki, but it says I think quite clearly is

11             that you only can hire substitutes that have an

12             emergency permit only after -- only if after all

13             other substitutes are qualified, certified have

14             been exhausted.

15             MR. KUHAR:  I object to the question in that

16             you're asking him about a letter that you

17             haven't asked him if he's seen --

18             MR. NICHOLS:  I'm asking if it accurately states

19             the policy.  Mr. Dolecki is the author, I'll take

20             it up with him, when I ask him --

21             MR. KUHAR:  Your question is?

22             MR. NICHOLS:  I'm just asking a simply honest

23             reading of this, does it state the policy?

24             MR. KUHAR:  As it currently exists?

25             MR. NICHOLS:  Either then or now.

89

1    BY MR. NICHOLS:

2        Q.    Mr. Heller, you're the administrator.    It's a

3    fair question.    You're an administrator, you run this show.

4    Mr. Dolecki run this show --

5              MR. KUHAR:    Without all the who runs the show, do

6              you have an answer to the question?

7        A.    I've never seen the letter.

8        Q.    You never seen the letter?

9        A.    Huh-uh, no.

10       Q.    But my question still stands though, was the

11   policy accurately stated?

12       A.    That's the procedure.

13       Q.    The procedure.

14             MR. NICHOLS:    All right, let's break for lunch

15             for about an hour, all right?

16             MR. KUHAR:    Yep.

17             MR. NICHOLS:    All right, we'll come back at 1:30.

18             THE WITNESS:    Sure.

19             MR. KUHAR:    All right.

20             (At 12:30 p.m. a recess was taken and the
               deposition resumed at 1:45 p.m.)
21

22             MR. NICHOLS:    Okay, we're back on the record at

23             approximately 1:45 p.m. today, September 27th,

24             2005.    We took a break for lunch and now we are

25             back in a very -- very fulsome mood, feisty mood.

1          Okay, we're back on the record.

2     BY MR. NICHOLS:

3          Q.   Mr. Heller, I'd like to continue.

4          A.   Sure, Mr. Nichols.

5          Q.   With the questioning from this morning.  Before I

6     proceed with Exhibit 18, I'd like to just step back a

7     moment.  With respect to the observations and the

8     interviewing of the candidates for Miss Pickens's position,

9     this morning in a letter you stated -- that you prepared,

10    the observation forms for each of the applicants that you

11    conducted the observation, correct?

12         A.   (Nodding head affirmatively.)

13         Q.   Were those made a part of the personnel file?

14         A.   No.

15         Q.   Not made a part?

16         A.   No, they're not in their file.

17         Q.   Okay.  Because Miss Wagner observation forms were

18    of course in her file.  Is there some particular reason why

19    they were not included in the personnel file of the other

20    applicants?

21         A.   The observation form that I did on Mrs. Wagner is

22    not in her file.

23         Q.   Not in her file?

24         A.   No.

25         Q.   Where would they be maintained if they're not in

1    the file, personnel file?

2         A.    I gave the people a copy of their file or their

3    observation form.

4         Q.    You returned it to --

5         A.    Yes.

6         Q.    -- You gave it to each of them?

7         A.    Uh-huh.

8         Q.    And you didn't maintain a copy as part of their

9    personnel file?

10        A.    Not after they were permanently employed, no, it

11   was prior to.

12        Q.    I see.  Miss Wagner tells me that she paid $25

13   for a copy that she received and that it was maintained in

14   her file.

15        A.    I don't believe it's in her file, not a copy of

16   my observation.

17        Q.    You're not sure?

18        A.    I haven't seen it in there.

19        Q.    You're telling me you didn't keep it in her

20   personnel file; is that right?

21        A.    I don't think it's in her personnel file, no.

22        Q.    She paid $25 she said.

23        A.    For a copy of her personnel file.

24        Q.    And it was in her file?

25        A.    I gave Mrs. Wagner a copy of the observation at

1   the post-conference, but I do not believe that that is in

2   her personnel file.

3        Q.   And it's likewise respective of the other

4   applicants, right?

5        A.   Correct.

6        Q.   So there's no records on file then of this --

7        A.   Of the others?

8        Q.   Right.

9        A.   No.

10       Q.   No records made?

11       A.   Correct.

12       Q.   Maintained, okay.  Moving forward.  Moving

13   forward, Exhibit 18.  Exhibit 18 is a compilation of the

14   work product of the committee that sat and interviewed

15   candidates for Miss Pickens's job.

16       And Mr. Heller, you did participate as a member of

17   that committee; did you not?

18       (Heller Deposition Exhibit 18 was marked.)

19       A.   As a member, yes, I did.

20       Q.   Did you organize the committee, the panel which

21   sat to interview Miss Wagner and others?

22       A.   Yes, I did.

23       Q.   Okay.  What is the proper reference to that

24   entity?  Is it a panel or a committee?

25       A.   I think you can call it what you want.

93

```
 1        Q.   Well, I notice that you were and counsel were

 2   very precise this morning to the extent that I want to be

 3   precise, on the same wavelength with respect to

 4   communicating.

 5        A.   I don't believe I used the word panel.

 6        Q.   Would it be committee?

 7        A.   That's correct.

 8        Q.   Would it be a personnel selection search

 9   committee?

10        A.   Selection committee.

11        Q.   Selection committee?

12        A.   Interview committee.  I don't think there's a

13   standard name for it.

14        Q.   Okay.

15        A.   I think we all know what we're talking about.

16        Q.   You organize the committee, did you?

17        A.   That's correct?

18        A.   Did you select the members who sat on that

19   committee?

20        A.   I -- Yeah, I guess you could say I did.

21        Q.   Is it fair to say you were the chairman of that

22   --

23        A.   I --

24        Q.   -- Committee?

25        A.   I look at it as more of a facilitator than a
```

1    chairman.  I don't think I'm chairman.  Like I said, I'm

2    more of a facilitator.

3        Q.   Were any minorities included on the committee?

4        A.   No.

5        Q.   Were any teachers --

6        A.   No.

7        Q.   -- On the panel?

8        A.   No.

9        Q.   All administrators?

10       A.   Administrators.

11       Q.   Did they report to you?  Did all of them -- Any

12   or all of them report to you?

13       A.   I guess if you look at the flow chart on the

14   hierarchy, I'm above them.  So, yes, they would report to

15   me.

16       Q.   I have here Exhibit 18, and ask it be made part

17   of the record.  And I notice first of all -- I notice first

18   of all that -- First, these documents I have here I should

19   say for the record for purpose of authenticity that Mr.

20   Kuhar provided these to me as part of the initial

21   disclosures.  Mr. Kuhar, as counsel for the district.  All

22   right.

23       Now, I have reviewed the employment interview analysis

24   forms of the applicants and I have here, first of all Miss

25   Szalewicz application.  And she in fact was the applicant

1    who got the job, correct?

2         A.    I guess --

3         Q.    She was the --

4         A.    I guess she is one of the applicants that got the

5    job.

6         Q.    To replace Miss Pickens though, is that --

7         A.    She's the one that was selected to replace Miss

8    Pickens, yes.

9         Q.    And prior to Miss Pickens -- And prior to --

10   Prior to Miss Szalewicz being placed in that job, Miss

11   Wagner had been in that job, right?

12        A.    As a substitute --

13        Q.    As a substitute?

14        A.    That's correct.

15        Q.    And she commands the duties in that position on

16   approximately -- on or about November 7th, 2002 she

17   commenced, correct?  Is that correct, Mr. Heller?

18        A.    I'd have to look.  I can't say for sure.

19        Q.    Okay.

20        A.    I'm not going to say -- It's sometime in

21   November.

22        Q.    Then subsequently there was a -- You conducted

23   the class observation of her, right?

24        A.    Yeah.

25        Q.    Correct?

1    A.    November 22nd.  I saw the date on it when you

2    showed me the form earlier.

3    Q.    And then four days later, approximately four days

4    later, Mr. Meader also conducted observation, class

5    observation of Miss Wagner, correct?

6    A.    That's correct.

7    Q.    All right.  And that of course those observation

8    results or forms have been made a part of the record now.

9    Now, you serving as a facilitator as you put it of this

10   committee, did you -- At the conclusion of the interview,

11   did you collect the forms?

12   A.    Yes.

13   Q.    Okay.  You had an opportunity to review them?

14   A.    Everybody does.

15   Q.    I'm talking about you in particular.

16   A.    Everybody on the committee has an opportunity to

17   review all the forms, yes.

18   Q.    And you had the opportunity --

19   A.    Which includes me.  I'm part of the committee.

20   Q.    Correct, of course.  Now, did you notice that

21   several of the forms were not signed by the evaluators?

22   A.    Most often they are.

23   Q.    Well, if I show you which now is Exhibit 18, Miss

24   Szalewicz, one, two, three -- Three of the, I believe

25   there's six, six members, right?

97

1          A.    I think there were.

2          Q.    Yeah, three of the six members of the committee

3    didn't sign Miss Szalewicz evaluation, interview form?

4          A.    Okay.

5          Q.    Okay.  Miss Hughes -- Well, at any rate there was

6    several of these.  Let's see, Hughes, Rowena, and Nikki

7    Shearer likewise.  And there were two or three not signed.

8    Mark Weathers, Erin, last name spelled, B-O-U-R-Q-U-I-N,

9    E-R-I-N first name.  Not signed properly.  Carolyn Beers,

10   B-E-E-R-S last name.  Miss McElwain interview analysis,

11   Karen Janeson (sic)?

12         A.    Jamison.

13         Q.    Jamison, correct, J-A-M-I-S-O-N.  Chad DuPont.  I

14   mentioned Stephanie Hughes before.  Alicia Foulk.  Stacy

15   Boca.  Blair Lawrence.  David Stearns.  All of these

16   interview -- employment interview analysis forms are

17   deficient in the sense this they are not signed by the

18   evaluator on at least one or two, possibly three instances,

19   okay.

20         Now, Mr. Heller, I notice Stephanie Hughes's form, I

21   looked on that and there's commentary on that on the second

22   page and it appears to be your handwriting.  Yeah, it was

23   your application where you evaluated Stephanie Hughes.  If I

24   might show this to you (indicating).

25         A.    Yes.

1    Q.   Okay.  And you will notice there -- That is your

2    handwriting there, isn't it?

3    A.   I --

4    Q.   Your name appears as the evaluator?

5    A.   I think it is, yeah.

6    Q.   I note there is a comment you made that included

7    in a group there of individuals -- right there that included

8    in that group is Miss Wagner's name?

9    A.   Uh-huh.

10    Q.   And you refer, no way.  That is your comment,

11    isn't it?

12    A.   It's in writing.

13    Q.   Right.  That is your comment, right?

14    A.   That's correct.

15    Q.   That's your writing and your comment?

16    A.   Uh-huh.

17    Q.   And when you made that comment it was in

18    reference to what?

19    A.   Well, I think from a discussion at the end of the

20    interview process as we were considering the rating scores,

21    these were the people that were at the lower end of the

22    rating scale and it was just a reference made that these

23    people wouldn't be in consideration for those four

24    positions.

25         MR. KUHAR:  What was the -- Did you say would or

1           wouldn't?

2               THE WITNESS:  Wouldn't.

3               MR. KUHAR:  Okay.

4    BY MR. NICHOLS:

5        Q.   Okay, thank you.  Miss Szalewicz did get the

6    position?  She got the position?

7        A.   Uh-huh.

8        Q.   And I notice on the scoring here that she scored

9    number nine.  Out of possibly 17, 18 applicants here she

10   scored number nine?

11       A.   Uh-huh.

12       Q.   Why -- What was so compelling about her, given

13   the fact that she got a nine that she would get the position

14   over the other eight who obviously scored higher according

15   to what is shown here on Exhibit 18?

16       A.   I understand what you're saying.  Part of the

17   selection process is that at the conclusion of the

18   interviews there's a lot of discussion that takes place and

19   there's a lot of information that can be shared by the

20   people that have participated in the selection process, part

21   of that committee.

22           And some of the information that is shared is

23   information based on performances within the buildings as a

24   substitute teacher, information shared on observations that

25   certain people have made.  And it can be a group consensus

1    or committee consensus.  We consider two levels at the

2    elementary.  A primary level, which is K through two.  And

3    intermediate level which is three through six.

4        And the committee many times determines who we would

5    feel is stronger at the primary level versus the

6    intermediate level.  Okay, so the rating is -- the rating is

7    significant, but it's not the only determining factor in the

8    selection process.

9        Q.    Okay.  Now two of the candidates of the

10   applicants in this pool were in college at this time, right,

11   when this interview was held; is that correct?

12       A.    Give me their names.

13       Q.    Robert Bazylak and Nikki Shearer?

14       A.    Okay.

15       Q.    That is a fact, right?

16       A.    They were finishing up their student teacher

17   experience.  I think they might have been in their last week

18   when we interviewed them.

19       Q.    But they were still in college at the time when

20   they sat for this interview, right?

21       A.    Robert Bazylak had been a graduate a long time

22   ago --

23       Q.    No, I'm saying at the time though?

24       A.    He was completing his teaching certificate.

25       Q.    Student teaching?

1         A.   Student teaching experience.

2         Q.   But he didn't have his degree?

3         A.   He had a degree.  He had a degree from Allegheny

4  College.

5         Q.   But he was doing graduate work?

6         A.   No, he was doing teacher certification work.  He

7  had a degree from a liberal arts school.

8         Q.   And Nikki Shearer?

9         A.   Nikki Shearer was finishing her student teaching

10  experience.

11         Q.   So that she had not yet received her

12  undergraduate degree?

13         A.   That's right.

14         Q.   And --

15         A.   But the didn't positions didn't start until

16  January.  Keep in mind they had their certificates when they

17  began.

18         Q.   At that time?

19         A.   Yes.

20         Q.   All right.  I notice the questions that the panel

21  posed to the different applicants were different questions

22  --

23         A.   No.

24         Q.   Each applicant had a different question they

25  posed?

1    A.    Each application --

2    Q.    Correction, each of the members of the --

3    A.    Committee.

4    Q.    Committee.

5    A.    Had a different question.

6    Q.    Right?

7    A.    That's correct.

8    Q.    Did the members themselves, the members of the

9    committee form the questions or did you do it in consensus

10   or separately or --

11   A.    We have a file with a bank of questions that's

12   been developed over the years.  I think that -- I don't know

13   how long it's been in place, but it was something that was

14   in place when I came here to Crawford Central School

15   District.  And then, you know, we revise them on a yearly

16   basis.

17   Q.    Getting back to Miss Szalewicz -- Smalowitz --

18   A.    Szalewicz.

19   Q.    Szalewicz, difficult name.  Miss Szalewicz who

20   got the job, who got Miss Pickens job, prior to that she was

21   not working as a part of the school system in the central

22   Crawford -- Crawford Central School District, right?  She

23   was working for Seton High?  Seton High was the Catholic

24   school?

25   A.    Yeah, I explained that to you about three hours

1   ago.

2        Q.   Yeah, I want to be clear on it.

3        A.   She taught at Seton school for two years.

4        Q.   Right.

5        A.   Okay, which I can't tell you the exact years

6   right now, but I know the 2002-2003 school year she was a

7   substitute.  During that year she had taken a leave of

8   absence from Seton, okay, and she decided to go to graduate

9   school.  She was going to graduate school to get a

10  certificate in -- I'm not even sure what it was, okay.

11       So she hadn't been employed at the time that these

12  vacancies occurred, she was not employed at Seton.  The two

13  previous years she was.  Okay, she substituted and she went

14  to graduate school, and we interviewed her.

15       Q.   Okay.  And I'm looking here at her file, her

16  experience component and shows Seton school from August 2002

17  to present.  And that she performed all teaching

18  responsibilities for a kindergarten class from 2001 to 2002,

19  school year.  And a self-contained first grade classroom,

20  2001 -- 2000-2001 school year.  This is what is shown in her

21  --

22       A.   Let me see.  Can I --

23       Q.   -- In her application.  This is what is shown in

24  her application?

25       A.   Yeah, it doesn't say she worked for Seton in

1    2002-2003, which I explained earlier.

2        Q.   But this position was 2002 that we were talking

3    about --

4        A.   The position actually was vacant in 2003, January

5    of 2003.

6        Q.   Yeah, but I mean Miss Wagner started in the

7    position November 7, 2002 to December 20th, 2002.

8            MR. KUHAR:  What's your question?

9    BY MR. NICHOLS:

10       Q.   She already started the position -- So the

11   position was vacant, technically vacant before 2003, wasn't

12   it, and it had to be, she occupied it during that period?

13       A.   That's a day-to-day substitute.

14       Q.   All right.

15       Q.   That's Szalewicz, okay.  Now the fact still

16   stands though doesn't it -- The fact still stands though

17   that when you hired her, Miss Szalewicz that is, when you

18   hired her you -- she was not a part of the system, I'm

19   saying the school district?

20       A.   I believe she was on a substitute list.

21       Q.   You sure she was on a substitute list?

22       A.   I'm pretty sure.

23       Q.   It's not on the -- Wait a minute.

24           MR. KUHAR:  That's his testimony, that he

25           believes that to be true.  I mean if you later

1    are going to prove him wrong, go ahead, but

2    that's his testimony here for purposes of this

3    depo.

4    MR. NICHOLS:  Okay, I would just note for the

5    record what is shown on her background, her

6    education of background and as a -- and is a part

7    of Exhibit 18 and shows for this pertinent

8    period for 2001-2002 she taught full-time at

9    Seton school, okay.

10        I'll leave it at that, let the record speak

11    for itself.

12    MR. KUHAR:  Are you going to include that as part

13    of Exhibit 18?

14    MR. NICHOLS:  Yeah, it's a part.

15    MR. KUHAR:  Not yet.

16    MR. NICHOLS:  What?

17    MR. KUHAR:  Not yet.

18    MR. NICHOLS:  Amy Lawrence -- Yeah, Amy Lawrence

19    -- Lawrence is her marriage name.

20    MR. KUHAR:  I didn't ask about that.  I just

21    wondered as a practical matter is that going to

22    become part of Exhibit 18?

23    MR. NICHOLS:  Right.

24    MR. KUHAR:  And the last time you gave the

25    exhibits to become part of the transcript.  Is

1          that your intent today?

2          MR. NICHOLS:  Yeah.

3          MR. KUHAR:  Then we don't have to worry as much

4              about what's in there and what isn't, right?

5          MR. NICHOLS:  Right.

6          MR. KUHAR:  Okay, just checking.

7  BY MR. NICHOLS:

8      Q.    It is a fact that when you hired her you hired

9  her in violation of Article 11 of the collective bargaining

10  agreement which says first preference is given to those that

11  work within the system, existing staff?  Is that not right,

12  Mr. Heller?

13      A.    I don't think it's in violation.  I don't believe

14  it to be.

15          MR. KUHAR:  Are you talking about Article 11 of

16              the contract?

17          MR. NICHOLS:  Right.

18  BY MR. NICHOLS:

19      Q.    Collective bargaining agreement.

20      A.    They're not part of the bargaining agreement.

21      Q.    What?

22      A.    They're not part of the bargaining agreement.

23      Q.    Yeah, but Article 11, what it provides -- You're

24  familiar with Article 11?

25      A.    I'll have to take a look at it.

107

1    Q.   It speaks for itself.  I mean, you know, it says

2  that preference is given to existing staff.  That is in

3  terms of vacancies, fill in vacancies.  That did not happen

4  with her, okay?

5    A.   I'm going to say I didn't violate anything.

6    Q.   I understand.  That's my statement, all right.

7  Okay, getting back to this issue of observation, you told me

8  this morning that you did -- that all of the applicants for

9  Miss Pickens job were, one, subjected to an observation.

10  All right, two, an interview.  Here, this interview

11  (indicating), that's what you testified this morning.

12      Now, given the fact that Miss Szalewicz was not within

13  the system, the Crawford Central School District system, how

14  did you observe her?

15          MR. KUHAR:  Object to the question.  He's already

16          testified that he thought that she was serving as

17          a day-to-day sub during the '02-'03 school year.

18          That's his testimony.  So how can you ask a

19          question given the fact that you just said

20          something different from what he said?

21          MR. NICHOLS:  Well, you said that -- My

22          understanding you testified all they went

23          through, she was a part of the group.

24          MR. KUHAR:  She what?

25          MR. NICHOLS:  The pool.

1              MR. KUHAR:  What?

2              MR. NICHOLS:  The pool.  One of the pool who was

3          interviewed and observed.

4    BY MR. NICHOLS:

5        Q.   And I'm asking you now -- You may have done --

6    You may have testified, but I'm asking you again to clarify

7    for the record to speak to this issue again, okay.  And that

8    is, did you or did you not observe Miss Szalewicz in

9    connection with her application for Miss Pickens's position?

10   Can you say yes or no?  Just give me a yes or no?

11       A.   Did I not -- I'm going to say this, I do not

12   believe that I interviewed her or I observed her prior to

13   those interviews.  But as I stated earlier, someone on the

14   interview committee had interviewed her, okay.

15             BERNARD WAGNER:  Observed her?

16       A.   Or observed her.

17       Q.   Okay.

18       A.   I'm getting, you know.  And the other thing I

19   need to make clear is this interview was just not for Mrs.

20   Pickens's position.

21       Q.   Right, you made that -- made that clear this

22   morning.

23       A.   Okay, but you keep coming back to that.

24       Q.   But I'm asking --

25       A.   It's not Mrs. Pickens's position, it's Mrs.

1    Pickens's position, it's Mrs. Rose's position, it's Mrs.

2    English's position --

3        Q.    I understand that you said this morning there

4    were four teachers?

5        A.    All right, that's correct.

6        Q.    But the fact that Miss Szalewicz filled the

7    position that Miss Pickens --

8        A.    That's what she was selected for.

9        Q.    For that position?

10       A.    That's what she was selected for.

11       Q.    That is a fact, right?

12       A.    That's a fact, right.

13       Q.    All right.  That's a fact?

14       A.    We can agree to that.

15       Q.    All right.

16       A.    All right.

17       Q.    Okay.

18       (Off-the-record discussion.)

19            MR. NICHOLS:  All right, 18.  Now, 19, Exhibit 19

20            is a batch of interview analysis forms.  And I

21            should note for the record that these were

22            provided to me by your counsel, Mr. Kuhar, on the

23            subpoena.

24            THE WITNESS:  Sure.

25       (Heller Deposition Exhibit 19 was marked.)

1    MR. NICHOLS:  And also I should note at this time

2    that before these documents, Exhibit 19, were

3    submitted to me, the union, through their lawyer,

4    Mr. McEwen, expressed some reservation regarding

5    divulging these and disclosing these forms to us,

6    okay.

7       And the -- We took the position that we were

8    entitled to them, having issued the subpoena for

9    them.  And that upon receipt of the documents

10   submitted to us, we reviewed them and then we

11   will let them know -- I'm referring to let them

12   know, I'm referring to Mr. Kuhar, to whom the

13   subpoena was issued, as well as Mr. McEwen, being

14   the union lawyer, whether or not their submission

15   would be satisfactory.

16      One of the things we asked for in addition

17   to that was the interview analysis forms, which

18   was not provided, has not been provided as of

19   this time by Mr. Kuhar.  Although Mr. Kuhar has

20   assured me that those documents, that the

21   interview analysis form, which is a pertinent

22   part of each one of these documents, which I'm

23   offering Exhibit 19, Mr. Kuhar has assured me

24   they would be forthcoming as of Wednesday.

25   Correct, Mr. Kuhar?

1    MR. KUHAR:  I said that we would not give them to

2    you?  I did not say they were part of these

3    documents.  If you want to organize them in that

4    fashion, you can.  I did say they would be as

5    early -- they would be available as early as

6    Wednesday.  That's what we're shooting for.

7    MR. NICHOLS:  Okay.  All right.  Now, --

8    MR. MC EWEN:  I would just, please, like to

9    clarify for the record the Association's

10    objections the to the original request was based

11    upon the fact that the original request was for

12    the entire personnel file of these various

13    teachers.  And we objected to the release of

14    portions of those personnel files that post-dated

15    their hiring by the district, as we believe that

16    they were not relevant and potentially

17    prejudicial to our clients.

18    MR. NICHOLS:  Okay.

19    MR. KUHAR:  So with that, what's the question?

20    MR. NICHOLS:  The question I'm putting forward,

21    I'm offering these as Exhibit 19 and offering

22    them -- I am putting forward -- In putting them

23    forward I will note with respect to each of these

24    documents based upon my critique of them the

25    deficiencies, and I'd like those noted for the

1    record.

2        And in turn, I would invite Mr. Heller any

3    comment he might wish to make in the form of the

4    justification for this hiring.

5    MR. KUHAR:  Well, I need to be heard on this.

6    MR. NICHOLS:  Yeah.

7    MR. KUHAR:  I know throughout these depositions

8    you've talked about putting things into the

9    record and Mr. McEwen and I haven't really

10   reacted much to that.  You know, I don't see any

11   -- I don't see any point to you critically

12   analyzing what are easily 200 maybe 300 pages of

13   documents during a deposition.  I mean when you

14   say you put things in the record, all that's

15   happened is that they become part of the

16   transcript of the deposition.

17       I mean, if you want to put them before the

18   Court, you've got to do that in a different way,

19   at a different time.  So, I mean it doesn't

20   matter when we're talking about you just putting

21   something in.  But if we're going to spend hours

22   going through this and have you assess what you

23   think are the deficiencies, I have a problem with

24   that.

25       As far as you asking Mr. Heller questions

1    about why certain people were hired, I have no

2    problem with that.

3    MR. NICHOLS:  That's what I'm doing.  Now, let me

4    clarify -- Are you finished, Mr. Kuhar?

5    MR. KUHAR:  I am.

6    MR. NICHOLS:  Did you finish?

7    MR. KUHAR:  Yes.

8    MR. NICHOLS:  Let me clarify why I'm including

9    these documents.  I'm including, be made a part

10    of the record, yes, will be part of the

11    transcript, okay, but the relevance lies in this.

12    As you know, Mr. Kuhar and Mr. McEwen, that the

13    dispositive motion which we are required to file

14    at the conclusion, at the close of the discovery,

15    file with the judge, will be supported -- will be

16    supported by these documented affidavits,

17    depositions.  We know that.

18    MR. KUHAR:  If you put them in the record.

19    MR. NICHOLS:  Yeah.

20    MR. KUHAR:  At that time.

21    MR. NICHOLS:  I mean it would be at that time,

22    Now, the records, what you think -- These are the

23    transcripts, are going to be composed --

24    MR. KUHAR:  Simply because a document or a pile

25    of 300 documents has been made a deposition

114

1        exhibit does not put it into the record for

2        purposes of filing or posing a motion for summary

3        judgment.

4        MR. NICHOLS:  Well, that's your position.  I

5        disagree.  Rule 56 allows it, so we don't have to

6        argue with -- about that.

7        MR. KUHAR:  Well, I am --

8        MR. NICHOLS:  I mean you can state it in your

9        opposition brief, but we know what Rule 56 allows

10       in terms of supporting a motion for summary

11       judgment and we know what the dispositive motion

12       all about it.

13       MR. KUHAR:  I'm not sure we all do.

14       MR. NICHOLS:  Well, that's my view, okay.  That's

15       my view.

16       MR. KUHAR:  In any event --

17       MR. NICHOLS:  That is the purpose why I ask that

18       these be made a part of the record now.  It's not

19       a frivolous gesture.

20       MR. KUHAR:  I didn't object.  You can make

21       whatever you want a part of the record for this

22       depo.

23       MR. NICHOLS:  All right.

24       MR. KUHAR:  But you're going through them and you

25       said -- You announced you were going to critique

1              --

2              MR. NICHOLS:  Yeah.

3              MR. KUHAR:  And make --

4              MR. NICHOLS:  When I say that -- And notice I

5         carefully state, Mr. Heller, if you wish to make

6         comments as I go through the people who were

7         hired and Miss Wagner was not hired for these

8         positions, I invite you to do so, in terms of

9         justification of why they were hired and she was

10        not.

11             MR. NICHOLS:  And I'm going to instruct Mr.

12        Heller not to just offer any random thoughts

13        about peoples names as they are mentioned.  If

14        you're going to ask questions which are otherwise

15        permissible, ask them.

16             MR. NICHOLS:  Okay.

17   BY MR. NICHOLS:

18        Q.   Let's start with Leslie Jensen.  Her file

19   application shows she was hired outside the school district

20   at the time she was hired.  There are no recommendations and

21   there are -- Of course, as to date I have no interview

22   analysis forms.

23             MR. KUHAR:  I don't even have Leslie Jensen on

24        the top of my pile.  What are you looking at?

25             MR. NICHOLS:  You sent them to me.  You sent them

1          to me there in that pile you provided me with

2          these documents.

3          MR. KUHAR:  I'm not I'm not saying I didn't give

4          you the documents --

5          MR. NICHOLS:  I didn't organize them perfectly.

6          MR. KUHAR:  We have to take turns.

7          MR. NICHOLS:  But we will go through these, okay,

8          they're in that pile.

9          MR. MC EWEN:  It's about the fourth one down in

10         my pile, Mark.

11         MR. NICHOLS:  Okay, if you don't care to, I'll

12         just go on, go on to file it.

13         MR. KUHAR:  Leslie Jensen.  You think they're all

14         in here, it's a matter of finding them?

15         MR. NICHOLS:  Yeah, they're all in there.

16         MR. KUHAR:  Okay, I'm looking at Leslie Jensen's

17         resume.

18    BY MR. NICHOLS:

19         Q.   Again, for the record, Mr. Heller, if you wish to

20    comment -- And the nature of my inquiry of you is, Miss

21    Jensen was hired outside the school district, and there are

22    no recommendations supporting her application.  What

23    justified you have hiring her and not Miss Wagner?

24         MR. KUHAR:  Are you --

25         A.   Are you asking me a question?