IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**Rowena Wagner**
**Plaintiff**                                              CIVIL ACTION NO. 04-264 ERIE
                                                                    Judge Sean J. McLaughlin
vs.                                                                ELECTRONICALLY FILED

**Crawford Central School District, et. al.**
**Defendants**

## MEMORANDUM ON LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**I. INTRODUCTION**

Plaintiff Rowena Wagner, a naturalized American citizen of Asian (race) and Filipino (national origin) descent, filed this employment discrimination action in September 2004 and filed an amended complaint, which is the operative document in this matter, on or about October 8, 2004.

Plaintiff had previously filed an employment discrimination complaint with the Pennsylvania Human Relations Commission (PHRC) on February 20, 2003 and received a Right To Sue Letter on or about June 22, 2004.

Plaintiff graduated from Edinboro University of Pennsylvania with a Bachelor of Science Degree in Education in May 2000 and pursuant to applicable state law, obtained certification to teach elementary education, grades K-6, in 2001.

Commencing in 2001, plaintiff began applying to teach in the Crawford Central School District (District). At all times relevant to this lawsuit, Michael E. Dolecki and Charles E. Heller, III, have served and continue to serve as the Superintendent and Assistant Superintendent of the District, respectively.

Plaintiff was hired as a substitute teacher for the District on September 24, 2001 and was notified of this hiring in a letter from Superintendent Dolecki (then, "Acting Superintendent") dated September 26, 2001. (Ex. 1). Plaintiff was told that "The District is pleased to secure the services of a quality individual such as yourself." (Ex. 1).

Up until the filing of her PHRC complaint, plaintiff served as a teacher for the District between 80% to 90% of the school year. Afterwards, the School District drastically reduced her hours. (Ex. 2).

The District also continued to deny plaintiff a long-term substitute position and a permanent full-time teaching job and this year, with plaintiff up for renewal of her teaching certification, intentionally failed to report to the Pennsylvania Department of Education that plaintiff met the required hours of certification and only did so after prompting by plaintiff's attorneys. (Ex. 2 & 3).

1

On or about November 13, 2002, plaintiff commenced a substitute teaching assignment for Ms. Joye Pickens, a second grade teacher, at Cochranton Elementary School and was summarily dismissed by Mr. Heller on or about December 20, 2002. Ms. Pickens had taken time off for hip replacement surgery and plaintiff was told she would hold the position to at least the end of the 2002 Fall Semester, if not to the end of the school year. (Ex. 2 & 4).

As more fully developed below, plaintiff was denied other opportunities for short-term and long-term substitute teaching positions as well as a full-time permanent elementary teaching position.

Plaintiff seeks a full-time permanent teaching position and other appropriate relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. section 2000e, et. seq., sections 1981 and 1983 of the Civil Rights Act of 1866, as amended, 42 U.S.C.A. sections 1981 and 1983, and the Pennsylvania Human Relations Act, 43 P.S. section 951, et. seq.

## II. MATERIAL FACTS

To avoid duplication and ensure brevity, where appropriate, plaintiff will reference defendants' documents in the recitation of material facts and throughout this memorandum of law.

Since September 2001, plaintiff has worked as a substitute teacher for the District, but began to experience a drastic reduction in her hours with the filing of an employment discrimination complaint with the PHRC on February 20, 2003. (Ex. 2). The reduction continues to the present. (Ex. 2).

The PHRC complaint was precipitated by plaintiff being summarily dismissed from a substitute teaching assignment on or about December 20, 2002, but also resulted from defendants' continuing refusal to hire plaintiff as a long-term substitute and full-time permanent teacher. (Amended Complaint No. 12 & Ex. 2).

Plaintiff had been hired to replace Ms. Joye Pickens, a 35 year veteran with the District and a second grade teacher at Cochranton Elementary School. (Ex. 2). On November 5, 2002, Ms. Pickens approached plaintiff with the possibility of replacing her and subsequently recommended plaintiff as her replacement. (Ex. 2 & 4). Plaintiff commenced this position on or about November 13, 2002 with the understanding that she would hold the position at least to the end of the 2002 Fall Semester, which was to conclude on or about January 17, 2003. (Amended Complaint No. 11 & Ex. 2).

On November 22, 2002, Mr. Heller conducted a classroom observation of plaintiff for 39 minutes. The observation instrument, entitled " Report of Classroom Visit", has a "key"that the observer is required to use in describing a teacher's performance. (Defendants' Ex. 3C). The "key" is: "S - Satisfactory"; "NA - Not Applicable"; "IN - Improvement Needed"; and "* - See Written Comment". (Defendants' Ex. 3C). In his deposition, Mr. Heller testified that plaintiff's performance was satisfactory, but she needed improvement in certain areas. (Defendants' Ex. 2, Pgs. 48-50). A review of the observation report will show that Mr. Heller found 6 areas "NA", 2 areas "IN" and 15 areas "S". He made limited comments, but did not report on the use of poor

grammar, a failure to properly manage the class or the now claim of lack of "insight and alertness" and lack of "knowledge of job". (Defendants' Ex. 3C).

On November 26, 2002, Mr. Kurt Meader, formerly Cochranton Elementary School's Principal, conducted another classroom observation of plaintiff for 35 minutes, using the same observation instrument as Mr. Heller. (Defendants' Ex. 3D). Mr. Meader recorded plaintiff's performance as "satisfactory" in 27 areas, "not applicable" in 8 and identified no areas for improvement. (Defendants' Ex. 3D). Mr. Meader observed "[S]tudents were redirected after getting off the subject of the discussion [.] and "[U]pcoming lessons were previewed[.]". (Defendants' Ex. 3D). Mr. Meader did not report on the use of poor grammar or a failure to control or manage the class or a lack of "insight and alertness" or a lack of "knowledge of job". (Defendants' Ex. 3D).

Despite these favorable reports and a prior commitment that she would hold Ms. Pickens' position until the end of the 2002 Fall Semester, which was scheduled to conclude on or about January 17, 2003, plaintiff was abruptly dismissed from the position on or about December 20, 2002. (Ex. 2 & Defendants' Ex. 5).

Since August 2001, plaintiff has applied for over seventy-five (75) long-term substitute or full-time permanent elementary teaching positions with defendants and has yet to be hired. (Ex. 2). She has been invited to just two (2) job interviews ------- in December 2002, for consideration as Ms. Pickens' long-term replacement and in March 2004, after the filing of her PHRC complaint, for a full-time position.

The candidate chosen for Ms. Pickens' position, Amy Szalewicz, a Caucasian, ranked 10th out of an applicant pool of 17. (Ex. 5). Candidates chosen for openings in the 2004-2005 school year had no experience or less teaching experience than plaintiff or were not properly certified.

While defendants claim that most of their available positions have gone to 'internal bidders", since 2002 at least 25 people outside the bargaining unit have been hired for elementary school teaching positions. (Ex. 2). Two (2) of these are minorities, Tammy Foster and Naomi Uy-Moore, both hired after commenced legal proceedings. (Ex. 2).

For the just completed school year, 2005-2006, the defendants went of their way and out-of-state, to hire a teacher of Asian and Filipino descent, Naomi Uy-Moore. Ms. Moore was brought into Pennsylvania and placed on staff without proper certification. She was hired into a position for which plaintiff had applied. After plaintiff questioned this hiring, the District changed the basis for which it sought certification for Ms. Moore, from out-of-state certification to an emergency permit. Nonetheless, this too was in violation of state law requiring the hiring of fully qualified and properly certified candidates where those candidates are available before a District can seek the issuance of an emergency permit. (Ex. 6).

Tammy Foster obtained her teaching certification in 1994; was hired as a teacher's aide in 1999; and only as a teacher in 2004. (Ex. 2, 7 & 8).

Since the filing of her PHRC complaint, plaintiff has been denied short-term, long-term and a permanent elementary teaching position. Her hours have been drastically reduced and the

3

defendants advised her she was not eligible to apply for a teaching position at Cochranton Elementary School.

## II. ARGUMENT
### Standard of Review for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedures (Civ.R.) requires the granting of a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In the instant case, both parties have moved for summary judgment, with plaintiff, in the alternative, seeking a Bench Trial.

An issue is genuine if there is a sufficient evidentiary basis for which a jury (or a fact-finder) could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986) . In evaluating a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party and where the non-moving party's evidence conflicts with the movant's, the Court must accept the non-movant's version as true. United States v. Diebold, 369 U.S. 654, 82 S. Ct. 993, 8 L. Ed.2 176 (1962) and Pastore v. Bell Tel. Co. of Penna., 24 F.3d 508, 512 (3d Cir. 1994). Thus, for example, where defendants claimed to have rejected plaintiff's numerous applications for employment solely on the basis of "relative merit", this Court must draw all reasonable inferences and conflicting evidence in favor of plaintiff.

The party moving for summary judgment bears the initial burden of demonstrating the basis for the motion and identifying evidence of record that establishes the lack of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U. S. 317, 322, 106 S. Ct. 2548, 91 L. Ed.2 265 (1986). The non-moving party must then present evidence of record showing that there is a genuine material issue of fact. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, L. Ed. 2d 538 (1986).

The Court is then presented with deciding "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson at 251-52 and Tabas v. Tabas, 47 F.3d 1280, 1287 (3d Cir. 1995).

A review of the record in its totality, establishes that defendants have not carried their burden. As set forth below, plaintiff herein presents evidence showing that she is entitled to a favorable ruling on her Motion for Summary Judgment or in the alternative, a Bench Trial.

### A.  THE DEFENDANTS REFUSED TO HIRE PLAINTIFF FOR PRETEXTURAL REASONS

4

This lawsuit was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended; the Pennsylvania Human Relations Act, as amended; and Sections 1981 and 1983 of the Civil Rights Act of 1866, as amended. The analytical framework is the same for all. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct.1817, 36 L. Ed.2d 668 (1973), Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997), and Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).

In a line of cases beginning with McDonnell Douglas Corp. and elaborated upon in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed.2d 207 (1981) and St. Mary's Honor Center, et. al. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), the U. S. Supreme Court established the framework for determining whether a plaintiff has established a prima facie case for employment discrimination. McDonnell Douglas dealt with the order and allocation of proof under Title VII and established a three-step burden shifting inquiry. A plaintiff must establish a prima facie case. If she succeeds, the burden shifts to the employer to establish some "legitimate, nondiscriminatory reason" for its actions. If the employer does so, the burden shifts back to the plaintiff to prove that the reason advanced by the employer is a mere pretext for discrimination. It should be noted that this burden shifting analysis does not change, even if the factual situation does. For example, the same analytical framework would be utilized in a refusal to hire case as well as a refusal to promote or in a retaliation case. McDonnell Douglas, Id. at 802, n.13.

In the instant case, plaintiff must establish a prima facie case by showing: 1. that she is a member of a protected group; 2. that she applied for and was qualified for the positions she sought; and 3. that despite her qualifications, she was rejected. Plaintiff Rowena Wagner is of Asian (race) and Filipino (national) descent. Defendants do not contest that plaintiff is a member of a protected group.

Plaintiff Rowena Wagner has filed over seventy-five (75) applications with defendants, seeking both long-term and full-time permanent teaching positions. Defendants do not contest that plaintiff filed numerous applications for employment.

Through her affidavit and other supporting documents, plaintiff has established being denied long-term and full-time employment and being summarily dismissed from a substitute position. Defendants don't deny their rejection of plaintiff; just the basis of that rejection.

Clearly, plaintiff has met the first prong under McDonnell Douglas. The burden then shifts to the defendants to articulate some "legitimate, nondiscriminatory" reason for their actions.

Assistant Superintendent Heller, in Paragraphs 20 and 24 of his Affidavit, stated that Plaintiff was not hired as a long-term substitute or full-time teacher because her interview scores were low, that she used poor grammar, and that she was not ready to manage her own class. Mr. Heller's conclusions are materially at variance with his own classroom observation of Plaintiff on November 22, 2002, Principal Kurt Meader's observation on November 26, 2002 and those of others who worked with Plaintiff daily and observed her classroom performance over a longer period of time: Professor John Lovett, Edinboro University, Supervisor of Student Teaching; Harriet Powell (Teacher at Second District Elementary); Douglas McCullough and Carole Fisher (Teachers at

5

Cochranton Elementary), all of whom found her work to be exemplary. (See Defendants' Ex. 3C-3D & Plaintiff's Ex. 2, with attachment of evaluations and affidavit.)

Defendants have selectively seized upon certain grammatical errors that Plaintiff may have made during the stress of her deposition and seek to magnify those mistakes, suggesting that Plaintiff's use of language is disqualifying.  This is the first time that Plaintiff has learned that her speech was at issue. Defendants raised it for the first time in Mr. Heller's Affidavit and in their Statement of Material Facts. It is not mentioned in Mr. Heller's class observation dated November 22, 2002 nor Mr. Meader's dated November 26, 2002. Neither gentlemen raised it with her in separate conferences held on December 3, 2002 (by Mr. Meader) and December 6, 2002 (by Mr. Heller). (Ex. 2). Nor is it mentioned in interviewing notes dated 2002 and 2004. (See Defendants' Ex.3A-3B).

Professor Lovett specifically stated "Although she had a dialect, her speech and grammar were never a concern. She had a clear, commanding voice, and good classroom control."(See Prof. Lovett's evaluation attached to Exhibit 2.).

Other than Mr. Heller, no one, not Superintendent Dolecki, Mr. Meader, Ms. Powell, Mr. McCullough nor Ms. Fisher, found that Plaintiff had a problem with grammar.

Similarly, a review of the above mentioned exhibits, will find that there is no evidence to support the assertion that Plaintiff lacks the ability to teach and manage her students. In his deposition, Mr. Heller testified that even though he noted certain areas for improvement, Plaintiff's performance was satisfactory. (Defendants' Ex. 2, Pgs. 48-50). Mr. Meader essentially gave Plaintiff "flying colors". Again, those educators who worked with plaintiff the most, found her work in these areas to be exemplary.

Plaintiff's treatment is similar to that of other minorities who have tried to become full-time teachers or advance within the District or hold on to a position once it has been obtained. This Court is asked to take judicial notice of <u>Armendia P. Dixon v. Crawford Central School District, et. al.</u>, at 83-0306 Erie; a case involving an African-American woman and her long struggle to become a principal within the District. Look at Tammy Foster, another African-American, who obtained her teacher's certification in 1994, but was only hired as a substitute teacher and later a teacher's aide before being hired as teacher in 2004, after Plaintiff filed her PHRC complaint. Look carefully at the small number of minority teachers; currently there are only three (3) at the elementary level and two (2) were hired after legal proceedings began, Tammy Foster and Naomi Uy-Moore. Presently pending before this Court is <u>Claudette deLeon vs. Crawford Central School District, et. al.</u>, at 05-126 Erie, a case involving a Hispanic-American and the District's efforts to get rid of her.

Crawford Central School District has a long history of mistreatment of minorities. Elias Allen, a free African-American, sued to desegregate Crawford County's Public Schools in the Court of Common Pleas of Crawford County, PA, No.56 November Term,1880.

The Third Circuit has held that "proof of a discriminatory atmosphere may be relevant in proving pretext since such evidence 'does tend to add color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." <u>Ezold v.Wolf</u>, Block, Schoor, and Solis-Cohen, 983 F.2d 509 (3d Cir. 1992). To establish a hostile work

6

environment Plaintiff must establish that she was discriminated against and that discrimination is "pervasive and regular." Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001). With regard to herself, Plaintiff has established that she has applied numerous times for elementary teaching positions, both full-time and as a long-term substitute or been recommended for such; that she was summarily dismissed from a substitute position on December 20, 2002, even though she had been told she would hold the position at least until the end of the 2002 Fall Semester; and that she was led to believe that the only way she could get a full-time position was to substitute. The defendants have essentially limited plaintiff to subbing on an "as needed basis". Thereby, preventing her from obtaining bidding rights under their Collective Bargaining Agreement and a related Arbitrator's Decision, which would assure her of a full-time job.

The Third Circuit has noted that most employment discrimination cases tend to turn on the third prong of the McDonnell Douglas test, i.e., the pretext stage. The Third Circuit application of the burden-shifting analysis of McDonnell Douglas/ Burdine/ Hicks, in Fuentes v. Perskie, 32 F.3d 759 (3d 1994), is instructional in this case.

Throughout the "burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Once the employer has met its burden of production, i.e., articulated some legitimate, nondiscriminatory reason for its action, the burden of production "rebounds to the plaintiff , who must now show by a preponderance of the evidence that the employer's explanation is pretextual ((thus meeting the plaintiff's burden of persuasion).)" Id. at 763. The Third Circuit elaborated:

> At trial, the plaintiff must convince the fact-finder '*both* that the reason was false, *and* that the discrimination was the real reason.' (Citing Hicks at ---- U.S.----, 113 S.Ct. 2752, 2754 and 2749; additional quotations omitted.) ... The test is whether the plaintiff ultimately persuades the fact-finder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the fact-finder's rejection of the employer's proffered evidence are circumstantial evidence of unlawful discrimination.(Citing Hicks at 2749). Supra.
>
> To prevail at trial, the plaintiff must prove not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision, that is, that but for the protected characteristic, the plaintiff would have been hired (or promoted). (Referring to Hazen Paper Co. v. Biggins, ---- U.S. ----, 113 S. Ct. 1701, 123 L. Ed.2d 338 (1993). Supra at 764.

The dispositive issue is whether Plaintiff was qualified for the positions that she applied for or whether the Defendants' asserted reasons for refusing to hire her are true and believable. The qualities of Plaintiff which the Defendants have found to be unsatisfactory are largely "subjective", qualifications, i.e., management and control of classroom, proficiency in use of language, and insight and alertness. In Fowle v. C. & C. Cola, 868 F. 2d. 59 (3d Cir. 1989), the Third Circuit ruled that subjective qualifications for a job should be evaluated at the later stages of the McDonnell Douglas/Burdine analysis.

In <u>Weldon v. Kraft,</u> 896 F.2d 793 (3d Cir. 1990), the employer argued that the employee was not qualified because of his poor performance evaluations which the employee disputed. The Third Circuit determined that the employee had made out a prima facie case solely on the basis of an uncorroborated deposition, reversed the dismissal of the discrimination claim, and remanded the case to the district court for trial. Here, we have more, including Plaintiff's deposition; performance evaluations and affidavit by those who actually worked with Plaintiff; Mr. Heller's and Mr. Meader's favorable evaluations; and the hiring of minorities after Plaintiff's lawsuit.

In <u>Weldon,</u> the Third Circuit reminds us that subjective evaluations are more susceptible to abuse and more likely to mask pretext. <u>Id.</u> at 798, quoting <u>Fowle</u> at 64-65. This is especially true where, as here, the Interview Forms are themselves subjective and the Conveying Coordinator is the immediate supervisor of the Interviewing Committee Members.

Further, subjecting Plaintiff to a language proficiency and grammar test, but not other applicants, is prohibited by <u>Griggs v. Duke Power Co.</u>, 401 U. S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971).

Finally, since 1990 Defendants have hired relatively few minority teachers out of a total teaching staff of 300, with two (2) being hired after Plaintiff instituted legal proceedings. (Exhibit 10). A Plaintiff alleging disparate treatment may use statistical evidence regarding an employer's general hiring practices at the pretext stage to rebut the employer's purported nondiscriminatory explanation. Evidence relating to company-wide employment practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual raises a discriminatory motive. <u>Hollander v. American Cyanamid Co</u>., 845 F.2d 80 (2d Cir.1990).

The Defendants' refusal to hire Plaintiff is because of her race and national origin, not her speech, class management skills or teaching ability.

### B. THE DEFENDANTS DISCRIMINATED AGAINST PLAINTIFF WHEN SHE WAS SUMMARILY DISMISSED

On or about December 20, 2002, plaintiff was summarily dismissed from a teaching position in which she was employed to replace Ms. Joye Pickens for the 2002 Fall Semester, which ended on or about January 17, 2003. (Amended Complaint, Paragraph 26(i) & Ex. 2). Plaintiff obtained the position on the recommendation of Ms. Pickens, a second grade teacher and a 35 year veteran of the District, which was reduced to writing in a letter dated November 17, 2002. (Ex. 4). The letter set forth plaintiff's teaching ability and the qualities she would bring to the classroom. (Ex. 4). Ms. Pickens testified that she and Mr. Heller had an agreement that Plaintiff would be her replacement until at least the conclusion of the semester, if not until the end of the 2002-2003 school year. (Defendants' Ex. 5, Pickens' Deposition, Pgs.14-17 ). Ms. Pickens further testified that she was surprised when Mr. Heller summarily dismissed plaintiff and that this event was different from the substitute employment practice that had been observed by the District during her 35 year history with the District. (Defendants' Ex. 5, Pickens' Deposition, Pg.16).

Superintendent Dolecki testified that he knew of no other instance in which a substitute teacher, having assumed her duties upon the recommendation of the permanent teacher, was abruptly dismissed. (Ex. 9, Dolecki's Deposition, Pg. 82).

In his Affidavit, Mr. Dolecki stated that teachers are not permitted to select their long-term substitutes. Plaintiff does not question the District's authority to hire teachers. Plaintiff challenges the District's departure from an established employment practice for substitute teachers and the manner in which Plaintiff was dismissed in December 2002. Both raised questions of whether Defendants discriminated against Plaintiff. Based upon the circumstances by which plaintiff was employed to replace Ms. Pickens for a discrete period, she was justified in her expectations that she would not be treated materially differently and more harshly or less favorably than other substitute teachers employed by the School District.

There was no compelling reason for the School District to have departed from its longstanding practice and summarily dismissed plaintiff as and when it did. On November 22, 2002, Mr. Heller conducted a classroom observation of plaintiff for 39 minutes. The observation instrument, entitled " Report of Classroom Visit", has a "key" that the observer is required to use in describing a teacher's performance. (Defendants' Ex. 3C). The "key" is: "S - Satisfactory"; "NA - Not Applicable"; "IN - Improvement Needed"; and "* - See Written Comment". (Defendants' Ex. 3C). In his deposition, Mr. Heller testified that plaintiff's performance was satisfactory, but she needed improvement in certain areas. (Defendants' Ex. 2, Pgs. 48-50). A review of the observation report will show that Mr. Heller found 6 areas "NA", 2 areas "IN" and 15 areas "S". He made limited comments, but Mr. Heller did not report on the use of poor grammar, a failure to properly manage the class or the now claim of a lack of "insight and alertness" and "knowledge of job". (Defendants' Ex. 3C).

On November 26, 2006, Mr. Kurt Meader, then Cochranton Elementary School's Principal, conducted another classroom observation of plaintiff for 35 minutes, using the same observation instrument as Mr. Heller. (Defendants' Ex. 3D). Mr. Meader recorded plaintiff's performance as "satisfactory" in 27 areas, "not applicable" in 8 and identified no areas for improvement. (Defendants' Ex. 3D). Mr. Meader observed "[S]tudents were redirected after getting off the subject of the discussion [.] and "[U]pcoming lessons were previewed[.]". (Defendants' Ex. 3D). Mr. Meader did not report on the use of poor grammar or a failure to control or manage the class or a lack of "insight and alertness" and "knowledge of job". (Defendants' Ex. 3D).

By letter dated May 23, 2003, Attorney Richard Perhacs, Solicitor for the School District, implicitly represented to the PHRC that in conducting formal interviews in December 2002, for Ms. Pickens' position and three (3) other long-term substitute positions, none of which were posted, the School District was not following formal policy of the District. (Exhibit 5). A careful review of Mr. Dolecki's Affidavit (Defendants' Ex. 1) and Mr. Heller's Affidavit (Defendants' Ex. 3) will reveal neither claims that long-term substitutes or full-time teachers are required to undergo a classroom observation. In filling Ms. Pickens' position, the School District followed neither formal policy nor established practice.

On page 5 of their memorandum, Defendants have misstated plaintiff's allegation contained in Paragraph 26(i) of the Amended Complaint. Plaintiff, among other things, alleged defendants deviated from its customary practice in hiring long-term substitutes. Superintendent Dolecki's Affidavit and Deposition, Ms. Pickens' Deposition and even Mr. Heller's Affidavit and Deposition confirm a departure from the District's established practice of employing substitute teachers**;** a departure apparently not announced to the faculty.

9

The Defendants Employed A "Double Standard" In Hiring Long-Term Substitute Teachers In Violation of Title VII

Throughout her efforts to teach, Plaintiff was given the opportunity for one (1) potential long-term substitute position, Ms. Pickens'. (Ex. 2). In Paragraph 26(a) of the Amended Complaint, Plaintiff alleged that she was required to undergo interviews for teaching positions, but others who were appointed as long-term substitutes did not. In Paragraphs 11, 12 and 13 of his Affidavit, Mr. Heller states that candidates for long-term substitute teaching positions must undergo an interview and classroom observations, except in certain specific circumstances. In practice, the School District has not faithfully followed this purported procedure. For example, Stacie Boca, a Caucasian, worked as a long-term substitute teacher at First District Elementary at the request of Ms. Hope, who was on maternity leave. Ms. Boca did not go through an interview process. (Ex. 2). Heather Hood, a Caucasian, served as a long-term substitute teacher at First District Elementary for Ms. Martin, who was also out on maternity leave. Ms. Hood did so at Ms. Martin's request and without having to be interviewed. (Ex. 2). Marcie Pifer, a Caucasian, replaced Ms. Darnell Terry who was out on maternity leave. Ms. Pifer was not interviewed. (Ex. 2). Karen Jamieson, a Caucasian, was allowed to teach an entire school year from August 2001 to June 2002 as a long-term substitute teacher without having to undergo an interview, again contrary to the assertion made in Mr. Heller's Affidavit.

During a conversation with the Cochranton Elementary School Principal, Mr. Kurt Meader, Plaintiff was told the District's hiring practice for long-term substitutes involved full-time teachers requesting specific individuals who usually got the job. Plaintiff got the job, she just wasn't allowed to keep it.

Finally, a review of Mr. Dolecki's and Mr. Heller's Affidavit, will reveal that while each claimed a candidate for a long-term substitute position must undergo an interview neither claimed the candidate must undergo a classroom observation; something Plaintiff had to do on November 22 and 26, 2002. (Defendants' Ex. 1, Paragraph #3 (Dolecki's Affidavit) & Ex. 3, Paragraphs #11 & 13 (Heller's Affidavit); and Plaintiff's Ex. 2).

### C. PLAINTIFF'S MARCH 2004 INTERVIEW AND THE SUBSEQUENT EMPLOYMENT OF LESS QUALIFIED CANDIDATES WERE IN VIOLATION OF TITLE VII

In paragraph 26(b) of the Amended Complaint, Plaintiff alleged that the Defendants hired long-term substitutes who were inexperienced and less qualified than she. Plaintiff conducted a comparative analysis of the professional backgrounds of the candidates who constituted the pool of applicants in March 2004. (Defendants' Ex. 3B). Plaintiff was not one of the nine (9) candidates selected to commence employment in the 2004-2005 school year. In their Memorandum of Law and Mr. Heller's Affidavit, Defendants stated the successful candidates interviewed better than Plaintiff, had other qualifications she lacked, and had higher interview scores. Defendants asserted Plaintiff made grammatical errors during her deposition. It is claimed that some of the interviewers noted a poor use of grammar. Based on Plaintiff's Reply, including supporting documentation, Defendants' assertions are unsubstantiated and seriously discredited.

The comparative analysis conducted with regard to the 2004 interviews and hirings disclosed that in some instances Plaintiff's comparators were less experienced and less qualified than Plaintiff. For example, Jennifer Steffanucci was hired immediately upon completion of Edinboro University in 2004 without any prior teaching experience, whereas, Plaintiff had served approximately three (3) years as a substitute teacher. Similarly, Erin M. Bourquin, Danielle Morris, Nikki Shearer, and Mark Weathers had no prior teaching experience when hired in 2004. Marcia Pifer had less teaching experience when hired in 2004 than Plaintiff. Had Karen Jamieson not been allowed to teach a full-year, 2001-2002, as a long-term substitute without having to undergo an interview she would not have enjoyed a decidedly unfair advantage over Plaintiff when they competed for a position in 2004.

In addition to hiring those with no or less teaching experience than Plaintiff, the District hired individuals who were not certified. Naomi Uy-Moore, an out-of-state applicant of Asian and Filipino descent, was hired in April 2005, but without proper state certification for out-of state-teachers; Susan Baker was hired in September 2001, but not certified until June 1, 2002; Leslie Jensen was hired in May 2004, but not certified until October 1, 2004; Lisa Shuffstall was hired in May 2004, but not certified until August 1, 2004. (Ex. 6). The District made these decisions in violation of state law and with full knowledge that it had a fully qualified and certified candidate in Plaintiff.

Interestingly, rather than correct any of these situations, the District chose, to compound matters with Ms. Moore by obtaining an emergency permit for her in violation of state law, which again requires the hiring of fully qualified and certified applicants before resort can be made to other candidates. (Ex. 6).

Plaintiff Was Not Evaluated By A Lawful, Objective, And Fair Criteria

The Commonwealth of Pennsylvania has established the minimal qualifications that a teacher must possess. The District failed to define those additional qualifications, if any, to which it held Plaintiff. The criteria on which Plaintiff was evaluated was ambiguous, arbitrary, subjective and highly susceptible to abuse. Plaintiff never knew what she had to do in order to be successful because the purported criteria was imprecise and not known.

A review of the Employment Interview Analysis Form and the notes of some of the evaluators will show the subjective nature of the instrument and the almost total lack of guidance given to the evaluators in grading the candidates. (Defendants' Ex. 3A-3B). For example, there is no guidance given with regard to how a candidate's previous work experience, if any, should be weighed, including substitute experience. The instrument leaves it up to each evaluator to define the various teaching "traits" (such as, "insight and alertness") or the measurement (such as, "satisfactory"). Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) and Lannin v.Septa, 308 F.3d 281 (3d Cir. 2002) speak to evaluation methodology and ensuring that the instrument used related to those actual skills required to do the job.

Plaintiff's Fifth Request for the Production of Documents attempted to obtain information on Defendants' methodology. The Response was largely non-responsive in that little, if any, information was provided that established the validity of Defendants' approach. The scoring and evaluation of Plaintiff had no correlation with Plaintiff's potential or actual performance in the

11

classroom, especially when viewed in light of her actual performance as a substitute and student teacher.

Finally, when Plaintiff's experience and skills are considered next to those with little or no experience, it is difficult to see how the evaluation instrument was used in a fair and objective manner.

While a school district has some discretion with respect to evaluating applicants, it must do so consistent with Federal and State Anti-Discrimination Laws.

Violation of Nepotism Statute

Brian Mahoney was hired as a substitute teacher for the school year 2000-2001 and as a full-time teacher in July 2002. Mr. Mahoney's father-in-law, Mr. Douglas Stanton, the Principal at Neason Hill Elementary School, was a member of the Selection Committee when Mr. Mahoney was hired as a full-time teacher.  Mr. Stanton's presence violated applicable provisions against nepotism. Where nepotism has a disparate impact on minorities, it can constitute racial discrimination. Thomas v. Washington County School Board, 915 F. 2d 922 (4th Cir.1990).  Mr. Heller testified that the District did not have procedures in place to screen applicants for the purpose of ensuring compliance with the Commonwealth's Nepotism Statute; that he did not know whether the Board had any procedures in place; that the hiring of Mr. Mahoney was unacceptable; that he acknowledged and took responsibility for the violation; that he brought the violation to the Board's attention; and that the Board, nonetheless, hired Mr. Mahoney. (Defendants' Ex. 2, Pgs. 171-173).

Superintendent Dolecki confirmed the fact that Mr. Mahoney's hiring was not in accordance with the Nepotism Statute and that the Board approved the hiring knowing that this was in violation of state law. (Ex. 9, Dolecki's Deposition, Pgs. 15-16).

As a result of this cavalier disregard for the Nepotism Act, Mr. Mahoney was given an unfair and discriminatory advantage over Plaintiff. In Thomas, the Fourth Circuit made clear that when a work force is predominately white, nepotism and similar practices, which operate to exclude outsiders, may discriminate against minorities as effectively as any intentionally discriminatory policy. Id. at 925.

In failing to implement the Anti-Nepotism Act, the School Distinct has maintained a teaching work force whose profile has remained virtually homogenous since 1991, with the conspicuous absence of teaching staff who are members of minority groups.  The racial composition of the teaching staff of the School District is delineated in Exhibit 10.

**D.  DEFENDANTS' RETALIATED AGAINST PLAINTIFF BECAUSE SHE FILED A COMPLAINT WITH THE PHRC AND THIS COURT**

Section 704 of Title VII prohibits an employer from retaliating against an employee for engaging in protected activity.  (42 U.S.C.A. section 2000-3(a)).  To establish a prima facie claim of retaliation, plaintiff must show that:  (1) she engaged in protected activity; (2) the Defendant took an adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse employment action.  Woodson v. Scott Paper Co., 19 3d 913, 920 (3rd Cir. 1997).

12

The McDonnell Douglas burden-shifting analysis also applies to retaliation claims. Wrenn v. Gould, 808 F. 2d 493, 500 (6th Cir. 1977); Corley v. Jackson Police Dept., 566 F. 2d 944, 999 (5th Cir. 1978); Novotoy v. Great American Fed Savings & Loan Association, 539 F. Supp. 437, 449 (W.D. Pa. 1982); Weston v. Pennsylvania 251 F. 3d 420, 230 (3rd Cir. 2001); Farrell v. Planters Lifesavers Co., 206 F. 3d 271, 279 (3d Cir. 2000), Kachmar v. Sungard Pasta Systems Inc., 120 F. 3d 1286, 1299 (3d Cir. 1997). Importantly, an employee may have meritorious retaliation claims, even though the underlying discrimination claim is determined to have no merit. The actions which the Plaintiff initiated to vindicate her federal civil rights and state rights include the filings of her complaint with the PHRC in February 2002. The Third Circuit has ruled that temporal proximity between protected activity and the termination of an employee is sufficient to establish a causal link. Woodson, supra. The most salient characteristic of the retaliatory tactics and methods employed by he Defendants in this case were those involving the connection between the protected activity and the retaliation. Commencing with the school year 2001-2002 and continuing through 2002-2003, Plaintiff worked as a substitute teacher 80% to 90% of the school year. (Ex. 2). On February 20, 2003, Plaintiff filed with the PHRC an administrative complaint alleging discrimination on the basis of the District's refusal to hire her as a long-term substitute or full-time teacher. Since the filing of the complaint, Plaintiff's opportunities to substitute have dropped precipitously. This became most notable at the beginning of the school year 2003-2004, at the very time the School District was projecting an increased need for substitute teachers. (Ex. 2 & 12).

On June 29, 2004, the School District executed an Agreement with Northwest Tri-County Intermediate Unit for purpose of training individuals with a Bachelor's Degree to obtain an emergency certification to teach in the School District. In the Agreement, Superintendent Dolecki remarked that there was a projected shortage of substitute teachers for the 2004-2005 school year. (Ex. 12). The School District has retaliated against Plaintiff in other ways. For example, Ms. Carole Bainbridge, an out-of-state teacher was allowed to teach on an emergency permit during the school year 2002-2003 and subsequent years in expressed violation of state law, despite Plaintiff's availability. (22 Pa Code (49.31). Further, Ms. Joanne Darling, a former principal at Cochranton Elementary School, advised plaintiff that the filing of her federal lawsuit disqualified her from applying for a teaching position. Plaintiff need not establish the underlying discrimination claim in order to recover on the retaliation claim.

The Supreme Court recently handed down a case which is pertinent to Plaintiff's retaliation claim. In Burlington N. &S.F.R. Co. v. White, 548 U.S.— (June 22, 2006), the Supreme Court ruled that the anti-retaliation provision of the 1964 Civil Rights Act, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. In so ruling, the Supreme Court rejected the Third Circuit's application of the same standard for retaliation that it had applied to a substantive discrimination claim. Robison v. Pittsburgh, 120 F. 3d 1286 (3d Cir. 1997). Under the new standard enunciated in Burlington, a trier of fact may take into account a wider universe of factors in making a finding of retaliation, as well as finding an adverse employment action where an employer refuses to hire for reasons of race, national origin and other pretextural reasons.

The Court is urged to review Plaintiff's retaliation claim in light of the new standard enunciated in Burlington. At the very least, Plaintiff makes out a triable issue of fact that the District's continuing refusal to hire her as a full-time teacher or long-term substitute and the reduction in the

opportunities to substitute resulted from the filing of her complaint with the PHRC and her subsequent lawsuit.

### E. PLAINTIFF'S CONSTITUTIONAL RIGHTS TO CONTRACT ON THE BASISOF EQUALITY PURSUANT TO SECTIONS 1981 AND 1983 OF THE CIVIL RIGHTS ACT OF 1866 WAS VIOLATED

As alleged in the Amended Complaint, Paragraph 28, the Defendants violated Plaintiff's constitutional right to contract on the basis of equality. The Defendants breached the Agreement by which Plaintiff was to substitute for Ms. Pickens when Plaintiff was summarily dismissed from that position and replaced by a Caucasian teacher.

There existed an employment contract between Plaintiff and Defendants. An employment contract is covered by section 1981. Plaintiff, a member of a protected class, asserts a claim based on race. The phrase "make and enforce contracts" include the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship". (42 U.S.C.A. section 1981 (b)). By virtue of the Civil Rights Act of 1991, Congress amended section 1981 by adding a new, broad definition of "make and enforce contracts". Spriggs v. Diamond Auto Glass, 165 F. 3d 1015 (4th Cir. 1999). In dismissing Plaintiff and replacing her with a white teacher, Defendants made a conscious decision, based on race, in violation of section 1981.

Further, in violation of section 1981, Defendants intentionally discriminated against Plaintiff by utilizing a screening and scoring methodology, totally subjective in nature and application, that worked as a barrier to employment for Plaintiff.

Paragraphs 32, 33 and 34 of the Amended Complaint provide the basis for Plaintiff's claims under the Fourteenth Amendment and sections 1981 and 1983. To the extent that the School Board and School Administrators participated or acquiesced in employment actions or practices which violated Plaintiff's constitutional rights, their wrongdoings are attributable to the School District in accordance with Paragraph 35 of the Amended Complaint.

Members of the School Board, Superintendent Dolecki and Assistant Superintendent Heller are properly regarded as policymakers under section 1983. They are proxies of the School District and it is through them that the District implements its policies and procedures. Since individuals cannot be held liable under Title VII (See Sheridan v. E.I. Dupont de Nemours & Co., 100 F. 3d 1061 (3d Cir. 1996), it is vital that policymakers be recognized as proper parties in a lawsuit. Andrews v. City of Philadelphia, 895 F. 2d 1469,1481 and 1482 (3d Cir. 1990). As the entity charged with authorizing, establishing, approving and ensuring compliance with Policies, Practices and Procedures, including those involving the hiring and firing of staff, the District, acting through the School Board, is ultimately responsible for its actions (or failure to act) and the actions of its staff, including Mr. Dolecki and Mr. Heller. Based on a conversation Plaintiff had with Mr. George Wright, then a Board Member, the Board was on notice as to Plaintiff's dismissal in December 2002 and her numerous efforts to be hired as a full-time teacher. (Defendants' Ex. 8, George Wright's Deposition, Pgs. 11-13, 29, 31). No corrective action was taken by the Board. Defendants Dolecki's and Heller's summary dismissal of Plaintiff, their refusal to hire her as either a long-term

substitute or full-time teacher, and use of flawed hiring procedures are attributable to the District for purposes of liability and damages.

Interestingly, while the Board failed to take any corrective action with regard to Plaintiff's complaint to Mr. Wright, it knowingly authorized the hiring of a teaching candidate, a Caucasian, in violation of Anti-Nepotism Requirements, which impacted upon Plaintiff's ability to enter into employment in 2004.  Andrews, supra, makes clear that where a Board and/or Administrator is found to have authorized, acquiesce in or participated in wrongful conduct such behavior can be attributed to the School District (Pg.1481-1482).  For that reason, it would be illogical to dismiss the Board, Mr. Dolecki and Mr. Heller from this lawsuit, thereby making a mockery of placing the locus of liability with the School District.

## IV.  CONCLUSION

Pursuant to the analytical framework established in McDonnell Douglas, supra, and its progeny, Plaintiff has established a prima facie case that defendants have and continue to violate employment and contractual rights ensured to her by the Civil Rights Act of 1964, the Pennsylvania Human Relations Act and the U.S. Constitution.  Plaintiff has established that the reasons being offered by the defendants for refusing to hire her as a full-time permanent elementary school teacher is a pretext for discrimination. Finally, Plaintiff has established that defendants' continued refusal to employ her, both as a long-term substitute and a full-time teacher, and the drastic reduction in the opportunities to substitute is in retaliation for plaintiff exercising rights ensured to her by the U.S. Congress and the Pennsylvania Legislature.

Respectfully submitted,

| | | |
|---|---|---|
| /s/Edith Benson_____ | and | /s/ Caleb L. Nichols_____ |
| Edith Benson, Esquire | | Caleb L. Nichols, Esquire |
| Benson Law Office | | Law Offices of Caleb L. Nichols |
| 4683 Budd Drive | | P.O. Box 1585 |
| Erie, PA 16506 | | Erie, PA 16507 |
| 814-838-3670 | | 814-838-1877 |
| Attorney No. 33510 | | Attorney No. 18773 |