IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Rowena Wagner
Plaintiff

vs.

Crawford Central School District, et. al.
Defendants

CIVIL ACTION NO. 04-264 ERIE
Judge Sean J. McLaughlin
ELECTRONICALLY FILED

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1. Plaintiff Rowena Wagner graduated from Edinboro University of Pennsylvania in May 2000. She has a Bachelor of Science Degree in Education. She is certified to teach in Elementary K-6. She did her student teaching and field experience in the Crawford Central School District. Her student training was supervised by Professor John Lovett, a member of Edinboro's Department of Education, with the assistance of Mr. Douglas McCullough at Cochranton Elementary and Ms. Carole Fisher at Cochranton Elementary School. Her student teaching consisted of preparing lesson plans to be used for each day for an entire two quarters and those other duties normally performed by the full-time teacher. (Ex. 2).

2. Plaintiff's field experience was conducted under the supervision of Professor Bruce Smith, a member of the faculty of Edinboro University, with the cooperation of Ms. Harriet Powell at Second District Elementary and Ms. Janice Koseff at Second District Elementary School. Her field experience consisted of, among other things, supervising the class in the teacher's absence and devising lesson plans involving subject matter to be taught once a week for two quarters. (Ex. 2).

3. Plaintiff received very positive and exemplary evaluations on the basis of both her field experience and her student teaching performance. In no instance did her supervising professors or cooperating teachers indicate that she used poor grammar or lacked insight or mastery of the subject matter that she taught. In fact, Professor Lovett remarked: "Rowena had an excellent classroom presence. She presented herself well to her students. Although she had a dialect, her speech and grammar were never a concern. She had a clear, commanding voice, and good classroom control." (Ex. 2). Neither former Superintendent James Lascola, who interviewed her in 2001, nor Superintendent Michael Dolecki, who hired her, nor Mr. Charles Heller, III, Assistant Superintendent, ever informed Plaintiff that her use of grammar or speech was an

1

impediment to her employment opportunities. In fact, by a letter dated June 15, 2005, Mr. Heller wrote Plaintiff a very complimentary letter, and expressed his regard and respect for the quality of her teaching during school year 2004-2005. (Ex. 2; Defendants' Ex. 2, Pgs. 19-20, 9/27/05).

4. In August or September 2001, Plaintiff commenced employment with the Crawford Central School District following the interview conducted by Mr. Lascola. Having applied for a full-time teaching position, upon inquiry, Mr. Lascola advised her that serving as a substitute teacher would place her on a career path leading to a long-term substitute or full-time teaching position. Based upon Mr. Lascola's advice, Plaintiff understood that the practice by which substitute teachers got long-term substitute and full-time teaching positions was well established. (Ex. 2).

5. During school years 2001-2002 and 2002-2003, Plaintiff worked as a substitute teacher throughout the School District approximately eighty (80) to ninety (90) percent of the school years. Teachers for whom Plaintiff regularly substituted prepared Summary Reports reflecting the excellence of Plaintiff's performance and these Reports remain in the possession of the School District. (Ex. 2).

6. During 2002, 2003, 2004 and 2005, Plaintiff applied for more than seventy-five (75) long-term substitute and full-time permanent teaching positions in the School District. The positions for at least twenty-five (25) of the teaching positions did not receive a bid from a member of the local union. Plaintiff was qualified for the announced vacancies established by the Defendants. (Ex. 2 & Ex. 6).

7. By practice, the Defendants had customarily filled vacancies of the teaching staff caused by medical, sabbatical and other unexpected leaves on the recommendation of the full-time teacher who was replaced. However, that practice was not followed when Plaintiff sought to replace Ms. Joye Pickens in November 2002. (Ex. 4; Defendants' Ex. 5).

8. In November 2002, Ms. Pickens took medical leave from her teaching position at Cochranton Elementary. Ms. Pickens reached a verbal agreement with Assistant Superintendent Heller that Plaintiff would be used as her substitute until the conclusion of the Fall Semester of 2002, which ended in January 2003, at which time the position was expected to be put up for bid. (Ex. 4; Defendants' Ex. 5).

9. Plaintiff began Ms. Picken's position on or about November 13, 2002. On November 22, Mr. Heller conducted a classroom observation of Plaintiff, and on November 26, Principal Kurt Meader conducted a classroom observation of Plaintiff. Plaintiff received a satisfactory on her performance from both Mr. Heller and Mr. Meader. (Ex. 2; Defendants' Ex. 3C & 3D).

10. Of the seventeen (17) applicants who were considered for four (4) long-term substitute positions, inclusive of Ms. Pickens', Plaintiff was the only minority included in the pool of applicants. These vacancies were not posted. (Ex. 2; Defendants' Ex. 3A).

11. On December 20, 2002, Mr. Heller summarily dismissed Plaintiff, informing her that the Interviewing Committee did not select her to replace Ms. Picken as a long-term substitute. The Interviewing Committee was established, managed and coordinated by Mr. Heller and consisted solely of individuals under his supervision, all of whom were Caucasian. (Ex. 2; Defendants' Ex. 2).

12. Superintendent Dolecki and Ms. Pickens testified that the School District had never summarily dismissed a substitute teacher and convened an Interviewing Committee to replace the substitute where the substitute, as was true in Plaintiff's case, had been assigned to a position with the expectations and assurance that she would work until the conclusion of the semester. (Defendants' Ex. 5, Pickens' Deposition, Pgs. 16-17; Ex. 9, Dolecki's Deposition, Pgs. 81-82).

13. Some of the Employment Interview Analysis Forms used by the Interviewing Committee were not signed by the evaluators and contained objectionable comments relating to Plaintiff's ethnicity and national origin. (Defendants' Ex. 3A). Plaintiff was required to undergo interviews and classroom observations, however, other applicants were hired as long-term substitutes or full-time permanent teachers without classroom observations (Ex. 14). Moreover, in evaluating Plaintiff in December 2002, Assistant Superintendent Heller manifested a closed-mind, stating "No Way" would Plaintiff be hired. (Ex. 16).

14. The Defendants have engaged in and acquiesced in a longstanding custom, policy or practice of denying Plaintiff and other minorities equal employment opportunities. (Ex. 10).

15. Ms. Tammy Foster, an African-American, was certified in 1994 to teach elementary education. She substituted in Crawford Central School District from 1994 until 1996, when she left the area in pursuit of professional opportunities. In 1999, she was hired by the School District as a Teacher's Aide. Approximately, ten (10) years passed before Ms. Foster was hired by the School District as a full-time teacher in 2004-2005, after Plaintiff had filed her lawsuit. (Ex. 2, 7 & 8).

16. Mr. Samuel Byrd, a former member of the School Board, testified that he knew African-Americans applicants who applied for teaching positions with the appropriate certifications that were not hired by the School District for the positions they sought. Mr. Byrd further testified that those individuals were: Tammy Foster, Eric Brown, Walt Moody, Hazel Moody, Tracey Balsamo and Lee McFerrin. (Ex. 11, Sam Byrd's Deposition, Pgs. 34-35).

3

17. The School District has hired teaching staff in violation of state certification requirements. For example, the School District hired Ms. Naomi Uy-Moore, an out-of-state applicant, to teach during the school year 2005-2006 knowing she lacked proper state certification for out-of-state candidates. Ms. Moore worked most of the 2005 Fall Semester in violation of this state provision. Upon inquiry by Plaintiff, the Defendants obtained an emergency permit for Ms. Moore, again in violation of state law. As of July 11, 2006, Ms. Moore is not certified to teach in Pennsylvania. (Ex. 6). Stacie Boca, certified in elementary education, was hired out of classification as a librarian. It is also documented that Susan Baker, Lisa Shuffstall and Leslie Jensen were not certified when hired by the School District. (Ex. 6). The Defendants have hired teaching staff in violation of state law and regulations. (Ex. 6).

18. Statistical evidence of an employer's pattern and practice with respect to minority employment is relevant to a showing of pretext. It may be used at the pretext stage to help rebut the employer's purported nondiscriminatory explanation. Since the school year 1990-1991, and continuing through the school year 2004-2005, the Defendants have hired, in the aggregate, thirteen (13) teaching staff from minority groups (Asian = 1, African-Americans =3, Hispanics = 9). (Ex.10). These statistics do not include Ms. Moore who was hired to teach beginning school year 2005-2006. As of school year 2004-2005, the School District had a total teaching staff of 300.

19. Except for some unspecified recruitment fairs that Mr. Dolecki testified that he attended before 2001, there is only one documented effort on the part of the School District to recruit professional minority teaching staff. (Ex. 9, Dolecki's Deposition, Pg. 46; Defendants' Ex. 2, Pgs. 10-13, 10/20/05).

20. The School Board and/or Administration failed to implement Pennsylvania's Anti-Nepotism Law for the purpose of screening possible relationships, by blood or marriage, between the Board and/or Administration and applicants for teaching positions. (Exhibit 9, Dolecki's Deposition, Pgs. 15-16, 165, 171-173). Mr. Dolecki and Mr. Heller testified that on at least one occasion the School Board approved the hiring of a teacher with knowledge and in violation of the Anti-Nepotism Statute.

21. On January 3, 2003, Plaintiff met with George Wright, then a member of the School Board, to bring to the Board's attention her difficulties in obtaining employment.

    According to Mr. Wright's testimony, the filing of Plaintiff's employment discrimination complaint and her federal lawsuit would have been brought to the attention of the School Board.(Defendants' Ex. 8, Pgs.18, 29).

22. The School District had an increased need for substitutes during the school year 2004-2005 during the period when Plaintiff's opportunities to substitute was drastically reduced. (Ex. 12).

4

23. Superintendent Dolecki certified and projected a shortage of substitute teachers for the 2004-2005 school year. (Ex.12).

24. In September 2004, Plaintiff was told by Principal Joanne Darling, Cochranton Elementary School, that she was ineligible to apply for a teaching position at Cochranton Elementary because she had filed a federal lawsuit against the School District. Consequently, Plaintiff ceased to pursue this teaching position. (Ex. 2).

25. By law, the Commonwealth of Pennsylvania has established the minimum qualifications that a teacher must possess. In general, a School District has some discretion in making hiring decisions. The exercise of this discretionary authority, however, is subject to federal and state anti-discrimination mandates and anti-nepotism provisions.

26. Defendants' method of evaluating and screening Plaintiff did not reflect the minimum qualifications necessary to successfully perform the position and the criteria used to evaluated Plaintiff were open-ended, ambiguous and arbitrary. (Ex. 13).

27. The School District has admitted through its solicitor, Attorney Richard W. Perhac, that "…the use of organized interviews of a group of candidates for substitute positions is not a formal policy of the District, or necessarily followed in 100% of the cases". (Ex. 9, Dolecki's Deposition, Pgs. 80-83 & Ex. 15).

28. In their respective Affidavits, Superintendent Dolecki and Mr. Heller stated that candidates for long-term substitute positions must undergo interviews. However, this is not a formal policy or practice of the District. (Ex. 15).

29. In his Affidavit, Superintendent Dolecki does not state that classroom observations are a required component of the hiring process for long-term substitute teachers. (Defendants' Ex. 1).

30. In his Affidavit, Mr. Heller stated that classroom observations are "often" part of the interviewing process for long-term substitutes, with the exception of those who have previously worked as long-term substitutes. However, the Defendants could not produce classroom observation reports for at least twenty-one (21) applicants hired during the 2004-2005 school year. (Ex. 14; see response to Question No. 11 of Plaintiff's Fourth Request for the Production of Documents). At least fifteen (15) of those individuals had no prior long-term substitute teaching experience with the District.