IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROWENA WAGNER, | ) Civil Action No. 04-264 ERIE |
| Plaintiff | ) Judge Sean J. McLaughlin |
| v. | ) ELECTRONICALLY FILED |
| CRAWFORD CENTRAL SCHOOL DISTRICT, et al. | ) |
| Defendants | ) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants, Crawford Central School District ("District"), Crawford Central School Board ("Board"), District Superintendent Michael Dolecki ("Dolecki") and District Assistant Superintendent Charles Heller ("Heller") (collectively the "District Defendants"), filed a motion for summary judgment and memorandum in support on June 26, 2006. On or about July 24, 2006, Plaintiff filed a memorandum of law opposing the District Defendants' motion and requesting summary judgment in her favor, along with a motion for summary judgment in Plaintiff's favor.[1] Most of Plaintiff's assertions in her memorandum are addressed in the District Defendants' memorandum of law in support of their motion for summary judgment. Several issues warrant limited reply.

---

[1] In actuality, Plaintiff does not specify a single ground upon which she should be granted summary judgment or the evidence supporting such a judgment in her memorandum or her motion. She simply titled her memorandum as being in support of her motion and generally summarized her suit and predicted her success in her motion.

I.      **Plaintiff is Unable to Evidence Any Alleged Violation of Her Civil Rights.**

The central issue in all claims of this case, with the exception of Plaintiff's retaliation claim, is whether race and/or national origin discrimination motivated the District's non-hire of Plaintiff for several positions.  Therefore, regardless of what Plaintiff thinks the District Defendants did "wrong" in a general sense, she must have adequate evidence to support a finding of race and/or national origin discrimination, or her action fails.  Plaintiff erroneously attempts to rely upon several basically true concepts in her memorandum.  First, Plaintiff has the required teaching degree and PDE certification for an elementary teaching position with the District.  Second, although she has applied for employment with the District numerous times and has substituted there often since August 2001, she has not been hired for long-term substitute or permanent positions.  Third, several District teachers and Plaintiff's college professors have assessed her teaching abilities and performance favorably.  However, these contentions miss the point because Plaintiff has not produced any evidence that race and/or national origin were factors in the District's non-hire of her.  There is no requirement that the District Defendants' actions be fair, correct or prudent, only that they not be discriminatory.  "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since *the factual dispute at issue is whether discriminatory animus motivated the employer*, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (italics added).

It is essential that civil rights actions do not become forums to second-guess a school district's or other employer's hiring standards or decisions.  The District had every right to develop its own approach to hiring.  This District has decided to hire the

candidate deemed best qualified by its hiring committee for each position, subject to review and approval by the Superintendent.  There is no self-imposed or legal obligation requiring the District to hire an individual based upon on the length of time he or she has been substituting and/or "waiting" for placement in a full-time position.  A substitute teacher, regardless of his or her race, could substitute for any number of years yet would never be hired as long as there is at least one candidate who is adjudged by the District to be even a slightly superior candidate.

Plaintiff contends that prior evaluations conducted by others are inconsistent with the District's interviewers' evaluations, which identified weaknesses in Plaintiff's job knowledge, insight and alertness and other such performance-related weaknesses, resulting in her non-selection.  Whether there is room for disagreement regarding Plaintiff's teaching abilities or whether the interviews portrayed Plaintiff's abilities best are beside the point.  The relevant point is not whether it is *fair* or *prudent* to hire the most qualified candidate instead of whomever has worked the longest, but whether the hiring committee *actually believed that Plaintiff was the most qualified (its chosen standard), yet failed to hire her merely because of her race or national origin*.  The decisions of the hiring committee are based on its individual interviewers' assessments of a candidate's qualifications.  Such a process is, by nature, highly subjective.  Plaintiff impliedly contends that the District's hiring committee places undue weight upon interviews, but as long as the hiring committee's decisions were not influenced by Plaintiff's race and/or national origin, it has not violated any civil rights statute or Plaintiff's constitutional rights.  The record is completely devoid of any evidence that the District's interview team was so unlawfully motivated.  Plaintiff has failed to carry her

3

burden to produce evidence of unlawful decision-making and, therefore, her claims must fail.

II.     **Most of the Facts as Stated by the District Defendants Have Been Admitted.**

The bulk of the District Defendants' concise statement of facts has been admitted by Plaintiff.  Pursuant to local rule 56.1, the District Defendants' motion was accompanied by a concise statement of material facts.  Plaintiff then was obligated to respond to each enumerated fact by admitting or denying each stated fact within thirty (30) days.  Specifically, Plaintiff was to file "[a] separately filed concise statement, which *responds to each numbered paragraph* in the moving party's Concise Statement of Material Facts by: (a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material; (b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitting in its entirety (as to whether it is undisputed or material), with appropriate reference to the record…and (c) setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgment."  LR 56.1(C) (italics added).  Any fact not denied within the thirty (30) day time period is deemed admitted for purposes of the summary judgment motion: "Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."  LR 56.1(E).  Plaintiff filed no response to the District Defendants' statement, but instead filed her own "Statement of Material Facts."

4

In that document, she either does not address or does not controvert facts numbered 1, 3-18, and 22-40. Those facts as set forth by the District Defendants are, therefore, admitted to be uncontroverted.

III. **Many of Plaintiff's Assertions are Irrelevant and Serve Only to Distract from the Overriding Fact that She Cannot Carry Her Burden of Proving Racial or National Origin-Based Motivations.**

   A. **Plaintiff's Comparison of Her Situation to Those of Other Minorities (pp. 5-8)**

Plaintiff identifies three other minorities (Armedia Dixon, Tammy Foster and Claudette de Leon) whom she claims have had trouble securing or maintaining employment opportunities with the District and she asserts that her treatment is similar to that of Dixon, Foster and de Leon. In actuality, the only similarity Plaintiff identifies is not a type of "treatment," but rather allegedly similar outcomes. In Plaintiff's view, it apparently took a "long time" for Dixon and Foster to be hired for the positions they sought, Dixon as a principal and Foster as a teacher. De Leon was terminated by the District. In short, Plaintiff alleges other minorities have experienced outcomes they did not like. The specific, distinguishable facts of these individuals are not before the Court and it cannot be assumed that the District has wronged them. Moreover, Plaintiff provides no comparison of these individuals, or herself, to non-minorities, hundreds of whom also are disappointed in their efforts to gain employment with the District each year. There is no record evidence that non-minorities as a group are not held to the same hiring process or standards as the minorities identified by Plaintiff in her memorandum or that less-qualified non-minorities are able to get their chosen jobs immediately or even sooner than Plaintiff. The mere fact that it may take Plaintiff or

5

others longer to secure their jobs than they might like, or that some minorities are never hired, does not imply any wrongdoing whatsoever on the part of the District.

Plaintiff attempts to rely upon Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F. 2d 509 (3d Cir. 1993) for the proposition that proof of a discriminatory atmosphere may be relevant to prove pretext. She then posits that she has endured a "hostile work environment" because of her several unsuccessful applications for a full-time teaching position and because she was allegedly "dismissed" from replacing regular full-time teacher, Joye Pickens, during Pickens' medical leave of absence ("Pickens Position"). Ezold does not further Plaintiff's position in the least. Nor does Plaintiff's complaint allege race or nationality-based harassment.

Ezold was a case in which the Third Circuit reversed the district court, holding that there was no proof that the defendant law firm's failure to promote the plaintiff, a female associate attorney, was based upon sex discrimination or that the law firm's proffered reason, plaintiff's lack of strong legal analytical ability, was pretext. The court also held that it was inappropriate for the district court to substitute its judgment for that of the law firm by questioning not only "Wolf's assessment of Ezold's ability to meet Wolf's standards, but also … Wolf's partnership standards themselves." Ezold, 983 F.2d at 527-28.

Ezold argued that assessing legal analytical ability was purely subjective and actually a pretext to hide the true reason, that she was female. The court held that, subjective or not, many of the partners' opinions were consistent with one another and even those who supported her promotion had misgivings because of her weak legal analytical abilities. "Where an employer produces evidence that the plaintiff was not promoted because of its view that the plaintiff lacked a particular qualification the

6

employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether the non-members of the protected classification were treated more favorably." Ezold, 983 F.2d at 528. The plaintiff could point to no male partners who were made partner despite being evaluated as having weak legal analytical skills so she had not shown that she was treated differently than her male counterparts.

Moreover, the fact that Ezold had positive evaluations in the past or that she was strong in areas other than analytic ability was not sufficient evidence to show pretext. "Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past received some good evaluations." Id. at 528. "The district court could not overturn Wolf's judgment that Ezold did not meet its standards for legal analytic ability without finding that Wolf's conclusions as to Ezold's legal analytic ability were pretextual. That finding, in order to stand, has to be based on evidence showing either that Wolf's asserted reason for denying Ezold a partnership position was not credible – either through comparison of her ability in that category, as Wolf perceived it, with the successful male associates, or by evidence showing that Wolf's decision not to admit Ezold to the partnership was more likely motivated by a discriminatory reason than by her shortcomings in legal analytic ability." Id. at 529. It is for the employer to determine what qualities are important for a position and to make a judgment on whether the applicant possesses those qualities. The defendant law firm considered analytic ability to be an essential quality and, in its judgment, the plaintiff was not strong in that area. Hence, the plaintiff could not succeed on her unlawful discrimination claim.

7

Likewise, here, the District's hiring committee utilized the same evaluation criteria for each candidate. The members of the hiring committee separately and consistently rated Plaintiff relatively low in certain areas. See Ex. 3A and 3B to First Heller Aff. – Interview Analysis Forms. The applicants who were hired received higher scores than Plaintiff overall, both collectively and in the specific areas in which Plaintiff was weak. Plaintiff does not dispute that the interviewers gave her a lower score than all of those hired. There is not one scintilla of evidence that Plaintiff's race and/or national origin were in any way a factor in her interview evaluations or in the District's decision not to offer her the positions she sought.

Plaintiff also attempts to rely on Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990) on pages 7-8 of her memorandum for the proposition that the interview forms and reasons behind the District's decision not to hire her as a full-time teacher were subjective, which she claims not only makes out a prima facie case, but entitles Plaintiff to overcome the District Defendants' summary judgment motion. However, the fact that a criterion is subjective is not enough to take a plaintiff to trial. For example, in Weldon, the court first found that the plaintiff had established a prima facie case based on subjective qualifications, and then found that there was additional evidence to sufficiently create an inference of racial discrimination. The plaintiff's evidence included information on the percentage of minorities who had been fired compared to minorities' overall make-up of the work force and testimony that a specific supervisor was known to be racist and had repeatedly targeted many black employees. Although Plaintiff claims that "[h]ere, we have more," she points to no evidence whatsoever that any of her treatment was at all related to her race and/or national origin, unlike the plaintiff in Weldon.

8

Just as in <u>Weldon</u>, Plaintiff must present evidence of unlawful discrimination or show that an unlawful characteristic played a role in the decision or Plaintiff cannot proceed to trial. Even if District Assistant Superintendent, Charles Heller, is considered in a supervisory position over the other members of the interview committee, there is no evidence whatsoever that Heller or any other District representative harbors any form of discriminatory animus against Plaintiff or persons of her race or national origin. Additionally, each member of the interview committee used his or her own independent judgment in interviewing candidates and assigning scores. <u>See</u> Second Heller Aff. at ¶ 5-6. There is no constitutional right to objective hiring criteria or even fair hiring criteria, only to be free of unlawfully biased criteria. Moreover, it is difficult to imagine any criteria that would satisfy Plaintiff here. The interview forms consist of nine categories, each with a possible score of 1 through 5. The form provides a general explanation of the qualifications that should be exhibited by a candidate to merit a particular score. For example, to receive a score of 4 for the category, "Insight and Alertness," the candidate must have "grasped all new points and concepts quickly," whereas to receive a score of 3, the candidate must have "understood most new ideas and share[d] in discussion points." <u>See</u> Ex. 3A and 3B to First Heller Aff. – Interview Analysis Forms.

Some criteria must be subjective, otherwise there would be no point to interviewing candidates. If subjective criteria could not be used, the only applicable criteria would be whether the applicant is certified and how much experience he or she has. Hence, the only factor to set applicants apart would be their experience level and hiring would be done on a "first come, first hired" basis. The importance of the teaching profession requires more scrutiny of teachers and thankfully, the law does not require that hiring be done in the way that Plaintiff advocates as being the most "fair."

9

Also, on page 6 of the memorandum, Plaintiff focuses on the District Defendants' claim that her grammar is imperfect by asserting that her college professors and some District teachers did not consider her grammar to be defective and that her grammar was not criticized in the classroom evaluations prepared by Heller and Principal Kurt Meader.  Plaintiff misunderstands the issue.  Even if Plaintiff's grammar was impeccable in the classroom as she taught, the District's hiring committee noted her usage of poor grammar during the interview (perhaps because, as Plaintiff explains, she was nervous).  This is a legitimate, non-discriminatory contributing factor to the hiring committee's decision that other applicants were better qualified than Plaintiff.  It is clear from the interview analysis forms, as well as Plaintiff's deposition, that the interviewers considered her grammar in their decision and did not offer Plaintiff the position.

Plaintiff identifies what she considers to be a small number of minorities teaching at the elementary school level and indicates on page 8 of her memorandum that only three minority teachers have been hired out of 300 total teaching staff since 1990.  However, she does not reveal how many minorities applied for positions, nor how many were the most qualified for the positions they sought, versus how many non-minorities applied.  She cites case law for the proposition that statistics can be used in a case such as this, but the mere fact that a certain number of minority teachers were hired is not a statistic and it proves nothing.  A case cited by Plaintiff illustrates the need for statistical information to be *complete* in order to be relevant.  In <u>Thomas v. Washington County School Board</u>, 915 F.2d 922 (4th Cir. 1990), the plaintiff teacher sought to prove racial discrimination by presenting statistics that the county's population was 1.8% black, yet black teachers constituted only .5% of the secondary school's faculty.  <u>Thomas</u>, 915 F.2d at 926.  The court had no choice but to reject those figures: "The

Board's policy of generally limiting its pool of applicants to county residents, coupled with the lack of proof of the number of qualified applicants living in the county, other than Thomas, made the data base inadequate for statistical purposes." Id.[2]  Likewise, here, Plaintiff presents incomplete data that has no meaning to this case.

    **B.**    **Plaintiff's Claim that She was Unlawfully "Dismissed" from the Pickens' Long-term Substitute Position (pp. 8-10)**

Plaintiff claims that she was discriminated against because she was "dismissed" from the Pickens Position. On page 8, and elsewhere throughout the memorandum, Plaintiff refers repeatedly to an "agreement" between Pickens and Heller and the understanding or representation made to Plaintiff that she would be able to finish the semester in the Pickens Position. There never was any such "agreement," other than perhaps by Pickens, who does not now and never did represent the District, and there never was any representation made to Plaintiff regarding how long she would have the Pickens Position. There is no such agreement of record, in fact, since at least February 2002, when Heller began his position as the District's Assistant Superintendent, he has not permitted teachers to independently choose their long-term replacements. First Heller Aff. at ¶¶10-12. Plaintiff does not dispute this. On page 10 of her memorandum, Plaintiff provides examples of times when a teacher has allegedly chosen his or her own long-term substitute and contends that those individuals were not required to undergo an interview. However, Plaintiff does not provide any dates for these alleged incidents, except for Karen Jamieson, which occurred in August 2001, before Heller assumed his duties. Differences in procedures between the time before

---

[2]   The court ultimately found that, based on 46 cases of nepotism and the admission that teaching positions were normally not posted, but filled via word of mouth, the plaintiff proved disparate impact and was entitled to the imposition of an injunction.

11

Heller became assistant superintendent and after is not proof of a discriminatory animus but merely proof of a change in personnel. Hence, Plaintiff has no evidence that she was discriminated against by being "dismissed" from her position as a long-term substitute nor by the District's not permitting Pickens to choose her own replacement. Even more significantly, there remains no evidence in the record that race or national origin was or is a factor in any of the District's actions regarding Plaintiff, however they are characterized.

Additionally, although Plaintiff claims it was unfair that she had to undergo a classroom observation when others did not, in reality, Plaintiff *requested* that a classroom observation be performed on her. Wagner Depo. at 19.

### C.  Plaintiff's Claims Regarding the March 2004 Interviews (pp. 10-12)

Plaintiff claims on page 10 of her memorandum that the District's interviews and hirings in 2004 violated Title VII because individuals less qualified than she were hired. In fact, the undisputed record evidence establishes that those hired in conjunction with the March 2004 interviews were more qualified. As much as Plaintiff would simply like to discount the interview evaluations because they are "subjective," she has no basis to ask the Court to do so. The interview evaluations are valid and legitimate, whether subjective or not. See, e.g., Ezold, 983 F.2d at 528. Although she claims that "Defendants' assertions" regarding her use of poor grammar during her interviews and deposition "are unsubstantiated and seriously discredited," exactly the opposite is true. Anyone can merely skim Plaintiff's deposition and find multiple, recurring grammatical errors. Moreover, the interview notes record interviewers' observations that her grammar was poor then. She may try to explain it away by pointing out other people who did not make an identical observation or that not everyone from the District noted

12

this, but *she does not deny that she used poor grammar or that the interviewers were influenced by such use*.

Plaintiff also complains, on page 11 of the memorandum, about the hiring of Naomi Uy-Moore, who is, like Plaintiff, Asian and of Filipino origin.  Uy-Moore had outstanding credentials, including a Master's degree in curriculum and instruction, 15 years of full-time teaching experience and she was the top rated candidate during the District's interview process.  See Second Heller Aff. at ¶ 7.  The District was misinformed by a representative of the Pennsylvania Department of Education that Uy-Moore's Maryland teaching certificate would be valid in Pennsylvania for one year before she had to obtain Pennsylvania certification.  The error was discovered and corrected and Ms. Uy-Moore now has valid certification to teach in Pennsylvania.  Second Heller Aff. at ¶ 8.  Further, it is entirely irrelevant to Plaintiff's situation whether or not Uy-Moore was certified or less qualified than Plaintiff because Uy-Moore is a minority and of the same nationality as Plaintiff.  Second Heller Aff. at ¶ 9.  Uy-Moore cannot possibly be used to show that the District preferred others to Plaintiff because of her race and/or national origin when the supposed comparator is the same race and national origin.

Plaintiff's memorandum on page 12 makes much of the allegation that one teacher was hired in violation of the District's self-imposed anti-nepotism policy.  Plaintiff claims that if teachers are hired in violation of the anti-nepotism policy, it could create a disparate impact on minorities because those minorities, having no family members to assist them, are not offered positions.  One teacher being hired in violation of the District's anti-nepotism policy is not enough to create a disparate impact.  One hiring would harm any applicant for a particular position equally, not just minorities.  "An action

13

premised on disparate impact … is made out when an employer is shown to have used a specific employment practice, neutral on its face but *causing a substantial adverse impact* on a protected group, and which cannot be justified as serving a legitimate business goal of the employer." O'Brien v. City of Philadelphia, 837 F. Supp. 692, 698 (E.D. Pa. 1993) (emphasis added).  This one incident is not enough to create a "substantial adverse impact" on minorities.  For example, in Thomas v. Washington County School Board, 915 F.2d 922 (4th Cir. 1990), upon which Plaintiff relies, the court noted 46 separate cases of nepotism and observed that the School Board's practice of not posting vacancies (relying on word of mouth instead) meant that black applicants were never even made aware of an opening.  Here, Plaintiff seeks the Court to infer disparate impact merely from one case of alleged nepotism.  This is not significant enough to create any impact at all on minorities or their ability to apply for and secure positions with the District.  Perhaps most importantly, the one person hired in violation of the District's anti-nepotism policy was for a position for which Plaintiff was not even certificated and for which she did not apply.  Second Heller Aff. at ¶ 10.

      **D.**    **Plaintiff's Retaliation Claim (pp. 12-14)**

Finally, Plaintiff claims that she has been retaliated against because she served as a substitute teacher less often after filing her complaint.  She attaches a chart that supposedly shows that she worked less in later years than earlier years.  Interestingly, the chart during early years does not indicate the specific days Plaintiff did not work, just days that she did work, whereas the chart for later years indicates each separate day that Plaintiff did not work, making it appear that there is a long line of consecutive unworked days.  Plaintiff does not total the number of days she worked in any one year,

14

nor does she do any sort of comparison between one year and another. Therefore, the chart is simply raw data and does not indicate a pattern of anything.[3]

Regardless of whether Plaintiff did or did not substitute less often after filing her EEOC/PHRC charge, the record is clear that the District has no control over how often substitutes are asked to work. See Second Heller Aff. at ¶ 2; Black Aff. at ¶ 5. Rather, an independent substitute placement service is responsible for choosing and contacting a substitute. Id. No one from the District ever asked or in any way influenced the substitute placement service to refrain from offering day-to-day substitute positions to Plaintiff. See Second Heller Aff. at ¶ 3; Black Aff. at ¶ 6. "To establish a prima facie claim of retaliation, a plaintiff must show that he/she is engaged in protected activity, that the employer took an adverse employment action against him/her, and that there is a causal connection between the protected activity and the adverse employment action." Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 323 (3d Cir. 2000); See also Parker v. University of Pennsylvania, 2005 WL 995514 (3d Cir. 2005) (not precedential). The substitute placement service is not involved in this lawsuit nor was it even aware of the lawsuit prior to being contacted in preparation of this memorandum. Further, it is solely responsible for filling day-to-day substitute positions so there is no "link" between the protected activity and adverse employment action and Plaintiff's alleged decrease in work cannot be retaliation. See Second Heller Aff. at ¶ 4; Black Aff. at ¶ 7.

---

[3] Plaintiff also makes much of the certification that Dolecki completed, projecting a shortage of substitute teachers for the school year 04-05. However, just because Dolecki projected a shortage does not mean that there was one or that there was a shortage of elementary school substitute teachers specifically.

15

Additionally, Joanne Darling, whom Plaintiff claims told her that she would not be hired for a Cochranton position because she had filed a lawsuit against the District, does not speak for the District and was not authorized to make any such representation. She was not a decision-maker in charge of Plaintiff's employment applications or the designation of interviewees and therefore could not retaliate on behalf of the District. Second Heller Aff. at ¶ 11.

Therefore, for the above reasons and for those set forth in Defendants' memorandum of law in support of summary judgment, Plaintiff has failed to present evidence that could allow a fact finder to find a reasonable inference of racial or national origin-based discrimination or retaliation and summary judgment should be granted in favor of Defendants and against Plaintiff.

    Respectfully submitted,

    KNOX McLAUGHLIN GORNALL & SENNETT, P.C.

BY: /s/    Mark J. Kuhar
    Mark J. Kuhar, Esq.
    120 West Tenth Street
    Erie, Pennsylvania 16501-1461
    Phone: (814) 459-2800
    Fax: (814) 453-4530
    E-mail: mkuhar@kmgslaw.com
    Bar No.: PA71185

    Attorneys for Defendants,
    Crawford Central School District,
    Crawford Central School Board,
    Michael E. Dolecki, Superintendent
    and Charles E. Heller, III,
    Assistant Superintendent

# 682618