IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
          Plaintiff


     v.                    CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
          Defendants


HEARING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Friday, October 27, 2006.



APPEARANCES:
          EDITH BENSON, Esquire, appearing on behalf
          of the Plaintiff.


          CALEB L. NICHOLS, Esquire, appearing on behalf

of the Plaintiff.

MARK J. KUHAR, Esquire, appearing on behalf of
Defendants Crawford Central School District,
et al.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S _

2          (Whereupon, the proceedings began at 1:30 p.m., on

3  Friday, October 27, 2006, in Courtroom C.)

4

5          THE COURT:  This is the time that we've set for

6  argument on the summary judgment motion.  Actually, I think

7  technically the plaintiff filed a summary judgment motion in

8  this case.

9          MS. BENSON:  Actually, your Honor, we both filed

10  motions.

11          THE COURT:  Which is very unusual for a plaintiff to

12  file a motion for summary judgment, to be quite candid with

13  you, but be that as it may.  I have cross-motions for summary

14  judgment here today.  And I'm going to start with the

15  defendants.  So if you want to come up.

16        MR. KUHAR:  Good afternoon, your Honor.  As, of

17  course, the court knows, we have extensively briefed our

18  position in this matter.  With respect to the discrimination

19  and the retaliation claims, it is essentially a show me brief.

20  We're testing the quality and quantity of the evidence and

21  suggests strongly that there is far too little of it to sustain

22  our motion for summary judgment.

23        THE COURT:  Maybe the best way to go about having

24  our discussion is for us to kind of break these claims down.

25  We'll put the retaliation claim last.  We'll essentially start


                            3


1  with a discussion of the plaintiff's contention, I'm going to

2  call her Title VII claim, if you will, that she was not hired

3  for -- I guess there's two aspects to it.  She was not hired

4  for either a permanent position or was not hired and suffered a

5  diminution in her substitute positions as a result of

6  discriminatory animus based on national origin.  Why don't we

7  talk about that.  Why don't you start by articulating,

8  summarizing, if you will, the district's legitimate

9  non-discriminatory reasons for those failures to hire?

10      MR. KUHAR:  Yes, your Honor.  They actually can be

11  dealt with I think uniformly.

12      THE COURT:  All right.

13      MR. KUHAR:  In that, essentially, the law of

14  Pennsylvania puts the responsibility of designating a selection

15  process and selection criteria for all the positions at issue,

16  they put that responsibility with the administrations and

17  school boards of our school districts.  In this case the

18  plaintiff has offered some, an affidavit and some letters from

19  others who suggest that as a college student, including as a

20  student teacher, she met or sometimes exceeded their standards.

21  And she herself, she's a competent teacher.  However, the

22  district had the right and responsibility to establish a

23  process that would lead to hiring.  In fact, no outside

24  applicants were hired from January 1st of '02 through April of

25  '04 anyway.  All of those positions were allocated based upon,

4

1  basically, union seniority, if you will.  But, indeed, there

2    were a few long-term positions, and then a number of permanent

3    positions, beginning in April of '04 is when the interviews

4    were conducted and through the current date.  Essentially, as

5    indicated in the memorandum and the affidavits supporting it,

6    the district appoints a committee, which is somewhat dependent

7    upon the position.  But in this case the plaintiff is

8    certificated only for elementary positions, so that's what

9    matters.  They would appoint a committee of administrators to

10   conduct an interview.  The interview was summarized on forms

11   and numerical scores are awarded by the interviewers.  Those

12   are part of the record.

13        THE COURT:  What am I to make of, and recognizing

14   for purposes of a summary judgment motion, for course, all

15   disputed issues of material fact are resolved in favor of the

16   non-movant.  What am I to make of the Wagner testimony to the

17   effect that Mr. Wright had commented that brown, black people

18   were not as smart as white people?

19        MR. KUHAR:  Your Honor, again, with that

20   understanding that we're not conceding it occurred, but having

21   to deal with it, it was absolutely completely removed from the

22   process.  This was one board member --

23        THE COURT:  How can that be removed from the

24   process, I say this, perhaps, it's not born out of ignorance,

25   but my understanding is that Mr. Wright was a board member, is

                                    5

1   that right?

2          MR. KUHAR:  Yes, your Honor.

3          THE COURT:  And my understanding is that ultimately

4   the decision as to who -- recommendations were made by

5   supervisory personnel in the high schools to the board, for the

6   board approval, is that essentially how it went, in essence?

7          MR. KUHAR:  Correct, your Honor, with it being

8   elementary schools, and then subject to the superintendent's

9   recommendation, but yes, your Honor.

10          THE COURT:  Isn't it, within the meaning of the

11   cases, isn't that statement direct evidence, not circumstantial

12   evidence, but direct evidence of discriminatory animus?

13          MR. KUHAR:  No, your Honor, in the sense that he was

14   not a decision-maker.  Again, the process is that, whether you

15   look at the complaint, which at some points alleges 75,

16   sometimes seven, and then the more recent submissions, which

17   indicate 25.  Whatever number of positions plaintiff is

18  contending she should have got gotten, one of which she should

19  have gotten, the process is the same.  Which she was

20  interviewed by administrators, they completed forms and

21  assessed her other characteristics and qualifications, they

22  said she was not the preferred candidate.  So it was never

23  recommended to the superintendent that she be hired.

24  Therefore, the superintendent never recommended to the board

25  that she be hired.  In other words, that board member never had

6

1  an opportunity to act upon any bias he may have had because he

2  was never asked to approve her hire.  Nor, did he ever give any

3  mandate to the people who they were recommending.  There is

4  absolutely no evidence that the administration had any

5  knowledge of this discrimination of the part of Mr. Wright, let

6  alone act upon it.

7        THE COURT:  What about the deposition testimony

8  that, I think this is Wagner's deposition testimony, during the

9  meeting with Heller and Dolecki regarding Wright's remarks,

10  Heller, who was a decision-maker in this process, agreed with

11  Wright's comments about blacks and browns not being as smart as

12  whites, and cited to a university study that allegedly

13  supported that view?

14        MR. KUHAR:  I don't recall that testimony, your

15  Honor.

16        THE COURT:  Get the deposition transcript, Becky,

17  get Wagner.  While she's doing that so we don't waste time,

18  we'll come back here.  What is the district's response to, and

19  this falls under the plaintiff's evidence of pretext, that it

20  had been the practice of the district to fill long-term

21  substitute teaching positions based largely on the

22  recommendation of the teacher who was being replaced; in this

23  particular instance Ms. Pickens?

24        MR. KUHAR:  Your Honor, there's no evidence of that.

25  That's an allegation, and the affidavits from Superintendent


7


1  Dolecki and Assistant Superintendent Heller, indicate that

2  since they went into their positions in 2000 and 2001, that has

3  not been the policy.  There is no record evidence that it had

4  been.

5        THE COURT:  Bear with me a minute, if you would.

6    I'm at page 23 of Mr. Wagner's deposition.

7        MR. KUHAR:  I don't have Mr. Wagner's with me.

8        THE COURT:  In any event, on page 23.  "Question:

9    We'll get to that.  So you told Mr. Heller about Mr. Wright's

10   comment?  Answer:  Yes, sir.  Question:  What else do you

11   recall?  Answer:  And Mr. Heller agreed that that is -- that's

12   a proven fact.  Question:  He said so?  Answer:  Yes.  He

13   agreed.  He said some university -- I can't tell you -- it

14   was -- a university did a study, or a professor -- I don't

15   know.  I can't actually -- Question:  But he cited some source?

16   Answer:  Right.  Question:  Of a study?  Answer:  Yeah.  I

17   don't -- can't remember -- couldn't recall what it was."

18   What about that?

19        MR. KUHAR:  Your Honor, we don't think that's

20   sufficient enough to constitute evidence of the direct remark,

21   because there is so much ambiguity built into it.  On top of

22   that, Mr. Heller was one person on a committee, and the

23   uncontroverted evidence is that the people on that committee

24   made up their own minds without being influenced by the others,

25   that they would score the people individually.  That's in Mr.

1    Heller's affidavit, and there is no evidence to the contrary.

2    I have not looked to see whether he was the lowest scorer or

3    not to be able to take my response to that level.  However, the

4    committee was constituted by approximately five to seven

5    people, the only evidence is the affidavit of Mr. Heller, which

6    indicates that they all came up with their own assessments

7    separately.

8          THE COURT:  Let's talk about her retaliation claim.

9    One of her claims is that after she filed her PHRC complaint,

10   thereafter she noticed a demonstrable drop in the number of her

11   substitute assignments, day-to-day assignments, I guess.  In

12   essence, aside from what other problems the district may

13   perceive she has with that aspect of her retaliation claim, I

14   gather that primarily it's a causation thing, in that the

15   district did not have control over the placement of

16   substitutes, in that that was handled by this outside agency,

17   is that right?

18          MR. KUHAR:  Exactly, your Honor.  There is

19   absolutely no suggestion or evidence to the contrary.

20          THE COURT:  That's part of the claim.  Then the

21   other part of the claim would be for positions that she claimed

22   she should have received but did not because of retaliation

23   that were not linked to the date, to this outside agency, but

24   were regular positions over which the district would have had

25   control?

9

1        MR. KUHAR:  Yes, your Honor.  With respect to those,

2   I think those are within the gambit of what we were discussing

3   before.  Essentially, the reason she was not hired for long

4   term or permanent positions in '05, or even early '06, for that

5   matter, or '04.  Those were evidence to be based upon her not

6   doing well in the process.

7        THE COURT:  Get Wright's deposition for me.  Thank

8   you.  What do you make of this intentional infliction of

9   emotional distress claim?

10        MR. KUHAR:  I think it's been abandoned, your Honor,

11   by lack of opposition to it, but otherwise we stand on our

12   brief.

13        THE COURT:  You make an argument that the inclusion

14   of the school board, that the school board is not really an

15  entity anyways, legal entity, and that it's redundant anyways,

16  because the Crawford School District is already named as a

17  defendant, is that essentially it?

18        MR. KUHAR:  Essentially, your Honor.  I don't mean

19  to jump ahead, but I guess the remaining one would be the

20  individual defendants.

21        THE COURT:  Yes.

22        MR. KUHAR:  They're not even alleged to have done

23  anything, as to indicate with more specificity in the

24  memorandum.  They're named in the caption and they're named

25  once or twice in the complaint.  As, for example, being the


                              10


1  superintendent or being assistant superintendent.  But they're

2  really isn't even any allegations against them individually.

3        THE COURT:  Now, let me ask you something on this

4  question of retaliation.  On the regular jobs, not the

5  substitute jobs.  As we were reviewing the record here, bear

6  with me a second -- this is Mr. Wright's deposition, page 63.

7  "Question:  Let me ask you this.  Does the fact that Ms. Wagner

8  filed a lawsuit, does that disqualify her for being further

9  considered for a teaching position?  Answer:  No, I would

10  think -- again, I'm not sure that it's helpful.  Question:

11  Would you hold that against her?  Answer:  If I wanted a paid

12  job at the school district, I wouldn't sue them as a place to

13  start."

14        What am I supposed to infer from that?

15        MR. KUHAR:  First of all, I think that that person

16  was sort of let out of the question, we don't on the record

17  actually have the answer to it.  But to the extent one is going

18  to infer that he's counseling against doing that, I would still

19  say it's the analysis, from our standpoint, is the same with

20  respect to the other comment that he supposedly made.  In this

21  case that was his deposition testimony.  But there is no

22  causation.  In the relevant past, and I think I was more

23  specific in the memo, during the administrations of Dolecki and

24  Heller, the board had never not approved somebody, nor have

25  they ever deviated from the practice of having the

11

1  administration recommend somebody.  So board members,

2  essentially, and one would hope it was through justified

3  deference to the administration, board members had never

4  changed the course of hiring during the relevant past, relevant

5  to the claim.

6       THE COURT:  When a decision would be made to hire X,

7  Y or Z teacher for a substitute or full-time position, would

8  the board give its approval for actual hirings, wouldn't it

9  have to brought before the board?

10       MR. KUHAR:  Yes, your Honor.

11       THE COURT:  Okay.  But are you saying -- they would

12  only pass on the actual people who are recommended, if you were

13  one of the people that never got by, was not recommended, the

14  board would have no impact on that, is that what you're saying?

15       MR. KUHAR:  Exactly, your Honor.  Nor is there any

16  evidence that the board became advocates for the whites who did

17  end up or others who are not comparable to the plaintiff, there

18  is no evidence any of those folks caused people to be

19  recommended based upon those characteristics.

20       THE COURT:  The names are running together again,

21  Mr. Wright was?

22       MR. KUHAR:  A board member.

23       THE COURT:  A board member.  And Mr. Heller was the

24  superintendent?

25          MR. KUHAR:  Assistant superintendent.


12


1          THE COURT:  Assistant Superintendent.  But he was

2    one of the decision-makers, wasn't he, one of the persons from

3    whom input would be sought?

4          MR. KUHAR:  To the extent that he filled out an

5    interview evaluation form, yes, your Honor.

6          THE COURT:  All right.

7          MR. KUHAR:  Again, I regret I didn't compare, I

8    suspect strongly that his scores were not out of line with the

9    others, but I honestly can't tell you that for certain.

10          THE COURT:  All right.  But as a matter of Title VII

11    law, inferential circumstantial law, isn't there a body of case

12    law that is relatively well-established, I guess fairly common

13    sensical, and I don't use this term pejoratively and I would

14    draw no conclusions one way or the other, I'm just reading the

15    evidence as I'm required to read for summary judgment purposes,

16    if you have "one bad apple" in a bunch, it is not unreasonable,

17    is it, to draw the conclusion that it infects the rest of the

18    apples?

19      MR. KUHAR:  Well, your Honor, I would not request --

20   that in jury instructions, for example, that a jury be told

21   that they were not allowed to reach that inference.  However,

22   when we look at the cases that say how much evidence there must

23   be to survive a motion for summary judgment, I don't think that

24   passes muster.  That would require a number of speculations --

25      THE COURT:  Well, I have two things here, Mark.  I

13

1   have the statement by the board member, the veracity of which I

2   do not pass on substantively, obviously, but I have to accept

3   it, that blacks are not as smart as whites.  And I have a

4   similar statement by the superintendent that blacks are not as

5   smart as whites.  Now, if believed, doesn't that suggest a

6   culture there where it would not be a quantum leap to conclude

7   that perhaps non-whites might get the shorter end of the stick?

8      MR. KUHAR:  Your Honor, no, with all due respect.

9   I think even if this were the Price Waterhouse, even if this

10   were a direct evidence case, I think then the burden would be

11   on the district to show that it would have made the decision

12   but for the discriminatory animus, and I think it would have.

13  For example, if you would say throw out Heller's score on the

14  evaluation forms, how did she rate.  I'm certain it's going to

15  be significantly less than successful applicants.  And,

16  clearly, there's even less of a causation with respect to the

17  board member's supposed comment.

18      THE COURT:  All right.  Let me hear what they have

19  to say.  Who is going to be speaking here on behalf of the

20  plaintiff?

21      MS. BENSON:  Your Honor, Mr. Nichols and myself

22  divided up the argument.

23      THE COURT:  In what respect?

24      MS. BENSON:  With him dealing with the issue of

25  retaliation.


14


1      THE COURT:  All right.  Let see if we can clean out

2  some of this underbrush.  You have a veritable grab bag of

3  counts here and theories.  You have a 1981, a 1983 -- this is a

4  Title VII case, isn't it?

5      MS. BENSON:  I think it is, your Honor.  When we

6  looked at 1981, we're talking about how there's a contract

file:///A|/WAG10-27.TXT

7    here, but I think it boils down to a Title VII.

8         THE COURT:  This is a Title VII substantive and a

9    Title VII retaliation case primarily, isn't it?

10        MS. BENSON:  I think it is.  And, your Honor, quite

11   frankly, I think in a way the defendants, through their

12   response to plaintiff's statement of material facts really, I

13   believe, establishes the fact that where we're at in these

14   proceedings really show that there are issues with regard to

15   material facts in dispute.

16        THE COURT:  Well, let's talk about it.  I mean,

17   let's start, not with your retaliation, but with your failure

18   to hire claim.  Let's start -- actually, you may be treading on

19   Mr. Nichol's toes here, but I'm going to ask you anyways and

20   he's free to say anything he wants.  Insofar as these

21   substitute positions were concerned, part of her claim is after

22   she filed the PHRA complaint, she noticed a mark diminution?

23        MS. BENSON:  That's correct.

24        THE COURT:  In the number of positions that she was

25   being afforded.  But as I look at the record here, Ms. Benson,

15

1  it appears that the district has come forward with evidence and

2  as far as I see it's not contradicted, that they had no control

3  over those assignments, and those assignments were exclusively

4  placed through an outside placement service.  Sit down, sir.

5  Were exclusively placed by an outside placement service.

6  That's a causation issue.  What's your response to that?

7      MS. BENSON:  Your Honor, I will acknowledge that the

8  district has come forward with a second affidavit from

9  Assistant Superintendent Heller.

10      THE COURT:  Incidentally, not to interrupt you, I'm

11  going to let you finish your thought.  We scoured this record

12  and there's nothing from your client or from anybody else, that

13  I can see, that rebuts that?

14      MS. BENSON:  Well, let me -- if you look at their

15  affidavit, obviously, we did not come forward with an affidavit

16  that says that they made no contact.  However, your Honor, we

17  have to look at it this way.  The district enters into a

18  contract with this communications center, I believe.  And Mr.

19  Heller claims in his second affidavit that we had no contact

20  with this organization.  But how do they explain that there was

21  such a drop.  For instance, we attached to the plaintiff's

22  affidavit a listing of assignments.  And if you go through that

23  list by school year to school year, she starts off in 2001 to

24  2002, working 125 and a half days.  The school year 2002 to

25  2003, it's 112 days.  2003 to 2004, it's 124.  And then school

16

1  year 2004 to 2005, it's 99 and a half days.  School year 2005

2  to 2006, it's 74 days.  And the current school year, 2006 to

3  2007, is 13 days out of 39 so far this year.  Someone has

4  control, plaintiff certainly don't have control of the

5  communications center.  It's the school district here that has

6  that control.

7        THE COURT:  That's what you say.  But what

8  evidence -- summary judgments are fought on the record.  What

9  evidence of record, how have you raised, and this isn't the

10  only aspect of your retaliation claim and I'm not going to keep

11  going down that road, I'll let Mr. Nichols talk about it.  All

12  I see is a list of assignments, which purports to show a

13  diminution over time.  A list of assignments that diminishes

14  over time that cannot be tied on the record to decisions made

15  by the defendant, doesn't really get you anywhere, does it?

16        MS. BENSON:  Well, I think --

17        THE COURT:  Would you excuse me a second, Ms.

18   Benson.  Stand up, would you please stand up, sir.  Let me make

19   something clear to you, Mr. Nichols.  I don't run a tag team in

20   my courtroom.  You're going to have an opportunity to speak as

21   fully and as fairly as you want to in a minute.  But I am not

22   going to be interrupted every two seconds by you raising your

23   hand like we're in a classroom.  Do you understand that?

24        MR. NICHOLS:  Judge, I understand that.  Judge, what

25   I simply want to say is I would like an opportunity to speak on


17


1   the issues after Ms. Benson.

2        THE COURT:  If you don't sit down right now, it's

3   going to be unfortunate, so just sit down and wait your turn.

4   Go ahead.

5        MS. BENSON:  Your Honor, the only organization that

6   has control with regard to the communications center is the

7   district, not Ms. Wagner.  So if she didn't receive those

8   assignments, I mean, you look at it and say well, fine, why

9   didn't she get those assignments when she did previously to it,

10    when it's clearly within their control.  Obviously, when we

11    filed our response and they came along with their affidavit,

12    second affidavit from Mr. Heller, and from the representatives

13    from the communications center, we were at a point where

14    discovery had closed.  And, obviously, if the court determines

15    that this matter should go to trial, we may come back to the

16    court and say give us an opportunity to really get in there and

17    do some additional discovery.

18        THE COURT:  You're not going to get that.  Is this

19    how you understand that it worked, though.  That this outside

20    agency, when the district indicated it would have a need or an

21    anticipated need for the coming week or coming month, this

22    outside agency was essentially responsible for beating the

23    bushes to find people and send them to the district?

24        MS. BENSON:  Actually, what happened is if we go

25    back to the year 2001, when Ms. Wagner applied for a full-time

18

1    position, at that time she's interviewed by the previous

2    superintendent, Superintendent Lascola.  She's in an interview

3    process there for a full-time position.  She basically is hired

4   as a sub, and her name is handed over to the school by the

5   school district to this -- outsourcing center, what have you.

6   And so she's placed on the list.  It's our understanding that

7   before her name is entered on that list, that the school board

8   had to approve her hiring as a day-to-day sub.  And with

9   teachers, there's a couple of ways they can get subs.  Number

10  one, the system may bring her, call her up.  Or teachers can

11  recommend her to be their substitute, so she can get positions

12  that way.  The teachers may ask for her directly or there may

13  be a phone call through the system or what have you, with

14  regard to that.

15        Let me, your Honor, if I could, in terms of dealing

16  with retaliation, we're not just dealing with the fact there

17  that was a drop.  We're also looking at the fact over this

18  period of time, beginning in the year 2001, she applied for

19  approximately 75 long-term substitute positions and/or

20  full-time teaching positions.  Now, in her affidavit we

21  identify 29 people that, to our knowledge, were hired during

22  this time period who were not union members.  They were not, as

23  the defendant claims, internal union bidders.  So they were at

24  the same status as she was.

25        THE COURT:  No dispute that -- no dispute that those

19

1   would be the only positions she would arguably have been

2   eligible for?

3        MS. BENSON:  That's correct.

4        THE COURT:  All right, let's talk about those

5   positions.  Now, insofar as their failure to have hired her,

6   either for a permanent position for which she was eligible and

7   can apply, or for a long-term substitute position, I assume

8   you're talking about long-term substitute positions, in

9   addition beyond the Pickens' position?

10       MS. BENSON:  That's right.  She applied -- let me do

11  a couple of things here.

12       THE COURT:  I have to tell you in all candor, these

13  briefs were very difficult to figure out what was going on,

14  very difficult.  And it wasn't through lack of effort on my

15  part.

16       MS. BENSON:  Right.  Let me just do a few things

17  here.  Ms. Wagner was hired routinely, if you want to say that,

18  as a day-to-day sub on an as-needed basis.  She, I think at

19  most, experienced being hired for one week at a time.  Okay.

file:///A|/WAG10-27.TXT

20   When you look at two weeks, three weeks, 90 days, she was never

21   given those extended opportunities.  Now, why is 90 days

22   important.  Well, when you work for the school district for 90

23   days, you get certain benefits, and they're like retirement

24   benefits, I believe.  If you do three 90-day periods, you then

25   become an internal bidder.  And that means you have a right to


20


1   a teaching position.  And it's our position that she was never

2   given those opportunities, especially the 90-day long-term

3   subs, because they knew what that would do, she would end up at

4   some point being an internal bidder, and they didn't want that.

5        THE COURT:  All right, let's cut to the chase, then,

6   what the heart of this is all about.  In essence, with respect

7   to the various failures to hire.  The position of the district

8   is, the alleged legitimate non-discriminatory reason is, is

9   that there was a process, there were rankings, and when you

10   look at the manner and method in which she was ranked, she was

11   lower than everybody else.  What I want you to do is by way of

12   summary, tick off for me, as you believe is reflected in this

13   record, evidence of pretext?

14         MS. BENSON:  Okay.  Let's take Mr. Heller's first

15    affidavit.  You look at his first affidavit, and Mr. Heller is

16    the assistant superintendent.  Says hey look, we didn't hire

17    her because her grammar was poor, her score was low and there

18    was "some other negative traits."  He doesn't identify what

19    those other negative traits were.  Now, if we look at the

20    record, though, we go to a classroom observation that Mr.

21    Heller conducted on November the 22nd, 2002, while she was

22    subbing for Ms. Pickens.  And also a classroom observation by

23    Mr. Kurt Meader, who was then the principal at Cochranton

24    Elementary.  There's a section on that -- this is Defendant's

25    Exhibit 3C and Defendant's Exhibit 3D.  There's a section on


21


1    there that's captioned "instructional techniques/efficiency."

2    And then underneath that it says "command of written and spoken

3    English."  If you look at the key to that, and Mr. Heller puts

4    an "S", says satisfactory.  Now, that's the highest score you

5    could get on this instrument.  Mr. Meader does the same thing.

6    So all of a sudden in the year 2006, not 2002, Mr. Heller finds

7    that the plaintiff's grammar is poor.  If you look at the

8   evaluations, this is called the interview, the employment

9   interview analysis forms, that was completed in December of '02

10   when Ms. Pickens' position and four others were up to be

11   filled.  Mr. Heller never mentions, and this is Exhibit 3A,

12   Mr. Heller, if you look at his score, his ranking, and there's

13   handwritten notes, he never mentions anything about her

14   grammar.  He never mentions anything -- so he talks about

15   grammar.  When it comes to class, classroom management, he says

16   "structured, a lot of learning," and then lot of, there's some

17   words I can't figure out.  He also notes her nationality in

18   that interview.

19        THE COURT:  Is there a box for that?

20        MS. BENSON:  A box for nationality -- no, it's a

21   handwritten note.  And this is Exhibit 3A.  I'm looking at his

22   evaluation.  If you look at, there is another individual who

23   filled out an employee interview analysis.  That person just

24   has the initials, looks like B.J.  Dated December, '02.  That

25   person notes her nationality.  So if you just look and you go


22


1   through every one of these employment interview analysis forms

2  for December of 2002, there is no mention of grammar.  If you

3  go through the ones in '04, there is no mention of poor

4  grammar.  If you look at Mr. Heller's evaluation of March of

5  '04 --

6        THE COURT:  Let me cut to the chase, then I want you

7  to go on to other evidence that you believe demonstrates

8  pretext.  Your argument is that the grammar is post hoc

9  justification?

10       MS. BENSON:  Absolutely.  And that's true -- if you

11  deal with the accusation that she did not manage her class

12  well, and if you deal with the accusation that she lacked

13  knowledge, all of that is post hoc.  The only thing I would

14  call the court's attention to -- are exhibits, defendants' own

15  exhibits -- 3C, 3B, I believe it's 3D, 3C, 3D.  And then

16  exhibit -- let me make sure I have the right numbers, your

17  Honor.

18       THE COURT:  All right.

19       MS. BENSON:  I'm sorry.  Heller's classroom

20  observation is Exhibit 3C.  Meader's classroom observation is

21  Exhibit 3D, that's from the defendants.  And then if you look

22  at the employment interview analysis of December 9, '02, that's

23  3A.  And then formal interview analysis of March 11, '04,

24  that's Exhibit 3B.  All of those are defendant's exhibits.  If

25  you look at that, you will see that their claims with regard to

23

1  the use of poor grammar, the lack of a command, ability to

2  manage the classroom and of general knowledge of the job, they

3  were all rationales developed after the fact.

4        THE COURT:  What do you say to Mr. Kuhar's position,

5  insofar as any statement that Mr. Wright may have made, that he

6  wasn't really a decision-maker?

7        MS. BENSON:  Well, first of all, number one, if you

8  look at both Mr. Heller's affidavit, his first affidavit, and

9  the superintendent's affidavit, they both acknowledge that

10  people can't be hired unless the board approves it.  They can

11  make all the recommendations in the world, but the board has to

12  approve them.  What's critical, I think, when you look at Mr.

13  Heller's.  Mr. Heller testified that hey, look, as the

14  assistant superintendent I'm responsible for organizing and

15  managing the hiring and interview process.  I go out and place

16  people on interview committees.  And when it comes to the

17  elementary candidates, I get people from the elementary school

18  system.  Put them on that committee.  Everyone in that room

19  hold positions where they are -- Mr. Heller is their boss.

20  Come in the room, they sit there.  Mr. Heller manages that

21  entire process, and it is he who takes the recommendation to

22  the assistant superintendent.  And from there the

23  superintendent takes it to the board.  So when you look at this

24  process here, Mr. Heller, obviously, plays a critical role, and

25  you look at his own testimony, obviously, he apparently shares

24

1  the thought of Mr. Wright when it comes to the abilities of

2  people of color.  Mr. Heller knows how Mr. Wright feels.  He

3  knew that.  So his role is critical.  The superintendent is

4  aware, his role is critical in terms of recommendation.  So

5  this isn't simply a question of Mr. Heller played a critical

6  role and he apparently shares the same thoughts about people of

7  color as Mr. Wright does.

8       THE COURT:  What other evidence of pretext do you

9  have?

10       MS. BENSON:  I think that when you look at the fact

11  that when the client, as I said, she applied for approximately

12  75 positions.  We in the opposition that at least 25 of those

13  people who got hired, were non-union bidders.  But you also

14  look at a couple of things.  Ms. Wagner files her complaint

15  with the Pennsylvania Human Relations Commission in 2003.

16  She filed the federal lawsuit in September of 2004.  She's

17  interviewed and her only other interview, other than the

18  Pickens' position, is like around March of '04.  About nine

19  people are hired.  One of whom was African-American, Tammy

20  Foster.

21          THE COURT:  That doesn't help your position, does

22  it?

23          MS. BENSON:  Well, wait a minute, I think it does,

24  let me explain why.  If you go look at Tammy Foster's job

25  application in 1997, and that's our Exhibit No. 7, and you also

25

1  look at our Exhibit No. 8, what does it show.  It shows that

2  Tammy Foster went to the school district, having graduated from

3  Edinboro University in 1994, and applied to be a teacher.  They

4  didn't hire Tammy Foster.  This is in 1994.  She wasn't hired

5  as a full-time teacher.  She was hired as a substitute.  And

6  she substituted from '94 to '96.  In '97 she applied again to

7  become a full-time teacher.  Wasn't hired.  In 1999, September

8  of '99, she was hired as a teacher's aide, despite the fact

9  that she was a full-time teacher, I mean certified as a

10  teacher.  And she stays in that position until June of '04.

11  Then miraculously she's hired after the plaintiff files her

12  lawsuit, to be a full-time teacher.  Plaintiff's lawsuit was

13  filed in this court in September of '04.  She gets hired, Tammy

14  Foster.  If you look at the fact that Naomi Uy-Moore, this is

15  really interesting.  The defendant goes out of state to

16  Baltimore, Maryland.  Not only did they go out of state, they

17  find an Asian, they find someone who is a Filipino.  And this

18  Naomi Uy-Moore, and they bring her to the State of Pennsylvania

19  and put her in a full-time teaching position.  And they did so

20  in violation of state law.  If you're going to bring somebody

21  from out of state to teach in Pennsylvania, that person has to

22  meet certain requirements that Pennsylvania requires.  And one

23  of those was she had to have out-of-state credentials and that

24  requires her to take a test.  They apply for her certification

25  and she did not pass the test.  But she's hired.  State law

1   says you can't do that --

2        THE COURT:  Let's assume all that is true, though,

3   I'm still not seeing how the fact they allegedly bring someone

4   in from out of state, that allegedly is illegal to do so, and

5   that person also happens to be a member of the protected class

6   and they hire her, how does that circumstantially increase the

7   likelihood that they were discriminating against your client?

8        MS. BENSON:  Because, your Honor, I think when you

9   look at it this way.  Here you have a fully qualified person,

10  who had applied for the position, was there.  The school

11  district acknowledged that she meets the minimum state

12  requirements to be hired.  Instead, they go out of state and

13  put somebody in.  And I think the question becomes why did they

14  do that in the years 2005, 2006, after she had filed a lawsuit.

15  Because they wanted to come to this court and say hey, look, we

16  don't discriminate, look, we got one.

17        THE COURT:  All right.  I have your point on that.

18  Anything else you want to tell me on the main claims before I

19  hear a little bit about the retaliation claims?

20        MS. BENSON:  One other thing, your Honor, I want to

21   talk about, and this somewhat is touching on the retaliation

22   somewhat.  As you know in Pennsylvania, teachers have

23   certification that has to be renewed every so many years.  Ms.

24   Wagner's came up for renewal this year.  She had completed the

25   work, she was told by the school district we're going to pass

27

1   that on to the state.  As time is coming to an end, we learned

2   that they never did.  And so the court has before it as our

3   exhibit, a letter to the defendant, which says please get this

4   information in, we consider your failure to do so a form of

5   retaliation.  And I believe that's our letter to Mr. Kuhar,

6   Exhibit No. 3, which is dated April 6th of this year.  We take

7   that as another example of -- their failure to move for it

8   until we insisted, once we became aware that they had not,

9   their failure to move forward would have meant that she would

10   not have been certified to teach.  And it was -- we were

11   fortunate that we caught it in time.  So she maintained her

12   certification.  We take that as another act of retaliation

13   pending this litigation.  I think those are the main examples,

14   your Honor, that I wanted to deal with regard to her claim.

15          THE COURT:  I'm going to take a short break, then

16   we'll hear from Mr. Nichols.

17          (Recess from 2:15 p.m.; until 2:20 p.m.)

18          THE COURT:  All right, Mr. Nichols.

19          MR. NICHOLS:  Judge, I would like to address the

20   issue that had arose concerning retaliation.  And I'm going to

21   be very brief on that.

22          THE COURT:  That's fine.

23          MR. NICHOLS:  I, in preparing for this oral argument

24   today, I read the most recent submissions, two of the most

25   recent submissions filed by Mr. Kuhar on behalf of the

28

1   defendant.  The first is an affidavit by Heidi Black, who is

2   the general manager of the communications center.  And she says

3   quite clearly, she said they are independent contractors and

4   that the school district has no control over this function.

5   It's an outsourced function.  And then I read the second

6   affidavit put forward by Mr. Heller.  And, again, in paragraphs

7   two, three and four, Mr. Heller says that we have no control

8   over the assignments of day-to-day substitutes, this is

9   accomplished through the communications center.  The district

10  has no control over the communications center.  And the bottom

11  line is that we have no control, this is the function of the

12  communications center.

13          THE COURT:  Right.

14          MR. NICHOLS:  I've reviewed, I knew this issue would

15  come to the floor.  If I was on the other side, I would do the

16  same thing from their vantage point.  I have four cases that I

17  would like to invite the court to review before making a

18  decision.  Because I think they cut right to the chase.

19          THE COURT:  In essence --

20          MR. NICHOLS:  But before I cite the cases to the

21  court, I would like to ask the court to seriously read pages 13

22  and 14 of the plaintiff's memorandum of law in support of the

23  plaintiff's motion for summary judgment as it relates to how

24  the district retaliated against --

25          THE COURT:  I'm sorry, as it relates to what?


                                29


1           MR. NICHOLS:  How the district retaliated against

2   the plaintiff.  Now, the first important thing is that the

3  record will show the time she was shown, that in the '01 school

4  year, 2002, and then the 2002-2003 school year, the plaintiff

5  worked approximately 89 percent of the time.  We have the

6  numbers, we have exhibits.  I don't debate that, I leave it to

7  you.  I offer nothing but facts, sir.  All right, 89 percent of

8  the time.  Then after she filed her complaint in February of

9  2003, then those numbers fell off very precipitously, starting

10  with the school year, particularly 2003 and 2004.  Fell off

11  very precipitously.  My question is why.  And I think in the

12  brief in opposition we raise at least an inference that the

13  district was reacting to a retaliation for the plaintiff having

14  engaged in protected activity, and that is going before the

15  PHRC and saying I have been discriminated, I filed a complaint,

16  as simple as that.  I think the causation we can establish, the

17  link, is that she engaged in protected activity, filed a

18  complaint with the PHRC.  They reacted, the district reacted

19  wrongfully, unlawfully.  The district reacted wrongfully and

20  unlawfully, by reaching a diminution in her opportunities to

21  serve as a substitute.  The numbers show that.  I don't argue

22  with the numbers, I give them to you.  The second thing is,

23  also shown in our brief, the pages I invite you to read --

24          THE COURT:  Before you do that, though, you peaked

25   my curiosity, do you have those four cases with you?


                              30


1          MR. NICHOLS:  Yes, sir, I have these cases right

2   here.

3          THE COURT:  Would you please hand them to my clerk.

4          MR. NICHOLS:  Sure.  The first one is Flowers_v.
                                                 _____ ___

5   Columbia_College, it's a 7th Circuit case.  The second one is a
    _____ _____

6   9th Circuit case, EEOC_v._Brown_Sellenbach_Company.  The third
                       ____ __ _____ _____ _____

7   is also a 9th Circuit case and it's Trent_v._Valley_Electric
                                        _____ __ _____ _____

8   Association,_Inc.  It's three cases, your Honor.  The only
    _____ ___

9   thing I want to say about these cases --

10          THE COURT:  How are they germane to our discussion?

11          MR. NICHOLS:  That first case I gave you, what is

12   the name of that first one?

13          THE COURT:  Flowers.
                        _____

14          MR. NICHOLS:  Flowers.  If you turn to the second
                          _____

15  page, what the judge says right there, if an employer can -- by

16  shifting responsibilities to some other independent contractor,

17  can do that willy-nilly, then it makes a mockery of the United

18  States Supreme Court decisions, civil rights, makes a mockery

19  of Title VII.  Notice what the judge says --

20        THE COURT:  You didn't give me the case?

21        MR. NICHOLS:  It's right there, sir.  At the bottom

22  of the first page and continuing on the second page.

23        THE COURT:  It's just a summary of the case.

24        MR. NICHOLS:  Right, a summary.

25        THE COURT:  That's not the case.


31


1        MR. NICHOLS:  That's what the 7th Circuit is saying.

2        THE COURT:  Well, hang on a second here.  Let me

3  just read the little bit that you gave me.  I've got it, thank

4  you.

5        MR. NICHOLS:  It's as simple as this.  I don't think

6  the United States Congress, the legislature of this state, when

7  they put on the books civil rights laws, that they intended for

8  the court to duck their responsibility, by simply being able to

9   contract it out.  That's what we have here.  That's all I have

10  to say about this issue of retaliation.

11          THE COURT:  Anything else you want to tell me before

12  you wrap it up?

13          MR. NICHOLS:  Judge, I just want to say this.  I

14  have spent, and Attorney Benson, we have spent the last two

15  years working on this case.  It has not been an easy labor.

16          THE COURT:  I know.

17          MR. NICHOLS:  It's been hard, we've been knocking on

18  your door.  What we have put before you is a pile of paper, but

19  it's more than a pile of paper.  The issues identified in our

20  memorandum of law, together with the exhibits, I think when you

21  take and take a thorough objective view of what we have put

22  forward, one, in terms of the Pickens' replacement; two, we

23  have challenged and called into question the method, the

24  methodology, by which the schools evaluated the plaintiff.

25  Both in 2002 and 2004.  And in doing so, we read very carefully


32


1   your opinion in the Pack decision.  When you quoted Lanning and

2   Griggs, against the police department.

3       THE COURT:  I've done that more than once.

4       MR. NICHOLS:  I understand, I'm talking about

5   methodology, though.  I read carefully what you said.  And I

6   think it has application here.  We also, though, not only

7   called into question the methodology by which she was

8   evaluated, it was wrong, erroneous, arbitrary and open-ended,

9   but also this question of comparative analysis.  She has taught

10  as a substitute teacher three years, she comes up to the line

11  to be evaluated, and the school knows she's experienced.  But

12  there are teachers whose credentials are far below hers and

13  they're chosen, we see that again and again.

14      THE COURT:  All right, we're going to wrap up now.

15      MR. NICHOLS:  That's what troubles me.  Now, let me

16  say one final thing, judge, then I'm going to shut my big

17  mouth.

18      THE COURT:  All right, I'll hold you to that.  Go

19  ahead.

20      MR. NICHOLS:  Indulge me, indulge me, I've worked

21  two years hard on this case.  This is important, judge, this is

22  an important case.  It's important for Ms. Wagner, it's

23  important for her family.  You asked my colleague, Ms. Benson,

24  whether this is a Title VII case alone.  And while I understand

25  your focus, I hope you do pay some attention to what we said in

33

1  the last two pages of our memorandum of law.  And this case is

2  not all together divorced from 1981 and 1983 considerations.

3  Why do I say that.  Because, one, they take the position that

4  substitute teachers are at-will employees.  Well, thank God for

5  the civil rights laws of 1981 and 1983, they apply to at-will

6  teachers as well.  That's one thing.

7       THE COURT:  So does Title VII.

8       MR. NICHOLS:  Precisely.  But at-will, I'm saying

9  at-will.  Second, the other thing.  She is a minority, she's in

10  a protected group.  I believe that there's racial animus that's

11  been shown here, that we can demonstrate that because if you

12  give us the opportunity.  And the last thing I want to say is

13  give her her day in court.  She, after two years of struggling

14  with this discovery, spending several dollars on sweat, she is

15  entitled to her day in court, judge.

16       THE COURT:  All right, thank you, I'm calling you on

17  it now.

18        MR. NICHOLS:  Thank you, judge.

19        MR. KUHAR:  May I be heard, your Honor?

20        THE COURT:  Come on up.  Very briefly.

21        MR. KUHAR:  May I address something or did you have

22  some questions for me?

23        THE COURT:  No, I have nothing to say right now.

24        MR. KUHAR:  Can I give this to your clerk, I'll make

25  this part of the record.


34


1        THE COURT:  Sure.

2        MR. KUHAR:  I'll show plaintiff's counsel this in a

3  second.

4        THE COURT:  What is it?

5        MR. KUHAR:  It's already of record, it's the '04

6  summaries of the interviews.

7        THE COURT:  All right.

8        MR. KUHAR:  And I'm doing this, I flagged two spots

9  in particular, I'm doing this because of all of the comments on

10  all of the interview forms, which were incorporated as the

11  defendants' articulated alternative non-discriminatory reason

12  for the action complained of, the only one that seemed to get

13  any attention was this grammatical errors issue.  And, in fact,

14  it was stated during Ms. Benson's presentation that it was

15  concocted after the fact because it wasn't raised at any

16  earlier time, it's not in any of these interviews.  It is, your

17  Honor, in these interview summaries.  I flagged for you the

18  last page of that packet.  For the benefit of the record, it's

19  the one that says Rowena Wagner in the upper left.  It's

20  Defendant's Exhibit 3A or 3B, I'm not certain, and it has March

21  11, '04 in the upper left as the date.  On the very back it

22  indicates that this rater's thought that the plaintiff had,

23  there were grammar concerns.  It was specific in that she

24  apparently used a double negative.  And inappropriate

25  prepositional usage.  That would be on the very back of that


35


1  packet.  And then there's also a flag on what would be the back

2  of the third page, which indicates some grammar articulation

3  errors.  I'm only responding to that because, again, it got so

4  much focus and a specific representation was made which was not

5  accurate.

6        THE COURT:  All right.

7        MR. KUHAR:  May I show it to her?

8        THE COURT:  Sure, go ahead.

9        MR. KUHAR:  Your Honor, do you have anything further

10  of me?

11        THE COURT:  No.

12        MS. BENSON:  First of all, I want to point out, and

13  I appreciate Mr. Kuhar pointing out those two documents on

14  those two exhibits.  However, the plaintiff indicated in her

15  affidavit the issue of grammar was never brought up to

16  plaintiff.  It occurs, it's only mentioned for the first time

17  when the defendants file their motion for summary judgment, now

18  we look at Mr. Heller's affidavit.  Then for the first time all

19  of a sudden this issue of grammar.  I would point out to the

20  court, if you go to the classroom observation of November of

21  '02, Mr. Heller and Mr. Meader finds nothing wrong with her

22  written and with her language.  Command of written and spoken

23  English, and the notation is satisfactory in a classroom

24  setting.  That's number one.

25        The other thing I want to point out to the court,

36

1   just very briefly, if you look at Ms. Pickens' deposition, Ms.

2   Pickens says, she's a 35-year school veteran, Ms. Pickens

3   recommended Ms. Wagner to be her long-term sub when she was

4   taking leave because of hip replacement surgery in 2002-2003.

5   Ms. Pickens' deposition says look, the practice of this school

6   district has been that on the recommendation of teachers, their

7   subs are hired.  No interviews, recommendations.  Mr. Heller,

8   in his deposition, in his affidavit says that policy changed,

9   that practice changed when I came in here in February of '02.

10   Superintendent Dolecki in his affidavit says oh, it changed

11   when I came here in '94.  The point of it is Ms. Pickens in her

12   deposition says I was unaware of it, I made that

13   recommendation.  I also followed up with a written letter, and

14   I had an in-person conversation with Mr. Heller.  And in that

15   conversation Mr. Heller says to me, and I learned for the first

16   time, that this practice of putting in long-term subs on

17   teacher's recommendations was changed.  Because I learned it

18   for the first time that that happened.  She says this here,

19   however, Mr. Heller made a commitment to me that Ms. Wagner

20   would sub for me at least until the end of the fall semester of

21   '02-'03.  Instead, Mr. Heller goes against that commitment, he

22  schedules and starts an interview process and then brings her

23  in.  So you have a history here of where a woman is testifying

24  that after 35 years of experience, that a practice that was in

25  place, all of a sudden changed with Ms. Wagner.  And even their

37

1  affidavits seem to imply very clearly that that practice did

2  exist, but both defendants want to say, Mr. Heller and Mr.

3  Dolecki, want to say oh, it changed when I arrived.  Apparently

4  no one knew about that.

5        THE COURT:  All right.  I have your point.  Now, I'm

6  going to look at what was just given to me for a few minutes

7  and look at some notes I've jotted down.  And then I think, in

8  all likelihood, I'm going to come out and I'm going to issue a

9  bench opinion on these motions.  Now, let's go off the record

10  here.

11        (Discussion held off the record.)

12        (Recess from 2:40 p.m.; until 2:50 p.m.)

13        THE COURT:  This is an order.

14                    ORDER

15        Presently pending before the court are cross-motions

16  for summary judgment.  Summary judgment, of course, is proper

17  if the pleadings, depositions, answers to interrogatories,

18  admissions on file, together with the affidavits, if any, show

19  that there is no genuine issue as to any material fact and that

20  the moving party is entitled to judgment as a matter of law.

21  Federal Civil Rule of Procedure 56(c).  In evaluating whether

22  the non-moving party has established each necessary element,

23  the court must grant all reasonable inferences from the

24  evidence to the non-moving party.  In other words, the court

25  must draw all reasonable inferences in favor of the non-movant.


38


1  See Knabe_v._Boury_Corp., 114 F.3d 407 (3rd Cir. 1997).
      _____ __ _____ _____

2        Under Title VII, it is of course unlawful for an

3  employer to refuse to hire or otherwise discriminate against

4  any individual with respect to his or her compensation, terms,

5  conditions or privileges of employment because of such

6  individual's race, color, religion, sex or national origin.

7  See Weston_v._Commonwealth_of_Pennsylvania,_Department_of
      _____ __ _____ __ _____ _____ __

8  Corrections, 251 F.3d 420, 425 (3rd Cir. 2001).  Title VII also

 9  prohibits retaliation and coercion directed at persons who have

10  taken steps to oppose an act or practice made an unlawful

11  employment practice under Title VII.  The PHRA has similar

12  prohibitions against employment discrimination, as well as

13  retaliation.  43 P.S. Section 955(d).  The Third Circuit has

14  consistently applied the same legal standard in analyzing

15  claims brought pursuant to Title VII and the PHRA.  Goosby_v.

16  Johnson_&_Johnson_Medical,_Inc., 283 F.3d 313, 317, n.3 (3rd

17  Cir. 2000).

18      With respect to plaintiff's 1981 and 1983 causes of

19  action, the Third Circuit has also applied the Title VII legal

20  standard.  See Schurr_v._Resorts_International_Hotel,_Inc., 196

21  F.3d 486, 499 (3rd Cir. 1999); Stewart_v._Rutgers,_The_State

22  University, 120 F.3d 426, 432 (3rd Cir. 1997).

23      We, of course, analyze plaintiff's claims under the

24  familiar burden-shifting test articulated in McDonnell_Douglas

25  Corp._v._Green, 411 U.S. 792, 802 (1973); and further refined

39

1    in Texas_Department_of_Community_Affairs_v._Burdine, 450 U.S.
     _____ _____ __ _____ _____ __ _____

2    248, 252-53 (1981).  Under the McDonnell_Douglas test and its
                                     _____ _____

3    progeny, the plaintiff has the initial burden of establishing a

4    prima facie case of discrimination, the substance of which will

5    vary depending on the type of claim; if the plaintiff is

6    successful, the employer must then articulate a legitimate,

7    non-discriminatory reason for the adverse employment action.

8    Krouse_v._American_Sterilizer_Co., 126 F.3d 494, 500 (3rd Cir.
     _____ __ _____ _____ ___

9    1997).  If the employer proffers a legitimate,

10   non-discriminatory reason for its action, the plaintiff must

11   then demonstrate that the proffered reason was merely a pretext

12   for unlawful discrimination.  Goosby, 228 F.3d at 319.
                                   _____

13          With respect to plaintiff's failure to hire claims,

14   defendants claim that they are entitled to summary judgment

15   because:  (1) plaintiff is incapable of establishing a prima

16   facie case of discrimination; and (2) even if the plaintiff

17   could establish a prima facie case, she has not come forward

18  with sufficient evidence to raise a triable issue of fact on

19  the issue of pretext.

20      In order to establish a prima facie case under Title

21  VII, the plaintiff must show that she, (1) is a member of a

22  protected class; (2) was qualified for the position; (3) was

23  subjected to an adverse employment action; and (4) under

24  circumstances giving rise to an inference of discrimination.

25  See Burdine, 450 U.S. at 254.  The district contends
    _____

40

1  essentially that the plaintiff's prima facie case fails on the

2  basis of a lack of qualifications for the respective positions

3  at issue.

4      In evaluating whether a plaintiff is "qualified" for

5  purposes of a prima facie case, we rely upon "objective"

6  factors.  Sempier_v._Johnson_&_Higgins, 45 F.3d 724, 729 (3rd
           _____ __ _____ _ _____

7  Cir.) cert. denied, 515 U.S. 1159 (1995).  Subjective

8  qualities, conversely, such as leadership or management skills,

9  are "better left to the later stage of the McDonnell_Douglas
                                              _____ _____

10  analysis."  Weldon, 896 F.2d at 798.

11          Here, plaintiff had the objective experience and

12   education necessary to qualify for the respective positions.

13   She possessed a Bachelor of Science degree in education and was

14   certified to teach elementary school grades K through 6.

15   Moreover, she was in fact hired as a substitute teacher by the

16   district in September of 2001.  We find, therefore, that she is

17   qualified for purposes of a prima facie case and a prima facie

18   case has been made out.

19          In essence, the district claims that it did not hire

20   the plaintiff for the Pickens' position based upon the fact

21   that her interview scores were lower than those of the

22   successful candidate.  Parenthetically, it appears that

23   plaintiff's scores ranged from 26 to 30 out of 45 potential

24   points; while the successful candidate scored in the range of

25   36 to 44.  See Exhibit 3A, interview analysis forms.


41


1          The district further contends that it did not select

2   the plaintiff for any other vacancies because her interview

3   scores were low, she displayed some negative traits during her

4    interviews, such as poor grammar, and because of noted

5    difficulties in the classroom as recorded, for instance, on

6    Heller's observation report, and Heller's conclusion that she

7    was not ready to manage her own class.  See Heller affidavit,

8    paragraphs 20 and 24.

9         Having articulated legitimate, non-discriminatory

10   reasons for the failure to hire, the question becomes whether

11   the plaintiff has pointed to some evidence "from which a fact

12   finder could reasonably either, (1) disbelieve the employer's

13   articulated legitimate reasons; or (2) believe that an

14   invidious discriminatory reason was more likely than not a

15   motivating or determinative cause of the employer's action."

16   Brewer_v._Quaker_State_Refining_Corp., 72 F.3d 326, 331 (3rd

17   Cir. 1995).

18        In support of her position that she has raised a

19   triable issue of fact on the issue of pretext, plaintiff points

20   to the following evidence:

21        (1) That it was the practice of the district to fill

22        long-term substitute teaching position vacancies

23        based upon the recommendation of the teacher who was

24        being replaced.  Plaintiff's affidavit, paragraph 7.

25          Pickens deposition, pages 14, 16, 24, 37.


42


1          (2) Pickens testimony that her request for a

2          specific substitute had been honored in the past by

3          the district.  Pickens deposition, pages 14, 16, 24,

4          37.

5          (3) That she was specifically requested by Pickens

6          to be her replacement, and Meader, the principal of

7          Cochranton Elementary School, agreed that she would

8          replace Pickens for the entire semester.  See

9          Pickens letter dated November 17, 2002, document

10          number 82.  Wagner deposition, page 12.

11          (4) That she was required to interview for the

12          position when the district did not have a formal

13          policy of interviewing candidates for substitute

14          positions, and did not interview candidates in

15          one-hundred percent of the cases.  See letter dated

16          May 23, 2003, document number 33.

17          With respect to other vacancies, plaintiff relies

18   upon the following evidence:

19        Wright's alleged comment that brown and black people

20        were not as smart as white people.  See Wagner

21        deposition, pages 18 through 19.

22        And the fact that her alleged poor grammar was never

23        brought to her attention as a reason for rejection

24        and, therefore, was essentially a post-hoc

25        justification for the rejection.  Plaintiff's


43


1        affidavit, paragraph 13.

2        With respect to the Pickens' position, the district

3   argues that all applicants for long-term substitute positions

4   were subjected to an interview and observation requirement, and

5   that teacher recommendations were only one factor considered by

6   the district in its selection of replacements.  In contrast,

7   plaintiff claims that the district consistently followed

8   teacher recommendations for replacements and interviews were

9   not required.  Plaintiff relies in part on the deposition

10  testimony of Pickens that it was the district's practice to

11  follow teacher recommendations, and that her requests for a

12  specific replacement had been honored in the past.  The

13  district contends that Wright was not responsible for the

14  decisions not to hire plaintiff, and there is no showing that

15  any other members were aware of or shared his alleged

16  prejudice.  Essentially, contending that the alleged statement

17  attributed to Wright is nothing more than a "stray remark."

18  In contrast, plaintiff claims that Wright's comments are

19  indicative of a discriminatory animus.  Stray remarks by

20  decision-makers may be circumstantial evidence of informal

21  managerial attitudes which can, in some circumstances, support

22  a showing of pretext.  Brewer, 72 F.3d at 333.

————

23         Here, while the district claims that Wright was not

24  a decision-maker, he did in fact have final decision-making

25  authority as a member of the board.  The comment was allegedly

44

1  made during the timeframe in which the plaintiff was seeking a

2  position with the district.  Moreover, the comment was

3  allegedly made at a meeting to discuss plaintiff's difficulties

4  in securing a position with the district.  We also note that

5  Mr. Wagner testified that during his meeting with Messrs.

6  Heller and Dolecki regarding Wright's remarks, Heller, who was

7    a direct decision-maker, allegedly agreed with Wright's

8    comments and cited a university study that was allegedly

9    confirmatory of the accuracy of the same.

10            Finally, plaintiff contends that her poor grammar

11    was never given as a reason for her not being hired.  The

12    district points to plaintiff's alleged difficulties in the

13    classroom, as recorded by Heller on the classroom observation

14    form and his conclusion that plaintiff was "not ready" to

15    manage her own class.  Plaintiff counters that although Heller

16    testified that plaintiff needed improvement in certain areas,

17    the observation of the plaintiff was "satisfactory."  And that

18    a review of the classroom observation form under the category

19    "management and organization" reveals no deficiencies recorded

20    in this area.  In sum, we find, based upon the above, that the

21    plaintiff's evidence with respect to pretext, although sharply

22    disputed by the district, raises a triable issue of fact

23    rendering summary judgment on the failure to hire claim

24    inappropriate.

25            I now turn to the issue of retaliation.  Retaliation

45

1  claims under Title VII involve the same McDonnell_Douglas
   _____ _____

2  burden-shifting analysis as outlined above.  Shellenberger_v.
   _____ __

3  Summit_Bancorp,_Inc., 318 F.3d 183, 187 (3rd Cir. 2003).  To
   _____ _____ _____

4  establish a prima facie case of retaliation, a plaintiff must

5  show:  (1) that she engaged in a protected activity; (2) that

6  the employer took an adverse employment action either after or

7  contemporaneous with the employee's protected activity; and (3)

8  a causal connection between the employee's protected activity

9  and the employer's adverse employment action.  Id. at 187.
                                                  __

10          In support of her retaliation claim, plaintiff

11   relies primarily on the following evidence:

12          (1) That after filing her PHRC complaint on February

13          20, 2003, she suffered a significant drop in

14          substitute teaching assignments.  Wagner affidavit,

15          paragraph 17.

16          (2) Following the filing of her federal lawsuit on

17          September 16, 2004, she was informed my Joanne

18          Darling, the former principal at Cochranton, on

19          September 24, 2004 that she could not be considered

20          for a teaching position because she had filed a

21          federal lawsuit.  Wagner deposition, page 60.

22          Wagner affidavit, paragraph 34.

23              In determining causation, courts have generally

24   focused on two factors:  (1) the temporal proximity between the

25   protected activity and the alleged discrimination; and (2) the


46


1   existence of a pattern of antagonism in the intervening period.

2   Jalil_v._Avedel_Corp., 873 F.2d 701 (3rd Cir. 1989).  However,
    _____ __ _____ _____

3   timing and proof of antagonism are not the only methods by

4   which a plaintiff can make out a prima facie showing of

5   causation.  Abramson_v._William_Paterson_College_of_New_Jersey,
    _____ __ _____ _____ _____ __ ___ _____

6   260 F.3d 265, 289 (3rd Cir. 2001).  Noting that a "broad array"

7   of circumstantial evidence may be used to illustrate a

8   potential causal link between a plaintiff's protected activity

9   and an employer's adverse action.

10              With respect to the plaintiff's contention that she

11   was retaliated against as evidenced by an alleged decrease in

12   her substitute assignments following the filing of her PHRC

13  complaint, even assuming that she has made out a prima facie

14  case with respect to the same, I find that she has failed to

15  rebut the district's legitimate non-retaliatory reason for any

16  alleged decrease in the day-to-day substitute assignments.

17  The district has come forward on this record with unrebutted

18  evidence that it had no control over which assignments

19  day-to-day substitutes were given, and that such assignments

20  were handled exclusively through a substitute placement

21  service.  Heller affidavit, paragraph 2.  The general manager

22  of the substitute placement service, Heidi Black, likewise

23  averred that the district has no control over those

24  assignments.  Black affidavit, paragraph 5.  Indeed, Black

25  indicated that the placement service had no knowledge of the


47


1  plaintiff's complaint or lawsuit prior to August 2, 2006, when

2  it was contacted to provide an affidavit in this case.  We

3  shall therefore grant the district's motion as to this aspect

4  of the retaliation claim.

5        We reach a different result, however, with respect

6  to plaintiff's remaining retaliation claim.  Plaintiff claims

7   that Darling's comments that she would not be considered for a

8   position because she filed a federal lawsuit evidence of

9   retaliatory animus.  The district contends, however, that

10  Darling was not authorized to speak for the district in this

11  matter.

12          While the plaintiff has failed to present evidence

13  linking Darling's comments directly to the district's decision

14  not to hire the plaintiff, we are not precluded from

15  considering other record evidence supporting an inference of

16  retaliation.  Farrell, 206 F.3d at 280-81.  As discussed more
            _____

17  fully in connection with the plaintiff's failure to hire

18  claims, plaintiff has, for purposes of the summary judgment,

19  cast doubt on the district's reasons for not hiring her as

20  either being post-hoc fabrications or otherwise not genuinely

21  motivating the district's decision.  We further observe, for

22  instance, that Mr. Wright testified at deposition that if he

23  wanted a paid job at the district "[he] wouldn't sue them as a

24  place to start."  Such a comment could reasonably be inferred

25  as reflecting a retaliatory animus.  We find, therefore, that

48

1    plaintiff has presented sufficient evidence to withstand

2    summary judgment on this aspect of the retaliation claim.

3         With respect to the fifth claim, the intentional

4    infliction claim, I find summary judgment is appropriate.

5    Specifically, I find that the plaintiff's intentional

6    infliction of emotional distress claim is barred by the

7    exclusivity provision of the Pennsylvania Workers' Compensation

8    Act.  See Matczak_v._Frankford_Candy_&_Chocolate_Co., 136 F.3d

9    933, 940 (3rd Cir. 1997).  Additionally, however, even if it

10   were not for the exclusivity provisions of the Act, the

11   allegations themselves not are not sufficiently egregious to

12   state a claim for intentional infliction under controlling

13   Pennsylvania law.

14        Defendants also seek summary judgment on behalf of

15   the School Board.  Defendants' contend that the School Board is

16   not a separate entity from the district and therefore it is an

17   improper and redundant party.  Relying on Glickstein_v.

18   Neshaminy_School_District, 1997 WL 660636 (E.D.Pa. 1997),

19   in which the court found the School Board was not amenable to

20   suit under Pennsylvania law.  The Glickstein court concluded

21  that because the School Board lacked the status of a political

22  subdivision under Rule 76, it could not be sued under Rule

23  2102(b).  We agree with the defendants because the school

24  district itself as a named party would ultimately be liable for

25  any judgment entered in the case and that the School Board is

49

1  in fact redundant.  Satterfield_v._Borough_of_Schuylkill_Haven,

2  12 F.Supp.2d 423, 431 (E.D.Pa. 1998).  Therefore, we'll grant

3  the defendants' motion insofar as the School Board is

4  concerned.

5        Finally, with respect to the defendants' motion

6  relative to Dolecki and Heller individually.  Defendants point

7  out that the claims set forth in the plaintiff's first amended

8  complaint reference defendants Crawford Central School District

9  and Crawford Central School Board, and there are no independent

10  allegations specifically to Dolecki or Heller.  Moreover,

11  neither Dolecki and Heller are employers for purposes of

12  liability under Title VII and the PHRA.  Dici_v._Commonwealth_

13  of_Pennsylvania, 91 F.3d 542, 552 (3rd Cir. 1996).  The court

14  agrees and they will therefore be dismissed from the case.

15       For the previous reasons, then, the plaintiff's

16  motion for summary judgment is denied.  The defendants' motion

17  for summary judgment is granted in part and denied in part for

18  the reasons previously set forth on the record.

19       All right, this case is non-jury.  We're about to be

20  going into our jury period here, we're not going to be able to

21  get this case in immediately.  But my Deputy Clerk is going to

22  be in touch with each of you with respect to -- well, the

23  present order that's already out, when are your pretrial

24  narrative statements due?

25       MR. KUHAR:  Your Honor, there is no due date set for


50


1  those yet.

2       THE COURT:  Well, you're going to get one right now.

3  20 days from today plaintiffs are due; 20 days from receipt,

4  the defendants are due.  And then we'll go ahead and set a

5  pretrial conference subsequent to the filing of both of the

6  pretrial statements.  I can assure you that this case isn't

7   going to get tried until sometime in early 2007.

8

9          (Whereupon, at 3:16 p.m., the proceedings were

10   concluded.)

11

12                    - - -

13

14

15

16

17

18

19

20

21

22

23

24

25             C E R T I F I C A T E

51

1

2

3

4    I, Ronald J. Bench, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11  _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25