**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROWENA WAGNER, | : | |
| Plaintiff, | : | |
| | : | C.A. No.: 04-264 |
| vs. | : | |
| | : | JUDGE McLAUGHLIN |
| CRAWFORD CENTRAL SCHOOL | : | |
| DISTRICT, et al | : | |
| Defendants. | : | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff hereby files her Proposed Findings of Fact and Conclusions of Law.

**A.    FINDINGS OF FACTS**

1.    Plaintiff Rowena Wagner graduated from Edinboro University of Pennsylvania in May 2000. She has a Bachelor of Science Degree in Education. She is certified to teach in Elementary K-6. She did her student teaching and field experience in the Crawford Central School District. Her student training was supervised by Professor John Lovett, a member of Edinboro's Department of Education, with the assistance of Mr. Douglas McCullough at Cochranton Elementary and Ms. Carole Fisher at Cochranton Elementary School. Her student teaching consisted of preparing lesson plans and other duties normally performed by the full-time teacher.

2.    Plaintiff's field experience was conducted under the supervision of Professor Bruce Smith, a member of the faculty of Edinboro University, with the assistance of Ms. Harriet Powell at Second District Elementary and Ms. Janice Koseff at Second District Elementary School. Her

field experience consisted of, among other things, supervising the class in the teacher's absence and devising lesson plans.

3.      Plaintiff received positive evaluations on the basis of both her field experience and her student teaching performance.  Her supervising professors and teachers never indicated that she used poor grammar or lacked insight or mastery of the subject matter that she taught.  Professor Lovett wrote:  "Rowena had an excellent classroom presence.  She presented herself well to her students. Although she had a dialect, her speech and grammar were never a concern.  She had a clear, commanding voice, and good classroom control."  Neither former Superintendent James Lascola, who interviewed her in 2001, nor Superintendent Michael Dolecki, who hired her, nor Mr. Charles Heller, III, Assistant Superintendent, ever informed Plaintiff that her use of grammar or speech was an impediment to her employment.

4.      In August and/or September 2001, Plaintiff commenced employment with the Crawford Central School District following the interview conducted by Mr. Lascola.  Mr. Lascola advised her that serving as a substitute teacher would place her on a career path leading to a long-term substitute or full-time teaching position.  Based upon Mr. Lascola's advice, Plaintiff believed that the practice by which substitute teachers got long-term substitute and full-time teaching positions was well established.

5.      During school years 2001-2002 and 2002-2003, Plaintiff worked as a substitute teacher throughout the School District approximately eighty (80) to ninety (90) percent of the school year.  Teachers for whom Plaintiff regularly substituted prepared Summary Reports reflecting the excellence of Plaintiff's performance.

6.      From 2002-2006, Plaintiff applied for more than seventy-five (75) long-term substitute and full-time permanent teaching positions in the School District.  Several of the posted teaching

positions were not bid on by members of the local union. At least 27 individuals were not

internal union bidders when hired at the elementary level during the period of 2002-present.

Although qualified for the announced vacancies, she never obtained a position, nor was she ever

interviewed after early 2004.

7.        By practice, Defendant had customarily filled vacancies of the teaching staff caused by

medical, sabbatical and other unexpected leaves on the recommendations of the full-time teacher

who was replaced. However, that practice was not followed when Plaintiff sought to replace Ms.

Joye Pickens in November 2002.

8.        In November 2002, Ms. Pickens took medical leave from her teaching position at

Cochranton Elementary. Ms. Pickens reached a verbal agreement with Assistant Superintendent

Heller that Plaintiff would be used as her substitute until the conclusion of the Fall Semester of

2002, which ended in January 2003, at which time the position was expected to be put up for bid.

9.        Plaintiff began Ms. Pickens' position on or about November 13, 2002. On November 22,

Mr. Heller conducted a classroom observation of Plaintiff, and on November 26, Principal Kurt

Meader conducted a classroom observation of Plaintiff. Plaintiff received a satisfactory on her

performance from both Mr. Heller and Mr. Meader.

10.       On December 20, 2002, Mr. Heller summarily dismissed Plaintiff, informing her that the

Interviewing Committee did not select her to replace Ms. Pickens as a long-term substitute. The

Interviewing Committee was established, managed and coordinated by Mr. Heller and consisted

solely of individuals under his supervision, all of whom were Caucasian.

11.       Of the seventeen (17) applicants who were considered for four (4) long-term substitute

positions, Plaintiff was the only minority. These vacancies were not posted.

12.     Superintendent Dolecki and Ms. Pickens testified that the School District had never summarily dismissed a substitute teacher and convened an Interviewing Committee to replace the substitute where the substitute, as was true in Plaintiff's case, had been assigned to a position with the expectations and assurance that she would work until the conclusion of the semester.

13.     Some of the Employment Interview Analysis Forms used by the Interviewing Committee were not signed by the evaluators and contained comments relating to Plaintiff's ethnicity and national origin.  Plaintiff was required to undergo interviews and classroom observations; however, other applicants were hired as long-term substitutes or full-time permanent teachers without classroom observation.  Moreover, in evaluating Plaintiff in December 2002, Assistant Superintendent Heller manifested a closed-mind, stating "No Way" would plaintiff be hired.

14.     The Defendants have engaged in and acquiesced in a longstanding custom, policy or practices of denying Plaintiff and other minorities equal employment opportunities.

15.     Despite testimony from the School Board members that they have actively attempted to recruit minorities as teachers, statistical evidence indicates that since the school year 1990-1991, and continuing through the school year 2004-2005, the Defendants have hired, in the aggregate, thirteen (13) teaching staff from minority groups (Asian=1, African-American=3, Hispanics=9). These statistics do not include Ms. Naomi Moore, who was hired to teach beginning school year 2005-2006. As of school year 2004-2005, the School District had a total teaching staff of 300.

16.     Mr. Samuel Byrd, a former member of the School Board from 1996-2000, testified that he knew African-American applicants who applied for teaching positions with the appropriate certifications that were not hired by the School District for the positions they sought.  Mr. Byrd further testified that those individuals were Tammy Foster, Eric Brown, Walt Moody, Hazel Moody, Tracey Balsamo and Lee McFerrin.

17.     The School District during 2002, 2004 and 2005 hired teachers who were comparatively

less qualified than Plaintiff in terms of experience and achievement.

18.     The School District has hired teaching staff in violation of state law because they were

not certified when hired.  For example, the School District hired Ms. Naomi Uy-Moore, an out-

of-state applicant, to begin teaching during the school year 2005-2006 when she was not yet

certified in Pennsylvania.  Upon inquiry by Plaintiff, the Defendants obtained an emergency

permit for Ms. Moore to teach.  As of July 11, 2006, Ms. Moore was not certified to teach in

Pennsylvania.  It is also documented that Susan Baker, Lisa Shuffstall and Leslie Jensen were

not certified when hired by the School District.  Further, in violation of state law and regulations,

the Defendants have hired teaching staff pursuant to an emergency permit when Plaintiff was

available as a fully qualified and properly certified applicant.

19.     Defendants claim they have sought to recruit minorities as teachers.  However, except for

some unspecified recruitment fairs that Mr. Dolecki testified that he attended before 2001, there

is only one documented effort on the part of the School District to recruit professional minority

teaching staff.

20.     On January 3, 2003, Plaintiff met with George Wright, then a member of the School

Board, to bring to the Board's attention her difficulties in obtaining employment.  According to

Mr. Wright's testimony, the filing of Plaintiff's employment discrimination complaint and her

federal lawsuit would have been brought to the attention of the School Board.  During his

deposition, Mr. Wright acknowledged that he told Plaintiff that the fact that she had filed a

lawsuit against the School District was an act he disapproved of.  Further, in a telephone

discussion with Bernard Wagner, Mr. Wright derided the intelligence of minorities, stating that it

was a proven fact that "brown and black people aren't as smart as white people."

21.     The School Board, of which Mr. Wright was a member, ultimately approved the hiring of teachers.  On or about January 5, 2003, Mr. Wright spoke with Mr. Wagner about Plaintiff's difficulties.  However, neither he nor the Board initiated an investigation, nor did he direct Plaintiff to file a complaint through the School District's internal grievance procedure.

22.     Mr. Wagner later met with Mr. Heller and told him about Mr. Wright's comment about the intelligence of minorities.  Instead of denouncing Mr. Wright's comment, Mr. Heller agreed, and stated that it was a proven fact, and that there were studies done by a university.

23.     In September 2004, Plaintiff was told by Principal Joanne Darling, Cochranton Elementary School, that she was ineligible to apply for a teaching position at Cochranton Elementary because she had filed a federal lawsuit against the School District in September 2004.  Principal Darling also told a teacher who had requested plaintiff as a substitute that Darling would not use plaintiff as a 3 week substitute teacher because she had filed a lawsuit against the District.  Principal Darling subsequently participated in the hiring process by which Plaintiff's application was rejected.

24.     On June 21, 2004, Plaintiff met with Mr. Heller and requested to see her interview evaluation form. Mr. Heller rejected her request, and told her to look for employment outside the District.

25.     The School District had an increased need for substitutes during the school year 2004-2005, yet plaintiff's opportunities to substitute were drastically reduced.

26.     In a letter dated June 15, 2005, Mr. Heller wrote plaintiff a complementary letter in which he expressed his regard and respect for the quality of her substitute teaching during school year 2004-2005.

27.     As a first year full-time teacher, Ms. Wagner's salary would have been approximately

$36,000 a year, plus benefits totaling approximately $10,000.00 yearly.

28.     The plaintiff has not had an interview for a teaching position in Crawford County since

March 2004 (the lawsuit was filed in September 2004), and has not been hired as a long-term

substitute or full-time teacher.


B.     CONCLUSIONS OF LAW


1.     Under Title VII, it is unlawful for an employer to refuse to hire or otherwise discriminate

against any individual with respect to his or her compensation, terms, conditions or privileges of

employment because of such individual's race, color, religion, sex or national origin.  See

Weston v. Commonwealth of Pennsylvania, Department of Corrections, 251 F.3d 420, 425 (3rd

Cir. 2001).  Title VII also prohibits retaliation and coercion directed at persons who have taken

steps to oppose an act or practice made an unlawful employment practice under Title VII.

Burlington Northern Sante Fe Railway Co. v. White, 126 S.Ct. 2405 (2006).

        The PHRA has similar prohibitions against employment discrimination, as well as

retaliation.  43 P.S. Section 955(d).

        The Third Circuit has consistently applied the same legal standard in analyzing claims

brought pursuant to Title VII and the PHRA.  Goosby v. Johnson & Johnson Medical, Inc., 283

F.3d 313, 317, n.3 (3rd Cir. 2000).

2.     With respect to plaintiff's 1981 and 1983 causes of action, the Third Circuit has also

applied the Title VII legal standard.  See Schurr v. Resorts International Hotel, Inc., 196 F.3d

486, 499 (3rd Cir. 1999); <u>Stewart v. Rutgers, The State University</u>, 120 F.3d 426, 432 (3rd Cir. 1997).

3.      The Court analyzes plaintiff's claims under the familiar burden-shifting test articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 7392, 802 (1973); and further refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  Under the <u>McDonnell Douglas</u> test and its progeny, the plaintiff has the initial burden of establishing a prima facie case of discrimination, the substance of which will vary depending on the type of claim; if the plaintiff is successful, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500 (3rd Cir. 1997).  If the employer proffers a legitimate, non-discriminatory reason for its action, the plaintiff must then demonstrate that the proffered reason was merely a pretext for unlawful discrimination.  <u>Goosby</u>, 228 F.3d at 319.

4.      Here, in order to establish a prima facie case under Title VII, the plaintiff must show that she (1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) under circumstances giving rise to an inference of discrimination.  See <u>Burdine</u>, 450 U.S. at 254.

5.      The defendant here contends essentially that the plaintiff's prima facie case fails because of a lack of qualifications for the respective positions at issue.

6.      In evaluating whether a plaintiff is "qualified" for purposes of a prima facie case, the Court relies upon "objective" factors.  <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3rd Cir.) cert. denied, 515 U.S. 1159 (1995).  Subjective qualities, conversely, such as leadership or management skills, are "better left to the later stage of the <u>McDonnell Douglas </u>analysis." <u>Weldon</u>, 896 F.2d at 798.

7.      Here, the Court concludes that plaintiff had the objective experience and education necessary to qualify for the respective positions.  She possessed a Bachelor of Science degree in education and was certified to teach elementary school grades K through 6.  Moreover, she was in fact hired as a substitute teacher by the district in September 2001 through 2006.  We find, therefore, that she is qualified for purposes of a prima facie case, and a prima facie case has been made out.

8.      In essence, the district claims that it did not hire the plaintiff for the Pickens' position based upon the fact that her interview scores were lower than those of the successful candidate.

9.      The district further contends that it did not select the plaintiff for any other vacancies because her interview scores were low, she displayed some negative traits during her interviews, such as poor grammar, and because of noted difficulties in the classroom as recorded, for instance, on Heller's observation report, and Heller's conclusion that she was not ready to manage her own class.

10.     Having articulated legitimate, non-discriminatory reasons for the failure to hire, the question becomes whether the plaintiff has pointed to some evidence "from which a fact finder could reasonably either, (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Brewer v. Quaker State Refining Corp., 72 F.3d 326, 331 (3rd Cir. 1995).

11.     Plaintiff has presented evidence of pretext as follows:

        (1)     That it was the practice of the district to fill long-term substitute teaching position vacancies based upon the recommendation of the teacher who was being replaced.

(2)     Ms. Pickens' testimony that her request for a specific substitute had been honored in the past by the district.

(3)     That Plaintiff was specifically requested by Ms. Pickens to be her replacement, and Mr. Meador, the principal of Cochranton Elementary School, agreed that she would replace Ms. Pickens for the entire semester.

(4)     That she was required to interview for the position when the district did not have a formal policy of interviewing candidates for substitute positions, and did not interview all the candidates.

(5)     Mr. Dolecki's testimony that to his knowledge a substitute had never been replaced in the middle of a long-term substitute assignment.

12.     With respect to other vacancies, plaintiff has presented the following evidence to demonstrate pretext:

(1)     Mr. Wright's alleged comment that "brown and black people were not as smart as white people," and Mr. Heller's agreement with such statement.

(2)     Her alleged poor grammar was never brought to her attention as a reason for rejection and, therefore, was essentially a post-hoc justification for the rejection.

(3)     Statistical evidence demonstrating that there were few minority teachers hired from 1991 to 2005 by defendant.

(4)     Despite the School Board's claim of actively seeking minorities for teaching positions, few efforts were made to do so, and plaintiff, a qualified minority teacher with experience, was not hired.

(5)     That neither Mr. Wright nor Mr. Dolecki allowed plaintiff to address her claims through the district internal grieving procedures.

13.     With respect to the Pickens' position, the district argues that all applicants for long-term

substitute positions were subjected to an interview and observation requirement, and that teacher

recommendations were only one factor considered by the district in its selection of replacements.

14.     The district also alleged that Wright was not responsible for the decisions not to hire

plaintiff, and there is no showing that any other members were aware of or shared his alleged

prejudice.  Essentially, the district argues that the alleged statement attributed to Wright is

nothing more than a "stray remark."

15.     To the contrary, Plaintiff argues that Wright's comments are indicative of a

discriminatory animus.  Stray remarks by decision-makers may be circumstantial evidence of

informal managerial attitudes which can, in some circumstances, support a showing of pretext.

Brewer, 72 F.3d at 333.

16.     Here, while the district claims that Wright was not a decision-maker, he did in fact have

final decision-making authority as a member of the board.  The comment was made during the

time frame in which the plaintiff was seeking a position with the district.  Moreover, the

comment was allegedly made at a meeting to discuss plaintiff's difficulties in securing a position

with the district.  Moreover, Mr. Wagner testified that during his meeting with Messrs. Heller

and Dolecki regarding Wright's remarks, Heller, who was a direct decision-maker, agreed with

Wright's comments and cited a university study.

17.     Finally, plaintiff contends that her poor grammar was never given as a reason for her not

being hired.  The district points to plaintiff's alleged difficulties in the classroom, as recorded by

Heller on the classroom observation form and his conclusion that plaintiff was "not ready" to

manage her own class.  Plaintiff counters that although Heller testified that plaintiff needed

improvement in certain areas, the observation of the plaintiff was "satisfactory." Plaintiff further

presented evidence that her prior teachers had no problems with her language.

18.    After consideration of the above testimony and evidence, we conclude that the plaintiff

has proven that the alleged reasons for her dismissal in December 2002 were for racial and/or

national origin discrimination.

19.    The plaintiff has also claimed that she was retaliated against for filing the EEOC claim

and the federal lawsuit. Retaliation claims under Title VII involve the same McDonnell Douglas

burden-shifting analysis as outlined above. Shellenberger v. Summit Bancorp, Inc., 318 F.3d

183, 187 (3rd Cir. 2003). To establish a prima facie case of retaliation, a plaintiff must show: (1)

that she engaged in a protected activity; (2) that the employer took an adverse employment

action either after or contemporaneous with the employers' protected activity; and (3) a causal

connection between the employee's protected activity and the employer's adverse employment

action. 318 F.3d 183, 187 (3rd Cir. 2003). To establish a prima facie case of retaliation, a

plaintiff must show: (1) that she engaged in a protected activity; (2) that the employer took an

adverse employment action either after or contemporaneous with the employers' protected

activity; and (3) a causal connection between the employee's protected activity and the

employer's adverse employment action. Id. at 187.

21.    Plaintiff presented the following evidence at trial:

        (1)    That after filing the PHRC complaint on February 20, 2003, she suffered a

significant drop in substitute teaching assignments.

        (2)    Following the filing of her federal lawsuit on September 16, 2004, she was

informed by Joanne Darling, the former principal at Cochranton, on September 24, 2004 that she

could not be considered for a teaching position because she had filed a federal lawsuit.

(3)     Ms. Darling told a teacher who had specifically requested plaintiff to replace her

for three weeks that plaintiff could not substitute because plaintiff filed a lawsuit against the

district.

(4)     Ms. Darling was a decision maker in whether to interview and/or hire plaintiff.

(5)     Mr. Wright stated that her lawsuit hurt her chances of being hired by the District.

(6)     Despite the defendants' repeated claims that they were actively seeking minorities

as teachers, and plaintiff's qualifications for a teaching job, plaintiff has not received a

single interview for a teaching position since March 2004 (she filed her lawsuit in

September 2004).

22.     In determining causation, courts have generally focused on two factors: (1) the temporal

proximity between the protected activity and the alleged discrimination; and (2) the existence of

a pattern of antagonism in the intervening period.  Jalil v. Avedel Corp., 873 F.2d 701 (3rd Cir.

1989).  However, timing and proof of antagonism are not the only methods by which a plaintiff

can made out a prima facie showing causation.  Abramson v. William Paterson College of New

Jersey, 260 F. 3d 265, 289 (3rd Cir. 2001)  (noting that a "broad array" of circumstantial evidence

may be used to illustrate a potential causal link between a plaintiff's protected activity and an

employer's adverse action.)

23.     Plaintiff claims that Darling's and Wright's comments that plaintiff would not be

considered for a position because she filed a federal lawsuit evidence of retaliatory animus.  The

district contends, however, that Darling was not authorized to speak for the district in this matter,

and that Wright had no direct hiring authority.

24.     The Court, however, is not precluded from considering other record evidence supporting

an inference of retaliation.  Farrell, 206 F.3d at 280-81.  As the Court discussed more fully in

connection with the plaintiff's failure to hire claims, plaintiff has proven that the district's

reasons for not hiring her were either being post-hoc fabrications or otherwise not genuinely

motivating the district's decision.  There is evidence that Mrs. Darling did participate in the

decisions whether the District should interview and/or hire plaintiff.  Indeed, there is evidence

that at least one time Darling hired another substitute teacher immediately after denying plaintiff

the opportunity to replace a teacher for a three week period because plaintiff had filed a lawsuit.

The Court further observes that Mr. Wright testified at deposition that if he wanted a paid job at

the district "[he] wouldn't sue them as a place to start."  Such comments reflect a retaliatory

animus.  After consideration of the evidence, we find that plaintiff has presented sufficient

evidence to prove that she was not interviewed or hired after March 2004 in retaliation for filing

the discrimination lawsuit.

25.     Regarding damages, the Court finds that an award of back pay (including benefits) from

the school year 2002-2003 to the present is mandated here, and therefore orders that back pay

and benefits in the amount of $ 226,181.60 be awarded to plaintiff.

26.     The Court further orders that plaintiff be hired by the District as a full-time elementary

teacher when the next appropriate teaching position becomes available.

27.     The Court further orders that defendants shall pay plaintiff's attorney fees and costs.

Accordingly, the attorneys for plaintiff shall submit said fees and costs to the Court within the

next 10 days for the Court's review.


                                        _____
                                        U.S. District Judge