IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
     Plaintiff


v.             CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
     Defendants



NON-JURY TRIAL - DAY NO. 1



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Monday, June 18, 2007.



APPEARANCES:
     JOHN J. MEAD, Esquire, appearing on behalf of
     the Plaintiff.

     CALEB L. NICHOLS, Esquire, appearing on behalf

of the Plaintiff.

MARK J. KUHAR, Esquire, appearing on behalf of
Defendants Crawford Central School District,
et al.

Ronald J. Bench, RMR - Official Court Reporter

2

1            I N D E X

2

3    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS

4

5  FOR THE PLAINTIFF:

6  Rowena Wagner            59    131     162      --

7

8  Carole Fisher          164    --      --       --

9

10   Douglas McCullough        170    --      --       --

11

12   John Lovett           174    --      --       --

13

14   Joye Pickens           178   189     196      --

15

16   Kathleen Maruska          197   214     218      --

17

18

19

20            - - -

21

22

23

24

25

3

1          P R O C E E D I N G S

2

3          (Whereupon, the Non-Jury Trial proceedings began

4   at 9:00 a.m., on Monday, June 18, 2007, in Courtroom C.)

5

6          THE COURT:  The first order of business, we have

7   some motions to take up here.  Specifically, we have the

8   defendants' motion in limine and plaintiff's response.  Do you

9   want to come up to the podium.  Let's take them one by one.

10         MR. KUHAR:  Good morning, your Honor.  First, we ask

11   for a ruling barring statistical evidence regarding the racial

12   composition of the district's staff and students for lack of

13   probative or prejudicial value.

14         THE COURT:  On the theory that?

15         MR. KUHAR:  On the theory that mere statistics alone

16   really offer nothing.  We cite extensive Third Circuit case law

17   that said for that kind of statistical information, for

18   statistical information to be valid, it has to produce

19   something from which a fact finder could infer discrimination.

20    Particularly, a comparison of the number of people who are

21    qualified applicants versus those who are hired.  And also

22    where someone is looking at an entire group, that's improper,

23    too.  It should be a focus on just a certain number of past

24    years relevant to the action, as opposed to an overall work

25    force.

4

1          THE COURT:  All right, let me hear from Mr. Mead on

2   this.  I looked at this Ezold case and of course that's the
            _____

3   controlling law in this circuit.  And the essence of it is

4   statistical, raw statistical evidence in and of itself is not

5   probative.  You have to have a sufficient foundation.  You have

6   to have evidence as to the size of the applicant pool, what

7   their relevant qualifications were.  But raw numbers alone lack

8   sufficient probative force.  Give me an offer of proof as to

9   what you would propose to prove that would put some flesh on

10  the skeleton of just raw statistical numbers?

11          MR. MEAD:  Well, your Honor, not just raw

12  statistical numbers are involved here.  As the court knows

13  through the facts of summary judgment, there is other evidence

14  besides statistics.

15          THE COURT:  Right, which really isn't the subject of

16  this aspect of the motion?

17          MR. MEAD:  Understood.  But I'm just saying it does

18  flavor the statistics, it gives some credence to the

19  statistics.  The statistics alone wouldn't tell the story.

20  However, with the statistics here, we would show that the

21  decision-makers in this case were the administration in this

22  particular situation.  The statistics that we intend to

23  introduce would show, number one, that there are no minorities

24  on the administration.  There is perhaps 18 to 20 at any point,

25  no minorities are on the administration.  Second, we would show

5

1  the number of minorities hired as teachers during the time

2  period from 1990 to the present, at least up to 2006.  And to

3  show that there was a very minimal amount of minorities hired

4  during that time period.

5       THE COURT:  But that's raw statistics, what are you

6  going to be able to show about the number of minorities that

7  applied during that period versus the number of non-minority

8  applicants; the specific needs of the district at any given

9  time and the relative qualifications of those people?

10       MR. MEAD:  Well, your Honor, there were 300 minority

11  students that were attending this school district during that

12  time period.  As the Supreme Court said in the one case I

13  cited, you would expect there to be somewhat of a balance

14  between the two of them, between the fact that there's 300

15  students who are minorities, you would expect there to be more

16  than one teacher, more than two teachers.  So, basically,

17  beyond that, your Honor, we're not --

18       THE COURT:  It's largely inferential?

19       MR. MEAD:  I agree, your Honor.

20          THE COURT:  All right.  Let's switch the playing

21    field again, get Mr. Kuhar up here, on your request that all

22    evidence of hiring decisions made and other actions taken by

23    the district after October, 2004.  I think the plaintiff and

24    the defendant might be ships passing in the night here.  I got

25    to figure out really what's at issue here.  Tick off for me,

6

1  Mr. Mead, the specific -- we know we have the Pickens' incident

2  or the Pickens' position back in 2002.  And there's a specific

3  claim for that, that she was not hired as a long-term

4  substitute as a result of that.  Then, if my notes are

5  accurate, was it in March of 2004 -- in 2004 there were eight

6  positions that became available, is that right?

7        MR. MEAD:  I believe nine, your Honor.

8        THE COURT:  Nine.  And she interviewed for those

9  positions; were those full-time positions?

10       MR. MEAD:  I believe so, and possibly also long-term

11  substitute positions.

12       THE COURT:  Of the nine, some were long-term, some

13  were full-time, is that your understanding?

14       MR. KUHAR:  No, your Honor.

15       THE COURT:  What do you think?

16       MR. KUHAR:  We think that there were approximately

17  eight positions that were filled stemming from those March of

18  '04 interviews.

19       THE COURT:  Were they full-time positions?

20          MR. KUHAR:  Yes.

21          THE COURT:  But they were not obviously being filled

22   by bidders, these were positions that she theoretically would

23   have been eligible for, is that right?

24          MR. KUHAR:  All of them were, judge.  Yes, all of

25   them were ones for which she would have been eligible.

1        THE COURT:  Whatever the number, eight or nine,

2   whatever the nature of those positions, it will become clear

3   during the testimony.  There is a claim that she was

4   discriminated against with respect to their failure to hire her

5   for one of those positions?

6        MR. MEAD:  Yes, your Honor, as well as a retaliation

7   claim.

8        THE COURT:  Okay, we'll get to that in a second.  I

9   just want to get the underlying employment decision claims.

10  And then in your papers, for the record I'm talking to the

11  defendant here, you say in 2004, sometime after March of 2004,

12  there was a discussion with her about what she could do to

13  improve her chances of getting hired.  And you claim you never

14  heard her or she didn't do it, you're not sure.  But, in any

15  event, is it accurate to say that after March of 2004, the

16  school district made the decision that it would not interview

17  her again; that's what you indicate in your papers?

18        MR. KUHAR:  Well, your Honor, the meeting was in

19  June of 2004.  In June of '04 is when those suggestions were

20    made to the plaintiff.  So it wasn't immediately, it wasn't the

21    week after that they essentially stopped considering her.

22            THE COURT:  Okay.  After the decision was made in

23    June of 2004, she was ineligible, she could apply, I suppose,

24    but she would not be considered, is that right?

25            MR. KUHAR:  Yes.  I'm just trying to be as specific

8

1    as possible about the dates.  The gist of what you're saying is

2    right, your Honor.  The March of '04 interviews served as the

3    basis for hires through September of '04.  So the suggestions

4    for improvement were made in June of '04.  The positions were

5    filled beginning in May of '04 through the summer of '04, into

6    September of '04.  Then basically the next time that interviews

7    were done for another position, which would have been October

8    of '04 and subsequent, those would be the positions for which

9    she was not considered for the reasons you indicated.

10          THE COURT:  All right.  Subsequent to September of

11    '04, October of '04, into '05, did she continue to submit

12    applications?

13          MR. MEAD:  Yes, your Honor, she did.

14          THE COURT:  All right.  So that's the universe of

15    positions that we're talking about, is that right -- was she

16    submitting applications for full-time and long-term substitute

17    positions?

18          MR. MEAD:  Yes, your Honor.  She was trying to get a

19    job either way.

20          THE COURT:  Okay.  Now, let's take up your point

21    that all evidence of hiring decisions made and other actions

22    taken by the district after October of 2004 should be barred.

23    Why should that be, if they told her in July -- if as of July

24    of 2004, on or about July of 2004, the district made a decision

25    that she would no longer be considered for a hire, I mean,

1  obviously, she wasn't interviewed after that.  So there is no

2  evidence, I'm not comparing anything because she wasn't

3  interviewed.  But why should, as a fact finder, should I not

4  crank into the entire calculous the fact that as of July of

5  2004, they would no longer consider her application?

6          MR. KUHAR:  Again, your Honor, we think October of

7  '04 is the more correct date.  I understand the question.

8          THE COURT:  All right, October.

9          MR. KUHAR:  Which is it will burden the record

10  significantly unnecessarily.  Essentially, those things are not

11  in the complaint.  We have looked at some cases about

12  circumstances under which an amendment might be allowed.  The

13  only attempt at amendment was denied in this case.  And that

14  was in part an attempt to update, if you will, the averments of

15  the complaint.  So, essentially, the plaintiff wants to be sort

16  of a living complaint, that every time something happens

17  relative to her efforts to get employment, namely, other people

18  are chosen.

19          THE COURT:  That's just one discreet thing, there

20  will be testimony back and forth.  Are you surprised by it.  I

21  mean you knew you made the decision in October of 2004.  And so

22  that's the end of the stretch, so to speak.  After October of

23  2004, whatever had happened before that, she was being

24  interviewed, she never was interviewed again?

25          MR. KUHAR:  But we think to fully defend ourselves

1  we would have to explain why those decisions were made

2  subsequent to '04.  In other words, all of the people hired

3  after that decision was made were interviewed, with the same

4  questions, same forms that she was subjected to or participated

5  in, they all had higher scores.  The point being that even if

6  we had not made that decision, she still would not have been

7  selected for any of those.

8          THE COURT:  All right, I have your point on that.

9  And finally, let me just turn to Mr. Mead, there can only be

10  one recovery in any case.  If, and I express no opinion one way

11  of the other.  But if, for instance, a Title VII plaintiff was

12  discriminated against in 2003 with respect to a position, well,

13  then you get -- and the only thing she's entitled to in this

14  case, since she's not entitled to anything other than economic

15  damages, if she's entitled to anything at all, then you get

16  your lost wages, back wages up to the present time, right?

17          MR. MEAD:  Correct.  And if I may just add the post

18  2004, your Honor, again, I know your Honor is going to touch on

19  this, we do have a retaliation claim.  We believe that since

20   she filed that lawsuit in October of 2004, actually September

21   of 2004, they have not interviewed her based on that particular

22   lawsuit.

23          THE COURT:  We'll talk about that in a second.

24          MR. MEAD:  That is one of the reasons we think post

25   2004 is also relevant.

11

1        THE COURT:  All right.  Then we have (c) under the

2  motion, all evidence regarding full-time elementary hiring

3  decisions made by the district between January, 2002 and April,

4  2004.

5        MR. KUHAR:  Your Honor, if I may just be heard very

6  briefly on that last point?

7        THE COURT:  Yes.

8        MR. KUHAR:  There is nothing in the complaint, from

9  our view, we don't see it as part of the action, that

10  retaliation has been alleged relative to the filing of the

11  complaint.  I mean intuitively, if they filed the complaint and

12  they wanted to allege retaliation for filing the complaint,

13  that would require an amendment, and we argue, as you know, an

14  administrative charge.  But my point is they could have just

15  said --

16         THE COURT:  Don't worry about it now, that's point

17  (d), we're going to come to retaliation.  Just stick with me on

18  where we're going with the motion, I'll give you an opportunity

19  to talk to me about that.  Now, all evidence regarding

20   full-time elementary hiring decisions made by the district

21   between January, 2002 and April, 2004, should be barred.  And

22   that's on the basis that you claim that the unrebutted evidence

23   will be that she was in fact ineligible for any of those

24   full-time positions because all those positions, per the union

25   contract, were filled by bidders, is that right?

12

1          MR. KUHAR:  Correct, your Honor.

2          THE COURT:  So, in essence, she's not similarly

3   situated to those other people?

4          MR. KUHAR:  Correct, your Honor.  We thought it was

5   actually amenable to a stipulation it's so uncontroverted.

6          THE COURT:  Well, let me hear from Mr. Mead on this.

7   If you have some evidence to suggest -- this was not the

8   subject, this wasn't addressed in the summary judgment, I

9   gather, not that it necessarily had to be?

10          MR. KUHAR:  No, your Honor, there were a number of

11   issues that we deferred doing for specific tactical reasons.

12          THE COURT:  All right, this is one.  But, in any

13   event, it seems to me just as a prudential matter if you don't,

14   if you have no evidence to contradict this, if you know what

15   their evidence is, maybe it could be handled by stipulation.

16   On the other hand, that is the fact that there allegedly were

17   not -- let me put it this way.  The fact that she was

18   ineligible for those positions, does serve as one of the

19   alleged nondiscriminatory reasons.  So really it's their burden

20  technically to come forward, so we could handle this by taking

21  evidence.  But what evidence do you have -- let me ask you

22  this.  What evidence are you going to be able to put on to

23  punch a hole, at least for purposes of raising a triable issue

24  of fact, to punch a hole in their contention that she was not

25  similarly situated?

13

1        MR. MEAD:  As far as this time period?

2        THE COURT:  Specifically that time period, but more

3   specifically that time period and full-time elementary

4   positions?

5        MR. MEAD:  Understood, your Honor.  Your Honor,

6   quite candidly, if that's the situation, we agree to that.  If

7   there were no full-time positions available that were available

8   to non-bidders, then we can't do anything about that.

9        THE COURT:  Is it your preference that you hear the

10   evidence on it?

11        MR. MEAD:  At this point, your Honor, in all candor,

12   Mr. Kuhar and I talked, I think we've been pretty agreeable

13   with each other, if we can work something out, I'm agreeable to

14   that, your Honor.

15        THE COURT:  What would be your evidence on this

16   point to establish that, how would you do it?

17        MR. KUHAR:  Your Honor, it would be brief.  It would

18   be Assistant Superintendent Charlie Heller, who would

19   essentially say what I've been saying and then we would expect

20  that to be uncontroverted.

21       MR. MEAD:  My only question is I don't know the

22  answer.  The court was correct, the reason we didn't think it

23  was a subject for a motion in limine, it's an affirmative

24  defense in this sense.  The only thing we were concerned about,

25  whether there were any long-term substitute positions that were

14

1    up there in this time period, which is different from a

2    permanent position, which she applied for but did not receive.

3         THE COURT:  Well, let me put it this way.  Absent an

4    agreement between the two of you that that is off the table, so

5    to speak, we'll just take evidence on it and it will either be

6    controverted or it won't be.  Then all evidence regarding

7    plaintiff's remaining retaliation claims defendant contends

8    should be dismissed based upon plaintiff's failure to exhaust

9    her administrative remedies.  Before we do that, so we can get

10   this teed up so you can respond to it.  Mr. Mead, tell me

11   specifically what are the factual averments that drive your

12   retaliation claim here?

13        MR. MEAD:  Yes, your Honor.  Your Honor, there are a

14   few of them.  Number one, after the EEOC claim was filed, it

15   was filed in approximately February of '03.  After February of

16   '03, her next interview, the plaintiff's next interview was

17   March, 2004.  The person that was most involved on behalf of

18   the district was Mr. Heller, as far as rebutting the PHRC

19   claim.  He was also the person who assembled the interview --

20          THE COURT:  Mr. Heller, for the record again, was

21  who?

22          MR. MEAD:  I think his title is assistant

23  superintendent for the district.  He is the one who assembled

24  the interview teams who interviewed Ms. Wagner in 2004.  He was

25  heavily involved in defending the PHRC claim, there's no

15

1    question he knew about the PHRC claim.  There's correspondence

2    that says hey, the answer looks fine.  So he's judging her as

3    to whether or not she's going to get a job, at the same time

4    he's fighting her on another front with the PHRC claim.  That

5    goes up to March of 2004.  After March of 2004, there's a

6    lawsuit filed, that is September of 2004.  Within a short time

7    period after that, we have at least three incidents that

8    pertain to retaliation.  Number one, Ms. Wagner is at a school

9    where she was going to be a substitute, she was subbing

10   day-to-day.  The principal of that school, Ms. Darling, told

11   her that she could not sub for any length of time because she

12   had filed a lawsuit.

13          THE COURT:  She was doing day-to-day subbing there?

14          MR. MEAD:  At that time, yes, your Honor.  That she

15   could not sub any longer than that because she had filed a

16   lawsuit.

17          THE COURT:  In other words, she could continue

18   day-to-day subbing but would not be considered for a long-term

19   substitute?

20          MR. MEAD:  Correct, your Honor.  As the court will

21    hear, basically a long-term sub is your roadway to becoming a

22    full-time teacher.  Second, this same person, Ms. Darling, was

23    approached by a teacher at the same school, who will testify,

24    and this teacher came up to her and said I'd like to have Ms.

25    Wagner take over for me for three weeks because I have to have

16

1   some surgery.  Ms. Darling told this teacher that no, she filed

2   that lawsuit, she can't go for three weeks.  Maybe a day here

3   or a day there, but she can't sub for three weeks because of

4   the lawsuit, she was specific.  Third, we have testimony from a

5   member of the school board, who was deposed, I believe the

6   court saw it through the summary judgment motion, that he was

7   asked during his deposition how come Ms. Wagner couldn't get a

8   job.  He said well, I wouldn't sue the school district as a

9   start.  Implying that had held her back from a job.

10      THE COURT:  That essentially forms the basis of your

11   retaliation claim?

12      MR. MEAD:  Exactly.  Combined with the fact that

13   there was no interviews after 2004.  She continued to sub

14   day-to-day, got rave reviews, which we would introduce.

15      THE COURT:  All right.  Now, let's talk about the

16   substance of your motion on this point.

17      MR. KUHAR:  Your Honor, if I could clarify one

18   point, too.  The proposed findings of fact that were filed,

19   upon looking at mine over the weekend, I think that I should

file:///A|/WAGDAY1.TXT

20   clarify this point.  Because I don't think there's anything

21   inaccurate in it, but I think we'll all have a clear

22   understanding of this eventually, but we might as well be clear

23   right now.  Which is that there are regular slash, also known

24   as permanent positions, regular positions, permanent positions,

25   same thing.

17

1      THE COURT:  Right.

2      MR. KUHAR:  There are long-term sub positions, which

3  are 90 plus.  And they're fewer than 90-day assignments, which

4  are day-to-day assignments.  That's in the eyes of the

5  contract, in terms of compensation, how we have to fill them.

6  However, when it comes to -- at least that applies to

7  contractual constraints.  However, there really are two types

8  of day-to-day subs.  And this is something I think may be

9  confused.  There is day-to-day subbing, which is a day at a

10  time, two days at a time.  Then there's three, four week

11  assignments, which are still day-to-day assignments.  In fact,

12  I think there may be evidence about a 60-day day-to-day

13  assignment.  To be clear, the testimony about day-to-day

14  assignments I think needs to be clear what people are talking

15  about.  Because, in fact, the court has ruled regarding

16  day-to-day assignments and that it is not part of the case.  Of

17  course, that wasn't defined, and what I'm trying to say is, is

18  that I think that ruling probably extends to day, single day,

19  two day, not the long-term day-to-day, if you will.  Because

20    you will hear testimony that those positions are not filled by

21    that outside service.

22          THE COURT:  I was unaware of the distinction when I

23    made the original ruling.  But so the record is clear, my

24    ruling at summary judgment, that wasn't on retaliation, was it?

25          MR. KUHAR:  Well, in the complaint the retaliation

18

1   alleged is the diminution in day-to-day subbing.

2       THE COURT:  But the basis for your moving for

3   summary judgment on the day-to-day subbing in your motion, was

4   not on the basis of failure to exhaust, it was on the basis

5   that as a matter of fact the district had no control over it?

6       MR. KUHAR:  Yes, your Honor, and that is true, with

7   respect to the day-to-day assignments not are multi-day

8   assignments.

9       THE COURT:  All right.  What is the cutoff date,

10  what is the cutoff point, two days, three days -- at what point

11  does it move, does the decision move outside the hands of the

12  independent contractor and back to the district?

13      MR. KUHAR:  I don't think it's going to be defined,

14  I think the shortest one that we're going to hear about is

15  three weeks.

16      THE COURT:  It's fact specific, all right, I

17  understand that.

18      MR. KUHAR:  Okay.  Now, regarding the retaliation

19  claim.  Essentially, what we're saying is any retaliation

20    associated with the complaint isn't in the complaint.  And the

21    complaint was never amended to add it.  Any retaliation for

22    having filed the administrative charge, would be a Title VII or

23    PHRC claim, not an 81 or 83 claim.

24        THE COURT:  There is some reference to this being a

25    83 case or a 81 case.  I've been viewing this solely as a Title

19

1   VII case, am I wrong?

2        MR. KUHAR:  Your Honor, in the sense that it's a

3   McDonnell_Douglas burden-shifting case.  And then the cases

4   link all those other acts together, I think it's one analysis,

5   it's a Title VII McDonnell_Douglas analysis and that's what

6   their proposed findings of fact would say.

7        THE COURT:  Your position in a nutshell is that any

8   retaliatory conduct which occurred either as a result of the

9   February, 2003 PHRC filing and/or the September -- what was the

10  date of the complaint, September of 2004?

11       MR. MEAD:  2004, your Honor.

12       THE COURT:  Any retaliatory, alleged retaliatory

13  conduct that occurred subsequent to 2004 as result of the

14  filing of the complaint, has not been exhausted?

15       MR. KUHAR:  Yes, your Honor, correct.

16       THE COURT:  All right, let me hear what you have to

17  say about that?

18       MR. MEAD:  Your Honor, I would rely on that

19    particular portion of the cases that I've cited.

20          THE COURT:  That's not the law in this circuit,

21    though?

22          MR. MEAD:  No, I could not find one.

23          THE COURT:  We did.  What I'm going to do is I'm

24    going to give -- there wasn't a reply filed, was there, by you?

25          MR. KUHAR:  No, your Honor.

20

1          THE COURT:  I would suggest that when everybody gets

2     a chance, they take a look at Robinson_v._Dalton.  In fact,
                                    ————————— —— ———————

3     we'll run some extra copies for you.  But, for the record, it's

4     107 F.3d 1018 (3rd Cir. 1997).  And, pertinently, they talk

5     about a former Third Circuit case called Waiters.  And Waiters
                                               ———————        ———————

6     specifically rejected a per se rule in Gupta, that Fifth
                                             —————

7     Circuit case that you cited.  And I'm quoting now from

8     Robinson.  It says "thus, in Waiters we identified two
      —————————                    ———————

9     circumstances in which events subsequent to a filed complaint

10    may be considered as fairly encompassed within that complaint,

11    either where the incident (1) falls within the scope of a prior

12    EEOC complaint, or (2) falls within the scope of the EEOC

13    investigation which arose out of it."

14          Now, I think we can have a more meaningful

15    discussion about how this may or may not fit once you've had an

16    opportunity to read that.  So we'll put that on the shelf for

17    the time being.  As long as I have you up here, tell me about

18    the testimony from plaintiff's former professors and student

19    teaching advisors; Carole Fisher, John Lovett and Douglas

20    McCullough?

21        MR. MEAD:  It's basically just background, your

22    Honor, they filed some reviews of her when she taught back in

23    2000.

24        THE COURT:  As a student teacher?

25        MR. MEAD:  As a student teacher.  One of the issues

1  that had come up that we argue is pretext is their claim that

2  Ms. Wagner didn't speak English well, she had problems with the

3  language.  Each one of these individuals would say they did not

4  notice any such problems with her.  I also want to put that

5  into context, because you'll hear that the extent the

6  administration reviewed her was one observation in 2002 for 39

7  minutes, and then a brief interview in 2002, I think for 20

8  minutes.  And then in 2004, an interview for a half hour.  We

9  have people who worked with her for three weeks, four weeks,

10  three months, who will testify that she did a great job.

11  Basically, that's the background of that.

12      THE COURT:  All right.  What about this -- sounds

13  like they're primarily going to come in and testify about her

14  language capabilities, is that right?

15      MR. MEAD:  That's fine, they'll talk about that,

16  your Honor.  They'll also just say they worked with her, she

17  did a great job, they have handwritten reviews.  They'll

18  probably be 10 minutes each, they're not long witnesses.

19      THE COURT:  Why doesn't it have some arguable

20    relevance?

21         MR. KUHAR:  Because, your Honor, it's not probative

22    at all because the standard should be not whether Ms. Wagner

23    was a good candidate or a poor candidate or the best candidate

24    ever.  The standard is whether the district, through

25    application of its processes and standards, concluded that she

22

1  was a good candidate, but made the decision not to hire her

2  because of her protected characteristics.

3         THE COURT:  All right.  Now, this evidence regarding

4  the district's hiring procedure.  This is not a Lanning case?

_____

5         MR. MEAD:  No.

6         THE COURT:  That's been mooted out, there's an

7  agreement --

8         MR. MEAD:  We're going to argue that the test is

9  subjective, but we're not going into why and compare things --

10        THE COURT:  This is not an objective criteria, this

11  is not a city of Erie case.

12        MR. KUHAR:  That's exactly what we were seeking to

13  confirm, your Honor.

14        THE COURT:  And he confirms that, okay.  And then,

15  finally, you say all evidence relevant to plaintiff's claim for

16  lost wages or associated fringe benefits she would have earned

17  had she been hired by the district should be barred.  Well,

18  isn't it your burden to prove that she's failed to mitigate her

19  damages?

20          MR. KUHAR:  It is, your Honor.  Since this was

21   filed, we have obtained a stipulation on the point.  I don't

22   know exactly, would this now be a good time?

23          THE COURT:   Yes, what is it?

24          MR. KUHAR:  Your Honor, this is my letter proposing

25   several stipulations.  As you can see the last one is not

1  agreed to, number five.  But number one is the one that is

2  relevant to what we're talking about right now.  And,

3  basically, it says in 1(a), it pretty much speaks for itself,

4  but it says in 1(a) the neighboring school districts hired back

5  all the way to August of '01, which I think is even prior to

6  the timeframe we're even talking about.  Back to '01 through

7  the current date they've hired 44, several and 15 elementary

8  teachers, who did not have bidding rights into permanent

9  positions.  This isn't even about long-term substitute

10  positions, short-term substitute positions or --

11       THE COURT:  Just to cut to the chase, is there an

12  agreement between the plaintiff and the defendant as to the

13  factual accuracy of 1(a) through (d)?

14       MR. MEAD:  Yes, your Honor.

15       THE COURT:  All right.

16       MR. MEAD:  We will argue it means different things

17  as far as mitigation.  But I have no dispute with the facts as

18  alleged by Mr. Kuhar.

19       THE COURT:  Now, isn't your motion in limine more

20    appropriately raised at the end of the case as to whether or

21    not as a matter of fact -- or is it your position that as a

22    result of this stipulation, it conclusively establishes that

23    she failed to mitigate her damages?

24            MR. KUHAR:  Exactly, your Honor, we modeled this

25    after the May, '07 Third Circuit pattern jury instructions on

1    mitigation.  We think that with this put in at the beginning of

2    the evidence, that there can't be any way that she could show

3    that she mitigated her damages such that a judgment on partial

4    findings would be appropriate at the end of her case.  Or in

5    light of it coming in now and, therefore, we wouldn't have the

6    burden the record with --

7         THE COURT:  Maybe I'm mixing apples and oranges, but

8    I thought as of, for instance, 2004, she could have applied

9    till the cows come home and they wouldn't have interviewed her?

10        MR. KUHAR:  No, there's confusion on that point.

11   Because these are the positions that were opened up at other

12   school districts.

13        THE COURT:  Other than Crawford?

14        MR. KUHAR:  Right.  These are the ones nearest.

15        THE COURT:  I'm going to take evidence on it.  The

16   stipulation may shorten the evidence, but I think it's

17   appropriate to take evidence.

18        Let me go back and clean up what I can.  First of

19   all, with respect to the motion in limine insofar as it relates

20   to the statistical evidence regarding the racial composition of

21   the district's teaching staff and students, after hearing the

22   proffer from plaintiff, I'm of the view that that evidence is

23   not probative.  And I'm relying in large measure on the

24   teachings of Ezold_v._Wolf, and that's 983 F.2d 509 (3rd Cir.
     _____ __ ____

25   1992).  Specifically, in my view, that type of wrong numerical

file:///A|/WAGDAY1.TXT

25

1   data without the necessary foundation or factual underpinning

2   as to the number of applicants that may have applied, their

3   relative qualifications, the specific needs, etc., leaves me

4   with nothing more than what this circuit has said is not

5   adequate.  And that is raw numbers floating in the air.  So I'm

6   going to grant the motion in that respect.

7           All evidence of hiring decisions made and other

8   actions taken by the district after October of 2004.  I'm going

9   to hear evidence concerning the decision made by the defendant

10  in or about July of 2004 not to further interview the

11  plaintiff.  Whether I consider -- one, I do not see it as

12  unduly prejudicial.  The information has been known to both

13  sides.  But, two, at this point, pending a ruling on the

14  retaliation aspect, it remains to be seen whether I consider

15  that evidence simply on the underlying discrimination charge or

16  consider it if the retaliation claim even sticks around,

17  whether I also consider it as evidence of retaliation.  But I

18  am going to take evidence on that because I think it may be

19  potentially probative.  But the exact scope for which I

20    consider it remains to be seen, pending my ultimate ruling on

21    this issue of retaliation.

22          With regard to the aspect of plaintiff's motion

23    insofar as relates to full-time elementary hiring decisions

24    made by the district between January, 2002 and April, 2004, the

25    contention is that no evidence should be taken concerning those

26

1   positions because as a matter of undisputed fact those

2   positions were filled exclusively by union contract bidders.

3   I'm advised that there's not yet a stipulation.  So, although,

4   it may well be, it certainly appears that that's the fact.  But

5   I think the most prudent way to do it is not to preclude

6   evidence on it, let the defendant put in its evidence and if it

7   comes in unrebutted, so be it.  And if before that time there's

8   a stipulation, we'll handle it that way.  But I'm not going to,

9   at the outset of the case, declare that as a matter of fact.

10          Then I'm going to defer ruling on this retaliation

11   claim until we've had a somewhat further opportunity to discuss

12   it, particularly, in the context of Robinson.

_____

13          I'm going to hear the testimony from the plaintiff's

14   former professors and student teaching advisors really on this

15   point.  It isn't particularly probative or relevant if there's

16   somebody that's going to come in and say I think she would have

17   been a good teacher and I think the district made a mistake in

18   not hiring her.  They weren't decision-makers and that's

19   testimony of the type that I think would not be particularly

20 helpful. However, if they are witnesses who can come in and as

21 a factual basis rebut one or more of the bases upon which she

22 was not hired, apparently, according to plaintiff's counsel,

23 including primarily the business about allegedly inadequate

24 skills, I'll hear the testimony for whatever it's worth, I'll

25 give it whatever weight I think is appropriate. Part (f) to

1  the motion is no longer in play because it's agreed -- the

2  issues generated in connection with the Lanning_v._Septa case
   _____ __ _____

3  simply are not in play in this case.

4       Then with respect to (g), I'm going to deny the

5  motion there as well, at least at this stage.  I'll take

6  testimony on mitigation and draw my own conclusions.

7       So the only thing that we need to do -- we may even

8  get started, I'm going to let you read Robinson, we'll have a
                                        _____

9  brief chat about it.  I'll either rule then or rule later on.

10  What do we have by way of testimony this morning lined up?

11       MR. MEAD:  Your Honor, we would call Mrs. Wagner.

12  We have the teacher who taught, Ms. Darling, coming in at one

13  o'clock.  We have Mr. Wagner here.

14       THE COURT:  With respect to witnesses, other than

15  parties, if there's any fact witnesses who are here, I see one

16  at least, I presume, this goes for both sides, I'm going to

17  want these people to be sequestered.

18       MR. KUHAR:  With respect to Mr. Dolecki, the

19  superintendent, and assistant superintendent, Charlie Heller,

20  they were named defendants in the underlying action.  Although,

21  dismissed now, dismissed in summary judgment, that is

22  interlocutory in this proceeding.  We would request that they

23  be allowed to stay as representatives of the defendant school

24  district and because they're defendants in the underlying

25  action.

1         THE COURT:  I didn't think they were defendants in

2    the underlying action?

3         MR. KUHAR:  Not currently they aren't, your Honor,

4    but they had been but were dismissed.

5         MR. MEAD:  One representative would be fine, your

6    Honor, they're two key witnesses.

7         THE COURT:  You're clearly entitled to have a

8    representative here.  So I'm going to give you an opportunity

9    to pick your representative, whoever that might be.  So I'm

10   going to take a recess, we'll run you this case, and then I'll

11   come back and we'll chat about it.

12        (Recess from 9:38 a.m.; until 10:00 a.m.)

13        THE COURT:  Now that you've had a chance to look at

14   the case, both of you -- let me ask you some questions then,

15   Mr. Mead.  Why don't you come on up.  Now, I'm reading from the

16   Robinson case, 107 F.3d 1018.  Just to put it in perspective.
     _____

17   It says "in Waiters we identified two circumstances in which
          _____

18   events subsequent to a filed complaint may be considered as

19  fairly encompassed within that complaint, either where the

20  incident (1) falls within the scope of a prior EEOC complaint,

21  or (2) falls within the scope of the EEOC investigation which

22  arose out of it."  My first question is do I have here

23  somewhere in the record or does someone have with them today a

24  copy of the EEOC complaint, charge?

25          MR. MEAD:  I do have it.  Now, this particular

1  retaliation for filing a EEOC claim, obviously, would not be

2  included in the EEOC--

3          THE COURT:  Because it has not yet occurred?

4          MR. MEAD:  Correct.  It occurred after the filing.

5          THE COURT:  The retaliation you're talking about is

6  the Darling incident?

7          MR. MEAD:  Exactly, your Honor.  Retaliation for

8  filing a complaint.

9          THE COURT:  And the comment of the other supervisor

10  that you contend would suggest retaliatory animus for failing

11  to interview her after October of 2004?

12          MR. MEAD:  Correct, your Honor.

13          THE COURT:  But all that having been said, what does

14  the charge -- do you have a copy of the charge?

15          MR. MEAD:  I do, your Honor.

16          MR. KUHAR:  Actually, it's in our binder --

17          THE COURT:  I want to see the charge and the

18  findings.  Because the findings will give me some indication as

19  to the nature of the investigation.

20        MR. KUHAR:  This is two sets, one of them consists

21  solely of really stipulated exhibits, so we're really looking

22  at two.  The charge is in Volume III, Tab 42, Exhibit PP.  And

23  the findings are in Volume II, Tab 31, Exhibit EE.

24        MR. MEAD:  Your Honor, if I might note for the

25  record, I also see the failure to hire questionnaire is

1  included in Volume I, looks like number 2, Defendant's Exhibit

2  B.  It appears to be a questionnaire.

3          THE COURT:  The intake questionnaire?

4          MR. MEAD:  I believe so, yes.

5          THE COURT:  Now, I've looked at -- so the record is

6  clear, there was only one PHRC filing, there is no subsequent

7  filing after February?

8          MR. MEAD:  No, your Honor.

9          THE COURT:  The allegations in that filing are

10  related solely to national origin discrimination, is that

11  right?

12          MR. MEAD:  I believe so, your Honor.

13          THE COURT:  As you point out, there was not at that

14  point any claim of retaliation because the alleged retaliation

15  occurred at some point in the future?

16          MR. MEAD:  Correct, your Honor.

17          THE COURT:  How do you get around Robinson then?
                          _____

18          MR. MEAD:  What I would argue, your Honor, is the

19  way I read Robinson, it talks about splitting circuits,

20   including even the Third Circuit, they go case by case, fact by

21   fact.

22          THE COURT:  Which is what I'm trying to do here by

23   looking at it.

24          MR. MEAD:  I appreciate that, your Honor.  My

25   argument here would be, number one, although it's a small

1   point, Robinson was a federal employee, not a state employee.

———————

2   I would assume that federal employees have would be more suave

3   as far as filings, etc.  Second, I did note in Robinson there

———————

4   was a single act that should have triggered his awareness to

5   file a complaint, he was fired.  That was in the subject of his

6   first complaint, he was actually fired.  Here we have an

7   ongoing situation.  She had the situation in 2002 and

8   thereafter, the basis of the retaliation claim is she has not

9   been interviewed or hired since then.  There hasn't been a

10  triggering event, like there was a triggering event in the

11  Robinson case.  Third, I think in this situation, as I read

———————

12  even the court's order for summary judgment, this was brought

13  before the court.  The parties were aware of it.  In the

14  court's summary judgment motion, I'm sorry, the order, the

15  court even addressed this particular issue regarding

16  retaliation.  In the retaliation, the court states "we reach a

17  different result, however, with respect to plaintiff's

18  remaining retaliation claim.  Plaintiff claims that Darling's

19   comments that she would not be considered for a position

20   because she filed a federal lawsuit evidence of retaliatory

21   animus.  The district contends, however, that Darling was not

22   authorized to speak for the district in this matter."  I would

23   note that the district has never raised this issue until the

24   eve of trial.

25         THE COURT:  I was thinking about that, but go ahead.

1        MR. MEAD:  "While the plaintiff has failed to

2    present evidence linking Darling's comments directly to the

3    district's decision not to hire the plaintiff, we are not

4    precluded from considering other record evidence supporting an

5    inference of retaliation.  As discussed more fully in

6    connection with the plaintiff's failure to hire claims,

7    plaintiff has, for purposes of the summary judgment, cast doubt

8    on the district's reasons for not hiring her as either being

9    post-hoc fabrications or otherwise not genuinely motivating the

10   district's decision.  We further observe, for instance, that

11   Mr. Wright testified at deposition that if he wanted a paid job

12   at the district, he wouldn't sue them as a place to start.

13   Such a comment could reasonably be inferred as reflecting a

14   retaliatory animus.  We find, therefore, that plaintiff has

15   presented sufficient evidence to withstand summary judgment on

16   this aspect of the retaliation claim."

17        THE COURT:  But the fact is they never raised

18   exhaustion in their summary judgment papers?

19        MR. MEAD:  They did not, your Honor.  And

20    considering that this opinion was back in October of 2006, I

21    don't know when the summary judgment motion was filed, I was

22    not present at that time, this retaliation would be an ongoing

23    event.  If the court dismissed it today, I would submit we

24    would be able to go to the EEOC and say we are being retaliated

25    against still because it's an ongoing situation.  She has not

33

1   been hired.  And that alone I think distinguishes Robinson as

_____

2   well, where there was a triggering event, a firing.  I think

3   Robinson leaves enough leeway.  And I look at the front page in

_____

4   which it says "courts are permitted in certain limited

5   circumstances to equitably toll filing requirements, even if

6   there has been complete failure to file."  I think this is one

7   of those situations here.  I think, I can understand it's a

8   close call, but I think because of the nature of the evidence

9   we have here, the fact it's been argued, briefed and has not

10   been raised until the eve of trial, the day of trial, the fact

11   that there are some distinctions between Robinson and today.

_____

12   And the fact I think it's a strong retaliation case, I believe

13   that we would be allowed to bring a claim in.

14          THE COURT:  Let me hear from him, then we'll get

15   going here.  Did you waive this?

16          MR. KUHAR:  No, we didn't, your Honor.  Failure to

17   state a claim couldn't be waived through not raising it in a

18   motion for summary judgment earlier.

19          THE COURT:  It's not a failure to state a claim,

20     it's an affirmative defense, failure to exhaust -- put it this

21     way, isn't this coming on awful late?

22          MR. KUHAR:  Your Honor, if you're asking whether it

23     could have been brought earlier, theoretically, it could have

24     been.  We made a decision not to do that.  We don't think it

25     prejudices our ability to take that position now.

34

1        THE COURT:  All right, go ahead, tell me about

2   Robinson?
    _____

3        MR. KUHAR:  Well, essentially, Robinson seems to put
                     _____

4   a lot of weight in the EEOC's process.  The notion that it

5   isn't just a hoop to jump through, it's actually supposed to

6   serve a purpose.  Therefore, it wants to direct all claimants

7   back into that process.  In fact, if I understand this case

8   through my quick read of it, it sounds like the EEOC in that

9   case maybe even refused to process part of the charge and it

10  did not, the Third Circuit did not on that basis toll it.  It

11  said let's send it back to see what the rationale might have

12  been.  We don't have any facts anywhere close to that, your

13  Honor.

14        THE COURT:  Let me make a suggestion here.

15  Particularly, since this issue really, although, it was raised,

16  there was no meaningful joinder because neither side cited what

17  the applicable Third Circuit law and that probably isn't all of

18  the Third Circuit law that we found on the point.  What I'm

19   going to do is this.  I'm going to defer ruling on this issue

20   of retaliation.  And I'm going to take any evidence on

21   retaliation that plaintiff wants to bring in and any evidence

22   in opposition.  And then at the conclusion of the case,

23   probably by way of, you're going to have an opportunity to file

24   post-hearing conclusions of law, findings of fact, refine your

25   findings of fact based upon what happened.  I will rule on that

35

1  Robinson issue once I've had an opportunity to give it some
   _____

2  further thought.  But I'm not going to delay the commencement

3  of taking of testimony and delay this any longer, that's what

4  we'll do.

5        MR. KUHAR:  Your Honor, to be clear, we did raise a

6  failure to exhaust in our answer as an affirmative defense.

7        THE COURT:  Yes, to make it clear on the record

8  here, I don't consider that the issue was waived, that is not

9  an issue in my mind, I think the issue was adequately

10  preserved.  All right, are we ready to go?

11        MR. MEAD:  Yes, your Honor.

12        MR. KUHAR:  We do have stipulations --

13        THE COURT:  To read into the record?

14        MR. KUHAR:  Yes.

15        THE COURT:  Okay.

16        MR. MEAD:  I was going to put my witness up and this

17  is something we can do at the end of the day and not keep the

18  witnesses here.  That's all right, whatever way you want to do

19  it.

20          THE COURT:  Is that the June 13th letter you're

21  talking about?

22          MR. KUHAR:  Yes.  And there are references in there

23  to the exhibits, so I thought for the benefit of the record --

24          THE COURT:  All right, let's do it up front.

25          MR. KUHAR:  This is the letter which I proposed --

36

1    would it be your preference that we submit the letter or just

2    read it, your Honor?

3            THE COURT:  No, if it's submitted, it's part of the

4    record.  Is this the letter of June 13, 2007?

5            MR. KUHAR:  It is, your Honor.

6            THE COURT:  How is it identified for the record?

7            MR. KUHAR:  Well, your Honor, the letter itself is

8    not in the binder.

9            THE COURT:  That's all right.  We'll just mark it --

10   why don't you call it Joint Exhibit 1.

11           MR. KUHAR:  Okay, paragraph 1(d) of this June 13th

12   Joint Exhibit 1, references collective bargaining agreements,

13   which are Exhibits GG, HH, II, JJ, KK, as being the collective

14   bargaining agreements of the other school districts, which are

15   all in the third binder.  The summary, which is in the third

16   line of 1(d), the reference to the summary of wages is to

17   Exhibit LL.

18           THE COURT:  Are you talking about the June 13th

19   letter?

20          MR. KUHAR:  Yes, your Honor.  And the third line of

21   1(d), the left margin says "agreements and summary."

22          THE COURT:  I don't see where you're reading, I

23   apologize?

24          MR. KUHAR:  The third line down, your Honor, where

25   the left margin says "agreements and summary."

37

1          THE COURT:  Yes.

2          MR. KUHAR:  That summary is Exhibit LL.  The number

3    two is a reference to Dan Hootman's testimony, an excerpt from

4    his deposition transcript, which is Exhibit MM.

5          THE COURT:  All right.

6          MR. KUHAR:  Number three relates to statistical

7    information regarding PSE membership, which I think is moot,

8    although we could put it in, we're not receiving any

9    statistical information, so that is irrelevant.  It's MM in any

10   event.  Four, similarly, the same type of thing.  And five was

11   not agreed to.

12         THE COURT:  All right.

13         MR. MEAD:  Your Honor, basically in my situation we

14   agreed that certain deposition testimony would be introduced

15   into evidence.  I have a notebook for the court as well, which

16   I provided to defense counsel.  If I may approach.

17         THE COURT:  Yes.  What is this, these are your

18   exhibits?

19         MR. MEAD:  They're my exhibits, your Honor.  But

20    included in those exhibits are some that we specifically agreed

21    to.  Because the reason we agreed to those by stipulations is

22    they were not listed in the pretrial statement as exhibits.

23    So we talked about it.  Basically, what they are, your Honor,

24    they're testimony from board members, school district board

25    members.  When Mr. Kuhar and I spoke, I thought it might

38

1  eliminate having to call those people by subpoena.  I think

2  they were listed by Mr. Kuhar as his witnesses.  I just wanted

3  certain portions of their deposition transcripts put into

4  evidence.  Those people are Jan Van Tuil, Professor Baskar and

5  Ross Prather.  And the stipulations are --

6      THE COURT:  So I can consider their testimony,

7  that's being submitted?

8      MR. MEAD:  That's been included in that particular

9  exhibit.

10     THE COURT:  They will not testify live?

11     MR. KUHAR:  Correct, your Honor.

12     THE COURT:  Okay.

13     MR. KUHAR:  Just to clarify, though, with respect to

14  Professor Baskar, the correct pages are in there, but the index

15  indicating what pages are in is slightly inaccurate.  So as

16  long as it's understood that the proper pages are in there,

17  without regard to the index.  It's the index that is in error,

18  not the pages, because I had added some pages to what he

19  proposed.

20          THE COURT:  At some convenient point, breaking point

21   in the proceedings, I will hear from you, both of you, by way

22   of brief summary as to what I'm supposed to glean from that

23   deposition testimony, and we needn't do that right now.

24          MR. MEAD:  Along those same lines, I would suggest

25   that, obviously, we can read it into record, I think since the

39

1  court will have copies of the relevant deposition transcripts

2  in its own exhibit, I don't know that we need to read it.

3      THE COURT:  We'll take a look at it.  All right,

4  let's go.

5      MR. MEAD:  I'm aware that the court is familiar with

6  this case, does the court want me to present an opening

7  briefly?

8      THE COURT:  Why don't you do that, it well help me

9  keep track of where you propose to go.

10      MR. MEAD:  Okay.  Your Honor, in this case we intend

11  to prove that the plaintiff was the victim of discrimination

12  because of her race and her natural origin, which is Filipino.

13  As well as the victim of retaliation because of her filing of a

14  PHRC complaint and the lawsuit.

15      The testimony will show that the plaintiff has

16  wanted to do one thing since she came to the United States in

17  1994, and that is to become a teacher for elementary school

18  children.

19      To fulfill this goal, she went to Edinboro

20  University, starting in approximately 1995, 1996, where she

21  majored in elementary education.  She received a degree, a B.S.

22  from Edinboro in elementary education.  She underwent her

23  student teaching examinations, and she did very, very well.

24  She then went and received her teaching certificate a short

25  time afterwards.  She was fully certified to be a teacher.

40

1    With glowing reviews, she was set to go into her future.

2          She went to Crawford County, she applied in Crawford

3    County.  She talked to people there about how to get a job,

4    including the principal of one of the schools, or an

5    administrator of the school district at Crawford County.  She

6    was told the best way to become a full teacher is to become a

7    substitute.  Preferably a long-term substitute, so that they

8    can a take a good look at her teaching abilities.  But if not

9    that, at least become a day-to-day sub.  Which is exactly what

10   she did, she became a day-to-day substitute teacher.  She

11   continued to do that throughout 2001-2002 school year.

12          Now, in 2002, she was teaching and she had been

13   substituting for a woman by the name of Joye Pickens.  Ms.

14   Pickens had seen Ms. Wagner's teaching ability or at least

15   discussed it and seen the results of her teaching ability.

16   During that time period Ms. Pickens was planning to take a

17   leave of absence for a medical reason.  She specifically

18   requested that Ms. Wagner take over her classroom because she

19   was confident in Ms. Wagner's ability to handle the class.  Ms.

20    Wagner, of course, was very excited, because this was her first

21    opportunity to try a long-term teaching situation.

22            THE COURT:  When you say take over her classroom, do

23    you mean as a long-term substitute?

24            MR. MEAD:  Yes, from approximately November of 2002

25    up till January of 2003.  Of course, the Christmas break would

41

1    be included in that, but during that two-month period.  It was

2    her first time she would be able to teach that consistently for

3    that period of time.  So she can began the teaching situation.

4    She thought she was doing fine and all of a sudden the rug was

5    pulled out from under her.  Because she was told that she no

6    longer had this position and that, in fact, she would have to

7    interview for this position.  While this came as a surprise to

8    her because she had been led to understand by quite a few

9    people that once she started this as a long-term sub, she would

10   have it until the very end.  However, she was told by Mr.

11   Heller, who was the assistant superintendent, who the court

12   will hear is basically the decision-maker as far as all the

13   teachers that are interviewed, that are selected for

14   interviews, that are ultimately selected to teach, either long

15   term or full term, Mr. Heller is really the man who does all

16   this.  He came up to her and accused Ms. Wagner of "playing

17   politics," by taking this position.  Ms. Wagner will say she

18   was taken aback by this, she didn't know what was going on.

19          THE COURT:  How long do you believe the evidence

20   will show she had the position before she was removed from the

21   position?

22          MR. MEAD:  Approximately, a month, your Honor.

23          THE COURT:  All right, go ahead.

24          MR. MEAD:  She was told that she would have to

25   interview for this.  And she said well, I'd like to interview,

42

1   but I'd also like you to come in and watch me teach, which is

2   what happened.  Mr. Heller came in and watched her teach, so

3   did the principal at the time, Mr. Meader.  Both these people

4   gave her satisfactory reviews.  It's also significant that

5   neither of them made any type of issue as to her dialect or the

6   way she spoke the English language.  There was some suggestions

7   for her to improve, which she'll tell you she didn't have a

8   problem with for the most part because she was a fairly young

9   teacher at that time.  But she was very surprised that she even

10  had to interview.  So there was an interview conducted, that

11  was conducted in December.  And in December she was interviewed

12  by Mr. Heller and a number of other people.  In fact, it was

13  not only for this long-term sub position, but there were three

14  other long-term sub positions open.  There were perhaps 18, 19

15  people interviewed.  She was the only minority, the rest were

16  white.  The decision-makers were apparently a board of

17  interviewers who are handpicked by Mr. Heller to interview her,

18  as well as the other people.  Of course, everybody on this

19  board who interviewed her were white as well, they were all

20  Caucasian.  She was not selected after this interview.

21  However, the woman who was selected to fill Ms. Pickens' job

22  wasn't the best candidate.  In fact, she finished number 9 out

23  of 18.  So despite what we'll hear that this was all done by

24  the book and that the best candidates always got the job, the

25  woman who took plaintiff's job in this particular case wasn't

43

1  even in the top five candidates.  So at this point all these

2  events prompted her to wonder what was going on.  Because,

3  again, she had heard no one had ever lost a sub job in the

4  middle of it.  She had known, again, without bringing in

5  statistics, that there were very few minority teachers,

6  including no minority administrators in the Crawford Central

7  School District.  And, also, two other events occurred that

8  brought Ms. Wagner to the conclusion that there was

9  discrimination going on.  Her husband had a conversation with a

10  member of the school board, a Mr. George Wright.  During this

11  conversation --

12        THE COURT:  When do you believe the evidence will

13  show that conversation occurred?

14        MR. MEAD:  That conversation occurred before she

15  filed her PHRC complaint in February, 2003.  Sometime between,

16  sometime in the year 2003, before the complaint was filed.

17  Sometime early 2003 is when it would have occurred.  We don't

18  have an exact date.  But during that conversation, Mr. Wright,

19  who sat on the school board, just to give a little background,

20   the school board ultimately approves the people who Mr. Heller

21   puts up for approval.

22          THE COURT:  For full-time and long-term subs?

23          MR. MEAD:  Yes, they have the ultimate authority.

24   Mr. Wright commented during the conversation with Mr. Wagner

25   that well, you know, Bernie, brown and black people aren't as

44

1   smart as white people.  Now, this comment --

2        THE COURT:  Not to interrupt you, is it your

3   contention that the evidence will show that this conversation

4   occurred in the context of Mr. Wagner complaining that his wife

5   was not hired?

6        MR. MEAD:  Yes.

7        THE COURT:  All right, go ahead.

8        MR. MEAD:  Thereafter, because of this comment,

9   there was another conversation that was held with Mr. Heller.

10  And I believe Mr. Heller and Mr. Dolecki were present.  And Mr.

11  Wagner brought up this same comment, because he was justifiably

12  outraged.  During that time period, Mr. Heller said well, you

13  know, that's a proven fact, that's been shown, there's a

14  university study that shows that.  Based on all these

15  incidents, your Honor, Ms. Wagner felt she had no choice but to

16  go file a PHRC complaint.  Which she did in February, 2003.

17  Now, after she filed this complaint, there will be testimony to

18  show that Mr. Heller was really the point man for the district

19  at this point.  He was the one who was reviewing the answers to

20   the PHRC complaint, providing information, etc.  During this

21   time period, Ms. Wagner continued to substitute day-to-day, she

22   got rave reviews, we have a copy of those reviews that we'll

23   show the court.  But she was not receiving any long-term sub

24   jobs or any permanent teaching jobs.  But in March of 2004,

25   there were several openings that were not going to be union bid

45

1   for jobs for long-term teaching and for permanent jobs.  I

2   thought it was nine available slots, perhaps there were eight,

3   I don't know.  But she was interviewed in March, 2004.  But

4   we'll show that the interview, which took place in March, 2004,

5   was done by Mr. Heller, who is also spearheading the district's

6   defense against the PHRC complaint.  Mr. Heller picked the

7   selection committee, the interview committee and he was heavily

8   involved with this.  Needless to say, she didn't get hired at

9   this interview.  So up to the time period of March, 2004, we

10  will show she had several, several favorable reviews from the

11  teachers who she substituted for, but yet only one observation

12  by Mr. Heller and one half-hour interview.

13        THE COURT:  What does the plaintiff believe the

14  evidence will show relative to her -- let me put it this way.

15  What does the plaintiff believe the evidence will show as to

16  her qualifications relative to the other applicants for those

17  eight positions who in fact were hired?

18        MR. MEAD:  She will show that it was equal or

19  better.  We're going to base that on evaluations by teachers

20   she actually substituted for.  Now, they may not have watched

21   her in the classroom every day, but they would be able to

22   submit papers in which they said she did a great job, the kids

23   are very enthusiastic.  They were very happy with the way she

24   taught.  We will show that a number of these people who were

25   actually hired had a lot less experience than the plaintiff

1   did.  They hadn't been out of school quite as long.  In fact,

2   one just came out of school, was hired immediately as a

3   long-term sub.  We will show that they did not have as much

4   experience, they did not have a track record, they did not have

5   the same type of glowing reviews as the other people did.  We

6   will show the only basis that the district was using at this

7   point was a short, I think it was 20 minutes and 20 minutes or

8   half-hour, half-hour interview done by a group of people hand

9   selected by Mr. Heller.  That was their only basis for denying

10   her this job at that time.

11         THE COURT:  But to be clear, I think it's helpful

12   for everybody to be on the same legal wavelength, whether the

13   interview was too short or too long or was conducted in a hot

14   room or a cold room or whether it was as in depth as it might

15   have been, as long as it was the same interview that everybody

16   else got, that kind of falls under the business judgment rule,

17   I mean that doesn't get you anywhere, does it?

18         MR. MEAD:  No, your Honor.  And we admit it's

19   subjective.  People look at this person and decide well, how

20  did they answer these questions, how did they do, and they rate

21  them.  But we would say that subjective type testing lends

22  itself more to subtle discrimination or retaliation than

23  objective testing.

24         THE COURT:  All right, go ahead.

25         MR. MEAD:  Then in September, 2004, she filed her

47

1    lawsuit.  At that point we have the direct evidence that I

2    earlier discussed, that she was discriminated against because

3    of this particular lawsuit.  And by discrimination, I mean the

4    retaliation.

5         THE COURT:  I know we're going to handle this at the

6    end of the case, but why after 2004 did she not file a separate

7    charge of retaliation with the PHRC?

8         MR. MEAD:  Your Honor, I think at that time it was

9    ongoing and they thought it was going to be resolved.  They

10   were hoping this would be resolved.  Quite frankly, if she had

11   been hired in 2005, our retaliation claim is pretty weak

12   because she had been hired.  I think only as time went on and

13   they refused to interview her at all, she realized that this is

14   retaliation at that point.

15        THE COURT:  But so I'm keeping the chronology right

16   here, she knew as of July of 2004 or October of 2004 --

17        MR. MEAD:  September actually is when the complaint

18   was filed.

19        THE COURT:  When do you believe the evidence will

20  show she was told, if in fact she was told, there's no point in

21  applying because we're not going to interview you?

22       MR. MEAD:  She was told that at the end of 2004,

23  shortly after she filed the complaint, by Ms. Darling.

24       THE COURT:  If in fact she was told that?

25       MR. MEAD:  That may be disputed.  But we will also

48

1    have a separate witness, a teacher at the same school, who will

2    say that she approached Ms. Darling and asked specifically for

3    Rowena Wagner to substitute for her for three weeks.  And was

4    told by the principal, Ms. Darling, that she can't do it

5    because she sued us, filed a lawsuit.

6        THE COURT:  All right.

7        MR. MEAD:  And then, again, the comment made by Mr.

8    Wright in which he stated I would not, if I wanted a job, I

9    would not sue the district as a start.  That's in his

10   deposition transcript.  And you'll hear that over this time

11   period from 2004 up to the present, several openings for

12   teaching jobs have opened up.  Several openings have opened up.

13   She has never been interviewed despite the fact --

14       THE COURT:  She has never applied, has she?

15       MR. MEAD:  Yes, she's applied.

16       THE COURT:  You're saying she was told she can apply

17   but she won't be interviewed?

18       MR. MEAD:  She was told, that was by Ms. Darling,

19   for that one specific job.  So she applied for any openings

20    that she found out about.  Because they're separate schools,

21    Ms. Darling isn't the only principal.

22            THE COURT:  She hasn't been interviewed since the

23    round of interviews in March of 2004?

24            MR. MEAD:  Correct.

25            THE COURT:  For anything?

49

1          MR. MEAD:  For anything.  She continued to

2     substitute during this time period, your Honor, day-to-day

3     substitute.  So our argument is despite the fact that openings

4     come up in 2005, 2006, 2007, despite the fact that at that

5     point she's been subbing day-to-day for five, six years, has a

6     very good track record, has several outstanding reviews during

7     that time period, and the school board itself, part of what I

8     put in for the court's review in the deposition transcript, is

9     that the school board of Crawford Central continuously says we

10    are seeking minorities.  We want minorities hired.  We're going

11    out there and recruiting them, we go to job fairs.  At the same

12    time they have a minority, who's applying for a job within

13    their district, who has five, six years teaching in the

14    district and they're ignoring her.  And we submit that that

15    shows there's retaliation.  That and the direct comments,

16    showing she hasn't been hired because she filed this complaint

17    with the PHRC and her lawsuit.

18          THE COURT:  What are you claiming her damage claim

19    is in this case and for what period of time?

20          MR. MEAD:  We would submit, as far as the initial

21     period she should have been hired was in 2002, 2003, she should

22     have been hired for that long-term job.  The long-term sub job,

23     that was Ms. Pickens' job.

24          THE COURT:  That would have ended at some point when

25     Ms. Pickens came back?

50

1        MR. MEAD:  No question.  She at that point, what

2    usually the pattern is, what you see in these cases is that a

3    long-term sub is usually hired thereafter by the district.  For

4    example, at least three out of the four that were hired in

5    2002-2003 as long term subs, did become full-time teachers.

6        THE COURT:  For what period of time is it your

7    contention that a damage award based upon a full-time salary

8    should run?

9        MR. MEAD:  From 2003.  From 2003, we would submit

10   after the time period that she was let go in 2002 or terminated

11   from her long-term sub job, we would say from the beginning of

12   the next school year she would have been full-time.

13       THE COURT:  Based upon what you contend was the

14   normal practice or custom?

15       MR. MEAD:  Correct.

16       THE COURT:  What will the evidence show on your

17   client's efforts to mitigate?

18       MR. MEAD:  She did not apply outside the school

19   district, and there's a few reasons for that, your Honor.

20   Number one, she has continued to sub.  She does substitute 90

21   to 100 days on a daily basis, but not any type of long-term

22   basis.  She'll go in when they call her, she's always been

23   working.  So they may say she didn't mitigate by going and

24   getting a full-time job, but she has been working for the

25   district.  Number two, that's where she lives.  And, number

51

1   three, I find it an interesting argument that the district

2   comes in and says well, she didn't apply to these other

3   schools, implying that they would have hired her.  Now, if they

4   would have hired her, why isn't she hired by the Crawford

5   Central School District.  Moreover, I think it's just a simple

6   fact that if she was going to apply to other school districts,

7   realistically this has been a very hotly covered issue up in

8   the Crawford County area, this lawsuit, I don't think it would

9   help her situation very much.  So I think the defendant has the

10  burden of proof to show that she would have been hired or

11  likely would have been hired by these other districts,

12  considering that they're saying she wasn't even qualified for

13  Crawford Central, I don't know how they can come in and say she

14  would have been hired for these other jobs.

15          THE COURT:  Are you saying the geography was

16  prohibitive?

17          MR. MEAD:  Somewhat.  She's in Crawford County,

18  these are the next counties over, the next districts over.

19  It's not the exact same thing.  She has four children.  She has

20   children in school in the Crawford Central School District as

21   well.  She wants to be home at certain times.

22          THE COURT:  All right.

23          MR. MEAD:  Basically, your Honor, that is what we'll

24   be submitting.  We have a number of witnesses that we'll

25   present, including Mr. and Mrs. Wagner.  People who evaluated

52

1  her back in the year 2000.  We have a person who was on the

2  school board during that time period up to 2000, who will

3  actually be able to tell how the district tried to recruit

4  minorities but were unsuccessful.  He worked with several of

5  the people that are still on the school board at this date.

6  We also have the two teachers who will talk about the fact they

7  tried to have Rowena substitute for them.

8          THE COURT:  Is Ms. Pickens going to testify?

9          MR. MEAD:  Yes, she'll be here.

10          THE COURT:  In your case?

11          MR. MEAD:  Yes.  And basically that is what our case

12  will consist of.

13          THE COURT:  All right.  Let me hear from Mr. Kuhar.

14          MR. KUHAR:  Very briefly, your Honor.  The case is

15  brought under several laws, but essentially it's a McDonnell
                                    —————————

16  Douglas test, as the court already noted and the plaintiff
    ————————

17  seems to agree.  And it's also important to note that none of

18  these laws burden the federal judiciary with the responsibility

19    of making, auditing or confirming the wisdom of the employer's

20    hiring decisions.

21          THE COURT:  All right, that's a given.  Let's go to

22    what you think your facts are going to show.

23          MR. KUHAR:  Well, your Honor, we will call several

24    of the administrators, potentially up to six or seven.

25    Basically, reserve judgment, see how that goes.  But we will

53

1   call several of the administrators who were involved in the

2   decisions in this case.  They'll credibly describe a credible

3   process.  Whereby they will also explain each of the decisions

4   they made and why.  We'll call the superintendent, Mike

5   Dolecki, for context, essentially.  We'll call George Wright,

6   who will deny making the discriminatory remark attributed to

7   him.  And briefly describe his pioneering efforts in the area

8   of racial equality in the '50s when he went to college.  In

9   fact, he'll testify he did not join fraternities because at

10  that time they were racist.  And rather than join the group,

11  and personally spearheaded a move to attract black students to

12  his college and start a scholarship fund for that purpose.  At

13  which time there were no minority students at the school.  And

14  that he worked in human resource positions for a significant

15  part of his career.  And in a million years would not have

16  thought or said such a comment.  Also, and quite probative, I

17  think will be the testimony of Frederic Wagner, who is the

18  brother of the plaintiff's husband.  Who was at that meeting

19  where that remark was supposedly validated by Assistant

20    Superintendent Heller.  Plaintiff's brother-in-law will say --

21        THE COURT:  Brother or brother-in-law?

22        MR. KUHAR:  Plaintiff's brother-in-law, Mr. Wagner's

23    brother, will testify that he was there and he recalls hearing

24    no such remark affirmed by Mr. Heller.  And he's an elected

25    official, has been for over 30 years.

54

1       THE COURT:  What does he do?

2       MR. KUHAR:  Treasurer in Crawford County.  And I

3   think it will be easy to infer that a public servant would

4   understand the outrageousness of such a remark, the validation

5   of one by Mr. Heller.  And I think it's extremely probative

6   also that it his brother's wife who is the plaintiff here.

7       THE COURT:  All right.

8       MR. KUHAR:  We will call several minority teachers

9   and a few Caucasian teachers for relatively brief testimony.

10   The minority teachers to describe the process that they went

11   through, which was essentially the full process that Ms. Wagner

12   has refused to participate in.  In other words, you'll hear

13   that Tammy Foster, applied herself for awhile, took herself out

14   of contention for personal reasons, she's an African-American.

15   It was actually Mr. Heller who sought her out and said I

16   noticed you've applied for a position, not a teaching position,

17   I see you have a teaching certificate, would you be interested

18   in being a teacher.  She says absolutely.  And he and Ms. Good

19   worked with this Tammy Foster to improve her to the point where

20    she can conduct an interview better than she otherwise had

21    been.  She in fact, and the thing she had to do to put herself

22    on that kind of a level are significant, including working for

23    a year in a part-time program at the school.  These are things

24    which were suggested to Ms. Wagner who was deemed to be --

25        THE COURT:  What do you believe your evidence will

55

1    show was suggested to Ms. Wagner that she should have done in

2    order to make her a more viable candidate?

3         MR. KUHAR:  Some of these are terms of art and best

4    described by the educators who are going to mention them.

5         THE COURT:  But you'll be asking the questions, so

6    what do you think, what do you believe your evidence will show?

7         MR. KUHAR:  That while she did tend to exhibit

8    classroom control, which is one of the things you look most for

9    in a substitute teacher --

10        THE COURT:  Because if you don't have control, you

11   don't have anything?

12        MR. KUHAR:  Right.  Frankly, with the shortage of

13   substitute teachers, if you have control, that is probably all

14   you can ask for.  If there's teaching that happens in there at

15   the time, too, that's great.  With the shortage of subs, that

16   is the prime directive, that is to find a sub who can control

17   the class.  Which no one has said Ms. Wagner can't do.  But

18   then when the interviewers on the committee who were

19   responsible, most responsible for assessing the substance to

20  her answers on the most important questions about whether she

21  knows the Pennsylvania standards, that are those standards

22  defined by the Department of Education regarding what students

23  are actually supposed to learn, she was very weak.  When it

24  came to -- the assessment factors that the districts are

25  supposed to use when looking at teachers, her answers on those

1  were always very weak, she was unfamiliar with those.  The

2  modern, the most modern, most cutting-edge learning techniques,

3  including balanced literacy, which Curriculum Director Suzanne

4  Good will best describe, but when balanced literacy were

5  introduced, she had poor answers for those, too.  Essentially,

6  we have never taken the position that Ms. Wagner cannot be

7  successful as an elementary school teacher.  We've taken the

8  position that every time that we post a position, we want the

9  most qualified applicant.  And, frankly, if there are 30

10  applicants for a position and she is number two, she's not

11  going to get the job.  So the fact that somebody subs for a

12  long period of time, applies for a lot of positions and is

13  average --

14        THE COURT:  So she would have to be number one?

15        MR. KUHAR:  Exactly, your Honor.  As much second

16  guessing as the testimony will suggest and Ms. Wagner's

17  testimony will suggest, as much of that as there will be, there

18  won't be any testimony that when the district applied the

19  standards that it decided upon, it did them in an objectively

20  irregular way or in a way that was inconsistent among the

21  candidates.

22          THE COURT:  Finally, the litmus test will be as I

23  hear the evidence come in, but if you can, just by way of

24  category, and I recognize we're probably talking about

25  subjective things here, but can you tick off for me by way of

57

1  the legitimate, nondiscriminatory reasons, can you give some

2  specificity to what would be the district's overall contention

3  that she was not as qualified in each instance as the person

4  who got the position; in what specific particulars do you

5  believe your evidence will come on that will delineate, in what

6  specific ways, whether it be communication, whether it be

7  presentation, whether it be industry, what specifically was it

8  that the interviewers were seeing in her or not seeing in her

9  that they would, for instance, be seeing in the successful

10  candidate?

11       MR. KUHAR:  Well and, again, maybe I didn't do a

12  good job of explaining it clearly, because those are the kinds

13  of things that you'll hear from them.  When it came to how do

14  you run a class -- well, I get their attention, she might say.

15  And I make sure that they're focused on me the whole time and

16  if they drift, I bring them back in.  She was very strong in

17  those kinds of answers to those kind of questions.  But when

18  the questions were more along the lines of what does the

19  Pennsylvania Department of Education mandate we teach a third

20  grader in terms of reading, that's where the weaknesses were.

21  Also, in our proposed findings of fact we do list about a half

22  a dozen types of deficiencies --

23          THE COURT:  Is it fair to say that would be -- the

24  deficiencies you list in your findings are kind of the heart of

25  the matter?

58

1          MR. KUHAR:  Yes, your Honor.

2          THE COURT:  Anything else you want to tell me?

3          MR. KUHAR:  Just real briefly about the Pickens'

4   position.  I'm not sure exactly what testimony we're going to

5   hear.  The deposition testimony by Ms. Wagner was that Mr.

6   Meader, who was the building principal at the time, you'll hear

7   testimony that there was conversation between Heller and Meader

8   about who was going to replace Pickens for this leave of

9   absence.  You'll hear that Ms. Wagner's deposition testimony

10  was that Mr. Meader did not promise her that position for a

11  period of time.  On the intake questionnaire that the court has

12  already looked at, you'll see that she did not indicate that

13  Mr. Meader promised that position for any period of time, to

14  the contrary, she actually indicated that when she told Mr.

15  Meader I'd be interested in that Pickens' position, according

16  to her and what she submitted to the PHRC, he said I'll try my

17  best.  And I think she's going to testify here that he said oh,

18  it's yours absolutely for a certain period of time.

19          THE COURT:  We'll see what she says.  All right,

20   thank you.  All right, let's go.

21        MR. KUHAR:  Your Honor, I would request

22   sequestration of the witnesses.

23        THE COURT:  All witnesses will be sequestered.

24        MR. MEAD:  Our first witness will be Rowena Wagner.

25        THE CLERK:  Raise your right hand, please.

59

1    ROWENA WAGNER, PLAINTIFF HEREIN, SWORN

2        DIRECT EXAMINATION

3  BY MR. MEAD:

4  Q.   Ma'am, could you state your name, please?

5  A.   Rowena Wagner.

6  Q.   Where do you live?

7  A.   166 North Franklin Street, Cochranton, PA, 16314.

8  Q.   How old are you, ma'am?

9  A.   I'm 34.

10  Q.   Do you have a family?

11  A.   Yes.

12  Q.   Are you married?

13  A.   Yes, I am.

14  Q.   To Bernie Wagner?

15  A.   That's correct.

16  Q.   Do the two of you have any children?

17  A.   Yes, we have four.

18  Q.   What ages?

19  A.   Eleven, nine, five and two.

20  Q.   Let me ask you a little bit about your background, Ms.

21  Wagner.  Where were you born?

22  A.   I was born in Manila, Philippines.

23  Q.   How long did you live in the Philippines?

24  A.   Twenty-one years.

25  Q.   At that point did you move to the United States?

60

1  A.   That's correct.

2  Q.   While you were in the Philippines, did you have any

3  educational background, take any schooling?

4  A.   Yes, I graduated high school and had three years of

5  college.

6  Q.   Did you finish college while you were in the Philippines?

7  A.   No, I did not.

8  Q.   What year did you come to the United States?

9  A.   June of '94.

10  Q.   Are you a naturalized citizen at this point?

11  A.   Yes, I am.

12  Q.   When did you become so?

13  A.   When did I become a sub?

14  Q.   A citizen?

15  A.   A citizen.  Right around September or October of '98.

16  Q.   When you came to the United States, did you seek to

17  continue your education?

18  A.   Yes.

19  Q.   Where did you go to school?

20  A.   I went to Edinboro University of Pennsylvania.

21  Q.   Why did you go to Edinboro, what was your goal?

22  A.   My goal is to become a teacher.

23  Q.   In particular, what kind of kids do you want to teach?

24  A.   Elementary level.

25  Q.   By elementary, what grades are you referring to?

61

1  A.   K through 6.

2  Q.   K being kindergarten?

3  A.   Kindergarten through grade 6, yes.

4  Q.   So you enrolled in Edinboro, was there any particular

5  major that you took?

6  A.   Elementary education.

7  Q.   All right.  So you came to Edinboro, you took education,

8  what is your major called?

9  A.   Bachelor of science in education, major in elementary

10  education.

11  Q.   What did that program consist of, what did you have to

12  do?

13  A.   As an education major, I had the four practicum

14  experiences.  Two in field experiences and two substitute, sub,

15  I'm sorry, I'm nervous.

16      THE COURT:  Don't be, but start that again.

17      THE WITNESS:  Okay.  As an education major, I had

18  the four practicum experiences.

19      THE COURT:  What does that mean?

20          THE WITNESS:  Two field experiences and two student

21    teaching assignments.

22    BY MR. MEAD:

23    Q.    Tell me what a field experience is?

24    A.    Field experience, my first placement was at Second

25    District.  My supervisor was Mr. Bruce Smith.  My cooperating

62

1  teacher was Ms. Harriet Powell, that was in first grade.

2  Q.    What do you mean by field experience, what do you do?

3  A.    I taught lessons in math, science, language arts.

4  Q.    Were you under the supervision of anyone at that time?

5  A.    Under Mr. Bruce Smith, and Ms. Harriet Powell.  That's my

6  first placement.

7  Q.    You said student teaching, is student teaching different

8  from a field experience?

9  A.    Yes.

10  Q.    What do you do in student teaching?

11  A.    Student teaching is more like you're doing the same

12  responsibilities as what the regular teacher would do.

13  Q.    Who do you do that for?

14  A.    My supervisor was Mr. Lovett.  My cooperating teachers

15  were Ms. Fisher and Mr. McCullough.

16        THE COURT:  If I may interrupt, I still don't

17  understand the difference between field experience, where you

18  go out and teach a class, as you just described you did with

19  Mr. Smith and Ms. Powell as your supervisors; and student

20    teaching where you also go out and teach a class, what's the

21    difference?

22          THE WITNESS:  Field experience is more like

23    assisting the teacher and you will be given an opportunity to

24    teach a lesson, like once a week.  Versus student teaching,

25    you're responsible in all the classroom activities, and teach

1  lessons every day just like a regular teacher.

2      THE COURT:  All right, I understand.

3  BY MR. MEAD:

4  Q.   If I may, as far as field experience, you're kind of a

5  teacher's aide?

6  A.   That's correct.

7  Q.   When you're a student teacher, you're in front of the

8  class teaching?

9  A.   That's correct.

10  Q.   Did you graduate from Edinboro?

11  A.   Yes, I did.

12  Q.   In what year?

13  A.   May of 2000.

14  Q.   What was your degree in when you graduated?

15  A.   I'm sorry, I didn't hear.

16  Q.   What was your degree in?

17  A.   My degree is bachelor of science in education, major in

18  elementary education.

19  Q.   Now, in Pennsylvania to become a teacher, do you have to

20  do anything else besides just graduate from college?

21  A.   Yes.

22  Q.   What do you have to do?

23  A.   To obtain a Pennsylvania teaching certificate.

24  Q.   And how do you obtain a Pennsylvania teaching

25  certificate?

64

1  A.   You take like four tests under practice.  That's the

2  assessments for beginning teachers.

3  Q.   And over what period of time do you do this, how long

4  does it take?

5  A.   Say that again, please.

6  Q.   How long does it take to get your certificate?

7  A.   How long does it take?

8  Q.   Yes.

9  A.   Well, there's actually, they're divided into four parts.

10  So I took some while I was still in college.  And the last one

11  I took was in 2001.

12  Q.   2001?

13  A.   Yes, 2001.

14  Q.   Did you receive the certificate?

15  A.   Yes.

16  Q.   Do you still have this teaching certificate?

17  A.   Yes.  As a matter of fact, I'm recertified to teach for

18  another six years.

19  Q.   When did you do the recertification?

20  A.   Last year.

21  Q.   After you received this certification, did you apply for

22  jobs anywhere?

23  A.   Yes.  And where, Crawford Central School District.

24  Q.   That's the only place you applied?

25  A.   That's correct.

1  Q.    When you applied there, did you speak to anybody about

2  the job that you were applying for?

3  A.    Yes.

4        THE COURT:  What year are we in now?

5  BY MR. MEAD:

6  Q.    What year?

7  A.    In 2001.

8  Q.    2001?

9  A.    Yes, August of 2001.

10  Q.    Now, you graduated in 2000, you were certified in 2000 or

11  2001?

12  A.    2001.

13  Q.    So after you were certified is when you applied for a job

14  with Crawford Central?

15  A.    That's correct.

16  Q.    Who did you speak to, if anyone, at Crawford Central?

17  A.    Mr. Lascola conducted an interview.

18        THE COURT:  Do you know how to spell that?

19        THE WITNESS:  Lascola, L-a-s-c-o-l-a.

20        THE COURT:  All right, go ahead.

21  BY MR. MEAD:

22  Q.    What was Mr. Lascola's job title?

23  A.    He was the superintendent.

24  Q.    Of the entire district?

25  A.    That's correct.

66

1  Q.   And you met with him?

2  A.   Yes.

3  Q.   When you met with the superintendent of the district, did

4  you discuss your desire to teach?

5  A.   Yes, I did.

6  Q.   What did he tell you?

7  A.   He informed me that I had to be a daily substitute

8  teacher to get a long-term substitute teaching job.  And then a

9  stepping stone to become a permanent teacher.

10  Q.   What was your goal at that time?

11  A.   To gain experience and become a permanent teacher.

12  Q.   That's still your goal today?

13  A.   Yes.

14  Q.   Did Mr. Lascola give you any other advice or tell you

15  anything else you should do?

16  A.   Well, I remember one time that, the same time he told me

17  that don't get my master's because it's likely the district

18  will not hire me.

19  Q.   Why?

20   A.   If I had my master's because they have to pay me more.

21   Q.   So Mr. Lascola told you not to get a master's --

22   A.   Yes.

23   Q.   Because the district would have to pay you more?

24   A.   Yes.

25   Q.   Did you in fact thereafter apply to become a substitute

file:///A|/WAGDAY1.TXT

67

1  teacher?

2  A.    Could you please repeat that.

3  Q.    Sure.  Did you apply to become a substitute teacher after

4  your conversation or before your conversation with Mr. Lascola?

5  A.    I applied for a permanent teaching position, but I

6  received a substitute teaching position instead.

7  Q.    If you look at Exhibit No. 1, can you turn to that in

8  your notebook; do you see what I'm referring to?

9  A.    Yes.

10  Q.    Is that letter from Mr. Dolecki the letter confirming

11  that you were going to be a substitute teacher?

12  A.    That's correct.

13  Q.    And you received that letter from Mr. Dolecki?

14  A.    That's correct.

15  Q.    Had you spoken to Mr. Dolecki at that time?

16  A.    No.

17  Q.    So September 26, 2001 you become a --

18  A.    A substitute teacher.

19  Q.    A substitute teacher, okay.  And it does say that your

20    name was approved by the Crawford Central Board of School

21    Directors at its regular meeting; do you see that in the first

22    paragraph?

23    A.    Yes.

24    Q.    Did you go to any type of meeting or anything to get

25    approved?

68

1  A.   No.

2  Q.   All right.  Besides speaking to Mr. Lascola, did you

3  speak to anybody else about this job, before you started?

4  A.   About?

5  Q.   Being a substitute teacher?

6  A.   No.

7  Q.   When was the first time -- did you start to substitute

8  then in 2001?

9  A.   October of 2001.

10  Q.   October of 2001.  How often would you substitute -- let's

11  go to 2001-2002, can you tell us how many days you substituted,

12  approximately, in that school year?

13  A.   Approximately 110 -- 110 days.

14  Q.   110 days total?

15       THE COURT:  Are you talking about for the school

16  year 2001-2002?

17       MR. MEAD:  Yes, your Honor.

18  BY MR. MEAD:

19  Q.   And what grades did you substitute for?

20   A.    Kindergarten through 6.  And I also subbed at the middle

21   school and high school.

22   Q.    During that time period, what was the longest sub job you

23   had; again, we're in 2001-2002?

24   A.    2001-2002, would be -- it's an everyday, day-to-day sub

25   for 2001-2002.

69

1   Q.   So you had no long-term sub --

2   A.   No.

3   Q.   It would be a different day, different job, different

4   class?

5   A.   That's correct.

6   Q.   What did you do as a substitute during that time period,

7   what would you have to do when you went in the classroom in the

8   morning?

9   A.   I'm sorry.

10  Q.   That's all right.  What did you have to do as a

11  substitute job that day when you walked into the classroom,

12  what would a typical day be if you were a substitute?

13  A.   Take attendance -- it depends if you're in elementary

14  level.  You have like -- I'm sorry, take the attendance, lunch

15  count, give the students fluoride and teach the lessons.

16  Q.   Who prepared the lessons?

17  A.   The teachers.

18  Q.   Did you ever have to prepare the lessons as a sub?

19  A.   Not this year, not in that 2001-2002 year.

20  Q.   Later you did?

21  A.   Yes, I did.

22  Q.   And so you would be in charge of this class for the

23  entire day, is that correct?

24  A.   That's correct.

25  Q.   So how did you feel you did that first year 2001-2002 as

70

1  a teacher?

2  A.   I thought I did very well.

3  Q.   And then I take it, did you substitute at all during the

4  summer, did you teach the summer school?

5  A.   No, I did not.

6  Q.   So after that first year, 2001-2002, were you a

7  substitute teacher for the following year, which is 2002-2003?

8  A.   That's correct.

9  Q.   By the way, when you would substitute teach, would you

10  ever get evaluations by the teachers you were replacing?

11  A.   Actually, at the end of the day I was required to write

12  down a summary of what I did that day.  And some teachers will

13  write down comments right on the bottom evaluating what

14  happened when they come back, and feedbacks from the teachers

15  or the aides and the students.

16  Q.   So some teachers would evaluate how you did and others

17  wouldn't?

18  A.   That's correct.

19  Q.   Now, we're going up to the school year 2002-2003.  Do you

20    know a Joye Pickens?

21    A.    Yes.

22    Q.    Who is Ms. Pickens?

23    A.    She was a second grade teacher at Cochranton.

24    Q.    Now, is she a friend of yours?

25    A.    We're friendly, but we're not friends.

71

1  Q.   Do you socialize with her?

2  A.   No.

3  Q.   Now, November of 2002, did anything happen involving your

4  substituting job and Ms. Pickens?

5  A.   Yes.

6  Q.   What was that?

7  A.   I was asked by Ms. Pickens to sub for her because she had

8  to undergo a surgery.

9       THE COURT:  Let me make a suggestion because these

10  terms tend to be interchangeable and they shouldn't be.  If you

11  mean long-term sub, you say long-term sub because that's a

12  different word than sub, all right?

13       MR. MEAD:  Yes, your Honor.

14  BY MR. MEAD:

15  Q.   Were you asked to do a long-term sub for her?

16  A.   That's correct.

17  Q.   And that was because she was going to have surgery,

18  correct?

19  A.   That's correct.

20  Q.   What was your reaction to that?

21  A.   I was excited.

22  Q.   And why is that?

23  A.   Finally this is the break that I've been waiting for.

24        THE COURT:  Keep your voice up, please.

25        THE WITNESS:  I was excited because finally this was

72

1    the break that I was waiting for.

2    BY MR. MEAD:

3    Q.    In this time period of subbing, that would have been from

4    November, 2002 until when?

5    A.    January 17th of '03.

6    Q.    Did you discuss this long-term subbing job with Mr.

7    Meader who was the principal of the school at that time?

8    A.    Yes, I did.

9    Q.    When did Mr. Meader tell you -- prior to you starting to

10    sub, long-term sub for Ms. Pickens?

11    A.    He didn't really tell me that I'll be Ms. Pickens --

12        THE COURT:  Start that all over again.  The question

13    on the floor was what?

14    BY MR. MEAD:

15    Q.    The question on the floor was did you have any

16    conversations with Mr. Meader about this position prior to you

17    beginning the position?

18    A.    No.

19    Q.    No?

20   A.   No.

21   Q.   Did you begin to do the substitute position then?

22   A.   Yes, I did.

23   Q.   That was in November, do you remember the date?

24   A.   November 16th.

25   Q.   Of?

73

1   A.   '02.

2   Q.   How were you doing in there?

3   A.   Very well.

4   Q.   Had you substituted for Ms. Pickens before?

5   A.   Yes.

6        THE COURT:  Do you mean day-to-day sub?

7   BY MR. MEAD:

8   Q.   I'm sorry, your Honor, day-to-day sub for Ms. Pickens?

9   A.   More than 10 times.

10  Q.   And when you had done the day-to-day sub for Ms. Pickens,

11  how had you gotten along with her children, her students?

12  A.   Very good.

13  Q.   So after this -- you began the long-term sub you believe

14  in November, correct?

15  A.   Yes.

16  Q.   Did anything happen to you while you were doing the

17  subbing?

18  A.   Yes.

19  Q.   What happened to you?

20   A.   Mr. Heller came --

21        THE COURT:  Mr. Heller, for the record was who?

22        THE WITNESS:  The assistant superintendent.

23        THE COURT:  All right, go ahead.

24        THE WITNESS:  During my planning time and accused me

25   of playing politics.

74

1   BY MR. MEAD:

2   Q.   Had you ever met Mr. Heller before?

3   A.   I believe that was the first time.

4   Q.   And when you met with you, he accused you of playing

5   politics?

6   A.   Yes.

7   Q.   Did you know what he meant by that?

8   A.   No, I did not ask him what he meant by that.

9   Q.   Why didn't you?

10   A.   Because I was afraid.

11   Q.   Why were you afraid?

12   A.   I still wanted him to consider me for the job.  And I

13   didn't want him to give me a black mark for questioning his

14   authority.

15   Q.   So what did you tell Mr. Heller when he said, he accused

16   you of playing politics?

17   A.   I told him to come in and observe me teach.  And so he

18   could see how, what kind of a teacher I am.

19   Q.   And at that time period do you know -- strike that.  Did

20  Mr. Heller subsequently take you up on that offer?

21  A.   Yes.

22  Q.   And do you recall when that was?

23  A.   November -- November 22nd, somewhere in that time.

24  November 20th, 22nd, I'm not sure what the exact date was.

25  Q.   Of 2002?

75

1  A.   Yes, that's correct.

2  Q.   How long did he observe you teach your class that day?

3  A.   35, 39 minutes.

4  Q.   Did he discuss with you or did he say anything to you

5  while you were teaching?

6  A.   No.

7  Q.   Did he discuss with you afterwards at any point your

8  evaluation or what he observed of you?

9  A.   He did.

10  Q.   Did he show you any type of form?

11  A.   Yes, he did.

12  Q.   If you could direct your attention to Exhibit 5; do you

13  see what I'm referring to?

14  A.   Yes.

15  Q.   It states it's a report of a classroom visitation.  Do

16  you know did Mr. Heller show you or provide you with this form?

17  A.   Yes.

18  Q.   Is that your signature at the bottom of the form?

19  A.   Yes.

20  Q.   Did the two of you go over this particular form and the

21  comments in there?

22  A.   Yes.

23  Q.   Did you agree with all the comments there?

24  A.   Not all of the comments.

25  Q.   Which ones did you agree with?

76

1    A.    Which ones did I agree --

2    Q.    You did agree with?

3    A.    I did or did not?

4    Q.    You did?

5    A.    I did.  Of course, the satisfactory comments.  And I

6    accepted the suggestions because I'm open to constructive

7    criticism.

8    Q.    You were open to suggestions you said?

9    A.    Yes.

10   Q.    Were there any comments you did not agree with?

11   A.    The first line that said "lesson plans evident.  Did not

12   see lesson plans."  I showed him my lesson plan before he came

13   in.

14        THE COURT:  Where are you reading from?

15        MR. MEAD:  If you look at the first category, your

16   Honor, it says "preparation - planning," the first sub category

17   under there says lesson plans evident.  Then there's a

18   handwritten comment, "didn't see lesson plans."

19        THE COURT:  All right, I'm with you, go ahead.

20  BY MR. MEAD:

21  Q.    There's handwritten comments afterwards "didn't see

22  lesson plans," is that correct -- Ms. Wagner, do you see where

23  I'm referring to?

24  A.    Yes.

25  Q.    That isn't your handwriting?

77

1  A.  No, it's not.

2  Q.  That's Mr. Heller's?

3  A.  That's correct.

4  Q.  So your testimony was you did show him a lesson plan?

5  A.  That's correct.

6  Q.  Who had put together the lesson plan?

7  A.  I did.

8  Q.  You didn't have Ms. Pickens do it at this point?

9  A.  No.

10  Q.  You were doing your own lesson plans?

11  A.  That's correct.

12  Q.  Were there any other comments that were made that you

13  disagreed with?

14  A.  Yes, under instructional technique/effectiveness.

15  Q.  Yes.

16  A.  The second line, it said "introduction and motivation."

17  And Mr. Heller's comment was "no introduction or lead into."

18  As the teacher every lesson that you are to teach you are

19  required to have an introduction.

20  Q.   Did you have an introduction that day?

21  A.   Yes, I did.

22  Q.   Anything else you disagreed with?

23       THE COURT:  Just so I'm clear, I don't know if it's

24  a term of art in the teaching world or not, what does an

25  introduction mean?

78

1       THE WITNESS:  Introduction, it's like catching the

2   student's attention of how you're going to introduce your

3   lesson of what you're going to teach that period.

4       THE COURT:  All right, go ahead.

5   BY MR. MEAD:

6   Q.   And your testimony is you did give an introduction that

7   day?

8   A.   That's correct.

9   Q.   Anything else in that particular form that you did not

10   agree with?

11   A.   It says "instructional technique/effectiveness."  Right

12   at the bottom -- third to last line, "time on task.  Students

13   were very restless, seated on the floor for so long."  I really

14   disagreed with that, the students were very well behaved.

15   Q.   There's one thing I'd like to ask you, under

16   "instructional technique/effectiveness" the first category is

17   called "command of written and spoken English;" do you see

18   that?

19   A.   Yes.

20  Q.  What was your grade on that?

21  A.  Satisfactory.

22  Q.  Was there anything else you disagreed with on this form?

23  A.  That's it.

24  Q.  It also states "appeared very nervous," under "personal

25  characteristics."  Were you nervous that day?

79

1  A.   Yes.

2  Q.   Is that the first time you had been observed?

3  A.   By Mr. Heller.

4  Q.   Who at that time was the assistant superintendent?

5  A.   Yes.

6  Q.   Now, you student taught day-to-day -- I'm sorry,

7  substitute teaching daily from this time period in 2002 up to

8  the present, correct?

9  A.   That's correct.

10  Q.   Hundreds of times, is that accurate?

11  A.   Yes.

12  Q.   Has Mr. Heller ever come in and observed you any other

13  time besides this date in November of 2002?

14  A.   No.

15  Q.   After you spoke with Mr. Heller, did anyone else come in

16  and observe your classroom?

17  A.   Yes.

18  Q.   Who was that?

19  A.   Mr. Meader.

20  Q.   And he was again who?

21  A.   The principal at Cochranton.

22  Q.   If you turn the page, is that his report of classroom

23  visitation?

24  A.   That's correct.

25  Q.   So he visited you on November 26, 2002?

80

1   A.   Yes.

2   Q.   How did you do that day?

3   A.   Very good.

4   Q.   Did he discuss his comments with you afterwards?

5   A.   Yes, he did.

6   Q.   Was there anything you agreed or disagreed with?

7   A.   Yes, the first line "preparation - planning, lesson plans

8   evident."  He wrote down "NA."

9        THE COURT:  What does that stand for?

10       THE WITNESS:  Not applicable.

11  BY MR. MEAD:

12  Q.   Not applicable, I believe.

13  A.   He thought that Ms. Pickens was still making the lesson

14  plans.

15  Q.   Was she?

16  A.   No.

17  Q.   You were doing it?

18  A.   Yes.  I informed him and he said he wasn't going to

19  change it.

20  Q.    Anything else you disagreed with?

21  A.    No.

22  Q.    Under "instructional technique/effectiveness," the first

23  subcategory is "command of written and spoken English," do you

24  see that?

25  A.    Yes.

81

1  Q.   Did he write "S" for satisfactory there?

2  A.   That's correct?

3  Q.   Did anyone else observe you teaching besides Mr. Heller

4  and Mr. Meader?

5  A.   No.

6  Q.   By the way, how long was Mr. Meader in the classroom that

7  day?

8  A.   Forty-five minutes.  40, 45 minutes.

9  Q.   Now, did you continue to substitute, long-term substitute

10  for Ms. Pickens during that whole time period until January?

11  A.   Yes.

12  Q.   Up to January --

13  A.   Until December 20th of 2000.

14  Q.   Prior to December 20th of 2002, were you interviewed?

15  A.   Yes, I was.

16       THE COURT:  Just for the record, you said December

17  20, 2000, did you mean 2002?

18       THE WITNESS:  2002.

19       THE COURT:  All right, go ahead.

20  BY MR. MEAD:

21  Q.    Did you substitute -- I'm sorry, you were interviewed on

22  a particular date before December 20th of 2002?

23  A.    Yes.

24  Q.    Do you recall who interviewed you?

25  A.    Mr. Heller, Ms. Good.

1        THE COURT:  Now, when you tell me these people, you

2    have to tell me not only what their name is, but also tell me

3    what their position was?

4        THE WITNESS:  Mr. Heller, the assistant

5    superintendent; Ms. Good, the curriculum director.  Mr.

6    Stanton, principal.

7        THE COURT:  Of what?

8        THE WITNESS:  Neason Hill.  N-e-a-s-o-n, Hill.

9        THE COURT:  All right, go ahead.

10        THE WITNESS:  Mr. Meader, M-e-a-d-e-r, principal,

11    Cochranton Elementary.

12        THE COURT:  Just so I'm clear, that's where you had

13    been teaching, is that right?

14        THE WITNESS:  That's right.

15        THE COURT:  Go ahead.

16        THE WITNESS:  Mr. Karns, principal, West End.  Ms.

17    Schoonover, principal, Second District.  That's all I can

18    recall right now.

19    BY MR. MEAD:

20  Q.   How long was your interview that day?

21  A.   20 minutes to 30 minutes.

22       THE COURT:  Orient me in terms of time, when is this

23  taking place?

24  BY MR. MEAD:

25  Q.   December 19, 2002, correct?

83

1  A.  That's correct.

2  Q.  Your interview took 20 minutes?

3  A.  Yes, 20, 30 minutes.

4  Q.  The people who interviewed you, were they all Caucasian?

5  A.  That's correct.

6  Q.  Were any minorities interviewed for this position?

7  A.  I'm sorry.

8  Q.  As a substitute teacher?

9  A.  No.

10  Q.  Were you at that time interviewing for any other

11  positions besides the position of Ms. Pickens?

12  A.  I believe I was interviewed for four positions.

13      THE COURT:  Do you mean beyond Ms. Pickens, in

14  addition to?

15      THE WITNESS:  Yes.

16  BY MR. MEAD:

17  Q.  And were they all elementary school positions?

18  A.  That's correct.

19  Q.  When were you notified whether or not you had received

20  Ms. Pickens' position?

21  A.  December 20, 2002.

22  Q.  What was told to you?

23  A.  Say that again, I'm sorry.

24  Q.  What were you told on December 20th?

25  A.  I was told by Mr. Heller and Mr. Meader that they chose

84

1    someone else to replace Ms. Pickens.

2    Q.    And do you know who that was?

3    A.    Amy Szalewicz.

4    Q.    Do you know what race Amy is, is she white?

5    A.    She's white, yes.

6    Q.    Were you told about how you did regarding the other three

7    vacancies?

8    A.    No.

9    Q.    Were you upset when you found this out?

10   A.    Very upset.

11   Q.    And why was that?

12   A.    Because I love my job.

13   Q.    Had you been told why the other women had been hired and

14   not you?

15   A.    No.

16   Q.    Did you subsequently find out who was hired for these

17   other positions?

18   A.    Mr. Heller sent me a letter of rejection.

19   Q.    Do you know who was hired for the other openings at this

20    time period?

21    A.    Yes.

22    Q.    Who was hired?

23    A.    Mr. Chad DuPont -- I can't really tell you what was the

24    exact position in what school.

25    Q.    All right.

85

1  A.   Ms. Anna McElwain.

2  Q.   McElwain?

3  A.   Yeah.

4  Q.   M-c-E-l-w-a-i-n?

5  A.   That's correct.  Ms. Nikki Shearer.  Mr. Robert Bazylak.

6  Q.   Now, these four people you mentioned, are they all

7  Caucasian?

8  A.   Yes.

9  Q.   Of those four people that you mentioned, as well as Amy

10  who you mentioned earlier, do you know if any of those --

11  strike that.  Were they all hired for long-term substitute

12  jobs?

13  A.   Yes.

14  Q.   Do you know if any of them were subsequently hired as

15  full-time teachers?

16  A.   Yes.

17  Q.   Were they all hired or how many?

18  A.   Mr. DuPont, Ms. Shearer and Mr. Bazylak.

19  Q.   Do you know what happened to Anna McElwain?

20   A.   I believe she left.

21   Q.   The district?

22   A.   Yes.

23   Q.   After this occurred, did you continue to substitute in

24   2002-2003?

25   A.   That's correct.

86

1   Q.   How often were you substituting?

2   A.   You want the total days?

3   Q.   An estimate if you want?

4   A.   114.

5   Q.   About 114?

6   A.   Yes.

7   Q.   And that's in 2002-2003, these are as a day-to-day

8   substitute, correct?

9   A.   That's correct.

10  Q.   Now, did you during that time period, during 2003 at any

11  point did you ever contact the Pennsylvania Human Relations

12  Commission?

13  A.   Yes, I did.

14  Q.   And what made you decide to do that?

15  A.   There's a lot of factors.  The first one would be the

16  manner of, how the district kicked me out of Ms. Pickens' job.

17  Q.   Did you ever have any discussion with Mr. Meader, the

18  principal, if he knew that had occurred before?

19  A.   Yes.

20  Q.   What was that conversation?

21  A.   He informed me that was the first time that it ever

22  happened, that the sub was kicked out.

23  Q.   The long-term sub was kicked out of a job?

24  A.   Yes.

25  Q.   He was the principal at the time?

87

1  A.    That's correct.

2  Q.    Continue, what was the reasons why you decided to go to

3  the PHRC?

4  A.    The other factors were the comments that the

5  administrators, who are the decision-makers in the district,

6  made to my husband, such as blacks and browns are not as smart

7  as white people --

8        THE COURT:  Excuse me, you have to say who these

9  people are, who made those comments to your husband?

10        THE WITNESS:  Mr. Wright made a comment to my

11  husband stating that blacks and browns are not as smart as

12  white people.

13        MR. KUHAR:  Your Honor, we just want to note a

14  hearsay objection if it's being offered as to why he made the

15  statement.

16        THE COURT:  It's why she did something, right?

17        MR. MEAD:  It's not for the truth, your Honor.

18        THE COURT:  All right, go ahead.

19  BY MR. MEAD:

20  Q.   Okay.  That was made by?

21  A.   Mr. Wright.

22  Q.   At the time Mr. Wright was a member of the Crawford

23  County School Board?

24  A.   Crawford Central School Board.

25  Q.   Crawford Central, correct.  How about, were there any

88

1  other comments that you were referring to?

2  A.  Mr. Heller agreeing about Mr. Wright's comments to my

3  husband.

4  Q.  Mr. Heller, as you previously testified, is the assistant

5  superintendent?

6  A.  Yes.

7      MR. KUHAR:  Same objection, your Honor.

8      THE COURT:  It's not being offered for the truth,

9  overruled.

10  BY MR. MEAD:

11  Q.  Did you speak to anybody else regarding going to the

12  PHRC?

13  A.  Before I went to the PHRC?

14  Q.  Yes.

15  A.  Yes, I went to Edinboro University and spoke with my

16  supervisor, my advisor, Ms. Melvin.  And she directed me to Dr.

17  Arnold.  Who was or is, I'm not sure, was the equal service

18  director at Edinboro University.  Who happened -- who was, I'm

19  sorry, who was the curriculum director of Crawford Central.

20          THE COURT:  I didn't get that, he was what?

21          THE WITNESS:  He was the curriculum director.

22          THE COURT:  Dr. Arnold was the curriculum director?

23  BY MR. MEAD:

24  Q.    Is that correct?

25  A.    That's correct.  He was surprised that I -- that the

89

1  district interviewed me for a long-term sub and he informed

2  me --

3          THE COURT:  I'm confused.  You went to Edinboro?

4          THE WITNESS:  Yes, before I filed the PHRC

5  complaint.

6          THE COURT:  And you spoke to, I want to get these

7  names right, to Ms. Melvin?

8          THE WITNESS:  Yes, she was my advisor.

9          THE COURT:  When you were a student there?

10          THE WITNESS:  Yes.

11          THE COURT:  Then what did she tell you to do?

12          THE WITNESS:  She directed me to Mr. Arnold, who was

13  the equal service director at Edinboro.

14          THE COURT:  Equal service director at Edinboro?

15          MR. KUHAR:  Just to try to clear this up, Dr. Arnold

16  had previously been curriculum director before he took that

17  position at Edinboro.

18          THE COURT:  When you say equal service director, I

19  don't mean to jump in on your examination, this is just

20    background, when was he equal service director?

21          THE WITNESS:  I don't know, sir.

22          THE COURT:  Do you know if it's like an EEOC person?

23          MR. MEAD:  I think he may be at Edinboro being in

24    charge of those types of situations, but he's not with the

25    state doing that outside of Edinboro University.

file:///A|/WAGDAY1.TXT

90

1        THE COURT:  Dr. Arnold had been the curriculum

2   director for Crawford Central, but he was then working at

3   Edinboro?

4        THE WITNESS:  He was then before he got the equal

5   service job.

6        THE COURT:  All right, go ahead.

7   BY MR. MEAD:

8   Q.   You had a conversation with Dr. Arnold?

9   A.   Yes.

10   Q.   You were testifying that he said that he knew of no one

11   who had been --

12   A.   Subjected to -- interviews.  Usually the practice --

13   Q.   For a long-term sub?

14   A.   Yes, that's correct.  The practice was that the teachers

15   request and it was honored.

16   Q.   The teacher who taught the class requested a substitute?

17   A.   That's correct.

18   Q.   Dr. Arnold told you that, to his knowledge, it was

19   honored?

20   A.   Yes.

21   Q.   Was there anyone else you talked to prior to filing the

22   PHRC complaint?

23   A.   Ms. Dixon.

24   Q.   Why did you talk to Ms. Dixon?

25   A.   Dr. Arnold actually directed me to Ms. Dixon because she

1   had filed a discrimination case against the district.

2        MR. KUHAR:  Your Honor, may we have an offer of

3   proof on this Dr. Dixon testimony, who had sued the district

4   many, many years ago.

5        THE COURT:  Who's Dr. Dixon?

6        MR. MEAD:  All we are asking, your Honor, it's just

7   leading up to why she went to the PHRC.  Dr. Dixon sued the

8   Crawford Central School District successfully in 1985 I believe

9   the verdict was rendered.  We're not bringing any part of that

10  case in because I think it's too far in the past.  I'm just

11  putting together her state of mind why she was doing what she

12  did at this time period.  In other words, she didn't treat it

13  lightly, she didn't just run to the PHRC.  I'm not going to go

14  into what the background of that case was, just that she talked

15  to somebody who had sued back in 1985.

16        THE COURT:  All right.

17  BY MR. MEAD:

18  Q.   Correct, you talked to Ms. Dixon?

19  A.   She helped me organize a binder, organized it like in

20  chronological order of how to present it to the PHRC.

21  Q.   So based on everything you've told us, did you file a

22  PHRC complaint?

23  A.   I'm not sure if I mentioned that I met with Mr. Wright.

24  Q.   No, you didn't.  Tell us about meeting with Mr. Wright?

25  A.   I met with Mr. Wright.

92

1        THE COURT:  When?

2        THE WITNESS:  Sometime after December 20th of '02.

3   BY MR. MEAD:

4   Q.    What was that meeting about?

5   A.    I told him about my situation of how Mr. Heller kicked me

6   out of Ms. Pickens' job.

7   Q.    And did he give you any suggestions or anything you could

8   do?

9   A.    He said he will talk to the board, and he also encouraged

10   me to put my application to the SCORE?

11        THE COURT:  To the what?

12        THE WITNESS:  SCORE, S-C-O-R-E.

13   BY MR. MEAD:

14   Q.    What is SCORE?

15   A.    I don't know what S-C-O-R-E stands for, but it's a

16   rehabilitation center that he is the director of, I believe.

17        THE COURT:  Is SCORE, I still don't understand what

18   SCORE is?

19   BY MR. MEAD:

20  Q.   Do you know what SCORE is?

21  A.   No, I don't.

22  Q.   So you didn't follow up on it obviously?

23  A.   No, I didn't.

24        THE COURT:  Is SCORE a school, is it part of

25  Crawford Central?

93

1          THE WITNESS:  No, it's not.  It's alcohol

2  rehabilitation, I'm really not sure.

3          THE COURT:  Is he involved in that?

4          THE WITNESS:  Yes.  I believe he was the director.

5  BY MR. MEAD:

6  Q.   To do your application, what was the purpose if you were

7  to apply to them, to get a job or to get training or both?

8  A.   He said it would look good in my resume.

9  Q.   Besides your conversation with that gentleman, who else

10  did you talk to, anybody else prior to filing the complaint?

11  A.   I believe that's it.

12          THE COURT:  Mr. Mead, we're going to take a short

13  recess.

14          (Recess from 11:30 a.m.; until 11:38 a.m.)

15  BY MR. MEAD:

16  Q.   Ms. Wagner, when we took the break, we were talking about

17  the different reasons you had decided to go to the PHRC.  When

18  did you file your PHRC claim?

19  A.   February of '03.

20          THE COURT:  What was the date if you know, is that

21   part of the record here, do we know?

22          MR. MEAD:  I can look if you'd like.

23          THE COURT:  Let's just get it for chronology.

24          MR. KUHAR:  It's Exhibit PP in ours.

25          THE COURT:  That would be February 20th --

94

1       MR. KUHAR:  The verification is then, your Honor, it

2   doesn't necessarily indicate the date of the filing.

3       THE COURT:  It's close enough.  All right.

4   BY MR. MEAD:

5   Q.   Ms. Wagner, so it was filed in February of 2003, correct?

6   A.   That's correct.

7   Q.   Did you continue to substitute teaching after that?

8   A.   Yes, I did.

9   Q.   Were you substitute teaching as much as you were before?

10      MR. KUHAR:  Objection, could we get an offer of

11  proof, because the court did rule on the motion for summary

12  judgment as to day-to-day, sounds like it's day-to-day subbing,

13  as to that issue, that's been dismissed.

14      MR. MEAD:  And I agree with that, your Honor, I'm

15  not raising it for that issue.  One of the things we're going

16  to do by showing how much she subbed is showing that she was

17  gathering experience during this time period.

18      THE COURT:  Go ahead, ask the question again.

19  BY MR. MEAD:

20   Q.    Did you continue to substitute as much as you did before

21   prior to the filing of the complaint?

22   A.    No.

23   Q.    If you could take a look at Exhibit No. 28 in your book

24   in front of you.  Rather than doing any guesswork, can you tell

25   me if you assembled on Exhibit 28 the number of days you taught

95

1  each school year?

2  A.   Yes.

3  Q.   All right.  Just for the record, tell us what you

4  determined, how many days you determined you taught in

5  2001-2002, as a day-to-day, this is substitute teaching?

6  A.   That's correct.

7  Q.   How many days in 2001-2002?

8  A.   2001-2002, 109 days.  2002-2003, 106 days.

9  Q.   Now, hold on one second.  Did it also include Ms.

10  Pickens' teaching?

11  A.   That's correct.

12  Q.   That was approximately how many days did you teach for

13  Ms. Pickens?

14  A.   A month.

15  Q.   Approximately, 20 days?

16  A.   Yes, 20 days.

17  Q.   All right, 2003-2004, how many days did you substitute?

18  A.   114 days.

19  Q.   2004-2005, how many days did you substitute?

20  A.   99 and a half.

21  Q.   Just for the record, these are all day-to-day, correct,

22  these are not long-term subs?

23  A.   That's correct.

24  Q.   2005-2006, how many days?

25  A.   86.5 days.

1  Q.   And in 2006-2007, how many days did you substitute?

2  A.   79.5 days.

3  Q.   All right.  Now, going back to the school year 2003-2004,

4  you continued to sub, did you continue to receive evaluations

5  while you substitute taught day-to-day?

6  A.   That's correct.

7       MR. MEAD:  And if I may, your Honor, from this point

8  on when I mention substitute teaching, it will be all

9  day-to-day, there was no long-term.

10      THE COURT:  All right.

11  BY MR. MEAD:

12  Q.   I'm going to direct your attention to that year of 2004,

13  did you ever talk to Mr. Heller about the PHRC filing that you

14  had done?

15  A.   No.

16  Q.   All right.  Did you ever have any meeting with Mr. Heller

17  in which you working somewhere else was discussed?

18  A.   No.

19  Q.   In 2004 did you become aware of any positions that were

20  going to be opening for elementary education?

21  A.   Yes.

22  Q.   How many positions were you aware of were going to be

23  opened?

24  A.   Nine or ten.

25  Q.   What did you do in order to put yourself in position, if

97

1   anything, for those jobs?

2   A.    I sent letters of interest to Mr. Heller.

3   Q.    Subsequently, were you interviewed?

4   A.    Yes, I was.

5   Q.    Do you recall when you were interviewed?

6   A.    March of '04.

7   Q.    Do you know the exact date?

8   A.    No, I'm sorry.

9   Q.    Okay.  In March of '04 who interviewed you?

10  A.    Mr. Heller, the assistant superintendent.  Ms. Good, the

11  curriculum director.  Mr. Stanton, principal, Neason Hill.

12  Ms. Schoonover, principal, Second District.  Mr. Meader,

13  principal, East End.  Ms. Darling, principal, Cochranton.

14  Mr. Karns, principal, West End.

15  Q.    Ms. Darling, is that the same Ms. Darling that you later

16  had a conversation with about your lawsuit?

17  A.    That's correct.

18  Q.    Now, in March of 2004, at the time of this interview, had

19  you had any hearing down at the PHRC?

20   A.   Yes.

21   Q.   Do you recall who attended for the district?

22   A.   Mr. Heller, Mr. Dolecki and Mr. Stanton.

23   Q.   And Mr. Stanton and Mr. Heller were also on this

24   interview panel, correct?

25   A.   That's correct.

98

1          THE COURT:  Would you say those people again?

2   BY MR. MEAD:

3   Q.   Mr. Heller?

4   A.   Mr. Heller, the assistant superintendent.  Mr. Stanton,

5   principal.

6   Q.   If I could hold you right there.  Those are two people

7   that are down at the PHRC hearing, correct?

8   A.   Correct.  And Mr. Meader, principal.

9   Q.   He was at the meeting?

10   A.   Correct.

11   Q.   Was he also on the interview committee?

12   A.   That's correct.

13          THE COURT:  Had you said Mr. Dolecki as well?

14          THE WITNESS:  Yes, Mr. Dolecki, the superintendent.

15   BY MR. MEAD:

16   Q.   Was Mr. Dolecki on the interview panel?

17   A.   No.

18          THE COURT:  I'm trying to determine who was at the

19   PHRC.  Was it those four individuals?

20          THE WITNESS:  That's correct.

21   BY MR. MEAD:

22   Q.   And three of those four individuals participated in your

23   interviews in 2004, correct?

24   A.   That's correct.

25   Q.   Were there any minorities who did any interviews during

1  that time period?

2  A.   No.

3  Q.   How long were your interviews, do you recall?

4  A.   20 minutes, 30 minutes.

5  Q.   Did you make any presentation or did you have the chance

6  to make any presentation to these people about your background

7  or your abilities?

8  A.   I showed the interviewers my portfolio.

9        MR. MEAD:  Is that Exhibit No. 26, just for the

10  record, that's included in our exhibit notebook?

11        THE COURT:  Mr. Mead, let me ask for clarification

12  here.  You used the term interviews.  Am I properly of the

13  opinion there was one interview for nine positions or there

14  were nine separate interviews?

15        MR. MEAD:  No, your Honor, my understanding there

16  was --

17        THE COURT:  Ask her.

18        THE WITNESS:  One interview for nine positions.

19  BY MR. MEAD:

20  Q.   Were there two groups who interviewed you, though?

21  A.   That's correct.

22  Q.   So one group of four?

23  A.   With Mr. Heller.  And the other group with the other

24  principals with Ms. Good.

25  Q.   So you actually underwent two interviews?

file:///A|/WAGDAY1.TXT

100

1   A.   Each 20 minutes, yes.

2   Q.   Each 20 minutes?

3   A.   Yes.

4   Q.   For the nine positions?

5   A.   That's correct.

6        MR. MEAD:  Is that clear, your Honor?

7        THE COURT:  Yes, it is.

8   BY MR. MEAD:

9   Q.   And just as I was saying, Exhibit 26 was the portfolio

10  that you presented?

11  A.   That's correct.

12  Q.   Did they review the portfolio, to your knowledge?

13  A.   Yes.

14  Q.   Now, after this interview in March of 2004, were you

15  hired?

16  A.   No.

17  Q.   How were you notified that you were not hired?

18  A.   Mr. Heller sent me a letter of rejection.

19  Q.   Now, did you have any discussions with Mr. Heller at this

20  time?

21  A.   Yes.

22  Q.   What was your discussion with Mr. Heller at the time of

23  your rejection?

24  A.   I went to his office, Ms. Good was present, too.  I asked

25  him why he kept rejecting my applications.  And I asked him if

101

1    I'm highly qualified, and he said according to Pennsylvania

2    Department of Education you are highly qualified.

3    Q.    What else was said during this conversation, if you can

4    recall?

5    A.    He told me to seek teaching positions, go to a different

6    district.

7    Q.    He told you to seek positions elsewhere outside the

8    district?

9    A.    Yes.

10    Q.    Did he tell you why he told you to go elsewhere?

11    A.    No.

12    Q.    To your knowledge, was there any Asian people hired or

13    Filipino people hired during these interviews with the nine

14    people?

15    A.    In 2004?

16    Q.    Yes.

17    A.    No Asian, I don't think there's any Asian people teachers

18    that were hired that year.

19    Q.    Again, the panel that interviewed was all white, correct?

20  A.    That's correct.

21         THE COURT:  Just so I'm clear, maybe you asked the

22  question and I missed it -- did you elicit from the witness or

23  it is your intention to do so, if she knows, what the

24  composition of the applicant pool was?

25         MR. MEAD:  I'll be glad to ask.

102

1   BY MR. MEAD:

2   Q.    Do you know the people who were interviewed for the nine

3   positions?

4   A.    Yes.

5   Q.    How many were white, black, Asian or other minority, to

6   your knowledge?

7   A.    I know there's one black teacher or lady.

8   Q.    Her name is?

9   A.    Tammy Foster.

10   Q.    She had taught how long there before, do you know?

11   A.    I believe she subbed for a year, two years for the

12   district and then left the district and came back and became an

13   aide, a teacher's aide.

14   Q.    How long had she been with the district?

15   A.    Approximately, 10 years.

16   Q.    And was she hired?

17   A.    Yes.

18   Q.    Were there any other minorities, to your knowledge, that

19   applied for these nine positions?

20  A.  No.

21  Q.  The rest were white, outside of you?

22  A.  Yes.

23  Q.  And Ms. Foster?

24  A.  Yes.

25  Q.  Now, after you were not selected in 2004, March of 2004,

103

1  did you continue to substitute day-to-day?

2  A.  Yes.

3  Q.  And where did you substitute, same school as you were

4  substituting before?

5  A.  Cochranton, West End, East End, Neason Hill, First

6  District.

7  Q.  During that time period, did you ever substitute at a

8  school whose principal was Ms. Darling?

9  A.  Yes.

10  Q.  What school was that?

11  A.  Cochranton.

12  Q.  At Cochranton grade school?

13  A.  Elementary school.

14  Q.  Elementary school, and Ms. Darling was the principal at

15  the time?

16  A.  That's correct.

17  Q.  How many times in 2004-2005, do you recall substituting

18  at that school?

19  A.  I would say more than 60.

20   Q.   So you knew Principal Darling?

21   A.   Yes.

22   Q.   And am I correct you filed the lawsuit in this case in

23   September of 2004, correct?

24   A.   That's correct.

25   Q.   After you filed the lawsuit, did you have any

104

1  conversations with Principal Darling regarding your subbing at

2  this school?

3  A.   Yes.

4  Q.   Tell us about those?

5  A.   I learned that there was going to be an opening, there

6  was going to be an opening in fourth grade.

7  Q.   Do you know whose?

8  A.   Mr. Erdley.

9  Q.   Mr. Erdley?

10  A.   Yes.  I went to Ms. Darling's office --

11       THE COURT:  Excuse me, what kind of opening?

12       THE WITNESS:  Fourth grade, long-term position.

13  BY MR. MEAD:

14  Q.   Do you know why he was leaving?

15  A.   I guess the district asked him to go back to the high

16  school and teach learning support.

17  Q.   So this would be a long-term substitute job?

18  A.   That's correct.

19  Q.   And when was this conversation, by the way, with

20   Principal Darling, do you recall?

21   A.   I can't really recall, but September or October of '04.

22   Q.   All right.  So you talked to her about this opening,

23   correct?

24   A.   Yes.

25   Q.   Long-term sub opening?

105

1  A.   That's correct.

2  Q.   Tell us about the conversation?

3  A.   I asked her to consider me for the fourth grade long-term

4  subbing position job.  She informed me that I was not eligible

5  to apply for the job because of the lawsuit.

6  Q.   By the lawsuit, you meant the lawsuit that had been filed

7  on your behalf in September of 2004?

8  A.   That's correct.

9  Q.   Did you have any conversation with her about why you

10  weren't eligible because of the lawsuit?

11  A.   No.

12  Q.   What else was said, if anything?

13  A.   That's it.

14  Q.   Did you receive a long-term sub position at that school?

15  A.   No.

16  Q.   Were you interviewed for a long-term sub position at that

17  school?

18  A.   No.

19  Q.   Do you know who received that long-term sub position that

20   you had sought out?

21   A.   Ms. Cheryl Krachkowski.

22   Q.   Did you ever have any conversations with Principal

23   Darling besides that time regarding the fact that you were not

24   eligible because you filed your lawsuit?

25   A.   No.

106

1  Q.   Did you ever sub for a Ms. Maruska there?

2  A.   Yes.

3  Q.   Who is Ms. Maruska?

4  A.   Ms. Kathleen Maruska is the kindergarten teacher at

5  Cochranton Elementary School.

6  Q.   What is your relationship with her, if any?

7  A.   Nothing.

8  Q.   You're not friends or social friends or anything?

9  A.   Professionally.

10  Q.   Do you know if she ever sought to have you substitute for

11  her?

12  A.   Yes.

13  Q.   How many times did that occur?

14  A.   Twice.

15  Q.   Do you know when?

16  A.   I believe one in '04, 2004.  And the second one was in

17  2005.

18  Q.   Were these long-term sub positions?

19  A.   Three weeks, I would consider it short-term.

20  Q.   Short-term sub positions?

21  A.   Yes.

22  Q.   Were you ever provided the opportunity to do so, to take

23  these sub positions?

24  A.   No.

25  Q.   Did you ever know why?

107

1  A.   No.

2  Q.   Now, during this time period, 2004-2005, did you continue

3  to apply for any jobs at the school district?

4  A.   Yes.

5  Q.   Do you recall how many jobs you applied for?

6  A.   You're asking?

7  Q.   Yes.

8  A.   Okay, 70 jobs, it would be 70, 75.

9  Q.   How would you apply for these jobs -- these are permanent

10  jobs, right?

11  A.   Permanent and long-term.

12  Q.   Is there a difference between applying for a long-term

13  sub job and a permanent job?

14  A.   It's actually difficult to, it's difficult to apply for a

15  long-term subbing position.

16  Q.   Why is that?

17  A.   Because most of the job openings were never posted.  So

18  you have to open your ears and find out, ask teachers.

19  Q.   How about the permanent positions, they are posted?

20   A.   Yes, they are posted.

21   Q.   You would agree that the permanent positions, sometimes

22   people who belong to the union there have the first bid

23   opportunity, correct?

24   A.   That's correct.

25   Q.   So if somebody bid from a union, they basically eliminate

108

1   you from getting that position?

2   A.   That's correct.

3   Q.   Now, 2004-2005, you did apply for jobs, correct,

4   permanent?

5   A.   Yes.

6   Q.   And long-term sub?

7   A.   And long-term sub.

8   Q.   Did you receive any interviews after March of 2004?

9   A.   No.

10  Q.   Have you ever received an interview since March of 2004?

11  A.   No.

12  Q.   Can you tell us, approximately, how many jobs you have

13  tried to get since March of 2004?

14  A.   Twenty.  That I applied for?

15  Q.   Yes.

16  A.   Twenty, 30 jobs.

17  Q.   And you've not received a single interview?

18  A.   That's correct.

19       THE COURT:  Would you say that question again I

20  didn't get it.

21  BY MR. MEAD:

22  Q.    How many jobs would you estimate that you applied for

23  since your interview in March of 2004?

24  A.    Okay, let me ask you a question, are you talking about

25  the non bid?

109

1  Q.    Non-bid jobs, yes?

2  A.    Ten, more than 10.

3  Q.    Did you receive any interviews for any of those jobs?

4  A.    No.

5        THE COURT:  Just as a point of clarification, the

6  original testimony was she applied for 70 to 75 jobs.

7        MR. MEAD:  Total from 2001.

8        THE COURT:  Of the 70 to 75, do you mean 60 or so of

9  those would have been for bid positions that you would not have

10  been eligible for?

11        THE WITNESS:  That's correct.

12        THE COURT:  All right.

13  BY MR. MEAD:

14  Q.    If I may, your Honor, I would direct the witness to look

15  at Exhibit 29, that may clear up what we're talking about here,

16  judge.  I'll have the witness explain that.  Basically, we

17  looked at the documents that were provided to us by defendant

18  and determined the number of positions that were open that were

19  non-union positions and the ones she bid on.  It's a summary

20   that she put together based on documents received from the

21   defendant.  That would be Plaintiff's Exhibit 29.  Can you turn

22   to that, Ms. Wagner?

23   A.    Yes.

24   Q.    Exhibit 29, can you tell us what that first page is,

25   that's entitled elementary teaching positions?

110

1  A.   That's correct.  School year 2001-2002 long-term

2  positions, three; permanent positions, zero.

3  Q.   Let me hold you up for a second.  There is an asterisk or

4  star at the top.  Underneath it says "no member of the union

5  bid on these positions," correct?

6  A.   That's correct?

7  Q.   So this list is simply positions that you would have been

8  eligible for despite the fact you're not in the union?

9  A.   That's correct.

10  Q.   If you could continue down the row and tell us, number

11  one, the long-term positions that you bid on or you applied

12  for, and the number there; if you can explain what this

13  document is?

14  A.   Long-term positions, there were three positions that were

15  filled by a substitute teacher that year.

16  Q.   Okay.  And no permanent positions that you were eligible

17  for?

18  A.   No permanent positions.

19  Q.   The second school year, 2002-2003?

20  A.   Long-term positions, five.  Permanent, zero.

21  Q.   And again these are positions that you were eligible for?

22  A.   That's correct.

23  Q.   School year 2003-2004?

24  A.   Long-term positions, zero.  Permanent, zero.

25  Q.   And that's because they were all union jobs, correct?

111

1  A.    To the best of my knowledge, yes.

2  Q.    School year 2004-2005?

3  A.    Long-term positions, three.  Permanent, nine.

4  Q.    These were all positions you were eligible for?

5  A.    That's correct.

6  Q.    School year 2005-2006?

7  A.    Long-term positions, four.  Permanent, four.  Part-time,

8  one.

9       THE COURT:  What does part-time mean?

10       THE WITNESS:  Short-term.

11       THE COURT:  Between day-to-day and long-term?

12       THE WITNESS:  Yes.

13  BY MR. MEAD:

14  Q.    School year 2006-2007?

15  A.    Long-term positions, two.  Permanent positions, four.

16  Q.    And, again, all these are ones you were eligible for?

17  A.    That's correct.

18  Q.    Did you total the amount at the bottom?

19  A.    Yes.

20  Q.   Long-term positions totaled 17?

21  A.   That's correct.

22  Q.   Permanent positions totaled 17?

23  A.   That's correct.

24  Q.   Part-time positions totaled 1?

25  A.   That's correct.

112

1   Q.    So total positions you were eligible for were 35?

2   A.    35.

3   Q.    Just so the court is aware, this document was put

4   together with the back-up documents behind it, the pages behind

5   it, is that where you got the information?

6   A.    That's correct.

7   Q.    You received this information from where?

8   A.    Mr. Kuhar through the discovery process.  And the school

9   year 2005 and 2007, some of the information, some of the

10  documents I got from the public library, public documents.  It

11  was the Crawford Central School District's board meeting

12  minutes.

13  Q.    Now, is there also attached to this document the number

14  of pages that indicate the school year where people were hired,

15  their graduation date, and perhaps some background, is that

16  attached as well?

17  A.    Yes.

18  Q.    Were you able to determine by looking at these different

19  positions as to the names of people who were hired?

20  A.   Yes.

21  Q.   If you could look at 2001-2002 --

22          THE COURT:  What exhibit number is this?

23          MR. MEAD:  It's the same exhibit, your Honor, it's

24  the back-up document.

25  BY MR. MEAD:

113

1  Q.  It's not the first page, not the second, not the third --

2  the fourth page, there's a small chart at the top, about a

3  quarter of the way down the page; is that correct, Ms. Wagner?

4  A.  That's correct.

5  Q.  Is says "school year 2001-2002," there's your name and

6  there's a list of three other names below there, correct?

7  A.  That's correct.

8  Q.  What do those three names represent below you?

9  A.  Karen Jamieson, Marci Pifer and Brian Mahoney.

10  Q.  And those are people who were hired for long-term

11  substituting jobs or permanent jobs?

12  A.  Long-term sub jobs.

13  Q.  And it indicates each one of those individuals were of

14  the white race, correct?

15  A.  That's correct?

16  Q.  Now, if you flip two pages, and look at the school year

17  2002-2003.  Again, there's a chart, correct?

18  A.  Yes.

19  Q.  And your name is on the top of the chart, correct?

20  A.   That's correct.

21  Q.   There are five names below your name, correct?

22  A.   That's correct.

23  Q.   Are those the names of the people who were hired for

24  long-term sub positions?

25  A.   That's correct.

114

1  Q.    And I notice under position/school there's the initials

2  LTS, that means long-term substitute?

3  A.    Yes.

4  Q.    Those five people who were hired in 2002-2003, the race

5  indicates each one of those people were white, correct?

6  A.    Yes.

7  Q.    I would also note there seems to be indication graduation

8  date, the third column over?

9  A.    Yes.

10  Q.    What does that reflect?

11  A.    I'm sorry --

12  Q.    The graduation date?

13  A.    Yes.

14  Q.    Do you see that?

15  A.    Yes.

16  Q.    Is that when these people that were hired graduated?

17  A.    Yes.

18  Q.    Am I correct it indicates, at least for the last two

19  people, Mr. Bazylak and Ms. Shearer, they graduated in December

20   of 2002, correct?

21   A.   That's correct.

22   Q.   And they were hired for that immediately following school

23   year, correct?

24   A.   Yes, January of 2003.

25   Q.   So, to your knowledge, they did not have any substitute

115

1  teaching experience at that time?

2  A.   That's correct.

3  Q.   If you turn, skip three more pages ahead to the school

4  year 2004-2005, do you see another chart that you assembled?

5  A.   Yes.

6  Q.   It puts you on the top of that chart?

7  A.   That's correct.

8  Q.   Are the people below you the people who are actually

9  hired for the positions?

10  A.   Yes.

11  Q.   And it indicates there were some long-term subs hired, as

12  well as some permanent teachers hired, correct?

13  A.   That's correct.

14  Q.   And it indicates of the people hired there were how many

15  white people and how many minorities?

16        MR. KUHAR:  Objection, your Honor, it would be our

17  position this seems like that raw statistical data.

18        THE COURT:  Well, let me ask a question here just to

19  get myself oriented.  This is 2004-2005?

20          MR. MEAD:  This is after the interview, your Honor.

21          THE COURT:  For any of the positions that are

22   reflected on there -- this is for the March, 2004 interviews?

23          MR. MEAD:  Yes.

24          THE COURT:  She was interviewed for these positions?

25          MR. MEAD:  Correct.

116

1       THE COURT:  What was the objection again?

2       MR. KUHAR:  The objection was to the testimony about

3  the races of the people.

4       THE COURT:  It's overruled.  Go ahead.

5  BY MR. MEAD:

6  Q.   It indicates there -- how many hires does it indicate, if

7  you can count those up for us?

8  A.   You said how many?

9  Q.   How many people were hired as long-term subs or permanent

10  teachers for elementary education in 2004-2005?

11  A.   There's three long-term sub positions and eight permanent

12  positions.

13  Q.   And the eight permanent positions --

14  A.   Nine, I'm sorry, nine permanent.

15  Q.   You indicated that there was one minority, Tammy Foster,

16  hired, correct?

17  A.   That's correct.

18  Q.   And Ms. Foster indicates her certification was back in

19  June of 1994, correct?

20  A.   That's right.

21  Q.   Were there any other minorities hired besides Ms. Foster

22  of this group?

23  A.   No.

24  Q.   Were there other people whose certifications were after

25  your certification in May, 2001?

117

1  A.   Could you please repeat that.

2  Q.   Certainly.  A number of these people seem to indicate on

3  their date of certification that they were certified after you

4  were?

5  A.   That's right.

6        THE COURT:  We're going to take our lunch recess

7  now.  It's about 12:05, let's be back at 1 o'clock.

8        (Luncheon recess from 12:05 p.m.; until 1:05 p.m.)

9        THE COURT:  All right, Mr. Mead.

10  BY MR. MEAD:

11  Q.   Ms. Wagner, when we took the break we were looking at the

12  summary that you had put together, that's Exhibit No. 29, do

13  you have that open in front of you?

14  A.   Yes.

15  Q.   I believe we have gotten up to the year 2005-2006, is

16  that correct, is that what we were last talking about?

17  A.   I have 2004-2005.

18  Q.   Okay.  Just to finish up with 2004-2005, your testimony

19  was that there was -- that you did not get a job during that

20   time period?

21   A.   That's correct.

22   Q.   Okay.  Now, if you could turn the page to the next chart

23   that's similar to that, which is about three pages away, it

24   indicates it's the school year 2005-2006, do you see that?

25   A.   Yes.

118

1   Q.   Am I correct that you weren't interviewed for any

2   positions that year at all?

3   A.   That's correct.

4   Q.   And through the documents that you received from the

5   defendants, any documents you obtained from the library, were

6   you able to determine how many people were actually hired,

7   either long-term subs or permanently hired for that year?

8   A.   Yes.

9   Q.   How many people were?

10  A.   Nine.

11  Q.   Nine people?

12  A.   Yes.

13  Q.   All right.  And these were for non-bid jobs?

14  A.   That's correct.

15  Q.   And that included kindergarten -- I'm sorry, that

16  included elementary only, correct?

17  A.   Yes.

18  Q.   And of that group, is there one minority?

19  A.   Yes.

20  Q.   And who is that?

21  A.   Naomi Uy-Moore.

22  Q.   And she's an Asian, am I correct?

23  A.   Yes.

24  Q.   According to the chart here, there were different people

25  hired who graduated at later years than you did, correct?

119

1  A.   Yes.

2  Q.   For example, Daniel Morris is May of 2004; Christopher

3  Peters, 2005; Norman Carter, 2004; correct?

4  A.   That's correct?

5  Q.   And, again, you weren't interviewed for any single

6  position, either long-term or permanent, during that year,

7  2005-2006 school year?

8  A.   That's correct.

9  Q.   Now, if you could flip to the next chart that you

10  assembled, probably closer to seven or eight pages down there,

11  indicates school year 2006-2007?

12  A.   Yes.

13  Q.   Can you tell me whether or not this chart indicates that

14  there were people hired full-time or long-term subs by the

15  defendant during this school year 2006-2007?

16  A.   Yes.

17  Q.   How many people?

18  A.   Six.

19  Q.   How many -- go ahead, I'm sorry, did you finish?

20  A.  Go ahead.

21  Q.  How many minorities were hired in 2006-2007 for the six

22  positions?

23  A.  None.

24  Q.  Were they all white?

25  A.  Yes.

120

1   Q.   Also, were you able to take a look at the individuals who

2   were hired as long-term subs during the time period 2001 up to

3   2006-2007 and make a determination whether or not these

4   long-term subs were eventually hired as full-time teachers?

5   A.   Yes.

6   Q.   When you looked at that particular aspect of the hiring,

7   what did you conclude, what did you see?

8   A.   Approximately, 12 teachers were long-term sub teachers

9   were hired to become permanent.

10  Q.   To become full-time?

11  A.   Yes.

12  Q.   That's just to your knowledge based on documents that

13  were provided by the other side, correct?

14  A.   That's correct.

15       THE COURT:  Out of how many total?

16  BY MR. MEAD:

17  Q.   Do you know how many total?

18  A.   12 out of 17.

19  Q.   12 out of 17.  Of those five that were not, do you know

20  what happened to any of those five?

21  A.   I believe two of those teachers went to --

22       THE COURT:  Keep your voice up.

23       THE WITNESS:  Two of the teachers went to a

24  different school district.  And I'm not sure what happened to

25  the other ones.

121

1  BY MR. MEAD:

2  Q.    Now, the two that went to different school districts, do

3  you know who they were?

4  A.    Anna McElwain and Mr. Peters, Chris Peters.

5  Q.    Now, again, you've already testified you weren't

6  interviewed after March of 2004, did you ever try to file any

7  type of internal grievance based on what was happening to you

8  at Crawford Central?

9  A.    What timeframe are you talking about?

10  Q.    At any timeframe?

11  A.    No.

12  Q.    Is that because you weren't a member of the union?

13  A.    That's correct.

14  Q.    Now, as part of getting ready for this case, did you put

15  together a list that indicated salary that first year, second

16  year, third year teacher would receive, as well as the time

17  period you were teaching, you were substitute teaching?

18  A.    Yes.

19  Q.    In order to determine how much back wages, if any, you

20  would have been paid, correct?

21  A.   That's correct.

22        MR. MEAD:  Your Honor, I would ask the court, if the

23  court wants us to submit this, we do have a document that

24  summarizes that.  However, I don't know if the court wants to

25  hear liability and then worry about this issue later or just

122

1  present it?

2          THE COURT:  If it's a logical place, why don't you

3  have her testify to it, we can talk about submitting the

4  document later.

5          MR. MEAD:  It's very brief, your Honor.  It's

6  basically a summary chart.

7          THE COURT:  All right.

8  BY MR. MEAD:

9  Q.   Ms. Wagner, if you could look at Exhibit 28 again.  Do

10  you see that, look at 28 initially.  That shows the days you

11  subbed and the amount of money you earned subbing, correct?

12  A.   That's correct.

13  Q.   Did you subsequently put together a list of how much you

14  would have earned if you had been hired full-time?

15  A.   Yes.

16  Q.   And that is Exhibit 24, is it not?

17  A.   I'd have to check.  Yes, that's correct.

18  Q.   All right.  It indicates the amount -- can you explain

19  what it indicates, rather, Exhibit 24?

20  A.   I had kind of summarized right there on top for

21  2001-2002, based on the information that Mr. Kuhar provided us

22  or me, of the step one salary for a permanent teacher would be

23  $32,066.

24  Q.   You indicate benefits of $12,826.40?

25  A.   Yes.

123

1  Q.   Where did you get that figure?

2  A.   I took the step one salary and minus 60 percent and came

3  out with 40 percent.  I'm not sure how accurate that is.

4  Q.   You're not exactly sure if that benefit is a hundred

5  percent correct, is that correct?

6  A.   That's correct.

7         THE COURT:  Which year are you on here?

8         MR. MEAD:  2001-2002, on the top of the chart, your

9  Honor, Exhibit 24.

10        THE COURT:  Is that just long-term sub salary?

11        MR. MEAD:  No, this is full-time.

12        THE COURT:  For 2001-2002?

13        MR. MEAD:  Correct.  The next figure, the $8,720,

14  would be what she received as a substitute teacher day-to-day.

15        THE COURT:  What does step one salary mean?

16        THE WITNESS:  It's how much a teacher would -- I

17  guess Mr. Kuhar would probably be the best person to explain

18  that.

19        THE COURT:  You would because you're on the stand

file:///A|/WAGDAY1.TXT

20  right now.  I'm just trying to figure out, does the $32,000

21  figure, $32,066 -- what I'm trying to figure out is, is that a

22  teacher's salary for 2001-2002 if it was a permanent position

23  or if it was a long-term sub?

24          THE WITNESS:  It's for a permanent teaching

25  position.

124

1        THE COURT:  Would all of these figures that you have

2  for '02-'03, '03-'04, etc., they would all be reflecting the

3  salary for a full-time position, not a long-term substitute

4  position?

5        THE WITNESS:  That's correct, your Honor.

6        THE COURT:  All right.

7  BY MR. MEAD:

8  Q.    Those are also minus the amount you actually earned as a

9  day-to-day substitute, correct?

10  A.    That's correct.

11  Q.    So the figures, and just so I can read into the record

12  and you can agree with me, the first figure, $36,172.40 is for

13  the year 2001-2002, what you believe you would have earned as a

14  full-time teacher minus what you actually did earn as a

15  day-to-day substitute?

16  A.    That's correct.

17  Q.    And that bottom line figure for 2002-2003 is $38,829.40,

18  correct?

19  A.    That's correct.

20  Q.  For 2003-2004 that figure is $40,322.80?

21  A.  That's correct.

22  Q.  For 2004-2005, that is $44,014.80, correct?

23  A.  That's correct.

24  Q.  For 2005-2006, $49,797.80, correct?

25  A.  Yes.

125

1  Q.   And 2006-2007, $53,216.60, correct?

2  A.   That's correct.

3  Q.   Now, during this time period, Ms. Wagner, did you apply

4  for any teaching positions outside of Crawford County?

5       THE COURT:  What time period?

6       MR. MEAD:  Sorry, your Honor.

7  BY MR. MEAD:

8  Q.   During the time period 2001 through the present, have you

9  applied for any teaching positions outside the district that

10  you taught in?

11  A.   No.

12  Q.   And why is that?

13  A.   Because I live in Crawford County.  I have children that

14  goes to Cochranton school.  And I'm also working as a

15  substitute teacher for Crawford Central School District.  This

16  is where I live and this is where I did my field experience and

17  I student taught, so this is my home.

18  Q.   Now, have you undergone any additional training since the

19  filing of this lawsuit?

20   A.   Yes, I did.

21   Q.   And what was that?

22   A.   It's the Act 180, continuing education to be recertified

23   as a teacher in Pennsylvania.

24   Q.   And what kind of training does that consist of?

25   A.   My first 150 hours were sponsored by the PDE, there's a

126

1  whole bunch of courses that involves the Pennsylvania teaching

2  standards.  And I also attended the APL training that was

3  sponsored by the school district.

4          THE COURT:  PDE, APL, these acronyms don't mean

5  anything to me?

6          THE WITNESS:  Pennsylvania Department of Education,

7  PDE.  APL was, I believe it stands for the name of three people

8  that organized the seminar.

9          THE COURT:  All right.

10          THE WITNESS:  And, also, I took a couple of courses

11  that was sponsored by WQLN station.  It's about using the

12  Internet in your classroom.

13  BY MR. MEAD:

14  Q.    Any other courses that you took?

15  A.    That's it.

16  Q.    You received your recertification in 2006?

17  A.    That's correct.

18  Q.    Now, I'd like you to look at the exhibit book again, I

19  just want to finish up with some of the exhibits that are in

20   there and explain to the court what these exhibits are; all

21   right?

22   A.   Yes.

23   Q.   If you look at 17, Exhibit No. 17, can you tell me what

24   Exhibit 17 is?

25   A.   It's a letter from Mr. Heller stating that -- or

127

1  complimenting me on the manner in which I performed my duties

2  as a substitute teacher.

3  Q.   If you would look at Exhibit No. 21, can you tell me what

4  that is?

5  A.   A letter from Mr. Heller dated July 21st of 2006 -- do

6  you want me to read it?

7  Q.   No.  It's just telling you that you weren't considered

8  for an interview --

9  A.   Yes.

10      THE COURT:  What exhibit was that?

11      MR. MEAD:  Exhibit 21.  Basically, it's a letter

12  from Mr. Heller explaining to Ms. Wagner that she was not

13  considered for an interview for open positions that year.

14      THE COURT:  Okay.

15  BY MR. MEAD:

16  Q.   And you received that letter?

17  A.   Yes.

18  Q.   Exhibit No. 23, can you explain what that is?

19  A.   A letter from Mr. Heller stating that -- there's two

20   vacancies in sixth grade and third grade that did not receive a

21   bid from a member of the union.

22   Q.   In you flip through the entire Exhibit No. 23, Ms.

23   Wagner, rather than going through each document, am I correct

24   that these are applications you made for various positions in

25   2004, through your attempts to obtain employment in the school

1   district?

2   A.   That's correct.

3   Q.   That goes up to 2006, and also includes some letters from

4   2005, correct?

5   A.   Yes.

6         THE COURT:  Do you mean the balance of the exhibit

7   are letters of application?

8         MR. MEAD:  That's correct.  Your Honor, rather than

9   just go through each one --

10        THE COURT:  For the record, the exhibit numbers

11   would be what through what?

12        MR. MEAD:  It's Exhibit 23, but there are several

13   letters.

14        THE COURT:  Those are all part of Exhibit 23?

15        MR. MEAD:  Right.  Rather than go through each one

16   individually, I thought it would be a good group exhibit.

17        THE COURT:  All right.

18   BY MR. MEAD:

19   Q.   Exhibit 24 you explained.  Now, Exhibit 26 was your

20   portfolio.  Exhibit No. 25 -- if you take a look at No. 25, I

21   don't think there's any dispute there that is the new people

22   who were hired for the 2005-2006 school year, correct?

23   A.   That's correct.

24   Q.   Exhibit 29 we've discussed.  If you look at Exhibit No.

25   30, could you tell us what No. 30 is?

129

1  A.   This is the summary report of a substitute teacher.

2  Q.   Now, am I correct that there's several of these summary

3  reports attached as joint exhibit for Exhibit No. 30?

4  A.   That's correct.

5  Q.   Can you tell us what these summary reports are?

6  A.   At the end of subbing, daily subbing job, I was required

7  to write down a summary of what happened that day.  And at the

8  bottom the teacher would put a mark yes or no, stating that the

9  lesson plans were followed.  And some of them made a comment.

10  Q.   Okay.  And if you look at No. 30, for example, you're

11  saying "nice job" was the comment by the regular classroom

12  teacher?

13  A.   Yes.

14  Q.   If you turn the page, "excellent" was the comment by the

15  teacher?

16  A.   Yes.

17  Q.   Next page, "wonderful job?"

18  A.   Yes.

19  Q.   Next page, "great?"

20  A.   Yes.

21  Q.   Next page, "wonderful?"

22  A.   Yes.

23  Q.   Next page, "Ms. Wagner did a very good job?"

24  A.   Yes.

25  Q.   Next page, "very good job, room ready the next day, all

130

1  papers checked?"

2  A.    That's correct.

3  Q.    "Very good job," on the next page?

4  A.    Yes.

5  Q.    "Very good," next page?

6  A.    Yes.

7  Q.    "Very nice job?"

8  A.    Yes.

9  Q.    "Nice job?"

10  A.    Yes.

11  Q.    "Ms. Wagner did a good job?"

12  A.    Yes.

13  Q.    "Good job?"

14  A.    Yes.

15  Q.    "Great job," etc., rather than reading all of them,

16  that's the comments by the teachers who you replaced, correct?

17  A.    Yes.

18  Q.    And what time period did these documents consist of,

19  during the time period that you were a day-to-day sub?

20  A.   2001 through 2005.

21  Q.   2005?

22  A.   Yes.

23         MR. MEAD:  Your Honor, again, I could go on and on

24  with these, but I think the court gets the idea, it's a

25  compound exhibit that's got her evaluations.

131

1        THE COURT:  I think that's sufficient.

2        MR. MEAD:  Your Honor, I would move for the exhibits

3   that I was referring to there.  I can do that by name, of

4   course.  We move for Exhibit No. 1, No. 5, which would be the

5   observation reports.  No. 17, No. 21, No. 23, No. 24, No. 25,

6   No. 26, No. 28, No. 29 and No. 30.

7        THE COURT:  Any objection?

8        MR. KUHAR:  Let me just take a quick look, your

9   Honor.

10        THE COURT:  All right.

11        MR. KUHAR:  They're fine, your Honor.

12        THE COURT:  Those are admitted.

13   BY MR. MEAD:

14   Q.   Ms. Wagner, at this point is it still your position, goal

15   or dream to be a full-time teacher?

16   A.   Yes.

17        MR. MEAD:  That's all I have.

18        THE COURT:  All right.  Mr. Kuhar.

19                CROSS-EXAMINATION

20  BY MR. KUHAR:

21  Q.   Ms. Wagner, you testified that you met with then

22  Superintendent Lascola in, I think it was August of '01, is

23  that correct?

24  A.   That's correct.

25  Q.   You're aware that he retired not long thereafter,

132

1  correct?

2  A.    Yes.

3  Q.    You're aware that his replacement was Mike Dolecki?

4  A.    Yes.

5  Q.    And Mike Dolecki, who had been assistant superintendent,

6  was replaced by Charlie Heller, right?

7  A.    Yes.

8  Q.    Now, you described the conversation you had with Mr.

9  Lascola about him giving you some advice regarding how you

10  might secure permanent employment, is that a fair

11  characterization?

12  A.    Yes.

13  Q.    After you became aware that Mr. Lascola was no longer

14  associated with the district, but those other gentlemen I just

15  mentioned were, did you go to them and talk to them about

16  seeking full-time employment with the district?

17  A.    In what year are you talking about?

18  Q.    At any time?

19  A.    Yes, I did.

file:///A|/WAGDAY1.TXT

20  Q.   When?

21  A.   Well, actually, Mr. Heller came to see me in 2002.

22  Q.   In conjunction with his observation of your class?

23  A.   Yes.

24  Q.   We'll talk about that more in a minute, sorry to

25  interrupt.  When was the next one?

1    A.    I've been sending letters of interest to Mr. Heller in --

2    Q.    My question was whether you had any conversations with

3    him or Mr. Dolecki?

4    A.    No.

5    Q.    Just the one you identified in conjunction --

6    A.    That's correct.

7         THE COURT:  Hang on a second.

8         THE WITNESS:  Sorry.

9         THE COURT:  Look it, he can't do this, both of you

10   are talking over each other.  So really slow down.  I want to

11   make sure I understand what just happened there.  You asked her

12   if she ever had a conversation with Mr. Heller or Dolecki, and

13   it's my understanding the only conversation you ever had with

14   either of those gentlemen was with Mr. Heller about employment

15   in 2002?

16        THE WITNESS:  That's correct.

17        THE COURT:  All right.  Go ahead.

18   BY MR. KUHAR:

19   Q.    So are you saying you did not have a conversation in June

20  of '04 with Mr. Heller?

21  A.   Could you please say that again.

22  Q.   I'm just checking to see whether you had a conversation

23  with --

24  A.   I'm sorry, go ahead.

25  Q.   Well, I had asked you about the conversations you had

134

1    with Mr. Dolecki or Mr. Heller about seeking employment with

2    the district.  And you had said once in '02 with Mr. Heller, is

3    that correct?

4    A.    I was confused with your question.  I thought you were

5    asking from the day or from 2001 till 2002.  So are you talking

6    about from 2001 to 2007?

7         THE COURT:  I don't think she understands the

8    question.  Set the timeframe you're talking about, do you mean

9    that year or ever.

10   BY MR. KUHAR:

11   Q.    Well, the first such conversation that you had was in

12   November of '02, correct?

13   A.    That's correct.

14   Q.    And at any time after that one, did you have any

15   conversations with Mr. Heller or Mr. Dolecki about your desire

16   to secure permanent employment with the district?

17   A.    Yes, with Mr. Heller.

18   Q.    Okay.  We'll talk about those two in a minute, I just

19   wanted to confirm that there were those two.  Now, I think you

20   testified that the observation of your classroom conducted by

21   Mr. Meader was about 40 to 45 minutes long, is that correct?

22   A.   Yes.

23   Q.   Do you think that that was too short to get a fair look

24   at your performance?

25   A.   You're asking my opinion?

1  Q.   Well, yes?

2  A.   I believe it was too short.

3  Q.   How long do you think such an observation should be?

4  A.   Well -- okay.  Let me, I'm kind of confused when you said

5  it's for -- could you rephrase your question, please.

6  Q.   Sure.  Mr. Mead had specifically asked you how long each

7  of the classroom observations were that Mr. Heller and Mr.

8  Meader had done of you; do you remember those questions?

9  A.   Yes.

10  Q.   Your answers?

11  A.   45, 40 minutes.

12  Q.   But you remember what they were?

13  A.   Yes.

14  Q.   And I'm just asking you, if you think that that was an

15  adequate amount of time or whether it was too short?

16  A.   Just for one observation?

17       THE COURT:  Wait a minute, I don't want to put words

18  in your mouth, but an adequate amount of time for what?

19  BY MR. KUHAR:

20   Q.   For him to observe her performance, which was part of the

21   original question.  In other words, are you saying they were in

22   there for too short a period or do you think they were in there

23   for a long enough time?

24   A.   I believe you cannot judge a teacher's skill, a very good

25   teacher for only 45 minutes.

136

1  Q.   Okay.  Do you have any reason to think that other people

2  were observed for longer periods of time?

3  A.   No.

4  Q.   Now, you had some disagreement or objections to the

5  things that Mr. Heller told you in conjunction with your 2002

6  observation report, correct?

7  A.   Yes.

8  Q.   You talked about what those were, correct?

9  A.   Yes.

10  Q.   But you did not bring any of them to his attention,

11  correct?

12  A.   No.

13  Q.   And you said that was essentially out of fear?

14  A.   Fear.

15  Q.   Had Mr. Heller ever said or done anything previously that

16  would make you fearful of him?

17  A.   Yes.

18  Q.   What?

19  A.   He accused me of playing politics.

20    Q.    And that would be the one time that you described

21    already?

22    A.    That's correct.

23    Q.    Did he ever do or say anything else that made you fearful

24    of him?

25    A.    No.

file:///A|/WAGDAY1.TXT

137

1  Q.    Do you know how frequently Mr. Heller or other

2  administrators observed other day-to-day subs?

3  A.    I don't.

4  Q.    And when I say observed, I mean in a formal way, such as

5  you were observed, which produced that form, do you understand

6  my question?

7  A.    Yes, I don't know.

8  Q.    Are you sure you weren't interviewed for the Pickens'

9  position on December 9th, I think you said it was the 19th, are

10  you sure?

11  A.    I didn't say the 19th, I believe Mr. Mead said the 19th.

12  I said December of 2002, I didn't give you a specific date.

13  Q.    So you're not sure of the date?

14  A.    No.

15  Q.    Now, during Mr. Mead's asking you questions about Ms.

16  Pickens' position, sometimes he referred to that as a long-term

17  substitute position?

18  A.    That's correct.

19  Q.    And you did, too?

20    A.    Yes.

21    Q.    Now, I thought it was your testimony that you expected to

22    be in there through January of '03, is that correct?

23    A.    That's correct.  And possible for the next semester, too,

24    the second semester.

25    Q.    Possible?

138

1  A.   Yes.

2  Q.   Did you have reason to think that was likely?

3  A.   I was informed by Ms. Pickens.

4  Q.   What did she tell you?

5  A.   That she had passed me or asked Mr. Heller if she could

6  use me has her substitute teacher.

7  Q.   Anything else that made you think that was likely?

8  A.   No.

9  Q.   So if you had been retained in that position from the

10  time you started it, by that I mean the Pickens' position, if

11  you had stayed in that position through mid January, the end of

12  the first semester, you would have been compensated as a

13  day-to-day sub for all those days, is that correct?

14  A.   Could you please rephrase your question.

15  Q.   Sure.  You're aware that long-term subs make more per day

16  than day-to-day subs, correct?

17  A.   Yes.

18  Q.   And you started that Pickens' position in November of

19  '02, correct?

20   A.    That's correct.

21   Q.    And I think you just told us that you expected that to go

22   through January of '03?

23   A.    Yes.

24   Q.    So that would not have been a long-term sub position,

25   would it, for pay purposes?

139

1    A.    I can't really tell you because the practice, usually a

2    substitute was assigned to teach for a month -- let me restate

3    that, please.

4    Q.    Sure.

5    A.    Usually, from what I learned about the district's

6    practice of employing long-term substitute teachers, if a

7    substitute was employed for one semester and the regular

8    teacher is not expected to come back for the next semester,

9    that long-term substitute teacher would be secured for that

10   following semester.

11   Q.    In a permanent position?

12   A.    No, a long-term for the second semester.

13   Q.    Okay.  Now, here what we had really, though, was November

14   to January --

15   A.    That's correct.

16   Q.    I'll try to do the same, but if you could let me finish.

17   From November through January was basically the first part of

18   the leave of absence, fair?

19   A.    Yes.

20  Q.    And you expected, once you started it, you expected to go

21  through mid January, fair?

22  A.    Yes.

23  Q.    That part is fewer than 90 days, isn't it?

24  A.    I believe, yes.

25        THE COURT:  I could take judicial notice of that.

140

1      MR. KUHAR:  Okay.

2  BY MR. KUHAR:

3  Q.    So, if in fact it was fewer than a 90-day assignment, you

4  would have been paid the day-to-day rate, is that correct?

5  A.    Yes.

6  Q.    Once you first started in that Pickens' position in '02,

7  did anybody ever tell you how long it would last?

8  A.    No.

9  Q.    Now, I think you testified about having a conversation

10  with Dr. Arnold, is that correct?

11  A.    Yes.

12  Q.    He's the person who was the curriculum director at

13  Crawford Central and became something at Edinboro University?

14  A.    That's correct.

15  Q.    Did you attribute to him -- I'm sorry, I'll withdraw

16  that.  Did he tell you what he recalled regarding the

17  district's practice of filling long-term substitute positions

18  while he was there?

19  A.    Yes.

20  Q.   What did he tell you?

21  A.   He informed me that teachers request substitute teachers

22  to fill in or, for example, sabbatical leave or medical leave,

23  and usually the request was honored.

24  Q.   Okay.  My book of exhibits is in front of you there.

25  Would you look to tab 2, please, at Exhibit B?

141

1   A.   I'm sorry, I can't hear you.

2   Q.   I apologize.  Would you refer to tab 2 of the book that I

3   had just put in front of you and look at Exhibit B; do you have

4   it?

5   A.   Yes.

6   Q.   Would you look at the sixth page, please -- it's says

7   page 2 of 2 at the top?

8   A.   Page 2?

9   Q.   It says page 2 of 2 at the top, yes.

10   A.   Okay.

11   Q.   "I had consulted," are you with me?

12   A.   No.

13        THE COURT:  It's the last page of your written

14   narrative.

15        THE WITNESS:  Okay, I got it.

16   BY MR. KUHAR:

17   Q.   You found that, okay.  By the way, this is a form you

18   filled out and sent to the PHRC, right?

19   A.   Yes.

20          MR. KUHAR:  Your Honor, should we assume the

21    exhibits discussed during the reading in of the stipulations

22    this morning and during the discussion of the Robinson case,

                        _____

23    like this one, should we assume those are in or should I offer

24    them now?

25          THE COURT:  Well, why don't you just offer them as

142

1  you go so you don't have to rattle off 25 million exhibits at

2  the end.

3       MR. KUHAR:  Okay.  Would the stipulated ones have

4  gone jointly?

5       THE COURT:  Yes, they're in.

6       MR. KUHAR:  All right.  We would offer this one in.

7       THE COURT:  It's admitted.  Are you moving

8  Defendant's Exhibit B, is that it?

9       MR. KUHAR:  Yes.

10       THE COURT:  And all of its various parts?

11       MR. MEAD:  We don't have any objection.

12       THE COURT:  All right, Exhibit B is in.

13  BY MR. KUHAR:

14  Q.   Ms. Wagner, on that sixth page that you're looking at --

15  A.   Yes.

16  Q.   Do you see where Mr. Arnold is referenced -- doesn't it

17  say "I had consulted my advisor from Edinboro University of

18  PA?"

19  A.   Yes.

20  Q.    "And she referred me to Mr. Arnold?"

21  A.    Yes.

22  Q.    "Equal and special services?"

23  A.    Yes.

24  Q.    And you can wait until I'm finished if you want.  "He was

25  also the former curriculum director of Crawford Central when

143

1  Mr. Bender was superintendent?"

2  A.   Yes.

3  Q.   "He told me that they don't interview for sabbatical?"

4  A.   Yes.

5  Q.   "They hire whoever they wanted to hire?"

6  A.   Yes.

7  Q.   Okay.  Isn't that what he said to you, isn't that why you

8  put it in here?

9  A.   Yes.

10  Q.   Now, you had referenced Exhibit 30 in the booklet that

11  your attorney had prepared, which were a series of reports

12  prepared by regular teachers after you had subbed for them.

13  You can look at that --

14  A.   You're talking about the sub summary forms?

15  Q.   Yes.

16  A.   Yes.

17  Q.   Where you read where it said very good and excellent and

18  all of that?

19  A.   Yes.

20   Q.   Okay.  Now, isn't it true that all of those folks that

21   fill out those forms don't actually see you teaching -- I mean

22   they're filling them out because they weren't there, right?

23   A.   Yes.

24   Q.   Do you have any reason to think that those forms have any

25   role in the district's selection of people for permanent or

144

1   long-term sub positions?

2   A.   Could you rephrase your question, please.

3   Q.   Sure.  Let me actually withdraw that and ask you, do you

4   know whether other people who subbed had those forms filled out

5   for them, too?

6   A.   I don't know.

7   Q.   You don't know?

8   A.   You're asking me -- the substitute teachers file out the

9   form at the end of the day.

10  Q.   Okay.  But the comments on them are put on by the regular

11  teacher, correct?

12  A.   Yes.

13  Q.   Okay.  Do you know whether the other substitute teachers

14  basically had the same situation; that they would fill out the

15  forms and the regular teacher would make some comment about

16  them and sign them?

17  A.   I don't know.

18  Q.   You don't know, okay.

19  A.   I don't know.

20  Q.   Do you have any reason to think that your observation

21  forms, the ones we're talking about, that the regular teachers

22  fill out, do you have any reason to think that those forms or

23  any forms that other regular teachers might sign and comment on

24  for other day-to-day subs, do you have any reason to think that

25  they have any impact on the hiring process of the district when

145

1    it comes to long-term substitutes or permanent positions?

2    A.    Could you rephrase your question again.

3        MR. MEAD:  I'm going to object, if she knows.

4        THE COURT:  I think, once again, I mean it's

5    non-jury, even in non-jury it's not my practice to do anything

6    other than clarify things because it's both your jobs to try

7    this case.  If I may, if this is not what you're asking, tell

8    me.  I think you're asking, I think he's asking you and I don't

9    think you understand what he's asking you.  Do you know one way

10   or the other whether the people who make the employment

11   decisions for permanent positions or long-term substitute

12   positions, consider those sub forms when they make their

13   decision; is that the question you're trying to ask?

14       MR. KUHAR:  Yes, your Honor.

15       THE COURT:  Do you understand that question?

16       THE WITNESS:  Yes, your Honor.

17       THE COURT:  Do you know one way on the other?

18       THE WITNESS:  I don't.  But if you would look at the

19   forms, some of them were initialed by the principals.  Which

20    means they viewed the comments from the teachers and it should

21    make a difference.

22    BY MR. KUHAR:

23    Q.    Are you familiar with the term highly qualified as being

24    a specific term of art under the No Child Left Behind law?

25    A.    Yes.

file:///A|/WAGDAY1.TXT

146

1  Q.   What does it mean?

2  A.   You have to be properly certified by the State of

3  Pennsylvania.

4  Q.   So is it fair to say that anyone who has an elementary

5  certificate issued by the Pennsylvania Department of Education,

6  would be highly qualified for purposes of No Child Left Behind?

7  A.   I believe so.

8  Q.   At some point Mr. Heller suggested to you that you look

9  elsewhere?

10  A.   To go to a different school district?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Correct?

14  A.   Yes.

15  Q.   I made a note that you actually said that you look

16  elsewhere, is that what you said or just words to that effect?

17  A.   I don't remember -- you're talking about I made a comment

18  early on, I testified to it?

19  Q.   Right.

20    A.    That I said look elsewhere?

21          THE COURT:  Hang on a second, ask the question

22    again.

23          MR. KUHAR:  To be honest, I'll withdraw it.

24    BY MR. KUHAR:

25    Q.    You had a conversation with Mr. Heller in which he

147

1   suggested that you look for employment at other districts,

2   correct?

3   A.   Yes.

4   Q.   Was that the June of '04 conversation?

5   A.   Yes.

6   Q.   What did you interpret that to mean, what did you think

7   he was saying to you?

8   A.   That there's no way that the district would hire me.

9   Q.   Did he say look elsewhere instead of applying here?

10  A.   No.

11  Q.   Did he say anything that made you think what you just

12  said, that there was no hope for you here?

13  A.   No.

14  Q.   Kathy Maruska has told you that she recommended you for

15  two three-week day-to-day assignments, is that correct?

16  A.   That's correct.

17  Q.   Is it your testimony that you don't know why you did not

18  get them?

19  A.   That's correct.

20  Q.   Do you know for a fact whether she did recommend you for

21  those two positions, beyond her telling you that?

22  A.   No.

23  Q.   Now, we reviewed some summaries that you had prepared

24  from looking at minutes and documents you had received from us

25  during the discovery phase.  They were documents that showed

148

1    what teachers were hired when?

2    A.    That's correct.

3    Q.    Do remember those?

4    A.    Yes.

5    Q.    Okay.  Do you know what the qualifications of any of

6    those people were relative to you?

7    A.    Yes.

8    Q.    Which ones?

9    A.    We could look at them right now and I'll tell you.

10   Q.    Okay.  And we will.  But, first, do you know how any of

11   them performed in their interviews with the district, do you

12   know how any of them performed in that?

13   A.    Yes.

14   Q.    How do you know that?

15   A.    Through discovery you provided us a ranking of the

16   candidates.

17   Q.    Okay.  So other than those forms that we prepared, those

18   summaries that we prepared, do you have any other knowledge

19   regarding how they did during their interviews?

20   A.   No.

21   Q.   Now, you had offered to show me where or by looking at

22   those forms, you were going to tell me what you knew about the

23   other people's qualifications, people who did get long-term sub

24   or permanent positions, right?

25   A.   Yes.

149

1  Q.  Let's do that.

2       MR. MEAD:  I think that's Exhibit 29, if it helps.

3  BY MR. KUHAR:

4  Q.  Ms. Wagner, you were going to show me which pages would

5  tell you what the qualifications of the other folks were?

6  A.  Yes.

7  Q.  So whenever you're ready you can start telling us?

8  A.  The school year 2001-2002 --

9  Q.  What are you looking at, ma'am?

10  A.  The third page.

11  Q.  Of which exhibit?

12  A.  Exhibit 29, the fourth page.

13  Q.  Is it the chart --

14  A.  Exhibit 29.

15       THE COURT:  She's looking at a chart that says

16  "school year 2001-2002," is that right?

17       THE WITNESS:  Yes.

18  BY MR. KUHAR:

19  Q.  I think I'm with you, go ahead.

20   A.    Okay.  Karen Jamieson was hired in August of 2001 for --

21   for a long-term subbing position in kindergarten at Cochranton.

22   Kindergarten position at Cochranton.  She didn't go for an

23   interview.

24   Q.    Okay.  I'm asking you what you know about their

25   qualifications relative to yours.  That's not really responsive

150

1  to my question, do you understand my question?

2  A.   Okay.  Karen Jamieson, we have the same area of

3  certification.  Marci Pifer --

4  Q.   I'm sorry to interrupt you --

5  A.   I'm sorry, I don't know what you mean.

6  Q.   Let me put it this way.  Are the only things that you

7  know about the successful candidates, by that I mean any of the

8  people who were successful in obtaining long-term sub or

9  permanent positions, are the only things that you know about

10  their qualifications the things that are in this exhibit?

11  A.   I believe we have the personnel files of the teachers.

12  Q.   Right now I'm asking what you know?

13  A.   Yes.

14  Q.   Okay.  Then the record will reflect that I didn't ask you

15  to go further and tell me what certifications they have?

16  A.   Okay.

17  Q.   So if they had qualifications beyond just a certain

18  certification, you would know that, right?

19  A.   Yes.

20   Q.   I'm correct when I say that?

21   A.   Yes.  It doesn't really show here on this chart that said

22   2001-2002, but if you would go to the next school year, I have

23   another column that says experience.  I'm not sure if that's

24   what you meant.

25   Q.   Well, in a sense you did tell us that everything you know

151

1  about their qualifications is on these forms, and that's on

2  those forms?

3  A.   Yes.

4  Q.   Since we're looking at that, where did you come up with

5  that?

6  A.   From the personnel file that you provided us through

7  discovery.

8  Q.   What do those things mean?

9  A.   It's one year --

10  Q.   I'm sorry --

11       THE COURT:  Hang on a second, the problem is yours,

12  you're going too fast, you have to slow down, Mr. Kuhar.  And

13  you're part of it, too, you're talking over each other, it's

14  impossible to get a record here.  Now, everybody just slow

15  down, we're going to be here as long as we need to.  Now, start

16  all over again.

17  BY MR. KUHAR:

18  Q.   First, are we on the same, especially the court, the

19  school year 2002-2003?

20        THE COURT:  That's where I am.

21  BY MR. KUHAR:

22  Q.   Ms. Wagner?

23  A.   Yes.

24  Q.   In the right-hand column it says "experience"?

25  A.   Yes.

152

1    Q.    You were telling me you got those from looking at

2    personnel files?

3    A.    That's correct.

4    Q.    What do those numbers mean?

5    A.    It's the years and the months, teaching experience.

6    Q.    So, for example, where it says Rowena Wagner 1.3, what

7    does that mean?

8    A.    One year and three months.

9    Q.    Of what?

10    A.    Of teaching experience.

11    Q.    Because you had been subbing since the prior August?

12    A.    Yes.

13    Q.    So it doesn't distinguish different types of experience?

14    A.    No.

15        THE COURT:  I don't understand that.

16    BY MR. KUHAR:

17    Q.    Just for example, if a person started subbing the same

18    time you did in August of '01 and they worked two days in the

19    '01-'02 school year and that is all, on this chart there would

20  be a 1.3 by their name, correct?

21  A.   By my name, yes.

22  Q.   Well, you worked many more than two days in the '01-'02

23  school year?

24  A.   Yes.

25  Q.   But a person who worked only two days in the '01-'02

153

1   school year would have 1.3 by their name?

2   A.   No.  The 1.3 I was talking about here is the number of

3   months, not the number of days.  If you're asking if a person

4   that subbed for a couple days prior to hiring, I would put

5   zero.

6   Q.   Well, I thought the 1.3 meant that you started subbing

7   one year and three months --

8   A.   Yes.

9   Q.   You have to let me finish.  I thought the 1.3 meant that

10  you had started subbing one year and three months prior to the

11  date on this form, which is December of '02 -- I'm wrong?

12  A.   I counted actually started like in August of -- okay, I'm

13  looking at the wrong form, I'm sorry.  Prior to August of '01,

14  when I was hired as a substitute teacher.

15  Q.   All right.  And I'm just trying to understand --

16  A.   You're confusing me.

17  Q.   I see that.

18       THE COURT:  Here, let me see if I can help again.

19  Let's get on the same page.  We're all looking at school year

20  2002-2003?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Look at the top where it says

23  experience, you put next to yourself 1.3?

24          THE WITNESS:  Yes.

25          THE COURT:  He's asking what does 1.3 mean and how

154

1  did you compute it?

2          THE WITNESS:  I computed the year as a school year

3  and three months where --

4          THE COURT:  Does that mean 1.3 years from the time

5  you jotted that down was the first time you subbed for the

6  district?

7          THE WITNESS:  That's correct.

8          THE COURT:  One year and three months?

9          THE WITNESS:  That's correct.

10  BY MR. KUHAR:

11  Q.   So, if during that time you had worked 100 days or 30

12  days or 10 days, you still would have put 1.3 down?

13  A.   Say that again, please.

14  Q.   This 1.3 tells us when you started subbing?

15  A.   Yes.

16  Q.   It doesn't tell us how many days you subbed?

17  A.   No.

18  Q.   Now, you had shown us a chart that indicated how much

19  money you would have made if you would have started as a

20  permanent teacher, right?

21  A.   Yes.

22  Q.   I think you told us that you approximated the value of

23  the benefits?

24  A.   Yes.

25  Q.   How did you compute that approximation?

155

1  A.   The 40 percent?

2  Q.   Yes.

3  A.   Just looking at my husband's tax records from his

4  employer.

5  Q.   Did you reference Act 180 hours?

6  A.   Continuing education, yes.

7  Q.   What is Act 180 hours?

8  A.   It's continuing education to be recertified.  To become

9  certified in teaching -- certified in Pennsylvania.

10  Q.   Or is to keep your certification?

11  A.   Yes, to be recertified.  Because once you're certified,

12  you have six years to keep that certification and you have to

13  renew it.

14  Q.   Okay.  Are you sure they're not Act 48 hours?

15  A.   Act 48, 180 hours.

16  Q.   All right.  Now, this is a complicated question, I'm

17  going to try to be as clear as possible.  You are aware that

18  the district hired a number of people into long-term subs and

19  into permanent positions during the time that you have been

20   trying to get those kinds of positions?

21   A.   Yes.

22   Q.   In fact, you have chose the charts as you have created

23   that show who those people were?

24   A.   Yes.

25   Q.   So you know exactly who I'm talking about?

156

1   A.   Yes.

2   Q.   Do you have any reason to think that for any of those

3   positions the district considered you to be more qualified for

4   those positions?

5   A.   Yes.

6   Q.   Tell me about that?

7   A.   Because Mr. Heller and Mr. Meader observed me teach and

8   both gave me a satisfactory grade.  And I believe that I did

9   very well in both interviews.

10  Q.   Both --

11  A.   I'm talking about the '02 and '04 interviews.  And not

12  including -- and also my experience as a substitute teacher.

13  Q.   Is it fair to say that you considered yourself to be more

14  qualified than some of those other folks who got those

15  positions?

16  A.   Yes.

17  Q.   I am asking a slightly different question, which is do

18  you have any reason to think that the administration at the

19  district considered you to be more qualified than any of the

20    people who got long-term sub or permanent positions at any time

21    when you were trying to get them?

22    A.    Could you rephrase that again, please.

23    Q.    Yes.  I understand you just gave me a few reasons why you

24    thought you were more qualified than some of the folks who got

25    long-term sub and permanent positions during the time that

1   you've been trying to get those kinds of positions, right?

2   A.   Yes.

3   Q.   Now, this is a little bit different, I'm asking you

4   whether you have any reason to think that the administration of

5   the district concluded that you were more qualified than any of

6   those people?

7       MR. MEAD:  I'm going to object, I think it's

8   speculation.  I understand why there's a problem here.  I think

9   Mr. Kuhar is asking her what the school district thought.

10      THE COURT:  I think that's right.  Do you understand

11  the question?

12      THE WITNESS:  You're asking me if -- no, not really.

13      MR. KUHAR:  Here's why it's critical.

14      THE COURT:  I'm not saying you can't ask it, I just

15  want to make sure she understands it.

16      MR. KUHAR:  Me, too.

17  BY MR. KUHAR:

18  Q.   The administration did not choose you for any long-term

19  subs or permanent positions, correct?

20   A.   That's correct.

21   Q.   Do you have any reason to think that they thought, that

22   they, the administrators, thought that you were more qualified

23   than any of the people who got positions, but chose not to hire

24   you anyway?

25        THE COURT:  Do you understand the question?

158

1        MR. MEAD:  Same objection, speculation.

2        THE WITNESS:  I can't answer it, but I'm not sure --

3        MR. KUHAR:  If I may be heard.  I'm not asking her

4   whether the administration thought that she was a better

5   candidate.  I'm asking whether she was aware of any facts,

6   evidence, occurrences that would lead one to infer that she

7   thought that --

8        THE COURT:  I'm going to sustain the objection.  The

9   question, I don't understand it.  So if you can rephrase it in

10  a way that she can understand it.  She's the critical person,

11  then you can ask it, but I'm going to sustain that.

12  BY MR. KUHAR:

13  Q.   You had not been granted any long-term sub or permanent

14  positions, we know that, right?

15  A.   Yes.

16  Q.   Do you think that's happened -- why do you think that's

17  happened?

18  A.   It's because of the lawsuit I filed.

19  Q.   Okay.  If the administrators were to come up here and say

20   that it was because they thought that the other people were

21   better qualified, are you aware of anything that would make

22   that seem untrue?

23   A.   Yes.

24   Q.   What?

25   A.   For example, hiring Ms. Naomi Uy-Moore, she is not

159

1  certified to teach in Pennsylvania.

2  Q.    Okay.

3  A.    And I am certified to teach in Pennsylvania.  And she was

4  hired and I was not.

5  Q.    Okay.

6         THE COURT:  What's her last name?

7         MR. KUHAR:  Naomi Uy-Moore.  U-y-M-o-o-r-e.

8         THE COURT:  Is she African-American?

9         MR. KUHAR:  She's Filipino, Asian.

10        THE COURT:  All right.

11  BY MR. KUHAR:

12  Q.    You understand my question I do see, what else?

13  A.    Mr. Heller interviewing student teachers for a possible

14  job and then hiring them without any experience, and here I am,

15  I have five years of experience as a substitute teacher and I

16  did not get hired.

17  Q.    Okay.  Anything else?

18  A.    That's all I can think of right now.

19  Q.    You graduated in 2000, correct?

20  A.   Yes.

21  Q.   You got your PDE certification in 2001?

22  A.   Pennsylvania Department of Education certification in

23  2001, that's correct.

24  Q.   Thank you for clarifying that.  Why the delay?

25  A.   I went back to the Philippines after my graduation and

1   got pregnant with my third child.

2   Q.   The district used an interview process to select the

3   replacement for Ms. Pickens, correct?

4   A.   I believe so, yes.

5   Q.   They used an interview process for the other positions

6   that were filled after that one, correct?

7        MR. MEAD:  I'm going to object, the ones she was

8   interviewed for.  She doesn't know -- did you say in 2004?

9        MR. KUHAR:  We'll do the 2004 one next.

10  BY MR. KUHAR:

11  Q.   So they used an interview process to select the candidate

12  in '02 to replace Ms. Pickens, correct?

13  A.   That's correct.

14  Q.   You participated in that?

15  A.   Yes.

16  Q.   Then they used an interview process in '04 to select a

17  number of candidates, approximately eight or nine, to begin in

18  the '04-05 school year in permanent positions, correct?

19  A.   That's correct.

20   Q.   Are you aware of any successful candidates who did not

21   have to participate in the same process?

22   A.   I am not sure what you meant by that, Mr. Kuhar.

23   Q.   People who were not interviewed in a fashion similar to

24   the way you were interviewed, are you aware of any such people?

25   A.   There's a couple of questions or requests from Mr.

161

1   Nichols asking the district to provide the interview analyses

2   of the other teachers that were hired that year.  And you did

3   not provide that to us, there's some questions there.

4   Q.   So you're unsure whether those folks were interviewed?

5   A.   Yes.

6   Q.   Would those be people who were hired in '04?

7   A.   Yes.

8   Q.   Okay.  Are there any people who you are sure were not

9   interviewed but got permanent positions either in the '02

10   long-term subs or the '04 permanent positions?

11   A.   From based on the form that you turned over to Mr. Mead,

12   the interview rankings of 2004, I'm not sure if you remembered

13   that form that you gave Mr. Mead.  There's a note on the bottom

14   that said Marci Pifer canceled interview, she was hired but it

15   didn't show on the ranking if she was ever interviewed.

16   Q.   Okay.  Any others?

17   A.   There was one person that did not show up, and I am not

18   sure if she was hired.

19   Q.   Okay.  Now, I will ask the same question about the people

20   who were hired after the '04 interview process.  Do you

21   understand what I'm asking about -- the people who were hired

22   into long-term subs or permanent positions after the '04

23   process that you participated in; do you understand the people

24   I'm talking about?

25   A.   Yes.

162

1  Q.   Okay.  Are you aware of whether or not those folks were

2  interviewed in a way that was similar to the way you were

3  interviewed?

4  A.   No, I don't.

5  Q.   Joye Pickens is your neighbor, right?

6  A.   Yes.

7       MR. KUHAR:  No further questions at this time, thank

8  you.

9       THE COURT:  All right.  Do you have any redirect,

10  Mr. Mead?

11       MR. MEAD:  Your Honor, just one question.

12              REDIRECT EXAMINATION

13  BY MR. MEAD:

14  Q.   Ms. Uy-Moore you testified was not certified, correct?

15  A.   That's correct.

16  Q.   When was she hired?

17  A.   I'm sorry.

18  Q.   When was she hired?

19  A.   When was she hired -- I believe in August of '04.  I can

20  look back.

21  Q.   If you can look, just to make sure?

22  A.   I'm kind of lost, which exhibit is that?

23  Q.   I believe you were looking at Exhibit 29?

24  A.   She was hired the school year 2005-2006,

25  Q.   So that's after you filed your lawsuit?

163

1   A.   That's correct.

2   Q.   And she's Filipino, correct?

3   A.   That's correct.

4   Q.   But she hadn't worked for the school district, correct?

5   A.   Say that again, please.

6   Q.   She hadn't worked at the Crawford Central School

7   District?

8   A.   No.

9   Q.   She was brought in from outside the school district to

10   teach after you filed the lawsuit?

11   A.   That's correct.

12   Q.   When she came in, she wasn't even certified, was she?

13   A.   That's correct.

14        MR. MEAD:  Thank you, that's all I have.

15        THE COURT:  Do you anything else?

16        MR. KUHAR:  No, your Honor?

17        THE COURT:  Thank you, ma'am.

18        MR. MEAD:  Call our next witness, your Honor?

19        THE COURT:  Who would that be?

20          MR. MEAD:  Your Honor, we can bring in some of the

21   teachers from 2000, they would be very brief, just to say they

22   saw her, had submitted their evaluation of her.

23          THE COURT:  All right.

24          MR. MEAD:  We would call Carole Fisher.

25          THE CLERK:  Ma'am, will you raise your right hand,

164

1    please.

2                CAROLE FISHER, PLAINTIFF WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MR. MEAD:

5    Q.    Ma'am, could you state your name, please?

6    A.    Carole Fisher.

7    Q.    Are you married?

8    A.    Yes.

9    Q.    Ms. Fisher, where do you live?

10   A.    In Cochranton.

11   Q.    What do you do for a job?

12   A.    I teach first grade at Cochranton Elementary School.

13   Q.    How long have you taught first grade?

14   A.    This is going on my 14th -- well, I just finished my 14th

15   year.  So I will start my 15th.

16   Q.    Are you a full-time teacher?

17   A.    Yes.

18   Q.    Where did you graduate from?

19   A.    Edinboro.

20  Q.  And what was your graduate degree in?

21  A.  Elementary early childhood.

22  Q.  Have you always worked for the one school district?

23  A.  Yes.

24  Q.  Do you know Rowena Wagner, the plaintiff here?

25  A.  Yes, I do.

165

1    Q.    How do you know Ms. Wagner?

2    A.    She was my student teacher in the year 2000.

3    Q.    Has she ever substituted for you since then?

4    A.    Yes.

5    Q.    How many times?

6    A.    That I don't know, various times.

7    Q.    So you say she student taught, did you say?

8    A.    Yes.

9    Q.    That was in the year 2000?

10   A.    Yes.

11   Q.    What did she do as a student teacher?

12   A.    She would, first of all, you start out with just basic,

13   maybe storytelling, leading the class in morning message,

14   simple direction.  And then leading into, I allow them to pick

15   which subject areas they are the most comfortable with.  And

16   then they progress into teaching the entire day.  That

17   encompasses lesson plans and behavior modification, whatever is

18   needed.

19   Q.    They progress to a different level of teaching?

20  A.   That's correct.

21  Q.   Under your supervision?

22  A.   Yes.

23       THE COURT:  Just out of curiosity, is behavior

24  modification a new word for disciplining a child who is acting

25  up?

166

1      THE WITNESS:  Yes.

2      THE COURT:  All right.

3  BY MR. MEAD:

4  Q.   At the end of her time period when she's student teaching

5  for you, do you have to prepare an evaluation?

6  A.   Yes, I do.

7  Q.   If you could look at Plaintiff's Exhibit No. 3, that's

8  the page I opened for you?

9  A.   Okay.

10  Q.   Can you tell us what Exhibit No. 3 is?

11  A.   It is the final evaluation that I submitted to the

12  college.

13  Q.   All right.  And if you flip through to the next page,

14  appears to be a final evaluation form, correct?

15  A.   Yes, it is.

16  Q.   Is that the evaluation you conducted at the time period

17  that she was student teaching?

18  A.   Yes.

19  Q.   What was your opinion about her teaching abilities at

20   this point?

21   A.   Well, it was exemplary, as you can see I have marked that

22   in every category of her teaching.  Her competency, her level

23   of expertise, her handling of the classroom.

24   Q.   Did you have any problems with her English, how she spoke

25   in your classroom?

1  A.   No, not at all.

2  Q.   You also testified, Ms. Fisher, since that time period,

3  she has continued to substitute for you, is that right?

4  A.   That's correct.

5  Q.   After she substitutes for you, do you fill out any kind

6  of form that says how she did?

7  A.   Yes.

8  Q.   Now, you don't actually watch her teach during that time

9  period?

10  A.   No.

11  Q.   How are you able to fill out an evaluation about how she

12  did if you haven't seen her teach?

13  A.   Well, when a substitute leaves your classroom, they have

14  to fill out a form as to what they had taught that day.  And

15  they leave all of their materials out on the desk or if that's

16  what you have set forth for them.  And usually they will write

17  a note to you as well, which she usually would do, stating

18  different things that she completed.

19  Q.   All right.  Were you able to observe anything about how

20   she taught, despite the fact you weren't able to actually

21   observe her teaching?

22   A.    Yes.  If I was not there, then let's say more than a day,

23   in one instance I was absent for three days.  And I didn't have

24   plans for the one day in reading, I called her, I said I'm

25   really sorry, and she went ahead, said don't worry about it, I

file:///A|/WAGDAY1.TXT

168

1   already have them done.  She had taken that initiative on her

2   own and filled out the plans for reading herself.  So I knew

3   then, as well as other times, that she had completed, she will

4   write a note I completed checking these papers, or these

5   students I did not get an opportunity to evaluate for you.

6   Q.   Were you able to ever determine from how the children

7   reacted to her, how she got along with the children?

8   A.   Fine.  I never heard any complaints from the children.

9   Q.   Do you occasionally hear complaints from the children for

10   a sub?

11   A.   Yes.

12   Q.   And you continue to use her as a substitute if you can

13   today?

14   A.   Yes, I do.

15   Q.   And why is that?

16   A.   Because I know that when I come back the classroom is

17   still in the same position, the children have not lost any

18   instructional time, and the behaviors are consistent with what

19   I would expect in my classroom.

20  Q.    And you're still a teacher with the Crawford Central

21  School District, aren't you?

22  A.    Yes, I am.

23          MR. MEAD:  Your Honor, I move for the admission of

24  Exhibit 3.

25          THE COURT:  It's admitted.

169

1  BY MR. MEAD:

2  Q.   Just to clear up the record, on July 12, 2006, you wrote

3  a letter to a Mr. Caleb Nichols, correct?

4  A.   That is correct.

5  Q.   That was per Mr. Nichols' request?

6  A.   Yes.

7  Q.   And that basically consists of an evaluation of her based

8  on what you saw of her as student teaching and how she's

9  performed to your knowledge in the classroom since then,

10  correct?

11  A.   Yes.

12  Q.   And according to your letter, you state "that I would

13  highly recommend her for any elementary position?"

14  A.   Yes.

15  Q.   And you also state "after seeing how she handled my class

16  numerous times as a substitute, I still have these same

17  recommendations for her?"

18  A.   Yes.

19  Q.   Is that correct?

20   A.   Yes.

21   Q.   By the way, are the two of you social friends or

22   anything?

23   A.   No.

24   Q.   This is a purely professional relationship?

25   A.   Yes, uh-huh.

170

1        MR. MEAD:  That's all I have, your Honor.

2        THE COURT:  All right.  Mr. Kuhar.

3        MR. KUHAR:  Nothing, your Honor.

4        THE COURT:  Thank you, ma'am, you're excused.

5        MR. MEAD:  Your Honor, I intend to introduce three

6  teachers from 2000.  This is the second one.  And then we can

7  probably switch gears toward a different subject.  These three

8  are probably very brief.  Then we'll have, for example, Ms.

9  Pickens and people like that.

10        THE COURT:  All right.

11        THE CLERK:  Raise your right hand.

12        DOUGLAS McCULLOUGH, PLAINTIFF WITNESS, SWORN

13              DIRECT EXAMINATION

14  BY MR. MEAD:

15  Q.   Sir, could you state your name, please?

16  A.   Pardon me.

17  Q.   Could you state your name?

18  A.   Douglas Christopher McCullough.

19        THE COURT:  How do you spell that?

20          THE WITNESS:  M-c-C-u-l-l-o-u-g-h.

21          THE COURT:  All right.  Go ahead.

22  BY MR. MEAD:

23  Q.    Mr. McCullough, I'm going to refer you to an exhibit

24  which we've marked as Exhibit No. 4, which I placed in front of

25  you.  Do you see what I'm referring to?

171

1   A.   Yes, I do.

2   Q.   Mr. McCullough, could you give us your background, what

3   do you do for a living?

4   A.   I taught school at Crawford Central for 36 years, I'm now

5   retired.

6   Q.   When did you retire?

7   A.   2004.

8   Q.   What did you teach while you were there?

9   A.   Sixth grade.

10  Q.    Now, as part of your responsibilities for teaching sixth

11  grade, did you ever get to know or meet a Rowena Wagner?

12  A.    Yes, I did.

13  Q.    And under what circumstances?

14  A.    I was one of her cooperating teachers.

15  Q.    And by cooperating teachers, what do you mean?

16  A.    She was assigned to me by Edinboro University, and then I

17  supervised her as she did her student teaching.

18  Q.    How long of a period did you do that?

19  A.    About seven weeks.

20   Q.   And that was in year 2000, is that fair?

21   A.   Yes, it was.

22   Q.   And as part of your evaluation of her, did you in fact

23   fill out a written evaluation?

24   A.   Yes, I did.

25   Q.   If I could direct your attention to Exhibit No. 4, can

1   you take a look at that and tell us what that is?

2   A.   This is a final writing that I did for her, an

3   evaluation.

4   Q.   Instead of reading it, was it a favorable review?

5   A.   Yes, it was.

6   Q.   Did she do a good job?

7   A.   Yes.

8   Q.   The last line says "I feel Rowena has achieved competency

9   in her student teaching experience and will be an excellent

10   teacher in the future."  That's what you said?

11   A.   Yes, it was.

12        THE COURT:  Where are you reading from?

13        MR. MEAD:  Exhibit No. 4, Mr. McCullough's written

14   evaluation.

15        THE COURT:  What page?

16        MR. MEAD:  First page.

17        THE COURT:  All right.

18   BY MR. MEAD:

19   Q.   If you can, sir, what's the last line of the first page

20  of your evaluation?

21  A.   Do you want me to read it?

22  Q.   Yes, please.

23  A.   "I feel Rowena has achieved competency in her student

24  teaching experience and will be an excellent teacher in the

25  future."

173

1  Q.    That's your opinion of her?

2  A.    Yes.

3  Q.    The next few pages are evaluations where you check

4  exemplary, proficient, basic, unsatisfactory, correct?

5  A.    That's right.

6  Q.    And by looking at it, I see that you checked, except for

7  three situations where you checked for proficient, each one

8  said exemplary, correct?

9  A.    Yes.

10  Q.    Did you have any problems with the way Ms. Wagner spoke,

11  understanding her?

12  A.    I could understand her, yes.

13  Q.    During the time period that you were still teaching, did

14  she ever substitute for you?

15  A.    Yes, I believe she did.

16  Q.    Do you know how many times?

17  A.    No, I don't.

18  Q.    Did you ever personally observe her teach for your class,

19  outside of the time --

20   A.   Outside of student teaching, no.

21   Q.   Did you ever evaluate her as a student teacher -- I'm

22   sorry, as substitute teacher, day-to-day teacher?

23   A.   We have a little form we had to fill out as to whether

24   our directions were followed, as to whether the lessons were

25   followed, completed.

174

1  Q.   How did she do, to your recollection?

2  A.   She did fine.

3        MR. MEAD:  Your Honor, I would move for admission of

4  Exhibit No. 4.

5        THE COURT:  It's admitted.

6        MR. MEAD:  That's all the questions I have.

7        THE COURT:  Do you have anything?

8        MR. KUHAR:  No, your Honor.

9        THE COURT:  Thank you, sir, you can head back home.

10  All right, we're going to take a recess.

11        (Recess from 2:28 p.m.; until 2:46 p.m.)

12        THE COURT:  Sir, come up here and my clerk will

13  swear you in.

14        THE CLERK:  Would you raise your right hand, please.

15        JOHN LOVETT, PLAINTIFF WITNESS, SWORN

16              DIRECT EXAMINATION

17  BY MR. MEAD:

18  Q.   Sir, could you state your name, please?

19  A.   John Lovett.

20  Q.   Sir, where are you employed?

21  A.   Edinboro University.

22         THE COURT:  You speak awfully fast, what is your

23  last name?

24         THE WITNESS:  John Lovett, L-o-v-e-t-t.

25         THE COURT:  Okay, go ahead.

175

1    BY MR. MEAD:

2    Q.    And do you work at Edinboro University?

3    A.    Edinboro University, right.

4    Q.    What is your job there, what do you do?

5    A.    Supervisor of student teachers.

6    Q.    Are you a professor?

7    A.    Yes.

8    Q.    As part of your duties as a professor and as supervisor

9    of student teachers, did you ever have the opportunity to

10   supervise or work with Rowena Wagner?

11   A.    Yes.

12   Q.    Do you recall when that was, approximately?

13   A.    Yes, it would be the spring semester of 2000.

14   Q.    Now, as part of your job with Ms. Wagner, what do you do

15   exactly -- what do you do as a student teacher?

16   A.    Well, I actually supervise the student teaching

17   experience.  And that's in cooperation with a cooperating

18   teacher and the student teacher.

19   Q.    Do you observe the student teacher?

20   A.   Yes, I would have visited her at least six times during

21   that period of time.

22   Q.   And that would have been the same for Ms. Wagner as well,

23   you would have observed her at least six times?

24   A.   That's what I mean, I observed her for six times.

25   Q.   Now, I opened a book in front of you, if look at Exhibit

176

1  No. 2 -- do you have that in front of you?

2  A.   Yes.

3       MR. MEAD:  Do you have that, your Honor?

4       THE COURT:  I do.

5  BY MR. MEAD:

6  Q.   Exhibit No. 2, can you tell me what that is?

7  A.   That would have been my final evaluation, letter of

8  recommendation for Rowena.

9  Q.   And at that time period did you feel, as you write in

10  this particular letter -- let me strike that.  I'll ask you,

11  how did she do as a student teacher?

12  A.   She did well as a student teacher.

13  Q.   And is that reflected in your review there?

14  A.   Yes, I believe it is.

15  Q.   Now, at one point you mentioned that "although she had a

16  dialect, her speech and grammar were never a concern."  Did you

17  have any problem with her speech or grammar or the way she

18  spoke English?

19  A.   No, I didn't.  Initially, when I first went in to observe

20  her the first time, I thought that might have been an issue.

21  But it turned out that it wasn't.  She spoke very perfect

22  English in the classroom.

23  Q.    This is what you observed of her in the classroom,

24  correct?

25  A.    Yes.

1  Q.   And your last line there, rather than read your entire

2  review, it says "it is a real pleasure to welcome Rowena Wagner

3  into the teaching profession.  She will be a great asset to any

4  school district."  That's what you felt at the time, correct?

5  A.   Yes.

6  Q.   The next two pages consists also of evaluations, correct?

7  A.   Yes.

8  Q.   Is that your signature as well -- on top of the page?

9  A.   Yes, it is.

10  Q.   She received exemplary in every field except for the one

11  where you put proficient regarding acceptable oral English,

12  correct?

13  A.   Yes.

14  Q.   And that's what you just explained to us, at first you

15  had a concern, then you watched her and you had no concerns

16  after that, correct?

17  A.   Right.

18  Q.   Is that correct?

19  A.   Yes, it is.

20          MR. MEAD:  That's all I have, your Honor.  Let me

21  back up, if I could move for the admission of Plaintiff's

22  Exhibit No. 2.

23          THE COURT:  All right, it's admitted.  All right,

24  Mr. Kuhar, do you have anything?

25          MR. KUHAR:  No questions, your Honor.

178

1        THE COURT:  Thank you, sir, you're excused.  Come up

2  here, ma'am.

3        MR. MEAD:  May I get the next witness, your Honor?

4        THE COURT:  Yes.  Come on up here, ma'am, we'll

5  swear you in.  You must be Ms. Pickens?

6        THE WITNESS:  That's correct.

7        THE CLERK:  Ms. Pickens, raise your right hand,

8  please.

9          JOYE PICKENS, PLAINTIFF WITNESS, SWORN

10               DIRECT EXAMINATION

11  BY MR. MEAD:

12  Q.    Ma'am, could you state your name, please?

13  A.    Joye Pickens.

14  Q.    Where do you live, Ms. Pickens?

15  A.    112 3rd Street, Cochranton.

16  Q.    How long have you lived in Cochranton?

17  A.    Oh, 10 years.

18  Q.    How many?

19  A.    About 10.

20      THE COURT:  What grade did you teach, refresh my

21  recollection, second?

22          THE WITNESS:  Yes, for 10 years I was second grade.

23          THE COURT:  In terms of volume, pretend you're

24  yelling at second graders.

25          THE WITNESS:  I will.

1   BY MR. MEAD:

2   Q.   How long have you been with the Crawford Central School

3   District?

4   A.   I was there 35 years and I've been retired three.

5   Q.   During the 35 years you're with the Crawford Central

6   School District, tell me what jobs you had?

7   A.   I was in special education.

8   Q.   For how long?

9   A.   For 23 years I taught first grade, second grade and sixth

10  grade.  Then most of the time was in special education.  And I

11  moved from that position, for the last 10 years I was in second

12  grade.

13  Q.   Did you teach second grade at the same school for the

14  last 10 years?

15  A.   Yes, all of my experience was in that building.

16  Q.   Again, tell us what year you retired?

17  A.   2003-2004 was my last year.  So I think June of 2004 is

18  my retirement time.

19  Q.   Now, during the time period that you taught, did you know

20  Ms. Wagner or Rowena Wagner?

21  A.   Yes, she student taught in our building.

22  Q.   How often did she student teach in your building?

23  A.   How often?

24  Q.   How often, do you remember?

25  A.   Well, that first semester she was in first grade for half

1  of that time, and in second grade for the other half.

2  Q.    Did she ever substitute teach for you during the time

3  period you were a full-time teacher?

4  A.    Oh, yes.

5  Q.    Was it frequent?

6  A.    Yes.  Off and on when she first graduated and had her

7  degree.  And then my last --

8        THE COURT:  Are we student teaching now or we

9  substituting?

10       THE WITNESS:  Substituting.

11       MR. MEAD:  Substitute teaching, your Honor.

12       THE COURT:  Was there an earlier question as to

13  whether she had student taught in her classroom?

14  BY MR. MEAD:

15  Q.    Had she done so, ma'am?

16  A.    No, she was two rooms down.

17  Q.    So any time she ever taught for you, it was substitute

18  teaching?

19  A.    Right.

20   Q.   And that's the only time you knew her from the teaching

21   is when she substituted teaching for you?

22   A.   Well, yeah.

23   Q.   Do you know her in any other fashion, do you know her

24   socially, do you know her outside the classroom?

25   A.   Not really.  It's Cochranton, it's a borough, you wave to

181

1  people.  I mean I know them.

2  Q.   Do you socialize with Ms. Wagner at all, do you go out?

3  A.   No.

4  Q.   Is it fair to say professional friends?

5  A.   Yes.

6  Q.   Friends through your profession?

7  A.   Yes.

8  Q.   But not necessarily outside of work?

9  A.   No.

10  Q.   You state that Ms. Wagner subbed for a number of times,

11  is that correct?

12  A.   Yes.

13  Q.   How did she do when she subbed for you, to your

14  knowledge?

15  A.   Excellent.

16  Q.   And this was your second grade class?

17  A.   Yes.

18  Q.   Did you ever have to fill out any of her forms or

19  evaluation forms that she'd leave on your desk at the end of

20  the day?

21  A.  Right, you do that every time you have a sub in.

22  Q.  Would you always give her good grades?

23  A.  Oh, yes.

24  Q.  Now, you never personally observed her in a classroom

25  setting teaching or did you?

182

1   A.   Not teaching, other than responsibilities outside of the

2   classroom.  You go to an assembly, recess duty, different

3   things, I observed outside of the courtroom.

4   Q.   So you observed Ms. Wagner outside the classroom, at

5   recess, recreation for the kids, lunchroom type situations?

6   A.   Yes, assemblies.

7   Q.   What did you observe as far as how she did?

8   A.   I thought she handled herself well.  Kept discipline,

9   didn't overreact.  You see a lot of difficult things from subs.

10   Q.   Now, were you able to formulate an opinion of how she did

11   in your classroom even though you weren't there to observe her?

12   A.   Right.

13   Q.   How were you able to formulate such an opinion?

14   A.   Various ways.

15   Q.   Tell us?

16   A.   She would leave in writing what was accomplished

17   according to the lesson plans.  And if there were any problems,

18   if the students, she didn't think some of the students got the

19   concept, she left very good sub notes.  And that's not always

20   the case.  You can walk in and not know anything that happened

21   and then spend the whole day asking the children did you cover

22   this or, you know, that.  So I didn't have to wonder about

23   that.  I could go early the next day, have a really good idea

24   of what happened.

25   Q.   Did you have any feedback from the second graders on how

183

1  she did?

2  A.   Yes.

3  Q.   You did?

4  A.   Yes.  You know, after a few years experience you get on

5  to this.  Now, if they're really excited that somebody is

6  coming, you don't want that one because they had too much fun.

7  But you just get a feel.  They approved of her coming.  And I

8  knew the lessons got done.

9        THE COURT:  So what are you saying the harder the

10  kids are on a sub, the better you know they did?

11        THE WITNESS:  You get a feel for it.

12  BY MR. MEAD:

13  Q.   So based on your background with Ms. Wagner, did there

14  ever come a time period where you wanted her to sub for you for

15  longer than a day or two?

16  A.   Right.  My physical condition came to a point where I had

17  to have a hip replacement done before semesters.  And so I knew

18  it was coming and I thought I was going to take it at

19  semesters.  So I was kind of working with her to get ready to

20  take my room for --

21        THE COURT:  Excuse me, one second, ma'am.  Someone

22  just came, I don't know if this individual is a witness or not?

23        MR. MEAD:  No.

24        THE COURT:  Go ahead.

25  BY MR. MEAD:

1  Q.   You were stating you were starting to prepare her to take

2  over?

3  A.   Right.  So then it became obvious I was going to have to

4  stop teaching before semesters.  And I requested her to come

5  into my room as a sub to continue.

6  Q.   Now, if you look, I have an exhibit in front of you, the

7  exhibit book, if you could look at Exhibit 6 in there -- I'll

8  help you if the judge doesn't mind, if I approach the witness.

9       THE COURT:  No, go ahead.

10  BY MR. MEAD:

11  Q.   Can you tell us what Exhibit No. 6 is?

12  A.   This is a letter I wrote to the school district saying

13  that I needed to take a leave for my hip replacement

14  reconstruction.

15  Q.   Can you read the second paragraph?

16  A.   "It is very difficult to leave my students, but have

17  given considerable thought to their particular needs and have

18  requested Rowena Wagner to be my substitute teacher.  In

19  addition to being an intelligent, enthusiastic and disciplined

20  educator, she will be able to expose them to the Philippine

21  language and culture.  This is of particular importance this

22  year, since I have a bilingual student with a Philippine

23  mother.  Mrs. Wagner will be extremely good influence on all my

24  students and I hope she will be able to work with them during

25  my absence."

185

1  Q.   Now, Ms. Pickens, who did you send this letter to?

2  A.   Well, it says "to whom it may concern," but I addressed

3  it to the Crawford Central School District.

4  Q.   Do you know who received the letter, did you give the

5  letter to anyone in particular?

6  A.   No, I just mailed it to the school district.

7  Q.   After you mailed this letter, did you have any

8  conversations with any of the administrators from the Crawford

9  Central School District about your choice?

10  A.   I had a conversation with Mr. Heller in the office at the

11  school.

12  Q.   Who is Mr. Heller?

13  A.   He's the assistant superintendent.

14  Q.   Assistant superintendent, all right.  When did you have

15  that conversation with Mr. Heller?

16  A.   About the sub in my room and I was using sick days --

17       THE COURT:  He said when did you have the

18  conversation, when?

19       MR. MEAD:  Before or after this letter, ma'am?

20          THE COURT:  The letter is dated November 17th of

21   2002?

22          THE WITNESS:  I'm not certain.

23   BY MR. MEAD:

24   Q.   Well, let me ask you this.  Do you ever remember any

25   conversations with Mr. Heller about Ms. Wagner replacing you?

186

1  A.   Yes, that's the conversation I had, I'm just vague about

2  the timeframe.

3  Q.   Tell us about the conversation?

4  A.   I had requested her and I said -- I wanted it to start

5  right away because I was having too much difficulty physically.

6  So I was going to have to take off, in addition to my leave,

7  from whatever date in November till January.  And I was using

8  sick days for that period of time.  And I asked if she could be

9  in there, and he related that he didn't think it would be a

10  problem because I was using sick days.  And so she could be in

11  there until semesters.  At which time the position goes up for

12  bid.

13  Q.   Semesters being in January, correct?

14  A.   Right.

15  Q.   January of 2003?

16  A.   Yes.

17  Q.   Had you ever requested a substitute teacher to replace

18  you in the past?

19  A.   Yes.

20  Q.   Had those requests been granted?

21  A.   Yes.

22  Q.   For long-term time periods?

23  A.   Yes, I've been off.

24  Q.   Had you had any problem with anyone subbing for you in

25  the past, was there any problem with the administration saying

187

1  no, we won't use that person?

2  A.   No.

3  Q.   So those requests had always been honored in the past,

4  correct?

5  A.   Yes.

6  Q.   How many times did that happen, do you know, where you

7  requested somebody in particular?

8  A.   In the past I can think of two specific times, parental

9  leave and a sabbatical, two long times.

10  Q.   Did you recommend a teacher each time?

11  A.   Yes.

12  Q.   Did they do the long-term subbing for you each time?

13  A.   Yes.

14  Q.   Were you aware of any policy or practice about a teacher

15  who was departing requesting a substitute teacher, a particular

16  substitute teacher?

17  A.   I just thought that's the way you do it.  So I would like

18  prepare somebody to take over my room and then request them.

19  And, you know, that's how it went.

20  Q.   As far as you know that's it?

21  A.   That had been the practice, yes.  As far as I was

22  involved.

23  Q.   Did you have any conversation with Mr. Meader about this,

24  about Rowena substituting for you, that you can recall?

25  A.   I don't -- I'm sure I did, because that was my practice.

188

1  Q.    Do you recall if Mr. Meader had a problem with Ms. Wagner

2  subbing for you?

3  A.    No, nothing registered, because I didn't know anything

4  was wrong.

5  Q.    In fact, did you leave in November of 2002 -- was it a

6  medical leave?

7  A.    Yes.

8  Q.    Were you planning surgery at that time?

9  A.    Yes, reconstructive hip surgery.

10  Q.    Did you in fact leave to have that surgery?

11  A.    Yes.

12  Q.    You had the surgery?

13  A.    I had the surgery, yes.

14  Q.    And at the time you left, was that November, mid November

15  of 2002, to the best of your knowledge?

16  A.    I had the surgery in December.  But I was off work, yes.

17  Whenever I started using my sick days.

18  Q.    Are you aware what happened to Ms. Wagner while you were

19  absent taking sick days preparing for your operation, were you

20   aware of what happened to her?

21   A.   I found out later when I was in the hospital

22   recuperating.

23   Q.   How do you find out?

24   A.   I was told.

25   Q.   By?

189

1   A.   Ms. Wagner.

2   Q.   What was your reaction, if any?

3   A.   Shock.

4   Q.   Why were you shocked?

5   A.   Because I thought things were settled and she was going

6   to be in my room until semesters, then it would go up for bid.

7   Q.   What did you do, if anything?

8   A.   I don't think I did anything.

9   Q.   Did you talk to anybody at this point?

10   A.   I honestly don't remember.

11   Q.   That's fine.  And were you still an employee of the

12   school district at this point as well?

13   A.   Right.

14   Q.   Now, in your 35-some years of teaching, had a substitute

15   teacher ever been dismissed like this, to your knowledge?

16   A.   No.

17        MR. MEAD:  That's all I have.

18                CROSS-EXAMINATION

19   BY MR. KUHAR:

20   Q.    Ms. Pickens, I'm Mark Kuhar, you probably remember me

21   from the deposition?

22   A.    Yes.

23   Q.    Okay.  Was there a time when you showed a letter to Mr.

24   Meader, the building principal, that you intended to send to

25   the parents, the parents of your students; do you remember

190

1    that?

2    A.    No, I don't.  But I could have.  Do you have a copy?

3    Q.    I'm just wondering what you remember?

4    A.    I do things -- I don't remember, honestly I don't.

5    Q.    Now, are you saying that you found out that Ms. Wagner

6    would not be your replacement because Ms. Wagner told you in

7    the hospital?

8    A.    I'm talking about the sick days.  She was supposed to be

9    in my room from December through January --

10   Q.    Okay.

11   A.    And that didn't happen.

12   Q.    And how did you learn that that did not happen?

13   A.    She told me.

14   Q.    Okay.  Was there a time when you told her that she would

15   not be your replacement for any portion of your leave?

16   A.    I thought she was going to be there using my sick days

17   until leave, that's all that I know.  Is that what you mean?

18          THE COURT:  I don't understand this.

19          THE WITNESS:  I don't understand --

20          THE COURT:  Hang on a second, if you don't

21  understand, you can say it.

22          THE WITNESS:  I don't understand.

23          THE COURT:  Let me see if I can clear this up.  When

24  you said you thought she was going to be there using your sick

25  days, that's what I don't understand, what you mean by someone

1  else using your sick days?

2       THE WITNESS:  That's how she gets paid is my sick

3  days.

4       THE COURT:  Explain what your understanding was?

5       THE WITNESS:  I was going to take a leave in

6  January, a medical leave.  Since I needed more than the medical

7  leave because I had to have the surgery earlier than

8  anticipated, I had enough sick days that I just let them use

9  sick days to pay for that period of time.  And since I was

10  using my sick days, often you request your sub and that's what

11  I had done.  So I was surprised she wasn't there.

12        THE COURT:  All right, go ahead.

13  BY MR. KUHAR:

14  Q.   I'm just trying to understand how it was that you learned

15  that she would not be there during the entire period that you

16  were using sick days, how did you learn that?

17  A.   She told me.  Because we had planned what to do and that

18  wasn't getting done.  I guess she told me.

19  Q.   As opposed to Mr. Heller, Mr. Heller did not advise you

20   to that, Ms. Wagner did?

21   A.   As far as I recollect, yes.

22   Q.   You don't recall any conversation with Mr. Heller in

23   which he explained to you that what you expected to happen

24   would not happen?

25   A.   I honestly don't, that would have been in the hospital

192

1  because I was in the hospital for nine weeks.  And he would

2  have come to the hospital.  If that happened, I regret saying

3  this, but I don't remember.  I had serious --

4       MR. KUHAR:  May I approach?

5       THE COURT:  Sure.  And, incidentally, either lawyer

6  can approach, you don't have to ask permission.

7  BY MR. KUHAR:

8  Q.   Ms. Pickens, I'm going to ask you to look at -- what is

9  page 16, line 8 of Defendant's Exhibit E, in the first binder

10  at tab 6.  You remember being deposed, right?

11  A.   Oh, yes.

12  Q.   Okay.  I'm going to read, you can tell me if I got it

13  right, okay?

14       THE COURT:  What page and what line?

15       MR. KUHAR:  Page 16, line 8.

16       THE COURT:  Okay.

17  BY MR. KUHAR:

18  Q.   Are you with me, Ms. Pickens?

19  A.   Yes.

20  Q.    The question is asked of you, "Yeah.  Now, during your

21  conversation with Mr. Heller, you said that there was a change?

22  Answer:  Probably not in policy, but in practice.  Question:

23  Speak to that, please, Ms. Pickens?"

24  A.    May I see what's leading up to this?

25  Q.    Sure.

193

1  A.    I don't understand why -- I was referring back to the

2  change because I had gone over the December around the world

3  with her, I think that references the change was in that not

4  happening.

5  Q.    What's around the world?

6  A.    In December I do December around the world.  It's not

7  just Christmas, it's all the different nations and what they

8  do.  And I had gone over that with Rowena.  So that wasn't

9  happening.  That wasn't going to happen.  I don't know, I'm

10  confused here.

11  Q.    Well, if we could start with line 8, which says "during

12  your conversation with Mr. Heller, you said that there was a

13  change."  And then you answered "probably not in policy, but in

14  practice."  So I'm thinking you did have a conversation with

15  Mr. Heller, but you're not remembering one, right?

16  A.    Just the one in the office that I already told you about.

17  I'm just getting confused.

18        THE COURT:  Ma'am, if you don't remember something,

19  that's fine.  If that's your best answer, you can just say I

20   don't remember.

21          THE WITNESS:  I really don't.

22          THE COURT:  She doesn't remember.

23          THE WITNESS:  I don't know that this means.

24          THE COURT:  Hang on.  She doesn't remember, go on to

25   another question.

194

1  BY MR. KUHAR:

2  Q.   The conversation you had with Mr. Heller in the office,

3  tell me what you remember of that conversation?

4  A.   That's when I became aware that after my sick days were

5  used up, that the position for the sabbatical comes up for bid.

6  And at that point she may not been in there.  But until that

7  time, she was supposed to be in my room.  so that's what I --

8  you know, got everything lined up to semesters.

9  Q.   I understand.

10       THE COURT:  Mr. Kuhar, I don't mean to interrupt,

11  unless it's necessary to clarify, I'll do the same with him,

12  I think she's talking about a conversation that occurred at the

13  beginning, is that right -- is that before you left?

14       THE WITNESS:  Oh, yeah.

15       MR. KUHAR:  It's clear to me now.

16  BY MR. KUHAR:

17  Q.   Okay.  So when you heard of that, what you just described

18  in the only conversation you remember with Mr. Heller, when you

19  heard that from him, did you tell Ms. Wagner about that?

20  A.   Yes.

21  Q.   And what did you say to her?

22  A.   Just that.  That she would be, that he thought there was

23  no problem with her being in my room under my sick days until

24  semesters.  And then that it went up for bid.

25  Q.   Did you, and I apologize for the expression, but it's in

195

1  another deposition transcript, did you tell Ms. Wagner we got

2  screwed?

3  A.   I said that?

4  Q.   I'm asking you whether you did?

5  A.   I'd rather doubt it.

6  Q.   From the time you went on that leave that began in

7  November of '02 through the time that you retired from the

8  district, do you understand what timeframe I'm talking about?

9  A.   Yes.

10  Q.   During that time are you aware of any situations where

11  the district allowed a permanent teacher to choose his or her

12  long-term substitute replacement?

13  A.   It wasn't an issue, I don't know.  After my leave, I went

14  back, I taught a year, I retired.

15  Q.   Do you have any reason to think that the district did not

16  choose the most qualified person when it filled your leave of

17  absence?

18  A.   It was not my decision.

19  Q.   Are you aware of any Caucasians who subbed for many, many

20   years without getting a permanent job; like Nichole Stockton

21   ring a bell?

22   A.   Yes.

23   Q.   Do you remember how many years she subbed without getting

24   a position?

25   A.   No, several, I guess.

196

1   Q.   You do live near the Wagners, right?

2   A.   Yes.

3   Q.   You're neighbors?

4   A.   No.

5   Q.   No?

6   A.   Our roads come together, she lives on Franklin, I live on

7   3rd.

8   Q.   Would it be accurate to say to get from her house to your

9   house, she would travel 39 feet down North Franklin Street,

10   hang a right turn and go 85 feet?

11   A.   Sounds like you've done some homework, so I assume that's

12   correct.

13        MR. KUHAR:  Thank you, nothing further.

14        THE COURT:  Do you have anything else?

15        MR. MEAD:  Yes, your Honor.

16              REDIRECT EXAMINATION

17   BY MR. MEAD:

18   Q.   The fact that you're her neighbor and live 39 feet apart,

19   doesn't affect your testimony here today, does it?

20  A.    No.  There are many people who live 39 feet -- never

21  mind.

22          MR. MEAD:  The only other thing, your Honor, is I

23  don't know if I moved for the admission of Exhibit No. 6.

24          THE COURT:  It's admitted.  Ms. Pickens, I have one

25  question for you.  You said you remembered two other times

1  where the person that you recommended became the long-term

2  substitute?

3      THE WITNESS:  Uh-huh.

4      THE COURT:  Who were those people?

5      THE WITNESS:  Oh, dear.  One was when my daughter

6  was born, so probably Nikki Stockton.

7      THE COURT:  Let me ask the question this way.  Were

8  they Caucasian or non-Caucasian?

9      THE WITNESS:  Caucasian.

10      THE COURT:  Both?

11      THE WITNESS:  I'm pretty sure it was Nikki Stockton

12  both.  I should know that, I'm not sure.  I know one for sure

13  was Nikki Stockton.

14      THE COURT:  And the other individual, do you know if

15  it was a man or a woman?

16      THE WITNESS:  It was a woman and I'm sure it was

17  Nikki, I'm pretty sure it was Nikki for both times.

18      THE COURT:  All right.  You can step down.

19      MR. KUHAR:  Your Honor, we would move for the

20  admission of Exhibit E.

21       THE COURT:  Exhibit E, it's admitted.

22       THE CLERK:  Raise your right hand, please.

23       KATHLEEN MARUSKA, PLAINTIFF WITNESS, SWORN

24            DIRECT EXAMINATION

25  BY MR. MEAD:

198

1   Q.   Ma'am, could you state your name, please?

2   A.   Kathleen Maruska.

3        THE COURT:  How do you spell that?

4        THE WITNESS:  M-a-r-u-s-k-a.

5   BY MR. MEAD:

6   Q.   Ma'am, where do you reside?

7   A.   Meadville.

8   Q.   How long have you resided in Meadville?

9   A.   It was a year June 13th.

10  Q.   Let me ask you your employment background.  Are you

11  currently employed?

12  A.   Yes.

13  Q.   What do you do for a living?

14  A.   I'm a kindergarten teacher at Cochranton Elementary.

15  Q.   How long have you been a kindergarten teacher at

16  Cochranton Elementary?

17  A.   I was hired permanently the '81-'82 school year.

18  Q.   So, 25 years, 26 years?

19  A.   Uh-huh.

20  Q.   You have to answer yes or no?

21  A.   I'm sorry, yes.

22  Q.   You were hired in 1981, and that was by the Crawford

23  County School District?

24  A.   Crawford Central.

25  Q.   Crawford Central, I stand corrected.  Can you tell us

199

1   what jobs you've had with the Crawford Central School District

2   since 1981?

3   A.   I've been in the same position since 1981 as a

4   kindergarten teacher.

5   Q.   You've taught kindergarten for approximately 26, 27

6   years, is that correct?

7   A.   Yes.

8   Q.   Do you know the plaintiff in this case, Rowena Wagner?

9   A.   Yes.

10  Q.   How do you know Ms. Wagner?

11  A.   Originally, I met her personally when she student taught

12  at Cochranton.  That's when I first approached her and met her

13  physically.  But I knew of her through my daughter.

14  Q.   Did she student teach for you?

15  A.   No, she did not.

16  Q.   After she student taught at Cochranton, did you ever have

17  any opportunity to have her substitute on a day-to-day basis

18  for you?

19  A.   Yes.

20   Q.   And can you tell us approximately when that occurred or

21   when it began to occur?

22   A.   It would have been following her graduation when she

23   started substituting.  She would come in a day here, a day

24   there, as a sick day or a personal day.

25   Q.   But you had a sick day or a personal day, correct?

200

1  A.   Yes.

2  Q.   So do you have any idea how many times she has substitute

3  taught for you?

4  A.   No.

5  Q.   More than 10, more than 20?

6  A.   Oh, more than 20.  More than 20 days, yes.

7  Q.   More than 50, do you know?

8  A.   Probably not 50.

9  Q.   So somewhere between 20 and 50, is that fair?

10  A.   Yes.

11  Q.   How did she do, to your knowledge, when she substitute

12  taught for you?

13  A.   She did very well.  The students responded to her

14  positively, when we would use the restroom or be in the hall

15  for some reason, and pass her in the hall, the students would

16  respond very positively with her.  Call her name or want to run

17  over and talk and I had to keep them in order.  That's from the

18  student aspect.  From my point, she always wrote very good

19  notes at the end of her day and noted everything she had done,

20   or something that wasn't gotten to in time.  It was very

21   informative and helpful and when I returned, I always commented

22   on what I thought her job was as a substitute, although, I

23   wasn't there.

24   Q.   You agree you never personally observed her teaching?

25   A.   Correct.

201

1  Q.   But you were able to formulate an opinion based on what

2  you just described, how your students reacted to her when

3  they'd see her?

4  A.   How the students reacted, how the lesson plans were

5  covered, and how neat and orderly things were left.  Any

6  physical aspect of her being in the room, I could come in and

7  pretty much take over from where she left off as she did for

8  me.

9  Q.   It's fair to say that after 25 years of teaching

10  kindergarten, you knew whether the children responded favorably

11  or not to a substitute teacher, correct?

12  A.   Yes.

13  Q.   And they had responded favorably?

14  A.   Yes.

15  Q.   How were the lessons the next day, did you feel she had

16  completed the lessons sufficiently?

17  A.   Yes.

18  Q.   How were you able to determine that?

19  A.   Because in kindergarten it's not a page or a lesson.  In

20  kindergarten it's expanding and follow up from previous

21  lessons.  It's just kind of spiraling.  So as we would discuss

22  things or bring up things that might have been mentioned the

23  day before, I could determine from that that they were well

24  covered and discussed.  It's very difficult in kindergarten

25  because you don't have a page number or a certain number of

1   problems to finish.  It's more discussion type learning and

2   independent work.  And I could tell from discussions that

3   things were completed very satisfactorily.  The routines were

4   done.  The opening messages, morning routines and all the

5   routines throughout the day were completed.

6   Q.   With all your interactions with Ms. Wagner, did you ever

7   have any problem with her use of the English language or

8   understanding her?

9   A.   No, I did not myself, no.

10  Q.   Now, as part of your -- strike that.  While you were a

11  kindergarten teacher at your school, did you ever specifically

12  request to anyone that Ms. Wagner substitute for you?

13  A.   Yes.

14  Q.   And tell us about that, when did that occur, to the best

15  of your recollection?

16  A.   I had requested Rowena several times.  And I missed a lot

17  in the last several years, I had two immediate deaths in the

18  family and I requested her, I believe she was in for Patrick.

19  Then I requested her on a day-to-day basis for certain sick

20  days.  If I would see her, I would ask her if she was

21  available.  Or I would call the sub service and they would ask

22  if I had a request, and I would state her name.  And then one

23  time I had several surgeries several years in a row.  And with

24  my first one, I believe it was my knee surgery, I had requested

25  her, and I was told that she could come in if it was a day or

203

1  two but not long-term.

2  Q.   Let's go back to that, you said you had knee surgery,

3  correct?

4  A.   Yes.

5  Q.   Did you request that Ms. Wagner be a substitute for you?

6  A.   Yes.

7  Q.   To whom did you request that?

8  A.   Joanne Darling.

9  Q.   Who is Ms. Darling?

10  A.   She was the principal at that time.

11  Q.   The principal of Cochranton?

12  A.   Yes.

13  Q.   Where you were teaching?

14  A.   Yes.

15  Q.   When you requested that Ms. Wagner come in and teach --

16        THE COURT:  I need a timeframe on this.

17  BY MR. MEAD:

18  Q.   Do you recall when, the timeframe?

19  A.   It was four years ago, it would have been the first year

20   that Ms. Darling was the principal.  The students are going

21   into fourth grade now, I'm trying to subtract --

22   Q.   Do your best?

23   A.   Do you want to know the school year?

24   Q.   Yes, the school year would be fine?

25   A.   Okay.  '02-'03.  It was either '02-'03 or '03-'04.  I'm

204

1  pretty sure it was '02-'03.

2  Q.    Do you recall that's when your knee surgery was during

3  that year?

4  A.    Yes, it had to be.  I had knee surgery and then I had two

5  other surgeries following that.  Three years in a row.

6  Q.    Do you think it was the 2002-2003 school year you had the

7  first conversation with Ms. Darling?

8  A.    It was her first year there.

9        THE COURT:  Let me ask you this.  Is it possible, so

10  we don't spend too much time on this, are you folks going to be

11  able to stipulate as to when Ms. Darling's first year was?

12        MR. MEAD:  That's fine, your Honor.

13        THE COURT:  Do you know when her first year was, I

14  mean as principal?

15        MR. KUHAR:  2003-2004, your Honor.

16  BY MR. MEAD:

17  Q.    2003-2004 was her first year as principal there?

18  A.    '03-04.

19  Q.    Does that help you at all, ma'am?

20  A.   Yes, it was the first year that she was there, if it was

21  '03-'04, then '04-'05 was her second year there.

22  Q.   So any request that you had it's fair to say happened in

23  either '03-'04 or '04-'05 school year, is that correct?

24  A.   With Ms. Darling?

25  Q.   Correct.

205

1    A.    Yes.

2    Q.    We're going to go to the first request you made, which

3    concerned your knee surgery, in '03-04?

4    A.    Yes.

5    Q.    You stated you requested Ms. Wagner, correct?

6    A.    Yes.

7        THE COURT:  I don't mean to interrupt, but time is

8    important here, that's a whole year.  I need to know specifics

9    here.

10   BY MR. MEAD:

11   Q.    The best you can, ma'am, do you recall when, what time of

12   the year it was?

13   A.    I would say late February or early March, it was after

14   the first semester.

15   Q.    So that would have been late February, early March of

16   2004?

17   A.    Yes.

18   Q.    That's your best recollection as you sit here?

19   A.    Yes.  Because, like I said, I'm sure there would be days

20   I did not go back and check my dates when I was out for the

21   surgery.  But I just remember that was the surgery I had in

22   that year.

23   Q.    So you requested Rowena Wagner during that time period,

24   the first time you went out, in February of 2004, correct?

25   A.    Yes.

206

1  Q.   Did you talk to Ms. Darling about that?

2  A.   Yes, I went in out of courtesy because it was going to be

3  a three week, two possibly three-week sick time.  I went in as

4  a courtesy to let her know.  I had already spoken with Rowena,

5  as I had in the past, are you available, can you come in, I'm

6  going to be off for three weeks.  And she said she was not

7  scheduled in advance that far.  So then I went to Ms. Darling

8  and asked, requested her that I wanted her to come in and she

9  told me no.

10  Q.   Ms. Darling told you no?

11  A.   Yes.

12  Q.   Did she give you an explanation why she would not let Ms.

13  Wagner teach for that three weeks?

14  A.   Only that she said if it was a day or two, as Rowena had

15  subbed in the past, although, she was in subbing longer for

16  immediate deaths, if it was a day or two, okay.  But if it was

17  long-term, she could not come in.  And I questioned that.  And

18  she said, her words were, well, there's that lawsuit, you know.

19  And I said I didn't know anything about it, other than what I

20  read in the paper.

21  Q.    Now, when she said there's that lawsuit, you know, that

22  was Ms. Darling's words?

23  A.    Yes.

24  Q.    Did you ever request from Ms. Darling at another time

25  that Ms. Wagner replace you while you were leaving for a

207

1   medical problem?

2   A.   I had a surgery the following year --

3   Q.   Would that have been the school year 2004-2005?

4   A.   Yes.

5   Q.   Do you recall what time period of the year it was -- if

6   it helps to think fall, winter, spring?

7   A.   I'm sorry, I can't testify to the exact time.

8   Q.   But you do recall it was the school year 2004-2005?

9   A.   Yes.  And it was again three weeks.

10  Q.   Did you approach Ms. Darling and ask her at that time

11  period if Rowena could substitute for you for those three

12  weeks?

13  A.   At that time I went in and discussed it again with her,

14  that I would be out for surgery.  And I gave her three names in

15  light of what happened the first time.  I gave her three names,

16  Rowena was the first.  Actually -- I'm sorry, the first

17  substitute that was in for me for my knee surgery, I gave her

18  name, also.  And that was Erin, Erin Bourquin.

19  Q.   So you gave three names to Ms. Darling the second time

file:///A|/WAGDAY1.TXT

20  you went in for this three weeks?

21  A.   Yes.

22  Q.   And one of the names was Ms. Wagner?

23  A.   Yes.  At the time there were only two names, I'm sorry,

24  there were only two.

25       THE COURT:  I'm confused again, I'm sorry.  Did you

1  give anybody's name besides Ms. Wagner the first time you went

2  to see Ms. Darling?

3          THE WITNESS:  No.

4          THE COURT:  How many names did you give the second

5  time you went to see Ms. Darling?

6          THE WITNESS:  Two.

7          THE COURT:  And who were they?

8          THE WITNESS:  Rowena Wagner was my first choice.

9          THE COURT:  Who else?

10          THE WITNESS:  And Erin Bourquin, who had substituted

11  for me for the previous time.

12  BY MR. MEAD:

13  Q.    Did you have any discussion with Ms. Darling about Rowena

14  Wagner the second time you came in there about her subbing for

15  you?

16  A.    No.

17  Q.    Did she say whether or not she could sub for you?

18  A.    No, I did not question.

19  Q.    Did she say one way or another anything regarding your

20  two choices?

21  A.   I just -- she listened to me when I said that I was very

22  protective of my class and did not want a stranger, I wanted

23  somebody that was familiar with my routine and I knew that

24  Rowena was.  And Erin was, also, because she had subbed the

25  previous year.  I had just reiterated what I had said the

209

1  previous time, that I wanted somebody that I knew and was

2  competent.  And Ms. Darling assured me that Erin would be that

3  person, and she was.  So I gave both names the second time and

4  did not question.

5  Q.    Do you know who was selected the second time?

6  A.    Kim Adams I believe subbed for me for one of my surgeries

7  when Ms. Darling was there.  And she came up when I had asked

8  for Rowena, she had come up and Ms. Darling told me, came to

9  see me the next day or a few days later and said that Ms. Adams

10  would be coming in for me --

11  Q.    Instead of Rowena?

12  A.    Yes, and I said I did not know her.  And I was very

13  uncomfortable with somebody I did not know coming into my room.

14  Because I was a very private person and I stayed in my room, I

15  was trying just to do my job.  And I did not want somebody

16  coming in there, that other people would come in and see what I

17  was doing and be critical of me.  I was very private on that

18  matter.  And I discussed that with Ms. Darling and she knew

19  that.  So she assured me that Kim Adams would be professional

20  about it.  And she told me that she wanted to close the deal

21  that day so she caught her in the hall --

22  Q.    Caught who in the hall?

23  A.    Ms. Adams in the hall and asked her if she had that

24  available time.  She came back and told me that Ms. Adams was

25  going to sub for me, she caught her in the hall and wanted to

210

1  have closure on that, so that I would know who was coming in.

2  And I again said that I wasn't comfortable with somebody coming

3  in that I did not know.  Because I just was not comfortable for

4  personal reasons.  And then she told me she was in the building

5  that day --

6  Q.   Who was in the building?

7  A.   Ms. Adams.  So I hunted her down.  And when I spoke with

8  her, I said I understand you're coming in for three weeks,

9  would you please come down to my room and, you know, see how

10  things are going, so I could explain my routine.

11  Q.   Let me hold you up there.  Basically, the explanation was

12  Ms. Adams was replacing you for the three weeks was that she

13  was in the building at the time?

14  A.   Yes, she was in the building that day.

15  Q.   Was Rowena Wagner in the building that day?

16  A.   Yes.

17  Q.   In the second conversation, was there any discussion

18  about the lawsuit?

19  A.   No.

20   Q.   That was the first conversation?

21   A.   Yes.

22   Q.   Had Rowena ever talked to you about a lawsuit?

23   A.   No, we never discussed it.  I only knew what I had read

24   in the paper.  We had become friends and we're together

25   socially at times and it was brought up one time by a third

1  party somewhere, and I was present to that and they asked her

2  about it and her response was she can't talk about it.

3  Q.   So she never discussed the details of this lawsuit with

4  you at all?

5  A.   No.

6  Q.   Did you ever have any other confrontations or problems

7  with Ms. Darling that involved Rowena Wagner?

8  A.   Yes.

9  Q.   And what were those?

10  A.   One that involved Rowena was Rowena was pregnant and --

11       THE COURT:  When did this occur, roughly?

12  BY MR. MEAD:

13  Q.   When did this occur?

14  A.   I don't know when she was pregnant.

15  Q.   How about the school year, can we start with that?

16  A.   I'm sorry, I remember the facts, not the timeframe.

17  Q.   Let me ask you this.  Did this conversation occur or this

18  incident occur after your first conversation with Ms. Darling

19  in which she said Rowena couldn't substitute because of the

20   lawsuit?

21   A.   Yes.

22   Q.   It happened after that?

23   A.   Yes.

24   Q.   What was the problem?

25   A.   She was pregnant and I had spoken with her about some

212

1   baby items and she said she had gotten rid of everything.

2   Q.    She being Rowena?

3   A.    Rowena.

4   Q.    Instead of saying she, if you could identify the person?

5   A.    Okay.  Rowena said many of her baby items were disposed

6   of.  And I had access to a lot of clothing and materials and

7   things.  And I told her I would stop up and give her a bag of

8   baby clothes.  So I did to her home.  And asked her at that

9   time, asked Rowena if she had a baby stroller.  And she said,

10  Rowena said no.  So I went back to school and asked a few of my

11  friends, who I believed were friends of Rowena, also, and

12  people that she had subbed for.  And I assumed they had

13  requested her or were not holding anything against her.  And

14  asked them to ask these fellow teachers if they would like to

15  pitch in for a baby stroller.  And we did.  And one day I

16  called Rowena and said, asked her if tomorrow she could come

17  over to my room, I had something for her.  And about 3:30.

18  So I called that same day about a quarter to three, after the

19  students were dismissed, and asked Rowena if she could please

20  come in a little bit earlier than 3:30 because some of the

21  other teachers, who were contributors to the baby gift, wanted

22  to be there when she came over, it was nothing preplanned.  She

23  said, Rowena said she would come over as soon as she could.

24  And she did arrive at about 3:10.  So the box was in the hall

25  outside of my room, it was never opened, it was never wrapped

213

1   or anything.  And we presented it to her, and some of the

2   teachers that were involved stopped in, saw her, said hi and

3   left.  A few days after that I was called into the office by

4   Ms. Darling and accused of having a baby shower.  And I was

5   very upset because I told her that I thought I was doing

6   something nice for a woman who needed some items, and my

7   definition of a baby shower was not what I had.  There were no

8   invitations, there was no cake.

9   Q.   Had other things happened like this in the past for other

10  teachers?

11  A.   Absolutely.

12  Q.   Had there been any problems before?

13  A.   No, we have a sunshine fund, and for bridal showers,

14  weddings.  They're always held on school time before 3:30 in

15  the library and it does involve all the things that I

16  mentioned, like cake and so on.

17  Q.   Just to cut you short, just to get to the point.

18  Basically, after this occurred, you were criticized for putting

19  this party together, although, it had happened in the past and

20  you had not received criticism, is that fair to say?

21  A.   Yes.

22  Q.   You thought that was not fair, according to your

23  conversation with Ms. Darling?

24  A.   I was devastated.

25         MR. MEAD:  That's all I have, your Honor.

214

1          THE COURT:  Mr. Kuhar.

2                    CROSS-EXAMINATION

3   BY MR. KUHAR:

4   Q.    Ms. Maruska, I'm Mark Kuhar, we spoke on the phone the

5   other day?

6   A.    Yes, we did.

7   Q.    Now, you said that you had two conversations in which you

8   suggested that Ms. Wagner should fill in for approximately a

9   three-week assignment, correct?

10  A.    The first time was a formal request.

11  Q.    And the second time you just basically provided two names

12  to Ms. Darling?

13  A.    Provided two names, Rowena was the first.

14  Q.    Okay.  The reason you didn't recommend Ms. Wagner the

15  second time was because Ms. Darling had previously said that

16  she was not suitable because of the lawsuit?

17          MR. MEAD:  Objection, she did recommend her the

18  second time.

19          THE COURT:  It's just like if there was a jury

20   there.  The way I would do that objection is it's up to the

21   jury to recall, it's up to me to recall what she said.  Go

22   ahead.

23   BY MR. KUHAR:

24   Q.   Well, there were two times where you at least mentioned

25   Ms. Wagner to Ms. Darling, correct?

215

1 A.   Yes.

2 Q.   And one was because of your knee surgery, and that would

3 have been in late February, early March of '04, correct?

4 A.   I'm not exactly sure of the timeframe, but it was that

5 school year.

6 Q.   You did testify --

7 A.   That was my best recollection.  Because I remember

8 returning and it was before track and field day.

9 Q.   So it would have been let's say January to May?

10 A.   Right, it was before May, yes, before track and field

11 day.  Because I had just returned and I was on medication, and

12 there was an accident at school and I had to go back on

13 medication.  And I remember that it was close to track and

14 field day.

15 Q.   Okay.  And that was in '04?

16 A.   It was the first year Joanne was there, which was

17 '03-'04.

18 Q.   The parties have stipulated it was '03-'04?

19 A.   Yes.

20  Q.   And the reason that you didn't recommend Ms. Wagner the

21  second time outright, but rather just proposed two names, was

22  because of that comment that Ms. Darling made the first time

23  relative to your knee surgery, correct?

24  A.   Yes.

25  Q.   And when Darling made that comment, the comment being Ms.

216

1  Wagner could not do this three-week or so assignment because of

2  the lawsuit, you said all I know about the lawsuit is what I

3  read in the paper, true?

4  A.   Yes.

5  Q.   Okay.  And you're sure that she referenced the lawsuit in

6  that conversation?

7  A.   I know that she referenced the lawsuit, I remember her

8  words.

9  Q.   Why are you hesitating?

10  A.   I'm hesitating because of the timeframe.

11  Q.   What do you mean?

12  A.   I don't remember the month, I'm still stuck on that.

13  Q.   Well, I'm saying even assuming we say somewhere between

14  January and May --

15  A.   Yes, she did reference the lawsuit to me.

16  Q.   Now, if I told you that the lawsuit had not yet been

17  filed, that the lawsuit had actually been filed in September of

18  '04, long after your knee surgery leave, would you still be

19  sure that she said that to you?

20   A.   If the lawsuit was filed the following year, then I know

21   that she said it to me and I have been hesitant on the

22   timeframe.  So I know what she said to me, if I'm confused on

23   which surgery it was, I would testify to that.

24   Q.   But I thought you told us the second time that you had

25   one of these approximately three-week assignments, the reason

217

1  you provided two names, rather than just Ms. Wagner's, was

2  specifically because of the prior comment by Ms. Darling that

3  the lawsuit prevented Ms. Wagner from getting an assignment?

4  A.    Yes.  And as far as my substituting, it could have been

5  that Erin was the '04-'05 -- and Kim was the following year.

6  Because it could -- I do not know the times when I was off, I

7  do not know the substitute for specific which time.  I just

8  know of my conversation when I requested Rowena.

9  Q.    What if I told you Ms. Bourquin, Erin Bourquin, was hired

10  as a permanent teacher in August of '04, that would make it

11  pretty clear that she wasn't subbing for you at anytime in '05,

12  wouldn't it?

13  A.    She subbed before Kim Adams.

14  Q.    And before she was hired as a permanent employee?

15  A.    Yes.

16  Q.    Right, they couldn't be both at the same time?

17  A.    Correct.

18  Q.    If Erin Bourquin started subbing -- I'm sorry, if Erin

19  Bourquin started as a permanent employee in August of '04, then

20  she must have filled in for your knee leave of absence in the

21  second half of '03-'04?

22  A.   '03-'04.

23  Q.   Which was months before the lawsuit was filed, right, or

24  are you unsure of when the lawsuit was filed?

25  A.   I don't know when the lawsuit was filed.

218

1          MR. KUHAR:  I have no further questions.

2          THE COURT:  Do you have anything else?

3          MR. MEAD:  Yes, your Honor.

4                   REDIRECT EXAMINATION

5  BY MR. MEAD:

6  Q.   Ma'am, is it your testimony today that you're not sure if

7  you were told the first or second time about the lawsuit

8  because of your confusion with dates?

9  A.   Correct.  I just remember my conversation with Ms.

10  Darling.

11         MR. MEAD:  That's all I have.

12         THE COURT:  This is really more directed to the

13  lawyers, just more of a question of record, but I'm trying to

14  keep all these dates straight.  I thought the lawsuit was filed

15  in February of 2003?

16         MR. MEAD:  The PHRC claim, your Honor.  The federal

17  lawsuit was filed later.

18         THE COURT:  The PHRC complaint was filed against the

19  district in February of 2003?

20          MR. MEAD:  Correct, your Honor.

21          THE COURT:  The lawsuit was filed -- the lawsuit

22   here in my court was filed when?

23          MR. KUHAR:  September of '04.

24          THE COURT:  All right.  Thank you, ma'am.  What else

25   do you have?

219

1        MR. MEAD:  Your Honor, we would have Mr. Byrd

2   testify, he was on the school committee in 2000, as to various

3   attempts to recruit minorities during that time period and

4   subsequent.  They're some of the same people overlapping on the

5   board.

6        THE COURT:  Who else do you have after him?

7        MR. MEAD:  Mr. Wagner.

8        THE COURT:  Then who else?

9        MR. MEAD:  That may be it.  If I can, we called

10   five, six, we only have two more witnesses.

11        THE COURT:  Mr. Byrd and Mr. Wagner?

12        MR. MEAD:  Yes.

13        THE COURT:  Then how many do you think you're going

14   to have -- who are they going to be, the best you can tell?

15        MR. KUHAR:  Mr. Dolecki and Ms. Good I would say

16   would be two hours or close.  Then a number of other

17   administrators.

18        THE COURT:  Mr. Heller?

19        MR. KUHAR:  Mr. Heller and Ms. Good would be the two

20  I just mentioned.  Mr. Heller and Ms. Good, approximately two

21  hours apiece.  Dolecki approximately a half-hour.  Price,

22  Karns, Darling, approximately 45 minutes.  And then teachers,

23  say three teachers, approximately 15 minutes, 20 minutes.

24        THE COURT:  Okay.  You know what we started at 9:00,

25  this is long enough for today.  It's 4 o'clock, by the time we

220

1    take a break, get back in here, it will be 4:15, 4:20, I think

2    that's a fairly long day.

3            MR. MEAD:  As a housekeeping matter, we do have

4    those deposition transcripts.  We don't have to read them, it's

5    not a jury situation.

6            THE COURT:  How long would it take to read them?

7            MR. MEAD:  Well --

8            THE COURT:  How many pages are there?

9            MR. MEAD:  Maybe a total of 40 to 50 pages.

10           THE COURT:  What do they add to mix here?  If I were

11   to sit down and read them, which I will if we don't have them

12   read, what are they and why are they important?

13           MR. MEAD:  One would be the admission by Mr. Wright

14   that if she wanted a job with the district, she shouldn't sue

15   them as a start.

16           THE COURT:  He said that at deposition?

17           MR. MEAD:  He said that at deposition.  We would

18   also present testimony from other board members saying that

19   they were actively seeking minorities during this time period.

20    Nothing controversial, believe me.  The other things that we

21    want to put in just to complete our case is basically how the

22    system worked.  Certain candidates were pre-screened.  Somebody

23    selected them for an interview.  Who does the interview.  And

24    the board's final approval.  Basically, just how the system

25    works.

221

1        THE COURT:  Not to interrupt you, but is Mr. Wright

2   not going to be a witness?

3        MR. KUHAR:  Yes, for us.

4        THE COURT:  If Mr. Wright is going to be a witness--

5        MR. MEAD:  I'm just saying for our case in chief,

6   your Honor, I realize he's going to be here.  But we've got to

7   present a case to the court to get to the next stage.  That's

8   why we would be presenting more evidence of retaliation in that

9   situation.  That's the only reason.  Plus there is no testimony

10  on how the board considers people, how it works.  So it's a lot

11  of, honestly, it's a lot of background, outside of that one

12  conversation, we're he says he wouldn't sue the district as a

13  start, nothing really earth shattering in there.

14        THE COURT:  Do you have something you want to tell

15  me?

16        MR. KUHAR:  The only deposition testimony we had

17  proposed was about five pages of the union president, Dan

18  Hootman's testimony.  Which would be he was in his capacity as

19  union president, as having been a teacher for 30 years, he was

20   unaware of this supposed practice whereby permanent teachers

21   get to pick their long-term subs.

22          THE COURT:  I may end up having somebody read this

23   stuff.  You might want to have, when it's time, I suggest maybe

24   you put the deposition testimony in last, bring somebody down

25   to read.

222

1        MR. MEAD:  I'll bring my secretary, she's a good

2    reader.

3        THE COURT:  You can do the same for the shorter

4    depositions, bring somebody down to read.

5        MR. KUHAR:  Your Honor, may I ask one more question.

6        THE COURT:  Yes.

7        MR. KUHAR:  Would the deadline for the revised

8    findings of fact and conclusions of law, will they be at a date

9    after we receive the transcript so we can make reference to it

10   or before?

11       THE COURT:  I don't know yet, I'll give it some

12   thought.  I'll ponder that and many other things over the next

13   couple of days.  But I don't know that.  Let's be back here and

14   ready to start at 9 o'clock tomorrow.

15

16       (Whereupon, at 4:00 p.m., the Non-Jury Trial was

17   adjourned for the day.)

18

19                - - -

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25