IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
    Plaintiff


    v.             CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
    Defendants


NON-JURY TRIAL - DAY NO. 2




Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, June 19, 2007.




APPEARANCES:
    JOHN J. MEAD, Esquire, appearing on behalf of
    the Plaintiff.

    CALEB L. NICHOLS, Esquire, appearing on behalf
    of the Plaintiff.

MARK J. KUHAR, Esquire, appearing on behalf of
Defendants Crawford Central School District,
et al.

Ronald J. Bench, RMR - Official Court Reporter

2

1             I N D E X

2

3     WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFF:

5  Sam J. Bird, Jr.         3      20     29        --

6  Bernard Wagner           33     --     --        --

7

8

9             - - -

10

11

12  FOR THE DEFENSE:

13  Frederic Wagner         96     101    --        --

14  George Wright           103    113    --        --

15  Tammy Foster            119    133    141       --

16  Karen Jamieson          143    154    159       160

17  Naomi Yu-Moore          161    165    168       169

18  Charles Heller          170    --     --        --

19

20

21

22

23              - - -

24

25

3

1           P R O C E E D I N G S

2

3           (Whereupon, the Non-Jury Trial proceedings began at

4  9:00 a.m., on Tuesday, June 19, 2007, in Courtroom C.)

5

6           THE COURT:  Before we get started, my Deputy Clerk

7  is on vacation.  We cannot lay our hands on the -- there was a

8  complaint and then an amended complaint, is that right?

9           MR. MEAD:  That's correct, your Honor, I believe

10  they filed a motion and it was denied.

11           THE COURT:  Do you have copy with you of the amended

12  complaint?

13           MR. MEAD:  Your Honor, I have one copy, I haven't

14  been referring to it.

15           THE COURT:  We'll make a copy.  Are you ready to go?

16           MR. MEAD:  Yes, sir.  I will get my witness, he's

17  out in the hall.

18           THE CLERK:  Would you raise your right hand, please.

19           SAM J. BYRD, JR., PLAINTIFF WITNESS, SWORN

20          DIRECT EXAMINATION

21  BY MR. MEAD:

22  Q.    Sir, could you state your name, please?

23  A.    Sam J. Byrd, Jr.

24  Q.    How old are you, Mr. Byrd?

25  A.    Fifty-seven.

4

1   Q.    Where do you live?

2   A.    404 Poplar, Meadville, Pa.

3   Q.    Are you married, sir?

4   A.    Widower.

5   Q.    Are you employed?

6   A.    Yes.

7   Q.    What do you do for a living?

8   A.    I work at Channellock as a polisher.

9   Q.    How long have you worked there?

10  A.    Twenty-nine years.

11  Q.    Now, sir, were you ever a member of the Crawford County

12  School Board?

13  A.    Yes.  Crawford Central, not Crawford County.

14  Q.    Excuse me, Crawford Central School Board?

15  A.    Yes.

16  Q.    What time were you a member of the school board?

17  A.    From '95 to 2000.

18  Q.    Until what time in 2000, what month?

19  A.    January 1st my term ended.

20  Q.   January 1st of 2001 or January 1st of 2000?

21  A.   2000.

22         MR. KUHAR:  Your Honor, may we request an offer of

23  proof since this gentleman was obviously off the school board

24  years before Ms. Wagner applied.

25         THE COURT:  Go ahead.

5

1      MR. MEAD:  Your Honor, the man was a member of the

2  school board at the same time several members of the school

3  board that he served with in 1995 through 1999 were on the

4  board today and were the decision-makers that are involved in

5  this case.

6      THE COURT:  All right.

7      MR. MEAD:  Mr. Byrd would testify as to his

8  knowledge of how minorities were not hired even though they

9  were qualified during that time period.  Which involved the

10  same members of the board that are on the board today.  He

11  would also say that he stayed active in trying to persuade the

12  board to hire minorities up to 2003.  In fact, he has a letter

13  in 2003 in which he requested that other people assist.  He

14  also was involved in, there was some testimony that a minority

15  teacher had been hired recently.  This same teacher approached

16  Mr. Byrd because she was frustrated in the sense he was not

17  getting hired by the school, prior to her being hired by the

18  school, she was having problems being hired as a minority.

19      THE COURT:  So, in essence, you're saying that Mr.

20  Byrd would testify to his knowledge of what he believes to have

21  been previous incidents of discriminatory treatment?

22          MR. MEAD:  That's true, your Honor.  As well as

23  incidents that occurred, he believed during the time period

24  that is relevant here.  Although, he was not on the board, he

25  was assisting people who were trying to get jobs.

6

1          THE COURT:  All right.  Do you want to say

2  anything -- that's the offer.

3          MR. KUHAR:  Okay, I understand.

4          THE COURT:  All right.  Go ahead

5  BY MR. MEAD:

6  Q.    Going back to what we were talking about, Mr. Byrd, you

7  were on the school board from 1995 to approximately the

8  beginning of 2000, correct?

9  A.    Correct.

10  Q.    Were you the only minority on the board at that time?

11  A.    I believe I was the only minority that ever sat on the

12  school board in the history of the district.

13  Q.    And can you tell me how many people sat on the school

14  board when you were there?

15  A.    Nine.

16  Q.    How many sit on it today?

17  A.    Nine.

18  Q.    Did you run for school board again in year 2000?

19  A.    I did not.

20  Q.    Was there a reason?

21  A.    Yes, I ran and was successful for running for councilman,

22  city councilman for Meadville.

23  Q.    Are you a city councilman today?

24  A.    No.

25  Q.    How long did you serve as a city councilman?

7

1    A.    I served one term, four years.

2    Q.    Did you run after that?

3    A.    No.

4    Q.    When you were back at the Crawford Central School Board,

5    what did you do as a member, what did you do generally?

6    A.    We established policy and we oversaw the decisions of the

7    administration when they were presented to us, recommendations,

8    and we made decisions based on those recommendations that were

9    given to us.

10    Q.    Let me ask you, who is still on the school board that was

11    there when you left in 2000?

12    A.    I believe currently Jan Van Tuil and Mary Vogan.

13    Q.    Is Mr. Wright still on the school board?

14    A.    No, I don't believe he is.

15    Q.    Do you know when he left?

16    A.    No, I don't remember when his term ended.

17    Q.    What was the board's role, if any, in the selection or

18    approval of teachers for Crawford Central?

19    A.    Ours was the consideration of recommendations given to us

20  by the administration.  We made the decision, the final

21  decision as to who was hired and who was not.  If we had any

22  objections, we voiced them pursuant to them being approved.

23  Whether it was successful or not, depending on the vote of the

24  board.

25  Q.   Now, during your time period that you were on the school

8

1  board, did the board or you have any issues regarding the

2  hiring of minority groups, teachers?

3  A.   From the beginning of my tenure, I did question why we

4  didn't have minority staff.

5  Q.   By staff, do you mean teachers?

6  A.   Teachers.  Not support staff, professional staff.  There

7  were support staff employees from the minority community.  But

8  there wasn't any professional staff except one.

9  Q.   One teacher?

10  A.   One teacher.

11  Q.   Out of how many?

12  A.   I would say roughly 450, I can't be sure of the number.

13  Q.   450 teachers?

14  A.   450 teachers.

15  Q.   During your time period there, do you know of any

16  minorities who applied to become teachers?

17  A.   Absolutely.

18  Q.   And can you tell us who they were?

19  A.   During my tenure or before my tenure?

20  Q.   During your tenure?

21  A.   Tammy Foster.  Tracey Balsamo.  Eric Brown.  I think Eric

22  Brown came after me.  Lee McFerrin.  That's to the best of my

23  recollection that I can think of off the top of my head.

24  Q.   Were these individuals all African-Americans?

25  A.   Yes.

file:///A|/WAGDAY2.TXT

9

1  Q.   And at that time period how did you know that they were

2  applying to become teachers, how did you learn about that?

3  A.   I was contacted by them, either prior to their becoming

4  candidates for those positions.

5  Q.   And do you know if any of those individuals were ever

6  certified to become teachers?

7  A.   They were all certified.

8  Q.   They were all certified?

9  A.   That's correct.

10  Q.   And to your knowledge they all applied to the Crawford

11  Central School District to become teachers?

12  A.   Correct.

13  Q.   You mentioned a Tammy Foster, did Ms. Foster ever

14  approach you regarding a situation?

15  A.   Yes.

16  Q.   Do you know what time period, what year?

17  A.   I can't be sure of the year, but it was during my

18  four-year period of term.

19  Q.   Now, are you aware whether or not she has been since

20  hired?

21  A.   Yes, she has.

22  Q.   Do you know what year?

23  A.   It was after I was off the board, so it was after 2000,

24  I'm not sure of the year.

25  Q.   When she approached you, was she having difficulties

10

1  being hired?

2  A.   Extremely.

3  Q.   Were you able to determine what the difficulties were?

4      MR. KUHAR:  Objection, your Honor, this is going to

5  be a hearsay response, Ms. Foster will be testifying.

6      THE COURT:  She will be testifying.

7      MR. KUHAR:  Yes.

8      THE COURT:  I'll sustain the objection if he's going

9  to say what she said for the truth.

10      MR. MEAD:  That's fine, your Honor, we'll move on.

11  BY MR. MEAD:

12  Q.   Let's say did you meet with Ms. Foster because of her

13  situation?

14  A.   Yes.

15  Q.   Did you do anything as a result of meeting with Ms.

16  Foster?

17  A.   I did.

18  Q.   What did you do?

19  A.   I'm not sure if it was one of our work sessions or if

20  after a meeting, but I inquired to the directors that were

21  present, well, I informed them that there had been a candidate

22  that approached me about a position that came open at the

23  elementary level and she was interested in securing that

24  position.  To that extent is all the conversation I had in

25  relation to that, because that was an administrative function

11

1  to interview and make recommendations.  But I did make the

2  board aware that I had been approached by a candidate that will

3  be submitting an application.

4  Q.    What was the board's reaction, if any?

5  A.    I think at some point after that, one of the comments

6  from one of the directors and I can't be sure which one, said

7  that the only reason that she is going to be granted an

8  interview is because I was sitting on the board.

9  Q.    Did they mean your race because you were the only

10  African-American on the board?

11  A.    I can't be sure of what their intent or meaning was.  But

12  truly, my understanding was, that the only reason she was

13  getting an interview for consideration was because I was

14  sitting on the board.  Now, what reference they meant by that.

15  Q.    Fair enough.  Now, during four years on the board, were

16  there any minority teachers hired?

17  A.    I think one, that was Lee McFerrin.

18  Q.    Did you ever voice your opinion about minority hiring to

19  the board?

20   A.   Often.

21   Q.   What was your opinion?

22   A.   I inquired to administration --

23   Q.   This is the administration, not the board?

24   A.   Correct.

25        THE COURT:  When you say administration, who

12

1    specifically do you mean?

2         THE WITNESS:  Superintendent, assistant

3    superintendent, who were directly responsible, and also the

4    board of directors.

5    BY MR. MEAD:

6    Q.    Can you name these individuals?

7    A.    At the time it was Mike Dolecki, he was the assistant

8    super, Jim Lascola, he was the superintendent.  Jan Van Tuil,

9    John White, Brian McCullom.  Joe -- I can't remember Joe's last

10    name.  Ron -- his last name escapes me as well, I know it.  I

11    can't remember their last names, but I did inquire to all of

12    the directors and the administration.

13    Q.    Did you mention Mr. Dolecki, was that the first person

14    you mentioned, Michael Dolecki?

15    A.    That's correct.

16    Q.    That was the one you dealt with directly, what was his

17    position at the time?

18    A.    He was assistant super.

19    Q.    What was their reaction about your opinion about minority

20  hiring?

21        MR. KUHAR:  I object, I don't think he stated his

22  opinion.

23        MR. MEAD:  That's fine, I'll ask him his opinion,

24  let me back up.

25  BY MR. MEAD:

13

1  Q.   Do you have an opinion about minority hiring at that

2  time?

3  A.   I think it was lacking and left a lot to be desired.

4  Q.   In what sense?

5  A.   We weren't hiring any of the qualified candidates that

6  were making application.  I was aware that there were

7  consistently applicants from the minority community that were

8  qualified that weren't getting either interviews or securing

9  positions.

10  Q.   And this is what you voiced to Mr. Dolecki?

11  A.   To the entire board and administration, yes.

12  Q.   Including Mr. Dolecki?

13  A.   Including Mr. Dolecki.

14  Q.   What was the reaction of Mr. Dolecki, what was his

15  reaction to this, if you can recall?

16  A.   I can't specifically remember what his personal reaction

17  was.  However, I was told --

18  Q.   By who?

19  A.   By John White.

20  Q.    Who was an administrator at the time?

21  A.    John White was a director.  I was told by Mike Dolecki

22  that we often attended job fairs for recruiting purposes at

23  colleges to specifically recruit minority applicants for

24  positions.

25  Q.    Do you know if that was true or not?

14

1  A.   I do know that it was true that they attended because we

2  were responsible for approving those trips to those fairs.

3  Q.   Do you know if those trips to those fairs were

4  successful?

5  A.   None of those trips to those fairs were ever successful

6  during my tenure.

7  Q.   Now, since you left the school board -- strike that.

8  Did you have any more conversations with any other

9  administrators about your opinion regarding minority hiring;

10  do you recall any other specific conversations?

11  A.   About minority hiring, yes.  I spoke with one of the

12  directors, John White, and I inquired about that.  And he said

13  that -- we go to fairs to recruit minority applicants to work

14  in the district, but they often are reluctant to come because

15  of the starting salary they're offered.  They're offered more

16  in other districts, so they don't come to our district, we're

17  not able to secure them.  I think that was echoed by Mike

18  Dolecki as well.

19  Q.   That they weren't going to be paid enough, was that the

20   issue?

21   A.   Correct.  It was always the issue of our starting salary,

22   they always chose another district because they were offered

23   more.

24   Q.   Did that satisfy your problems, did you believe that?

25   A.   No.

15

1  Q.   Why not?

2  A.   Well, because at the time that that was occurring, I know

3  specifically that Tammy Foster had sought a position for at

4  least three or four years, I think she was unsuccessful in

5  getting a position, a professional position on the teaching

6  staff.  However, she was hired as support staff at some point.

7  Q.   Now, you stated you left the school board at the

8  beginning of 2000, correct?

9  A.   That's correct.

10  Q.   Prior to leaving the school board, did you make any

11  efforts personally, outside of talking to the board and the

12  administration, about getting more minority teachers?

13  A.   I did indeed.

14  Q.   What did you do?

15  A.   Those that I was aware of that had qualifications or

16  graduations, I encouraged them to apply to Crawford Central.

17  Q.   How did that go, how was that effort on your behalf?

18  A.   I don't believe any of the applicants that was referred

19  ever received an interview or succeeded in securing a position.

20  Q.    And you left the school board at the beginning of 2000,

21  is that correct?

22  A.    Correct.

23  Q.    Now, have you stayed active in the community regarding

24  matters involving the school board since then?

25  A.    I have indeed.

16

1  Q.   What have you done?

2  A.   On several occasions I was informed, and specifically

3  after this suit was filed, that the community at large was

4  satisfied with the hiring practices of our district.  And I

5  disagreed with that vehemently.

6       MR. KUHAR:  Your Honor, I'm going to object in that

7  it's hearsay, we don't know who the speaker is.

8       THE COURT:  It may or may not be, who informed you

9  of that?

10      THE WITNESS:  I think that was Bernie Wagner.

11      MR. MEAD:  I would withdraw the question, I

12 understand that would be hearsay, your Honor.

13      THE COURT:  It is.

14      MR. MEAD:  I agree.

15 BY MR. MEAD:

16 Q.   So if you could look at the book in front of you for a

17 second, please -- there are a couple of them.  If you could

18 look at Exhibit No. 14 -- can you identify Exhibit No. 14,

19 please?

20  A.   I'm sorry.

21  Q.   Could you please identify Exhibit No. 14, tell us what it

22  is?

23  A.   It's the letter that I had written to the Crawford

24  Central Board of Directors.  It's dated June 6th of '03.

25  Q.   That's your signature at the bottom?

17

1  A.   Yes, it is.

2        MR. MEAD:  Your Honor, I would move for admission of

3  Exhibit 14 at this time.

4        MR. KUHAR:  As long as it's not being offered for

5  the truth of the matter asserted in the letter --

6        THE COURT:  Hang on a second, I'm looking for the

7  letter here.

8        MR. MEAD:  Exhibit 14, your Honor.

9        THE COURT:  It's admitted.  I gather it's not being

10  offered for the truth or the effect for what the district did

11  or did not do?

12        MR. MEAD:  Correct, your Honor.  Basically, it is

13  opinion, so I don't think it would be offered for the truth

14  anyway.

15        THE COURT:  All right, it's admitted.

16  BY MR. MEAD:

17  Q.   Mr. Byrd, that is the letter you wrote to the school

18  board?

19  A.   Yes.

20  Q.   The second to last line says, "I personally know that

21  there has been many qualified minority applicants that have

22  applied for positions in our district."  Is that correct, is

23  that your writing?

24  A.   That is correct.

25  Q.   Who were these people that you knew had applied for

18

1  positions?

2  A.   Tammy Foster.  Tracey Balsamo.  Even before my tenure,

3  Walt Moody, Hazel Moody.  That's all I can think of off the top

4  of my head.

5  Q.   As being involved in the community and also being on the

6  school board and a councilman as well, are you aware of

7  approximately how many minority school children there are in

8  Crawford Central?

9  A.   When I looked at the census last --

10      MR. KUHAR:  Your Honor, I object in that this is raw

11  statistical data.

12      THE COURT:  I'll take it for what it's worth.  I

13  made my ruling, that will control.  It may be relevant on some

14  point.  Go ahead.

15  BY MR. MEAD:

16  Q.   Go ahead, sir?

17  A.   When I received the statistical data from the

18  administration, I think it worked out to be something like 10

19  percent.

20   Q.   Approximately, 10 percent?

21   A.   Of the total student population.

22   Q.   Do you know how many minority teachers, what percent of

23   minority teachers were in the school district?

24   A.   At that time I believe it was either one or two.

25   Q.   What time period, sir?

19

1   A.   '95 to 2000.

2   Q.   Did you view this difference as a problem as a school

3   board member?

4   A.   Yes, I did.

5   Q.   And why is that?

6   A.   It represented to me either a lack of concern or neglect

7   on the part of our administration to secure minority teachers

8   for our district.  Even as a representative of the professional

9   staff.  And I thought that it showed no consideration for the

10   professionally qualified applicants that made application and

11   never got jobs.

12   Q.   Do you believe, through your duties at the school board,

13   that it's important for school children to have minority

14   teachers, especially minority school children?

15   A.   I do indeed on several differ points.  One, it shows that

16   there are qualified role models that the children can look up

17   to and inspire to be.  And, two, I think it fosters a respect

18   from all ethnic groups that all people, people of color and

19   not, to foster respect.  Because without that example and role

20   model, they have nothing to judge by.  Except what they might

21   hear in the media or read in the paper.  And some of those

22   aren't the best examples that I can think of as role models.

23          MR. MEAD:  Thank you, that's all the questions I

24   have.

25          THE COURT:  Mr. Kuhar.

20

1          CROSS-EXAMINATION

2   BY MR. KUHAR:

3   Q.   Good morning, Mr. Byrd.

4   A.   Good morning.

5   Q.   I'm going to refer you to that Exhibit 14 that you were

6   looking at before, that's the letter?

7   A.   Okay.

8   Q.   Everything you wrote in there is accurate, correct?

9   A.   I would think so, yes.

10   Q.   Okay.  And in the third paragraph, could you read the

11   second sentence?

12   A.   You would like me to read it?

13   Q.   Please, sir, outloud.

14   A.   "I know that our administration is committed to hiring

15   the most qualified candidates when a position becomes

16   available."

17   Q.   Now, for all times that you've been familiar with the

18   Crawford Central School District, it has been the policy of the

19   school district to select the most qualified candidates for

20  each position, correct?

21  A.   That's correct.

22  Q.   When you were a school board member and the

23  administration recommended hires to the board --

24  A.   Yes.

25  Q.   You voted on them, correct?

21

1    A.    That's correct.

2    Q.    How many of them did you vote against?

3    A.    I don't have a specific number, but there were many.

4    Q.    And were any of them because the candidate chosen was

5    being preferred to a minority candidate?

6    A.    Yes.

7    Q.    For which positions?

8    A.    Teaching staff?

9    Q.    Yes, sir.

10   A.    Elementary level, I can't specifically what grade or that

11   individual.

12   Q.    You can't remember any of the names?

13   A.    Not offhand, no.

14   Q.    Nor the numbers of times that you did that?

15   A.    No, I can't remember the number of times I did that.

16   Q.    Do you think it was numerous times?

17   A.    Very much so.

18   Q.    You listed all of the minority candidates who you knew to

19   have applied for teaching positions?

20  A.   Correct.  But that's not the complete list, that's just

21  what I can remember off the top of my head.

22  Q.   I see.  Are you affiliated with the NAACP currently?

23  A.   I am.

24  Q.   What is your affiliation?

25  A.   I'm president currently.

22

1   Q.   For how long?

2   A.   2005, I believe.  2005, 2006.

3   Q.   And that is a local chapter?

4   A.   That is correct.

5   Q.   Meadville?

6   A.   That's correct.

7   Q.   So it's fair to say that you are an advocate for the

8   rights of minorities?

9   A.   Absolutely.

10  Q.   I think you indicated that Lee McFerrin was chosen for a

11  teaching position, correct?

12  A.   That's correct.

13  Q.   Do you remember when?

14  A.   I do not.

15  Q.   And Tammy Foster was as well, correct?

16  A.   Yes, she was, eventually.

17  Q.   After you stepped off the board, correct?

18  A.   That is correct.

19  Q.   The minority candidates whose names you mentioned who

20  were not selected for teaching positions, I want you to think

21  about those folks for a second, okay?

22  A.   Yes.

23  Q.   Do you have any knowledge regarding how their

24  qualifications compared to the qualifications of the people,

25  the people who were chosen?

23

1   A.   Yes.

2   Q.   What is your knowledge?

3   A.   We were given their qualifications in the process of

4   choosing candidates.  And one of the problems that I had with

5   that was sometimes we chose graduates over staff that had been

6   on the substitute list and had taught for a period of time in

7   the district.  And I questioned that -- to the administration

8   and to my fellow board members because that was a concern of

9   mine.  Policy said that when we have a position open, we would

10  first hire from the substitute list that we had for people that

11  were already on staff.  And then after those positions didn't

12  have any more candidates, we would go outside that list and

13  hire applicants.

14  Q.   Where was that policy?

15  A.   It was a standing policy that we had as a procedure for

16  the board.  I'm not sure if it is written, but it is a past

17  practice.

18  Q.   I thought you told me a minute ago that the policy of the

19  board at all times relevant to this had been to hire the most

20  qualified applicant?

21  A.   That's correct, that was my concern.  I didn't feel that

22  a graduate student was more qualified, no matter what grades

23  they attained, over a teacher that was already teaching in the

24  district and subbing, that was foreign to me.

25  Q.   Well, a minute ago, did I understand you correctly to say

24

1  that you thought that the district had a policy of always

2  promoting from the sub list prior to going outside the

3  district?

4  A.   That's correct.

5  Q.   What could you point to to show us that that was the

6  policy?

7  A.   Past practice.

8  Q.   What would be the past practice, what are the examples?

9  A.   If you want specific candidates from that list that were

10  hired, as opposed to those hired outside the district, I

11  couldn't give them to you without researching that.

12  Q.   Okay.

13       THE COURT:  Mr. Byrd, I'm confused on the point, I

14  want to make sure I understand what your testimony is.  You

15  said that you were concerned that on some occasions rather than

16  hire, for instance, a long-term sub for a permanent position,

17  they hired a graduate.  You mean someone fresh out of teaching

18  school when you use the term graduate?

19       THE WITNESS:  That's correct.

20          THE COURT:  And were you referencing instances where

21   a long-term substitute minority had not been hired and instead

22   a graduate was hired; that's not clear to me?

23          THE WITNESS:  I think what I was referencing was

24   that we had teachers on the list that were actively subbing.

25   And rather than hire from that list, whether they were

1   minorities or just professional staff, we hired graduate

2   students that had no experience.

3        THE COURT:  All right.  Go ahead.

4   BY MR. KUHAR:

5   Q.   In fact, those subs were mostly Caucasian, weren't they?

6   A.   I think almost all of them were, yes.

7   Q.   I'm going to ask you to refer to Exhibit F, which is

8   behind tab 6 in the binder that I opened up when I was over

9   there a minute ago.  Actually, let me ask you a question first,

10  I may need to do that.  Is it fair to say that with respect to

11  the minority candidates whose names you've mentioned today, all

12  you know about their qualifications is that they had a PDE

13  issued certificate to teach, is that correct?

14  A.   I think if that would fit within the parameter of my

15  term, I had more than that knowledge.  Because we had

16  transcripts as well to review for the applicants that we had

17  questions about.  So it went a little bit more than just

18  knowing that they had graduated.

19  Q.   Well, the minorities that you listed, would be minorities

20   beyond Ms. Foster and Mr. McFerrin, the other minorities would

21   be people who did not go before you so, therefore, you did not

22   see their packets?

23   A.   That's correct?

24   Q.   So relative to those folks, isn't it true that all you

25   know about their qualifications is that they had a PDE issued

26

1   certificate to teach?

2   A.   Yes.

3   Q.   And that you do not know what the qualifications of the

4   successful candidates were -- well, I'll withdraw that second

5   half of the question.

6        THE COURT:  What was the second half of the

7   question?

8        MR. KUHAR:  That he did not know what the

9   qualifications of the other candidates were.

10  BY MR. KUHAR:

11  Q.   I'm not asking that at this time, Mr. Byrd.

12  A.   Okay.

13  Q.   Mr. Byrd, if two candidates for teaching positions at

14  Crawford Central are equally qualified but one is a minority,

15  whom should the district choose?

16  A.   Would you say that again.

17  Q.   If two candidates --

18       MR. MEAD:  I object to that as far as relevance.

19       MR. KUHAR:  I think one can infer bias because he

20   answered this question during his deposition testimony.

21         THE COURT:  Well, go ahead.

22   BY MR. KUHAR:

23   Q.   Mr. Byrd, if two candidates applying for teaching

24   positions at Crawford Central are equally qualified, but one's

25   a minority, whom should the district choose?

27

1   A.   Based on our history, that would seem relatively simple.

2   But from my perspective, I would like to see more minority

3   teachers hired.  Who we would choose would depend on how the

4   board voted.

5   Q.   I understand in reality it would depend on how the board

6   voted.  But you would vote to choose the minority candidate,

7   right?

8   A.   Yes.

9   Q.   Because they're the minority candidate?

10   A.   Because of the lack of minority staff would be my reason.

11   Q.   Mr. Byrd, are you aware of any occurrence, anything that

12   has happened that would make you think that the district hired

13   someone for a position that Ms. Wagner was interested in where

14   that person was less qualified than Ms. Wagner?

15   A.   Has anything happened?

16   Q.   Yes, sir, are you aware of anything that has happened

17   that you can tell us about, that suggests to you that the

18   district chose someone less qualified for a position Ms. Wagner

19   was interested in?

20   A.   Yes.

21   Q.   What is it?

22   A.   I'm aware of the fact that the district went outside the

23   district, outside the state, to hire another minority that was

24   neither qualified or certified in the State of Pennsylvania,

25   and gave her that position over Ms. Wagner.

28

1  Q.   Would that be Naomi Uy-Moore?

2  A.   That is correct.

3  Q.   Is that the only thing that you can tell us about that is

4  responsive to my question?

5  A.   Without knowing the qualifications of the other teachers,

6  I can't think of any offhand.  That's the most egregious I can

7  think of.

8  Q.   Okay.  So Tammy Foster, Lee McFerrin, someone with the

9  last name Balsamo?

10  A.   Tracey Balsamo.

11  Q.   And then another one named Hazel Woody, I'm sorry if

12  that's wrong?

13  A.   Hazel Moody.

14  Q.   Are there any others who you listed as being people who

15  were certificated but denied employment?

16  A.   Walt Moody.

17  Q.   Walt Moody.

18  A.   Eric Brown.

19  Q.   Any others?

20  A.   None that I can think of off the top of my head.  I'm

21  sure there are others but I just can't remember at the moment.

22  Q.   So that's six, right?

23  A.   If that's what you have, yes.

24  Q.   And two of them were hired, right?

25  A.   Two?

29

1  Q.   Lee and Tammy?

2  A.   Lee was subsequently hired, and Tammy I think nine years

3  later was hired.  I think that was only in response to a

4  criticism that had been in the paper from a teacher that had

5  subbed at Meadville and wrote a letter to the Tribune.

6  Q.   Is my math correct, though?

7  A.   Yes, I believe so.

8  Q.   Do you have any idea what percentage of Caucasian

9  applicants for teaching positions at the Crawford Central

10  School District have been accepted or rejected?

11  A.   I wouldn't have an idea of the percentage, no.

12       MR. KUHAR:  Nothing further.

13       THE COURT:  Do you have anything else?

14       MR. MEAD:  Just briefly, your Honor.

15              REDIRECT EXAMINATION

16  BY MR. MEAD:

17  Q.   Now, sir, you mentioned Mr. McFerrin, has Mr. McFerrin

18  left the school district, to your knowledge?

19  A.   Yes, he has.

20   Q.   Is it correct to say that he also approached you for your

21   help in this situation?

22   A.   That is correct.

23   Q.   Your help for what?

24   A.   As I understand it, Mr. McFerrin had applied for a

25   principalship in Crawford --

30

1      MR. KUHAR:  Your Honor, can I have an offer of proof

2  on this because I think it's going to be all hearsay.

3      THE COURT:  Hang on a second, we haven't heard the

4  question, sit down and wait until we hear it one by one.  Go

5  ahead.

6      MR. MEAD:  Your Honor, I was asking him if the

7  person, Mr. McFerrin, who was mentioned, is somebody that had a

8  job, whether he came to Mr. Byrd with any problems about

9  getting hired.  I won't ask about the conversation, I just want

10  to show that he went to Mr. Byrd in order to get some help, I

11  won't go any further as to the conversation.  What the offer of

12  proof basically is, is that he tried to be an administrator, he

13  was not hired as an administrator and he left the school

14  district and is now an administrator at another school

15  district.

16      THE COURT:  All right.

17      MR. KUHAR:  May I be heard.  The deposition

18  transcript is that he was never discriminated against on the

19  basis of race by Crawford Central School district.  The only

20   probative inference that they're shooting for here has to be he

21   has some kind of problem seeking employment that the court

22   should infer was tied to his race.

23          THE COURT:  Well, is he going to testify?

24          MR. KUHAR:  No.

25          THE COURT:  If that's what he would testify to, he

31

1  can't testify to what the fellow told him.

2      MR. MEAD:  Correct, I don't have a problem with

3  that, your Honor.  I just want to show there were problems, and

4  they've approached Mr. Byrd for that.  I won't go any further

5  into any conversation, I will just ask if he knows that

6  occurred and is Mr. McFerrin still working.

7      THE COURT:  Ask the question, then I'll rule on the

8  objection, I don't know what the question is anymore.

9  BY MR. MEAD:

10  Q.    Did you have any discussion with a Mr. McFerrin about

11  this situation in Crawford Central?

12  A.    Yes.

13  Q.    Did you do anything on behalf of Mr. McFerrin based on

14  those conversations?

15  A.    I advised him the steps that he could take in terms of

16  securing a position, and it's much similar to what I advised

17  Ms. Rowena Wagner to do as well.

18      THE COURT:  Was McFerrin a teacher at the time?

19      THE WITNESS:  He was.

20          THE COURT:  All right, go ahead.

21   BY MR. MEAD:

22   Q.   Is Mr. McFerrin still a teacher at Crawford Central?

23   A.   No.

24   Q.   Do you know where he is at now?

25   A.   I believe he's in the Farrell School District at this

32

1  point.

2  Q.   Do you know what position?

3  A.   Assistant super, I believe.

4  Q.   Earlier you were asked a question if you knew about any

5  qualifications that minority teachers had, correct, do you

6  remember that?

7  A.   Yes.

8  Q.   It's fair to say that you had conversations with these

9  same people about their situation, correct?

10  A.   That's correct.

11  Q.   And it's also correct that during your conversations, you

12  learned more than they just were certified, you learned about

13  their education, their background, etc.?

14       MR. KUHAR:  Your Honor, he's leading the witness.

15       THE COURT:  Little bit, don't lead.

16       MR. MEAD:  That's fine.

17  BY MR. MEAD:

18  Q.   Is it fair to say that you learned more about these

19  people than just their certifications?

20  A.   That's correct.

21  Q.   Including Tammy Foster?

22  A.   Yes.

23  Q.   While you were with the school district and to the

24  present your knowledge, were there ever any minorities on the

25  school administration, not teachers, but administration?

33

1  A.   No.

2       MR. MEAD:  That's all I have.

3       THE COURT:  Anything further of this witness?

4       MR. KUHAR:  No, your Honor.

5       THE COURT:  Thank you very much, sir, you're

6  excused.

7       MR. MEAD:  Mr. Wagner.

8       THE CLERK:  Raise your right hand, please.

9       BERNARD R. WAGNER, PLAINTIFF WITNESS, SWORN

10           DIRECT EXAMINATION

11  BY MR. MEAD:

12  Q.   Sir, could you state your name, please?

13  A.   Bernard R. Wagner.

14  Q.   Sir, where do you live?

15  A.   Cochranton, Pennsylvania, 166 North Franklin Street.

16  Q.   Are you married to the plaintiff in this case, Rowena

17  Wagner?

18  A.   Yes, sir.

19  Q.   And how long have the two of you been married?

20  A.  Fourteen years.

21  Q.  Do you have children?

22  A.  Yes.

23  Q.  How many?

24  A.  Four.

25  Q.  Would you tell us their ages?

34

1   A.   Eleven, nine, five and two.

2   Q.   Sir, are you currently employed?

3   A.   Yes.

4   Q.   What do you do for a living?

5   A.   I'm self-employed.

6   Q.   Doing what?

7   A.   Farming.

8   Q.   Farming.  Now, sir, it's correct that you are aware of

9   your wife's attempt to become a full-time teacher, correct?

10   A.   Yes, sir.

11   Q.   During the course of her attempts to become a full-time

12   teacher, did you ever attempt to speak to anybody about this

13   situation?

14   A.   Yes, sir.

15   Q.   Can you tell us who you spoke to about the situation?

16   A.   Mr. George Wright, Mr. Heller and Mr. Dolecki.

17   Q.   All right, we're going to take these one at a time.  Tell

18   us about your conversations with Mr. Wright and, first of all,

19   tell us who Mr. Wright is?

20  A.   He was a school board member.

21  Q.   During what time period?

22  A.   I think just from 2000 to 2004, I think that was his

23  tenure.

24  Q.   When you spoke to him, was he a member of the school

25  board?

35

1  A.   Yes, sir.

2  Q.   How many conversations did you have with Mr. Wright?

3  A.   I believe four or five, six.

4  Q.   Were these in person or on the telephone?

5  A.   In person and telephone both.

6  Q.   Tell us about the first conversation you can recall, what

7  happened?

8       THE COURT:  And when?

9  BY MR. MEAD:

10  Q.   And when?

11  A.   It was in December.

12  Q.   Of what year?

13  A.   Of '02.

14  Q.   And what prompted this conversation?

15  A.   The reason I contacted him is because he was on a talk

16  show, radio show that I heard -- about hiring minorities, that

17  they couldn't find minorities in Crawford Central that would

18  qualify to be teachers.

19  Q.   And when you heard that, why did you believe you would

20  have to contact him or why did you want to contact him?

21  A.   I just thought -- I didn't know anyone on the board, and

22  so my wife wrote him a letter and I called him on the phone.

23  Q.   When you called Mr. Wright on the phone, what did you

24  discuss with him?

25  A.   To see if I could make an appointment with him to talk to

file:///A|/WAGDAY2.TXT

36

1  him about --

2        THE COURT:  Keep your voice up, Mr. Wagner.

3        THE WITNESS:  I wanted to talk to him about a

4  situation that my wife was involved in.

5  BY MR. MEAD:

6  Q.   Involving her being hired or not hired, correct?

7  A.   Right, about being hired at Crawford Central.

8  Q.   So the first time you talked to him was in December of

9  2002, that's correct?

10  A.   Yes.

11  Q.   And was that was over the phone?

12  A.   Yes.

13  Q.   And you set up a meeting, is that correct?

14  A.   Yes.

15  Q.   Did you subsequently have that meeting?

16  A.   Yes.

17  Q.   Where was the meeting?

18  A.   At his office.

19  Q.   Where is his office, do you recall?

20  A.    In the old Talon building, he has an office there.

21  Q.    The old what building?

22  A.    Talon building.

23  Q.    Could you spell that?

24  A.    T-a-l-o-n.

25        THE COURT:  Is that the zipper company, Talon?

37

1          THE WITNESS:  Yes, it is, they went out of business.

2          THE COURT:  On 322?

3          THE WITNESS:  No, up on Pine, I think Pine Street.

4          THE COURT:  Go ahead.

5   BY MR. MEAD:

6   Q.   So when you met with Mr. Wright -- did you meet with him?

7   A.   Yes, my wife and I met with him.

8   Q.   Who else was there, just your wife?

9   A.   Just my wife.

10  Q.   What did the three of you discuss?

11  A.   About being hired.  Getting a job, about minorities being

12  hired in the school district.

13  Q.   What was his reaction, what did he say?

14  A.   He said that he would look into it.

15  Q.   And was that about the extent of the conversation?

16  A.   Yes.  And then I called him on the phone a couple times

17  and I think we had one more meeting --

18  Q.   We're going to address each one of those one at a time,

19  if we could.  After that first meeting, did you subsequently

20  call him, did you say?

21  A.  Yes.

22  Q.  Approximately, how much after the first meeting, how long

23  after the first meeting?

24  A.  Probably two or three days.

25  Q.  What did you talk about in that conversation?

38

1  A.    To get an update on the situation, if he talked to

2  anyone.

3        THE COURT:  Mr. Wagner, you got to keep your voice

4  up, pretend you're out on the farm and you're yelling at

5  somebody across the field.

6        THE WITNESS:  Okay.

7        THE COURT:  Go ahead.

8  BY MR. MEAD:

9  Q.    So the second conversation on the phone you say you

10  asked --

11  A.    Right.  And there might have been a third conversation on

12  the phone, too.

13  Q.    Tell us about the second conversation, it was a few days

14  later, what did you say, what did he say?

15  A.    I just asked him if he had heard anything about my wife

16  being hired and minorities, if he discussed it with anyone.

17  Q.    What did he reply?

18  A.    I can't really -- I can't really remember exactly what he

19  said at that time.  My memory is -- I just can't exactly say.

20  Q.   So it's fair to say nothing significant?

21  A.   Right, nothing significant happened.

22  Q.   Did you have subsequent contact with him after that

23  second phone conversation?

24  A.   Yes, we met again.  He wanted to meet with us again to

25  talk to my wife about maybe -- something about drug and

39

1    alcohol, he wanted to take her -- get her involved in something

2    else.  And so we went to his office again.

3    Q.    In the old Talon building, did you say?

4    A.    Yes.  He talked about --

5    Q.    Who was present there?

6    A.    Just the three of us.  And he wanted my wife to get

7    involved in, maybe get involved in the alcohol and drug program

8    and that there.  And so he said he'd like to have her go to a

9    dinner with him, if I minded.  I said no, that's fine, anything

10   to help get her exposed to stuff.

11   Q.    And by drug and alcohol, you're not implying that your

12   wife had a problem, it's just she could help?

13   A.    Yeah, he was involved in that there, right.

14   Q.    Is it an awareness program or something?

15   A.    I can't really tell you.  I asked him about, you know --

16   he really kind of didn't say too awful much about her hiring,

17   her being hired at Crawford Central.

18   Q.    So after that meeting, did you have any subsequent phone

19   conversations with him?

20  A.  Yes, I had one more phone conversation.

21  Q.  When was that?

22  A.  That was probably a week later.

23  Q.  A week after the meeting?

24  A.  Right.

25  Q.  Tell us when the meeting was, the second meeting?

40

1  A.   That was probably early January.

2  Q.   So about a week after your meeting in early January, you

3  had a phone conversation, right?

4  A.   Correct.  I had a couple phone conversations.  I called

5  him I think a couple times more.

6  Q.   Tell us about those phone conversations?

7  A.   Well, pretty near every time I called, he just had no

8  good answer, everything kind of he's working on it, you know.

9  Not really anything.  And then the final one, the final

10  conversation was on the phone --

11       THE COURT:  You're talking way too fast, you've got

12  to slow down.

13  BY MR. MEAD:

14  Q.   When was the final conversation, tell us, approximately?

15  A.   Approximately, I would say about the 20th of January.

16  Q.   2003?

17  A.   2003.

18  Q.   Did you call him from home, where did you call him from?

19  A.   I called him from home.

20  Q.   Where did you call him, at his office?

21  A.   At his home, yes.

22  Q.   Tell us about that last conversation?

23  A.   Well, he had told me that -- that nothing more has really

24  been done to get my wife a job.  But he said you know, Bernie,

25  he said I'd been in several jobs, and he said I had a job in

41

1  Erie here -- he worked with, I think the human relations, I

2  think he was with human relations at Hamot, I think he said.

3  And he said, Bernie, you just got to understand one thing.  He

4  said black people and brown people are not as smart as white

5  people and that's the reason, you know, she's not going to get

6  a job.

7  Q.   What was your reaction to this statement?

8  A.   I said thank you and hung up.

9  Q.   That was the end of the conversation?

10  A.   Yes, I didn't want to say something about that, that I

11  shouldn't say.

12  Q.   Were you upset by this conversation?

13  A.   Yes.

14  Q.   What did you do as a result of the conversation?

15  A.   I made an appointment, I called the superintendent, Mr.

16  Dolecki, and asked to have a meeting with him and Mr. Heller.

17  Q.   And what time period was this phone call, how soon after

18  your conversation?

19  A.   I think the next day.

20  Q.   The next day.  Do you remember who you called, was it Mr.

21  Dolecki or --

22  A.   I think it was Mr. Dolecki.

23  Q.   Did you set up a meeting during that conversation?

24  A.   Yes, they set up a meeting.

25  Q.   How soon after the phone conversation was the meeting?

42

1  A.   I think maybe a couple, three days.

2  Q.   So we're still in the January timeframe?

3  A.   Yes.

4  Q.   Of 2003?

5  A.   Yes, sir.

6  Q.   Now, did you have a meeting?

7  A.   Yes.

8  Q.   Where was the meeting held?

9  A.   At the administration office.

10  Q.   And where, Crawford County?

11  A.   At Crawford Central, Meadville.

12  Q.   And who was present at this meeting?

13  A.   Mr. Dolecki, Mr. Heller, myself and my brother, Fred.

14  Q.   Why was your brother there?

15  A.   I took him along, I asked him to go with me so -- I

16  wouldn't get out of control.

17  Q.   Were you worried about being out of control?

18  A.   Well, I wasn't worried about being out of control, I just

19  wanted to make sure they couldn't say that I used bad language

20  or got out of control.

21  Q.  You wanted a witness?

22  A.  Yes.

23  Q.  When you went and had this meeting, do you recall what

24  time of day it was?

25  A.  No, sir, I can't tell you.

43

1   Q.   Was it in a small conference room, an office, do you

2   recall where?

3   A.   Yes, it was in the office of Mr. Dolecki and I think --

4   their offices kind of run together, I think it was.

5   Q.   Can you tell us how you started off this conversation?

6   A.   I bluntly told him that I was concerned about my wife not

7   being able to get a job and other minorities.  And of the

8   comments that Mr. Wright had made to me about black and brown

9   people not being as smart as white people.

10   Q.   What did they do in response to this?

11   A.   Ninety percent of my conversation was with Mr. Heller.

12   Mr. Dolecki and my brother, Fred, was -- they was more talking

13   among themselves and that there.  But Mr. Dolecki and Mr.

14   Heller, it was -- it was kind of all, you know, in one room.

15   Q.   When you explained your concern about the comments that

16   were made by Mr. Wright, what was the reaction of either Mr.

17   Heller or Mr. Dolecki?

18   A.   Mr. Dolecki didn't say nothing.  Mr. Heller said yes,

19   that's true.  There was a study done somewhere where some

20    college professor or college university did a study, he named

21    it.

22    Q.    He named the study?

23    A.    Yes.  And he said that's a true statement that Mr. Wright

24    made to you.

25    Q.    When he said that, what was your reaction?

44

1  A.   I'd say well, you know --

2        THE COURT:  Who's they?

3  BY MR. MEAD:

4  Q.   Go ahead.

5  A.   I was referring to the school district and Mr. Heller and

6  Dolecki.

7        MR. MEAD:  I'm sorry, your Honor, I'm not sure --

8        THE COURT:  I don't understand, say the question

9  again.

10  BY MR. MEAD:

11  Q.   After Mr. Heller made his comment, what was your

12  reaction, what did you say?

13  A.   He said if that's how they feel, you know --

14  Q.   Do you know what he meant --

15  A.   I was meaning the professor or the college, the

16  university, you know, they have facts to that.  You know, you

17  have to accept it, you know, just except it.  But I said it's

18  not right, you know.  Just because one person or a group of

19  people says that, that's very close minded.

20  Q.    You were referring to the alleged study done by the

21  college at that point?

22  A.    Right.

23  Q.    Or the university?

24  A.    Right.

25  Q.    Was their a response by Mr. Heller or Mr. Dolecki to

45

1  that?

2  A.    Not really none.  Mr. Heller agreed that, he agreed that

3  that was a true statement, you know.

4  Q.    What was a true statement?

5  A.    That black and brown people are not as smart as white

6  people.

7  Q.    After that conversation, that portion of the

8  conversation, how much more time did you spend in this meeting?

9  A.    It was probably 45 minutes.  I said well, you know,

10  there's regulations, I talked a little bit about, you know, you

11  get federal subsidies, I said I'm not up to -- to knowing all

12  the regulations, but when you get federal money, there's

13  guidelines to follow on hiring.  Usually that's how it is when

14  you get that.  And Mr. Heller at that time said well, you know,

15  those are just guidelines, we have our own rules and

16  regulations and we go by them.  You know, those are just

17  guidelines, that's about what we have to do.  I said there's

18  state and federal laws and that there, he said they're just

19  guidelines for us to go by.

20   Q.    What were you referring to when you said federal or state

21   laws, what kind of laws were you referring to?

22   A.    Well, usually how -- I always was under the impression

23   that if federal money and state moneys are appropriated to a

24   school district, they have regulations that they have to

25   follow.  You know, whether it's hiring, whether it's the

46

1  students that they educate, they have certain guidelines that

2  they have to follow.  And Mr. Heller agreed that they're

3  nothing but guidelines, the regulations are nothing but

4  guidelines for them to follow.  And I said well, you know, if

5  this is, and I mentioned at that time before I left, I said if

6  this school district doesn't want to change their thinking and

7  guidelines, you know, and follow the regulations, then we have

8  to go someplace else, we have to go to court.  And you know, I

9  wasn't threatening them, I just was making a statement that I

10  was not accepting the way the school district was being run.

11  Q.    Did they have any reaction to that, either Mr. Dolecki or

12  Mr. Heller?

13  A.    None.

14  Q.    Was this pretty much the end of the meeting?

15  A.    Yes, sir.

16  Q.    How did the meeting end, was anything else said at the

17  end?

18  A.    I just thanked them for their time and that there and

19  asked them if they would, you know, think about -- changing

20   their ways of hiring at Crawford Central.  It wasn't just

21   because of my wife, it was all minorities.

22   Q.    Since that time period, have you had any further

23   conversations with Mr. Heller or Mr. Dolecki?

24   A.    I don't think -- yes, I did.  I had a conversation with

25   Mr. Dolecki, I think, yes.

47

1  Q.    When was this conversation?

2  A.    That was I think a couple years ago.  It was about -- I

3  was concerned, I read an article in the paper about a steroid

4  problem that I said that I would like to have the school

5  district think about putting -- implementing a steroid and drug

6  test for their athletes.

7  Q.    But to cut it short, it wasn't about the hiring decision?

8  A.    No.

9  Q.    Or anything to do with your wife?

10  A.    No.

11  Q.    It was a conversation on another topic?

12  A.    Yes, sir.

13  Q.    Did you have any further conversations with anybody from

14  the Crawford Central administration regarding the issue of your

15  wife?

16  A.    Yes.

17  Q.    With whom?

18  A.    With two board members.

19  Q.    Who were they?

20  A.  Stan -- Rothman, Mr. Rothman, he's a school board member.

21  Q.  And do you recall the other individual?

22  A.  And Mr. Prather.

23  Q.  P-r-a-t-h-e-r?

24  A.  Yes, he's the president of the board.

25  Q.  When did this conversation occur?

48

1  A.   It was, the conversation was with Mr. Rothman and Mr.

2  Prather after the first agreement that we tried to implement.

3        THE COURT:  Say that again?

4  BY MR. MEAD:

5  Q.   Are you talking about a settlement?

6  A.   The settlement agreement.

7  Q.   We don't want to talk about --

8  A.   That's what it was about.

9        THE COURT:  Hang on a second, please.  This fellow

10  here has to get down everything that you and the lawyer are

11  saying, don't talk over him, wait until he's done.

12        THE WITNESS:  I'm sorry.

13        THE COURT:  Ask your question again.

14  BY MR. MEAD:

15  Q.   So this is during the time period when there was some

16  type of negotiations going on --

17  A.   The negotiations --

18  Q.   You ran into my statement again, let me finish.  That was

19  sometime during the time period there was negotiations between

20  your lawyers and the lawyers for the district, correct?

21  A.   Yes.

22  Q.   Is there anything said regarding this case that was not

23  involved with the settlement discussions here in your meeting

24  with Mr. Rothman and Mr. Prather?

25  A.   No, not really.

49

1        MR. MEAD:  That's all the questions I have.

2        THE COURT:  We're going to take a short recess.

3        (Recess from 10:04 a.m.; until 10:18 a.m.)

4        THE COURT:  All right, let's continue.

5        MR. KUHAR:  No questions, your Honor.

6        THE COURT:  None, okay.

7        MR. MEAD:  Your Honor, at this point we do have

8  deposition testimony that we could read into evidence or submit

9  to the court.  I know we touched on this issue yesterday,

10  whatever the court's preference, of course.

11        THE COURT:  Let's hear it.  Do you have a reader?

12        MR. MEAD:  During the break I called my secretary to

13  come down, so she should be here momentarily.  We can put her

14  on the stand and just do a question and answer, if that's what

15  the court prefers.

16        MR. KUHAR:  I certainly have no objection to that.

17  Just in terms of utilizing the time, there was another issue

18  that I was going to put before the court.

19        THE COURT:  Go ahead.

20          MR. KUHAR:  Towards the beginning of the proceedings

21   you had asked Mr. Mead to specify what positions were at issue.

22   I think he had indicated that it began with the Pickens'

23   position in November of '02.  And then they sort of theorized

24   she might have gotten a full-time position in August of '03.

25   And then, basically, they requested she should have been

50

1   appointed to one of the long-term substitute positions or

2   regular permanent positions beginning in August of '03 through

3   the current date.  And then we also heard testimony from Ms.

4   Maruska about two, approximately, three-week day-to-day

5   assignments.  I guess what I'm seeking, your Honor, is for the

6   plaintiff to specify if those are the positions at issue or

7   whether there are other ones, in specifying what their prima

8   facie case is so we know all the ones we're supposed to defend.

9         THE COURT:  Let's do that.

10          MR. MEAD:  Basically, starting off with Ms. Pickens'

11   position.  We don't submit that we have any acts or evidence of

12   discrimination prior to Ms. Pickens' situation in November.

13   Ms. Pickens' testimony was that she was out, I believe, the

14   entire school year, not just up to January.  It would have been

15   up for bid in January of '03.  Our first complaint, the first

16   thing we would seek damages for, is for the time period from

17   November to January of '03.  We would also argue that based on

18   past practice and the patterns, that a long-term substitute

19   does become a full-time teacher.  That would apply as well in

20   the situation in January of '03 with Ms. Pickens.  Because she

21   did not return at that point.  We would argue that at that

22   point Ms. Wagner would have stayed in that position full-time

23   until the end of the school year as a full-time substitute, a

24   long-term substitute.  So what we are seeking are damages are

25   from the time period in 2002, November -- excuse me, December,

51

1  when she was dismissed from that position up to the current

2  time.

3        THE COURT:  At what point is it your position that

4  her status as a long-term substitute, assuming that she had

5  continued in Ms. Pickens' position for the balance of that

6  school year, when do you claim she would have morphed into a

7  permanent teacher?

8        MR. MEAD:  Your Honor, I don't know, I can't give

9  you an exact date.  I can only say that the pattern and

10  practice has been that they do become a full-time teacher after

11  a certain number, a certain time period.

12        THE COURT:  I understand that period of time

13  November, and you say as a matter of fact she was out longer

14  than January, she was out till the end of the year, because the

15  practice would have been, your contention is the practice would

16  have been the same long-term sub would have just stayed there

17  the whole year?

18        MR. MEAD:  Yes.

19        THE COURT:  But beyond that job placement, the only

20  other specific instance, per the complaint or the testimony,

21  then takes us to where she actually applied and was

22  interviewed, are those eight or nine permanent positions, and

23  that's for the '04 school year?

24          MR. MEAD:  2004-2005, I believe.

25          THE COURT:  '04-'05.

52

1        MR. MEAD:  Yes.  I expect and I have no rebuttal for

2   the testimony that there were no long-term sub positions open

3   or permanent positions open during that -- that were open to

4   non-bidders in the 2003-2004 year.  I expect that was one of

5   the motions we talked about, motion in limine.  I don't expect

6   to be able to overcome that.  However, she was already in that

7   position at that time period.  The fact that there were no

8   positions open for bid during the 2003-2004 would be

9   irrelevant, because she would have already been in the

10   position.

11        THE COURT:  So, just to get it clear again, your

12   damages is based upon a little over one year of long-term

13   subbing with Ms. Pickens?

14        MR. MEAD:  Correct.

15        THE COURT:  And then what going forward?

16        MR. MEAD:  2004 going forward.  The fact that she

17   was not given any opportunity, that she was not hired, we

18   submit she should have been hired, she was not hired because of

19   either discrimination or because of retaliation --

20          THE COURT:  For one of those eight or nine permanent

21   positions?

22          MR. MEAD:  Yes, sir.

23          MR. KUHAR:  To keep us on the same track, when you

24   said at issue was the Pickens' position, which would have

25   lasted just over a year, was it meant just over a semester, in

53

1   other words --

2        MR. MEAD:  The school year.

3        MR. KUHAR:  Well, the Pickens' position was

4   basically November to January, and then a full semester from

5   January through the end of the '03-'04 school year.  I'm

6   confused by the reference to a little over a year?

7        THE COURT:  As I understand it, it's from November,

8   it would have been till January had she come back, but she

9   didn't come back.  So the plaintiff's contention, as I

10  understand it is, that if she had a long-term substitute

11  position based on your contention as the past practice, she

12  would have continued for a long-term sub for Ms. Pickens for

13  the balance of that year.

14       MR. KUHAR:  I understand that, the balance of that

15  year being '03-'04 school year.  It's still a little less than

16  a year and I think the comment was made a little more than a

17  year.

18       THE COURT:  We're parsing it way too fine here.

19       MR. KUHAR:  I just wanted to make sure we're talking

20    about the same thing, your Honor.

21            MR. MEAD:  That's correct, your Honor.

22            THE COURT:  Then it's the eight or nine positions in

23    '04 that she interviewed for?

24            MR. MEAD:  Yes.  So, basically, what would be cut

25    out, I suppose in fairness we could say, is the 2003-2004 year

1   because there was no openings that were non-union openings at

2   that point.  Then we get to 2004-2005, where we submit she

3   should have been hired.

4        THE COURT:  All right.  Does that clarify it for

5   you?

6        MR. KUHAR:  Yes.  Except, though, is she seeking

7   essentially those eight or nine positions, which again would

8   bring her up to date for her complaint or do we need to defend

9   beyond that time -- I understand the court has asked for

10  testimony regarding the reaction that the district had to her

11  apparent -- her not doing those things that were suggested?

12       THE COURT:  Well, look it, as far as I'm concerned,

13  you did not put on testimony about 2006, about the applicants

14  in 2006, 2007, etc., the point being that there was testimony

15  that they're not interviewing her?

16       MR. MEAD:  That is correct.

17       THE COURT:  Going forward from 2004, is that right?

18       MR. MEAD:  There is evidence in the record for

19  2006-2007 as to who was hired, your Honor, as part of our joint

20   exhibit, I believe it was 27.  Those people were hired in

21   2006-2007.  Our theory is the same as your Honor stated.

22   Basically, she's not being interviewed now because she filed a

23   lawsuit.  That started after she filed the lawsuit to the

24   present.  There is evidence in the record to 2006-2007, that

25   there were a number of people hired for elementary school

55

1  positions.

2      THE COURT:  All right.

3      MR. KUHAR:  And '05-'06 hasn't been addressed at

4  this time, either.  So I guess what the clarity I'm looking for

5  is if the court were to conclude that the decision not to

6  interview her was improper, would she then after '04, let's say

7  we assume the '04 non-hires were proper, and it was decided the

8  post '04 decision not to interview anymore were improper, would

9  she be contending that she should have been interviewed and,

10  therefore, would have gotten those positions such that I need

11  to defense them?

12      MR. MEAD:  Yes, your Honor, we submit it's a

13  retaliation claim and damage for the retaliation.  She didn't

14  even get an interview.  That the interview would have led to a

15  job but for retaliation.

16      THE COURT:  That's the theory.

17      MR. KUHAR:  On that issue we say, first, the

18  complaint was not updated to include any of that; and second,

19  we have Robinson.

_____

20          THE COURT:  I have that under advisement.

21          MR. KUHAR:  Okay.

22          THE COURT:  We'll address that in greater detail.

23    But we have the reader here, is that right?

24          MR. MEAD:  I believe the reader has arrived.

25          THE COURT:  Come on up.  I'm going to give an oath

56

1   to you which is a little different than the oath I give to most

2   people because you're not going to be testifying, but you're

3   going to be reading.  So I'm going to ask you to swear that the

4   reading that you're about to do from the transcripts that you

5   will be reading, will be true and correct, to the best of your

6   knowledge, information and belief.

7          MS. POTTER:  Yes.

8          (Whereupon, Hallie Potter was sworn.)

9          MR. MEAD:  For the record, will you state your name?

10          MS. POTTER:  Hallie Potter.

11          MR. MEAD:  And you're my secretary?

12          MS. POTTER:  Yes.

13          MR. MEAD:  What we're going to do here, Ms. Potter,

14   is that I'm going to ask the questions where it says "Q" and

15   where it says "A" you just answer, as in question/answer.

16          MS. POTTER:  Okay.

17          MR. MEAD:  For simplicity sake, we have a line as to

18   particular lines that we're reading, do you understand?

19          MS. POTTER:  Yes.

20          MR. MEAD:  Ms. Potter, the first thing we are going

21  to be reading is from the deposition of Ms. Van Tuil, V-a-n

22  T-u-i-l.  It's page 6, line 15, to page 6, line 21.

23  "Q.    And you're currently a member of the board, the school

24  board?

25  "A.    Yes.

57

1  "Q.    When were you first elected to the school board?

2  "A.    I don't know the year.  I've been on the board 14

3  years."

4        MR. MEAD:  Turn to page 27.  Page 27, line 22, to

5  page 28, line 4.

6  "Q.    Are there other things that you can point to where the

7  school district has initiated in terms of recruitment or trying

8  to diversify the teachers staff?

9  "A.    I mentioned more than just the switch program.  I

10  mentioned the job fairs --

11  "Q.    The job fairs.

12  "A.    I mentioned going after student teachers who were

13  minority, asking them to come to our district."

14        MR. MEAD:  If you could turn the page, page 60, line

15  6 to line 18.

16  "A.    His last sentence, 'by actively recruiting and hiring

17  minority teachers, counselors and administrators Crawford

18  Central School District will become a better educational

19  experience for persons of color, and an even better educational

20   experience for all students.'  That's a great sentence, I agree

21   with that.

22   "Q.   You agree with that?

23   "A.   With that sentence, I agree with that.  I think we do

24   that.  I think we actively recruit and do our best to hire and

25   maintain minority teachers, counselors and administrators.  I

58

1    think the school district always tries to hire the best person

2    for the job.  That's what I agree with."

3         MR. MEAD:  The next deposition transcript we'll be

4    reading from is Ms. Baskar, B-a-s-k-a-r.  We're going to start

5    at page 4, line 16 to line 19.

6    "Q.    For background purposes, would you state your

7    professional background, please?

8    "A.    I'm on the faculty of Allegheny College.  I'm teaching

9    in the economic department."

10        MR. MEAD:  Page 5, lines 20 to 24.

11   "Q.    Does the board have other functions apart from being a

12   policy maker?

13   "A.    Generally speaking, that's it.  It's not a managerial

14   level in the school district, but a policy setting level."

15        MR. MEAD:  Page 6, line 15 to 21.

16   "Q.    When did it first come to your attention, this lawsuit?

17   "A.    I don't have a specific date, but I think maybe I knew

18   it was filed about -- give or take a year ago.

19   "Q.    Did it come to your attention as a consequence of your

20  serving as a member of the board?

21  "A.    Right."

22          MR. MEAD:  Page 20, line 15 to 19.

23  "Q.    All right.  Now go back to -- so the board gives its

24  final blessings to any position or teacher who is recommended

25  by the administration to be hired; is that correct?

59

1  "A.   That's correct."

2      MR. MEAD:  Page 21, line 21, to page 23, line 3.

3  "Q.   And I'd just highlight that the district in 2004, last

4  year, consisted of --

5  "A.   Yes.

6  "Q.   Four-thousand students, 300 of whom are minority, and

7  there's very few, very few administrators, supervisors,

8  teachers of color.  Does that trouble you?

9  "A.   Um --

10  "Q.   That fact?

11  "A.   Yes, it does.  And it does both for the school district

12  and the college.  The college has the same problem recruiting

13  minority faculty.  We do have a small contingency of minority

14  students, and we want to serve them as much.  It is a fact we

15  don't have many.  How do we change it is we ask the

16  administration to make every effort whenever they have

17  qualified candidates to make every effort to attract them,

18  advertise jobs, where they're likely to be read by qualified

19  minority candidates.  And I believe they do.  So -- but in the

20   end, you know, my experience at the college has been that, you

21   know, when we do find highly qualified candidates, we fail to

22   attract them to Meadville to the college.  And that I have been

23   involved in firsthand.  I have not been involved in recruiting

24   for the district, but I guess -- I'm guessing here the same

25   thing is happening for the district as well.  We have very few.

1  Whether or not because the applicant pool doesn't contain many

2  minority applicants or some other reason.  So your guess is as

3  good as mine.  But I think the directive from the board to the

4  administration is very clear that whenever possible we would

5  like to see an increase in the number of hires from minority

6  backgrounds.  I think that message is always there."

7          MR. MEAD:  Page 24, line 7, to page 24, line 17.

8  "Q.    And I'm asking you in that capacity, as a member of the

9  board, you know, are you concerned after seeing these?

10          "MR. KUHAR:  What's the question.

11  "A.    Your question is if it bothers me?

12  "Q.    Yeah.

13  "A.    It does bother me that we don't have more minority

14  teachers, minority staff, minority administration.  But bothers

15  does not solve the problem.  We know that the numbers aren't

16  there, but we're trying our best to change that."

17          MR. MEAD:  Page 31, line 24, to page 32, line 6.

18  "Q.    Certain people are hired under the emergency permit?

19  "A.    Yeah.

20   "Q.   Are you conversant with that?

21   "A.   I know that there are some who have been hired on

22   emergency certification, but very few.  Because I know one of

23   our colleagues on the board always objects to that."

24         MR. MEAD:  We had a stipulation, your Honor, that we

25   would continue, I had originally said up to only a certain

1  line, but we have a stipulation, I'll continue.  I just want to

2  make sure I'm on the right page.

3  "Q.    Who is that?

4  "A.    So there are very few who -- I don't know--

5  "Q.    Who finds that objectionable?

6  "A.    I don't know if I can speak for him.

7  "Q.    You can give his name, identify?"

8       MR. MEAD:  One thing that happened, your Honor,

9  sometimes Mr. Kuhar is asking a question to clarify, I'll read

10  that if it makes more sense.

11       THE COURT:  All right.

12       "MR. KUHAR:  If he said that at a board meeting --

13       "THE WITNESS:  Yeah.

14       "MR. KUHAR:  Or she --

15       "MR. NICHOLS:  It's a public statement --

16  "A.    Grant Shorts has always --

17  "Q.    Who?

18  "A.    Grant Shorts has always objected to emergency

19  certification, hiring teachers or substitutes on emergency

20  certification.  And I know that we do -- when we are approving

21  people, he does point those out and objects to them being

22  hired.  That's my way of keeping track how many, because

23  they're aren't that many.

24  "Q.   Do you know -- at the meeting, the board meeting, where

25  applicants for teaching positions have been rejected for --

62

1   "A.   No.

2   "Q.   For reasons of lack of certification?

3   "A.   Oh, I don't know, because I'm not part of the

4   application selection.  From the applicant pool when they

5   decide who to bring in for an interview, I'm not part of that

6   process, so I don't know who is being rejected at that level,

7   in the initial selection or screening process.  I don't know.

8   But I know that we don't hire anybody who has the

9   appropriate -- who does not have the appropriate certification.

10  "Q.   Okay.

11  "A.   We don't hire people without certifications."

12       MR. MEAD:  We're going to go to the deposition of

13  Ross, R-o-s-s, Prather, P-r-a-t-h-e-r.  Page 4, line 13, to

14  page 5, line 1?

15  "Q.   Okay.  Would you state your full name for the record,

16  Mr. Prather?

17  "A.   Ross Clayton Prather.

18  "Q.   And your -- and would you state your professional

19  background for the record?

20   "A.   I'm an attorney.

21   "Q.   And you practice in Pennsylvania?

22   "A.   Yes.

23   "Q.   Okay.  And you currently serve on the school board?

24   "A.   Correct.

25   "Q.   When were you first elected to the school board?

63

1   "A.   I was elected in 2001."

2        MR. MEAD:  Page 5, line 10, to page 5, line 17.

3   "Q.   Are you aware of the lawsuit that's filed by Miss

4   Wagner?

5   "A.   Yes.

6   "Q.   When did you first become aware of that?

7   "A.   Sometime in the last year or two.

8   "Q.   And it was in your capacity as a member of the board

9   that it came to your attention?

10   "A.   Yes."

11        MR. MEAD:  Page 23, line 18, to page 25, line 12.

12   "Q.   Yeah, the number --

13   "A.   It says that out of 4,300 kids in Crawford Central 307

14   are of African decent.

15   "Q.   Yes.

16   "A.   I mean, is your question whether I think we should have

17   more African decent children or less?

18   "Q.   Well, in the context of the article he writes, do you

19   agree with him, disagree with him, what he's saying about

20  the --

21  "A.   I think that --

22  "Q.   About the racial composition of the teaching staff and

23  in the school district?

24  "A.   I'm not exactly sure what his point is from the one

25  paragraph that I've read.  He starts out by saying, on

64

1    principle he's against --

2    "Q.    And do --

3         "MR. KUHAR:  He's trying to answer.

4    "A.    On principle he's against affirmative action.  So I

5    disagree with him there, I'm for affirmative action.  If his

6    point is that Crawford Central is not doing what it can to

7    recruit, hire and retain minority applicants, then I simply

8    agree, that's a meritorious position, but I disagree with his

9    conclusion that we're not doing enough.  And I don't know if he

10   really knows what we've done.  I don't know, Mr. DiAngi.

11   "Q.    So you're saying you think the school district is doing

12   enough?  You're satisfied with the school district in this

13   regard?

14   "A.    From what I know of the school district's efforts to

15   recruit -- I'll use his words, hire and retain --

16   "Q.    Right.

17   "A.    Minority applicants, from what I know, we are taking

18   substantial steps.

19   "Q.    Okay.  As a member of the board can you articulate

20  specific -- what you're doing or have done?

21  "A.   I can tell you that the board has discussed it, the

22  board has indicated that we would like to see more applicants,

23  we would like to see more teachers and administrators and staff

24  who are of -- of a minority background.  And I can only speak

25  for myself, I'm satisfied that the administration that we have

65

1    spoken to is listening and doing what they can.  It's a

2    challenge.  It's a challenging request that we've made to

3    them."

4          MR. MEAD:  Page 30, line 1 to line 6.

5    "Q.    As it relates to hiring in this school district?

6    "A.    Okay.  As I indicated, the board is proactive and

7    concerned with regard to hiring of minorities.  In fact, we

8    would like to have more minorities as teachers, as

9    administrators and as staff at Crawford Central."

10         MR. MEAD:  We're going to read now from the

11   deposition of Mr. Wright, W-r-i-g-h-t.  Page 16, line 10

12   through 19.

13   "Q.    I see.  Let me ask you this, Mr. Wright.  Are you aware

14   of the lawsuit that's been filed by Miss Wagner against the

15   school district?

16   "A.    In general terms.

17   "Q.    But you are aware of it, right?

18   "A.    Yes.

19   "Q.    How did it first come to your attention, the lawsuit?

20  "A.   It was brought to the board's attention as a whole."

21       MR. MEAD:  Page 17, lines 3 through 6.

22  "Q.   You say it was brought to the attention of the board as

23  a whole?

24  "A.   Right, that's when I was officially notified of the

25  lawsuit."

66

1          THE COURT:  Was that date, read that date again?

2          MR. MEAD:  It was page 17, lines 3 through 6.

3   "Q.   You say it was brought to the attention of the board as

4   a whole?

5   "A.   Right, that's when I was officially notified of the

6   lawsuit."

7          MR. MEAD:  For some reason, your Honor, I think a

8   few of the pages weren't copied --

9          THE COURT:  That doesn't tell me when it is.  He

10  said that's when we learned about the lawsuit.  It's not clear

11  to me from the deposition when he learned about the lawsuit?

12         THE COURT:  I don't know if that's answered in

13  deposition.

14         THE COURT:  It is what it is then.

15         MR. MEAD:  Correct.  If I may, I'm going to hand the

16  witness the transcript, just so we make sure we're covered, I

17  think a few pages were missing by accident out of that.

18         MS. POTTER:  It's in here.

19         MR. MEAD:  You got it?

20        MS. POTTER:  For some reason it's marked differently

21  on here, but it is in here.

22        MR. MEAD:  Page 18, lines 10 through 16.

23  "Q.    Were you, prior to this lawsuit, there was an

24  administrative complaint filed with the Pennsylvania Human

25  Relations Commission.  Was that also brought to the board, the

67

1  board's attention?

2  "A.   I really don't recall.

3  "Q.   It's possible?

4  "A.   In all likelihood we would have been informed."

5      MR. MEAD:  Page 19, lines 11 through 16.

6  "Q.   Let me step back.  What about the administrative

7  complaint that's filed with the administrative agency, in this

8  case, the Pennsylvania Human Relations Commission, would that

9  also have been brought to the attention of the board as a

10  matter of standard procedure?

11  "A.   I imagine that it would have."

12      MR. MEAD:  Page 25, line 11 through 15.

13  "Q.   You said that the school board did discuss this lawsuit

14  together.  You did make that statement, correct?

15  "A.   It was brought to our attention.

16  "Q.   All right.

17  "A.   Surely."

18      MR. MEAD:  Page 61, line 6.

19  "Q.   No, no.  What I'm asking, sir, as I understand the

20   process, the teachers, that the initial hiring -- I mean the

21   recruitment, the screening of candidates for teaching positions

22   occurs with the administration, right?  And then those that are

23   recommended to be hired as teachers are presented to the board

24   for its final blessing or approval, is that correct?

25   "A.    That's correct.

1    "Q.    The regulations I read requires the board approves the

2    hiring, is that correct?

3    "A.    Yes.  Every month there's a list --

4    "Q.    So I mean the administration, Mr. Heller and Mr.

5    Dolecki, don't have the exclusive unilateral authority to hire

6    teachers under the existing regulations, is that correct, that

7    is the board's function?

8    "A.    They recommend it.

9    "Q.    Right, recommend.

10    "A.    Right.

11    "Q.    But that's different.  The board has final approval?

12    "A.    Right, and the board doesn't preside over hiring coaches

13    and so on.  I don't think so.  That's not our job, that's their

14    job.  They give us the recommendations and by and large there

15    are not objections to those.  Sometimes there's personal

16    knowledge or something, but the legal criteria is if it's a

17    board members relative, we have to deal with it.  The rest of

18    it is an administrative matter."

19            MR. MEAD:  Page 63, lines 14 through 22.

20   "Q.   You do approve or disapprove, okay.  Let me ask you

21   this.  Does the fact that Miss Wagner filed a lawsuit, does

22   that disqualify her for being further considered for a teaching

23   position?

24   "A.   No, I would think -- again, I'm not sure that it's

25   helpful.

69

1    "Q.    Would you hold it against her?

2    "A.    If I wanted a paid job at the school district, I

3    wouldn't sue them as a place to start."

4          MR. MEAD:  We're now going to turn to the deposition

5    transcript of Mr. Dolecki.

6          THE COURT:  Excuse me, one second.  What was the

7    pagination on the last testimony that was just read into the

8    record?

9          MR. MEAD:  Yes, your Honor, it was page 63 of Mr.

10   Wright's deposition, lines 14 through 22.

11         THE COURT:  All right, go ahead.

12         MR. MEAD:  We're going to turn to Mr. Dolecki's

13   deposition, lines 9 through 14.

14   "Q.    Your current position?

15   "A.    Superintendent of schools of Crawford Central School

16   District.

17   "Q.    And how long have you been in that position, Mr.

18   Dolecki?

19   "A.    A little over four years."

20          MR. MEAD:  Page 45, line 15, through page 46, line

21   18.

22   "Q.   Now, being chief executive officer of the school

23   district, let me ask you straight up and down.  Is there a need

24   for minority of one professional staff in this school district,

25   working in the school district, and if so, and I'm including

70

1   teachers, is there a need?

2   "A.   There has always been concern for hiring minorities in

3   our school district.  I have --

4   "Q.   Go ahead.

5   "A.   I have expressed that in our recruiting efforts, the

6   need.

7   "Q.   Speaking of your recruiting efforts.  What have you done

8   in that area?  What tangible steps have you taken in regards to

9   recruiting efforts?

10   "A.   Couple things.  When I was the assistant superintendent,

11   we always attempted to look at minorities.  And knowing that --

12   even to a point initially that I wanted to advertise for

13   minorities to apply for positions.  At that time I was informed

14   by our then solicitor that I could not do that because it would

15   be -- in his opinion it would be reverse discrimination.

16   "Q.   To advertise?

17   "A.   That's correct.  So that was my thought process.  So we

18   went to recruiting fairs when I was there at the table I would

19   ask minorities to come over and talk to me.  Also, that if we

20    had -- if there was an opportunity to hire a minority, I would

21    look very closely at that individual.

22    "Q.    You attended these recruitment fairs?

23    "A.    Yeah, when I was the assistant I did, that was before

24    2001 now, 2001 and before."

25         MR. MEAD:  Page 53, lines 2 through 5.

71

1  "Q.   Now, on the efforts of diversity, does the school

2  district support or sponsor any kind of employee education

3  training program, community outreach program?

4  "A.   We do not."

5       MR. MEAD:  Page 75, lines 1 through 16.

6  "Q.   As I understand it, again, basic policy, help me

7  crystallize this.  Permanent full-time teachers are recommended

8  by the administration, the board gives its blessing, that is

9  hire, disapproval or approval, right?

10  "A.   (Witness moved head up and down.)  If I can rephrase

11  again, permanent teachers are recommended by the

12  administration.  They are then given to the board at a board

13  meeting and then they approve them, yes.

14  "Q.   Long-term substitutes are also recommended by the

15  administration to the board and the board -- for the board's

16  approval?

17  "A.   That's correct.

18  "Q.   Substitutes are, there is a list of substitutes that

19  must be approved by the board, right?

20  "A.    Substitutes -- for any employee to be paid in this

21  school district they must be approved by the school board."

22          MR. MEAD:  Page 79, lines 14 through 22.

23  "Q.    One other thing, the practice by which long-term

24  substitute positions are filled, and you have been with the

25  school district since -- when did you come?

72

1  "A.    November of '94.

2  "Q.    Now, based upon your experience, long-term substitutes

3  those who have filled positions, long-term substitutes have not

4  always been subjected to an interview process, is that correct?

5  "A.    Not always."

6       MR. MEAD:  Page 81, line 5 through line 10.

7  "Q.    Well, if you'd be kind enough to favor us again with it.

8  As to what the policy has been applied as a practice?

9  "A.    It's not a policy, it's a practice.  The practice I just

10  described to you.  There is different ways of filling long-term

11  positions and I just mentioned that to you."

12       MR. MEAD:  Page 82, lines 8 through 19.

13  "Q.    Then I asked you a follow-up question.  I asked, do you

14  know of any instance during your tenure with the school

15  district, either as an assistant superintendent or as

16  superintendent, where you had a teacher who takes leave, before

17  she takes leave she writes the assistant superintendent, look,

18  I want this substitute to replace me during my absence.  The

19  substitute comes aboard and starts to work, and then two weeks

20    later or so is abruptly dismissed from the position, no longer

21    allowed to continue to substitute for that teacher.  Do you

22    know any instance where that has happened, apart from Mrs.

23    Wagner?

24    "A.    No."

25          MR. MEAD:  We're going to turn now to Mr. Heller's

73

1  transcripts.

2      THE COURT:  I'm sorry, no instance other than apart

3  from who?

4      MR. MEAD:  Ms. Wagner.  Again, this is Mr. Heller's

5  transcript from his deposition.  The first page would be page

6  6, lines 1 through 3.

7  "Q.   How long have you been assistant superintendent?

8  "A.   I began my employment at Crawford Central School

9  District February 18th, 2002."

10      MR. MEAD:  Page 10, lines 1 through 7.

11  "Q.   Relates to the budget, what is your best estimate if you

12  know, if you don't, you can say so, of the budget, the

13  district's budget is devoted to the recruitment, the efforts to

14  recruit, encourage, and to diversify the teaching faculty of

15  the district?

16  "A.   I don't know that question.  I don't know the answer to

17  that question.

18      MR. MEAD:  Page 29, line 1 down to 14.

19  "Q.   Between you and Miss Pickens about this matter?

20  "A.   I believe I had a conversation with her on the phone,

21  but never in person.

22  "Q.   What was the nature of the conversation?

23  "A.   I believe that it was a conversation that we had been

24  interviewing candidates to fill her position at the Second

25  District -- as a second grade teacher at Cochranton Elementary

74

1  School along with a few other openings that we had for the

2  remainder of the year in the school district at the elementary

3  level as well.  And that we would respect her recommendation

4  but she's not part of the selection process.  You know, that's

5  pretty much what the conversation consisted of.  I can't be any

6  more specific than that."

7       MR. MEAD:  Page 48, lines 13 through 21.

8  "A.   First of all, I'm going to go back to what I said

9  previous to this.  It's not, it's not an evaluation.

10  "Q.   It's an observation?

11  "A.   It's an observation.

12  "Q.   Right.

13  "A.   And I wouldn't determine her observation to be

14  unsatisfactory.  I think that there's some areas that I felt as

15  an observer at that specific time there was some areas that

16  needed improvement.  That's --"

17       MR. MEAD:  Page 62, lines 5 through 11.

18  "Q.   Okay.  Now, is it also correct to say then that the

19  qualifications that a substitute teacher must satisfy are the

20  same ones that a long-term substitute, full-time teacher must

21  meet?

22  "A.   Yes.

23  "Q.   The qualifications are the same, is that correct?

24  "A.   Yes.

25        MR. MEAD:  Page 76, lines 16 through 20.

1  "Q.   And I'm saying, one, with respect to Karen Jamieson,

2  Exhibit 15, she was allowed to teach a full year without an

3  interview.  But Miss Wagner was subjected to an interview.  How

4  can you justify that under your policy?

5  "A.   I wasn't here."

6      MR. MEAD:  Page 92, lines 12 through 22.

7  "Q.   Maintained, okay.  Moving forward.  Moving forward,

8  Exhibit 18.  Exhibit 18 is a compilation of the work product of

9  the committee that sat and interviewed candidates for Miss

10  Pickens' job.  And, Mr. Heller, you did participate as a member

11  of that committee, did you not?

12  "A.   As a member, yes, I did.

13  "Q.   Did you organize the committee, the panel which sat to

14  interview Miss Wagner and others?

15  "A.   Yes, I did."

16      MR. MEAD:  Page 93, line 12, to page 94, line 15.

17  "A.   Interview committee.  I don't think there's a standard

18  name for it.

19  "Q.   Okay.

20    "A.    I think we all know what we're talking about.

21    "Q.    You organize the committee, did you?

22    "A.    That's correct.

23    "Q.    Did you select the members who sat on that committee?

24    "A.    I -- yeah, I guess you could say I did.

25    "Q.    Is it fair to say you were the chairman of that --

1   "A.   I --

2   "Q.   Committee?

3   "A.   I look at it as more of a facilitator than a chairman.

4   I don't think I'm chairman.  Like I said, I'm more of a

5   facilitator.

6   "Q.   Were there any minorities included on that committee?

7   "A.   No.

8   "Q.   Were there any teachers --

9   "A.   No.

10   "Q.   On the panel?

11   "A.   No.

12   "Q.   All administrators?

13   "A.   Administrators.

14   "Q.   Did they report to you?  Did all of them, any or all of

15   them report to you?

16   "A.   I guess if you look at the flow chart on the hierarchy,

17   I'm above them.  So, yes, they would report to me."

18         MR. MEAD:  Page 96, lines 20 through 22.

19   "Q.   Correct, of course.  Now, did you notice that several of

20   the forms were not signed by the evaluators?

21   "A.   Most often they are."

22       MR. MEAD:  Page 97, line 20, through page 98, line

23   16.

24   "Q.   Now, Mr. Heller, I notice Stephanie Hughes's form, I

25   looked on that and there's commentary on that on the second

77

1  page and it appears to be your handwriting.  Yeah, it was your

2  application where you evaluated Stephanie Hughes.  If I might

3  show this to you (indicating).

4  "A.    Yes.

5  "Q.    Okay.  And you will notice there -- that is your

6  handwriting there, isn't it?

7  "A.    I --

8  "Q.    Your name appears as the evaluator?

9  "A.    I think it is, yeah.

10  "Q.    I note there is a comment you made that included in a

11  group there of individuals -- right there that included in that

12  is Ms. Wagner's name?

13  "A.    Uh-huh.

14  "Q.    And you refer, no way.  That is your comment, isn't it?

15  "A.    It's in writing.

16  "Q.    Right.  That is your comment, right?

17  "A.    That's correct.

18  "Q.    That's your writing and your comment?

19  "A.    Uh-huh.

20          MR. MEAD:  Page 99, lines 5 through 25.

21    "Q.    Okay, thank you.  Miss Szalewicz did get the position,

22    she got the position?

23    "A.    Uh-huh.

24    "Q.    And I notice on the scoring here that she scored number

25    nine.  Out possibly 17, 19 applicants here she scored number

1    nine?

2    "A.    Uh-huh.

3    "Q.    Why -- what was so compelling about her, given the fact

4    that she got a nine that she would get the position over the

5    other eight who obviously scored higher according to what is

6    shown here on Exhibit 18?

7    "A.    I understand what you're saying.  Part of the selection

8    process is that at the conclusion of the interviews there's a

9    lot of discussion that takes place and there's a lot of

10   information that can be shared by the people that have

11   participated in the selection process, part of that committee.

12   And some of the information that is shared is information based

13   on performances within the buildings as a substitute teacher,

14   information shared on observations that certain people have

15   made.  And it can be a group consensus or committee consensus.

16   We consider two levels at the elementary.  A primary level,

17   which is K through two.  An intermediate level, which is three

18   through six.  And the committee many times determines who we

19   would feel stronger at the primary level versus the

20    intermediate level.  Okay, so the rating is -- the rating is

21    significant, but it's not the only determining factor in the

22    selection process.

23    "Q.    Okay.  Now, two of the candidates of these applicants in

24    this pool were in college at this time, right, when this

25    interview was held, is that correct?

79

1  "A.   Give me their names.

2  "Q.   Robert Bazylak and Nikki Shearer?

3  "A.   Okay.

4  "Q.   That is a fact, right?

5  "A.   They were finishing up their student teacher experience.

6  I think they might have been in their last week when we

7  interviewed them."

8         MR. MEAD:  And for the record that was page 100,

9  lines 1 through 18, I didn't mention it.  Page 101, lines 8

10  through 13.

11  "Q.   And Nikki Shearer?

12  "A.   Nikki Shearer was finishing her student teaching

13  experience.

14  "Q.   So that she had not received her undergraduate degree?

15  "A.   That's right."

16         MR. MEAD:  Page 156, lines 6 through line 23.

17  "Q.   When you met with her --

18  "A.   The summer of 2004.

19  "Q.   You're referring to the time you met with her?

20   "A.   Yes.

21   "Q.   Uh-huh.

22   "A.   I retract that.

23   "Q.   And she asked you for a copy of her evaluation and she

24   was told that you were -- analysis and you told her you would

25   not make it available to her?

80

1  "A.   That's right, I didn't make them available to anybody.

2  "Q.   As a matter of policy or what is it?

3  "A.   Procedural protocol.

4  "Q.   Why would you withhold it if she wanted to see and to

5  work on it, and to obviously be informed?  It was her concern.

6  It was her evaluation?

7  "A.   It's just a decision I made at that particular time,

8  that's the only thing I can say about it."

9         MR. MEAD:  Page 171, lines 3 through 19.

10  "Q.   I also understand there is a relationship between Brian

11  Mahoney and Mr. Stanton?

12  "A.   That's correct.

13  "Q.   At the time he was hired?

14  "A.   That's correct.

15  "Q.   It was a son-in-law relationship?

16  "A.   Son-in-law.

17  "Q.   Right?

18  "A.   That's right.

19  "Q.   That relationship is obviously not acceptable,

20    unacceptable, isn't it, for purposes of the anti-nepotism law?

21    "A.    That's correct.

22    "Q.    How was that addressed by the committee?

23    "A.    How was that addressed by the committee?

24    "Q.    Right.

25    "A.    I'm going to take responsibility for it."

81

1        MR. MEAD:  This is Mr. Heller's second transcript

2  from October 20, 2005, just a few short pages.  Page 34, lines

3  1 through 25, to page 35, lines 1 through 6.  And page 35,

4  lines 16 through 20.

5  "Q.   What do you consider the essential attributes or

6  characteristics or qualities that a teacher who aspires to be a

7  role model should have?

8  "A.   Basically somebody who has all the characteristics, all

9  the positive characteristics that students would look up to.

10  "Q.   To look up to?

11  "A.   Yeah.

12  "Q.   To be specific, in terms of numeration of them, what

13  would you say in terms of one through five in qualities?

14  "A.   I would say, number one, I think it has to be someone

15  that is genuine.  Someone that is respectful.  Someone who has

16  interest, caring and kind.  That's five, I believe.  Not

17  necessarily in that order but they are all close.

18  "Q.   Um-hmm.  That kind of person you would like to

19  interview, wouldn't you, for a job, wouldn't you?  Wouldn't you

20  like to attract that style of person at Crawford Central School

21  District as a teacher?

22  "A.   Yes.

23  "Q.   Those quantities that you just specified you wouldn't

24  say -- would you say -- if I were to ask you and reflected on

25  Mrs. Wagner, you have seen her application many times, her

82

1   background, is she without any of those qualities?

2   "A.   She has --

3   "Q.   Is she without any of those qualities?

4   "A.   Is she without any of those qualities?

5   "Q.   Um-hmm.

6   "A.   No."

7        MR. MEAD:  Line 16.

8   "Q.   And this has -- she had been persistent in submitting

9   these applications at least four years now, is that correct?

10  "A.   Yes, that's correct.

11  "Q.   Okay."

12       MR. MEAD:  And the last deposition is Suzanne Good.

13  Page 5, lines 13 through 25.

14  "Q.   Okay.  Let's come forward, please.  If you might, start

15  with your college experience, your academic experience, and

16  come forward?

17  "A.   Okay.  I graduated from Indiana University of

18  Pennsylvania with a degree in elementary education.  I have a

19  master's, and a reading specialist, and a reading supervision

20    certificate from Clarion University.  And I also have my

21    superintendent letter from Westminster.  This is my 33rd year

22    in public education.  This is my seventh year at Crawford

23    Central.  My fourth year as directory of elementary curriculum.

24    "Q.    Okay.  And you taught prior to assuming your

25    administrative position?

83

1   "A.   Yes."

2          MR. MEAD:  Page 6, lines 10 through 20.

3   "Q.   Now, in the course of your responsibilities here, you

4   sit on the selection personnel committee, don't you?

5   "A.   I am part of the interview process, yes.

6   "Q.   And do you advise, typically, the rest of the

7   composition of the members who sit on those committees?  I'm

8   referring to a selection of teacher's selection committees, for

9   the composition of administrators who sit on those committees?

10   "A.   For the elementary selection, there are the elementary

11   principals, Mr. Heller, the assistant superintendent, and

12   myself."

13          MR. MEAD:  Page 32, lines 3 through 11.

14   "Q.   And how do you go about that?  And tell us -- feel free

15   to elaborate on this.  How did the issue come to the board and

16   be put on the table, and what was the nature of the discussion

17   on the part of the committee?

18   "A.   When we are looking for candidates, we are out looking

19   for candidates who have diversity to add to our teaching

20  population.  If we had candidates for the interview process

21  that had represented a minority, we would certainly consider

22  their qualifications as well."

23       MR. MEAD:  Page 35, lines 7 through 19.

24  "Q.   Right.  I understand that.  Right.  But I'm now asking

25  you, is there a screening committee which is separate and apart

84

1   from the interview committee?

2   "A.   Prior to the interview, there would be a group of

3   interview candidates that would be identified.

4   "Q.   And who performs that function?

5   "A.   It could be a variety of people.

6   "Q.   Like who?  Would that be administrators?

7   "A.   They would be administrators.

8   "Q.   And who, typically?  Would it be Mr. Heller, Mr.

9   Dolecki?

10   "A.   It could be Mr. Heller, Mr. Dolecki, the elementary

11   principals for an elementary position."

12        MR. MEAD:  Page 41, lines 6 through 20.

13   "Q.   Right.  Let me step back then, why she was not

14   interviewed -- extended the opportunity to be interviewed?

15        "MR. KUHAR:  Do you mean for the '05 --

16        "MR. NICHOLS:  2005 --

17        "MR. KUHAR:  Spring interviews.

18        "MR. NICHOLS:  '06.

19   "Q.   Yes.  Would you like to address that Ms. Good?

20   "A.    She was not part of the pool that we interviewed, I can

21   tell you that.

22   "Q.    That means her application was not selected to be a part

23   of that pool then, right?

24   "A.    Yes.

25   "Q.    She did, in fact, apply, so that means that her

85

1  application was not selected --

2  "A.   Right.

3  "Q.   To be included in the pool, right?"

4       MR. MEAD:  Page 54, lines 11 through 15.

5  "Q.   That's what I'm saying, though, the screening, why she

6  was not invited for an interview?

7       "MR. KUHAR:  Identification.

8  "Q.   Yeah.  Can you think of a reason why she didn't?

9  "A.   I can't tell you that, I don't know."

10      MR. MEAD:  Page 63, lines 1 through 8.

11  "Q.   Wagner, you, and Mr. Heller discussed a proposed course

12  of action that she would take, including going to a Web site,

13  some other courses of instruction, did you hear Mr. Heller

14  state to my client that she should look to teaching

15  opportunities at other school districts?

16  "A.   Yes.  I would say that --

17  "Q.   All right.  That's enough, yes.

18  "A.   He had suggested other school districts."

19      MR. MEAD:  Page 88, lines 14 through 20.  You start

20   off the answer.

21   "A.   You asked me if there was a need for students with

22   special needs to have role models?

23   "Q.   Yes.

24   "A.   All students need role models.

25   "Q.   How about minority students, that includes minority

86

1  students?

2  "A.   They need, right, role models, yes."

3       MR. MEAD:  Page 98, lines 9 through 17.

4  "Q.   Shortage of personnel.  But that would be inclusive of

5  substitute teachers, wouldn't it?

6  "A.   That's what I was talking about.

7  "Q.   That's what you were talking about, right, when you said

8  shortage of personnel?

9  "A.   Right.

10  "Q.   And being very specific, when you say personnel, you're

11  saying substitute teachers, right?

12  "A.   On a day-to-day basis."

13       MR. MEAD:  That's it, your Honor.

14       THE COURT:  All right.  Thank you.

15       MR. MEAD:  Your Honor, at this point we rest.

16       MR. KUHAR:  Did they rest?

17       MR. MEAD:  Yes.

18       THE COURT:  Yes.

19       MR. KUHAR:  Just to finish the thought on -- we

20  still don't know what's still in play.  There is one other

21  issue relative to what we were discussing, what's in play, what

22  isn't.  There were some averments in the proposed findings of

23  fact submitted by the plaintiff, I think in the complaint as

24  well, regarding a Tammy Costello, short-term, I'm sorry,

25  long-term day-to-day assignment.  In other words, an

1   approximately 60-day assignment which was paid on a day-to-day

2   basis.  I think that was put into play in the complaint and in

3   the proposed findings.  We have Ms. Costello here.  But

4   pursuant to an agreement between the parties, we are not going

5   to call Ms. Costello, and the court should basically ignore all

6   references to Ms. Costello in any of the submissions.

7           MR. MEAD:  I don't know if there were any, quite

8   frankly --

9           THE COURT:  But if there are, they do not form in

10  any fashion the basis for any damage claim?

11          MR. MEAD:  Correct, your Honor.

12          THE COURT:  All right.

13          MR. KUHAR:  I would just ask our conversation that

14  we had before the reader arrived, I just wanted to basically

15  ask whether there was anything else in play, I wasn't sure?

16          THE COURT:  The way to do this, Mr. Kuhar -- first

17  of all, in terms of the damage aspect of this, I think, Mr.

18  Mead, you ticked off, did you not, the two damage components.

19  One is the LTS with Ms. Pickens from November through the end

20  of the 2003 school year?

21          MR. MEAD:  That's included, your Honor.

22          THE COURT:  That's one damage claim.

23          MR. MEAD:  Yes.

24          THE COURT:  And the other damage claim is your claim

25  that from 2004 onward, she would have, but for your theories,

88

1   had a full-time permanent -- had a full-time position?

2       MR. MEAD:  Correct, your Honor.

3       THE COURT:  And that relates to those eight

4   positions?

5       MR. MEAD:  Yes.  There may have been more than

6   eight, but we're on the same wavelength.

7       THE COURT:  Then related but slightly different,

8   there is a claim, independent of those, beyond those, that

9   since she was precluded from interviewing going forward from

10  2004, there's a separate claim?

11      MR. MEAD:  Yes.

12      THE COURT:  Those are the three claims.

13      MR. MEAD:  As well as we would also put in the claim

14  that she was not hired for this three-week position that the

15  one kindergarten teacher spoke about the other day.  Where

16  there was testimony that she wouldn't have been hired because

17  of the filing of the lawsuit.

18      THE COURT:  All right.

19      MR. KUHAR:  To be sure we're talking about the same

20    thing, that would be Kathy Maruska's late February to possibly

21    as late as May of '04 assignment, which was approximately three

22    weeks in duration?

23            MR. MEAD:  Yes.  Or it could have been the other

24    one.  I think she was confused as to the two three-week

25    periods.  But there are two three-week ones when she was not

1  hired.  We would argue both of them.

2      MR. KUHAR:  The other one being in the second half

3  of the '04-'05 school year?

4      MR. MEAD:  That would be right.

5      THE COURT:  All right.

6      MR. KUHAR:  Your Honor, we move for judgment on a

7  few issues.  First, with respect to the specific '02 and '04

8  hires, there has been no specific evidence of pretext.  The

9  only evidence of pretext that we have seen is the remarks

10  attributed to Mr. Heller, actually for a validation of Mr.

11  Wright's remarks by Mr. Heller.  And then Mr. Wright's remarks

12  themselves.  With respect to Mr. Wright's remarks, we would say

13  there's been no evidence whatsoever that had any impact on any

14  decision at issue.  With respect to Mr. Heller's alleged

15  remarks, there's no impact that even if he were biased, as

16  evidenced by the alleged remark, that his being biased would

17  have made any difference on the outcome of the decisions

18  complained of.  That would be with respect to the '02 and '04

19  hires.

20        THE COURT:  All right.

21        MR. KUHAR:  We further transform our motion in

22  limine with respect to the retaliation claim into a request for

23  a judgment at this point with respect to the failure to

24  exhaust, based on the Robinson analysis and the discussion we

_____

25  had most of yesterday.

90

1          We also seek a ruling based on the mitigation issue.

2    If the defense were to offer no testimony whatsoever, the

3    stipulated testimony, as well as Ms. Wagner's testimony,

4    indicates that, we think it indicates that there's a nominal

5    award case.  Because although we had the burden of showing

6    alternate substantially equivalent employment, we did that

7    through the stipulation.  And then the plaintiff had the burden

8    as to why it was she didn't pursue that.  Her testimony on the

9    point was essentially that she lived in the Crawford Central

10   School District and her children went there, which we think is

11   inadequate under the law as a matter of law.  That's our

12   motion, your Honor.

13          THE COURT:  She also said that it was, in essence,

14   it was problematic to travel the distances involved given the

15   children at home.

16          MR. KUHAR:  I don't remember that testimony, your

17   Honor.

18          THE COURT:  In any event, those motions are denied.

19   Except I should say this as a matter of clarification, I'm

20   denying the motions, but I still have this retaliation issue

21   under -- let me be very clear.  I'm denying the motion relative

22   to the 2002 hiring, a long-term position, and the 2004 hirings,

23   on the basis that you had articulated relative to Mr. Heller

24   and Mr. Wright.

25          With respect to the retaliation claim, I am still

1  looking at that issue and it is my intention, in all likelihood

2  that a specific finding on your objection, which is preserved,

3  I shouldn't say in all likelihood, most definitely will be

4  included in my conclusions of law, as to whether that claim --

5  as to the effect of your exhaustion argument.  It will go one

6  way or the other.  Either I will find in connection with my

7  findings, that as a matter of law the claim under these

8  circumstances was not exhausted and there was no excuse for

9  failure to exhaust and/or there was no waiver.  Or I will find

10  under the unique circumstances of this case, the claim of a

11  failure to exhaust is not well-taken, in which case I will

12  reach the merits of the retaliation claim.  All that having

13  been said, that issue remains open.  So I wanted the record to

14  be clear, I wasn't denying your relief on that basis.

15          MR. KUHAR:  Understood, your Honor.

16          THE COURT:  Are you ready to go?

17          MR. KUHAR:  May we have five minutes.

18          THE COURT:  Yes, who are we going to hear from

19  coming up that is your first witness?

20          MR. KUHAR:  Fred Wagner, whose testimony we would

21  anticipate taking 10, 15 minutes.

22          THE COURT:  He's the brother?

23          MR. KUHAR:  Yes, sir.  And then approximately three

24  to four teachers, whose testimony likely will be shorter than

25  10 minutes.

92

1          THE COURT:  While I have you here and we're looking

2   at the issue in there on this exhaustion thing.  So the record

3   is clear, there was one charge that was filed with the PHRC in

4   February of 2003, is that right?

5          MR. MEAD:  In 2003, yes.

6          THE COURT:  There was no amended charge filed?

7          MR. MEAD:  No.

8          THE COURT:  All right.  The original complaint that

9   was filed in this case, and the date escapes me, but it would

10   have been sometime in 2004, I gather?

11          MR. MEAD:  The lawsuit, your Honor -- September of

12   2004.  I think it was perhaps amended in October of 2004.

13          THE COURT:  It was.  The original complaint did not

14   contain a retaliation claim, is that right, but the amended

15   complaint did?

16          MR. MEAD:  I believe I saw the word retaliation in

17   the complaint, your Honor, I don't have it right in front of

18   me.

19          THE COURT:  It's in the amended complaint in

20  October?

21          MR. MEAD:  Yes, I believe it is.

22          THE COURT:  Now, with respect to the discovery in

23  this case that proceeded after the October of 2004 complaint.

24  I presume, is it accurate to say that there was discovery on

25  all aspects of the October of 2004 complaint, including both

1    the underlying charge, as well as the retaliation charge?

2        MR. KUHAR:  Your Honor, I would have to look at the

3    amended complaint to confirm that.  I don't recall any specific

4    territory excluded from the discovery process.

5        THE COURT:  There was just an allegation in there

6    that she was, in essence, retaliated against with respect to

7    various job -- do you have it there?

8        MR. MEAD:  I have the first amended complaint, your

9    Honor.  Again, I apologize to the court, I did not draft it,

10   the complaint, if I could just flip through it a little bit.

11       THE COURT:  I don't have the complaint in front of

12   me, my law clerk has it.

13       MR. KUHAR:  The question is?

14       THE COURT:  First off, I want to hear the averment

15   with respect to retaliation in that complaint.  It's paragraph

16   (h), 26(h), says "defendants Crawford Central School District

17   and the Board unlawfully retaliated against plaintiff by

18   denying her long-term or full-time teaching positions because

19   she filed a complaint with the Pennsylvania Human Relations

20    Commission on February 20, 2003."

21            MR. MEAD:  Correct.

22            THE COURT:  I assume that that allegation,

23    specifically the retaliatory aspect of this, formed in some

24    part the subject matter of discovery that subsequently occurred

25    in the case, is that right?

94

1    MR. MEAD:  Your Honor, again, I was not present

2  during discovery.  I've read the depositions, I believe that

3  was part of it.  If I'm not mistaken, I believe that was also

4  part of the summary judgment motion.

5    THE COURT:  It was part of the summary judgment

6  motion.  There was discovery concerning retaliation, is that

7  right?

8    MR. KUHAR:  There was some, yes, your Honor.  It

9  really wasn't segregated from the other discovery that I can

10  recall, except with respect to the allegation that the

11  retaliation manifested through the diminution in short-term sub

12  assignments, which is the part that was ruled dismissed.

13    THE COURT:  All right.  We're going to take a

14  recess.

15    (Luncheon recess from 11:22 a.m.; until 1:00 p.m.)

16    THE COURT:  All right, we ready to go?

17    MR. KUHAR:  Yes, your Honor.  I have a brief

18  stipulation before we hear from the first witness.  The parties

19  stipulate that during her deposition testimony, the plaintiff

20    indicated that when Joye Pickens advised her of the

21    administration's decision not to employ the plaintiff --

22            THE COURT:  I'm sorry, can you start that all over

23    again, who advised who?

24            MR. KUHAR:  Sure.  Ms. Wagner testified at her

25    deposition that when Ms. Joye Pickens in November of '02

95

1  advised the plaintiff that the administration was not going to

2  have the plaintiff fill in for Ms. Pickens' leave of absence,

3  entire leave of absence, that Ms. Pickens said to the plaintiff

4  "we got screwed."

5       THE COURT:  All right.

6       MR. MEAD:  I have no problem with that, your Honor.

7  If Mr. Kuhar wants to read the exact quote from the deposition,

8  that's fine.

9       THE COURT:  Well, I think that is the exact quote?

10      MR. MEAD:  That is the exact quote?

11      MR. KUHAR:  I don't have it in front of me, either,

12  that's what I had proposed.

13      THE COURT:  You asked her that -- didn't somebody

14  ask her?

15      MR. KUHAR:  I asked Ms. Pickens whether she had said

16  that and she said she had not.

17      THE COURT:  As a matter of fact, she said I never

18  would have used a word like that.

19      MR. KUHAR:  Something to that effect.

20          THE COURT:  All right.  Then if you both stipulate

21    that's in the deposition, well, I would know it's in the

22    deposition, but the deposition isn't going to be submitted?

23          MR. KUHAR:  It hasn't been yet.

24          THE COURT:  I accept that it's in there.

25          MR. MEAD:  No problem, your Honor.

96

1       MR. KUHAR:  Okay.  May we call our first witness?

2       THE COURT:  You may.

3       MR. KUHAR:  Mr. Fred Wagner.

4          FREDERIC WAGNER, DEFENSE WITNESS, SWORN

5             DIRECT EXAMINATION

6  BY MR. KUHAR:

7  Q.   Mr. Wagner, where do you reside?

8  A.   In Meadville, Pennsylvania.

9  Q.   Where are you employed?

10  A.   I'm the Crawford County Treasurer.

11      THE COURT:  Keep your voice up just a little bit and

12  speak slowly.

13  BY MR. KUHAR:

14  Q.   Is that an elected position, sir?

15  A.   Yes, it is.

16  Q.   How long have you held that position?

17  A.   For 34 years.

18  Q.   Do you recall -- I'm sorry, how are you related to the

19  plaintiff?

20  A.    That would be my brother's wife.

21        THE COURT:  Otherwise known as your sister-in-law?

22        THE WITNESS:  Sister-in-law.

23  BY MR. KUHAR:

24  Q.    Bernie Wagner is your brother?

25  A.    Yes.

97

1  Q.   Correct?

2  A.   That's correct.

3  Q.   Okay.  Do you recall participating in a meeting at the

4  Crawford Central School District administrative building with

5  your brother in attendance?

6  A.   Yes, sir, I remember that.

7  Q.   Who else was there?

8  A.   Mr. Heller and Mr. Dolecki.

9       THE COURT:  Who was the first one that was there?

10       THE WITNESS:  Mr. Heller.

11  BY MR. KUHAR:

12  Q.   Assistant Superintendent Charlie Heller?

13  A.   Yes.

14  Q.   And the other one was Superintendent Mike Dolecki?

15  A.   That is correct.

16  Q.   Okay.  Now, why were you there for a meeting?

17  A.   Basically, I just went along with my brother, he wanted

18  to go over to talk to Mr. Dolecki and Mr. Heller.  I said well,

19  since there was only one of him and two of them, why I better

20    go along and make sure that, to try to keep everything under

21    control if at all possible.

22    Q.    When was this?

23    A.    I can't tell you the exact date.

24    Q.    If Bernie Wagner testified that that was in January,

25    February of 2003, does that sound right?

98

1  A.    If that's what was testified to, yes, I would say so

2  because it was only over there one time, so I was with him.

3  Q.    I think you said your purpose there was to essentially,

4  in light of fact that there was one of him and two of the

5  administrators?

6  A.    That's correct, sir.

7  Q.    Were you trying to essentially ensure that it didn't get

8  out of hand in any way?

9  A.    Hopefully, I could have been able to do that, yes.  If it

10  did, that's what I was there for.

11  Q.    Is it fair to say that your purpose for being there also

12  included being a witness to the event?

13        MR. MEAD:  I object to the leading nature of these

14  questions.  He's not our witness.

15        THE COURT:  All right, don't lead.  Was there any

16  reason.

17  BY MR. KUHAR:

18  Q.    Right.  Was there any other reason that you were there?

19  A.    Not that I remember, all I know is I just went along.

20  Q.    If Bernie Wagner testified that you were to be there to

21  be a witness to the event, does that sound inaccurate or

22  accurate?

23  A.    Well, I was there, so I suppose I'd be a witness to

24  whatever there was going on.  The reason why I went along was

25  to make sure that everything remained calm.  That was my

99

1   intentional purpose.

2   Q.   Do you recall -- I'm sorry, withdraw that.  How long was

3   the meeting?

4   A.   Probably, I would say, maybe a half-hour, in that area.

5   Q.   What do you recall of what was discussed during that

6   meeting?

7   A.   Well, I really -- you know, I was talking to Mr. Dolecki

8   a lot and he was talking to Mr. Heller.  You know -- I can't

9   say that I really recall a great deal of what that was about,

10  because that wasn't my intent to do that.  My intent was to

11  make sure that everything remained calm.  Because, and so it

12  did.  So I was just there.

13  Q.   Did Bernie Wagner ever tell you that George Wright had

14  made a comment to the effect of black and brown people are not

15  as intelligent as white people?

16  A.   He made that comment to me before we went over there.

17  Q.   Is there more?

18  A.   No.

19  Q.   Okay.  Did you understand that Bernie Wagner was

20   intending to discuss that comment with the administrators

21   during that meeting, in advance of the meeting, was that your

22   understanding?

23   A.   I would assume that probably he was going to discuss

24   that, but he did not tell me for sure.

25   Q.   During that meeting did Bernie Wagner attribute that

100

1   remark to George Wright?

2   A.   He could have.  Like I said, I was talking to Mr. Dolecki

3   a lot of the time about other things.  I just wanted to make

4   sure that he remained calm, that's all.

5   Q.   Is if fair to say that you don't recall whether he did?

6   A.   I would say that it was probably fair to say that he

7   didn't because I cannot remember whether he mentioned that or

8   not.

9   Q.   Did any administrator confirm or agree with such a remark

10   during that meeting?

11   A.   As far as I'm concerned, Mr. Dolecki did not.  I could

12   not say that Mr. Heller didn't.

13   Q.   Do you have any recollection of him doing so, Mr. Heller?

14   A.   I don't have any recollection, I can't remember anything

15   distinctly that he mentioned that to him.

16   Q.   Would you agree that if Mr. Heller had confirmed that he

17   agreed with that kind of a remark, that that would have been a

18   surprise to you?

19   A.   I don't know whether it would have been a surprise or

20  not, you know.  I guess I would been somewhat surprised if he

21  would made that comment about that.  But, you know --

22  Q.   I can't tell whether you're agreeing with my question or

23  disagreeing with it.  I think at the beginning you were unsure,

24  at the end you said you would have been surprised?

25  A.   I guess, you know, him being a professional like that,

101

1  I'd probably been surprised if he had made a comment like that.

2  Q.   It would have surprised you?

3  A.   I think so.

4  Q.   In your 30 plus years in public service, have you ever

5  heard a public servant say anything like that?

6  A.   Yes.

7  Q.   When?

8  A.   I can't exactly remember the dates and stuff.  But I've

9  been in various meetings with county officials and stuff and

10  I've heard some people make comments to that effect, yes.

11  Q.   And sitting here today you remember them, don't you?

12  A.   I remember, you know, comments made, but I cannot tell

13  you exact times or dates or when this was, you know.  No, I

14  can't do that.

15  Q.   But even though some of them were many, many years ago,

16  sitting here today you remember them because that's such an odd

17  statement for a public servant to make?

18  A.   Well, it's a little bit out of the ordinary for anyone to

19  say unless they're sitting around, you know, at someplace

20  socializing somewhere.  But kind of in a public meeting, why I

21  wouldn't expect anyone to say that.

22          MR. KUHAR:  I have nothing further, thank you.

23          THE COURT:  All right.  Mr. Mead.

24          MR. MEAD:  Thank you, your Honor.

25                  CROSS-EXAMINATION

102

1  BY MR. MEAD:

2  Q.    Now, Mr. Wagner, it's fair to say that when you came to

3  the meeting, you had no agenda yourself, correct?

4  A.    That is correct.

5  Q.    You were just there to support your brother in case

6  something occurred, correct?

7  A.    That is correct.

8  Q.    While you were there, is it true that you were talking to

9  Mr. Dolecki while at the same time Mr. Wagner was talking to

10  Mr. Heller?

11  A.    That is correct.

12  Q.    So you weren't privy to all the conversation between Mr.

13  Heller and Mr. Wagner?

14  A.    That is correct.

15  Q.    So there could have been a comment made by Mr. Heller,

16  but you just wouldn't have heard it, correct?

17  A.    That is correct.

18  Q.    When you left that meeting, did you have any impression

19  about what was going to happen to Ms. Wagner based on what you

20  had heard?

21  A.   Based upon the conversation that I had with Mr. Dolecki

22  and the comments that my brother made to me, I told him, I said

23  that I didn't feel that she was going to, that there was any

24  sense of us going over there.

25  Q.   Why?

103

1   A.    Because I just felt that they already had made their mind

2   up that they were not going to hire her.

3          MR. MEAD:  Thank you, no further questions.

4          MR. KUHAR:  Nothing further, thank you.

5          THE COURT:  Thank you, Mr. Wagner, you're free to

6   go.

7          MR. KUHAR:  Your Honor, the next witness is George

8   Wright.

9          THE COURT:  Mr. Wright, come right up here.

10          THE CLERK:  Raise your right hand, please.

11          GEORGE WRIGHT, DEFENSE WITNESS, SWORN

12               DIRECT EXAMINATION

13   BY MR. KUHAR:

14   Q.    Good afternoon, Mr. Wright.

15   A.    Good afternoon.

16   Q.    Where do you reside?

17   A.    In Meadville, Pennsylvania.

18   Q.    For how long?

19   A.    I've been there about 11 years.

20  Q.   Are you employed?

21  A.   No, I've been retired for many years.

22  Q.   I would ask you to maybe move that microphone down a

23  little bit.  Thank you.  When did you retire from active

24  employment?

25  A.   1979.

104

1   Q.   And where were you working at that time and in what

2   capacity?

3   A.   Hamot Medical Center, I was director of human resources.

4   Q.   How long had you held that position?

5   A.   I was there for approximately five years.

6   Q.   What position did you have prior to that and at what

7   employer?

8   A.   I was human resources director at the Lake County

9   Hospitals in Ohio.

10   Q.   So, from approximately '74 back until approximately when?

11   A.   I went there in '71.

12   Q.   Where did you work prior to that?

13   A.   I was at Erickson Tool Company in Solon, Ohio.

14   Q.   And what was your position there?

15   A.   I was director of personnel.

16   Q.   Is that the first personnel position you held?

17   A.   Actually, yes.  I did personnel functions in previous

18   jobs, but that was the first time I was in charge of the

19   department.

20   Q.   For how many years prior to that appointment had you been

21   responsible for personnel functions at employers?

22   A.   At Ohio Bell I had a number of personnel functions in the

23   traffic management department.  Safety, interviewing, the

24   employment office, things like that.

25   Q.   At these various HR positions and the prior positions

105

1  where you had personnel duties, were you responsible for

2  assuring your employer's compliance with EEO laws?

3  A.   I wouldn't have been in the prior positions because there

4  was a super personnel function that took care of those things.

5  But I was responsible for them in the last four assignments.

6  Q.   Do you accept the concept of equal employment

7  opportunity?

8  A.   Of course.

9  Q.   Any resistance or reluctance to implement it?

10  A.   Not a bit.

11  Q.   At some point did you become a Crawford Central School

12  District board member?

13  A.   Yes, I did.

14  Q.   When was that?

15  A.   I was elected to serve starting in 2001.

16  Q.   Through when?

17  A.   Through 2005.  December to December.

18  Q.   Do you know Bernie Wagner?

19  A.   Yes, I do.

20  Q.   How did you come to know him?

21  A.   I had talked to him on the telephone a number of times

22  and I did meet with him one time.

23  Q.   When was that, sir?

24  A.   2002, 2003, I'm not sure exactly.

25  Q.   You said you met with him one time, correct?

106

1  A.  Right.

2  Q.  And where did you meet with him?

3  A.  I met with him at an office that we have for the Service

4  Corps of Retired Executives, it's an office that I had access

5  to, it's a neutral place, I thought it would be a good place to

6  meet with him.

7  Q.  Is the acronym for that organization SCORE?

8  A.  Right.

9  Q.  Why did you meet with him, who set up the meeting?

10  A.  They wanted to talk about the employment of his wife.

11      THE COURT:  Who's they?

12      THE WITNESS:  Mr. and Mrs. Wagner.  But I talked to

13  him about it, I didn't talk to Mrs. Wagner at that time.

14  BY MR. KUHAR:

15  Q.  Are you saying you had a telephone conversation with him?

16  A.  To set up the meeting?

17  Q.  Yes.

18  A.  Yes.

19  Q.  Okay.  So did you propose a meeting or did he, Mr.

20  Wagner?

21  A.   I was trying to help them solve a problem, I'm not sure

22  whether he proposed that we meet or I proposed that we meet.

23  But it was mutually agreeable that we have a meeting.

24  Q.   Did you propose having it at the SCORE office?

25  A.   I did.  Because of the privacy and the neutral territory.

1  Q.    And who all was present at that meeting?

2  A.    Just Mr. and Mrs. Wagner and myself.

3  Q.    How long did it last?

4  A.    Not real long, 20 minutes to half an hour.  Seems like

5  that much of time.

6  Q.    Prior to that meeting, had you ever met Ms. Rowena

7  Wagner?

8  A.    No.

9  Q.    Had you at any time, had you ever invited her to a drug

10  and alcohol commission meeting?

11  A.    That was subsequent to that.

12  Q.    Okay.  We'll defer that for a minute then.  So what was

13  the expressed purpose for the meeting?

14  A.    Mr. Wagner wanted to talk to me about helping get a job

15  for his wife as a school teacher, as an employee.

16  Q.    What do you recall being said during the actual meeting

17  that took place at the SCORE building?

18  A.    Well, I told him that that wasn't my level of

19  responsibility, I wasn't involved in hiring teacher personnel,

20   and I mainly listened to what they wanted to tell me.

21   Q.   How much of the talking did you do versus how much did

22   Mr. Wagner do or Ms. Wagner?

23   A.   I did very little of it.  And Mrs. Wagner did very little

24   of it.  Mr. Wagner carried the conversation essentially.

25   Q.   During that conversation, did you make any comments to

108

1  the effect of white people being more intelligent or smarter

2  than black or brown people?

3  A.    Absolutely not.  I would never say anything like that,

4  it's contrary to my total philosophy.

5  Q.    Did anybody say anything like that during that meeting?

6  A.    I don't recall, there's no reason why they would have.

7  So there was no one else there.

8  Q.    Was anything that you deemed offensive said during that

9  meeting by anyone?

10  A.    No, not really.  I think we were trying to work out a

11  problem.

12  Q.    And how did the meeting end?

13  A.    I told them again that there was nothing I could do, they

14  had to go through the regular process.

15  Q.    You think that was the last comment you made?

16  A.    I'm sure that I said that it would be an expensive task

17  and especially for the taxpayers, and that they might have very

18  little chance to prevail in a court of law.  That was an

19  offhand opinion that I had.

20   Q.   Well, let's talk about that a little bit.  What did they

21   say that made you say this about having a little chance of

22   succeeding?

23   A.   It was just -- my understanding of what had happened, it

24   seemed like everything was done appropriately.

25   Q.   Did Mr. Wagner suggest or say that he was inclined to

109

1  file a lawsuit or that his wife was so inclined?

2  A.    I don't know, I think it was at least implied.

3  Q.    And, again, tell me how you responded to that

4  implication?

5  A.    I said you certainly have that opportunity.  I've been

6  involved probably in thousands of hiring decisions and I can't

7  ever recall that that was the approach that had been taken.

8  Q.    You said all of that or --

9  A.    No, I just thought that.  I thought back over all these

10  people and nobody had used that approach to get a job anywhere

11  else I had been.

12      THE COURT:  Just so I'm clear, you say that

13  approach, what approach are you talking about?

14      THE WITNESS:  About suing to get a job.

15      THE COURT:  All right.  Go ahead, Mr. Kuhar.

16  BY MR. KUHAR:

17  Q.    At any time through today, all the way back to when you

18  became affiliated with the school district through today, has

19  any school board member or administrator ever said or done

20  anything that made you think that they would retaliate against

21  somebody who filed an administrative charge of discrimination

22  or a lawsuit?

23  A.    No.  Well, for one thing they can't, I mean it wouldn't

24  be appropriate.

25  Q.    But even though it wouldn't be appropriate for that to

110

1  happen, talking that into account, has anyone ever done

2  anything that made you think that they would inappropriately

3  retaliate against someone?

4  A.    No, nothing to my personal knowledge.

5  Q.    As a board member, when you were a board member, what

6  involvement did you have in hiring teachers?

7  A.    Basically, each month a whole list of both resignations

8  and new hires is presented for our approval.  And it's approved

9  in a summary basis.

10  Q.    During the time that you were on the board, were any of

11  those recommendations voted down?

12  A.    The recommendations of the administration -- I can't

13  think of any instance where what they recommended was rejected

14  by the board.

15  Q.    At anytime that you were affiliated with the school

16  district, did you in any way participate in the decisions

17  regarding whom the district would interview?

18  A.    For management positions, but not for teachers.

19  Q.    Thank you for clarifying that.  Where did you obtain your

20   undergraduate degree -- you do have an undergraduate degree,

21   right?

22   A.   Right, DePauw University at Greencastle, Indiana.

23   Q.   Would you spell that, please?

24   A.   D-e-P-a-u-w, it's not the big basketball school from

25   Chicago.

111

1   Q.   At the time that you were there, were there fraternities?

2   A.   There were.

3   Q.   Did the fraternities allow racial minorities as members?

4   A.   No, they didn't at that time.

5   Q.   Were they permitted in any social organizations?

6   A.   The only one on campus was Mens Hall Association.

7   Q.   Were you a member of any fraternities?

8   A.   No.

9   Q.   Were you a member of the Mens Hall Association?

10  A.   I was.

11  Q.   Why?

12  A.   Because they had a policy of an individual being

13  important and responsible, and it was a non-discriminatory

14  scholarship based organization.  It wasn't based on social

15  fraternity premises.  I just felt more comfortable in that kind

16  of organization.

17  Q.   Were you an officer of that association?

18  A.   Yes, for several years, I ended up being president.  And

19  then I was an officer in our alumni group after that.

20  Q.   When did you graduate from DePauw?

21  A.   I graduated in the class of '54.

22  Q.   Were you at all involved in any civil rights movements at

23  DePauw?

24  A.   I was a member of the congress of racial equality.

25  Q.   Please describe that, tell us what that means?

112

1　A.　It was an organization that was fighting for civil rights

2　for minorities and, as I recall, Senator McCarthy granted it as

3　un-American.  I thought it was very American actually.

4　Q.　What did you do in conjunction with that organization?

5　A.　It was just meetings and discussing the problems with the

6　minorities on campus, the problems they were having.

7　Q.　When you were at DePauw, were there any African-American

8　females in attendance?

9　A.　There were none in the four years I was there.

10　Q.　Was there ever any move to recruit any to the school?

11　A.　We came up with a plan in the year that I was president

12　to present a small welcome to DePauw scholarship for the first

13　black woman that would come to the university.

14　Q.　When you said we, who did you mean?

15　A.　Our organization, the Mens Hall Association government.

16　Q.　Why did your organization do this?

17　A.　Well, all the black members on campus were in our group,

18　and they actually pretty much had to go to Indianapolis or

19　Terre Haute to date or get their hair cut or anything.  It was

20   just a situation of reasonable fairness that we thought there

21   should be representatives of the female persuasion of the black

22   race on the campus.  We actually had minorities on campus, but

23   they were foreign exchange students.  They could be from

24   somewhere else, Africa or something like that, but they weren't

25   American citizens.

113

1   Q.   And your group opposed that distinction?

2   A.   Yes.

3   Q.   Was that effort successful in recruiting any

4   African-American females to DePauw?

5   A.   It took some time.  But when I came back from the Air

6   Force, I went into the alumni organization where we actually

7   approved and funded that scholarship, probably four years

8   later, which would have been '58.  We still were way ahead of

9   the Civil Rights Act being passed?

10  Q.   Which Civil Rights Act was that?

11  A.   Of 1964.

12       MR. KUHAR:  I have no further questions, thank you.

13                   CROSS-EXAMINATION

14  BY MR. MEAD:

15  Q.   Mr. Wright, when you testified earlier that you had been

16  involved in thousands of hiring decisions, you weren't

17  referring to your time period on the board, correct?

18  A.   No, that's my total experience in human resources.

19  Q.   So there was a lot fewer when you were on the Crawford

20   Central School Board, correct, there weren't thousands of

21   hiring decisions made during that time period?

22   A.   Are we talking about everybody now, the teachers

23   included?

24   Q.   Yes.

25   A.   I was only involved in the management hiring at the

1  school district.  No, probably not.  Because at Hamot I had

2  2,200 employees.  With a fairly high turnover rate.

3  Q.    Understood.  So when you say thousands of hirings, you're

4  referring to your time period at Hamot as well, correct?

5  A.    And the previous hospital and the tool company prior to

6  that, yes.

7  Q.    When you were on the board, the school board, am I

8  correct that the school board had final approval of

9  recommendations made by the administration?

10  A.    Yes.

11  Q.    So it was actually the school board's decision whether or

12  not somebody would be hired because, in all fairness, if you

13  didn't want that person hired, you could have blocked it?

14  A.    But we wouldn't have had any basis to do that.  We

15  wouldn't have interviewed them, we wouldn't know who they are.

16  Q.    So are you telling us that you would blindly accept any

17  recommendations by the administration and just give a rubber

18  stamp of approval, is that your testimony?

19  A.    No, if there was somebody that we could identify as

20   having been a problem in the community, somebody that was well

21   known to be, you know, an acceptable employee, we would

22   certainly voice an opinion on that.  And the board could have

23   rejected somebody.  I just don't recall that we ever did.

24   Q.    Fair enough.  So the board did have the power to reject

25   someone if they wanted to?

115

1  A.   Yes.

2  Q.   And you say if a person was a problem within the

3  community, that person may be rejected as well, correct?

4       MR. KUHAR:  Objection, he is not fully stating the

5  comment, changing it in effect.

6       THE COURT:  Overruled.  Do you understand the

7  question, sir?

8       THE WITNESS:  Would you repeat it.

9  BY MR. MEAD:

10 Q.   Certainly.  I believe your testimony was that if you had

11 heard that somebody was a problem within the community, that

12 could have been discussed and possibly the board could reject

13 that person, correct?

14 A.   In a fairly small community, if you know somebody would

15 be a detriment to the school board, you wouldn't want to put

16 them in charge of a classroom of our people, our children.

17 Q.   And such people could include people who file lawsuits,

18 correct?

19 A.   No.  That's -- people are allowed to do that.  This is a

20  free country, they can file a lawsuit if they want to.  It

21  can't be prejudicial.

22  Q.    However, if a person was looking for a job, your

23  recommendations would be you wouldn't sue a potential employer

24  as a start, correct?

25  A.    Well, as I say, I had never experienced that as an

1   approach to getting a job in my prior time.

2   Q.   So in your opinion that wouldn't be a very good approach,

3   would it?

4   A.   I would think it would be a desperate last-ditch effort.

5   Q.   That would not be looked favorably upon by the potential

6   employer, would it?

7   A.   But the employer should know that that's not something

8   that they can use.

9   Q.   Well, supposed they don't, I'm saying in your opinion --

10  A.   Well, their personnel director should have told them what

11  is legal or what's not or their legal counsel should have told

12  them what's legal or what's not.

13  Q.   Let me direct your attention back to the time period when

14  you were on the board.  We heard that -- well, let me ask you.

15  When you were on the board, did you have any discussions with

16  the administration as to whether or not they should be seeking

17  out more minority hires?

18  A.   Well, with the demographics, that was something that was

19  discussed and everybody realized that it was desirable that we

20   have a better balance.

21   Q.   By everyone, do you mean everyone on the school board?

22   A.   I think everybody understands the desirability of having

23   that kind of an organization.

24   Q.   So, is it correct, in your opinion, more minorities mean

25   more diversity, which equals a better school system; would you

117

1   agree with that statement?

2   A.   Yes.  I'm sure that we made substantial efforts to

3   recruit minorities.

4   Q.   Tell me about your efforts?

5   A.   I wasn't involved in them.  I'm talking about the efforts

6   the administration went to, I know they went to special

7   recruiting processes and things like that.

8   Q.   Well, from 2001 to 2005, tell me how many minority

9   teachers were hired due to these substantial efforts?

10   A.   I don't know because the hiring list doesn't identify

11   people by race.  I'm sure that there were not many.

12   Q.   So when the list comes to you for approval as a member of

13   the board, you don't know whether or not they're minorities?

14   A.   No.

15   Q.   That's not discussed among the board, whether or not a

16   person who's applying is or is not a minority?

17   A.   The board wouldn't be discussing hiring people at that

18   level on any basis.  Of course, when we were interviewing

19   management, managers, we would have known because we would be

20  talking to them.

21  Q.    By managers, sir, do you include the administration of

22  the Crawford Central School Board?

23  A.    Yes.

24  Q.    Can you tell us how many minority administrators for the

25  Crawford Central School Board you personally hired or the board

118

1  hired during your administration?

2  A.  There weren't any.  I think we hired --

3  Q.  Zero?

4  A.  I think we hired three managers all together.  And each

5  of them were in specialized positions.  I don't recall that

6  there were any applicants that were minorities.

7  Q.  So no minorities were hired as administrators by the

8  board during your time period there, is that correct?

9  A.  Correct.

10      MR. MEAD:  That's all I have.

11      THE COURT:  Do you have anything else, Mr. Kuhar?

12      MR. KUHAR:  No, your Honor.

13      THE COURT:  I have just one or two questions for you

14  to fill in some blanks for me.  When the administration would

15  make hiring recommendations to the board, not for teaching

16  positions now, whether it be long-term substitutes or permanent

17  positions, what information did you receive with respect to a

18  prospective candidate that was being recommended, did you

19  simply get a name or would there be a resume, would you see the

20   forms that had been filled out, give me some idea as to what

21   you knew?

22          THE WITNESS:  The name and salary, that would be

23   all.  In other words, if they gave them salary increments

24   based on experience or some differential from the starting

25   salary, we would know their name and their pay scale.

119

1          THE COURT:  Okay.  Thank you, very much, sir, you're

2  excused.

3          MR. KUHAR:  Tammy Foster will be our next witness,

4  your Honor.

5          THE CLERK:  Would you raise your right hand, please.

6          TAMMY FOSTER, DEFENSE WITNESS, SWORN

7              DIRECT EXAMINATION

8  BY MR. KUHAR:

9  Q.   Good afternoon, Ms. Foster.

10  A.   Good afternoon.

11  Q.   Where do you reside and where are you employed?

12  A.   I reside at 470 Arch Street, Meadville, Pa.  And I'm

13  employed with the Crawford Central School District.

14          THE COURT:  I suspect you're a little bit nervous?

15          THE WITNESS:  I'm very much so.

16          THE COURT:  Why don't we do this, why don't you give

17  her some water, that usually does the trick.  All right, go

18  ahead.

19  BY MR. KUHAR:

20  Q.   Do you have a college degree?

21  A.   Yes.

22  Q.   Where is from and what's it in?

23  A.   Edinboro University and it's in elementary education,

24  bachelor.

25  Q.   When did you receive that?

120

1  A.   1994.  '94, yes.

2  Q.   1994?

3  A.   Uh-huh.

4  Q.   Where are you employed right now and in what capacity?

5  A.   I'm at First District Elementary School, second grade.

6  Q.   In Crawford Central School District?

7  A.   Crawford Central.

8  Q.   Full-time?

9  A.   Full-time.

10  Q.   When did you first apply for employment with the

11  district?

12  A.   Right when I graduated, I had submitted my application to

13  be on the sub list.  So that would have been in '94, when I

14  graduated.

15  Q.   Of course school started in August, so your first

16  subbing, I imagine, was in August or September of '04?

17  A.   Yes.

18  Q.   And how frequently did you sub -- would that be a

19  day-to-day sub?

20  A.  Day-to-day, yes.

21  Q.  And how frequently did you sub during that first school

22  year?

23  A.  It wasn't everyday, I would say maybe twice a week,

24  sometimes more than that.

25  Q.  And for how long did it continue like that?

121

1    A.    For that whole year, for the school year from '94-'95, I

2    did it that whole year.  Not day-to-day, but subbed

3    periodically throughout that year.  And I think I did it just

4    for that year straight through.  And then afterwards I had to

5    go out and seek something else just on my own.

6    Q.    Other employment?

7    A.    Yes.

8    Q.    That was your own decision?

9    A.    Uh-huh.

10         THE COURT:  Yes or no?

11         THE WITNESS:  Yes.

12   BY MR. KUHAR:

13   Q.    Why did you make that decision?

14   A.    I didn't like the fact the phone calls that I would get

15   early in that morning, and not knowing, not consistently being

16   in one place at one time.

17   Q.    What kind of employment did you move to?

18   A.    I was a physical therapy aide?

19   Q.    Where?

20   A.   At Anderson, it's called Anderson Physical Therapy in

21   Meadville.

22   Q.   Was that full-time?

23   A.   No, that was part-time.  And I would still get calls and

24   if I didn't have to work for them, I would go sub.  After that

25   next year, but not as much as I did the first year that I

122

1   subbed.

2   Q.    Okay.  So that would be in '95-'96?

3   A.    Yes.

4   Q.    Is that how it was for all of '95-'96?

5   A.    Yes, I didn't sub very often that year, during that whole

6   school year.

7   Q.    What about '96-'97, what did you do in terms of

8   employment, if anything?

9   A.    I think I was still at the end of some physical therapy,

10  part-time.

11  Q.    When did things change?

12  A.    I became pregnant.

13  Q.    When?

14  A.    In '98.  And my father got sick in '97, so I pretty much

15  didn't do anything but help my mother with him.

16  Q.    For how long were things like that?

17  A.    From '97 to -- he passed away in October of '98.

18  Q.    And then how soon thereafter did you start actively

19  working again?

20    A.    I had a son in '99, and then I got back into the district

21    part-time as an aide.

22    Q.    How did you obtain that position?

23    A.    I had a phone call from Mr. Dolecki and I was asked that

24    this position was open, would I be interested.

25    Q.    Had you submitted your name?

123

1  A.   Yes.

2  Q.   And did you take it?

3  A.   Yes.

4  Q.   So from what time, during what timeframe did you have

5  that employment?

6  A.   I was part-time from -- I think I did that position for I

7  think about two years.

8  Q.   So help me out on the dates if you can?

9  A.   I did it the school year from '99, 2000 and I believe

10  2001-2002.  Oh, maybe I bid into -- I'm kind of confused about

11  the dates.

12  Q.   Take your time, it's okay.

13  A.   I did a part-time, an extended school year kindergarten

14  aide, I believe I did that for two years.  And then I bid on a

15  full-time aide position because there was nothing else

16  available.

17  Q.   And when did you do that?

18  A.   I want to say either 2000 or 2001.

19       THE COURT:  When you said part-time, what did that

20    mean, part-time?

21         THE WITNESS:  I would come to work at 11, it was an

22    afternoon kindergarten session that I worked with.  There's a

23    morning session and there was an aide for the morning session.

24    And then there's an afternoon session, I was the aide for that

25    afternoon session.

124

1          THE COURT:  An aide, as opposed to a full-time

2  teacher?

3          THE WITNESS:  Yes, I would assist the full-time

4  teacher in the room.

5          THE COURT:  Go ahead.

6  BY MR. KUHAR:

7  Q.   For how long did you hold that position?

8  A.   The full-time aide?

9  Q.   I'm sorry, thanks for clarifying that.  You were

10  describing the part-time position in response to the judge's

11  questions?

12  A.   Yes.

13  Q.   So when did you get a full-time position?

14          THE COURT:  Just roughly?

15          THE WITNESS:  I want to say 2001 maybe.

16  BY MR. KUHAR:

17  Q.   For how long did you have that position?

18  A.   Two years.

19  Q.   And what kind of employment did you have after that?

20   A.   That's when I applied for a full-time teacher's position.

21   Q.   Do you recall when that was?

22   A.   I believe I was hired 2004.  So I would have applied

23   during the school year prior to that.

24   Q.   Did you have any conversations with Mr. Heller prior to

25   applying for that teaching position, about the position?

125

1  A.   Yes, through incidental contacts.  A friend was down at

2  Second District School, that's where I did my aide position --

3  Q.   At the time you were a full-time aide at Second District

4  Elementary School?

5  A.   Yes.

6  Q.   Go ahead.

7  A.   And I had a friend that was getting ready to graduate

8  from Edinboro University in teaching.  And so she had ran into

9  Mr. Heller, he was at Second District and she said I hear

10  there's going to be --

11        MR. MEAD:  I object to this, this is hearsay.

12        THE COURT:  Sustained.

13        MR. KUHAR:  We're just using this to explain why she

14  applied for the position --

15        THE COURT:  All right.  If it's why she was doing

16  it, that's fine.

17        THE WITNESS:  I was with a friend who ran into Mr.

18  Heller, who had said there was going to be a lot of jobs.

19        MR. MEAD:  I'm still going to object to that.

20          MR. KUHAR:  Your Honor, we'll stipulate that we're

21   not using this testimony to show that there were a lot of jobs.

22   But, rather, I want to explain the process, the net effect of

23   which is, as soon as Mr. Heller had any sense that this witness

24   was qualified to apply for teaching positions, he encouraged

25   her to do so and made a lot of meaningful suggestions.

126

1    THE COURT:  Well, is the upshot here that based upon

2  what she heard from this woman, she then decided to apply?

3    MR. KUHAR:  Yes.  But in between as Mr. Heller's

4  overhearing this and encouraging her to apply.

5    MR. MEAD:  That's being brought out for the truth of

6  the matter he's encouraging her to apply.  That's what he's

7  trying to establish here.  That he encouraged her to apply,

8  that's what the statement would be.

9    MR. KUHAR:  That would not be hearsay.

10    THE COURT:  Put it this way, I'm not taking the

11  testimony for the truth of the matter.  I'm simply taking the

12  testimony as to why this witness did certain things.  That's

13  how it's being offered, is that right?

14    MR. KUHAR:  Yes, your Honor.

15    THE COURT:  All right, overruled.

16  BY MR. KUHAR:

17  Q.    So there was this conversation, and Mr. Heller overheard

18  part of that?

19  A.    Right.  And I said I would apply, also.  He was not aware

20  that I had a teaching degree.

21  Q.   Did he say so?

22  A.   Yes.

23  Q.   That he wasn't aware?

24  A.   Yes, I think his words were I wasn't aware you have your

25  teaching degree, I didn't know that.

1        THE COURT:  I'm going to sustain that objection,

2  that is hearsay.

3        MR. KUHAR:  On the issue of whether he knew she had

4  a teaching degree?

5        THE COURT:  That's hearsay.  That doesn't affect

6  what she was doing, that's for the truth of the matter.

7  BY MR. KUHAR:

8  Q.   During that conversation did Mr. Heller say anything

9  else?

10  A.   No.

11  Q.   At some subsequent point did Mr. Heller encourage you to

12  apply for that position?

13  A.   Yes.

14  Q.   When?

15  A.   Well, prior to that there was a grant that the Second

16  District School had obtained.  And they would be in need of

17  teachers to run the after-school program.  And he came to a

18  day-care job that I had at a different school --

19  Q.   Would this have been in '03?

20   A.   Yes.

21   Q.   Do you remember which month?

22   A.   It was in the summer because I was at summer day camp.

23   I'm not sure what month it was.

24   Q.   Please, go ahead.

25   A.   And he asked if I would be interested in a teaching

128

1   position for this after-school program.  And I said sure.

2           THE COURT:  What year was this now, roughly, or when

3   was this?

4           THE WITNESS:  '03, maybe 2002.

5           MR. KUHAR:  Well, I asked her whether it was '03,

6   she had said it was, and said it was the summer of '03.

7           THE WITNESS:  Yes.

8           THE COURT:  All right.  Go ahead.

9           THE WITNESS:  Then I said yes.  Then he referred me

10  to Suzanne Good to get some books to read up on to be more

11  familiar with different teaching styles and strategies, which I

12  did.

13  BY MR. KUHAR:

14  Q.   Did you meet with Ms. Good?

15  A.   I did.

16  Q.   What do you recall of that conversation?

17  A.   She heard that I would be teaching an after-school

18  program.  There were also some other teachers that would be

19  doing it.  And so for the first half of the year she wanted me

20   to work with a math teacher so I could be familiar with the

21   different math strategies that would be used in the classroom.

22   So I did that.  And then the second half of the year I worked

23   with the reading teacher.  To be familiar with some reading

24   strategies.

25   Q.   Okay, I just want to clarify what you're talking about

129

1  exactly.  When you say the first and second half of the year,

2  you're talking about the '03-'04 school year?

3  A.   Yes.

4  Q.   And these things that you said Ms. Good wanted you to do

5  this and wanted you to do that, are those things she told you?

6  A.   Yes.

7  Q.   This was an after-school program?

8  A.   Correct.

9  Q.   What was it called again?

10  A.   The Stars after-school program.

11  Q.   And were you paid for participating in that?

12  A.   I don't remember what the teacher's salary was back then.

13  I don't know what it was approximately.

14  Q.   But it was a teacher's pay?

15  A.   Yes.

16  Q.   Okay.  And, approximately, how many hours a week was

17  that?

18  A.   It was from 2:30 to 5:00, when it first started it was

19  Monday through Friday, for the first year.

20  Q.    Is that the only year you were in it?

21  A.    No, I continued to do it through this past school where

22  the grant ended.

23  Q.    I see.  Okay, so you did that for the '03-'04 school

24  year?

25  A.    Yes.

1   Q.   And did you continue to work as an aide as well?

2   A.   Yes.

3   Q.   Full-time?

4   A.   Uh-huh, yes.

5   Q.   Okay.  At some point did you express interest formally in

6   a permanent teaching position?

7   A.   Yes, I resubmitted my resume when I was aware of all the

8   retirees and positions that there would be.

9   Q.   Would that have been during the '03-'04 school year?

10  A.   Yes.

11  Q.   Do you recall what month, what time of year?

12  A.   I don't know what month it was.

13  Q.   Do you recall when -- were you interviewed?

14  A.   Yes.

15  Q.   Do you recall when that was?

16  A.   It want to say April or May, I'm not sure, of the '03-'04

17  school year.

18  Q.   And by whom were you interviewed?

19  A.   There were two different sessions.  I had to go in one

20  room with Mr. Heller and several building principals for a

21  30-minute interview.  And then when I left from that interview,

22  I went into another room for another 30-minute interview with

23  Suzanne Good and the rest of the elementary school principals.

24  Q.   Did you consider any part of the interview that you

25  participated in to be unfair towards you?

131

1  A.   No.

2  Q.   Did any person make any remark or do anything that you

3  thought, that made you think they were bias because of your

4  race or minority?

5  A.   No.

6  Q.   And for the benefit of the record, you're

7  African-American?

8  A.   Yes.

9  Q.   How do you think your interview went?

10  A.   I think it went well.  I spent several weeks prior to

11  that preparing for it.  Reading up on books and talking to

12  colleagues that I had worked with during Stars, I think I did a

13  pretty well job.

14  Q.   Were those the books that you had been encouraged to

15  read?

16  A.   Yes, and different magazine articles, yes.

17  Q.   By whom?

18  A.   Suzanne Good?

19  Q.   Do you recall any other titles?

20  A.  I can't remember the names.

21  Q.  Do you recall what they were about, generally?

22  A.  They were about planning and preparation.  They were

23  about different strategies, newer strategies from what I was

24  taught back in '94 when I when was in college.

25  Q.  Would it be fair to say that some of those strategies you

132

1  had been taught in college had been replaced by newer

2  strategies?

3  A.    Yes.

4  Q.    And then were you offered a position?

5  A.    Yes.

6  Q.    I'm sorry, were you offered a regular permanent teaching

7  position?

8  A.    Yes.

9  Q.    When did that start?

10  A.    The 2004-2005 school year.

11  Q.    Who notified you that you had been selected for that?

12  A.    Mr. Heller.

13  Q.    You obviously accepted?

14  A.    Yes.

15  Q.    Prior to Mr. Heller's reacting the way he did to you

16  saying that you had a certificate, were you acquainted with

17  him?

18  A.    I met him, our daughters played basketball together.  So

19  I knew him, but I really didn't know him.

20  Q.   You knew who he was?

21  A.   I knew who he was.

22  Q.   Currently, how would you describe your relationship with

23  him?

24  A.   A good friend.

25  Q.   Has he befriended your children?

133

1  A.   Yes.

2  Q.   Which children?

3  A.   My two sons.

4  Q.   And how old are they?

5  A.   Twelve and seven.

6  Q.   What are their names?

7  A.   Artrell is twelve and Armanti is seven.

8  Q.   Does he engage in recreational activities with them?

9  A.   Yes.  My 12-year-old is a basketball player and he's

10  really into fitness, and Mr. Heller trains him the correct way

11  to condition himself.

12  Q.   Work out?

13  A.   Yes.

14       MR. KUHAR:  Thank you, I have no further questions

15  at this time.

16       THE COURT:  All right.

17            CROSS-EXAMINATION

18  BY MR. MEAD:

19  Q.   When you first graduated, it was the year 1994, correct?

20  A.  Correct.

21  Q.  And you graduated with a degree in education?

22  A.  Yes.

23  Q.  From Edinboro University?

24  A.  Yes.

25  Q.  At anytime thereafter did you get your certification?

134

1  A.  My teacher certification?

2  Q.  Yes.

3  A.  Yes.

4  Q.  And you received that in what year?

5  A.  Had to be soon following my graduation.

6  Q.  Sometime in 1994 would you believe?

7  A.  Yes.

8  Q.  So you've been a certified teacher since 1994, correct?

9  A.  Correct.

10  Q.  When did you start your full-time job with the district?

11  A.  Full-time teaching job?

12  Q.  Yes.

13  A.  2004.

14  Q.  Now, during the time period in 1994, did you become a

15  substitute teacher at any time?

16  A.  Yes.

17  Q.  And when you became a substitute teacher, you said you

18  subbed about two days a week, correct?

19  A.  About that, yes.

20  Q.   And you did that for approximately a year, two years, how

21  long?

22  A.   I'd say about -- two years, and consistently.  The first

23  year I just, that's all I did was sub.  The second year, like I

24  said, I didn't like the phone calls I would get at five in the

25  morning, I didn't like the inconsistency.  I just didn't like

135

1   subbing, I guess.

2   Q.    Did you see it as a valuable experience, the subbing, did

3   it help you learn how to teach?

4   A.    Yes, coming from out of college, I would say yes.

5   Q.    So the experience you gained while subbing, it's fair to

6   say helped make you a better teacher, correct?

7   A.    In some points, yes.

8   Q.    So that when you became a full-time teacher, you had

9   already had your feet wet in a sense because you had been

10   teaching beforehand for a number of years, as well as being an

11   aide?

12   A.    Yes.

13   Q.    Now, at one point did you contact a Mr. Sam Byrd because

14   of frustrations you were having with getting a job with the

15   district?

16   A.    We had conversations.

17   Q.    Well, is it fair to say he initiated the conversations or

18   you initiated the conversations?

19   A.    I think he did.

20   Q.    He talked to you about the fact that you were not

21   teaching full-time; do you recall him talking to you about

22   that?

23   A.    Yes.

24   Q.    And do you recall expressing dissatisfaction to him about

25   the fact that you had not been hired full-time?

136

1  A.   I think what I said was there was another year, I can't

2  remember the year, where there were a lot of positions

3  available.  Well, that year a lot of learning support teachers

4  jumped out of their positions into the regular ed positions

5  leaving, I don't have a special ed degree.  So that was what

6  was frustrating to me.

7  Q.   Did you discuss those frustrations with Mr. Byrd?

8  A.   At some point.

9  Q.   Did Mr. Byrd encourage you to continue to apply to the

10  school district?

11  A.   I already had my resume in.  But there was nothing I was

12  qualified for.

13  Q.   There was nothing you were qualified for?

14  A.   I think at one point there was, there was one point there

15  was.  But all the other years there was nothing.

16  Q.   And what was your qualification again, ma'am?

17  A.   Elementary education.

18  Q.   So you're saying from the time you were an aide in 2000

19  up to 2004, there was nothing that you were qualified for as

file:///A|/WAGDAY2.TXT

20  far as elementary education at the school district?

21  A.    From 2000 to 2004?

22  Q.    Yes.

23  A.    I can't recall when the one position came open.  I don't

24  know if it was in that timeframe, but there wasn't much.  There

25  were a lot of learning support teachers jumping out of their

1  jobs into the regular ed jobs, which left nothing for the

2  people -- with just a degree like I had.

3  Q.   Well, ma'am, were you aware that in 2002 that the

4  district hired four or five long-term substitute teachers in

5  elementary education?

6  A.   Yeah, I never put in for -- I can't say I ever put in for

7  one of those positions.

8  Q.   You weren't interested in a long-term sub position?

9  A.   I never interviewed for one.

10  Q.   I didn't ask you that.  Were you interested in a

11  long-term substitute position?

12  A.   No.  At the time I was happy with where I was at with the

13  aide's position, with a young child and I never -- I think you

14  had put letters in, letters of intent to go for those.  I was

15  kind of out of the loop in the classroom that I was in.  I

16  didn't talk to many people, so I really didn't -- make an

17  interest into getting one of those positions.

18  Q.   So you were content being a full-time aide then you're

19  saying from 2000 up to 2004?

20  A.  Yes, I didn't really apply to do anything else.

21  Q.  And you're saying you weren't aware of any long-term

22  substitute positions that became available during that time

23  period?

24  A.  I'm not saying I wasn't aware of some, but I never put an

25  effort forward to apply for them.

138

1  Q.   And am I correct that the first conversation you had with

2  Mr. Heller about this possible position was in the summer of

3  2003, was that your testimony?

4  A.   For the Stars position, the teaching position?

5  Q.   Yes.

6  A.   Yes.

7  Q.   So in the time period that you went to Stars, the Stars

8  teaching position -- that was a paid position, was it not?

9  A.   Yes.

10  Q.   And did you say that Ms. Good helped you obtain this

11  position?

12  A.   She helped me read up on some materials that would help

13  with different teaching strategies.

14  Q.   Did she provide those materials to you?

15  A.   I contacted Suzanne Good by phone and she gave me some

16  different names of books and referred me to two teachers that I

17  would be working with, and they also gave me these things.

18  Q.   Was this for the Stars program?

19  A.   Yes.

20  Q.   So she referred you to the two teachers and provided a

21  book and also got you into this Stars program, correct?

22  A.   Correct.

23  Q.   During that Stars program, you're also paid during that

24  time period, as you testified, correct?

25  A.   Correct.

139

1  Q.    How long were you in the Stars program?

2  A.    Until this past school where the grant just ended.

3  Q.    Did you teach full-time at the same time you were in the

4  Stars program -- did you teach full-time or was this Stars

5  position full-time, maybe I got you confused?

6  A.    No, I taught full-time.  And then prior to me getting my

7  full-time teaching position, I would teach Stars five days a

8  week is how it started.  Eventually it went down to four days a

9  week.  But when I got my teaching job, it was hard for me to

10  juggle that and still maintain the four days a week for Stars.

11  So I dropped down to two days a week in Stars along with --

12       THE COURT:  I'm sorry to interrupt you, ma'am, tell

13  me again what the Stars program is, who it was your teaching,

14  what were the hours, fill it in for me a little bit, will you?

15       THE WITNESS:  The Stars program was an attendant for

16  children who needed a little extra help in the areas of reading

17  and math, to help build up their testing scores.  And it was,

18  the day started right after their school day.  It was for

19  second grade up to, it was sixth grade, but then eventually

20    sixth grade was phased out.  And it was from 2:30 to 5:00.

21          THE COURT:  So these were Crawford Central School

22    District kids that were in it?

23          THE WITNESS:  Second District kids.

24          THE COURT:  Essentially, it's a tutoring program?

25          THE WITNESS:  Yes.  The first year I was in third

140

1  grade and fifth grade because I was with the two teachers that

2  I was supposed to be with.  Then eventually I went to second

3  grade, which is the grade I currently teach.

4  BY MR. MEAD:

5  Q.    Did you apply to be in this Stars program?

6  A.    No.

7  Q.    You were just placed in it upon your request, how did you

8  wind up being in the Stars program?

9  A.    I heard about it and asked if I was interested in doing

10  it and I said yes.

11  Q.    Someone asked you if you were interested in doing it, is

12  that correct?

13  A.    Yes.

14  Q.    So you were approached to enter into this program, this

15  Stars program?

16  A.    Yes.

17  Q.    That approach took place in the summer of 2003?

18  A.    Correct.

19  Q.    At that point had you indicated any interest to anyone

20  else about the Stars program?

21  A.    Interest to anyone else?

22  Q.    Yes, did you say you wanted to be in the Stars program to

23  anyone?

24  A.    Well, no, I took the offer right when it was given to me.

25  Q.    But it was an unsolicited offer, is that correct?

141

1  A.   Correct.

2  Q.   And that unsolicited offer was by Mr. Heller?

3  A.   Yes.

4  Q.   How long were you in the Stars program from the summer of

5  '03?

6  A.   How long?

7  Q.   Yes, how long did you continue to teach there?

8  A.   Until just this past school year, the grant has ended.

9  Q.   And that's when you were hired to become a full-time

10  teacher?

11  A.   No, I was hired to become a full-time teacher in 2004.

12  Q.   Ma'am, do you know how many African-American teachers

13  were teaching full-time in 2004?

14  A.   I think it's just myself.

15       MR. MEAD:  Thank you, that's all I have.

16            REDIRECT EXAMINATION

17  BY MR. KUHAR:

18  Q.   You read these books, you read these magazines in

19  preparation for your '04 interview, correct?

20   A.   Correct.

21   Q.   And then you worked in this Stars after-school program

22   where you taught during the '03-'04 school year, correct?

23   A.   Correct.

24   Q.   And you did all that while you were a full-time aide

25   during the students school day, correct?

142

1   A.   Correct.

2   Q.   And why was it that you did those things beyond being an

3   aide, those other things, why did you do those things?

4   A.   To bring me shall I say up to speed with the new teaching

5   styles that had been implemented in the years that I hadn't

6   been teaching.

7   Q.   Did it work, did those things do that?

8   A.   Yes.

9   Q.   What impact, if any, did your teaching in the Stars

10  program have on your ability to teach in the classroom?

11  A.   I would say in the planning and preparation part.

12  Because when you're an aide, even when you're subbing, unless

13  you have a long-term sub position, you don't have to do any

14  planning or preparation for the day.  I had to do this, I was

15  required to turn in lesson plans for the Stars.  And so that

16  would have been the first time that I really had to do that in

17  a teaching job.

18         MR. KUHAR:  I have nothing further.

19         THE COURT:  Anything else?

20          MR. MEAD:  Nothing further, your Honor.

21          THE COURT:  Thank you very much, ma'am, you're

22   excused.  Who would be your next witness, Mr. Kuhar?

23          MR. KUHAR:  Karen Jamieson.

24          THE COURT:  How long is Ms. Jamieson going to be?

25          MR. KUHAR:  Approximately, 20 minutes, maybe 15,

143

1    your Honor.

2         THE COURT:  Let's take a short recess.

3         (Recess from 2:10 p.m.; until 2:25 p.m.)

4         THE COURT:  All right, you ready?

5         MR. KUHAR:  Call Karen Jamieson.

6         THE CLERK:  Raise your right hand, please.

7          KAREN JAMIESON, DEFENSE WITNESS, SWORN

8              DIRECT EXAMINATION

9    BY MR. KUHAR:

10   Q.   Ms. Jamieson, where do you reside and where do you work?

11   A.   I live in Carlton, Pennsylvania, and I work at Meadville

12   Middle School for the Crawford Central School District.

13   Q.   Are you an elementary teacher?

14   A.   Middle school teacher, 8th grade.

15   Q.   Did you begin your full-time employment there as an

16   elementary teacher?

17   A.   No, my permanent employment with the Crawford Central

18   School District started as a reading specialist at First

19   District Elementary School.

20   Q.   For what grade level?

21   A.   I serviced first through third grade, I think.

22   Q.   I assume Carlton is in Crawford County near Meadville

23   somewhere?

24   A.   Actually, it's right over the line in Mercer County, just

25   outside of Cochranton, Pennsylvania.

144

1   Q.   Where had you gotten your college degree or degrees, what

2   is it or what are they in?

3   A.   I have a bachelor of science in sociology from Sacred

4   Heart University in Fairfield, Connecticut.  I'm currently

5   working on my master's at Edinboro.

6   Q.   In what?

7   A.   Reading.

8   Q.   Do you have a PDE, a Pennsylvania Department of Education

9   certificate to teach elementary?

10  A.   I do, I have an elementary certification, a reading

11  specialist certification and a secondary social studies

12  certification.

13  Q.   How long have you had those?

14  A.   Oh, I would say I've had the elementary certification

15  probably since I moved here in 1997.  And reading certification

16  and social studies, maybe since 2002.

17  Q.   When were you first employed at Crawford Central?

18  A.   My first teaching position for Crawford Central School

19  District, besides daily substituting, was in 2001-2002 as a

20  kindergarten teacher at Cochranton Elementary.

21  Q.    Was that as a long-term sub?

22  A.    It was a one-year long-term substitute.

23  Q.    Did you say prior to that you had served as a day-to-day

24  sub?

25  A.    Yes, I was a day-to-day sub, and I also was assistant

file:///A|/WAGDAY2.TXT

145

1  track coach for Meadville High School.

2  Q.    During what period?

3  A.    I don't remember when I started that, but I just

4  resigned.

5  Q.    As coach?

6  A.    Yeah, last month.

7  Q.    During what period did you serve as a day-to-day sub?

8  A.    I'm not very good with dates, but I think it was

9  2000-2001.  I started daily substituting in Crawford Central

10  School District.  The year prior to that I substituted at

11  Lakeview School District.

12  Q.    Okay.  You served in a long-term substitute position in

13  '01-'02 kindergarten?

14  A.    Correct.

15  Q.    Were you observed in that position?

16  A.    Yes.

17  Q.    By whom?

18  A.    Kurt Meader, who was the principal at the time.  Suzanne

19  Good --

20          THE COURT:  Not to interrupt, we're talking about

21   being observed as a long-term substitute, is that right?

22          MR. KUHAR:  Yes, your Honor.

23   BY MR. KUHAR:

24   Q.   Do you understand that to be the question?

25   A.   Yes.

146

1  Q.   So I think you mentioned Kurt Meader, Suzanne Good?

2  A.   I can't -- I don't remember if I was observed by anyone

3  else.  I remember Charlie Heller was in my classroom at the end

4  of the year, but I don't think it was a formal observation, but

5  I don't remember.

6  Q.   Again, this is '01-'02?

7  A.   Correct.

8  Q.   So those observations were favorable?

9  A.   Yes.

10  Q.   Would you recall anything specific about any of them?

11  A.   Mr. Meader told me that he was very happy with me, didn't

12  feel that I was --

13       MR. MEAD:  I'm going to object, this is hearsay.

14       THE COURT:  Sustained.

15       MR. KUHAR:  Your Honor, whether in fact she was a

16  good teacher is not what we're offering this for, we're

17  suggesting that when she was chosen for positions it was

18  because she was perceived as being a good teacher.  Evaluations

19  and opinions of educators regarding the plaintiff and the other

20    candidates are all woven throughout the case.

21          THE COURT:  It's hearsay, sustained.  Go ahead.

22          MR. KUHAR:  Okay.

23          THE COURT:  Next question.

24    BY MR. KUHAR:

25    Q.    You served as a long-term sub during that school year?

147

1    A.    Correct.

2    Q.    Did you have any employment during the '02-'03 school

3    year with the district to start the year out?

4    A.    No -- that's incorrect.  I'm sorry, I did.  Half a day, I

5    don't remember how many weeks, for a second grade teacher who

6    had had knee replacement surgery over the summer.

7    Q.    You don't recall how long?

8    A.    It was only -- six, eight weeks.

9    Q.    At the beginning of the '02-'03 school year?

10   A.    Yes, from what I recall, I started the first day of

11   school, she taught in the morning, I taught the second half of

12   the day.

13   Q.    Did you teach as a day-to-day sub during the rest of the

14   school year?

15   A.    Yes.

16   Q.    Did you interview for long-term sub positions in December

17   of '02?

18   A.    Yes, I did.

19   Q.    And who interviewed you?

20  A.   It was a panel of people, Mr. Heller, Suzanne Good, and

21  all of the building principals.

22  Q.   Do you recall how long that interview lasted?

23  A.   I would have to say around 20 minutes.

24  Q.   Was that interview for a long-term sub -- well, do you

25  know for how many long-term sub positions the group was being

148

1   interviewed for, how many that were available?

2   A.   I think there was four.

3   Q.   Was Ms. Joye Pickens among them?

4   A.   Her position?

5   Q.   Yes.

6   A.   Yes, I think it was.

7   Q.   And were you awarded one of those positions?

8   A.   No, I was not.

9   Q.   Do you know why?

10  A.   I requested a meeting after I found out that I was not

11  going to get one of the positions with Mr. Heller and Ms. Good

12  to discuss what I could do better, what I needed to do

13  differently, and specifics as to why I didn't get one of the

14  positions.

15  Q.   What did they tell you?

16  A.   Mr. Heller told me that a few of my answers to a few of

17  the questions were not quite up to par.  I did not present a

18  portfolio.  All the other candidates had presented, all the

19  candidates who received jobs had presented a portfolio.  And

20   just that I did not interview as well as some of the other

21   candidates and he felt that it was important to give the jobs

22   to people who interviewed well.

23   Q.   Did that sit well with you?

24   A.   It hurt.  But I didn't disagree with him.

25   Q.   So then after you interviewed in December of '02, is it

149

1   your testimony that you were a day-to-day sub for the balance

2   of the '02-'03 school year?

3   A.   To my recollection, yes.

4   Q.   And where were you employed in the '03-'04 school year?

5   A.   I started out that school year at French Creek Valley

6   Christian School.  And then by the end of September had gotten

7   a permanent position at North Clarion County School District.

8   Q.   This would have been September of '03?

9   A.   I'm hoping my dates are right, yes.

10   Q.   And then for how long did you hold that position?

11   A.   A year.

12   Q.   For the remainder of that school year or literally a

13   year?

14   A.   For the remainder of that school year, I ended up

15   resigning the following summer.

16   Q.   Why?

17   A.   Because I received a position with Crawford Central

18   School District.

19   Q.   Did you interview with Crawford Central School District

20  in March of '04?

21  A.   Yes.

22  Q.   Do you know whether you were included on the initial list

23  of people to be interviewed?

24  A.   I know that I knew jobs were opening up in Crawford

25  Central School District, even though I held a permanent

150

1   position at North Clarion School District.  I sent Mr. Heller a

2   letter of interest because Crawford Central School District is

3   my home district and that's really where I wanted to be.  I

4   sent him a letter of interest, and they called me with an

5   appointment to interview.  I don't know anything about a list.

6   Q.   And you interviewed?

7   A.   Yes.

8   Q.   In March of '04?

9   A.   Yes.

10  Q.   Did you do any better, in your opinion?

11  A.   Well, I followed Mr. Heller's suggestions and brought a

12  portfolio and answered the questions so that it was aligned

13  with current educational philosophy and pedagogy and I feel I

14  did better, yes.

15  Q.   Did any of the administrators tell you that you had done

16  better?

17          MR. MEAD:  Objection.

18          THE COURT:  It's sustained.

19          MR. KUHAR:  Again, your Honor, just to be heard on

20    this, the interview analysis forms of numerous people are going

21    to be offered and have been challenged and contain exactly the

22    same thing, which is the sentiment of the observers.

23            MR. MEAD:  I don't recall the challenging of any

24    interviews forms at this point.

25            MR. KUHAR:  I thought it was built into the case

151

1  that you were going to prove, you were going to attempt to

2  prove that that was pretextural.  We're going to say that the

3  reason for the selection was in large part the interview

4  scores, which are simply the reflection, the opinion of the

5  people who did the interviews.  And you're going to attempt to

6  prove that those are pretextural and not the real motive for

7  the decisions.

8        MR. MEAD:  Your Honor, I may or may not, it hasn't

9  been done yet.  I still see it, he's asking how people told her

10  how she did in an interview.  That is being brought up for the

11  truth of the matter asserted.  She did well, well, that means

12  she did well.

13        MR. KUHAR:  Your Honor, whether she did well or not

14  objectively does not matter.  What would be relevant would be

15  the absence of any sign of pretext.  If she's awarded a job --

16        THE COURT:  Actually, let me roll this back and

17  think this through again.  You're not offering the supervisor's

18  observation as proof of the fact that as an objective fact she

19  performed well, you're offering it as evidence of his

20   perception as to how she performed?

21          MR. KUHAR:  Exactly, your Honor.

22          THE COURT:  I think I was wrong on that, I'll take

23   it on that basis, it's not hearsay.  Go ahead.

24   BY MR. KUHAR:

25   Q.   Were you given any feedback regarding how you performed

152

1  during your '04 interview?

2  A.    After the formal questioning was over, the principals

3  told me that it was nice to see me and we talked a little bit

4  about my new position at North Clarion County School District,

5  Mr. Heller asked me a few questions.  And the consensus that I

6  got from the room was that things went very well and it was

7  nice to see me at Crawford Central.

8  Q.    Were you offered a position for the '04-'05 school year?

9  A.    I originally received a letter stating that they were

10  sorry, all the positions were filled.  And then I received a

11  phone call from Mr. Heller, I would have to say towards the end

12  of June, but again I'm not sure about my dates, and he asked if

13  I would come in to discuss a position with he and Suzanne Good.

14  Q.    What position was that?

15  A.    It was a part-time title one reading position.

16  Q.    When was that to begin?

17  A.    That would have begun the next January.  So it is '04.

18  Q.    The interview was in March of '04, I believe?

19  A.    Yes, this position would have began in September of '04.

20  Q.   Initially you said January, do you mean September?

21  A.   Yes.

22  Q.   At the beginning of the school year?

23  A.   Correct.  I'm sorry if I said January.

24  Q.   Did you take that position?

25  A.   I did.

153

1   Q.   And then have you been -- I'm sorry, at some point did

2   you become full-time?

3   A.   Yes.  That part-time position was a permanent position

4   with the school district, I was employed by the school

5   district.  And then a full-time position that I was qualified

6   to teach opened up and I bid on it and then moved into that

7   position.

8   Q.   Is that the position you hold or did you bid again?

9   A.   That's the position I hold.

10   Q.   At any time did Charlie Heller tell you that performing

11   well during an interview was a requirement to being hired into

12   a permanent position with the district?

13   A.   During the discussion that I had with he and Suzanne Good

14   after the December, '02 interviews, one of the things that

15   Charlie had talked about was that you have to do well during an

16   interview because regardless of where you are, you're always

17   representing the school district and you're always representing

18   yourself, and you're always representing education.  And

19   knowing that I would be dealing with parents on a daily basis

20  and other community members and being a representative of the

21  school district, I should be able to perform well in all

22  different kinds of settings.  So he did say that performing

23  well at an interview showed how I would represent the school

24  district.

25  Q.    Did he go so far as to say you wouldn't be hired until

154

1  you had a successful interview?

2          MR. MEAD:  I'm going to object to that, it's

3  hearsay, wouldn't be hired.

4          THE COURT:  I'm going to sustain that.

5          MR. KUHAR:  May I be heard on that, your Honor?

6          THE COURT:  You just were, go on to the next

7  question.

8          MR. KUHAR:  No further questions.

9          THE COURT:  All right.

10                    CROSS-EXAMINATION

11  BY MR. MEAD:

12  Q.    Ma'am, am I correct that you were a substitute day-to-day

13  teacher from October of 2000 to June of 2001 in the Crawford

14  Central School District?

15  A.    I think that's the way I remember it, yes.

16  Q.    Was that your first year of substitute teaching?

17  A.    No.

18  Q.    Had you been a substitute teacher previously?

19  A.    Where?

20   Q.   I'll ask you, where had you --

21   A.   Yes.

22          THE COURT:  You're talking over each other.  Slow

23   down just a little bit.

24   BY MR. MEAD:

25   Q.   If I interrupted you, I apologize, you have to listen to

155

1   the question.  I was asking you prior to becoming a substitute

2   teacher, day-to-day at Crawford Central, had you subbed

3   elsewhere?

4   A.   Yes, at Lakeview School District.

5   Q.   For how long?

6   A.   I think a year.

7   Q.   Was that a day-to-day type situation?

8   A.   No, sometimes it was day-to-day, and then I did get two

9   long-term positions, one was in first grade, one was in a title

10   reading.

11   Q.   And we would agree that the time period that you

12   substitute taught was a valuable learning experience for you as

13   well, correct?

14   A.   Yes.

15   Q.   Did you learn a lot, did you get a lot of experience

16   while you substituted?

17   A.   Yes.

18   Q.   Did that help you become a full-time teacher later down

19   the road do you believe?

20   A.   I believe it probably contributed, yes.

21   Q.   Now, when you taught day-to-day in 2000-2001 in the

22   Crawford Central School District, about how many days did you

23   teach, do you recall?

24   A.   I know I went over the 90-day mark only because they

25   increase your pay after 90 days, and I was excited about that.

156

1   But I don't know how many days.

2   Q.    Was it 90 days in a row or 90 days total?

3   A.    The first year I did day-to-day subbing at Crawford

4   Central -- no, it wasn't 90 days in a row.  But I know I was in

5   some positions for more than one day at a time.

6   Q.    Am I correct the following school year, 2001-2002, you

7   were hired at Crawford Central School District as a long-term

8   substitute?

9   A.    Correct.

10   Q.    Did you teach for one particular teacher the entire year?

11   A.    During 2001-2002?

12   Q.    Yes, we're focusing on that?

13   A.    Yes.

14   Q.    Who was that teacher?

15   A.    Lisa Beck.

16   Q.    Did you interview for that position for 2001-2002 as a

17   long-term teacher?

18   A.    No.

19   Q.    Did Ms. Beck recommend you for that position?

20   A.   I know Ms. Beck told me that she was going to request me.

21   Q.   So Ms. Beck requested that you be a long-term substitute

22   for her during the school year 2001-2002, correct?

23   A.   She told me that that's what she was going to do.

24   Q.   She would have made that request to whom, to your

25   knowledge?

1  A.    I assume it would have been the administration, Mr.

2  Dolecki or Mr. Lascola.

3  Q.    So the entire school year 2001-2002, you taught one

4  class?

5  A.    Correct.

6  Q.    And as I stated, you had no interview prior to that,

7  correct?

8  A.    Correct.

9  Q.    And you stated that you were observed in your classroom

10  during that time period?

11  A.    Yes.

12  Q.    Did you receive a formal interview form after that

13  observation?

14  A.    I don't understand your question, I'm sorry.

15  Q.    All right.  I think you testified that at some time

16  period during that year someone came in and observed you

17  teaching, is that correct?

18  A.    Correct.

19  Q.    After they did that, did they provide you with a written

20  document which indicated how you did during that time period?

21  A.    A formal observation form?

22  Q.    Yes.

23  A.    Yes, I did receive formal observation forms.

24  Q.    And did you keep those, did you maintain those, were they

25  back in your file?

158

1  A.   Yes.

2  Q.   You kept them?

3  A.   Yes.

4  Q.   And am I correct, then, after your long-term sub job, you

5  applied to become a full-time -- strike that.  The position in

6  2002 that we were discussing, was that a long-term sub or a

7  full-time teacher?

8  A.   It would have been for long-term subbing positions.

9  Q.   And am I correct you stated you were not hired for that?

10  A.   Correct.

11  Q.   Subsequently, you student taught -- I'm sorry, substitute

12  taught day-to-day after you were denied that position, correct?

13  A.   Correct.

14  Q.   Was that a valuable experience as well?

15  A.   Yes.

16  Q.   You became a better teacher because you got more

17  experience, right?

18       THE COURT:  Yes or no.

19       MR. MEAD:  Yes or no --

20          THE COURT:  Hang on a second, yes, no or I don't

21   know or --

22          THE WITNESS:  Yes.

23   BY MR. MEAD:

24   Q.    And subsequently you were hired to become a full-time

25   teacher when?

159

1   A.   For Crawford Central School District.

2   Q.   Yes.

3   A.   In June of '04.

4   Q.   And at the time period that you were hired, you

5   previously had been a full-time teacher somewhere else,

6   correct?

7   A.   Correct.

8   Q.   For what school district?

9   A.   North Clarion County School District.

10   Q.   And you left North Clarion because you wanted to teach at

11   home, isn't that true?

12   A.   That was part of the reason.

13   Q.   Is that a main part of the reason?

14   A.   It was one of the main parts, yes.

15          MR. MEAD:  That's all I have.

16          THE COURT:  Anything else of this witness?

17          MR. KUHAR:  Yes, your Honor.

18                 REDIRECT EXAMINATION

19   BY MR. KUHAR:

20  Q.   Ms. Jamieson, your long-term sub position that began at

21  the beginning of the '01-'02 school year, Mr. Heller was not

22  employed at the district at that time, correct?

23  A.   Correct.

24  Q.   If I told you that Mr. Heller started in February of '02,

25  halfway through your long-term sub assignment, does that sound

160

1   right?

2   A.   Yes.

3   Q.   From February of '02 through today, are you aware of any

4   situations where any person has been assigned a long-term

5   substitute position at Crawford Central without an interview?

6   A.   No.

7        MR. KUHAR:  Nothing further.

8        THE COURT:  Anything else, Mr. Mead?

9        MR. MEAD:  Yes, your Honor.

10              RECROSS-EXAMINATION

11  BY MR. MEAD:

12  Q.   Except for you, of course, you were assigned as a

13  long-term sub without an interview, weren't you?

14       MR. KUHAR:  My question was --

15       THE COURT:  I understood what your question was.

16  BY MR. MEAD:

17  Q.   You did not interview when you became a long-term

18  substitute in 2001-2002, did you?

19  A.   No, but Mr. Heller wasn't working at the district at that

20   time.

21   Q.    But he started to work there in the time period you were

22   a substitute teacher in 2001-2002, correct?

23   A.    Correct.

24          MR. MEAD:  I have no further questions.

25          THE COURT:  Thank you very much, ma'am.

161

1          MR. KUHAR:  Your Honor, Ms. Naomi Uy-Moore.

2          NAOMI UY-MOORE, DEFENSE WITNESS, SWORN

3               DIRECT EXAMINATION

4    BY MR. KUHAR:

5    Q.    Good afternoon, Ms. Uy-Moore.

6    A.    Good afternoon.

7    Q.    Where do you live, where do you work, and how long --

8    where do you live?

9    A.    Meadville, Pennsylvania.

10   Q.    How long have you lived there?

11   A.    Two years, one-and-a-half years.

12   Q.    Where do you work?

13   A.    Crawford Central School District.

14   Q.    In what capacity?

15   A.    Fourth grade teacher at Cochranton Elementary.

16   Q.    Both years -- same position both years?

17   A.    No, I was in another school the year before.

18   Q.    You were at a different school the year before?

19   A.    Uh-huh.

20  Q.    When was the first day on the job for you at Crawford

21  Central?

22  A.    August of 2005.

23  Q.    So you worked all of '05-'06 and '06-'07, correct?

24  A.    Yes.

25  Q.    As an elementary teacher?

162

1  A.   Uh-huh.

2        THE COURT:  Yes or no.

3        THE WITNESS:  Yes.

4  BY MR. KUHAR:

5  Q.   At different schools?

6  A.   Yes.

7  Q.   And you relocated to Meadville about two-and-a-half years

8  ago, did you say?

9  A.   About two years ago for me, yes.

10  Q.   Two years ago.  Why did you relocate to Meadville and

11  from where?

12  A.   From Fort Washington, Maryland.  And my husband got a job

13  with Big Brothers and Sisters of Crawford and Mercer counties.

14        THE COURT:  Slow down just a little bit.

15        THE WITNESS:  My husband got a job with Big Brothers

16  and Sisters of Crawford and Mercer counties.  And that was the

17  year before I came.

18  BY MR. KUHAR:

19  Q.   Did he move to Meadville a few months before you did?

20   A.   Almost a year before I did.

21   Q.   Why the delay?

22   A.   Because I had to finish my contract in Charles County,

23   Maryland for the public school system there.

24   Q.   When you were living in Meadville, did Crawford Central

25   School District undertake, do anything to sort of -- I'm sorry,

1    I'll withdraw that question.  When you were living in Maryland,

2    did the Crawford Central School District do anything to sort of

3    reach out and recruit you into this area?

4    A.    No.

5    Q.    How was it that you were even considered for employment

6    with Crawford Central, did you apply?

7    A.    I applied, yes.

8    Q.    When?

9    A.    I started my application in the spring of 2005.  And then

10   in the summer of 2005, that's when I got a call -- no, I met

11   with Mr. Heller.  And then in July of 2005, sorry, August of

12   2005, I was called to come in for an interview.

13   Q.    And after that interview, you were offered a position?

14   A.    Uh-huh, yes.

15   Q.    That's the position that you held for the '05-'06 school

16   year?

17   A.    Yes.

18   Q.    Which led into the '06-'07 school year position?

19   A.    Different position.

20  Q.  But I mean it was not a gap?

21  A.  No.

22  Q.  What did you do in Maryland?

23  A.  I taught in the elementary schools.

24  Q.  The public school system?

25  A.  Public schools, Charles County public school system.

164

1  Q.   For how many years?

2  A.   Sixteen.

3  Q.   And what is your educational background?

4  A.   I have a bachelor's from the University of Maryland at

5  College Park.  A master's from Western Maryland College, which

6  is now known as McDaniel College.

7  Q.   What is the master's in?

8  A.   Curriculum and instruction.

9  Q.   What positions did you hold in Maryland?

10  A.   Third, fourth and fifth grade, I taught those years.  I

11  was the building rep for the association.  I was a coordinator

12  for the summer math program one summer.  I was part of various

13  committees in different subject areas.

14  Q.   Okay.  So I think you said that you were interviewed in

15  the summer, I'm sorry, August of '05 at Crawford Central, is

16  that correct?

17  A.   Yes, August.

18  Q.   For the record, what race are you and in what country

19  were you born?

20  A.   I'm Asian, I was born in the Philippines.

21  Q.   What do you recall of that August, '05 interview?

22  A.   There was a panel of many people, I was expecting a few

23  people.

24  Q.   How many do you recall, can you approximate?

25  A.   Ten, twelve.

165

1  Q.    At one time or in groups?

2  A.    One time.

3  Q.    Did you consider anything that happened during that

4  interview process to be unfair towards you?

5  A.    No.

6  Q.    Irregular in any way, odd?

7  A.    No.

8  Q.    Have you ever been discriminated against by Crawford

9  Central School District in any way?

10  A.    No.

11        MR. KUHAR:  I have no further questions.

12        THE COURT:  All right, Mr. Mead.

13            CROSS-EXAMINATION

14  BY MR. MEAD:

15  Q.    Ma'am, am I correct you stated that you have two master's

16  degrees?

17  A.    No, I have a bachelor's and a master's.

18  Q.    Bachelor's and a master's, I apologize.  What is your

19  master's in?

20   A.   Curriculum and instruction.

21   Q.   And currently you're teaching fourth grade?

22   A.   Uh-huh, yes.

23   Q.   Yes.  I was looking at your resume, which I've marked as

24   Exhibit No. 32, if you could just take at look at it for a

25   second.  Under qualifications, it states -- third line, "my

166

1  expertise includes curriculum and instruction development

2  leading seminars in diversity and blended cultures," do you see

3  that?

4  A.   Yes.

5  Q.   Have you had any seminars, done any teaching in diversity

6  and blended cultures in Crawford Central?

7        MR. KUHAR:  Your Honor, sorry to interrupt, we don't

8  have a copy of it, it's not in the book.

9        MR. MEAD:  That's the only question I'm going to

10  have --

11        MR. KUHAR:  That's fine.

12        THE COURT:  If that's it, go ahead.

13        THE WITNESS:  Could you repeat the question?

14        MR. MEAD:  Certainly.

15  BY MR. MEAD:

16  Q.   I saw in your qualifications you indicate that you have

17  led seminars in diversity and blended cultures; do you see

18  where I'm referring?

19  A.   Yes.

20  Q.  Have you led any seminars in diversity and blended

21  cultures in the Crawford Central School District?

22  A.  No.

23  Q.  No.  Am I also correct that when you came to teach at

24  Crawford Central, that was in August of '05?

25  A.  Yes.

1  Q.    And at that time period you were not certified to teach

2  in the State of Pennsylvania, correct?

3  A.    I thought I was.  But --

4  Q.    You later learned you weren't, is that fair to say?

5  A.    Yes.

6  Q.    So you were hired without a Pennsylvania certification,

7  is that fair to say?

8  A.    Yes.

9  Q.    Did you subsequently obtain an emergency certification in

10  order to allow you to teach in the State of Pennsylvania?

11  A.    I believe I did, yes.

12  Q.    And did that occur in the year 2006?

13  A.    I'm not sure if it occurred in '05 and then I got the

14  notification in '06.

15  Q.    Fair enough.  So you're not sure if it happened in '05 or

16  '06 that you received the emergency certification to teach in

17  the State of Pennsylvania, correct?

18  A.    Correct.

19  Q.    How long did this emergency certification for the State

20  of Pennsylvania last, how long did you teach pursuant to that?

21  A.   I believe a few months because then I got my certificate

22  after I took the practices.

23  Q.   So at what point were you certified for the State of

24  Pennsylvania?

25          THE COURT:  Do you mean on a permanent basis?

168

1        MR. MEAD:  Yes, your Honor.

2        THE WITNESS:  That's a different time than the

3   emergency basis?

4   BY MR. MEAD:

5   Q.   Well, let me ask you, have you ever received a full-time

6   teaching certificate for the State of Pennsylvania?

7   A.   Yes, I did.

8   Q.   When?

9   A.   Summer of '06, I believe.

10  Q.   Summer of '06.  So it's fair to say that you taught the

11  entire school year 2005-2006 without a Pennsylvania

12  certification, correct?

13       MR. KUHAR:  I think the testimony was that she had

14  an emergency one at some point in '05-'06.

15       THE COURT:  She can explain.

16  BY MR. MEAD:

17  Q.   Correct?

18  A.   I believe so, yes.

19  Q.   But you did teach pursuant to an emergency certification

20  during that time period 2005-2006, correct?

21  A.   Yes.

22       MR. MEAD:  That's all I have.

23            REDIRECT EXAMINATION

24  BY MR. KUHAR:

25  Q.   Ms. Uy-Moore, you just testified that you thought you had

1   a valid certificate beginning with the first day of employment

2   with Crawford Central, correct?

3   A.   Yes.

4   Q.   Why did you think that?

5   A.   Because when I was applying, I went on the PDE Web site,

6   I got a booklet for applicants with an out-of-state degree.

7   And everything I filled out I turned in, I completed everything

8   that was required of me pending my practice.  It did say in

9   that booklet, I thought it said I had a year after turning in

10  my paperwork to take my practice to complete everything that

11  needed to be done to get my certificate.

12  Q.   Did you think you had reciprocity?

13  A.   Yes.  Because there's a page in that book that listed the

14  states that have reciprocity with Pennsylvania, and Maryland

15  was stated.

16  Q.   Do you have any reason to think that the district was

17  aware that there was a certificate problem at the time they

18  hired you?

19  A.   No.

20      MR. KUHAR:  Nothing further.

21      THE COURT:  Anything else, Mr. Mead?

22              RECROSS-EXAMINATION

23  BY MR. MEAD:

24  Q.   So you never had any discussion with anyone representing

25  the district whether or not you were even certified to teach in

170

1   the State of Pennsylvania?

2   A.   I don't think I did.

3          MR. MEAD:  Thank you, no further questions.

4          THE COURT:  Thank you very much, ma'am, you're

5   excused.

6          MR. KUHAR:  Your Honor, we call Charlie Heller at

7   this point, who we anticipate being a more lengthy witness.

8          THE COURT:  Mr. Heller, before you get up here,

9   we're going to take a short recess.

10         (Recess from 3:00 p.m.; until 3:10 p.m.)

11         THE COURT:  All right, Mr. Kuhar.

12         MR. KUHAR:  We would call Charlie Heller, III.

13         CHARLES E. HELLER, III, DEFENSE WITNESS, SWORN

14               DIRECT EXAMINATION

15  BY MR. KUHAR:

16  Q.   Mr. Heller, where are you employed?

17  A.   Crawford Central School District.

18  Q.   And how long have you been employed there?

19  A.   I've been employed there since February 18th of 2002.

20  Five years and four months.

21  Q.   Okay.  And when you started working at the district, was

22  it in your current position?

23  A.   Excuse me.

24  Q.   Were you hired as assistant superintendent?

25  A.   I was hired as assistant superintendent.

1  Q.   You held that position through the current date?

2  A.   Yes.

3  Q.   What is your education?

4  A.   My education is I have a BS in secondary education and

5  social studies from Clarion University.  I have a master's

6  degree in education from Gannon University.  I have a secondary

7  administrative certificate from Youngstown State.  I have an

8  elementary administrative certificate from Youngstown State.

9  Superintendent's certificate from Youngstown State.  I've

10  completed course work and comprehensive exams for a doctoral

11  program at the University of Pittsburgh.

12  Q.   Where did you work before you worked at Crawford Central?

13  A.   Titusville School District.

14  Q.   In what capacity?

15  A.   I was in several capacities, the last of which was

16  principal of the high school.

17  Q.   From when to when?

18  A.   I believe from -- '98 to 2002.

19  Q.   Who has been the superintendent then at Crawford Central

20  while you've been there?

21  A.   Michael Dolecki.

22  Q.   The whole time?

23  A.   The whole time.

24  Q.   Do you have a role in the district's hiring of elementary

25  teachers?

172

1  A.    Yes, I do.

2  Q.    Please explain it?

3  A.    My role is to facilitate and coordinate the hiring

4  process of elementary teachers.  I utilize a committee of all

5  the building principals, director of secondary curriculum,

6  elementary curriculum, excuse me.  And we have a meeting to

7  start off with and I take recommendations from the building

8  principals.  The reason I do that is when I first came to

9  Crawford Central, I found out that the elementary teaching

10  positions are highly competitive.  We had a lot of substitutes

11  that were very talented and felt that we needed to utilize I

12  guess the staff that we have within the district to look at

13  filling vacancies.  So I take recommendations from the building

14  principals, which would include who they feel are outstanding

15  student teachers in their building.  I take recommendations

16  from other administrators in the district as well to compile a

17  candidate list in which we will interview.  Once that is

18  completed, we establish some dates in which we will conduct the

19  interviews among the team.  We look at the questions, we revise

20   the questions, the interview analysis instruments, and from

21   there we proceed.

22   Q.   Okay.  Now, I think you described who would be on the

23   committee.  I think you referenced two groups.  One group was a

24   group that suggested names that the district would interview,

25   correct?

173

1   A.   That's correct.

2   Q.   And then a group that would interview, correct?

3   A.   Correct.

4   Q.   Is it the same group, do the same people -- is it the

5   same people who meet to decide who the district will interview,

6   are those the same people who do the interviews?

7   A.   That's correct.

8   Q.   Okay.  And do you pick the administrators who will be on,

9   who do those functions?

10   A.   They're not handpicked, we have six elementary

11   principals, I have six elementary principals there to

12   interview.  Unless some unforeseen problem or circumstance that

13   one of them can't be there, we normally have all six elementary

14   principals and the director of curriculum.

15   Q.   No more no less absent something unusual?

16   A.   Yes.

17   Q.   Why do you have the director of elementary curriculum

18   there?

19   A.   She's the district expert in curriculum and instruction.

20  So I think it's very important that she be there.

21  Q.   Is it that committee which ultimately chooses the

22  employees of the district?

23  A.   It's a team decision, it's a committee consensus.  It's

24  my responsibility to take the recommendation to the board for

25  approval, however, it's a team consensus.

1   Q.   Now, are we talking about the selection of day-to-day

2   subs, long-term subs, permanent positions or some combination?

3   A.   We're talking about permanent teacher positions and

4   long-term substitute positions.

5   Q.   What is a long-term sub?

6   A.   A long-term sub is someone who we know in advance that

7   they will be employed on a basis of 90 plus days.  And it

8   requires board approval.

9   Q.   What is a permanent position?

10   A.   A permanent position is when there has been a vacancy

11   determined in the district that has not been filled by any

12   internal bidders and it is, I guess, you could say it's a job

13   forever in a sense, we hire someone permanently for that

14   position.  It's not for any particular length of time.

15   Q.   Is it fair to say the person who used to have it is not

16   coming back?

17   A.   Correct.

18        THE COURT:  This is neither here nor there, just

19   information on my part, but I assume, Mr. Heller, that another

20  distinction between the permanent and long-term subs would be

21  that permanents are members of the bargaining unit, long-term

22  subs are not?

23          THE WITNESS:  That's correct.

24          THE COURT:  All right.  Go ahead.

25  BY MR. KUHAR:

175

1  Q.   I'm going to ask you to assume that when I'm talking

2  about teaching positions, you should assume we're talking about

3  elementary teaching positions, okay?

4  A.   Okay.

5  Q.   When you answer, we will make the same assumption.  If

6  you intend to reference something other than elementary

7  positions, you'll tell us, right?

8  A.   Yes.

9  Q.   Do you know what certificates or how many certificates

10  Ms. Wagner has?

11  A.   She has one certificate.

12  Q.   What's it in?

13  A.   Elementary education, K through 6.

14  Q.   Those are the only grades she can lawfully teach?

15  A.   Yes.

16  Q.   Are you responsible for hiring any other positions at the

17  district?

18  A.   I'm responsible to -- I guess, all positions.  And I'm

19  going to say not necessarily hire, I would say coordinate,

20  facilitate, that's the way I function in every position --

21          THE COURT:  Mr. Heller, you're way too fast, slow

22  down.

23          THE WITNESS:  All right.  It could be for any

24  position in the district.  Any professional position, any

25  administrative position.  Any support staff position, which

176

1   would include food service, custodial, clerical,

2   paraprofessional.

3   BY MR. KUHAR:

4   Q.    And you use the words facilitate and coordinate, correct?

5   A.    Correct.

6   Q.    Is that because those decisions are made through teams?

7   A.    They're made through teams.  I never conducted an

8   interview by myself and made the recommendation to the board

9   myself, it's always been within a team concept.

10   Q.    Real briefly a question or two about this food service

11   and custodial subs.  When did you have responsibility, when did

12   you get responsibility for hiring those positions?

13   A.    Within the last two years, I believe.

14   Q.    Did you make any changes with respect to how those

15   positions are filled?

16   A.    Yes, I have.

17   Q.    Describe it, please?

18   A.    Well, first off, the personnel files used to be in the

19   director of building and grounds and the transportation office.

file:///A|/WAGDAY2.TXT

20   And there was a need to consolidate all the personnel files

21   within our district.  And they used to operate independently,

22   I guess with those two situations, with the food service and

23   the custodial maintenance staff.  So I consolidated the

24   personnel files.  And from there it became a process in which I

25   would interview with the -- if it was food service, I would

1  include all the people that needed to be involved in food

2  service.

3         THE COURT:  Keep your voice up.

4         THE WITNESS:  If it was custodial, I would interview

5  with the necessary people, supervisors, to select custodial or

6  maintenance.

7  BY MR. KUHAR:

8  Q.   Prior to you assuming that responsibility, how were the

9  successful candidates chosen for food service and custodial

10  subs?

11  A.   Most senior substitute.

12  Q.   Automatically?

13  A.   Yes, that's what was explained to me, yes.

14  Q.   Once you took it over, what did you do with it?

15  A.   I treated it the same as if we were interviewing a

16  teacher.  I would have a team of people there and we would have

17  the interview analysis forms, and then we would have questions

18  and we would interview for the position.

19  Q.   What drove who was chosen?

20  A.    Scores, highest score.

21  Q.    Do you know whether long-term subs -- well, do you know

22  whether people holding long-term subs end up in the bargaining

23  unit at some point?

24  A.    They could, if you're in a long-term position.  There was

25  a consent arbitration in 1999, prior to my time coming to the

1    Crawford Central School District.  If a long-term sub had been

2    in a position for two full semesters and then were in the third

3    semester and the bidding process was alive and there became a

4    vacancy, they had the opportunity to bid into that position at

5    that time.

6    Q.    Okay.  Please look behind tab 8, hopefully we have the

7    right binder up there.  At Exhibit H?

8    A.    Yes.

9    Q.    What is this?

10   A.    It's the collective bargaining agreement between Crawford

11   Central School District and Crawford Central Education

12   Association.

13        MR. KUHAR:  I think we have a stipulation on this,

14   Mr. Mead, that the contract requires vacant positions be

15   awarded to an internal bidders before outside applicants are

16   hired or do you want me to get into questions about it?

17        MR. MEAD:  I don't have a problem with that, your

18   Honor.  It says what it says.  But I have no reason to doubt

19   it.

20          THE COURT:  Well, it's easier to tell me what it

21   says so I don't have to go through and read the whole thing

22   unless it's pertinent.  If that's the agreement, I'll accept

23   that as a given fact.

24          MR. MEAD:  I have no problem with that.

25          MR. KUHAR:  To be specific, article eleven.

1        THE COURT:  All right.

2        MR. KUHAR:  We offer Exhibit H, your Honor.

3        THE COURT:  It's admitted.

4  BY MR. KUHAR:

5  Q.    Please lift the tab, so we're now looking at the exhibit

6  behind tab 9, which is Exhibit I; do you see it, Mr. Heller?

7  A.    Yes.

8  Q.    What is it -- is this the arbitration award you

9  referenced?

10  A.    I was reading further into it, it's the consent

11  arbitration in 1999.

12  Q.    Go ahead.  Is this the way long-term subs end up

13  potentially in the bargaining unit?

14  A.    Potentially they could end up that way, yes.

15  Q.    How does this work, how long does the long-term sub get

16  into the bargaining unit -- pursuant to this exhibit?

17  A.    They would have to work a semester, they don't have to be

18  one right after another, but they have to work for one semester

19  and they have to complete another semester.  And then be in

20   another position for another semester.  And during that

21   semester, the bidding process, the posting of, the vacancy

22   needs to be posted, the teachers have the right or the

23   opportunity to bid on those vacancies.  And once nobody who is

24   holding a permanent position does not bid into that vacant

25   position, then they can assume that position.  That's when they

180

1  can become a member of the bargaining unit.  That's my

2  understanding and I'm aware of it happening one time since I've

3  been at Crawford Central.

4  Q.    So, basically, a person obtains bidding rights at some

5  point during their third semester, long-term subbing rights?

6  A.    That's correct.

7  Q.    Do those bidding rights expire?

8       THE COURT:  Hang on just a second.  I'm sorry repeat

9  your question if you could.

10  BY MR. KUHAR:

11  Q.    I was just confirming that a person obtains a long-term

12  sub, obtains bidding rights at some point in their third

13  semester of long-term subbing, is that what you said?

14  A.    That's correct.

15  Q.    And do those bidding rights expire at some point?

16  A.    The last day of school.  So if today would be the last

17  day of school, I would no longer have bidding rights if I was

18  in a long-term position for the third semester.  So if nothing

19  has become vacant after that specific date, then you no longer

20   have the opportunity to take advantage of that, of the bidding

21   process at that time.

22   Q.   So if nothing becomes vacant during that third or

23   successive long-term sub assignment, then you can't bid on it?

24   A.   Right.

25   Q.   But if it does, you can?

181

1  A.   Right.

2  Q.   If that happens, the district is required to award that

3  position?

4  A.   Yes, they are.

5  Q.   What are your expectations of a day-to-day sub -- what do

6  you expect them to do?

7  A.   First off, they need to report to the school in which

8  they were called for on time.  And they need to report to the

9  office and make sure that they get everything that they need to

10  start the day off with, which would include a key to get into

11  the room.  And from there, there should be some lesson plans in

12  the classroom, and they're required to follow lesson plans.  At

13  the conclusion of the school day, they need to fill out, they

14  are required to fill out a summary sheet.  They turn everything

15  into the office.  This is what they need to leave for the

16  teacher, and they complete the day.

17  Q.   If someone is effective as a day-to-day sub, does it

18  automatically follow that they'll be a successful classroom

19  teacher?

20  A.   No.

21  Q.   Why not?

22  A.   There's different requirements.  For a day-to-day sub

23  most often there's no preparation for lesson plans.  And

24  because there's no preparation for lesson plans, there's not

25  really a threat requirement or a need for them to be up-to-date

1   in the latest trends and just current.  In order to utilize --

2          THE COURT:  Let me ask you a question, not to

3   interrupt you.  The concept of the latest trends has come up,

4   has been testified to and the importance of keeping up with the

5   latest trends.  How often does a trend change in the teaching

6   world?  I know it's somewhat imprecise.  But if someone comes

7   out of school 10 years ago, will they have been subjected to a

8   significantly different curriculum or approach to let's say

9   fifth grade students than a grad who comes out 10 years later?

10          THE WITNESS:  Well, as you said, I can't give you a

11   specific timeframe of when change takes place, but I can tell

12   you that with technology, education is no different.  It

13   certainly has been expedited change, it happens much faster now

14   than it did 10 years ago.  When I talk about change, change in

15   different learning styles, different types of instructional

16   strategies, that address the different learning styles, with

17   the specific learner.  There's different -- forms of assessment

18   more valid than others, to name a few.

19          THE COURT:  Okay.  Fair enough, go ahead.

20  BY MR. KUHAR:

21  Q.    If someone says Pennsylvania State Educational standards

22  in the educational setting, what do they mean?

23  A.    The Pennsylvania state standards have been I guess

24  defined to the 501 school districts.  What they have

25  established is the minimum competencies in the core areas in

183

1   which students are expected to achieve at.

2   Q.   Is it fair to say in layman's terms that's what students

3   are supposed to learn at various levels?

4   A.   At the minimum, at the minimum to be proficient.  And,

5   therefore, our curriculum and content needs to be aligned to

6   the Pennsylvania academic standards.

7   Q.   Do those standards change over time?

8   A.   Yes.

9   Q.   Do you know whether they've changed in the last say 10

10   years?

11   A.   Yes, they have changed.

12   Q.   Significantly?

13   A.   Within the last 10 years, yes.

14   Q.   Other than this arbitration award that we talked about

15   already, other than that, does the collective bargaining

16   agreement dictate how the district must choose its long-term

17   subs?

18   A.   No.

19   Q.   Does the collective bargaining agreement or any

20   arbitration award dictate how the district chooses day-to-day

21   subs?

22   A.   No.

23   Q.   Is it fair to say that currently you're responsible for

24   dictating or deciding the process, at least in the selection of

25   long-term subs?

1  A.    Yes.

2  Q.    And, again, the process, not the individual choices but

3  the process?

4  A.    That's correct.

5  Q.    And that would be the process you described towards the

6  beginning of your testimony, correct?

7  A.    Yes.

8  Q.    Has that remained constant from the time that you started

9  in February through the current date?

10  A.    Yes, it has.

11  Q.    Is it the same process that you use when filling

12  permanent positions?

13  A.    Yes.

14  Q.    Now, of course, you know Rowena Wagner, right?

15  A.    Yes.

16  Q.    When did you first become familiar with her?

17  A.    The first time I met Rowena Wagner is shortly after I

18  came to the Crawford Central School District.  She had made an

19  appointment to come into my office to talk to me about a

20  concern that she had that she was not -- she was subbing on a

21  day-to-day basis and that the sub service in which we contract

22  through, was calling, we refer to them as guest teachers or

23  people that were issued emergency certificates first.  That's

24  not the way it works.  And so I listened to her concerns and I

25  called, I explained to her that I would take care of it to the

185

1    best of my ability.

2    Q.    I'm sorry to interrupt, but I want to define some of

3    those terms.  I think you said guest teacher, emergency teacher

4    and how it relates to day-to-day subs.  Can you explain

5    basically what you said?

6    A.    A variety of people who I guess you would say have a

7    license to be a substitute teacher.  We have the certified

8    teachers who are approved by our board to be on an approved

9    list to substitute on a daily basis.

10   Q.    Such as Ms. Wagner has the regular PDE certificate?

11   A.    Correct.

12   Q.    There are other people who can sub?

13   A.    Yes.  Then we have what we refer to as a guest teacher,

14   anybody who has a four-year degree and chooses to go through

15   the IU --

16   Q.    What's the IU?

17   A.    The intermediate unit, which is located in Edinboro.

18        THE COURT:  You're too fast, slow down.

19        MR. KUHAR:  Yes, your Honor.

20          THE WITNESS:  The intermediate unit, which is

21   located in Edinboro, it's IU-5, it's an organization, there's

22   many intermediate units throughout the State of Pennsylvania.

23   It provides support in terms of special education, professional

24   development and technology, and other things like that that are

25   helpful to school districts.  That many times you can do on a

186

1  shared basis with another school district, which helps to cut

2  back on incidental costs with the school district.  So they

3  provide a one-day training for these people who have a

4  four-year degree but not certification in teaching.  And then

5  they're required to go through a shadowing experience at an

6  elementary in a secondary building.  And then that certifies

7  them through the state to become what we call a guest teacher.

8  But they're also issued an emergency certificate at that point.

9  BY MR. KUHAR:

10  Q.   Just to check in with you here, the intermediate unit,

11  which is an organization that provides support to public school

12  districts in the region, has a program whereby people who do

13  not have regular certificates basically get an emergency

14  certificate under a guest teacher program?

15  A.   That's correct.

16  Q.   Okay.

17  A.   Then we have the other group, we have a group of retired

18  teachers, small group.  But we have a few, maybe a half dozen,

19  who stay on the sub list and they're permitted to teach up to,

20    substitute teach up to 95 days.  But certified teachers are

21    supposed to be called first, the other two groups, the guest

22    teachers and the retired teachers are supposed to be followed.

23    Q.    Only if needed?

24    A.    Only if needed, it's desperation.  So once that concern

25    was registered with me, I called the sub service to make sure

187

1    they were following the process that they're supposed to be.

2    Q.    So that was a concern raised by Ms. Wagner in the

3    conversation that you had when you first met her?

4    A.    That's correct.  Sometime in the spring.

5    Q.    Of?

6    A.    2002.

7    Q.    You basically told her that you would look into it?

8    A.    Yes.

9    Q.    Did you?

10    A.    Yes.

11    Q.    Go ahead and tell us what you -- basically, did you learn

12    of any irregularities?

13    A.    No, I didn't learn of any irregularities.  I just called,

14    I said this concern has been brought to me, explained to them

15    who reported it to me.  I phoned the sub service, said are you

16    following the procedures, the protocol that you're supposed to

17    have in place.  They said yes, we are.  And I said well, I've

18    had a concern expressed to me that you're not.  So that was it.

19    Q.    Okay.  You were here when Ms. Wagner testified to some

20    comments that Mr. Lascola, former superintendent, made,

21    correct?

22    A.   Uh-huh, yes.

23    Q.   Did Ms. Wagner address any of those issues with you,

24    again, the things that Mr. Lascola allegedly told her, did she

25    ask you about any of those things when she talked to you in the

1   spring of '02; do you know what I'm asking about?

2   A.    Yes, I remember what Ms. Wagner testified about, subbing

3   and an episode to get a permanent position, that kind of thing.

4   Q.    Something to that effect, right?

5   A.    I can't recall that exactly, that she said anything.

6   Q.    Did she ask you for a road map to becoming a permanent

7   teacher; did she say what can I do that will guarantee me to

8   get there or what should I do or anything like that?

9           MR. MEAD:  I'm just going to object to the leading,

10  I know it's getting late in the day.

11          THE COURT:  He just asked him what did she say, you

12  can answer the question.

13          THE WITNESS:  I think that she had expressed to me

14  that she was interested in getting a full-time job at some

15  point.

16  BY MR. KUHAR:

17  Q.    She expressed that to you?

18  A.    She was subbing and she wanted to sub, that was her

19  purpose in coming, she didn't feel she was getting enough days

20   at that particular, she felt that there might have been some

21   type of snag in the system that needed to be corrected.  And

22   that she felt she needed to sub more days, that it would help

23   her chance of getting a full-time job, that's the way I had

24   perceived it.  She mentioned she was interested in a full-time

25   position, that was about the extent of things.

189

1  Q.   Did she ask you for information along the lines of what

2  should I do or what can I do to secure a permanent position?

3  A.   At that -- within that conversation, I don't remember, I

4  would have to say I don't think so, no.

5  Q.   Now, you already told us that you know what certificate

6  Rowena Wagner has, right?

7  A.   Yes.

8  Q.   Do you know if she ever obtained bidding rights?

9  A.   No, she doesn't have bidding rights.

10  Q.   Never had them?

11  A.   No.

12  Q.   Are you generally familiar with her qualifications?

13  A.   Yes.

14  Q.   I'm going to fast toward a little bit.

15  A.   Sure.

16  Q.   Were you at a meeting with Mr. Bernard Wagner and Fred

17  Wagner and Mike Dolecki, where the four of you were discussing

18  things?

19  A.   Yes.

20  Q.   Do you recall when that was?

21  A.   I don't recall the specific time period, but I remember

22  the four of us in a meeting.  I remember that Mr. Bernard

23  Wagner had made a contact with Mr. Dolecki to set up a meeting

24  and informed us that his brother was coming along as well.

25  Q.   Okay.  You heard the testimony that that was in January

190

1    or early February of '03?

2    A.    Yes.

3    Q.    Does that sound right; if you don't know, say you don't

4    know, but do you know?

5    A.    I don't know.

6    Q.    Okay.  How many conversations did the four of you have

7    together at one time where all four of you were there?

8        THE COURT:  I don't understand that question, how

9    many conversations did you have together?

10        MR. KUHAR:  I'll withdraw the question.

11   BY MR. KUHAR:

12   Q.    The four of you had a conversation, correct?

13   A.    Correct.

14   Q.    You know which four I mean, right?

15   A.    Yes.

16   Q.    Did the four of you ever have another conversation or is

17   that the only conversation you ever had?

18   A.    We had one meeting.

19   Q.    During that meeting, did Bernie Wagner attribute to Mr.

20  Wright the comment that black and brown people are less

21  intelligent than whites or anything to that effect?

22  A.   I didn't hear anything like that in that meeting.

23  Q.   Did you hear about it at some other time?

24  A.   I heard about it.  I'm not sure when, it could have been

25  after the lawsuit had been filed.  I can't pinpoint when it

191

1  was.

2  Q.    During that meeting, did you in any way agree with that

3  concept?

4  A.    No.  I never would agree with that, I don't feel that

5  way, never have.

6  Q.    You heard the testimony that there was some university

7  study cited?

8  A.    I've never read a university study.

9  Q.    On that subject?

10  A.    No, ever.

11  Q.    Did you say that you knew one existed?

12  A.    No.

13  Q.    Did you say anything that you can think of that might

14  have been confused into that?

15  A.    I don't know what that would have been.

16  Q.    Okay.  Now, Ms. Wagner was a sub during the '01-'02

17  school year, correct?

18  A.    Correct.

19  Q.    Again, when I mean long-term sub, I'll say long-term sub.

20  She was a daily sub, correct?

21  A.   Correct.

22  Q.   Now, again, you started at the district in February of

23  '02, right?

24  A.   Correct.

25  Q.   Did you know how long-term substitutes were filled prior

192

1  to your arrival at the district?

2  A.   I really can't answer that question.  I was given an

3  assignment by the superintendent, my responsibility was to make

4  recommendations to the board for hire.  And it was up to me to

5  come up with the process which I wanted to use.  Actually, he

6  gave me complete autonomy to create a system that I thought was

7  the most effective to put into place.  I assume that they would

8  have been.

9  Q.   But you don't know?

10  A.   No, I don't know.

11  Q.   Is it fair to say it didn't really matter to you?

12  A.   It didn't matter to me at all.  I was doing it, I felt I

13  needed to do it the way I felt was the best at that time, I was

14  most comfortable with.

15  Q.   From February of '02 through today, do you know how many

16  regular permanent elementary teaching positions Ms. Wagner

17  could have been selected for?

18  A.   Regular permanent?

19  Q.   Yes.

20    A.    Approximately, 20.

21    Q.    And about how many long-term substitute positions she

22    could have been considered for -- I'm sorry, could have been

23    hired into?

24    A.    Since 2002?

25    Q.    Through the current date?

193

1  A.    Around 13.

2  Q.    Generally speaking -- I'm sorry, let me back up.  You

3  coordinated all of the processes that led to recommendations

4  for those positions, right?

5  A.    Yes.

6  Q.    Generally speaking, do you know why Ms. Wagner wasn't

7  chosen for any of those positions?

8        THE COURT:  Just timeframe, are we talking 2002 to

9  today?

10       MR. KUHAR:  Yes, your Honor.

11  BY MR. KUHAR:

12  Q.    And you were with respect to the answer you just gave,

13  right, you understood my questions to be long-term subs and

14  permanent positions from when you started through today,

15  correct?

16  A.    Right.

17  Q.    And you gave those numbers, 20 for the permanent

18  positions and 13 for the long-term subs, correct?

19  A.    Correct.

20  Q.    Okay.  Now, my question was, generally speaking, why

21  wasn't Ms. Wagner chosen for any of those positions?

22          MR. MEAD:  Your Honor, I would have an objection to

23  generally speaking, I think there's specific instance here why

24  she wouldn't have been chosen in 2002, why in 2004, and we have

25  no interviews after that.  So I would have an objection to

1   general statements like that, when there are specifics in the

2   record.

3           THE COURT:  I gather the question was seeking a

4   general answer?

5           MR. KUHAR:  Yes, your Honor, and we do intend to

6   drill down for every position.

7           THE COURT:  If you're going to drill beneath the

8   surface later, you start at the top, you can ask that question.

9   BY MR. KUHAR:

10  Q.   Do you understand the question?

11  A.   Yes.  Because she wasn't the most qualified candidate for

12  any of the positions.

13  Q.   How many individuals who are Asian and/or born in the

14  Philippines have applied for long-term substitute or permanent

15  teaching positions with the district, to your knowledge, in the

16  history of the district?

17          MR. MEAD:  Objection to in the history of the

18  district.

19          THE COURT:  Is it foundational?

20        MR. MEAD:  Foundation.

21  BY MR. KUHAR:

22  Q.    As far back as you're aware?  I'll withdraw the question

23  and start over.  You don't know what happened in the district

24  in 1935?

25  A.    No.

195

1  Q.   In 1955?

2  A.   No.

3  Q.   You know what happened at the district from when you

4  started there through the current date, right?

5  A.   Correct.

6  Q.   Is it fair to say you know some of the things that

7  happened during the several years before you got there?

8  A.   Some of them, yeah, it's fair.

9  Q.   To your knowledge, with a particular focus on February of

10  '02 through the current date, but to your knowledge, at any

11  time how many people who were Asian and/or Filipino born have

12  applied for teaching positions at the Crawford Central School

13  District?

14  A.   Three.

15  Q.   Who were they?

16  A.   Ms. Rowena Wagner, Ms. Naomi Yu-Moore, and there was a

17  lady before me who was a social studies teacher, she retired

18  when I was here, I think her name was Ms. Froelich, I'm not

19  sure.

20  Q.   Are you aware of any other such individuals who applied?

21  A.   No, I'm not.

22  Q.   Are you certain no other such individuals applied as long

23  as you've been there?

24  A.   Yes.

25  Q.   Is it fair to say that if you got an application from

196

1  such a person but never met them, you might not know their

2  race?

3  A.    That's a possibility.

4  Q.    But other people whose race and country of national

5  origin you've come to know who have applied, the only ones who

6  have been Filipino and/or Asian since you've been there, are

7  Naomi Uy-Moore and Rowena Wagner, true?

8  A.    Correct.

9  Q.    Has the district hired other minorities for permanent

10  teaching positions since you came on board in February of '02?

11  A.    Yes.

12  Q.    And, again, I mean elementary when I ask that, right, you

13  understand when I say that, I'm asking about elementary

14  positions, right?

15  A.    Only elementary.

16  Q.    Yes, sir.

17  A.    Okay.

18  Q.    Who were there?

19  A.    Tammy Foster.

20  Q.   As you go, tell us the dates?

21  A.   She was hired in 2004.  And Jennifer Christie-Serles.

22  Q.   Could you spell that, please?

23  A.   Serles?

24  Q.   Yes.

25  A.   S-e-r-l-e-s, I think.

197

1 Q.   That was Christie-Serles?

2 A.   Yes.

3 Q.   First name is Jennifer?

4 A.   Yes.

5 Q.   Go ahead.

6      THE COURT:  When was she hired?

7      THE WITNESS:  2005.  It would have been in 2005-2006

8 school year.  Tammy was 2004-2005.

9 BY MR. KUHAR:

10 Q.   Thank you.

11 A.   That's it for elementary.

12 Q.   I understand.  Were they both African-American?

13 A.   Yes.

14 Q.   Have other teachers who are not elementary been hired who

15 were racial minorities since you've been with the district?

16 A.   One.

17 Q.   Who was that?

18 A.   Her name is Vera Campbell, she was a guidance counselor

19 at Meadville Area High School.

20  Q.  What race was she?

21  A.  She was Hispanic.

22  Q.  Has she left?

23  A.  She's left the district.

24  Q.  Why?

25  A.  Because she ended up receiving a job closer to her home,

file:///A|/WAGDAY2.TXT

198

1  she was traveling about an hour and 15 minutes to Meadville.

2  Q.   Does the district seek more minority teachers?

3  A.   Do we?

4  Q.   Yes, sir.

5  A.   Yes.

6  Q.   Why?

7  A.   I think it could be of some value to the district.

8  Q.   What do you mean?

9  A.   It could be an educational value, it could be a value in

10  regard to role models to our students.  It provides our

11  students with cultural experiences.

12  Q.   Why hasn't the district hired more racial minorities or

13  foreign-born people since you've been at the district?

14  A.   Well, I've attended many job fairs.  And there's a very

15  small percentage of minorities at the job fairs and I think

16  that have chosen a career in education.  And I think that

17  demographically and just the northwest region of Pennsylvania,

18  it's not an area that is heavily populated with minorities.

19  And so many of the school districts surrounding us, they don't

file:///A|/WAGDAY2.TXT

20  have minorities within their school system.

21  Q.    None?

22  A.    I haven't checked, but the school district that I came

23  from prior had zero.

24  Q.    Which was what school district?

25  A.    Titusville Area School District.  And I think that --

1   people, minorities who choose a career in education, are more

2   marketable maybe in the urban, suburban areas, where the

3   teaching salaries are quite a bit higher than they are in our

4   area, which makes a significant difference.  If you go an hour

5   south from our location, you're into suburban, urban areas,

6   their salaries are higher than ours.

7   Q.   How much higher?

8   A.   Probably somewhere in the neighborhood of $20,000.

9   Q.   Per year?

10   A.   Their top ends probably closer to 40, yes.

11   Q.   $40,000 higher that your top end teacher's salary?

12   A.   That's correct.

13   Q.   I understand.  But the answer to my question was the 20

14   number you gave --

15   A.   To start at the bottom, maybe somewhere around there.

16   Q.   $20,000 --

17        THE COURT:  So I have a sense of this, what are the

18   starting teachers in K through 6, the elementary school

19   teachers, what do they start at in the Crawford Central School

20  District?

21       THE WITNESS:  Low forties.

22       THE COURT:  Okay.

23  BY MR. KUHAR:

24  Q.   Basically, you're saying low sixties --

25  A.   I think that would be fair to the suburban, urban areas.

200

1   I know a school district like North Allegheny, for example,

2   just settled a contract where their teachers at top end are

3   going to be making $100,000.  The eastern side of the state

4   where is really, it's more metropolitan, the salaries are even

5   higher.  And the steps to get to the top are smaller.

6   Q.    What does that mean?

7   A.    Meaning that they've compacted their contracts in

8   salaries and so -- our contract's currently steps 1 to 16, it

9   takes 16 steps to get to the top.  If you experience any

10  compaction in between there, you may not move forward.  Maybe

11  years two through five, just because of the compaction that

12  takes place.  In some of the more metropolitan school

13  districts, their compaction is 10 steps.  Mathematically you

14  can get to the top step much faster.

15  Q.    Again, translating that into lay terms, are you saying

16  that in urban areas it might take you 10 years to get to the

17  journeyman's rate, whereas, in your district it takes 20 or

18  more?

19  A.    Yeah, not that many, we're down to 17.

20   Q.    Okay.

21         THE COURT:  Mr. Kuhar, I have some matters I have to

22   attend to a bit later this afternoon.  So this seems to me at

23   10 to four, as good a place as any to call our day.  Besides

24   Mr. Heller, once you finish up with him, how many more

25   witnesses do you have -- do you have Mr. Dolecki?

201

1        MR. KUHAR:  Yes, your Honor.  Would you like me to

2   run through the others?

3        THE COURT:  I'm trying to get a timing sense.

4        MR. KUHAR:  We really don't have any more of the

5   five or ten minute witnesses.  We have basically the

6   administrators.  Including Mr. Dolecki, finish Mr. Heller.  We

7   have the other administrators, four or five of them, who were

8   involved on these committees.  Two of them who are of

9   particular note, are Joanne Darling, about whom some testimony

10  has already been given, and Kurt Meader, who was the

11  administrator at the school where Joye Pickens leave of absence

12  arose.

13       THE COURT:  Really there shouldn't be no reason why

14  we couldn't finish all that tomorrow?

15       MR. KUHAR:  Your Honor, I forgot about Suzanne Good,

16  the curriculum director.  I think in large part it depends on

17  the cross, too.  But it's certainly possible from my

18  standpoint.

19       MR. MEAD:  I don't know if I'll have any rebuttal,

20  your Honor, but if we do, it will be brief.  Along those same

21  lines, would you want us to close at the end of the evidence?

22          THE COURT:  It's always helpful to me.  And I

23  recognize that your closing is really going to be your findings

24  of fact and conclusions of law.  But you'll have the

25  opportunity to do it, I think it's always helpful.  Every judge

1   is different, but it's helpful for me to hear from each of the

2   lawyers as to what you think happened and as to what you think

3   is significant.  So I get a closing sense from you, just like a

4   jury would, as to what you think I should be looking for when I

5   get down to specifically looking at the transcript.  That

6   having being said, I want to see both the lawyers back in my

7   chambers when I get off the bench.  And we're going to start at

8   8:30 tomorrow morning.

9

10          (Whereupon, at 3:58 p.m, the Non-Jury Trial

11   proceedings adjourned for the day.)

12

13                        - - -

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25