IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
        Plaintiff


v.                    CIVIL ACTION NO. 04-264 ERIE


CRAWFORD CENTRAL SCHOOL
DISTRICT, et al.,
        Defendants



NON-JURY TRIAL - DAY NO. 3



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, June 20, 2007.




APPEARANCES:
        JOHN J. MEAD, Esquire, appearing on behalf of
        the Plaintiff.

        CALEB L. NICHOLS, Esquire, appearing on behalf

of the Plaintiff.

MARK J. KUHAR, Esquire, appearing on behalf of
Defendants Crawford Central School District,
et al.

Ronald J. Bench, RMR - Official Court Reporter

2

1          I N D E X

2

3     WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE DEFENSE:

5

6  Charles Heller           3     141     190       --

7

8  Joanne Darling          196    214      --       --

9

10   Michael Dolecki          218    222      --       --

11

12

13

14

15

16                  - - -

17

18

19

20

21

22

23

24

25

3

1           P R O C E E D I N G S

2

3      (Whereupon, the Non-Jury Trial proceedings began at

4   8:30 a.m., on Wednesday, June 20, 2007, in Courtroom C.)

5

6           THE COURT:  Are we ready to go?

7           MR. KUHAR:  Yes, your Honor.  Your Honor, we'd like

8   to start off by moving for the admission of Exhibit I, that

9   consent arbitration award from '99.

10          THE COURT:  It's admitted.

11      CHARLES E. HELLER, III, DEFENSE WITNESS, PREVIOUSLY SWORN

12          (Continued - DIRECT EXAMINATION)

13   Q.   Good morning, Mr. Heller.

14   A.   Good morning, Mr. Kuhar.

15   Q.   When we broke yesterday, I think we had begun talking

16   about job fairs or a job fair.  So that's where we're going to

17   begin with today.  Who's Lee McFerrin?

18   A.   Lee McFerrin is a former teacher at Crawford Central

19   School District, now a high school principal at Farrell Senior

20  High.

21  Q.   Is he African-American?

22  A.   Yes, he is.

23  Q.   Why did he leave the district's employment?

24  A.   He was offered and administrative position with the

25  Franklin School District as an elementary principal.

4

1  Q.    And then from there he went to Farrell, apparently?

2  A.    From there he went to Farrell, yes.

3  Q.    Was there a time when you attended a job fair where you

4  were looking for teaching applicants?

5  A.    Yes.

6  Q.    When was that?

7  A.    It was approximately four years ago.  I invited Mr.

8  McFerrin to come along with me to attend the job fair, which

9  was held at Edinboro University.  And the purpose for Mr.

10  McFerrin attending was to assist in the recruiting process,

11  specifically minority recruiting.

12  Q.    Did he have any formal role in the interview or selection

13  process for teachers?

14  A.    At the job fair?

15  Q.    In his position with the district -- he was a teacher,

16  right?

17  A.    He was a teacher, yes.

18  Q.    Did he have any formal role --

19  A.    No.

20  Q.   So the reason you took him there was what?

21  A.   To assist in recruiting minorities and also in the

22  general recruiting process for teachers.

23  Q.   It is fair to say in part you took him there because you

24  were hoping other minorities would notice he was a minority?

25  A.   Yes.

5

1  Q.   Who attended this job fair, I don't mean the school

2  districts -- was it college students?

3  A.   I'd say the majority were college students from Edinboro

4  University.  There were some students that attended from

5  neighboring universities, such as Mercyhurst, Gannon, kind of

6  thing.  Most of them were either recent graduates or graduates

7  to be.

8  Q.   And did you see any minorities there, racial minorities?

9  A.   I saw a few, very few.

10  Q.   Can you approximate the number?

11  A.   There were, I didn't count, but there were maybe four or

12  five out of several hundred.  Mr. McFerrin and I talked about

13  that.

14  Q.   Did you talk to any of those candidates?

15  A.   I didn't, no.

16  Q.   Did any of them visit your booth or your area?

17  A.   No.

18  Q.   Did you see any Asians?

19  A.   I don't recall.

20  Q.   You don't recall --

21  A.   I don't recall seeing any Asians.

22  Q.   Now, a little bit out of order, if you would bear with

23  me.  The conversation that you had yesterday which the Wagner

24  gentlemen approximated to be in January or February of '03,

25  where Mike Dolecki was also there?

6

1   A.   Yes.

2   Q.   You heard the testimony that, from the Wagners, Fred and

3   Bernie, that there were essentially two conversations taking

4   place?

5   A.   I heard that yesterday, yes.

6   Q.   Was that accurate?

7   A.   That wasn't my impression of the meeting.

8   Q.   Explain what you mean?

9   A.   My impression of the meeting was that the meeting was

10  requested by Mr. Wagner, Mr. Wagner and his brother attended

11  the meeting with Mr. Dolecki and myself.  Mr. Wagner --

12  Q.   Which one?

13  A.   Bernie.

14       THE COURT:  Would you give me the participants of

15  the meeting, whoever was there, one more time?

16       THE WITNESS:  Bernie Wagner, Fred Wagner, Mike

17  Dolecki and myself.

18  BY MR. KUHAR:

19  Q.   And to be clear, this is the meeting where supposedly you

20   agreed with the notion that black and brown people are not as

21   intelligent as white people?

22   A.   Correct.

23   Q.   Which you've already denied saying?

24   A.   Correct.

25   Q.   Okay.  Go ahead, you were explaining your impression of

1   the meeting?

2   A.   My impression of the meeting was that Mr. Bernie Wagner

3   was expressing some frustration because his wife wasn't able to

4   get a job at that point or had been offered a job at that

5   point.  And that he did most of the talking, we did most of the

6   listening.  Most often when I'm in a meeting with Mr. Dolecki,

7   he's the superintendent, I'm the assistant superintendent, he

8   does the majority of the talking, I'm kind of his back up.

9   That's pretty much the way the meeting went.  Specifically to

10   what was said, I can't tell you.  Other than there was a lot of

11   frustration expressed on behalf of Mr. Bernie Wagner.  I

12   remember him stating that sometimes, you know, people have some

13   personal vendettas against him, he didn't want them to take

14   them out on his wife, I remember that.

15   Q.   Okay.

16   A.   Otherwise, that's it.

17   Q.   Okay.  Were you and Mr. Dolecki talking at the same time?

18   A.   No.

19   Q.   Okay.  I'm going to take you back to November of '02,

20  just a few months before then?

21  A.  Sure.

22  Q.  Do you recall receiving a telephone call from Kurt Meader

23  regarding Joye Pickens need to be absent?

24  A.  Yes, I do.

25  Q.  When was it and who's Kurt Meader?

8

1  A.   Kurt Meader is the principal, was the principal of

2  Cochranton Elementary at that particular time, November of

3  2002.

4  Q.   I'm sorry.

5  A.   In November of 2002 he was the principal of Cochranton

6  Elementary.

7  Q.   He called you about the Pickens' position, what do you

8  recall of that conversation?

9  A.   He kind of called me in a panic because we had discussed

10  earlier that we were going to have some long-term positions

11  open in January of 2003.

12  Q.   Who's we?

13  A.   Elementary principals, myself and Ms. Good.  And we had

14  planned to interview for the selection of those four positions.

15  Q.   Prior to this phone call that you're describing?

16  A.   Prior to that phone call.

17  Q.   Okay.

18  A.   So he called in a panic stating that Ms. Pickens had just

19  come to him and said that she was having some health

20   problems --

21         MR. MEAD:  Objection, this is hearsay.

22         MR. KUHAR:  Your Honor, his answer was that she was

23   saying she was having health problems.

24         THE COURT:  This is why he did something?

25         MR. KUHAR:  Exactly, your Honor.

9

1       MR. MEAD:  I would just point out that Mr. Meader is

2   going to be testifying, to my understanding.

3       THE COURT:  I haven't heard any hearsay yet, go

4   ahead.

5   BY MR. KUHAR:

6   Q.   Go ahead, what do you recall of the conversation?

7   A.   Earlier in the year Ms. Pickens had made Mr. Meader aware

8   that she was going to be gone in January for the remainder of

9   the year because she was going to have some surgery for some

10  health problems that she was having.

11  Q.   At least that's what Mr. Meader told you?

12  A.   Prior to that.  So we were aware that her position was

13  going to be available on a long-term basis prior to the

14  November phone call, along with three other positions in the

15  school district.

16  Q.   Okay, I just want to stop you there.  I think you

17  testified that there were going to be four long-term sub

18  positions starting in January of '03, correct?

19  A.   Correct.

20  Q.    And before Mr. Meader telephoned you, that group that you

21  had just mentioned of administrators, had decided to interview

22  for those four positions, which included Pickens?

23  A.    Correct.

24  Q.    So then Mr. Meader calls you?

25  A.    Mr. Meader called me in a panic and said that Ms. Pickens

10

1   had just come to him a few minutes before and had showed him a

2   letter that she was going to send home with her students, and

3   that she had talked to Ms. Wagner about taking the position for

4   the time period that she was going to be out.  That was the

5   first time that he had been aware that Ms. Pickens was going to

6   leave.

7   Q.   At all, that she was going to leave at all?

8        MR. MEAD:  I'm going to object to that --

9        THE COURT:  That's hearsay, sustained.

10       MR. KUHAR:  Okay.

11  BY MR. KUHAR:

12  Q.   So, basically, explain the rest of the conversation that

13  caused you to do something?

14  A.   So I explained to him don't have her send the letter home

15  because that's not what we had discussed.  And we need to talk

16  with Ms. Pickens about the way she handled the situation.  I

17  have no problem, we have no problem with teachers making

18  recommendations for the replacement.  But Ms. Pickens had taken

19  it upon herself, not only to make a recommendation, but to make

20   an appointment.  Which was going to eventually have to have

21   some board approval.  That's not her function as a teacher,

22   it's nowhere in her job description.  It's an administrative

23   function for us to make the decision on teacher selection and

24   make a recommendation to the board.

25   Q.   So you're saying that she had already prepared a letter

11

1    to be sent to the parents announcing Ms. Wagner is taking over?

2    A.    Correct.

3    Q.    So in response to your learning this from Mr. Meader,

4    what did you do?

5    A.    I told him not to send the letter home, that he needed to

6    tell her we will talk about this further.  She left I think the

7    following day, she was gone for the remainder of the year.

8    Q.    Who is she?

9    A.    Ms. Pickens.

10   Q.    So beginning with the next day she was out on this health

11   leave that ran through the end of the '02-'03 school year?

12   A.    That's correct.

13   Q.    So what happened next in terms of filling in Ms. Pickens'

14   long-term absence?

15   A.    Well, it was my feeling and also was Mr. Meader's feeling

16   that she created a very awkward situation, by taking it upon

17   herself to appoint Ms. Wagner to that position.  And the

18   understanding to us was that she was going to be in that

19   position for the remainder of the year.  That was not what we

20   had intended to do.  It wasn't that we were unwilling to listen

21   to any recommendations from her, but it was the first time that

22   we had heard that she was interested in using Ms. Wagner for

23   that position.  But she didn't have the authority, it wasn't

24   her function, and it wasn't in her job description to make

25   those decisions.  So in many ways she circumvented her building

12

1    supervisor, which happened to be Mr. Meader, the building

2    principal.

3    Q.    Okay.  Did you speak with Joye Pickens about this issue?

4    A.    I called Joye Pickens a few days later at her home and

5    talked with her and expressed to her that what she did was not

6    appropriate.

7    Q.    Did you have a face-to-face meeting?

8    A.    I never ever had a face-to-face meeting with Ms. Pickens.

9    I talked to her on the phone.  Only on the phone, and that is

10   when she was aware that, I never told her that Ms. Wagner would

11   not be in that position, that she was going to have to

12   interview for that position.  We were going to keep her in that

13   position until we completed the interview process and made a

14   decision on who was going to fill that position.

15   Q.    You said those things to --

16   A.    I told her that.

17   Q.    Again, we have to allow each other to finish.

18   A.    Yes.

19   Q.    Did you hear her testimony that she met with you

20  personally about this issue?

21  A.   I heard.

22  Q.   Is it correct?

23  A.   No.

24  Q.   There was no such meeting?

25  A.   There was no such meeting.  I'd like to add one thing.

13

1  If there would have been a meeting, Mr. Meader would have been

2  aware of it.  I would have had the meeting with Mr. Meader.

3  Q.    But, in any event, it didn't happen?

4  A.    It didn't happen.

5  Q.    Since you have been with the district, which was February

6  of '02?

7  A.    Yes.

8  Q.    Has any permanent teacher chosen their long-term

9  substitute -- I'm sorry, chosen a long-term substitute?

10  A.    No.

11  Q.    Again, since you've been at the district, how frequently

12  have teachers, permanent teachers, who needed a long-term

13  substitute, how frequently have they recommended who their

14  substitute should be?

15  A.    I don't keep track of that.  Teachers do recommend from

16  time to time.  In that particular situation, there were four

17  positions at that time.

18  Q.    At that time being January of '03?

19  A.    Correct.

20   Q.    Okay.

21   A.    And Ms. Pickens was the only teacher that made a

22   recommendation.  The other three teachers, two of them were at

23   West End, the other was Second District, in no way made any

24   recommendations.  And the teacher at Second District who went

25   out on a medical leave, I had numerous conversations with,

14

1  because she was experiencing a problem in potentially being off

2  and never at any time recommended a replacement for herself.

3  Q.    Second District and West End, those are elementary

4  schools?

5  A.    That's correct.

6  Q.    Did you ever tell Ms. Pickens or Ms. Wagner that Ms.

7  Wagner was going to teach for Joye Pickens in her absence

8  through the end of the first semester?

9  A.    No.

10  Q.    Did you at some point agree that Ms. Pickens -- I'm

11  sorry, that Ms. Wagner could remain in Ms. Pickens' class for

12  some period of time?

13  A.    I agreed that she could remain in that position until the

14  interview process was complete and we made decisions on where

15  people were going to be offered positions.

16  Q.    Did that happen?

17  A.    Yes.

18  Q.    Did you conduct an observation of Ms. Wagner's teaching

19  performance in conjunction with the filling of the Pickens'

20   long-term substitute position?

21   A.   Yes.

22   Q.   I'm going to ask you to look at Exhibit K, you should

23   have binder two within reach?

24   A.   Right here.  What tab number?

25   Q.   Behind 11.  Are you looking at it, sir?

15

1   A.   Yes, I am.

2   Q.   What is it?

3   A.   It's an observation form that I completed when I did an

4   observation on Ms. Wagner.

5   Q.   Why did you observe Ms. Wagner and when did you observe

6   her?

7   A.   I observed her on November 22nd.

8   Q.   Why?

9   A.   Well, first of all, she invited me to observe her and I

10   had planned to observe her.  I talked with Mr. Meader and asked

11   Mr. Meader to observe her as well.

12   Q.   Okay.  And how long were you in her classroom?

13   A.   I was in her classroom for 39 minutes.

14   Q.   It says so at the top, right?

15   A.   Yes.

16   Q.   Everything on this form is accurate?

17   A.   Yes.

18   Q.   What does this form represent, what information is on it?

19   A.   It's an observation.  I guess you could say it critiques

20   her teaching experience during the time that I was in her

21   classroom.

22   Q.   You heard her testimony that she felt that she did have a

23   lesson plan but that you indicated that at the very top under

24   preparation, where it says "NA", you heard her say that you put

25   NA for lesson plans when in fact she did have one.  Do you

16

1  recall that testimony?

2  A.   I recall.

3  Q.   Did she have a lesson plan?

4  A.   I didn't see the lesson plan.

5  Q.   Did she present it to you?

6  A.   I don't remember her presenting it to me.  I don't think

7  I would have written didn't see lesson plans if I would have

8  saw her lesson plans.

9  Q.   Is this "NA" that you written there, any kind of black

10  mark against her?

11  A.   No, it's not a black mark.

12  Q.   It's not a negative?

13  A.   Not in any way.

14  Q.   What does "NA" stand for?

15  A.   Not applicable.

16  Q.   Not a positive, not a negative?

17  A.   No.

18  Q.   Well, using your memory and as necessary this document to

19  remind yourself of the observation that you did, what do you

20   recall of her teaching performance that you observed during

21   that observation?

22   A.   I observed when I went into the classroom and sat down

23   and I watched her conduct her class.  And she had, the students

24   were sitting in their seats, and she had them move to an area

25   in the room where they could sit on the floor and she read a

17

1   story to them.

2   Q.   Okay.  Anything else?

3   A.   That's it.

4   Q.   Okay.  How did you critique that as teaching performance?

5   A.   Well, I made some suggestions.  That I felt that when she

6   started out the lesson, she needed to be a little bit more

7   specific in detail in her introduction and create more

8   enthusiasm and excitement to the students, to get them excited

9   about what they're going to hear, spark their interest and keep

10  their attention.  That was one of the areas.

11  Q.   What else?

12  A.   As she was reading, she would stop, she would discuss

13  specific points, she needed to involve more of the students

14  into the discussion.  She would -- I don't know how many

15  students were there, somewhere in the neighborhood of 20, give

16  or take, she needed to involve more students in the lesson and

17  make sure that there was an understanding throughout the entire

18  class, not just with a few specific students.  Which is what we

19  refer to as checking for understanding, which is an informal

20  assessment that teachers are supposed to be using in their

21  classroom.

22  Q.    What is assessment, when a teacher does assessment?

23  A.    They're assessing their instruction, they're assessing

24  the students and sometimes they have to make some instructional

25  decisions.  Sometimes they need to back up, sometimes they need

18

1   to reteach.

2   Q.   Is assessment checking to see if the students are

3   learning?

4   A.   Yes.

5   Q.   Okay.

6   A.   Right.

7   Q.   Was that happening, assessment?

8   A.   It wasn't happening to the entire class.  It was

9   happening to a few students.  I just suggested that she include

10  more students into the class discussion.  And that when

11  students would respond with the correct answer, to use more

12  positive reinforcement, such as a great job, to try to help

13  their self-esteem, build more confidence.  And also reinforce

14  the answer, so it benefited all the students in the classroom,

15  not just the student that was answering the question.  So it

16  was a learning experience for all.

17  Q.   What else?

18  A.   I noted that I felt for second graders it was a long time

19  for the students to be sitting in one place and doing one thing

20    for a period of time.  Second graders, you know their attention

21    span is not real long.  And we recommend, suggest, our

22    philosophy is that we expect students to be engaged in the

23    elementary level about 90 percent of the time, that's how they

24    learn.  Keep them on task, keep them focused.

25    Q.    I understand.  What else did you note?

19

1   A.    I suggested that -- well, that's all I noted at that

2   point.

3   Q.    Okay.  Now, again, you heard Ms. Wagner testify that this

4   was not deemed an unsatisfactory evaluation by you.  Would you

5   agree with that?

6   A.    I would agree.

7   Q.    How would you characterize it, from poor to outstanding

8   or somewhere in between?

9   A.    Well, first of all, I want to make it clear that it

10  wasn't an evaluation, it was an observation.

11  Q.    What's the difference?

12  A.    An observation, it's just a form of data used to

13  evaluate, but it's not an evaluation instrument.  It's the time

14  when you go in, you can observe what the teacher does in class,

15  and then it gives you an opportunity to reflect with the

16  teacher, in a constructive manner.  The data is used for the

17  evaluation process.  As far as rating, I would say her

18  observation was adequate at best.  But, you know, there was

19  room for professional growth, there was room for improvement.

20        MR. KUHAR:  We offer Exhibit K.

21        THE COURT:  It's admitted.

22  BY MR. KUHAR:

23  Q.    I think you testified already that you instructed Mr.

24  Kurt Meader to observe her as well, right?

25  A.    Yes.

20

1  Q.   And I'll ask him about that.  But why did you make that

2  decision, that instruction?

3  A.   I believe it just would be more meaningful.  He was the

4  building principal in that particular building, it was

5  convenient.  It just would have been more meaningful for more

6  than one person to observe Ms. Wagner or any other teacher.  If

7  the opportunity presents itself.

8  Q.   At some point did you discuss Exhibit K, that observation

9  report with Ms. Wagner?

10  A.   Yes.

11  Q.   When?

12  A.   On the 6th of December, 2002.

13  Q.   Is that indicated on the form?

14  A.   Yes.

15  Q.   What do you recall of that meeting with her -- where was

16  it, how long did it last, what do you recall of the content?

17  A.   I'm not exactly sure how long it lasted, 20 minutes, half

18  hour, at the most.  It was in a classroom in which she was

19  teaching, it was during prep period.

20  Q.    What is prep period?

21  A.    It's a preparation period, there's no students.  There's

22  no students in the classroom at that particular time.  With the

23  elementary class, they're usually in a special class, art,

24  music, phys. ed., something of that nature.  The teacher has

25  that length of time to prepare.

21

1  Q.    So you're in there during that time when no students are

2  there; what do you recall of the content of that conversation?

3  A.    Okay.  Well, we met to go over the observation as we had

4  planned and as I do with any other teacher that I observe, and

5  we discuss all the points that I had brought up a few minutes

6  ago.

7  Q.    Here today?

8  A.    Yes.

9  Q.    Okay.

10  A.    In addition, I had suggested that she meet with Ms.

11  Braden, who is a title one reading specialist, to pick up some

12  strategies that could help her, since the lesson I observed was

13  a reading lesson, more of a guided type of reading or read

14  aloud, is what Ms. Wagner was using.  She could pick up some

15  strategies that would be beneficial not only to her, but also

16  beneficial to the students which she had in class.

17  Q.    I'm sorry to interrupt, Ms. Braden, her position again?

18  A.    She was a title one reading specialist at Cochranton

19  Elementary School at that particular time.

20   Q.   Okay.  What else did you suggest?

21   A.   I suggested to her that she see Ms. Good --

22   Q.   Why?

23   A.   If she had an opportunity.  I thought Ms. Good could

24   provide her with some resources which would be beneficial to

25   her and give her a more in-depth understanding in a lot of

22

1    areas that would be helpful to her.

2    Q.    Is it fair to say you wanted a dialogue to start between

3    the two?

4    A.    Correct.

5    Q.    Did you explain that to her?

6    A.    Yes.

7    Q.    How did she react, specifically was she receptive?

8    A.    I wouldn't say she was receptive --

9    Q.    I'm sorry, start over, please?

10   A.    I wouldn't say she was receptive.  She was professional,

11   she was polite, I think she was a little disappointed.  I think

12   she felt her lesson in her eyes went better than what I had

13   observed.  She didn't say that she agreed, she didn't say that

14   she disagreed with any of the concepts.

15   Q.    Did she embrace your suggestions in any way?

16   A.    Well, I didn't get the impression during the conversation

17   that she embraced --

18   Q.    I'm sorry, just to be clear, did you say did or didn't?

19   A.    I didn't get the impression that she embraced my

20    suggestions.

21    Q.    Did she say that she did; for example, did she say oh,

22    yes, I'll do that?

23    A.    No.

24    Q.    Did you make any other suggestions that you recall, in

25    terms of things she could do?

23

1  A.    No, I pointed out the four areas and then I suggested a

2  few resources, two resources to her.

3  Q.    What do you mean the four areas?

4  A.    The areas that we talked about earlier, about the

5  introduction --

6  Q.    The things we talked about here?

7  A.    Yes.

8  Q.    Okay.  Do you know whether she did any of the things that

9  you encouraged her to do?

10  A.    Well, after I had mentioned to Ms. Wagner that she should

11  see Ms. Braden and Ms. Good, I made sure that I talked with Ms.

12  Braden just to give her a heads up that Ms. Wagner would

13  probably come by and ask her for some suggestions, some advice,

14  some recommendations, on some strategies in her classroom.

15  Q.    Why did you do that?

16  A.    Just polite, professionalism, so that she didn't show up

17  and Ms. Braden didn't know anything about it.  I also did the

18  same with Ms. Good.  She never met with Ms. Good at all.

19  Q.    Let me be clear on this point and I'll ask Ms. Good about

20  this.  Do you have any reason to think that she did meet with

21  Ms. Good?

22  A.   No.

23  Q.   Do you have any reason to think that she did meet with

24  Ms. Braden?

25  A.   I'm aware that she did meet with her.

24

1  Q.    How many times?

2  A.    One time.  And according to Ms. Braden, it was a very

3  superficial visit, she just touched base with her.  I don't

4  know that she got a lot out of the conversation.

5  Q.    All right.  Now, ultimately, who filled in for Ms.

6  Pickens on a long-term substitute basis?

7  A.    Well, on a long-term substitute basis, Amy Szalewicz.

8  Q.    I want you to describe the process that the district

9  employed to determine that Ms. Szalewicz would be the person?

10  A.    Well, we had a meeting, myself -- I believe there were

11  five elementary principals there and Ms. Good.

12  Q.    Is that all of them?

13  A.    No, there was one that couldn't be there.

14  Q.    Who was that?

15  A.    Mr. Bocwa, who retired shortly after that.

16  Q.    Go ahead.

17  A.    We had a meeting and at that point I had taken, I acted I

18  guess more or less a scribe, and made a few recommendations

19  myself, but I took the recommendations from the committee on

20   who we were going to interview for the four positions.  The

21   second grade position at Cochranton; the half-day position,

22   kindergarten position at West End; the third grade position at

23   West End; and the fifth grade position at Second District

24   Elementary School.  We assembled 17 people --

25   Q.     Interviewees?

25

1  A.    Interviewees.

2  Q.    Go ahead -- wait, I'm sorry.  And those 17 were agreed to

3  at the meeting?

4  A.    They were all agreed upon by the seven people that were

5  involved, going to be involved in the selection process.

6  Q.    Ms. Wagner was among them?

7  A.    Ms. Wagner was among them.

8  Q.    The 17?

9  A.    The 17, that's correct.

10  Q.    Go ahead.

11  A.    Then we have a bank of questions for interviews and we,

12  as a group, revised the questions and established two dates,

13  December 9th and December 19th of 2002, we were going to

14  conduct the interviews.

15  Q.    Just a second.  Look behind tab 12, please, at Exhibit L?

16  A.    Yes.  I have it.

17  Q.    What is that?

18  A.    That's the interview questions that we ask all

19  candidates.

20  Q.   During the December, '02 interviews?

21  A.   That's correct.

22  Q.   Okay.  Go ahead, you were describing the process?

23       THE COURT:  What exhibit was that, Mr. Kuhar?

24       MR. KUHAR:  Exhibit L, your Honor.

25       THE WITNESS:  We revised the questions.  My

1  secretary set up the times, which I had instructed her to do.

2  And we conducted the interviews on the 9th and the 19th.  The

3  other thing that we did at that time, as I had introduced a

4  numerical rating sheet, which the district hadn't used in the

5  past.

6  BY MR. KUHAR:

7  Q.   Had or had not?

8  A.   Hadn't used in the past.  Nine categories, 1 to 5,

9  5 being the best, maximum points could be 45.  And that's the

10  interview analysis instrument that we used for the interview

11  process in December of 2002 on the 9th and the 19th.

12        MR. KUHAR:  We offer Exhibit L, your Honor.

13        THE COURT:  It's admitted.

14        MR. MEAD:  Your Honor, my only comment is there

15  seems to be handwriting on the side, at least on mine.  If you

16  could identify what those initials are?

17        MR. KUHAR:  Sure.

18        THE COURT:  But there's handwriting on each of the

19  interview question forms.

20          MR. MEAD:  There's also a blank page with no

21   questions, just seems to have a score.

22          THE COURT:  Why don't you explore that with him?

23          MR. KUHAR:  Yes, your Honor.

24   BY MR. KUHAR:

25   Q.   To clarify, it's a four-page document, correct, this

1  Exhibit L?

2  A.   Yes.

3  Q.   Take a look at each of those four pages and explain to us

4  what they are?

5        MR. MEAD:  Mark, mine has five pages.

6        MR. KUHAR:  Your Honor, how many do you have?

7        THE COURT:  Four.

8        MR. MEAD:  For some reason I have five, I don't mean

9  to make a big deal out of it, I just need an identification.

10        THE COURT:  I have one set here, my clerk has a set

11  for some reason that has five, mine has four.

12        MR. KUHAR:  Okay, there is one page that is in your

13  clerk's and Mr. Mead's which we'll include, we'll make an extra

14  copy of and we'll include that in the exhibit.

15        THE COURT:  Is it another interview question form?

16        MR. KUHAR:  Yes, your Honor.

17        THE COURT:  Just as a housekeeping matter, have all

18  of these exhibits been electronically filed?

19        MR. KUHAR:  No, your Honor.

20          THE COURT:  They should be at some point.  That's

21   the only way they're going to be made part of the official

22   record.

23          MR. KUHAR:  Okay.

24          THE COURT:  I was taking it that my exhibit binders

25   were simply one mechanism for me to follow along.  But

1  eventually you should both know that you're going to have to

2  get these filed.  It doesn't have to be immediately, but at

3  some convenient point.

4        MR. KUHAR:  Understood, your Honor.

5        THE COURT:  All right.

6        MR. MEAD:  Judge, just to be clear, I don't believe

7  I'm going to have an objection once it's explained.

8        THE COURT:  Well, we all have to be on the same

9  page.

10        MR. KUHAR:  I apologize for the confusion in the

11  copying of that.

12  BY MR. KUHAR:

13  Q.   Mr. Heller, do you understand the question, it's

14  essentially explain those five documents that make up that

15  exhibit?

16  A.   They're the questions that were used for the interview.

17  Q.   Well, there are some notes?

18  A.   The notes on the side, are the interview committee's

19  initials of the people who asked those questions.

20   Q.    What about the page that just has Nolan, Shearer, Wagner

21   and some numbers on it, what is that?

22          MR. KUHAR:  It's the third in line, your Honor, it's

23   handwritten?

24   BY MR. KUHAR:

25   Q.    What is that, Mr. Heller?

29

1  A.   I don't know.  It's the back of somebody's evaluation

2  form.

3  Q.   Oh, it is?

4  A.   I think, yes.  That's what it looks like.

5  Q.   All right.

6       MR. KUHAR:  We move for the admission of Exhibit L.

7       MR. MEAD:  With the exception of one he can't

8  identify, I have no objection.

9       MR. KUHAR:  He initially said that it was the back

10  of an interview form.

11      MR. MEAD:  He doesn't know whose writing it is.

12      THE COURT:  Let me see that page that we're talking

13  about.  Do you know who prepared that page -- it seems like an

14  entirely different type of document than any of the other

15  documents that make up Exhibit L, is that right?

16      MR. KUHAR:  Your Honor, we just took two-sided

17  documents and made them into single-sided documents for

18  convenience, it was the back of one of those sheets.  We don't

19  think it has any probative value, so if it's problematic --

20          THE COURT:  I think it is, at least this witness

21  can't lay a foundation, maybe somebody else could.

22          MR. KUHAR:  We offer that exhibit without that page.

23          MR. MEAD:  No objection.

24          THE COURT:  It's admitted.

25  BY MR. KUHAR:

30

1  Q.  So you had said -- you had described the process, you

2  were describing the process.  And then you indicated that these

3  were the questions that were asked of the interviewees,

4  correct?

5  A.  Correct.

6  Q.  How long did those interviews last?

7  A.  Approximately, 30 minutes.

8  Q.  There were how many of them?

9  A.  There were 17 over two days.

10  Q.  Over two days.  If you could please turn to Exhibit M,

11  which is the next one?

12  A.  Okay.

13  Q.  Let me confirm that's a four-page exhibit.  Mr. Heller,

14  what are those four pages?

15  A.  Those four pages are the names and composite scores of

16  the people who interviewed on December 9th and December 19th.

17  Q.  Were these prepared by the committee?

18  A.  They were prepared by the committee.

19  Q.  And are these scores taken from actual scoring sheets?

20  A.   They were taken from the scoring sheets that I explained

21  earlier.

22      MR. KUHAR:  Which we're going to go over shortly.

23  But with that understanding, at least those witnesses who

24  testify are going to talk about this, they will offer their

25  score sheets in.  With that understanding, we offer Exhibit M.

31

1      THE COURT:  It's admitted.

2      MR. MEAD:  If the witness knows whose handwriting is

3  on each page, I have no problem with it being admitted.  We're

4  waiting for the person whose actual interview was conducted.

5  There seems to be a lot of evaluations, writings, etc.

6      THE COURT:  Do you know who the scriber was that

7  actually jotted those numbers down?

8      THE WITNESS:  I think it looks like Suzanne Good's

9  writing.

10     MR. MEAD:  For all four pages?

11     THE COURT:  Just so the record is clear, I was

12  referring to the first page upon which Exhibit M, the first

13  page that has the Exhibit M sticker on it.

14     THE WITNESS:  The first page probably is Suzanne

15  Good's, and the averages mine, on the left-hand side.

16  BY MR. KUHAR:

17  Q.   On the left-hand side of the first page down?

18  A.   Yes.

19     THE COURT:  Let me ask another question here just so

file:///A|/WAGDAY3.TXT

20  I can move this along.  Next to each of the candidates, there

21  are 1, 2, 3, 4, 5, 6 numbers do you see that, Mr. Heller?

22         THE WITNESS:  Yes, I do, your Honor.

23         THE COURT:  Would each of those, do each of those

24  scores represent the individual score given by each of the

25  individual interviewers; for instance, one individual would

32

1  have given Amber Nolan 40?

2          THE WITNESS:  On the right-hand side?

3          THE COURT:  Yes.

4          THE WITNESS:  That represents the individual's

5  scores.

6          THE COURT:  The average score appears on the far

7  left-hand side?

8          THE WITNESS:  That's correct.

9          THE COURT:  All right.  Go ahead.

10  BY MR. KUHAR:

11  Q.    Again, just to clear it up, for Rowena Wagner, on the

12  first page down, her number is 168, her total score, I assume

13  that column of numbers from the second from the left is the

14  total of the individual's score numbers, correct, Mr. Heller?

15  A.    Yes.

16  Q.    But hers is much lower than the others, but she seems --

17  I'll withdraw that.  Her 28 is an average of 168, correct?

18  A.    That's correct, that's the average.

19  Q.    All right.  If we were to look at the interviews

20   conducted on the 19th, which are memorialized on the fourth

21   page of this exhibit?

22   A.   Yes.

23   Q.   Are those numbers beginning with 41.7, in the center of

24   the page, to the left of Anna Marie McElwain --

25         MR. KUHAR:  Your Honor, do you see my reference, to

33

1    the left of the name Anna Marie McElwain?

2        THE COURT:  Yes.

3    BY MR. KUHAR:

4    Q.   The number 41.7, Mr. Heller, do you see that?

5    A.   Yes.

6    Q.   What is that number?

7    A.   That's her average score out of 45.

8    Q.   So this page would have the same information, but those

9    people were interviewed on the 19th?

10   A.   Correct.

11       MR. KUHAR:  We would offer Exhibit M, your Honor.

12       THE COURT:  It's admitted.

13       MR. MEAD:  I don't know whose handwriting is on the

14   top, again, I'm not trying to be difficult, for

15   cross-examination and other purposes, I don't know whose

16   writing this is?

17       MR. KUHAR:  The fourth page of M, you're asking me

18   about?

19       MR. MEAD:  Yes.

file:///A|/WAGDAY3.TXT

20          THE WITNESS:  I think it's Suzanne Good's.

21          MR. MEAD:  That's fine, your Honor, I know it's

22    coming in, I just wanted that identification.

23          THE COURT:  It's admitted.

24    BY MR. KUHAR:

25    Q.    All right.  I would ask you to refer to the next exhibit

34

1  behind tab 14.  Exhibit N, do you see that, Mr. Heller?

2  A.   Yes, I do.

3  Q.   What is it?

4       THE COURT:  Let me interrupt for just a second.  On

5  that page we were just looking at, the December 19th

6  interviews, I had been under perhaps the mistaken assumption

7  that 17 individuals were interviewed for that position.  But

8  when I count up the number of names, it's more than that?

9       THE WITNESS:  No.

10       THE COURT:  Is that wrong?

11       MR. KUHAR:  I apologize for the confusion on the

12  issue.  But if we look at the number of names on December 9th,

13  then it would be seven individuals there, beginning with Amber

14  Nolan through Jennifer Tworek.

15       THE COURT:  Yes.

16       MR. KUHAR:  If we count the others, it's 8, 9, 10,

17  11, 12, 13, 14, 15, 16, 17, your Honor, in other words, 10 on

18  the last page of M, talks about December 19th.

19       THE COURT:  Let me see.  Yes.  There's typed in

20   individuals at the bottom and there's handwritten individuals

21   at the top?

22           THE WITNESS:  Which put that in rank order, the ones

23   at the top are in ranked order.

24           THE COURT:  That's the same group from the bottom?

25           THE WITNESS:  Yes.

1          THE COURT:  I understand, I was double counting.

2          MR. KUHAR:  I appreciate the clarification.

3    BY MR. KUHAR:

4    Q.   Those handwritten names on the top half of the last page

5    of M, that is a list in descending order of all 17 of the

6    candidates with their scores, is that right, Mr. Heller?

7    A.   That's correct.

8    Q.   Okay.  I would ask you to look at the next exhibit,

9    Exhibit N?

10   A.   Okay.

11   Q.   Now, before we talk about that exhibit though, actually,

12   was Ms. Wagner selected for any of the four long-term

13   substitute positions that began in December or January of --

14   I'm sorry, in December of '02 or in January of '03, was she

15   selected for any of them?

16   A.   No.

17   Q.   Why?

18   A.   Because her score was the lowest out of the 17 that we

19   interviewed.  And it was the consensus of the committee that

20   she wasn't the highest quality candidate for any of those four

21   positions.

22   Q.    Now, I do want you to look at Exhibit N.  And you had

23   previously indicated that a form was used to rate the

24   interviews?

25   A.    That's correct.

36

1  Q.   Is that the form?

2  A.   Yes.

3  Q.   Is this the form you completed for Ms. Wagner?

4  A.   Yes.

5  Q.   Let's go through this page by page at the beginning.  The

6  second one, what is that, the second page, it says

7  "Philippines" at the top in the left-hand corner?

8       MR. MEAD:  Is that his handwriting?

9       THE COURT:  Remember, we don't have a jury here, so

10  bear in mind we can move this along a little quicker.  What

11  does the second page represent?

12      THE WITNESS:  That's my handwriting, that was on the

13  back of the evaluation form.

14  BY MR. KUHAR:

15  Q.   And then continuing, what is the next one?

16  A.   The next form?

17  Q.   Yes, sir.

18  A.   It's an evaluation analysis for Nikki Shearer.

19  Q.   That you completed?

20   A.   Yeah.

21   Q.   And the next one?

22   A.   Amy Szalewicz.

23   Q.   That you completed?

24   A.   That I completed.

25   Q.   The next page, which is not a form, which says "Seton

37

1  School," do you see that, Mr. Heller?

2  A.   Yes.

3  Q.   What is that?

4  A.   That's the back of my evaluation.

5  Q.   For Ms. Szalewicz?

6  A.   Yes.

7  Q.   The next one?

8  A.   Evaluation on Anna McElwain, it's mine.

9  Q.   And the next, which is not a form, but says --

10  A.   It's the back of my evaluation.

11  Q.   Again, I know we're both trying to move things along, we

12  still have to let each other finish.  To identify it at the

13  top, it says "graduate of Millcreek?"

14  A.   Millersville.

15  Q.   What is the next one?

16  A.   It's an interview analysis for Robert Bazylak.

17  Q.   You completed it?

18  A.   Yes.

19  Q.   Are the interview analysis forms for the unsuccessful

20  candidates, other than Ms. Wagner, in here?

21  A.   I'm sorry, can you repeat that.

22  Q.   Are the interview analysis forms for the other

23  unsuccessful candidates -- I'm sorry, are the interview

24  analysis forms for the unsuccessful candidates, other than Ms.

25  Wagner's, in here?

38

1  A.   No.

2  Q.   So these are only the successful candidates?

3  A.   That's correct.

4  Q.   Plus Ms. Wagner?

5  A.   Correct.

6  Q.   So now we're looking at the front of Exhibit N, okay,

7  which is the pages we were just talking about?

8  A.   Yes.

9       THE COURT:  Just as a matter of curiosity, do the

10  interview forms -- I should put it this way.  Are the interview

11  forms, the employment interview analysis forms for the other

12  unsuccessful candidates, in addition to Ms. Wagner, do they

13  appear in the record anywhere; do you know, Mr. Kuhar?

14      MR. KUHAR:  I don't recall for certain if they do.

15  It would have been in conjunction with the cross-motions for

16  summary judgment, but I'm not certain.

17      THE COURT:  All right.  Go ahead.

18  BY MR. KUHAR:

19  Q.   Okay.  Looking at the first page, which is the

20   observation of Ms. Wagner, that form that you completed?

21   A.   Yes.

22   Q.   Using that as a guide and primarily using your memory but

23   as necessary that document, what do you recall of her interview

24   and her performance during the interview?

25   A.   During Ms. Wagner's interview, I recall that she missed

39

1  many of the concepts, and the concepts that she didn't miss

2  from the questions that we asked, she didn't elaborate in

3  detail.  Therefore, it was very difficult for us to really

4  determine --

5        THE COURT:  What do you mean by missed concepts?

6        THE WITNESS:  She missed the concepts.

7        THE COURT:  What do you mean by that term, missed

8  the concepts?

9        THE WITNESS:  Like, for example, a question would

10  be, we asked her to, it is something that I had discussed with

11  her earlier, informally, about integrating the four processes

12  into content areas, which are the four processes, reading,

13  writing, speaking and listening.  And she wasn't able to do

14  that.

15  BY MR. KUHAR:

16  Q.    She wasn't able to explain that?

17  A.    She wasn't able to explain that and how she was going to,

18  how she would integrate that into her lesson.

19  Q.    Did you say you had talked to her about that?

20  A.   I talked to her about that a couple days earlier

21  informally -- I put it down on the back on my observation form.

22  Q.   What do you mean?

23  A.   Or my evaluation instrument.

24  Q.   The second page of Exhibit N?

25  A.   Right.  She didn't know the processes and I told her

40

1   about that Friday.  Which was three days, Friday was the day

2   that we talked for her post-observation conference.

3   Q.    Again, you made a note of that on the second page --

4   A.    It's right there.

5   Q.    Let me finish my thought, please.  On the second page of

6   Exhibit N, "she didn't know the processes, I told her about

7   that Friday?"

8   A.    Right.

9   Q.    That reflects the fact that she couldn't explain those

10  four processes that you just said you described, reading,

11  writing -- what were the others?

12  A.    Reading, writing, listening and speaking.

13  Q.    She couldn't describe those in her interview?

14  A.    Right.

15  Q.    Even though you had explained them to her a few days

16  earlier?

17  A.    We talked about them, yes, that's what I have noted.

18  Q.    Okay.  What else do you recall of the interview?

19  A.    When I say didn't elaborate, she didn't go into detail.

20   Like, for example, assessment, working in a diverse classroom.

21   We would expect her to talk about differentiation.

22   Q.   What is differentiation?

23   A.   Differentiation means that you're not teaching to the

24   whole class, you're teaching individuals within the classroom.

25   Q.   That's supposed to be the goal, you are supposed to

41

1   differentiate?

2   A.    You are supposed to differentiate.  Have the ability and

3   have the knowledge to be able to differentiate within your

4   classroom.  For example, in an elementary classroom, it's

5   possible to have a student that has a 140 IQ, it's also

6   possible to have a student that has a 70 IQ, and you have 20 in

7   between there.  So there is a very wide variety of ability.

8   And you have to be able to challenge, you should be able to, as

9   a teacher, as an effective teacher, you should be able to

10   challenge each one of those students.  So they have to have

11   different instruction, they must have different tasks to

12   complete.  Some are a lower level, some are a higher level,

13   some are at a middle level.  Teachers have to be able to do

14   that.

15          THE COURT:  Are you talking about the ability to

16   give different students of different capabilities, different

17   types of attention?

18          THE WITNESS:  That's correct.

19          THE COURT:  Go ahead.

20  BY MR. KUHAR:

21  Q.   And this is called differentiation?

22  A.   It's called differentiated instruction.

23  Q.   She was not able to explain that?

24  A.   She didn't explain in detail.  She didn't elaborate, so

25  it gave us the idea that she didn't have an understanding of

42

1  what should be needed in a diverse classroom.

2  Q.   Did you say she didn't elaborate?

3       THE COURT:  You've got to slow down.  This is my

4  classroom rule, you are talking too fast, slow down.

5       MR. KUHAR:  We're just trying to get through a lot

6  of material, your Honor.

7       THE COURT:  I know, but it's going to be useless if

8  I don't have a record.  Go ahead.

9       MR. KUHAR:  Understood, your Honor.

10  BY MR. KUHAR:

11  Q.   I was just trying to clarify what I had thought you had

12  said.  I thought you said she failed to demonstrate that she

13  understood differentiation such that she could employ it?

14  A.   That's correct.  She failed to demonstrate that she had

15  the knowledge base to employ it.

16  Q.   What else do you recall of her interview?

17  A.   Well, I explained that I felt overall she missed

18  concepts.  She didn't elaborate in detail to really give us a

19  basis that she had an understanding and a knowledge base in the

20  areas that we expected her to have the knowledge base in.

21  Q.    Do these scores accurately reflect your assessment of her

22  during that interview?

23  A.    Well, in many ways I would have to say that my -- my

24  numerical scores from her interview in a sense mirrored her

25  observation.  I had said earlier --

43

1  Q.   Which observation?

2  A.   The observation that I conducted, the only observation

3  that I conducted of her.

4  Q.   Of her class?

5  A.   Of her class, yes.

6  Q.   Go ahead.

7  A.   That she didn't go in depth, in detail, she didn't

8  elaborate.  And I said at best her performance in the classroom

9  was adequate.  I think that most of the numbers here indicate

10  exactly that.  If you look under number three, which I gave

11  her, which is satisfactory --

12  Q.   Okay.

13  A.   The words that we see there are adequate, sufficient,

14  average, but we're looking for more than that.  We are looking

15  for exceptional, clearly outstanding.

16  Q.   Okay.  Let's flip two pages, then, to your interview

17  analysis form for Nikki Shearer.  Are you there?

18  A.   Yes.

19  Q.   What do you recall of the interview of Nikki Shearer?

20    A.    I recall that Nikki Shearer had an in-depth understanding

21    of knowledge base of everything we asked her.  If we refer to

22    the questions which were employed during the interview, she hit

23    on every one of them, that's indicative of the scores I gave

24    her.  The only satisfactory score I gave her was based on

25    experience because she didn't have any real life experience at

44

1   that particular time.  But she did have experience in the

2   classroom as a student teacher and did very well.  But, yet,

3   when it came to answering the questions, she hit, she went in

4   depth and demonstrated that she had a very strong knowledge

5   base in all the areas that we expected her to have.

6   Q.   Did you note any deficiencies in her interview; again,

7   other than the fact you said you gave her an adequate under the

8   category of experience?

9   A.   No, no deficiencies.

10   Q.   And the next one is for Amy Szalewicz, right?

11   A.   That's correct.

12   Q.   What do you recall of that interview?

13   A.   I felt that Amy Szalewicz had a strong interview as well.

14   And that she demonstrated a very strong knowledge base.  She

15   did have more than adequate experience.  She had two years of

16   permanent teaching at Seton Catholic School.  She didn't score

17   as high as Nikki, but she scored pretty high, 41, that's high.

18   Q.   Okay.  The next page, I think that's the back of an

19   interview form, is yours?

20  A.   Right.

21  Q.   Any deficiencies in Ms. Szalewicz's interview that you

22  noted?

23  A.   No.

24  Q.   Now, let's flip to the next one, Ann McElwain.  What do

25  you recall of that interview?

45

1  A.   I felt that she was another candidate that she scored

2  very well on the interview.  She had a very in-depth

3  understanding of the questions that we asked her, the knowledge

4  base.  She, I think was involved in -- had some experiences

5  outside of the country.

6  Q.   And, actually, I'll ask you about some of those general

7  attributes and characteristics in a minute, but in terms of

8  what you remember about her performance during the interview,

9  anything else beyond what you mentioned?

10  A.   Well, she was strong, she demonstrated from experience

11  that she was strong in the primary grade level.  Specifically,

12  we had a primary grade level position open.

13  Q.   Any deficiencies?

14  A.   No.

15  Q.   This graduate of Millersville page, I think you said was

16  your handwriting on the back of Ms. McElwain's, right?

17  A.   Yes.

18  Q.   So then if you could flip to the next one, which is

19  Robert Bazylak, are you there?

20  A.   Yes.

21  Q.   Okay.  What do you recall of Mr. Bazylak's interview?

22  A.   Mr. Bazylak, I recall that he interviewed very, very

23  well.  He was very thorough, he was very detailed.  Overall, he

24  had the highest rating of the interview committee.  He was able

25  to answer our questions and also tie a little bit of humor in

1  there.  He did an outstanding job.  Again, I gave him clearly

2  outstanding and exceptional scores, with the exception of his

3  experience because he was just completing his student-teaching

4  experience.  But he has served as a guest teacher prior to

5  that.  But, again, it wasn't permanent or long-term experience.

6  Q.    Any deficiencies noted during that interview?

7  A.    None.

8  Q.    With respect to the five interviewees whose forms that

9  were just reviewed, did all the scores that you gave those

10  folks match your perceptions of their performance during the

11  interviews?

12  A.    Yes, they do.

13        MR. KUHAR:  Okay.  We offer Exhibit N.

14        THE COURT:  It's admitted.

15  BY MR. KUHAR:

16  Q.    Of the people who were interviewed in December of '02,

17  how many of those folks were Caucasian?

18  A.    All 16.

19  Q.    Do you know if any of them were born in a country other

20  than the United States?

21  A.    Just Ms. Wagner is the only one.

22  Q.    Is it fair to say that 13 Caucasian born -- I'm sorry,

23  Caucasian American-born people were declined positions?

24        THE COURT:  Wait a minute, this is more complicated

25  than it has to be.  There were 16 Caucasians interviewed and

47

1   the plaintiff, is that right?

2        MR. KUHAR:  Yes.  I think my math is a little off,

3   too.

4   BY MR. KUHAR:

5   Q.   Of the people who did not get positions -- I'm sorry,

6   there were 16 Caucasian American-born people, plus Ms. Wagner,

7   who were interviewed, right?

8   A.   Right.

9   Q.   Four people got positions, they were Caucasian

10  American-born?

11  A.   Right.

12  Q.   So 12 Caucasian American-born people --

13  A.   Didn't gets jobs.

14  Q.   Right.  Now, the numbers that were on that exhibit that

15  we were just talking about, those interview forms, how did each

16  person who wrote down those numbers do that, did they do that

17  in isolation or part of a group or what?

18  A.   It wasn't completely in isolation because we were in the

19  same room, we were sitting around the table.  But there's no

20  discussion.  We don't have any discussion at all, before or

21  after any of the interviews until all the interviews are

22  completed and we have all the scores documented.  So in many

23  ways you could say that it's done in isolation because we don't

24  share the information, it's done independently.  We sit at our

25  own seats and we score these things without any conversation.

48

1  My scores are my scores.  Ms. Good's scores are her scores.

2  And then at the end, after the 17th person has been interviewed

3  in this particular situation, then we share the scores.  And

4  then once we share the scores and we have a composite, then we

5  have a discussion.  That is the first time we have discussion

6  about any of the candidates.

7  Q.    Did you have any impact on any of the scores assigned to

8  those candidates by the other interviewers?

9  A.    I had no impact.

10  Q.    I'm going to ask you to skip to Exhibit P, which is

11  behind tab 16?

12  A.    I have it.

13  Q.    What is it?

14  A.    It's an interview analysis form.

15  Q.    Well, it's not really a form --

16  A.    A chart, I'm sorry.

17  Q.    To be clear, this is a summary of information that we had

18  provided --

19       MR. KUHAR:  Any objection to me asking about this?

20          MR. MEAD:  It's basically a summary of the other

21  interviewers' scores and everything?

22          MR. KUHAR:  Correct.

23          MR. MEAD:  I don't have an objection to it.

24          THE COURT:  That's fine.

25  BY MR. KUHAR:

49

1 Q.   Does this show the scores and the names of all of the

2 folks who were interviewed in December of '02?

3 A.   Yes, it does.

4 Q.   And do the yeses on the right-hand column indicate those

5 folks who were selected?

6 A.   Yes.

7 Q.   And does the "N" to the right of Ms. Wagner's indicates

8 she was not selected?

9 A.   Correct.

10 Q.   Now, I notice that Ms. Szalewicz scored a 39.9, if I'm

11 reading this correctly, right?

12 A.   That's correct.

13 Q.   And it looks like above her are Boca, Nolan, Foulk and

14 Lawrence, correct?

15 A.   Correct.

16 Q.   Those folks did not get jobs?

17 A.   Correct.

18     THE COURT:  To be accurate, and Tworek, number two?

19     MR. KUHAR:  Yes, and Hughes I didn't mention,

20  either.

21  BY MR. KUHAR:

22  Q.   Why did Tworek not get a position?

23  A.   We offered her a position, she had accepted another

24  position elsewhere.

25  Q.   Why did Hughes not get a position?

50

1  A.   At that point we didn't feel that she had enough

2  experience in a regular classroom setting -- most of her

3  experience was in special ed, her strong suit was special ed.

4  She had a dual certificate in elementary and special ed.  The

5  interview process is where the discussion starts, it's a

6  starting point.  And as you can see the scores are relatively

7  close.  So from there we feel we make decisions, consensus

8  based, based on where these people strengths would best benefit

9  the district.

10  Q.   Let's talk about, have you talk about that a little bit

11  more.

12  A.   All right.

13  Q.   So it's not one-hundred percent driven by the numbers?

14  A.   Not one-hundred percent, no.  But it is a starting point.

15  Q.   And you just gave an example of why, although somebody

16  scored well, you essentially passed over them?

17  A.   That's correct.

18  Q.   Why weren't Boca, Nolan, Foulk and Lawrence hired;

19  and, again, we're talking about for the December, '02 Pickens'

20    long-term sub and the January, '03 long-term sub positions, why

21    weren't these folks hired for those?

22    A.    Well, first of all, those five people were within 1.2 of

23    each other.  So the highest score being 41.3 down to 39.9, the

24    spread is only 1.2 between five people.  So as far as scores,

25    there's little significance, they're all within the same

51

1  framework, as far as being able to demonstrate the necessary

2  knowledge.  And so from there, there was a discussion based on

3  who we felt had the most experience in a primary-level

4  classroom.  And the decision was made, and it was the consensus

5  of the group, that Ms. Szalewicz at the time had the best

6  qualifications to perform the duties in Ms. Pickens' classroom.

7  Q.   I think you mentioned she was a teacher at Seton, what is

8  Seton and what experience did she have there?

9  A.   Seton is a catholic school in Meadville.  And she had two

10  years of permanent experience at Seton.  We're required to

11  share our title one services with the parochial schools.  And

12  Ms. Good is in charge of title one services.  And we have a

13  teacher over there that we employ.  And she goes over there

14  from time to time and does different things in regard to the

15  title one program and had interactions with the principal.

16  Q.   The teacher or Ms. Good had interactions?

17  A.   Ms. Good had interactions with the teacher, Ms.

18  Szalewicz, teachers and the principal.  And so we were very

19  aware of Ms. Szalewicz's performance at Seton while she was

20   there.

21   Q.    Had Ms. Szalewicz attended any activities at Crawford

22   Central?

23   A.    She was involved in the study group at West End during

24   that period of time.  She was not employed at Seton during the

25   time of these interviews.  She had resigned from her position,

52

1   was completing her master's in reading during this time period.

2   And at the time of the interview, she was in graduate school at

3   Edinboro.  She was involved in the study group and so she had a

4   very good working knowledge of our philosophies at the

5   elementary level.

6          MR. KUHAR:  I would move Exhibit P, your Honor.

7          THE COURT:  It's admitted.

8   BY MR. KUHAR:

9   Q.    You said that the interview scores were not one-hundred

10  percent of the determination, right?

11  A.    Not one-hundred percent, no.

12  Q.    I think you illustrated that by talking about Ms.

13  Szalewicz's other characteristics?

14  A.    That's correct.

15  Q.    Did Ms. Wagner have anything beyond her interview that

16  weighed in her favor?

17  A.    No.

18  Q.    Did anybody say anything during the interview process for

19  those '02-'03 positions that indicated any kind of bias against

20   foreign-born people or Asians?

21   A.   No.

22   Q.   Did the district interview any candidates who lacked

23   bargaining unit bidding rights between these positions, these

24   '02 and January of '03 positions that we've been talking about,

25   between that time and the interviews conducted in March of '04,

53

1  did the district hire anyone who lacked bidding rights for a

2  long-term substitute --

3       THE COURT:  You asked a different question, you

4  started out saying did they interview anybody, now you're

5  asking -- what is it?

6       MR. KUHAR:  Thank you.  I'm going to withdraw that.

7  BY MR. KUHAR:

8  Q.   The question is hiring.  Between the time that these

9  positions were filled that you just talked about, including

10  Szalewicz, between the time those positions were filled with

11  those people, through the interviews done in March of '04,

12  did the district hire any long-term subs or permanent people or

13  permanent positions in elementary teaching positions?

14  A.   No.

15       THE COURT:  Just so I'm clear, so nobody was hired

16  between that time and March of '04, or the only people that

17  were hired were bargaining unit people?

18       MR. KUHAR:  What you said first was mostly correct

19  except that if they're bargaining people, we really wouldn't be

20  hiring them, they would be people who exercised bidding rights

21  to come out of, for example, special ed, as a classroom

22  migration.

23          THE COURT:  So is the point that between 2002, when

24  the long-term substitute positions were filled that we're

25  talking about, and March of '04, there were no hires, is that

54

1   what you're saying, Mr. Heller?

2        THE WITNESS:  That's correct, your Honor.

3        THE COURT:  For either long-term or permanent?

4        THE WITNESS:  Correct.

5        THE COURT:  However, during that time period someone

6   from the bargaining unit may have moved into a position but

7   that's not considered a hire?

8        THE WITNESS:  That's correct.

9        THE COURT:  All right, I understand that.

10  BY MR. KUHAR:

11  Q.   When that would happen, would you have had the discretion

12  to choose an outside person or were you required to have the

13  internal person take it?

14  A.   We were required to have the internal person take it.

15        THE COURT:  How much longer do you have with him on

16  direct?

17        MR. KUHAR:  Well, I'm about three-quarters the way

18  through my questions.  However, when we get into the '04, we

19  have to end up talking 10 to 12 candidates --

20          THE COURT:  All right, we're going to take a break.

21   This goes for both sides.  We've got to move this out a little

22   bit, otherwise, I'm concerned about getting this done, I was

23   hopeful about getting this done today, it's looking like maybe

24   tomorrow.  But I've got Friday open.  But that's all I have

25   blocked out for this thing.  So a word to the wise, be

55

1  judicious on how you do your questioning.  Remember, I've heard

2  a lot of this and I haven't heard from this witness on some

3  areas, but I've got a lot of the background already.  So try to

4  avoid rolling over the same ground as much as you can.  We're

5  going to take a short recess.

6      (Recess from 9:48 a.m.; until 10:00 a.m.)

7      THE COURT:  All right, Mr. Kuhar.

8  BY MR. KUHAR:

9  Q.   Mr. Heller, were there a number of retirements effective

10  at the end of '03-'04 school year?

11  A.   Yes.

12  Q.   Were interviews conducted to restaff in light of those

13  retirements?

14  A.   Yes, in anticipation of the vacancies that we were going

15  to have at the elementary level.

16  Q.   Vacancies at the beginning of what school year?

17  A.   It would have been the '04-'05 school year.

18  Q.   What was done to prepare for those interviews?

19  A.   Well, first of all, we met as a committee, which was

20  myself, Ms. Good, director of elementary curriculum, and the

21  six elementary principals.  And we first started by -- we

22  wanted to make sure that we had an up-to-date interview

23  process, which would include questions and that interview

24  analysis form.  So as a committee, there were eight of us, we

25  used the PDE 427 form, which is a form that is mandated by the

1   Pennsylvania Department of Education to evaluate teachers for

2   their tenure, and also evaluate them for their instructional

3   two certificate.

4   Q.   Now, who mandates that the 427 form be used, and what is

5   an instructional two certificate?

6   A.   Okay, two questions.  The Pennsylvania Department of

7   Education, PDE, mandates the 427.

8   Q.   That is to be used by whom?

9   A.   All school districts.

10  Q.   To do what?

11  A.   To evaluate teachers on their tenure, which means they

12  have to have six satisfactory semesters of teaching under their

13  belt.

14  Q.   And that's tenure, t-e-n-u-r-e?

15  A.   Yes, tenure.  And then the instructional two certificate,

16  which is they have to have a minimum of six semesters of

17  satisfactory teaching and have completed 24 credits, beyond

18  their bachelor's.

19  Q.   So that 427 form is used by districts for those purposes

20   per the PDE?

21   A.   That's correct.

22   Q.   And you had, I think the context of this is you were

23   describing the 427 form had some role on what was done to

24   prepare for the '04 interviews?

25   A.   We used that as a resource to design our questions.

1   And, also, our evaluation or are interview analysis form.

2   Which we weren't going to use the old one -- the one we used

3   previous in 2002.  So the PDE form is made up of four domains.

4   Preparation and planning, this is what teachers are supposed to

5   know.  There is different competencies under each domain.

6   Preparation and planning.  There's classroom environment.

7   There's instructional delivery.  And there's professionalism.

8   Also, included in that evaluation instrument is sources of

9   evidence.

10   Q.    Sources of what?

11   A.    Sources of evidence.  So from there we use that as a

12   resource, this is what teachers are to know and we designed 16

13   questions.  And the reason we came up with or developed 16

14   questions, the reason we came up with 16 questions is we had

15   four for each domain.  Created four questions under each

16   domain.  Preparation and planning, so forth, down the line

17   through professionalism.

18   Q.    We have an exhibit that I want to refer you as you're

19   continuing with this.  I'm uncertain whether P is in --

20        THE COURT:  What is P again?

21        MR. KUHAR:  Summary of the '02 hires and non-hires.

22        THE COURT:  If I didn't admit it, it's admitted.

23   BY MR. KUHAR:

24   Q.    Now, I would you ask to flip to and look at Exhibit Q,

25   which is behind tab 17?

58

1   A.   I have it.

2   Q.   What is this?

3   A.   That is one set of questions for one team.

4   Q.   It says "Team A," right?

5   A.   That's correct.

6   Q.   Does the third page say "Team B?"

7   A.   That's correct.

8   Q.   So what are Team A and Team B -- I'm sorry, it's the page

9   behind the page that's says "Team A," does that go with the

10   Team A page?

11   A.   Yes.

12   Q.   Does the page behind the Team B page, go with Team B?

13   A.   Yes.

14   Q.   Okay.  So what are those two pairs of documents, A and B?

15   A.    They're the questions for each team under the four

16   domains that I had just mentioned a couple different times.

17   And, also, underneath the questions are points that we feel

18   that candidates should know.  That would be more or less you

19   could consider as a rubric, a guide to go by.  It's competency

20    and expectation --

21         THE COURT:  Let me ask this to move this.  Is it

22    accurate to say that the questions that are reflected here in

23    Exhibit Q, some of which would have been given to Team A

24    interviewers, some of which would have been given to Team B

25    interviewers, form the basis for the questions that you asked

59

1  the people who were applying for the permanent positions?

2       THE WITNESS:  Yes.

3       THE COURT:  All right.

4  BY MR. KUHAR:

5  Q.    Were these the actual questions asked?

6  A.    Yes.

7  Q.    Okay.  And these boxes, the first one on Team A,

8  mentioned language arts and math standards, do you see that

9  box?

10  A.   Yes.

11  Q.    There are boxes all throughout this exhibit like that.

12  What do those phrases after those boxes indicate?

13  A.    They're the main points that people should hit on.

14  Q.    In their answer?

15  A.    Yes.

16  Q.    Okay.  Did you divide the interviewers between Teams A

17  and B?

18  A.    Yes, I did.

19  Q.    Do you recall who was on which?

20  A.    The one team consisted of Ms. Good, Mr. Meader, Ms.

21  Darling and -- Mr. Price.

22  Q.    Who is Mr. Price?

23  A.    Mr. Price is the principal -- was the principal at First

24  District Elementary School at the time.

25  Q.    Do you recall who was on the other team?

60

1    A.    Yes, myself, Mr. Stanton, principal at Neason Hill

2    Elementary School; Mr. Karns --

3          THE COURT:  Slow down a little bit, please.

4          THE WITNESS:  Mr. Stanton was the principal at

5    Neason Hill Elementary School.  Mr. Karns was the principal at

6    West End Elementary School.  Ms. Schoonover was the principal

7    at Second District Elementary School.  That was my team.

8    BY MR. KUHAR:

9    Q.    I'm fast forwarding a little bit to the actual

10   interviews?

11   A.    Yes.

12   Q.    We had just been talking about what you did leading up to

13   the interviews.  During the actual interviews, did each

14   candidate interview with both teams?

15   A.    Yes, that was the plan.

16   Q.    Why?

17   A.    We felt that it would give us -- we planned on

18   interviewing a large group of people because we anticipated a

19   large number of vacancies at that time period.  So we felt we

file:///A|/WAGDAY3.TXT

20  could get a jump on things.  So we wanted to make sure that we

21  were able to do a comprehensive and as objective of a process

22  as possible.  So we divided into two groups, and we could ask

23  more questions in a more efficient time period.  So we had set

24  it up where the candidate would interview with one group first

25  for a half-hour, approximately a half-hour, no longer than a

1  half-hour, and then would come over and interview with the

2  second group for a half-hour.  So we actually had two

3  interviews going on at the same time with two different

4  candidates, then they would flip flop.  That would be one hour.

5  Then we would come back and interview another two people.  We

6  did that approximately 40 times -- well, 20 times, because

7  there was two for each hour.

8  Q.    Okay.  Forty candidates, approximately, interviewed?

9  A.    Well, we had planned I think 41 or something like that,

10  but we ended up interviewing 39.

11        MR. KUHAR:  Your Honor, we offer Exhibit Q.

12        THE COURT:  It's admitted.

13  BY MR. KUHAR:

14  Q.    And these interviews were over four days?

15  A.    Yes.

16  Q.    In what month?

17  A.    March.

18  Q.    Of?

19  A.    2004.

20  Q.   Please flip to tab 18 and look at Exhibit R -- are you

21  there, Mr. Heller?

22  A.   Yes, I am.

23  Q.   What is Exhibit R?

24  A.   Exhibit R is a composite of all the people who were

25  interviewed on those specific days for positions at our

62

1    elementary level.

2    Q.    I'm going to ask you about your specific interview

3    analysis forms in a minute.  But for now is it fair to say the

4    interviewers scored the candidates?

5    A.    That's correct.

6    Q.    Analogous to the '02 process?

7    A.    Correct.

8    Q.    And does the column indicating or labeled "total points,"

9    that's the sum total of the scores?

10   A.    Total points, yes.

11   Q.    What about "rank," in basically the middle of the page on

12   R, do you see that word rank?

13   A.    Yes.

14   Q.    The numbers below that mean what?

15   A.    Rank in descending order.  Number one being the highest,

16   I don't know what the lowest is 20, twenty-some, some people

17   were tied.

18   Q.    When was this prepared?

19   A.    It was prepared at the conclusion of the March 19th

20  interviews.

21  Q.   Now, I think you said 39 people you thought were

22  interviewed?

23  A.   I believe there were 39.  Yes, there were.

24  Q.   Is anybody ranked 39th?

25  A.   No.

63

1  Q.   Why?

2  A.   Because we had some people that had the same scores.  So

3  if you had, for example, we had one, two, three, then maybe we

4  had four people who had the same score for number four, that

5  were ranked number four.  So then we would go to five, six and

6  so on.

7  Q.   So multiple people took up the same ranking slot?

8  A.   Right.

9  Q.   If there was a tie?

10  A.   That's correct.

11  Q.   What's the lowest rank anybody got, if you don't

12  remember, you can look at that?  I see 26, do you see anything

13  lower, Mr. Heller?

14  A.   No, I don't think so, 26 would be the lowest.

15  Q.   What did Ms. Wagner end up scoring, what was her rank?

16  A.   Twenty-four.  Yes, 24.

17       THE COURT:  Once again, the reason the rankings

18  don't go 1 through 41 is because of a number of people, for

19  instance, would end up with the same percentile -- because I'm

20    not seeing that on the chart?

21          THE WITNESS:  If you look at, like the first group,

22    number six and number nine have the same score.  So there's a

23    double four there.  And that happens throughout.

24          THE COURT:  I see.  All right.

25          MR. KUHAR:  We offer Exhibit R.

64

1        THE COURT:  It's admitted.  I have one question

2   about R.  On the March 11th group where Rowena Wagner had a

3   total score of 136 -- do you see where I am there, Mr. Heller?

4        THE WITNESS:  Yes, I do.

5        THE COURT:  Then if you go up you'll see that --

6   wait a minute, I might be answering my own question, bear with

7   me a second.  I answered my own question, never mind.  Go

8   ahead.

9   BY MR. KUHAR:

10  Q.    You had testified a half hour or so ago about how

11  individuals came up with their scores independent of each

12  other, do you remember that?

13  A.    Yes.

14  Q.    Was that true here, too?

15  A.    Same concept, just they're are two different groups.

16  Q.    But even within those groups was there conversation

17  before the scores were assigned?

18  A.    No.

19  Q.    So were people slotted into jobs as the interviews were

20    going or was the interview process separate -- who was going to

21    be recommended for what process?

22    A.    As I stated earlier, we interviewed a large number of

23    people based on anticipation of a large number of vacancies.

24    And so we knew that because the process is time-consuming, that

25    we needed to start early.  The bidding process takes a long

65

1    time, particularly, when you have a lot of postings.

2    Q.    We haven't talked about the bidding process lately, what

3    impact on this process does the bidding have, because this is

4    what led to outside hires, right?

5    A.    This group of people filled the permanent vacancies.  But

6    before you can fill permanent vacancies you have to have

7    permanent vacancies, so you have to follow the contract.  So

8    once we receive a resignation or retirement -- they're

9    resignations, they're most often for purposes of retirement, we

10   have to post the position.  Until there's board action, either

11   it's posted as a vacancy or if it's a board action, if there

12   hasn't been board action, then it's an anticipated vacancy.  So

13   you have to wait until, before you can award a position, it has

14   to be a permanent vacancy.

15   Q.    At the time these interviews were happening in March of

16   '04, did your team know how many permanent positions would

17   ultimately be available?

18   A.    No, I can only tell you we anticipated, because we had a

19   large number of retirements.  We knew we were going to have

20  twenty-some retirements.  I can't remember the exact number,

21  but it was well into the twenties, of elementary ed teachers.

22  Q.    The bidding process was still happening?

23  A.    It was just getting started.

24         THE COURT:  I mean it's conceivable, although,

25  probably, I presume in your mind unlikely, but would it have

1   been possible to go through this entire interview process, rank

2   these people, only to find at the end of the day unexpectedly

3   that all of the slots got filled by people who wanted to bid,

4   who wanted to bid, who were in the bargaining unit?

5        THE WITNESS:  That's very possible, and a lot of

6   those positions were filled.

7        THE COURT:  And this is neither here nor there, just

8   more of a curiosity.  Why wouldn't you wait until you knew how

9   many positions actually were going to be open and were not

10   affected by the collective bargaining unit, why wouldn't you

11   wait then, rather than -- didn't you have the cart before the

12   horse?

13        THE WITNESS:  No, because we were fully aware that

14   the school districts surrounding us were going to experience

15   the same mass exodus that we were.  So it's competitive, our

16   goal is to find the most qualified people out there.  So we're

17   kind of in the center, our location of our school district is

18   in the center of two other school districts.  So people living

19   in our community can go either way.  So it's important to us

20  that we got a jump on things, so we were ready to go and start

21  offering positions once we had confirmed vacancies.

22         THE COURT:  Go ahead, Mr. Kuhar.

23  BY MR. KUHAR:

24  Q.   Was Ms. Wagner offered a position at any time after the

25  '04 interviews were done, in conjunction with the '04

1  interviews?

2  A.   No.

3  Q.   Over what period of time did these '04 interviews lead to

4  actual hire recommendations and board decisions?

5  A.   I believe the first set hires was in May for the

6  following year, for that next school year, 2004-2005 school

7  year.  And I believe the last vacancy, although, it wouldn't be

8  permanent, it was long-term, that we used these interviews for,

9  was maybe in October of '04, that we used those interviews for.

10       THE COURT:  How many positions were actually filled

11  as a result of these interviews; and how many were permanent,

12  how many were long-term subs or were they all permanent

13  positions?

14       THE WITNESS:  No -- we're only talking like

15  elementary ed positions?

16       MR. KUHAR:  Yes, throughout all these questions

17  unless somebody indicates otherwise.

18       THE WITNESS:  Eight or nine, eight or nine permanent

19  positions and there were a few long-term positions.

20          MR. KUHAR:  Your Honor, we will have a chart that

21   shows exactly that.

22          THE COURT:  All right.  Go ahead.

23   BY MR. KUHAR:

24   Q.   So from that time, from May until October of '04?

25   A.   Yes.

68

1  Q.    Did Rowena Wagner get one of those positions?

2  A.    No.

3  Q.    Why not?

4  A.    She didn't qualify.  In terms of score, she wasn't in the

5  running.

6  Q.    Now, that exhibit that we had been talking about, which

7  was Exhibit R, shows her position compared to other candidates,

8  correct?

9  A.    Correct.

10  Q.    I'd ask you to flip to behind tab 19, which is Exhibit

11  S --

12        MR. KUHAR:  Which, Mr. Mead, is the summary of the

13  information provided to you.

14        MR. MEAD:  Thank you.

15  BY MR. KUHAR:

16  Q.    What is Exhibit S, Mr. Heller?

17  A.    It's a summary of the applicants that were offered and

18  accepted positions for the 2004-2005 school year, permanent and

19  temporary.

20   Q.   If a person's name is on this Exhibit R that had the 39

21   or so people, but not on this Exhibit S, what does it mean?

22   A.   Can you repeat that one more time.

23   Q.   If a person is listed on this Exhibit R -- do you have

24   Exhibit R --

25   A.   Yes.

69

1  Q.   If they're listed on Exhibit R as having been

2  interviewed, scored and ranked, but they're not on Exhibit S,

3  what does it mean?

4  A.   It means they didn't get a job.

5  Q.   Okay.  So this would be a list of people who did receive

6  jobs flowing out of the '04 interviews?

7  A.   Sure.

8  Q.   Right?

9  A.   That's correct.

10     MR. KUHAR:  We would offer Exhibit S.

11     THE COURT:  It's admitted.

12  BY MR. KUHAR:

13  Q.   Okay.  Please flip to the next tab, to Exhibit T, please,

14  would you tell me what that is?

15     THE COURT:  Just so the record is clear, this

16  obviously was a form that was prepared, is that right, for

17  litigation?

18     MR. KUHAR:  Yes, your Honor.

19     THE COURT:  For the record, all but one of the

20   individuals listed on Exhibit S were hired, but that last

21   individual is Rowena Wagner, who's on Exhibit S, she was not

22   hired?

23          MR. KUHAR:  Correct.  I thought that his testimony

24   was she had not been hired, which preceded his testimony about

25   this, I thought I clarified that, but I apologize if I didn't.

1        THE COURT:  In other words, all the individuals

2  listed on Exhibit S, ending with Porter, all of those people

3  were the top scores in the interviews and they got jobs, is

4  that right, Mr. Heller?

5        THE WITNESS:  These are the people who were offered

6  positions.

7  BY MR. KUHAR:

8  Q.    Rowena is on this but she was not offered a position?

9  A.    Except Rowena, yes.

10       MR. KUHAR:  I prepared this summary just for

11  comparison purposes, I'll put it right there so it would be

12  evident.

13       THE COURT:  Basically, the "Ys" say that they were

14  hired, and the "N" next to Rowena says she was not?

15       MR. KUHAR:  Is that accurate, Mr. Heller?

16       THE COURT:  It's been adequately established for my

17  purposes that she wasn't hired, so let's keep going.

18       THE WITNESS:  Yes, that's accurate.

19  BY MR KUHAR:

20  Q.    Mr. Heller, let's look at Exhibit T, please, are you

21  there?

22  A.    I'm there.

23  Q.    What is it?

24  A.    It's the interview analysis instrument that we used for

25  the March, 2004 interviews.

71

1  Q.   This differs from the one used in '02, correct?

2  A.   That's correct.

3  Q.   Why?

4  A.   Because that was the instrument as a committee that we

5  designed, it goes hand in hand with our questions.

6  Q.   Okay.  Is this what you were talking about when I asked

7  you what your team did to prepare for the '04 interviews?

8  A.   This is what we made, yes.

9  Q.   And it differs from the old one because you wanted to

10  update it in accordance with the 427 form?

11  A.   Yes.

12  Q.   All right.  So you recall interviewing Ms. Wagner,

13  correct?

14  A.   Yep.

15  Q.   And that would be the first page of Exhibit T, the form

16  that has her name on it and yours, correct?

17  A.   Correct.

18  Q.   Is that the form you used to score her interview?

19  A.   Yes.

20  Q.    Do those scores accurately reflect your perception of her

21  interview performance?

22  A.    I believe.

23  Q.    Do all those forms that we're about to go through

24  accurately reflect your perception of the interviewees'

25  performance?

72

1  A.  Yes.

2  Q.  What do you actually recall of Ms. Wagner's interview?

3  A.  I recall, once again, that there was no in-depth

4  explanation of the questions that we asked, there was very

5  little detail.  She was unable to establish that she had a

6  strong knowledge base in the areas that we had expected;

7  under planning/preparation, classroom environment,

8  instructional delivery and professionalism.  Which would

9  include curriculum, content, standards, assessment --

10  instructional delivery.  Classroom management, which includes

11  more than just making sure the class behaves themselves.

12  There's a lot of other things that go with it.  Those kinds of

13  things.

14  Q.  If you flip two pages, see the form that says Becky

15  Kelly?

16  A.  Yeah.

17  Q.  Did you fill that out based on your interview of her?

18  A.  Yes.

19  Q.  What do you recall of that interview?

20  A.  We interviewed Becky Kelly for a gifted position.

21  Q.  Is that elementary ed certification or special ed?

22  A.  Actually, there's no certification at that point that

23  goes with -- they don't have a gifted certification.  And so we

24  were looking for somebody who naturally had an elementary

25  certificate, but we wanted somebody that also had a working

73

1    knowledge in a gifted program and somebody that's familiar with

2    GIEPs, and could serve as an excellent addition to the gifted

3    program.

4         MR. KUHAR:  One second.  Your Honor, I'm trying to

5    think of a way to shorten this up a little bit.  I have not

6    proposed a stipulation on this point -- I guess I'm proposing a

7    stipulation that, if given a chance, Mr. Heller would make

8    comments about these candidates consistent with the scores that

9    he gave them.

10        MR. MEAD:  I don't have a problem with that, your

11   Honor, I mean the scores were the scores.

12        MR. KUHAR:  Just for my information, there will be

13   no effort to impeach whether these scores actually matched his

14   perception of the interview candidate's performance.

15        MR. MEAD:  Your Honor, I may ask about a few of the

16   candidates, of course, as part of my cross-examination.  But

17   whatever he wrote down, he wrote down.

18        THE COURT:  Well, then the stipulation is that the

19   forms that we have in front of us here, those are the forms he

20   filled out and those were the scores he gave those candidates.

21   And the last part of the stipulation, I gather, is that it's

22   stipulated to that those were the scores that he gave those

23   candidates based upon his perception as to the

24   qualifications -- based on his perception as to how each of

25   those candidates did in the interview, is that right?

74

1          MR. MEAD:  That's fine, your Honor.

2          MR. KUHAR:  Yes, your Honor.

3          THE COURT:  Then that will take care of a lot of

4   that.

5          MR. KUHAR:  We offer Exhibit T.

6          THE COURT:  It's admitted.

7   BY MR. KUHAR:

8   Q.   I would ask you to go backwards in the booklet to the

9   document behind tab 15, which is Exhibit O, please, are you

10  there, Mr. Heller?

11  A.   Not yet.  Yes.

12  Q.   May I see your booklet, please.

13         MR. KUHAR:  Your Honor, I'm just reordering the

14  pages of the exhibits, they were out of chronological order.

15         THE COURT:  All right.  What numerical tab is it?

16         MR. KUHAR:  It's behind 15, your Honor.  We

17  reordered them to make them in chronological order.  So the

18  first one we have would be '01, November of '01 would be the

19  first entry on it.  The second one would be November of '03 at

20   the top.  The next one, the third one, would have March of '05

21   at the top.  And the last would have September of '06 at the

22   top.

23   BY MR. KUHAR:

24   Q.   What is Exhibit O?

25   A.   A summary sheet of people who were hired between June of

1  2001 and May of 2007.

2  Q.    Prepared by your office?

3  A.    Yes.

4  Q.    Based on board minutes?

5  A.    Yes.

6         MR. KUHAR:  We offer Exhibit O.

7         THE COURT:  It's admitted.

8         MR. KUHAR:  We do intend to go through that in a

9  minute, your Honor.

10        THE COURT:  Okay.

11        MR. KUHAR:  I'm going to refer Mr. Heller to Exhibit

12  29 -- this is the third or fourth page in 29, because I think

13  the pagination in this binder may be a little bit off, it's

14  either the third or fourth page, depending on what booklet you

15  look at, that says July 13, '05 at the top of the chart.

16  It's Exhibit 29 in plaintiff's, your Honor.

17        THE COURT:  All right.

18  BY MR. KUHAR:

19  Q.    Mr. Heller, you're looking at the document that has July

20  13, 2005 in the center, it's a chart or a printout, right?

21  A.  Yes.

22  Q.  This was an exhibit offered by Ms. Wagner, correct?

23  A.  Yes.

24  Q.  Have you had a chance since it was offered to review it?

25  A.  As of right now I am.

76

1  Q.   Well, do you see where it says Michele Freymuth at the

2  left-hand margin?

3  A.   Yes.

4  Q.   For Michele Freymuth for June of 2002 --

5       MR. MEAD:  Mine says June of 2001.

6       THE COURT:  She appears twice on the list.

7       MR. KUHAR:  Right, I'm looking at the one where it

8  says June, 2002, which is about eight or nine numbers down.

9       MR. MEAD:  I'm sorry, thank you.

10  BY MR. KUHAR:

11  Q.   Mr. Heller, do you see that?

12  A.   Yes.

13  Q.   Okay.  What can you tell us about that position?

14  A.   That was a position that she was awarded through the

15  bidding process.

16  Q.   So Ms. Wagner was not eligible for that?

17  A.   No, that was through the consent arbitration in 1999, the

18  collective bargaining unit.

19  Q.   Thank you, that's enough on that one.  The next page, my

20   version of this says school year 2002-2003 at the top, it looks

21   like more of a spreadsheet printout, okay.  Do you see the

22   entry for Mr. Chad DuPont, Mr. Heller?

23   A.   Yes.

24   Q.   What can you tell us about that position?

25   A.   That's not a long-term position, that was based on

1  day-to-day.

2  Q.    A multi day-to-day?

3  A.    Yeah, it was a position that we became aware that was

4  opened right between the interviews actually, December 9th and

5  19th of 2002.  There was a fourth grade position at Neason Hill

6  that was going to open up.  It wasn't a semester position, it

7  wasn't one that required board approval.  We wouldn't label it

8  or define it as a long-term sub position because it wasn't

9  that.

10  Q.    How did you fill it?

11  A.    We used the interview process from 2002, the 17

12  applicants that we had interviewed for that position, we went

13  off of that.

14  Q.    And he scored better than Ms. Wagner?

15  A.    Yes.

16  Q.    Okay.  We are still in 29 --

17  A.    Okay.

18  Q.    So we're looking at this chart, says school year '05-'06

19  on it, it's copied in such as fashion that it's a little bit

20  offset, for the benefit of the record.  Are you there, Mr.

21  Heller?

22  A.    Yes.

23  Q.    There's a reference to a Katherine Mealey on there,

24  correct?

25  A.    Yes.

78

1  Q.   What do you know about the position?

2  A.   She was hired as a part-time ESL, which you need a

3  special certificate in order to assume that responsibility.

4       THE COURT:  What does ESL mean?

5       THE WITNESS:  English as a second language teacher.

6  BY MR. KUHAR:

7  Q.   Which is a certificate we know Ms. Wagner does not have,

8  correct?

9  A.   Yes.

10  Q.   We're done with that exhibit for a while.  Okay.  I would

11  ask you, Mr. Heller, to refer to Defendant's Exhibit O, which

12  is in one of our binders.

13       THE COURT:  What number?

14       MR. KUHAR:  Behind tab 15, your Honor.

15  BY MR. KUHAR:

16  Q.   Are you there, Mr. Heller?

17  A.   Are on the summary sheet?

18  Q.   Yes.

19  A.   Yeah.

20  Q.    Okay.  So we've talked about the hirings of Szalewicz --

21  I'm sorry, we've talked about the interviews of Szalewicz,

22  McElwain, Shearer and Bazylak in January of '03.

23        MR. KUHAR:  Does your Honor, Mr. Mead, see where I'm

24  at, January of '03 on that?

25        THE COURT:  Right.

79

1       MR. MEAD:  Yes.

2   BY MR. KUHAR:

3   Q.   Mr. Heller, do you see where we're at?

4   A.   Yes.

5   Q.   You've talked about those interviews and the ratings,

6   etc., already, correct?

7   A.   Correct.

8   Q.   I think you also testified about some of the other

9   factors that were considered outside of the interview scores

10   themselves, correct?

11   A.   Correct.

12   Q.   Anything else notable about the qualifications of those

13   folks, other than their interview scores, that you took into

14   account when recommending their hiring?

15   A.   No.

16   Q.   Which you did not already discuss?

17   A.   No.

18   Q.   Okay.  So then I think you testified, as this chart

19   indicates, that there were no long-term subs or permanent

20   positions filled until May of '04, correct?

21   A.   Correct.

22   Q.   By the way, this chart contains long-term subs and

23   permanent positions, correct?

24   A.   Correct.

25   Q.   If they were filled through the bidding process, would

1  they be on this chart?

2  A.   No.

3  Q.   If they were positions for which Ms. Wagner was not

4  eligible to apply because of the absence of a certificate,

5  would they be on this chart?

6  A.   No.

7  Q.   So this is a chart of positions she could have been hired

8  for if the district had chosen to do so, correct?

9  A.   Correct.

10        THE COURT:  Let me just ask a question, maybe it's

11  in the record.  You've explained the process for interviewing

12  for permanent positions, the mechanism, the mechanism for

13  interviewing for long-term substitute positions.  Was there an

14  established mechanism for hiring day-to-day subs -- was there

15  an interview process for day-to-day subs?

16        MR. KUHAR:  Well and, again, there's an affidavit

17  about the day-to-day, single day -- from that sub service, are

18  you asking what we've been calling --

19        THE COURT:  In other words, the day-to-day sub, just

20    the one day here or two days, that was handled exclusively by

21    your independent agency, is that right?

22        THE WITNESS:  No.  They're the people who contact

23    yes, they contact.  But are you talking about interviews --

24        THE COURT:  Let me ask the question this way.  You

25    would receive your day-to-day subs, not your long-term subs or

1   even the sub that would go longer than day-to-day but shorter

2   than long-term subs, are you with me?

3        THE WITNESS:  Yes.

4        THE COURT:  The pool from which you would draw would

5   be through this outside independent agency, placement agency,

6   is that right?

7        THE WITNESS:  That's correct.

8        THE COURT:  My question is when that agency would

9   send you people, would there be any interview that would occur

10  of the day-to-day subs or would you simply accept what you got?

11        THE WITNESS:  We do a cursory interview.  Then we

12  substitute teacher's names to the board for approval.  Then we

13  forward those names to the sub service.  And then they use them

14  from there.  So we give the approval before they use them.

15  BY MR. KUHAR:

16  Q.   So the sub service does not hire day-to-day subs, they

17  use a list of names that the district has briefly interviewed,

18  board appointed, and given to the sub service?

19  A.   Correct.

20          THE COURT:  Not to spend too much time on it, but

21   the sub, the prospective sub who wants to be a day-to-day sub

22   in your school district, comes first to you?

23          THE WITNESS:  Right.

24          THE COURT:  You perform or someone performs -- who

25   performs what you described as a cursory interview?

1          THE WITNESS:  I do.

2          THE COURT:  If they pass muster with you, then you

3   submit that name to the agency and they then become one of the

4   subs in the pool, is that right -- in the independent agency?

5          THE WITNESS:  Right.

6          THE COURT:  From which you will periodically be sent

7   subs?

8          THE WITNESS:  Right.  But we still have to have

9   board approval before they're sent.

10          THE COURT:  Before you send the name to them?

11          THE WITNESS:  Yes.

12   BY MR. KUHAR:

13   Q.    So we're looking at Exhibit O, which is that chart of '01

14   through '07, okay?

15   A.    Yes.

16   Q.    Now, if we look at May of '04, Rebecca Kelly -- do you

17   see that, Mr. Heller?

18   A.    Yes, I do.

19   Q.    And then down through Lisa Taormina?

20   A.   Yes.

21   Q.   Do see that group in there?

22   A.   Yes, I do.

23   Q.   Okay.  Are those permanent positions?

24   A.   They're permanent positions, yes.

25   Q.   Now, to understand this chart, see in the very middle,

1   near at the top, it says "person subbing for if long-term sub?"

2   A.   Yes.

3   Q.   Now, there's nothing typed in there for any of those May,

4   '04 hires, correct?

5   A.   Correct.

6   Q.   That would tell the reader of this form that those were

7   not long-term subs?

8   A.   Correct.

9   Q.   And by default they have to be permanent positions

10  because those are the only two types of positions on this

11  chart?

12  A.   That's correct.

13  Q.   All right.  So with respect to Rebecca Kelly, then I'm

14  going to ask you about the other folks as well, what position

15  were they hired into -- in addition to the score which has

16  already been -- well, we have a stipulation that those

17  interview scores are already in the record, what they mean, you

18  assigned to them.  And we have the chart that shows they all

19  scored higher than Ms. Wagner.

20          THE COURT:  Just so I'm clear, the chart that we're

21    looking at now, which is part of this Exhibit O, what is this

22    adding to the mix, that isn't already part of the record or we

23    don't know already know from some other testimony or some other

24    document?

25          MR. KUHAR:  We haven't been told which positions

84

1  those '04 people got.  There's a chart that says yes, they got

2  hired, we know how they did during the interview.

3      THE COURT:  The only additional information this

4  provides is what position they actually got?

5      MR. KUHAR:  Yes, your Honor.  And I'm going to ask

6  him at that time whether there were other factors beyond the

7  interview score.  And just to complete it, additionally, for

8  the post '04 hires, this will be the first evidence on the post

9  '04 hires.

10      THE COURT:  All right.  Go ahead.

11  BY MR. KUHAR:

12  Q.    Okay, Mr. Heller, with respect to, again, the first one

13  on Rebecca Kelly, what position was she awarded and why; and

14  it's understood it's already in evidence that she interviewed

15  such that her score was higher than Ms. Wagner's.  So I'm

16  asking you to focus on any factors that were relevant beyond

17  her interview performance?

18  A.    She's had, the number one factor is she's had experience

19  as a secondary gifted facilitator.  So she had a very good

20    working knowledge of the gifted program.  Even though it was at

21    the secondary level with an elementary certificate.  And she

22    was very knowledgeable in the area of technology.

23    Q.    I don't know if it's just me, I'm still not quite hearing

24    you as loudly as I would like.

25    A.    Okay.

1  Q.   And was there more?

2  A.   No.  Her gifted experience, secondary facilitator was a

3  strong consideration.  She had the elementary certificate, and

4  she had very good technology skills.

5  Q.   Okay.  And, again, as you go through this, you're going

6  to tell us things like that, that's my request for you to do

7  that.  I'm inclined not to ask you each time did Rowena have

8  that qualification.  Instead, I'll just ask you at the

9  beginning that if you're about to explain for us something that

10  was deemed relevant by the committee in recommending that

11  person and Rowena Wagner had that attribute as well, you'll

12  tell us, correct?

13  A.   Right.

14  Q.   Otherwise, we'll assume that she didn't?

15  A.   That's correct.

16       MR. MEAD:  Your Honor, maybe to shortcut it a little

17  bit, I have no problem stipulating to the position, what grade

18  they're in, it's right there in the chart, that will save a

19  question or two.

20          THE COURT:  Okay.

21          MR. KUHAR:  So we don't have to actually mention the

22   position they were hired into, unless it's part of your answer.

23   Like this was a minute ago.

24          THE COURT:  I got it, let's cut to the second part

25   of the question then.

86

1  BY MR. KUHAR:

2  Q.    Do you understand, this is a pretty complex question, I

3  want to be sure you understand?

4  A.    I understand.  Leslie Jensen?

5  Q.    Yes.

6  A.    She had experience out of state, gifted program.  She has

7  a music degree, it's a gifted and talented program.  Many times

8  the talent part of the student has to do with a music

9  background.  She was working on an online master's program

10  through the University of Missouri, I believe, in gifted,

11  talented.  Amy Szalewicz.  At this point had completed a

12  long-term sub position at Cochranton and had done an exemplary

13  job.  Robert Bazylak --

14  Q.    And, again, if they had other qualifications that you

15  have talked about, like having a permanent position at Seton

16  Catholic Elementary School, again, you're not going to tell us

17  about that again, correct?

18  A.    I won't do that.

19        THE COURT:  Let's do it this way, this is getting

20   way more complicated than it has to be.  What you're asking him

21   is if there's anything else he remembers that he hasn't already

22   told us that went into the decisional mix as to why they were

23   hired, is that right?

24           MR. KUHAR:  Yes, your Honor, thank you.

25   BY MR. KUHAR:

1  Q.    Okay.  So with Ms. Szalewicz?

2  A.    And we've talked about her long-term position at Seton.

3  She had a great understanding of balanced literacy.

4  Q.    Anything else?

5  A.    No.

6  Q.    Okay.  Next?

7  A.    Mr. Bazylak.  We've mentioned him.  He's a second career

8  person, he had a degree first from Allegheny College.  He was

9  in management and he went on and earned a certificate in

10  teaching.  He did a long-term sub.  He was one of the highest

11  scores, we already talked about that.

12  Q.    As a long-term sub, what was that?

13  A.    He did the long-term sub, he did a great job.  We've

14  already talked about that.

15  Q.    Well, we talked about him getting it, but I don't think

16  we talked about him doing a good job?

17  A.    Well, he did a great job, we were very happy with his

18  performance at the Second District in fifth grade.

19  Q.    Okay.

20   A.   Erin Bourquin.  She did a long-term position at Penncrest

21   and did an outstanding job.  She came to us with good

22   references.  However, she did sub in our district, she

23   interviewed in 2002 with us.  We didn't offer her a position at

24   that time.  She was one of those people who we were concerned

25   about going to another district.  And she had student taught in

88

1   our district and did an exceptional job as well.  Again, we had

2   the scores.

3   Q.   Thank you.  Continue, please?

4   A.   Tammy Foster.  Some of her testimony was mentioned

5   yesterday.  But we have her test scores.  But her experiences,

6   that she was in the Stars program, learned a lot.  Had a very

7   successful experience in the Stars program.  Demonstrated that

8   she was a team player.  Worked very well with her colleagues.

9   Q.   Through the Stars program?

10  A.   That's correct.

11  Q.   You heard her testimony yesterday, right?

12  A.   Yes.

13  Q.   Was it accurate?

14  A.   It was very accurate.

15  Q.   One part that I think remained unclear was at the time

16  that she was speaking to another employee at the district and

17  said something to the effect of -- I would like one of the

18  teaching positions that I expect to open because of all these

19  retirements, this comment that she made in the summer of '03?

20   A.   Yes.

21   Q.   At the time you heard that, did you know that she had a

22   certificate to be an elementary teacher?

23   A.   No, I didn't, I was not aware of it at the time.  I

24   assumed that she was a paraprofessional.  But if she had a

25   teaching certificate, she would be trying to utilize it.

89

1  Q.    Okay, please continue down the list?

2  A.    Lisa Taormina.  She first had a bachelor's degree in

3  child development.  And then she was involved in a master's

4  intensive teaching program at the University of Pittsburgh,

5  which is a model program, recognized as a model program in the

6  eastern part of our country actually.  It's a student-teaching

7  experience that they have for a complete year, instead of a

8  semester, like they do kind of in northwest Pennsylvania in the

9  state schools.  She came to us very knowledgeable in standards,

10  and she had a strong technology base and high interview scores.

11  Q.    Again, we take that as a given.

12  A.    Good references, we checked her references, her

13  references were exemplary.

14  Q.    What about standards, what did you mean by that?

15  A.    The standards of the minimum competencies that the

16  students are expected to achieve.  In the core areas as defined

17  by the State of Pennsylvania.  And teachers need to know that.

18  But we don't know if they know that unless they tell us.

19  Q.    She told you?

20  A.  She told us, didn't leave anything out.

21  Q.  Okay.  Anything else on her?

22  A.  No.

23  Q.  Okay.  Please proceed?

24  A.  Mark Weathers.  Mark Weathers is another person who had

25  interviewed with us in 2002 and wasn't offered a position at

90

1   that time.  His interview score wasn't nearly as high as it was

2   the second time.  But, in the meantime, he had gotten involved

3   in the Stars program.  In the Stars program he had the

4   opportunity to learn to -- well, they had to prepare lesson

5   plans.  So he was involved in the preparation of lesson plans.

6   He was involved in differentiation instruction.  He was

7   involved in -- the objective of this program was to teach

8   students in reading and math.  So in order to do that, you had

9   to have a very good understanding of the standards.  And he was

10  able to absorb that.

11  Q.    Now, this Stars program that he was in, is the same one

12  Tammy Foster described?

13  A.    Same one, right.

14  Q.    And her description of that yesterday was accurate?

15  A.    It was pretty accurate, yeah.

16  Q.    Okay.

17  A.    I can explain the Stars program in a little more detail

18  if you'd like.

19          MR. MEAD:  I'd would object to that, we heard that

20  yesterday.

21      THE COURT:  Well, the Stars program, I mean just so

22  I have a sufficient working knowledge for purposes of its

23  relevance to this case, the Stars program is an after-school

24  tutoring program where children who have special needs in

25  special academic areas are instructed by teachers, is that

1  right?

2      THE WITNESS:  Yes.  It's a federally-funded

3  competitive grant that we receive.  It's for at promise

4  students.  And it was written -- it was written to actually

5  address the needs of students in economic deprivation.

6  Students who were at risk in reading and math.  And they are

7  expected to increase their achievement in reading and math.

8  And also develop social and character skills as well.

9      THE COURT:  And the gentleman who you were just

10  referencing who had participated in the Stars program was who?

11      THE WITNESS:  Mark Weathers.

12      THE COURT:  Is that the same program the plaintiff

13  participated in?

14      THE WITNESS:  No, the plaintiff didn't participate

15  in the Stars program.

16      THE COURT:  She did not participate in the Stars

17  program?

18      THE WITNESS:  No.

19      THE COURT:  Okay.

20   BY MR. KUHAR:

21   Q.   Was it recommended to her?

22   A.   Yes.

23   Q.   We'll get into that more later.  Unless there's anything

24   else on that person, please proceed?

25   A.   Chad DuPont.  Chad DuPont had done a day-to-day sub

92

1  position at Neason Hill and he was observed by the building

2  principal, Mr. Stanton.  Ms. Good observed him, I observed him,

3  he did very well when we observed him in the classroom.  He

4  left at the conclusion of that year there we no permanent

5  position, he went to North Carolina and accepted --

6          THE COURT:  A little slower, please.

7          THE WITNESS:  He accepted a fifth grade position in

8  North Carolina, I can't tell you the name of the school

9  district.  But he taught in North Carolina for one year, he

10  came back for the interviews.  He did very well, his knowledge

11  base had increased greatly.

12  BY MR. KUHAR:

13  Q.   Okay.  Next?

14  A.   Marcie Pifer.

15  Q.   Actually, if I could interrupt you on that one.  The

16  process was a little bit different with respect to her, wasn't

17  it?

18  A.   Yes.

19  Q.   Explain that?

20  A.    Okay.  Marcie Pifer, when we scheduled the interviews in

21  March, we had a cancellation day because of snow.

22  Q.    Again 'O4?

23  A.    In '04.  Okay.  And so we had to reschedule the day in

24  which Marcie was scheduled to interview, and I can't remember

25  the exact date we scheduled to, it might have been March 11th

93

1   or something of that nature.  But, anyway, on the day that we

2   rescheduled, Marcie was in the delivery room having a baby, so

3   she was unable to come for the interviews.  By the time we

4   completed our interviews, there was no other interview days

5   left.  So at that point we didn't offer her an interview.

6   Sometime in June there was discussion on where we were going to

7   place people, where they would fit our needs best, where we

8   would benefit from their strengths and these kinds of things.

9   And Suzanne Good was in the process of writing a grant, she

10  wrote a grant, it was called the early childhood accountability

11  grant.  In that grant it included segregated sub groups.  Which

12  meant that the student population that would be addressed would

13  be students in economic deprivation, minority students and IEP

14  students.  And also within the grant, they had to have a very

15  strong understanding of the standards and differentiated

16  instruction.

17  Q.    These were requirements of the grant?

18  A.    Requirements of the grant.  So we weren't sure whether it

19  would be a part-time job or a full-time job, at that point we

20   were only thinking it was going to be a part-time job, but

21   later turned into a full-time job.

22   Q.   Slow down.  When you say at that time, what time is that?

23   A.   In June.

24   Q.   Okay.

25   A.   We didn't get approval until the later part of June.

94

1   So anyway, during our discussion, there was some referencing

2   from our principals, as we were going over our list, Marcie

3   Pifer had been there, had worked some positions in different

4   schools and was recommended by some of our principals that

5   maybe we should interview her.  Well, the principals don't work

6   in the summertime.  The only people on that interview committee

7   that work are myself and Ms. Good, we're the only 12-month

8   employees.  The other six are 10-month employees.  So they

9   weren't available.  So, with consensus of the committee, Ms.

10   Good and I, I guess you could say informally because it was the

11   two of us, we interviewed Marcie Pifer.  And we made sure that

12   we asked her questions that dealt specifically with the

13   requirements within the grant.  Which would be the standards,

14   which would be the differentiated instruction, and using those

15   instructional strategies within differentiated instruction to

16   address the needs of those sub groups that I had mentioned

17   earlier.

18   Q.    And after that it was determined that she would be

19   recommended?

20   A.    As part-time first.  Then I think in August, I can't

21   remember the exact -- might have even been in July, the

22   position, we received more money than we anticipated to be able

23   to make it full-time instead of a part-time position.

24   Q.    Now, I'm going to break this pattern for just a minute,

25   we sort of skipped over a phase of this, I just want you to

95

1  explain briefly.  We talked about what led up to the

2  interviews.  We talked about what was on those forms.  We

3  talked about how the interviews went, mostly via stipulation.

4  After those scores were assigned to people and they were

5  ranked, who made the decision that a specific person would be

6  slotted in a specific position, those decisions that you're

7  describing the bases for, for the last 20 or 30 minutes, who

8  made those decisions?

9  A.    The interview committee.

10  Q.    So they reconvened?

11  A.    I'm not sure I understand your question.

12  Q.    Okay.  The interview committee met after all the

13  interviews were done?

14  A.    Correct.

15  Q.    To decide on which positions would be offered to which of

16  the high-ranking interviewees?

17  A.    Yes.

18  Q.    Okay.  So when you say these things like --

19        THE COURT:  Would it be equally if not more accurate

20    to say the interview committee met to determine which names

21    would be submitted to the board, which recommendations would go

22    to the board?

23            THE WITNESS:  In the specific positions, yes.

24            MR. KUHAR:  Thank you, for the clarification.

25    BY MR. KUHAR:

96

1  Q.   Okay, you just told us about Marcie Pifer, right?

2  A.   Yes.

3  Q.   Now, those dates, by the way, to the left of Mark

4  Weathers' name, in this case June, '04, what do those dates

5  mean -- do you see where I'm at?

6  A.   Year of certification.

7  Q.   On the left of Mark Weathers' name?

8  A.   The hire date.

9  Q.   By the board or by your committee?

10  A.   By the board.

11  Q.   Because the board is actually hiring?

12  A.   Right.

13  Q.   Is that when the board voted on the person?

14  A.   Yes.

15  Q.   Okay.  The next one is in August of '04, correct, this

16  Danielle Morris?

17  A.   Yes.

18  Q.   We're still running with the same question that you were

19  answering when you were talking about these other folks; do you

20  understand the question?

21  A.   Yes, I understand.

22  Q.   Go ahead with Danielle Morris?

23  A.   Danielle Morris was a student teacher at West End, she

24  did an extraordinary job there.  Well, we have her scores, she

25  particularly scored high on the interview.  And she didn't have

1   a great deal of experience, but she certainly demonstrated that

2   she had a wealth of knowledge.  So the purpose for offering her

3   a long-term position, instead of a permanent position.

4   Q.   Okay.  And if in fact there isn't a whole lot more to add

5   beyond they did really well in the interview score and ranking,

6   that's okay for you to say so.  But, again, Danielle Morris was

7   for a long-term sub position, right?

8   A.   Right.

9   Q.   Meghan Porter, that's a long-term sub as well?

10  A.   Yes.

11  Q.   And were there any other considerations about awarding

12  her that position beyond the interview score?

13  A.   She was another that had some experience outside of our

14  district in non-public day-care programs, early childhood

15  programs.  And came to us with very good references.  To be

16  honest with you, her scores were a little lower, she started

17  out in the group opposite of me.  And this came out in the

18  conversation, their scores were quite a bit lower than our

19  scores.  She was very nervous.  By the time she got to our

20  group, she kind of composed herself and she did a nice job.

21  But it still brought the average down in the score.  But we

22  needed, it was an opportunity to see what she really could do

23  as a long-term sub.

24  Q.    The next one?

25  A.    Lori Carr?

98

1  Q.    Yes.

2  A.    Lori Carr, she had experience in Conneaut Valley as a

3  fourth-grade teacher for a long-term position there.  Her

4  references were wonderful.  She also served in a long-term

5  position in Conneaut Valley in 7th and 8th grade.  She had

6  subbed, never long-term for us, but she had served some

7  extended time prior to me, I know the principals were very

8  knowledgeable of her.

9  Q.    Who?

10  A.    Lori Carr.

11  Q.    Which principals?

12  A.    I think Brenda Schoonover was one of them.

13  Q.    She said so?

14  A.    Yes.

15  Q.    Now, Cheryl Krachkowski, was she chosen because of her

16  '04 interview score, was she in the next batch?

17  A.    Cheryl Krachkowski was chosen on the March interviews

18  score.

19  Q.    Okay.  Is she the last one?

20  A.    She's the last one.

21  Q.    Okay.  Are there any other considerations or

22  qualifications of hers that affected the recommendation?

23  A.    She was, besides her score, she had experience at the

24  time she was heading the Allegheny America Reads Program.

25  Q.    What's that?

99

1  A.    It's a program that is deeply involved in reading.

2  Offers reading throughout the county and the community.  And

3  she had a strong knowledge base in reading.

4  Q.    Was she in a leadership role?

5  A.    She was in a leadership role, she was the lead person.

6  Q.    Anything else about her?

7  A.    No.

8  Q.    Okay.  So I'm going to stop us there, which would be we

9  just finished with Cheryl Krachkowski, and now I'm going to

10  have you go back in time to June of '04, which is a few months

11  backwards, right?

12  A.    Yeah.

13  Q.    And did you have a meeting with Rowena Wagner at that

14  time?

15  A.    Yes, Rowena Wagner had requested a meeting with me at

16  that time.

17  Q.    Who was in attendance at that meeting?

18  A.    Rowena Wagner and Suzanne Good and myself.

19  Q.    Where did it happen, how long was the meeting?

20  A.   It happened at, the meeting was held in my office and

21  probably a half-hour, I'm not sure of the time.  Somewhere in

22  the neighborhood of a half-hour.

23  Q.   Did Ms. Wagner tell you in advance why she wanted the

24  meeting?

25  A.   No.

100

1  Q.    So you and Ms. Good, you make yourself available, she

2  shows up for this meeting with anyone else?

3  A.    No, she was by herself.

4  Q.    What do you recall of that meeting?

5  A.    I recall that Ms. Wagner came into my office and sat

6  down, we shut the door, three of us.  And the first thing that

7  came out of her mouth was do I ever have a chance of getting a

8  job in this district.  And from there my response was yes, but

9  there's some things you need to work on.

10  Q.    Just go ahead with what you remember, keep going?

11  A.    From there, we had suggested, when I say we, this is Ms.

12  Good and I, that was the purpose for having Ms. Good there.

13  Because I anticipated something like this was going to occur, I

14  felt I needed to have Ms. Good there because she is the

15  identified expert in our district in the area of curriculum

16  instruction, assessment.  So I wanted her there.  Because she's

17  an excellent resource, much better than I can be.  So we had

18  suggested to her that what she needed to do was to familiarize

19  herself, go home and familiarize herself, which she could get

20   online at the PDE Web site, PDE 427 form.  Which again I will

21   say, is used to evaluate people for tenure positions and for

22   their instructional two certificate, teachers.  And it's a

23   mandated instrument in the State of Pennsylvania.  Underneath

24   there it has everything teachers really need to know.  I also

25   had said that once you do that, you need to call me back and

101

1  we'll make an appointment, we'll discuss it and we'll go

2  further.  And we want to get you into the Stars program, which

3  will help you with hands-on experiences.  And I also explained

4  to her and I said, and this is a quote, I said that you need

5  not to have all your eggs in one basket.  You need to look at

6  other districts as well, since were so closely located to other

7  districts, because it will help expand your professional

8  experiences.  And it will give you an opportunity to see what

9  other districts are doing, which can only benefit you.  And

10  that's pretty much, there might have been a little bit more

11  dialogue, but that's about it.  We left the meeting with the

12  understanding that she was going to get in touch with us.  And

13  she never did.

14  Q.    Get in touch with you about?

15  A.    Setting up another meeting to discuss the information

16  that we had highly recommended or strongly recommended that she

17  study and learn.

18  Q.    And the Stars position?

19  A.    At that point we would talk further about the Stars

20  program.

21  Q.    By the way, this Stars position, Ms. Foster didn't

22  remember what it paid, do you remember the hourly rate?

23  A.    At the time I can't tell you what it is exactly or what

24  it was at that time, but it was whatever the bargaining unit

25  agreement stated, it was somewhere around twenty.

102

1  Q.   $20 an hour?

2  A.   Yes.  Probably then it was $19 or $20, could now be up to

3  $22.

4  Q.   But those folks get a paycheck from the district, they're

5  people teaching in the Stars program, are employees of the

6  district?

7  A.   Right.  Well, yes, they are, just like a substitute,

8  yeah.

9       THE COURT:  But it's funded by the government, is

10  that right?

11       THE WITNESS:  The money is channeled through the

12  government, yes.

13  BY MR. KUHAR:

14  Q.   Now, during your '04 meeting, did you say anything to Ms.

15  Wagner about any need to improve her grammar?

16  A.   No, I didn't.

17  Q.   Why?

18  A.   I didn't notice it to be that big of a problem.

19  Q.   Did you discuss shortcomings in her interview?

20  A.   Excuse me.

21  Q.   Did you discuss shortcomings in her interview with her?

22  A.   I discussed not in that meeting so much was specifically

23  things -- I guess I wanted to keep it as positive as possible.

24  I didn't point out all these weaknesses, I just wanted to point

25  instruments that were going to help her improve, make her a

103

1    stronger candidate.

2    Q.    Were those suggestions driven by what you perceived to be

3    deficiencies in her interview?

4    A.    Yes.

5    Q.    Had you noticed any grammar errors in her interview on

6    her part?

7    A.    Maybe a small part but I was more concerned, I felt there

8    was other shortcomings I guess that we needed to address more

9    than the grammar issues and it wasn't a major concern of mine.

10   Q.    Did Ms. Wagner come back to you after your June 4th

11   meeting, the next phase, did she come back to you and say I've

12   done what you suggested, I'm ready to talk about Stars or have

13   any other kind of an exchange with her?

14   A.    No, she never came back again.

15   Q.    Did you at some point have a brief exchange with her in

16   your office?

17   A.    Just real quick, superficial.  I think it was in August,

18   a month or two later after our meeting, and she came in, I

19   didn't know, she came into my secretary's office -- I came out

20  of my office, I happened to run into her.  I said hello, how

21  are you, are you going to get back to us.  That was pretty much

22  the extent of it.  Rowena was real quiet and evasive at that

23  point.  She had come in, I think my secretary was coming in,

24  she was getting a copy of her personnel file.

25  Q.    She told you that after she left?

104

1  A.  Yeah.

2  Q.  But you had inquired whether she had done those things?

3  A.  I inquired if she was going to get back to us.  If she

4  was working on those things, was going to get back to us, yes.

5  Q.  The reason she would have gotten back to you would have

6  been what?

7  A.  To have further discussion and to take the next steps.

8  Q.  Was this before or after she filed her lawsuit?

9  A.  Before.

10  Q.   She didn't give you any sense as to whether she had done

11  anything or was going to meet with you, no material response?

12  A.   At that point when I ran into her, no.

13      THE COURT:  That meeting was just happenstance, is

14  that right?

15      THE WITNESS:  When I ran into her in my office?

16      THE COURT:  Yes.

17      THE WITNESS:  Yes.

18      THE COURT:  Go ahead.

19  BY MR. KUHAR:

20  Q.    Okay.  I'd like you to refer back to the list, which is

21  Defendant's O again.

22          THE COURT:  How much more do you figure you have on

23  direct, do you see the light at the end of the tunnel?

24          MR. KUHAR:  I'd say probably a half-hour to 50

25  minutes.

1        THE COURT:  Okay, keep going.

2        MR. MEAD:  Your Honor, if I may, I believe we're

3    going to get into the hiring of '05 and '06 at this point,

4    correct?

5        MR. KUHAR:  Actually, it would be the hiring at the

6    beginning of late '04.  We've gone into September and October

7    of '04, I think there's one more in late '04, and then through

8    to the current date.

9        THE COURT:  What is your suggestion?

10       MR. MEAD:  There is no argument that there was no

11   interview conducted of her for that time period for those

12   positions.  The people there, their qualifications won't mean

13   much to our case because basically she never got an interview,

14   never had a chance to compete with them.  So they're not going

15   to be able to show apples to apples at this point.  Plus, the

16   people who were hired, it doesn't indicate who was interviewed

17   for these positions.  We won't have any testimony regarding who

18   was actually interviewed.  Because that's the pool that's

19   relevant.  Not who was hired in '05-'06, but actually who's

20  interviewed.  I don't see any indication in here who was

21  interviewed in '05-'06.  That's our beef as far as '05-'06 --

22        THE COURT:  Let me ask you this in terms of maybe

23  moving this along again by way of a stipulation.  With respect

24  to, and I assume for the candidates who were hired in '05-'06

25  or '06-'07, do you have similar documentation that you have for

106

1   the '04 people, such as their rankings and comments about them,

2   that type of thing?

3        MR. KUHAR:  In terms of the rankings, I was just

4   going to offer the testimony that they all scored better using

5   the same process than Ms. Wagner did in the '04 interview.  And

6   then I was going to ask about some of these extra-interview

7   considerations.

8        MR. MEAD:  Again, there's my objection.  Because she

9   wasn't interviewed.  I'm just trying to shortcut it as well,

10  your Honor.

11       THE COURT:  Is the thing that is pertinent to you,

12  are you willing to stipulate with respect to whatever rankings

13  or scores those people had who were not interviewed, who were

14  interviewed and of course your client was not, that they

15  accurately represent the perception of the rankers as they were

16  filling out those forms?

17       MR. MEAD:  I don't have a problem with that, your

18  Honor.  The only other thing I would ask, if we're going to

19  have a stipulation, is it includes how many people were

20    actually interviewed for this position.

21        THE COURT:  Well, let's talk about that.  Do you

22    have documentation as to the number of people, were there

23    people hired for these positions -- let me ask the witness

24    because he's the individual that's under oath.  Were there

25    people hired after '04 for permanent or long-term sub positions

1    who were hired but who were not interviewed?

2         THE WITNESS:  No, everybody was interviewed.

3         THE COURT:  All right.  So everybody was

4    interviewed.

5         MR. MEAD:  So the next step back is how big was the

6    pool of interviewees, because our argument is she was not even

7    interviewed to get into the interviewee pool.

8         THE COURT:  Then you have a raw number of people who

9    would have been interviewed or could that be computed, the

10   total number of interviewees?

11        MR. KUHAR:  I don't know whether it could, your

12   Honor.  But I don't see its probative value in the sense that

13   if we interview ten, and the one who got the job scored better

14   than she did, or we interviewed three and the one who got the

15   job scored better than she had in her most recent effort, I

16   honestly just analytically don't understand why it matters

17   whether we interviewed 10 that were unsuccessful or 20 that are

18   unsuccessful.

19        THE COURT:  All right, let me hear from Mr. Mead.

20          MR. MEAD:  Your Honor, I just want the evidence to

21   show that there were more than six people in an interview pool

22   because it will show if there was a 100 people interviewed and

23   she wasn't interviewed, that's significant.  More significant

24   than if there was three or four or five or six people.  I just

25   want to know how many people were actually interviewed for this

108

1   position.

2        THE COURT:  It would have been more than one

3   position, it would have been several positions.

4        MR. MEAD:  Correct.  That would be -- again, I would

5   just like to do that to shortcut.  And I'm just trying to

6   shortcut, if Mr. Kuhar is going to do what he wants or whatever

7   the court needs, that's fine.  I'm just thinking because our

8   position is going to be hey, she wasn't interviewed because of

9   retaliation in '05 and '06, that's a fact, I don't think anyone

10  is disputing that.  I would just like to know how many people

11  were interviewed.

12       THE COURT:  I think they dispute she wasn't

13  interviewed because of retaliation?

14       MR. MEAD:  I didn't mean that, your Honor, nobody

15  disputes the fact that she was not interviewed.

16       THE COURT:  Right, no one disputes that.  What

17  you're interested in trying to establish, either through

18  documentary evidence or asking Mr. Heller, is some number, even

19  if it's his best estimate, as to the total number of applicants

20  who were interviewed for various positions from '04 onward, is

21  that right?

22          MR. MEAD:  Yes.  And, again, your Honor, I'm just

23  trying to shortcut some of this.

24          MR. KUHAR:  Well, your Honor, I'm certainly trying

25  very hard to shortcut things, too, as we go.  But it sounds

1  like the plaintiff is trying to have both sides of this issue

2  because she's saying all she really is complaining about is not

3  being interviewed after '04.  Not really, she's also

4  complaining about not being selected after '04.

5        THE COURT:  I mean it's not enough, I mean you also

6  have to prove that even if she had been interviewed -- you have

7  to carry the burden on, that's only one step towards hiring.

8        MR. MEAD:  But she isn't making that step, she's not

9  going to get hired.

10        MR. KUHAR:  She's not making the allegation that she

11  would have been thereafter hired --

12        MR. MEAD:  No, we submit she would have been.  We're

13  not disputing that.  What we're saying is you can't get hired

14  unless you're interviewed, according to their policy.

15        MR. KUHAR:  And our defense and we would have to

16  articulate a legitimate reason for why we chose all those other

17  people.  And if the court would find that our non-interview of

18  her was wrongful, and our defense would be they interviewed

19  better than she did when she was interviewed, and they had

20    these other things going for them, as had been coming into

21    evidence about these other folks beyond their raw interview

22    scores.  As I analytically don't understand why the number of

23    other candidates matters, if it's to infer that we had room to

24    interview her or anything like that, the testimony will be we

25    did, we made a conscious decision not to.

110

1      THE COURT:  All right.

2      MR. MEAD:  And I may just address that.  We would

3   also be interested in the people who were interviewed, did get

4   they get interviewed the first time around in '04.  Did they

5   get interviewed again in '05 or '06.  Did they get interviewed

6   again in '06, '07.

7      THE COURT:  Look it, this is how we're going to do

8   this.  All that stuff that you're interested in finding out,

9   you're going to be able to find out on cross-examination, to

10  the extent that he knows.

11      MR. MEAD:  Correct.

12      THE COURT:  That's number one.  And, number two,

13  with respect to the qualifications of the various -- with

14  respect to the rankings of the various candidates post '04,

15  as will be reflected in these records, are you essentially

16  saying Mr. Kuhar need not go through each of those documents

17  with Mr. Heller and establish what their rank was or why their

18  rank was, because you are stipulating that each of those

19  candidates, however they were ranked, 1 through to 10 or

20    however many there were on each individual interview day, were

21    ranked appropriately insofar as the perception -- let me put it

22    this way.  Each of those candidates were ranked based upon the

23    legitimate perception of each of the interviewers based upon

24    how each of those candidates performed in the interview on that

25    day?

1          MR. MEAD:  And I have no problem with stipulating

2   like that, your Honor, because what I'm going to do on cross,

3   they're going to say that's how I saw it.  So I don't have a

4   problem doing it that way, no.

5          THE COURT:  Does that make your road a little

6   shorter in terms of going through each of those documents?

7          MR. KUHAR:  I think so.  I think I don't need to

8   have witnesses go through the actual interview records or

9   testify about the actual interviews.

10         THE COURT:  Because now the records speak for

11  themselves.  He is willing to stipulate that they accurately

12  reflect the genuine perception of each of the interviewers

13  insofar as the relative qualifications of each of those

14  candidates were, is that right?

15         MR. KUHAR:  Actually, to be clear on this, your

16  Honor, I did not intend to offer in and they're not in my

17  binder, unless I'm having a temporary lapse, those score sheets

18  for all those folks, I was just going to have the global

19  testimony that all the successful candidates were interviewed

20    in the same process by the same people, maybe not the same

21    individuals, but the same representatives --

22         THE COURT:  With the same approach being utilized,

23    with the same independent, each of them sitting down and

24    marking it on their own and then with the same consensus at the

25    end as to the names they would forward to the board.  The same

112

1   approach that had been utilized in the years past.

2       MR. KUHAR:  And that they all scored higher than Ms.

3   Wagner did when she was most recently interviewed.

4       THE COURT:  All right, are you willing to stipulate

5   to all of that?

6       MR. MEAD:  That's fine, your Honor.

7       THE COURT:  All right.  Well, then, I think we just

8   moved this case out quite a bit.

9       MR. KUHAR:  Now, I still think what we can't and

10  didn't stipulate to would be extra score characteristics, which

11  is going to be pretty brief actually, for those maybe 20, 30

12  minutes, I'm hoping for those post '04 people, I don't see how

13  we can stipulate that they had other things going for them

14  other than the interview scores.  But which would be part of

15  our legitimate reason for choosing them.

16       THE COURT:  Well, why don't we do this.  I'm going

17  to take a short recess, because we've been doing this for an

18  hour and a half.  Why don't you and Mr. Mead talk about that

19  aspect.  And that light at the end of the tunnel might be much

20  larger than we even think.  We're going to take a short recess.

21          (Recess from 11:27 a.m; until 11:38 a.m.)

22          MR. MEAD:  Your Honor, if I may address what we

23  spoke about.  I believe we have a stipulation regarding the

24  fact that the 2005 and the 2006 interview reports, they are

25  what they are.  We have no problem with a stipulation that if

113

1  the witness came in, they would say that we did the evaluation,

2  this was our perception.  And then the scores would be entered.

3  That's what we want to do.

4        MR. KUHAR:  Actually, it was sort of the proposal

5  that you had made before the recess, I think.  Was did you

6  think you had teed it up such that we could say yes or do we

7  need to flush it out again?

8        THE COURT:  Well, I thought the proposal as to the

9  content of the interview forms was that -- the content of the

10  interview forms accurately reflect the individual interviews

11  perceptions as to how each of those applicants performed on the

12  day of their interview, relative to the score, including in

13  getting the score, the raw score, including any other

14  additional factors that the interviewer may have considered.

15  And that the same process was employed, as had been previously

16  testified to, relative to the long-term substitutes.  That is

17  after they independently filled out their forms, they convened

18  and then determined which applicant's name would be forwarded

19  to the board for approval.

20          MR. KUHAR:  Agreed.  I apologize for the confusion

21   on things on that point.  Right, I think we agreed to that

22   before the recess, and you were charging us with the next

23   level --

24          THE COURT:  What was the next level?

25          MR. KUHAR:  It was going forward, again, we'll call

114

1   them the post '04 interview decisions.  With respect to those,

2   whether there was any way we could obviate the need for

3   testimony really about anything else about the successful

4   candidates.  I think was what you were having us think about.

5   I think we're still sort of hung up on the issue of, the

6   district feels that it needs to explain any extra-rating

7   considerations and plaintiff doesn't see how they could

8   stipulate to them.  Because, to be honest, they don't know what

9   they are.  I'll let him speak for himself.

10          MR. MEAD:  That's correct, your Honor.  I think

11  where we're going to short circuit this is it won't be

12  necessary to call additional witnesses after Mr. Heller.

13  Because those interview forms won't be in dispute.  That's

14  where I think we could eliminate some time in the trial.

15  However, going forward, I think the district and the plaintiff

16  have a problem because the district will say well, was there

17  anything else in addition to the interview forms as to who were

18  hired in '05 and '06.

19          THE COURT:  You don't know that is?

20        MR. MEAD:  I don't know what it is.  And I don't

21    want to stipulate to that.  But I think where we're going to

22    cut it short is that we're going to eliminate the need for a

23    few more witnesses that would come in and do basically in

24    smaller detail what Mr. Heller has been doing this morning.

25        MR. KUHAR:  In other words, that's sort of the new

115

1  proof we have, is that I think we can stipulate that with

2  respect to Mr. Karns, Mr. Price --

3          THE COURT:  These are the other interviewers?

4          MR. KUHAR:  Yes, your Honor.  So with respect to

5  Mr. Karns, Mr. Price, Ms. Good, Ms. Darling and Mr. Meader.

6          THE COURT:  Insofar as their interview testimony is

7  concerned, will be largely if not completely eliminated?

8          MR. KUHAR:  Because I think at this point we're

9  extending it to even include the '02 and '04 things, which I

10  don't think we talked about before the recess.

11          THE COURT:  So, basically, Darling would just come

12  in largely on conversations that she allegedly had, and so that

13  really shortens your case.

14          MR. KUHAR:  As would Mr. Meader.

15          THE COURT:  But your case is significantly shorter?

16          MR. KUHAR:  Yes, your Honor.  And I'm going to have

17  to give it a little more thought whether we have another

18  unique --

19          THE COURT:  Why don't we do this, it's coming up on

20    a quarter to 12.  Given this refinement of how your case is

21    going to end up, why don't we break for lunch now, you can give

22    some further thought on how you're going to question your

23    witness, Mr. Heller, consistent with the stipulation.  And then

24    we'll come back at, let's be back at a quarter to 1:00.

25         (Luncheon recess from 11:42 a.m.; until 12:45 p.m.)

116

1        THE COURT:  Mr. Heller, you can resume the stand.

2   All right, Mr. Kuhar.

3   BY MR. KUHAR:

4   Q.   Mr. Heller, we had discussed the October, '04 hire of

5   Cheryl Krachkowski, correct?

6   A.   Correct.

7   Q.   And, essentially, we're proceeding with the same process

8   that we had been doing before.  So with respect to October of

9   '04, Jennifer Stefanucci.  In addition to her -- well, let me

10  clarify this.  She was not one of the folks who was interviewed

11  in '04, correct, in March of '04?

12  A.   Correct.

13  Q.   When was she interviewed?

14  A.   She was interviewed right before that position was

15  available.  September, I believe.

16  Q.   Of '04?

17  A.   Yes.

18  Q.   To confirm what I think we stipulated to before, her

19  interview score was higher than that of Ms. Wagner during Ms.

20  Wagner's '04 interview?

21  A.  Correct.

22  Q.  And for all of the folks that were hired into long-term

23  sub and permanent positions after Ms. Stefanucci, who we are

24  going to talk about, the same is true for them as well?

25  A.  Yes.

117

1  Q.   So as we do this again, you're focusing on things other

2  than their high interview score, okay.  If there is something

3  compelling having to do with the interview you can tell us

4  that, but if it's just a matter of they scored well, we've

5  already stipulated to that, okay?

6  A.   Yes.

7  Q.   All right.  So were there other considerations relevant

8  to the committee's recommendation for Jennifer Stefanucci,

9  other than her interview score?

10  A.   This was a kindergarten position and we were primarily

11  interested in somebody who had a dual early childhood

12  elementary certificate.  Which is what Jennifer Stefanucci had.

13  Q.   Dual meaning she had two certificates?

14  A.   Yeah.

15  Q.   Was that a hard and fast requirement for the position?

16  A.   It's not a hard and fast requirement, but they

17  specifically had been trained in early childhood education, and

18  a kindergarten classroom is considered early childhood

19  education, that's what we would like to have at the

20  kindergarten level.

21  Q.  Anything else regarding Ms. Stefanucci?

22  A.  Not that I recall.

23  Q.  All right.  Now, also, with respect to Ms. Stefanucci's

24  position, the one she with hired into?

25  A.  Yes.

118

1  Q.   And the positions, both long-term sub and permanent that

2  were filled after Ms. Stefanucci's position, was Ms. Wagner

3  interviewed for any of those positions -- do you understand the

4  question?

5  A.   State it one more time.

6  Q.   Okay.  Was Ms. Wagner interviewed for the position that

7  was awarded to Jennifer Stefanucci?

8  A.   No.

9  Q.   Was she interviewed for any of the positions that were

10  filled after Ms. Stefanucci was hired into that position?

11  A.   No, she wasn't.

12  Q.   Why not?

13  A.   Well, the reason that I decided that we weren't going to

14  interview her any longer was that she had performed poorly on

15  her 2002 interview.  She showed very little progress in her

16  2004 interview.  The suggestion that I had made to her,

17  specifically, in regard to consulting with the reading

18  specialist at Cochranton, I guess it was just a half-hearted

19  attempt, from the feedback that I had gotten --

20          MR. MEAD:  I'm going to object to that as being

21   brought up for the truth of the matter.

22          THE COURT:  Sustained.

23          MR. KUHAR:  Your Honor, it's for his impression of

24   it, which led him to making a decision.

25          THE COURT:  From where did you obtain the

119

1  information which caused you to form the impression that her

2  attempts were half-hearted?

3          THE WITNESS:  From the person who I recommended.

4          THE COURT:  It's not being offered for the truth, is

5  it?

6          MR. KUHAR:  No, your Honor.

7          THE COURT:  It's overruled.

8  BY MR. KUHAR:

9  Q.   Please, continue.

10 A.   There was never any contact made with Suzanne Good for

11 2002.

12 Q.   As far as you know?

13 A.   That's a fact.

14 Q.   Okay.

15 A.   And then the suggestions that were made in 2004, there

16 was no follow-up to any of it.  And so that leads me to believe

17 that there was no progress made thereafter.  And most often if

18 somebody interviews that poorly after they've been given a

19 second chance, we don't interview them again.

20  Q.   Can you think of anybody whose been interviewed for

21  long-term sub positions or permanent positions more than two

22  times since you've been at the district?

23  A.   Right now I can't think of anybody that's been

24  interviewed more than two times.

25  Q.   I cut you off, go ahead and finish your answer.

120

1  A.   I was going to say I felt very confident and comfortable

2  that we had extended ourselves to provide her the opportunity

3  to gain some professional development, and there was no effort

4  to take advantage of it.

5  Q.   Now, we're moving to the next page of that Exhibit O,

6  which would have at the top March of '05 in the left-hand

7  margin; is it clear we were are, Mr. Heller?

8  A.   I'm here.

9        MR. KUHAR:  Mr. Mead?

10        MR. MEAD:  Yes.

11  BY MR. KUHAR:

12  Q.   So the next hire into a long-term sub or permanent

13  position was Jennifer Christie, correct?

14  A.   Correct.

15  Q.   And were there any other considerations beyond her

16  success in her interview that contributed to Jennifer

17  Christie's recommendation and selection?

18  A.   Other than outside of the interview?

19  Q.   Well, outside of her interview score.  If there was

20   something that happened in the interview that you think was a

21   factor, go ahead and tell us about that, you just don't have to

22   tell about the fact she scored well?

23   A.    Besides her interview, Jennifer Christie spent some time

24   working in the Stars program as a parent liaison as she worked

25   towards her teacher certification at Edinboro University, which

121

1  was a benefit.  It certainly kept her informed and abreast of

2  the district's philosophies and the district's initiatives.

3  And kept her up to date on the current trends in education.

4  Q.    Okay.  Meghan Porter?

5  A.    Meghan Porter -- I think we already talked about her

6  before.  We talked about her in 2004.  She went through the

7  interview process and the only thing I would add to that would

8  be that she did a superb job in the position that she was at

9  West End, in a long-term sub position.

10  Q.    In August of '04?

11  A.    Yes, correct.

12  Q.    The position that she was given in July of '05 was as a

13  long-term sub as well?

14  A.    Well, it started out that way.

15  Q.    It's listed that way, right?

16  A.    Yes.  But then we ended up with a permanent position and

17  we moved her to that position in First District, in the summer.

18  So she never held that first position.

19  Q.    I see.  That's why she's in here twice in a row in July

20    and August of '05?

21    A.    Correct.

22    Q.    Danielle Morris is the next one, what do you have to say

23    about her?

24    A.    She spent a year as a long-term sub and did an excellent

25    job.

122

1  Q.   At your district?

2  A.   In our district.

3  Q.   That was within the period, we've already talked about

4  her?

5  A.   Uh-huh, yes.

6  Q.   Now, Mr. Peters?

7  A.   Mr. Peters had completed his student-teaching experience

8  at Second District Elementary School and had worked hand and

9  hand with Mr. Price, the principal of Second District

10  Elementary School.  He also was involved in the Stars program

11  while he was completing his student-teaching experience.

12  Q.   When you say involved, what do you mean?

13  A.   I think he was -- he held a position there.

14  Q.   A paid position?

15  A.   Yes, I believe.

16  Q.   Go ahead.

17  A.   That's it.  Interview.

18  Q.   Okay.  Norman Carner is the next one, right?

19  A.   Yes.

20  Q.  Anything to say about Mr. Carner?

21  A.  Just that he interviewed very well.

22  Q.  Naomi Uy-Moore?

23  A.  Naomi Uy-Moore came to us from Charles County, Maryland.

24  She had taught in Maryland for quite a number of years.  She

25  had --

123

1  Q.   And I'm sorry to interrupt, just for brevity, you were

2  here when she described her background and qualifications,

3  correct?

4  A.   Yes, I was aware of those before.

5  Q.   Were you aware of those at the time you made, your group

6  made the recommendation?

7  A.   Yes, I was.

8  Q.   Were those part of the reason that the recommendation was

9  made?

10  A.   I think her different experiences, diverse experiences

11  that she had enhanced her interview.

12  Q.   So I guess what I'm saying is the evidence already

13  contains her testimony about her qualifications, so I'm asking

14  whether there's anything else you want to add regarding her

15  that wasn't already put into evidence through her testimony --

16  on the issue of why she was recommended?

17  A.   Well, I can tell you she has a great deal of experience

18  in inclusion.

19  Q.   What is that?

20   A.   It's when we include IEP students in the regular

21   classroom --

22   Q.   What's an IEP student?

23   A.   A student that has a learning disability.

24   Q.   Special ed student?

25   A.   Special ed, yes.

124

1  Q.    Go ahead.

2  A.    We begin that process in math in the inclusionary model,

3  she had quite a bit of experience in it.  And thought that also

4  could be helpful, besides her expertise in curriculum and

5  instruction.  Certainly, the inclusionary model, since nobody

6  in our district really had much experience with the

7  inclusionary model, she could be helpful.

8  Q.    Now, I'm going to ask about the next person in a minute.

9  We're going to talk a little bit more about Naomi Uy-Moore.

10  At the time that she interviewed and at the time she started in

11  September of '05, what kind of certificate did she have?

12  A.    She had a certificate from Maryland.

13  Q.    Did you consider that to be any kind of a blemish?

14  A.    No.

15  Q.    Explain why not?

16  A.    Well, had another candidate, out-of-state candidate, who

17  we were interested in, in a completely different field, but

18  applied for a position in our district --

19  Q.    Not an elementary position?

20  A.   It was a health and PE position.

21  Q.   Go ahead.

22  A.   It was in an elementary school, though.

23  Q.   But what kind of certificate was required for that?

24  A.   Health and PE.

25  Q.   Go ahead.

125

1  A.    The requirements in Chapter 49 were a little bit sketchy

2  on whether we had complete reciprocity with states that

3  surround Pennsylvania; which would be Ohio, West Virginia,

4  Maryland, New Jersey, New York and so forth.  And so this other

5  person who had come into my office and talked to me about his

6  out-of-state certificate and explained to him --

7  Q.    Who explained to him?

8  A.    The dean of his college explained to him that he had

9  reciprocity and was certified to teach in Pennsylvania.

10        MR. MEAD:  I'm going to object, that's hearsay.

11        THE COURT:  It's hearsay, sustained.

12        MR. KUHAR:  Your Honor --

13        THE COURT:  Who is the fellow we're talking about

14  now, who is this teacher?

15        MR. KUHAR:  This person who came here, what's his

16  name?

17        THE WITNESS:  Joe Haruska.

18        MR. KUHAR:  Who came here with an out-of-state

19  certificate.  What Mr. Heller learned from him was part of the

20   impression, formed the impression that Mr. Heller had about Ms.

21   Naomi Uy-Moore's eligibility to teach based on reciprocity.

22          THE COURT:  Is that what the offer will be?

23          MR. KUHAR:  Yes, your Honor.  In fact, the PDE had

24   taken the position that there was a defect with respect to Ms.

25   Naomi Uy-Moore.  So we're not trying to prove it.

126

1        THE COURT:   That obviously proved not to be the

2   case.

3        MR. KUHAR:  Exactly, your Honor.  So we're clearly

4   not trying to prove that it was a valid reciprocity situation.

5        MR. MEAD:  I'll withdraw the objection, I'd rather

6   just get through this part.

7        THE COURT:  All right.

8        THE WITNESS:  So, anyway, in my conversation with

9   Mr. Haruska, I advised him to contact PDE and find out for

10   himself firsthand.  And so he contacted PDE and was informed

11   that his certificate was valid for one year.

12   BY MR. KUHAR:

13   Q.   That's what he was told by them?

14   A.   He was told by them.

15   Q.   All right.

16   A.   So I said it's not that I don't want to take your word

17   for it, but I'm going to follow-up, who did you speak with.  So

18   I spoke with the same person at PDE, from the certification

19   bureau at PDE.

20  Q.    Who was that?

21  A.    Her name was Marjorie Blaze.  And she explained the same

22  process to me.  Is that these people, as long as they file

23  paperwork, complete the check sheet, which Naomi Uy-Moore had

24  and Joe Haruska had, they have one year to fulfill a

25  requirement, which is in most cases there is one practice exam

1   that they would not have completed prior to moving into

2   Pennsylvania and be able to accept the certificate.  And so

3   there was no mention made to Joe Haruska, Naomi Uy-Moore,

4   myself, and even another candidate by the name of Leslie

5   Jensen, who I dealt with prior to that, that we needed to do

6   any further paperwork.

7   Q.   Let me ask you this.  Did you have at the time you

8   recommended Ms. Naomi Uy-Moore to the board for hire in a

9   permanent position in August of '05, did you have any reason to

10  think that she was not properly certificated to teach in

11  Pennsylvania?

12  A.   I had no reason not to believe that she wasn't properly

13  certificated in Pennsylvania because I had been told that she

14  was.

15  Q.   Wait a minute, no reason not to believe that she wasn't

16  certificated?

17  A.   She was certificated.

18  Q.   Can you start that over.

19  A.   I have no reason to believe that she wasn't certificated

20  in the State of Pennsylvania.

21  Q.   Thank you.

22  A.   And that's according to --

23        THE COURT:  In other words, that's a double

24  negative, but you're saying, I'm not putting words in your

25  mouth, I'm trying to get this out -- are you saying you

128

1  believed that he was certificated?

2        THE WITNESS:  She.

3        THE COURT:  She, rather?

4        THE WITNESS:  And he, both candidates.

5  BY MR. KUHAR:

6  Q.   Focusing on Naomi Uy-Moore --

7  A.   Correct, I believe they were both certificated and had to

8  complete one test within a year.

9  Q.   To obtain a permanent teaching certificate?

10  A.   Correct.  In which they both did.

11  Q.   Okay.  Is the next person Melonie Courson?

12  A.   Yes, Melonie Courson.

13  Q.   Do you remember the question, we're looking for

14  considerations other than a high interview score which was

15  relevant to the committee's recommendation?

16  A.   She had several years of experience outside of our

17  district teaching, I believe at Calvary Baptist.

18  Q.   What is Calvary Baptist?

19  A.   It's a private school.

20  Q.    Where?

21  A.    I think it's located in Seagertown, I'm not sure exactly

22  of the location, but close by, it's in the county.

23  Q.    Anything else about that person?

24  A.    No.

25  Q.    And then next is Cheryl Krachkowski again, right?

129

1  A.   Yes.

2  Q.   Which is another long-term sub?

3  A.   Uh-huh.

4  Q.   Anything we need to add about her or have we covered her

5  already?

6  A.   Other than she did the long-term position at Cochranton

7  prior to this position in fourth grade.

8  Q.   How did she do?

9  A.   She did a good job.

10  Q.   Stacey Thompson?

11  A.   Stacey Thompson had worked prior to this position, she

12  was working as substitute, she worked as a TSS, also, with some

13  students at Second District.

14  Q.   What is a TSS?

15  A.   It's a therapeutic support staff person, provides

16  behavior modification to students, it's a state initiative.

17  We have many of them in our school district, there's many in

18  the county, who shadow students.

19  Q.   So that's an employment position for her?

20  A.    Yeah, it's more experience, it's associated with

21  education.

22  Q.    I understand.  Anything else you have to say about her?

23  A.    That's it.

24  Q.    We have Cheryl Krachckowski again; how did she perform

25  during that November of '05 long-term substitute?

130

1  A.    She did a great job.  I mean we had numerous parent

2  references just marveling about how well she did.

3  Q.    Anything else to add about her or have we covered her,

4  Cheryl Krachkowski?

5  A.    I think we covered her enough.

6  Q.    Lauren Mattocks?

7  A.    Lauren Mattocks was substituting in our district.  She

8  did a couple positions that were, they weren't considered

9  long-term but extended three weeks here, three weeks there.

10  She was involved in the Stars program.

11  Q.    How did she perform during those multi-week assignments?

12  A.    Performed well.  Some of them were even at the secondary

13  level, the high school, in a learning support class.

14  Q.    You said she participated in Stars?

15  A.    Yes.

16  Q.    At what point?

17  A.    She was a teacher.

18  Q.    So she worked?

19  A.    Yes.

20  Q.   Okay.  For what period was she in that Stars program?

21  A.   Prior to the hire.

22  Q.   If you don't know how long, that's fine?

23  A.   I think it was 2006, January of 2006 when she probably

24  started, right around there, right after finishing school.

25  Q.   Okay.  And then the next page that we're going to be

131

1  reviewing is the one that begins with Stacey Thompson at the

2  top.

3  A.    Okay.

4  Q.    What do you have to add about her?

5  A.    Stacey Thompson, that really was -- she filled in at the

6  position at Second District Elementary School and she did an

7  outstanding job.

8  Q.    A person we already talked about?

9  A.    Yes.

10  Q.    Nothing knew to add about her?

11  A.    No.

12  Q.    Tara Kelyman?

13  A.    Tara Kelyman is the person who went back to school, she

14  already had a degree, went back and earned a teacher's

15  certification, she was a second career person.  She did her

16  student teaching in our district.  She interviewed well.

17  Q.    Anything else?

18  A.    No.

19  Q.    We have Melonie Courson again?

20    A.    She did a nice job in her long-term substitute position.

21    Q.    That's the previous one we talked about?

22    A.    At West End, yes.

23    Q.    Rebecca Spadafore?

24    A.    Rebecca Spadafore had a good interview, we had a teaching

25    lesson.  We had the opportunity to do model teaching lessons

132

1  for all the candidates during that interview.

2        THE COURT:  Slow down, please, Mr. Heller.

3        THE WITNESS:  Sorry.  She performed well,

4  outstanding.

5  BY MR. KUHAR:

6  Q.    Here's Tara Kelyman again, anything else to add about

7  her?

8  A.    No, it was according to the contract, that was a

9  situation where we had a vacancy, she was in a position, she

10  automatically gets hired.

11  Q.    Because of her bidding rights?

12  A.    Yes.

13  Q.    Obtained through three semesters?

14  A.    No, it was a position in which we hired her for

15  temporarily and it became a permanent vacancy.  There was a

16  permanent vacancy due to a death in our faculty.  So it just

17  through the language becomes -- she gets hired for that

18  position.

19  Q.    Okay.  There was some deposition testimony read in

20  regarding a Mr. Mahoney and in relation to a nepotism policy at

21  the district; do you remember that testimony being read in?

22  A.  Yes.

23  Q.  Does the district have a nepotism policy?

24  A.  Yes.

25  Q.  What is it?

133

1  A.    That any time that we interview a member of a family of

2  an administrator or the board, that there needs to be a board

3  member present.

4  Q.    Look behind tab 10, please, at Exhibit J; are you there,

5  Mr. Heller?

6  A.    Yes.

7  Q.    What is this exhibit?

8  A.    Employment of professional employees.

9  Q.    Does this contain a nepotism policy?

10  A.    Yes.

11  Q.    Now, was there a technical violation of the nepotism

12  policy with respect to Mr. Mahoney's hire?

13  A.    Yes.  In June of 2002?

14  Q.    Yes.

15  A.    Yes.

16  Q.    Or at least in the interview process that led up to it?

17  A.    Yes.

18  Q.    Tell us what part of the nepotism policy was technically

19  violated, and basically tell us what happened in that situation

20  from start to finish?

21  A.   What happened was that we conducted our interviews like

22  we normally do and we selected our candidates.  And Brian

23  Mahoney was the son-in-law of a district administrator, and we

24  didn't have a board member present for the interview.

25  Q.   That's the extent of the violation?

134

1  A.    That's the extent of the violation.

2  Q.    That part that a board member wasn't there?

3  A.    Yes.

4  Q.    That's the violation?

5  A.    That's the violation.

6  Q.    Okay.  At the time that that happened, were you

7  supervising that interview process?

8  A.    I was facilitating it.

9        THE COURT:  All right, let me ask you a question

10  about the nepotism policy so I understand it.  Would that mean,

11  for instance, let's assume you had a brother who wanted to

12  apply for a permanent position as a teacher, would you still be

13  able to interview your brother and participate in the

14  collective interviewing process that you previously described

15  and go ahead and rate your brother as long as there was a board

16  member present?

17        THE WITNESS:  That's my understanding.

18        THE COURT:  All right.

19  BY MR. KUHAR:

20  Q.   Has that ever happened?

21  A.   What?

22  Q.   Where you rated a relative of yours?

23  A.   No.

24  Q.   Are you aware of anybody who rated a relative of theirs

25      at any time you've been at the district?

135

1    A.    Through marriage.

2    Q.    What do you mean?

3    A.    Brian Mahoney was rated by his father-in-law.

4    Q.    Now, no board member was present for that interview,

5    right?

6    A.    That's correct.

7    Q.    Were you aware of the nepotism policy at the time that

8    you coordinated that interview?

9    A.    I was not aware of the nepotism policy at that time.

10   Q.    How soon after you started with the district did it

11   occur?

12   A.    I believe that Brian was approved at the June board

13   meeting, so less than four months I had been in the district at

14   the time, I wasn't aware that there were a nepotism policy in

15   place.

16   Q.    Okay.  Did you advise the board of this before the board

17   voted to hire Mr. Mahoney?

18   A.    There was no intention to make a mistake on my part.  And

19   once I became aware that there was a mistake made, I made the

20  board aware immediately.

21  Q.   How did they react?

22  A.   They reacted in a manner that they said well, thank you

23  for being up front and honest with us and do you think that

24  there's any problem.  Do you think that there's any problem,

25  they asked me if I thought that there would be a problem.  Was

136

1  there anything, as far as wrongdoing in the interview, anything

2  that was underhanded.  I said no, everybody evaluated the

3  candidates independently, just like we always do.  There's no

4  conversation during, only after.

5  Q.    Into what kind of position did Mr. Mahoney get hired this

6  way?

7  A.    A special ed position.

8  Q.    Was that a position that Ms. Wagner was eligible to be

9  hired into?

10  A.    No, she's not eligible for that position.

11  Q.    Did this situation have any impact on Ms. Wagner's

12  ability, sorry -- did it have any impact whatsoever on Ms.

13  Wagner's lack of success in obtaining employment with the

14  district?

15  A.    No, it didn't.

16  Q.    Do you know where the Franklin, Conneaut Valley and

17  Penncrest School Districts are located relative to your

18  district?

19  A.    Yes.

20  Q.   Do you know where their elementary schools are within

21  those districts?

22  A.   I know where some of them are.

23  Q.   Do you know, approximately, how far the elementary

24  schools in those districts, which are closest to Ms. Wagner's

25  residence, do you know how far they are from her residence?

137

1  A.    Some of them.

2  Q.    How far are they?

3  A.    The closest elementary school in Franklin is around 12

4  miles.  Penncrest, 17.  Conneaut, 17 or 18 miles,

5  approximately.

6  Q.    If Ms. Wagner had been chosen for either of the two

7  approximately three-week day-to-day assignments necessitated by

8  Kathy Maruska's absence in the latter half of the '03-'04 and

9  '05-'06 school years, if she had been chosen for those, how

10  would she have been compensated?

11  A.    Day-to-day.

12  Q.    Which is what?

13  A.    Depending on the number of days that she had accumulated,

14  $70, $80 or $90 days per day.

15  Q.    How does that compare to what a full-time teacher would

16  make in one of these other school districts?

17  A.    Less than half.

18  Q.    Which is less than half of which?

19  A.    Would be less than half of a first step per diem in any

20  of the districts.

21  Q.    Those day-to-day sub rates that you just mentioned?

22  A.    Correct.

23  Q.    Now, Ms. Wagner talked somewhat and introduced those

24  forms that regular teachers fill out when they've had a sub in

25  their class, right?

138

1  A.   Yes.

2  Q.   And, in fact, it sounds like it's partially filled out by

3  the sub and there are comments written on there by the

4  permanent teacher, right?

5  A.   Yes.

6  Q.   What's the purpose of those forms?

7  A.   They're summary sheets, they're there for the benefit of

8  the teacher.  As far as just making sure everything was done

9  the way it was supposed to be done.  If there was any reason

10  why it wasn't done.  It's a communication sheet for feedback.

11  Communication between the substitute teacher and the teacher.

12  And then once the sheet has been reviewed by the teacher, it's

13  forwarded to the office.  And the principal signs off on it.

14  The principal most often reviews it to see if there's any

15  problems that have occurred.  Any problems that were brought to

16  the attention by the teacher.  And if not, they're just filed.

17  Q.   Do you see them?

18  A.   Very, very few.

19  Q.   Can you approximate how many you've seen -- let's say

20  this school year that just ended?

21  A.    Probably less than five.

22  Q.    Do they play any role in the selection of long-term subs

23  or permanent employees?

24  A.    No, none.

25  Q.    Did you write "no way" on a document that was involved in

139

1  one of the interview processes that we talked about?

2  A.  Yes.

3  Q.  You heard the testimony about it?

4  A.  Yes.

5  Q.  Why did you write that?

6  A.  I wrote it down because it was the lowest of five scores

7  that we were looking at, out of that group of 17.  It was just

8  to make a mental note to myself.

9  Q.  Did you intend for anyone else to ever see that?

10  A.  No.

11        THE COURT:  Which score was this?

12        MR. KUHAR:  It was a comment, I'm sorry, it was a

13  notation made on the interview sheet, that you guys put into

14  evidence, do you remember which one it was?

15        MR. MEAD:  I don't believe we put it into evidence,

16  but it had been Exhibit No. 10 for us in our book.

17        THE COURT:  Is it the evaluation form for Ms.

18  Wagner?

19        MR. MEAD:  No, it's someone else's evaluation

20  form -- from 2002, it's the back page of another interview

21  form.  In which there are handwritten notes by Mr. Heller, one

22  of which indicates "no way," with different names listed after

23  that.

24          THE COURT:  All right.

25          MR. KUHAR:  The five people who scored the poorest.

140

1        THE COURT:  All right.  As I'm sitting here

2   thinking, so I'm clear, the nepotism, the official nepotism

3   policy, I assume it's written someplace, is that right?

4        THE WITNESS:  Yes, it's district policy.

5        THE COURT:  The district policy, the nepotism

6   policy, is not that a relative of a candidate must recuse

7   himself or herself from scoring that candidate, but only that

8   you have a board member there during the interview process, is

9   that right?

10        THE WITNESS:  Correct.

11        MR. KUHAR:  Your Honor, we move for the admission of

12   Exhibit J, which does contain the nepotism policy.

13        THE COURT:  It's admitted.

14   BY MR. KUHAR:

15   Q.   Mr. Heller, when your committee looks at candidates, I

16   assume some of them have a regular teaching certificate and

17   some of them have the paperwork indicating they will eventually

18   get a certificate, but that they've just graduated.  And some

19   people have these certificates from other states, correct?

20  A.   Correct.

21  Q.   Does the committee weight any of those as being any

22  better than the others when -- I'm sorry, did the interview

23  committee weight a candidate having any one of those three as

24  being any better than having the others; do you understand?

25        THE COURT:  I don't understand the question.

141

1        MR. KUHAR:  Okay.

2    BY MR. KUHAR:

3    Q.    Some applicants have paperwork that indicates they're

4    going to receive a certificate but they've just graduated,

5    correct?

6    A.    Right.

7    Q.    Some people actually have the permanent certificate,

8    correct?

9    A.    Correct.

10   Q.    Some people, such as Naomi Uy-Moore, brought with them a

11   certificate from another state, which you expected to be

12   honored through reciprocity?

13   A.    Correct.

14   Q.    When your committee looks at candidates, do they consider

15   a candidate possessing any one of those as being better than a

16   candidate possessing one of the other ones?

17   A.    No.

18        MR. KUHAR:  Thank you, I have no further questions

19   at this time.

20          THE COURT:  All right.  Mr. Mead.

21                    CROSS-EXAMINATION

22  BY MR. MEAD:

23  Q.    Mr. Heller, am I correct that you stated that you taught

24  in the Franklin School District for a long time?

25  A.    No.

142

1  Q.  Did you teach in Franklin at all?

2  A.  I student taught there.

3  Q.  Student taught?

4  A.  Yes.

5  Q.  Are you from that area?

6  A.  No.

7  Q.  Where are you from?

8  A.  From the Williamsport area.

9  Q.  Williamsport, New York or Pennsylvania?

10  A.  Pennsylvania.

11  Q.  And am I also correct that you were a wrestling coach at

12  different universities and different high schools for a number

13  of years?

14  A.  Yes.

15  Q.  Head wrestling coach?

16  A.  Two high schools.

17  Q.  Two different high schools?

18  A.  Yes.

19  Q.  But you were also a wrestling coach as some universities

20  as well?

21  A.   Two.

22  Q.   Two universities, Bucknell and Clarion, if I'm not

23  mistaken?

24  A.   That's correct.

25  Q.   When you were a wrestling coach you worked with what

143

1    years, freshmen through seniors?

2    A.    Yeah.

3    Q.    So when they came in --

4            THE COURT:  Was this high school or college?

5    BY MR. MEAD:

6    Q.    High school or college, did you work with freshmen

7    through seniors?

8    A.    Both.

9    Q.    Both?

10   A.    Yeah, at college or the high school level, yeah.

11   Q.    And, of course, when freshmen came in, they were there to

12   learn, they were there to learn from you and from their

13   experience as well, correct?

14   A.    Correct.

15           MR. KUHAR:  Your Honor, may I have an offer of

16   proof?

17           MR. MEAD:  If I could have a little leeway here,

18   your Honor, I'm just showing that experience is helpful.

19           THE COURT:  It's background, let's see where it

20  goes.  Go ahead.

21  BY MR. MEAD:

22  Q.   Well, you would agree with me that as you were a coach,

23  you would see improvements in most of the students, student

24  athletes, from their freshman year to their senior year,

25  correct?

144

1   A.   Uh-huh.

2   Q.   That would be based on either your coaching or your

3   experience, correct?

4   A.   Correct.

5   Q.   And if I'm not mistaken, you were also a student teacher

6   at one point, correct?

7   A.   Correct.

8   Q.   How long did you student teach?

9   A.   A semester.

10   Q.   Did you see some improvement in yourself over the course

11   of a semester?

12   A.   Yes.

13   Q.   Now, your earlier testimony and I realize there's been a

14   lot of testimony the last few days, was in 2002 when you came

15   to the school district of Crawford Central, it didn't, in your

16   words, it didn't matter to you what the prior practices were,

17   correct?

18   A.   Could you say that one more time?

19   Q.   Certainly.  You were asked when you came to the school

20   district in 2002 by counsel, did it matter to you what the

21   prior practices were regarding what happened in the district

22   previously, do you remember answering that question?

23   A.   On what?

24   Q.   You were asked generally did it matter to you what the

25   prior practices were?

145

1   A.   I don't recall that.

2          MR. KUHAR:  Your Honor, that's a misstatement, I

3   understand there's some leeway, that's why I didn't object the

4   first time --

5          THE COURT:  If your recollection is that wasn't the

6   question you were asked, then you can clarify it as to what you

7   think you were asked.

8          THE WITNESS:  What I thought I was asked was on how

9   to conduct the selection process of candidates.

10  BY MR. MEAD:

11  Q.   Fair enough.  So, according to your testimony, as far as

12  selecting candidates for positions, it didn't matter to you

13  what had happened in the past, right, what processes happened

14  in the past?

15  A.   It did or didn't?

16  Q.   Did not?

17  A.   I didn't take that into consideration.

18  Q.   Because you're the new sheriff in town, right, it's your

19  game now, right?

20   A.   I was charged with that responsibility of selecting the

21   best candidates possible.

22   Q.   You were in charge of that, you'd agree with that,

23   correct?

24   A.   Yes.

25   Q.   And as such, your testimony has been that in 2002 you

146

1  observed the plaintiff one time?

2  A.    Correct.

3  Q.    Teaching, for 39 minutes?

4  A.    Correct.

5  Q.    And since 2002 you've had two interviews of the

6  plaintiff, correct?

7  A.    That's correct.

8  Q.    20 minutes in 2002, December of 2002, correct?

9  A.    20 to 30.

10  Q.    20 to 30 minutes, and a one-half hour interview in March

11  of 2004?

12  A.    Actually, two.  She went through two interviews in 2004.

13  Q.    Were you at both interviews?

14  A.    I was at one.

15  Q.    I'm asking you personally, you saw her one time for a

16  one-half hour interview in March of 2004, correct?

17  A.    That's correct.

18  Q.    And you know that she subbed approximately 600 days,

19  would you agree with that?

20  A.   That would be a fair statement.

21  Q.   And she's subbed probably at least 200 times since March

22  of '04, hasn't she?

23  A.   Probably.

24  Q.   Have you observed her in her class student teaching at

25  all since your first observation in '02?

147

1  A.   No, I haven't.

2        THE COURT:  You said student teaching?

3        MR. MEAD:  I'm sorry, you're absolutely right,

4  substituting teaching, your Honor.

5        THE WITNESS:  No, I haven't.

6  BY MR. MEAD:

7  Q.   So you don't know if she has improved in the classroom,

8  do you?

9  A.   I'm not exactly sure how to answer that.

10  Q.   Well, have you personally observed her teach in the

11  classroom since 2002?

12  A.   I have not been in her classroom since I have observed

13  her in 2002.

14  Q.   And you've testified today that you hired what, nine new

15  teachers in 2005 and 2006?

16        THE COURT:  How many did you say?

17        MR. MEAD:  I said nine, I believe it's four

18  long-term substitutes, four permanent, and one part-time

19  substitute; do you agree to that?

20          THE WITNESS:  Yeah, I think.

21   BY MR. MEAD:

22   Q.    How many interviews did you conduct to get these nine

23   people?

24   A.    In 2004?

25   Q.    In 2004 for the 2005-2006 school year?

148

1        MR. KUHAR:  Objection, the '04 interviews were not

2   for the '05-'06 school year, so I think it's a confusing

3   question.

4        MR. MEAD:  Well, let me ask you this.

5        THE COURT:  Excuse me, are you talking about how

6   many interviews did you conduct for interviews in which the

7   plaintiff did not participate?

8        MR. MEAD:  Yes.  And Mr. Kuhar may be correct on

9   that, your Honor, if I may clear that up.

10        THE COURT:  All right.

11   BY MR. MEAD:

12   Q.    The interviews you've been talking about for March of

13   2004, that was for the 2004-2005 school year, correct?

14   A.    Correct.

15   Q.    For the school year 2005-2006, how many interviews did

16   you conduct?

17   A.    I can't say for sure.

18   Q.    Well, we agree that there were nine new teachers hired

19   for that year, correct, 2005-2006; can we agree to that?

20  A.   If you give me a piece of paper, I'll look at it.

21  Q.   You've got every book you want in front of you, you've

22  been looking at them for a long time, feel free.

23        MR. KUHAR:  If he could direct him to a certain

24  page.

25        THE COURT:  Do you know where he should look?

1          MR. MEAD:  No, I don't.

2          MR. KUHAR:  If I could assist.

3          THE COURT:  All right.

4          MR. KUHAR:  I think he's referring to Exhibit O.

5          THE COURT:  Would these nine positions be positions

6   that were not generated as a result of the March, 2004

7   interviews --

8          MR. MEAD:  Not generated.

9          THE COURT:  So there would have been subsequent

10  interviews that generated those positions, is that right?

11         MR. MEAD:  Right, your Honor, yes.

12         MR. KUHAR:  There's been some discussion, are you

13  sure you understand the question, Mr. Heller?

14         THE WITNESS:  Let me restate it.  You want me to

15  tell you how many different people we've interviewed in order

16  to complete the process in which we selected these teachers

17  from 2005?

18         THE COURT:  Here's my confusion, I'm sorry to

19  interrupt you, Mr. Heller.  It's important that I understand

20   what's going on.  You interviewed people in March of 2004?

21          THE WITNESS:  Correct.

22          THE COURT:  And that was the list, that was some 17

23   people you've already testified about, correct?

24          THE WITNESS:  In 2002 we did 17 people.

25          THE COURT:  I apologize.  How many did you interview

150

1  in 2004?

2        THE WITNESS:  Thirty-nine.

3        THE COURT:  That's right, 39.  Now, those people

4  that were selected as a result of the March, 2004 interviews,

5  would they not have been selected for positions during the

6  2005-2006 school year or would that have been -- that would

7  have been 2004-2005?

8        THE WITNESS:  Yes.

9        THE COURT:  All right.

10  BY MR. MEAD:

11  Q.   That's why my question is based on what I'm seeing in

12  Exhibit 15, behind tab 15, I believe it's Exhibit O, that there

13  were a number of people hired in July, 2005 and August, 2005;

14  do you see what I'm referring to?

15  A.   Yes, I do.  You want to know how many people overall we

16  interviewed?

17  Q.   Yes, I do.

18  A.   Approximately?

19  Q.   Approximately.

20        MR. KUHAR:  This is July, '05 through September,

21   '05?

22   BY MR. MEAD:

23   Q.    For the school year 2005-2006?

24   A.    I would say a minimum of 30.

25   Q.    Thirty for the 2005-2006?

151

1  A.    Total interviews?

2  Q.    Total interviews?

3  A.    I would say in the neighborhood of about 30, that's my

4  best guess.

5  Q.    Now, the following the school year, 2006-2007, can we

6  agree that there were --

7  A.    Excuse me, Mr. Mead.

8  Q.    Sure.

9  A.    I was including through the current.

10  Q.    You're saying 2005-2006 and 2006-2007?

11  A.    That's what I'm thinking, yes.

12  Q.    But that wasn't my question.  Are you telling me that 30

13  people total were interviewed for those two school years?

14  A.    I'm saying it's somewhere in the neighborhood of about 30

15  interviews, meaning that somebody could have been interviewed

16  twice, that's a possibility.

17  Q.    So we can move on, from July, 2005 up to January, 2007,

18  which indicates on this exhibit is when people were hired, you

19  believe there were 30 interviews conducted for those positions?

20   A.   Approximately.

21   Q.   Approximately.  Now, is it fair to say that there is a

22   pre-screening committee which decides who gets interviewed?

23        MR. KUHAR:  Again, that question misstates the

24   testimony.

25        THE COURT:  Let him answer the question, I would

152

1  permit that question with a jury, it's up to him to answer the

2  question.  Overruled.

3       THE WITNESS:  Selection committee, yeah.

4  BY MR. MEAD:

5  Q.   Is the selection committee that actually does the

6  interviews the same selection committee who decides who gets

7  interviews?

8  A.   Yes.

9  Q.   And am I also correct that you are in charge of picking

10  who's on the interview committee?

11  A.   That's correct.

12  Q.   So it's your decision who's going to get an interview --

13  I'm sorry, your decision who gets on the interview committee?

14  A.   Yes.

15  Q.   And am I correct that everyone on this interview

16  committee reports to you?

17  A.   Yes.

18  Q.   Now, if you can take a look at tab 13 and 14 -- tab 13,

19  first of all, of the exhibit that your attorney provided to you

20  up there.  Do you see tab 13, the page first page, Exhibit M?

21  A.   Yes, I do.

22  Q.   After the time there's initials "ST" under at least four

23  of these people, what does that mean?

24  A.   I don't know, I can't tell you.

25  Q.   Does it mean student teacher, substitute teacher -- you

153

1    don't know?

2    A.    I don't know, I didn't write that.

3    Q.    And if you flip ahead a few pages where you have the

4    evaluations and the numbers -- remember, it's about four pages,

5    you have a lot of written numbers there?

6    A.    Yes.

7    Q.    You testified earlier that Amy Szalewicz -- is that the

8    correct pronunciation?

9    A.    Yes.

10   Q.    She was what, number 10 out of 17, correct?

11   A.    9 or 10, I'm not sure.

12   Q.    Go ahead and add it up if you want to?

13   A.    10, you're correct.

14   Q.    Number 10 out of 17, that's how she did on the interview

15   collectively -- correct, everybody ranked her totally as number

16   10 out of 17?

17   A.    That's correct.

18   Q.    But she was still hired despite her ranking, correct?

19   A.    Correct.

file:///A|/WAGDAY3.TXT

20  Q.   If I could show you Exhibit 10 from my notebook -- if you

21  could look at Exhibit No. 10 of my notebook, can you tell me

22  what that is?

23  A.   Could you say it one more time.

24  Q.   Sure, take a look at Exhibit No. 10?

25  A.   I got that.

154

1  Q.   All right.  If you turn to the page, it looks like the

2  first page is employment interview analysis, correct; do you

3  see number 10?

4  A.   Okay.  Are you talking about this one?

5  Q.   I'm talking about that one, flip the page.

6  A.   I got it.

7  Q.   There seems to be handwriting there, is that your

8  handwriting?

9  A.   Yes, it is.

10  Q.   Now, maybe about halfway down it's written "no way" and

11  then a number of arrows to candidates, correct?

12       THE COURT:  What exhibit number is this?

13       MR. MEAD:  Exhibit No. 10, your Honor, but it's in

14  my exhibits, plaintiff's exhibits.

15       THE COURT:  All right.

16  BY MR. MEAD:

17  Q.   That's your handwriting, sir?

18  A.   Yes.

19  Q.   You write the word "no way" next to a number of

20  candidates, including Rowena Wagner, correct?

21  A.  Correct.

22  Q.  You also wrote that next to Karen Jamieson, correct?

23  A.  That's right.

24  Q.  And Ms. Jamieson was subsequently hired, was she not?

25  A.  Eventually.

155

1  Q.   Eventually, after a year or two of subbing after this,

2  correct?

3  A.   Yes.

4  Q.   What race is Ms. Jamieson?

5  A.   White, Caucasian.

6  Q.   By the way, what race was the interviewing committee that

7  you selected?

8  A.   Caucasian.

9  Q.   All of them?

10  A.   Yes.

11  Q.   If you turn to Defendant's Exhibit N, do you see that,

12  we're switching from my notebook to the notebook your counsel

13  gave you.  Can you look at Exhibit N, which is after tab 14;

14  do you have that in front of you?

15  A.   Yes.

16  Q.   On the front page there's a category called communication

17  ability, do you see that?

18  A.   Yes.

19  Q.   And you rated Ms. Wagner 3, correct?

20  A.  Uh-huh.

21  Q.  Correct?

22  A.  That's correct.

23  Q.  Which means sufficient for adequate job performance,

24  correct?

25  A.  Yes.

156

1  Q.   And turn the page, if you would.  The first comment --

2  those are your comments, correct, handwritten, the second page

3  there, is that your writing?

4  A.   Yeah.

5  Q.   The very first thing written is "Philippines," correct?

6  A.   That's correct.

7  Q.   Anywhere else in your interview forms did you write

8  anybody's nationality or place of origin?

9  A.   No.

10  Q.   And you've earlier commented that, to your knowledge,

11  everyone that was interviewed during this time period, 2002,

12  was born in the United States; do you remember saying that?

13  A.   Uh-huh.

14     THE COURT:  Yes or no?

15  BY MR. MEAD:

16  Q.   Yes or no?

17  A.   Everybody accept for Ms. Wagner I said.

18  Q.   How did you know that?

19  A.   Because she said it in the interview.

20  Q.  How did you know everybody else was born in the United

21  States?

22  A.  I guess it was an assumption.

23  Q.  It was an assumption, did you ask if they were born in

24  the United States?

25  A.  No, I didn't.

1  Q.   Did you ask Ms. Wagner if she was born in the

2  Philippines?

3  A.   She said that she was in her interview, that's why I

4  wrote it down.

5  Q.   So you thought that was so significant you wrote it down

6  first, Philippines, correct?

7  A.   Just a little mental note, that's all it's for.

8  Q.   Why did you need that mental note, that she was from the

9  Philippines?

10  A.   I just wrote it down.

11  Q.   Why?

12  A.   I don't know why.

13  Q.   You were also asked if she had any other qualifications

14  besides what was said on this form, correct; you were asked did

15  she have any other qualifications that stood out, do you

16  remember that question?

17  A.   Yes.

18  Q.   And you said no -- answer yes or no?

19  A.   Yes.

20  Q.   Is the fact she is from the Philippines, is that a

21  different qualification that adds or detracts from her

22  qualifications?

23  A.   It certainly doesn't detract.

24  Q.   Does it help?

25  A.   Yes.

158

1  Q.   Why does it help?

2  A.   I think the cultural diversity.

3  Q.   So you would agree that someone from the Philippines

4  should get a higher rating overall, like you've been talking

5  about everyone else, because they add diversity, correct?

6  A.   Say that again.

7  Q.   Certainly.  You spent about an hour or so talking about

8  the fact that you didn't only look at interview reports of

9  these people but you looked at other factors, correct; do you

10  remember going over all of that?

11  A.   Yes.

12  Q.   So you're agreeing right now that the fact she's from the

13  Philippines is a positive?

14  A.   I don't think it's a negative.

15  Q.   Is it a positive?

16  A.   Yes, I would say it's a positive.

17  Q.   However, when you were asked by your counsel whether

18  there was anything else that added to Ms. Wagner's interview,

19  you didn't mention the fact that she was from the Philippines,

20  correct?

21  A.   No, I didn't.

22  Q.   And you'll agree based on this, your own documents here,

23  the best scores didn't always win, did they?

24  A.   I wouldn't say they always did, I said it was a starting

25  point.

1  Q.   Because there are other factors you'd agree besides just

2  the scoring that you did?

3  A.   Exactly.

4  Q.   And somebody from the Philippines would get a little

5  more, it would be a little plus because you view that as

6  positive, correct?

7  A.   Like I said, it's a positive, yes.

8  Q.   Now, am I correct that the claim with the PHRC was filed

9  in February, 2003, do you agree with that?

10  A.   Yes.

11  Q.   Would you also agree that you were the main point man

12  back at the district as far as responding to this PHRC

13  complaint, correct?

14  A.   I think it came through the superintendent.

15  Q.   All right, let me hand you what I've marked as Exhibit

16  No. 41; is that your signature on Exhibit No. 41?

17  A.   Yes.

18  Q.   And it's a letter dated April 10th to Mr. Perhacs from

19  Knox McLaughlin, correct?

20  A.   Uh-huh.

21  Q.   And it says Dear Rich, I've reviewed the complaint and

22  statement of position, it is accurate, and two documents are

23  signed, thanks; and you signed it?

24  A.   That's correct.

25  Q.   And, also, the second page is a verification in which you

160

1   also sign, correct?

2   A.   Correct.

3   Q.   And it says here that you're authorized to execute this

4   verification on behalf of the respondent, who is the school

5   district, correct?

6   A.   Correct.

7   Q.   And all the facts are true and correct to the best of

8   your knowledge, information and belief, correct?

9   A.   Correct.

10  Q.   So, basically, you were the one they were going to for

11  the PHRC claim -- as far as you were the liaison between the

12  lawyer and the school district, correct?

13  A.   Correct.

14  Q.   As a matter of fact, you read the complaint because you

15  did the verification, correct?

16  A.   Correct.

17  Q.   Is there anybody else in the school district named in

18  that complaint besides you?

19       THE COURT:  Excuse me a second, you said you read

20   the complaint because you did the verification.  You mean he

21   read the position statement -- I don't know what you mean?

22          MR. MEAD:  He said he reviewed the complaint and the

23   statement of position, he also executed the verification on

24   behalf of the respondent.

25          THE COURT:  All right, I misunderstood.  Is the

161

1  position statement of record in this case?

2      MR. MEAD:  No, your Honor, I do have a copy of the

3  complaint.

4      THE COURT:  The PHRC complaint, okay.

5  BY MR. MEAD:

6  Q.   And I'll be happy to show you a copy of this, sir, but

7  would you agree with me that you were the only administrator

8  from the district who is named in this complaint to the PHRC?

9  A.   Are you telling me that I am?

10  Q.   You reviewed it.

11  A.   It's been a long time since I reviewed it.

12  Q.   Take a look?

13  A.   Okay.

14      THE COURT:  Is that part of the record?

15      MR. MEAD:  No, your Honor, I won't introduce it, I

16  don't need to introduce it.

17      THE COURT:  What is it?

18      MR. MEAD:  It's a PHRC complaint, your Honor.

19      THE COURT:  It has to be part of the record, didn't

20  I see it somewhere?

21      MR. KUHAR:  When we had the Robinson discussion on

_____

22  the first day, you looked at the PHRC complaint and the

23  findings of the PHRC, I was under the impression those were

24  admitted in that process.

25      THE COURT:  Was that in your book?

1        THE CLERK:  Exhibit PP I have as the charge.

2        THE COURT:  When he's done looking at it, let me see

3   it.  But here's my question.  Do I have in these voluminous

4   books someplace, is there of record in this case the position

5   statement filed by the district?

6        MR. KUHAR:  I don't think so, your Honor.

7        MR. MEAD:  I don't think so, your Honor.

8        THE COURT:  All right.  Mr. Mead, go ahead.

9   BY MR. MEAD:

10  Q.    Sir, is there anybody else named in the district besides

11  you?

12  A.    No.

13  Q.    So you're the only administrator named in that complaint

14  to the PHRC, correct?

15  A.    Correct.

16  Q.    So it's fair to say that come the interview time in March

17  of '04, you were well aware that Ms. Wagner had filed a PHRC

18  complaint, correct?

19  A.    Oh, yeah.

20  Q.    Sure, because you were named in it, correct?

21  A.    Yes.

22  Q.    Ever been named in a PHRC complaint before?

23  A.    I don't know if I was specifically named in one, but I

24  was involved in the process prior to, yes.

25  Q.    Were you ever sued before?

163

1  A.   Yes.

2       MR. KUHAR:  I object to that unless it's in the

3  employment context.

4       MR. MEAD:  I'll limit it to the employment context.

5  BY MR. MEAD:

6  Q.   Were you ever sued in the employment context?

7  A.   Yes.

8  Q.   What were you sued for?

9  A.   I don't know what I was sued for.  I mean I'm not exactly

10  sure, it had to do with a situation in the district.

11  Q.   With the Crawford Central School District?

12  A.   Yes.

13  Q.   Was this the first time you were sued, when you were

14  eventually sued in September of '04?

15       MR. KUHAR:  By Ms. Wagner, I assume you mean, the

16  other one hasn't been dated?

17  BY MR. MEAD:

18  Q.   That's what I'm asking, this is the first time you were

19  ever sued in this capacity, in your work capacity was the first

20   time you were ever sued in September of 2004?

21   A.   No, I don't think so.

22   Q.   You've been sued before?

23   A.   Yes, one other time.

24   Q.   And when was that?

25   A.   I don't know what the exact date was, but it was since

1   being employed at Crawford Central School District.

2   Q.   So it was in the last five, six years?

3   A.   Yeah.

4   Q.   Regarding the PHRC complaint, I'm also correct that you

5   were the person who went to the PHRC hearing?

6   A.   That's correct.

7   Q.   Let's go up to March, 2004.  So in March, 2004, you're

8   well aware of the PHRC claim, there's no question about that?

9   A.   Yes.

10   Q.   You're basically responding to the allegations in the

11   PHRC claim?

12   A.   Yes.

13   Q.   The same time you hand pick the committee that's going to

14   do interviews, don't you?

15   A.   For 2004?

16   Q.   For March, 2004?

17   A.   Yes.

18   Q.   And, again, this interview team, all Caucasians, correct?

19   A.   Yes.

20  Q.    All reported to you?

21  A.    Yes.

22  Q.    Now -- let me move back, they all knew about the PHRC

23  claim, didn't they?

24  A.    You know I can't honestly say that they did.

25          MR. KUHAR:  Objection, in that I don't know what

165

1   they all knew --

2          MR. MEAD:  The interview committee.

3          MR. KUHAR:  Which one, they did vary somewhat over

4   time?

5          MR. MEAD:  There's only one PHRC complaint.

6          MR. KUHAR:  I thought you were asking about the

7   interview committee, there were multiple ones.

8          THE COURT:  Are you asking about the interview

9   committee in --

10  BY MR. MEAD:

11  Q.    I was directing his attention to March, 2004.  Who do you

12  know knew about it and who do you know didn't know about it?

13  A.    Well, the only people I know for sure that knew about it

14  were the two people that accompanied me to the hearing.  I

15  didn't announce it.

16  Q.    Who are they?

17  A.    Mr. Meader and Mr. Stanton.

18  Q.    Both who were on the committee, the interview committee?

19  A.    They're elementary principals, they belong on the

20  committee.

21  Q.    You say that after interviews were conducted, the group

22  would talk about the candidates, correct?

23  A.    That's correct.

24  Q.    Well, after this happened -- let's say you interview Ms.

25  Wagner.  Are you telling us that at no point it was discussed

1  that she had a PHRC claim which was filed?

2  A.   I'm going to tell you that I never had any discussion

3  with that group about the PHRC, never.

4  Q.   I didn't ask if you had any discussion, while you were

5  present do you know if it was discussed?

6  A.   I would say that when I was there, it wasn't discussed.

7  I can't tell you otherwise.

8  Q.   Now, do you know a Brenda Schoonover?

9  A.   Yes.

10  Q.   That's S-c-h-o-o-n-o-v-e-r?

11  A.   Yes.

12  Q.   Did she report to you?

13  A.   Yes.

14  Q.   I'll hand you what I have marked as Exhibit No. 40, if

15  you could look at the last line of this --

16        MR. MEAD:  And I'm not moving this into evidence or

17  anything at this point, your Honor.

18  BY MR. MEAD:

19  Q.   This appears to be an e-mail from Brenda Schoonover to

20   Harriet Powell, subject checking in; do you see that?

21          MR. KUHAR:  Your Honor, I'm objecting to any

22   questioning about this, there's been no authentication of it.

23          THE COURT:  First of all, who are these people?

24          MR. MEAD:  Brenda Schoonover is one of the persons

25   on the committee that was interviewing in 2004, I believe she

167

1   was a principal at the time.

2         THE COURT:  Who's Harriet Powell?

3         MR. MEAD:  She is a teacher.

4         THE COURT:  So this is Harriet sending an e-mail to

5   Brenda?

6         MR. MEAD:  Brenda sending an e-mail to Harriet

7   Powell.  If I could cut through it, your Honor, why I'm asking

8   this question is the last line says "now, can I check your

9   memory, Rowena Wagner did her field experience with you, do you

10   remember how she did, do you have any concerns, if you can

11   recall, please let me know."  The date of this is March 31,

12   2003.  I was going to ask the witness if he knew or if he had

13   told Ms. Schoonover about this PHRC claim.

14         MR. KUHAR:  Your Honor, I certainly don't mind him

15   asking, I'm sorry, I don't object to him asking whether he had

16   a conversation with Ms. Schoonover, however, I don't think it's

17   necessary to refer to this to do so.  We don't know if this is

18   authenticate, we don't know why it was sent --

19         THE COURT:  I'm going to admit it without it being

20   authenticated, you can ask him the question.

21          MR. MEAD:  I'm not going to move for it, your Honor.

22          THE COURT:  All right.

23   BY MR. MEAD:

24   Q.   What I was going to ask you is do you recall having any

25   conversation with Ms. Schoonover from the time period that the

168

1   PHRC claim was filed in February, 2003, until March 31, 2003,

2   when we have an e-mail from Ms. Schoonover to a teacher asking

3   how Rowena Wagner did?

4          MR. KUHAR:  Again, your Honor, the question goes to

5   this e-mail.

6          THE COURT:  Well, I'm just disregarding that part of

7   it, I'm listening for the answer as to whether he had a

8   conversation with this person.

9          THE WITNESS:  Are you asking me if I told Brenda

10  Schoonover to do this?

11  BY MR. MEAD:

12  Q.   No, did you tell her about the PHRC complaint?

13  A.   No.

14  Q.   So your testimony is Brenda Schoonover didn't know about

15  the PHRC complaint?

16  A.   She did know?

17  Q.   She did know?

18  A.   I don't know if she knew, I didn't tell her.

19          THE COURT:  Hang on a second, he testified he didn't

20   tell her.

21         MR. MEAD:  That's fine.

22   BY MR. MEAD:

23   Q.    And you started to say if she found out, it didn't come

24   from you, correct?

25   A.    That's right.

169

1  Q.   Are you saying that in the Crawford Central School

2  District, to your knowledge, only three people on that

3  interview committee were aware of the PHRC filing by Ms. Wagner

4  during the time period of that interview in March of 2004?

5  A.   Say that again.

6        MR. MEAD:  Could you read the question back, Ron.

7        THE COURT:  I can speed it along.  He said, the

8  question was are you saying that, to your knowledge, only three

9  people on the interview committee were aware of the PHRC filing

10  in February of 2003 when the interviews were conducted in March

11  of 2004; was that your question?

12        MR. MEAD:  That's correct, your Honor.

13        THE WITNESS:  I can't say that I'm aware that other

14  people knew, other than Mr. Stanton, Mr. Meader, myself.  All I

15  can tell you is I did not announce it to the group, nor did I

16  have any conversations with other members on the committee.

17  BY MR. MEAD:

18  Q.   How about Ms. Good, do you know if she knew?

19  A.   She may have.

20  Q.  Now, these 2004 interview reports -- strike that if I

21  may.  Going back to December of 2002, you testified about a

22  Chad DuPont, correct?

23  A.  Yes.

24  Q.  He was hired at that point, wasn't he?

25  A.  He wasn't hired through board approval, no.

170

1  Q.   I'm going to hand you what we'll just mark as Plaintiff's

2  Exhibit No. 42, it's a letter dated December 20, 2002, to

3  Rowena Wagner.  If you could just take a look at it and tell me

4  if you wrote that letter?

5       MR. KUHAR:  Can I take a look at it.

6       MR. MEAD:   Sure, it's in my notebook here, I'll

7  show you where.

8  BY MR. MEAD:

9  Q.   Is that your letter?

10  A.   Yes, it is.

11       THE COURT:  What exhibit is it?

12       MR. MEAD:  Your Honor, I identified it for the

13  record as Exhibit 42.  But it's also included in our Exhibit

14  No. 29 to make it easier.  It's in my Exhibit No. 29,

15  approximately -- eight pages.

16       THE COURT:  Yours is the multicolored tabs, right?

17       MR. MEAD:  If I may, your Honor, if you would like

18  me to point that out, I'd be happy to do so.  Your Honor, for

19  the record's sake, I would like to refer to Exhibit 29, and I

20   would withdraw it being submitted as Exhibit No. 42, since it's

21   already in evidence.  But that is the one page I was referring

22   to.

23   BY MR. MEAD:

24   Q.    That was a letter written by you to Ms. Wagner, correct?

25   A.    Correct.

1  Q.    And at that point you were telling Ms. Wagner that Chad

2  DuPont had been hired, correct?

3  A.    That he was selected for a position that we just found

4  out about, that it wasn't considered a long-term position

5  because it wasn't within the 90-day period.

6  Q.    Well, what you are telling Ms. Wagner, I don't see

7  anything about a 90-day period in there, aren't you telling her

8  he has been hired?

9  A.    It doesn't say anything in there that these people are

10  all being board approved, either.

11  Q.    Was he not board approved?

12  A.    No, he wasn't board approved.

13  Q.    He was or was not?

14  A.    Not, he didn't teach a full semester.

15  Q.    But, in any event, you did send a letter to Ms. Wagner,

16  which you identified him as someone who was selected, would you

17  agree with that?

18  A.    Yes.

19  Q.    Now, if you could turn to Exhibit P, which is behind tab

20  16 of the defendant's exhibits?

21  A.  Yes.

22  Q.  Mr. DuPont is ranked even lower than Ms. Szalewicz, isn't

23  he?

24  A.  Yes, he is.

25  Q.  What is he ranked, number 12 out of 17?

1  A.   I'm sure that's the number.

2  Q.   So Mr. DuPont was recommended by you for a job, correct,

3  or the interviewing committee for a job, correct?

4  A.   It was the consensus of the interviewing committee to

5  select Chad DuPont for a job, yes.

6  Q.   So of the five people we talked about, there were 17

7  interviewed, you recommended number 10 and number 12, as well

8  as what, number 1, number 3 and number 5, correct?

9  A.   Correct.

10  Q.   By the way, the top applicant, Robert Bazylak, do you see

11  him?

12  A.   Yes.

13  Q.   He was also a nephew of a current teacher, wasn't he?

14  A.   He may have been.

15  Q.   And the number 3 candidate, Nikki Shearer, she was the

16  daughter-in-law of a current teacher, wasn't she?

17  A.   Yes.

18  Q.   By the way, Mr. Bazylak and Ms. Shearer, they were fresh

19  out of school, correct, they were just graduating?

20   A.   Just graduating.

21   Q.   In your evaluations of them, am I correct you gave them a

22   3 as far as experience?

23   A.   Uh-huh.

24   Q.   Is that what you gave them, a 3?

25   A.   Yes.

173

1    Q.    All right.  And you gave Ms. Wagner a 3 as well, didn't

2    you; despite the fact she had been teaching, subbing for over a

3    year, you ranked them a 3, all these people the same, a 3,

4    correct?

5    A.    Yes.

6    Q.    Two students who had never taught, had never substitute

7    taught, were ranked a 3 as well, correct, the same as Ms.

8    Wagner?

9    A.    Correct.

10   Q.    Let's go up to the 2004 hirings.  If you look at

11   Defendant's Exhibit No. 18, behind tab 18, it's Exhibit R, do

12   you see that?

13   A.    Yes, I do.

14   Q.    Meghan Porter ranked number 22 out of the 24, didn't she?

15   A.    Yes, she did.

16   Q.    She was hired?

17   A.    Long-term.

18   Q.    Long-term sub, she was a long-term sub.  She was ranked

19   number 22 out of 24, correct?

20   A.   That's correct.

21   Q.   Earlier you said you did not interview -- I'm sorry, you

22   did not select Ms. Wagner "she didn't qualify in terms of

23   score, she was not in the running."  Are you saying that

24   someone who was a 22 is qualified in terms of score and is in

25   the running?

174

1   A.   I think I explained that earlier what had happened.  She

2   interviewed with the first group and was very nervous, and her

3   scores were much lower.  And she kind of regained herself and

4   when she came to the second interview, I think she performed at

5   a much higher level.  I think that was taken into consideration

6   within the discussion.

7   Q.   I believe you also testified that you thought we should

8   give her a chance, isn't that how you testified?

9   A.   Because of that.  Because of just what I explained.

10   Q.   Despite her low scores, you thought you should give her a

11   chance, correct?

12   A.   Because of the experience that I just explained, yes.

13   Q.   Well, she had two years experience, correct?

14   A.   She had two years experience?

15   Q.   Did she, do you know?

16   A.   What do you mean two?

17   Q.   How many years experience did she have in 2004?

18        THE COURT:  What kind of experience?

19   BY MR. MEAD:

20  Q.  Long-term sub, short-term sub, do you know?

21  A.  In 2004 she had experience outside of our district, not

22  in our district.

23  Q.  So you had never seen her teach, in other words?

24  A.  Personally, I have never seen her teach.

25  Q.  In fact, if we look at your employment interview analysis

175

1  of her, which is behind tab 20, Exhibit T, please flip through

2  it?

3  A.    Yes.

4  Q.    In category number three, instructional delivery, you

5  gave her a 2, is that correct?

6  A.    Uh-huh.

7        THE COURT:  Yes or no?

8        THE WITNESS:  Yes.

9  BY MR. MEAD:

10  Q.    So that was, in your mind at least, a deficiency?

11  A.    In my mind.

12  Q.    Yes, a deficiency?

13  A.    I'm one person, in my mind.

14  Q.    Sure.

15        MR. KUHAR:  Your Honor, I guess we would call this

16  an offer, and then we had a stipulation already, that these

17  score sheets accurately represent -- I thought the stipulation

18  did extend to him, that's why I didn't ask him essentially

19  about these '04 interviews that he's asking him about right

20    now.

21         MR. MEAD:  That's fine, your Honor, I'm asking him

22    if that's what he thought.  If that's our stipulation, the

23    people wrote down what they thought about the interview, he

24    thought it was a 2.

25         THE COURT:  That's what the stipulation was I

176

1  thought.  That every score reflected by any of the raters

2  accurately reflects what they believed in their own mind to be

3  the appropriate score for that category.

4      MR. KUHAR:  That's what I thought it was.

5      MR. MEAD:  That's fine.  That's why I asked him if

6  she rated at 2 on that.

7      THE COURT:  He did.

8  BY MR. MEAD:

9  Q.   All right.  Now, am I also correct that Ms. Porter's

10  average score overall was 18, and I'm looking at Exhibit 19 --

11  behind 19, Defendant's Exhibit S, do you see that?

12  A.   Yes, I see it.

13  Q.   So she scored an average score of 18, correct, Meghan

14  Porter?

15  A.   Uh-huh.

16  Q.   And she was -- let's see the one in front of her was

17  Tammy Foster at 19.9, correct, is that what you see on your

18  chart?

19  A.   I'm in the wrong place.

20  Q.   Look at Defendant's Exhibit S, which is behind tab 19?

21  A.   Yes, I have it.

22  Q.   Did you see it now?

23  A.   Yes, I see it.

24  Q.   I'm saying Tammy Foster is at 19.9, correct?

25  A.   Correct.

177

1  Q.    Meghan Porter is 18.0, correct?

2  A.    Correct.

3  Q.    Then Rowena Wagner at 17.0.  Now, if you could turn the

4  page, there's also a Leslie Jensen, correct?

5  A.    Correct.

6  Q.    Her score was 18.4 average, correct?

7  A.    Yes.

8  Q.    She was hired as well, wasn't she?

9  A.    Excuse me.

10  Q.    She was hired, wasn't she?

11  A.    Yes.  Gifted, part-time.

12  Q.    She was a part-time hire?

13  A.    Part-time gifted.

14  Q.    So, again, we can agree that as in 2002, in March of

15  2004, the highest scores were not always hired, correct?

16  A.    If you're asking me did we go right one, two, three,

17  four, right down the line in descending order and placed people

18  in positions, no, we didn't follow that completely.

19  Q.    By the way, if you could look at tab 20, Defendant's T,

20  which is Rowena Wagner's interview analysis?

21  A.   Yes.

22  Q.   The second one, classroom environment, it looks like you

23  wrote down a 3, and then you changed it to a 2, is that

24  correct?

25  A.   Yes.

178

1   Q.   Now, let's go up to September, 2004.  You were aware of

2   the lawsuit filed by Ms. Wagner, correct, you were named as a

3   defendant?

4   A.   Yes, as soon as it came out I was aware of it, that was

5   September of 2004, you're right.

6   Q.   You're a defendant?

7   A.   Yes, of course.

8   Q.   And you became very involved in the defense of the

9   lawsuit, is that correct?

10   A.   That's correct.

11   Q.   In fact, you attended every deposition in the whole case,

12   didn't you?

13   A.   In my position it was my responsibility, yes.

14   Q.   What, about 13, 14 depositions, you were at each one?

15   A.   Many, yes.

16   Q.   Now, at the same time you're defending this lawsuit on

17   the basis of, on behalf of the district, you're still making

18   decisions who's going to be interviewed down the line, aren't

19   you?

20   A.   Collectively.

21   Q.   Collectively.  But, of course, the people who are on the

22   decision-making committee all report to you and are all

23   selected by you, aren't they?

24   A.   Their positions select them more so than anything else.

25   I include all administrators, it's on their job description.

1  Q.   But you also agree they all report to you, don't they?

2  A.   Yes.

3  Q.   And you also agree that everybody knew about the lawsuit

4  once it was filed, to your knowledge?

5  A.   It was in the newspaper.

6        THE COURT:  What's the name of the paper down there?

7        THE WITNESS:  Meadville Tribune.

8        THE COURT:  Okay.

9  BY MR. MEAD:

10  Q.   You agree that once it hit the paper, it was pretty well

11  known, that's fair to say, right?

12  A.   I would say that it was very well known.

13  Q.   Now, you were also in charge of minority recruiting and

14  still are, aren't you?

15  A.   Yes.

16  Q.   And I believe earlier you testified that's an important

17  thing that you do, minority recruiting, correct?

18  A.   Yes.

19  Q.   And you also stated that you went to a job fair at one

20  time with a Mr. McFerrin, correct?

21  A.   Yes, I did.

22  Q.   When is the last job fair you went to?

23  A.   Well, the last job fair I went to was not this past

24  school year, I had to send representatives, I wasn't able to

25  attend.  I sent a representative to Edinboro, I sent a

180

1  representative to Slippery Rock.  But I attended a minimum of

2  two job fairs the past few years that I've been at Crawford

3  Central School District, just not this past year.

4  Q.    And besides attending the job fairs, what else have you

5  done in order to recruit minority teachers?

6  A.    We advertise regionally.

7  Q.    You advertise for minorities?

8  A.    We advertise for applicants.

9  Q.    You don't mention minorities?

10  A.    No.  But we advertise positions for applicants locally,

11  regionally, and we advertise over Penn-Link, which is

12  statewide.

13  Q.    But, again, you're advertising generally for teachers,

14  you're not advertising for minorities?

15  A.    No, I don't think we can do that, just say minority

16  applicants.

17  Q.    So, basically, so I'm clear, the only thing that you have

18  done regarding recruiting minorities is a couple job fairs and

19  some general advertising for positions in your district, is

20  that correct?

21  A.   That's correct.

22  Q.   Is that the extent of it?

23  A.   I would say that would be the extent of it.

24        THE COURT:  Mr. Mead, how much more do you have?

25        MR. MEAD:  Not much more, your Honor.  Maybe five,

181

1    ten minutes, if you want to take a break.

2        THE COURT:  Let's go to quarter after.

3    BY MR. MEAD:

4    Q.    Now, sir, you would also agree that you believe that Ms.

5    Wagner is a role model?

6    A.    Yes.

7    Q.    She's a good role model for minorities, don't you agree?

8    A.    Yes.

9    Q.    And you also agree that the board has expressed to you

10   several times a preference or let's say a desire to hire more

11   minorities, correct?

12   A.    Yes.

13   Q.    By the way, when you give your recommendations to the

14   board, do you include the race?

15   A.    No.

16   Q.    So when you submitted for recommendation to be hired

17   Tammy Foster, you did not state that she was an

18   African-American?

19   A.    No, I didn't.

20   Q.   So the board has no way of knowing, at least based on

21   what you submitted to them, whether or not a minority has been

22   hired?

23   A.   We introduce all the new teachers to the board at a board

24   meeting.

25   Q.   Prior to their approval?

182

1    A.    No.

2    Q.    After their approval?

3    A.    Well, usually we try to do it in August, right before

4    school starts during school time.

5    Q.    Let me make sure I'm clear then.  After they've already

6    approved them is when you introduce them?

7    A.    Yes, that's what I said.

8    Q.    All right.  And let's talk about this meeting in 2004

9    that you were discussing earlier.  You basically told Ms.

10   Wagner to go look at a Web site at one point, right?

11   A.    I went and told her to get on the PDE Web site and find

12   the PDE 427, which is very accessible, and everybody in

13   education should be aware of the PDE Web site because there's a

14   lot of research and that kind of thing on the Web site.  So

15   it's not a massive undertaking.

16   Q.    Do you know if she did that?

17   A.    She was supposed to report back to me.  She was supposed

18   to call back and set up an appointment.  So no, I haven't had a

19   conversation regarding that -- once she had an opportunity to

20  view, read, look at the document, she was supposed to call and

21  meet Ms. Good and I, that was the arrangement.

22  Q.    So, basically, you don't know whether she has or not, she

23  hasn't told you whether she has or not?

24  A.    She hasn't contacted me about it, never made an effort to

25  contact me.

183

1  Q.   Of course, you would admit that after September of 2004,

2  when she sued you, she may not want to contact you, you could

3  agree to that, couldn't you?

4  A.   Possibly, but I've seen her passing in the schools, I've

5  never strayed away, I've said hello to her, she said hello to

6  me, it's not like there's any type of adversarial relationship.

7  Q.   Just because she sued you, you don't feel adversarial

8  towards her?

9  A.   I act very professional around Ms. Wagner.

10  Q.   I didn't ask you how you acted, you don't feel

11  adversarial towards her?

12  A.   No.

13  Q.   Now, during this meeting, didn't she ask for all of her

14  evaluations that were done during her interview?

15  A.   She did.

16  Q.   But you refused to give them to her, didn't you?

17  A.   Like anybody else.

18  Q.   Like who else came in and asked for their evaluations?

19  A.   I've never given evaluations to anybody, I just haven't

20  made a practice of that.

21  Q.   Isn't it policy that an employee is allowed to look at

22  their forms?

23  A.   It wasn't based on their performance as an employee, it

24  was based on their performance in the interview.

25  Q.   So you're making a difference between the fact that was

1  done in an interview versus her daily performance, am I

2  correct?

3  A.    That's correct.

4  Q.    By the way, you testified earlier about Ms. Pickens --

5  you testified you never had a meeting with her, right?

6  A.    I never had a meeting with that lady.

7  Q.    So Ms. Pickens is lying, in other words?

8  A.    I don't know what she's doing.

9          MR. MEAD:  Your Honor, if I may just have a minute,

10  I think I may be finished.

11          THE COURT:  All right.

12          MR. MEAD:  Your Honor, if you want to take a

13  five-minute break now, I'm sure I'll be done in five minutes,

14  whatever is easier.

15          THE COURT:  All right, we'll take a recess now.

16          (Recess from 2:16 p.m.; until 2:25 p.m.)

17          THE COURT:  All right.

18          MR. MEAD:  I know the court always hears this, but I

19  only have a few more questions.

20          THE COURT:  Where, I can't remember whose tab this

21   is in, where is the PHRC determination, where do I find that?

22          MR. MEAD:  I believe it's defendants, not ours.

23          THE CLERK:  Judge, it's Defendant's EE.

24          MR. KUHAR:  Volume II.

25          THE CLERK:  Volume II, behind tab 31.

185

1        THE COURT:  This is neither here nor there, but I'll

2   take it up now since it's fresh in my mind.  Was there a

3   hearing transcript generated in connection with the PHRC

4   hearing?

5        MR. KUHAR:  Your Honor, I did not handle that.  But

6   I've never been at one where one was produced.

7        MR. MEAD:  Your Honor, my clients indicate no.  I

8   wasn't there, either, but we don't have one.

9        THE COURT:  All right.  Go ahead, Mr. Mead.

10  BY MR. MEAD:

11  Q.   Mr. Heller, I'm going to hand you what is marked

12  defendant's responses to defendant's Crawford Central Education

13  Association's first set of interrogatories directed to

14  defendants.  Could you read question number one and answer to

15  question number one, please; read it out loud, if you would?

16  A.   "State the names and current addresses of all witnesses

17  with information regarding the hiring" --

18        THE COURT:  Too fast.

19        THE WITNESS:  "State the names and current addresses

20    of all witnesses with information regarding the hiring,

21    termination of plaintiff as it relates to the teaching position

22    set forth in paragraph three of the first amended complaint."

23    BY MR. MEAD:

24    Q.    Could you read the answer?

25    A.    The whole thing?

1  Q.   Just the first paragraph, please?

2  A.   "The association's reference to termination of plaintiff

3  is inaccurate.  Plaintiff was never terminated by the district.

4  Without waiving the defendant's objection, the following

5  information regarding the decision not to staff Ms. Pickens

6  position on a long-term substitute basis."

7          THE COURT:  Hang on a second, you read it.

8          MR. MEAD:  May I, your Honor.

9          THE COURT:  Go ahead.  I need the know the question

10  so I can understand the answer.

11          MR. MEAD:  Fine, your Honor.  Number one.  "State

12  the names and current addresses of all witnesses with

13  information regarding the hiring and termination of plaintiff

14  as it relates to the teaching positions set forth in paragraph

15  three of the first amended complaint?"  Answer:  "Objection,

16  the association's reference to 'termination of plaintiff' is

17  inaccurate.  Plaintiff was never terminated by the district.

18  Without waiving defendant's objections, the following

19  information regarding the decision not to staff Ms. Pickens'

20    position on a long-term substitute basis from approximately

21    November, 2002 to June, 2003."

22    BY MR. MEAD:

23    Q.    Did you hear that, sir?

24    A.    Yes.

25    Q.    Am I also correct that you were the person who signed the

1   verification for the answers to these interrogatories?

2   A.   That's correct.

3   Q.   Now, sir, you earlier testified that there was a decision

4   made in advance of Ms. Pickens' actions to staff her position?

5   A.   There was.

6   Q.   So this is directly contrary to that, correct?

7   A.   That's correct.

8   Q.   So the interrogatory answer is wrong, is that what you're

9   saying?

10  A.   It's not what we had intended to do, no.

11       MR. KUHAR:  Your Honor, without interrupting, can I

12  see that, I don't have a copy of that?

13       MR. MEAD:  Sure.

14       THE COURT:  Let me see it, too, when you're done

15  reading it.  I'm sorry, what did you say was wrong about this?

16       THE WITNESS:  Our intentions were to staff that

17  position as a long-term substitute position.

18       THE COURT:  For the balance of the year?

19       THE WITNESS:  That's correct.

20  BY MR. MEAD:

21  Q.    But you'll agree that the interrogatory answer says

22  something different?

23  A.    Yes.

24  Q.    You also agree you were the person who verified this

25  answer?

188

1   A.   That's correct.

2   Q.   And you also agree that you verified this on July 19,

3   2005?

4   A.   That was the date, yes.

5   Q.   Did you read the answers to these before you signed it?

6   A.   I believe I did.

7   Q.   Also, I'd like to show you an affidavit that I believe is

8   from yourself, if you could take a look at this.  I'm going to

9   ask you about a specific paragraph, but I just want to make

10  sure you can identify it as your affidavit?

11  A.   Yes.

12  Q.   Would you turn to paragraph 20 of your affidavit, please.

13  And for the record, let me read it, it's in the record, your

14  Honor, it was part of the summary judgment.  If I may, Mr.

15  Heller.  It is document number 62 filed July 26, 2006.  We're

16  looking at number 20.  Could you read that answer, please?

17  A.   "Plaintiff was not selected for any of those positions

18  because her interview scores were low and she displayed

19  negative traits during her interviews, such as poor grammar" --

20          THE COURT:  That's too fast for him to get it down.

21          THE WITNESS:  I can read it slow.

22          THE COURT:  Go ahead.

23          THE WITNESS:  "Plaintiff was not selected for any of

24   those positions because her interview scores were low.  She

25   displayed some negative traits during her interview, such as

189

1   poor grammar."

2   BY MR. MEAD:

3   Q.   Where in your interview report does it say that Ms.

4   Wagner had poor grammar?

5   A.   There is nowhere in my grammar report.  But there are

6   places within the interview team where it reports grammar.

7   Q.   How about in your evaluation of her teaching in 2002,

8   where did it say poor grammar in that?

9   A.   It didn't say poor grammar anywhere, in mine.

10  Q.   Or in Mr. Meader's?

11  A.   That's correct.  But there were six other people that

12  interviewed.

13  Q.   The six people you chose, correct?

14  A.   Six people that had the responsibility to be there due to

15  their job descriptions.

16  Q.   That report to you, we agreed on that already?

17  A.   Yes, we agreed on that.

18  Q.   Also, when you talked about Meghan Porter, and I wrote

19  this down, see if you agree.  You stated "we gave her an

20  opportunity to see what she really can do," is that your words?

21  A.  Uh-huh.

22  Q.  And this was the same Meghan Porter who finished what, 22

23  out of 24, correct?

24  A.  That's correct.

25  Q.  But that same opportunity was not given to Ms. Wagner,

1  was it?

2  A.    We didn't give her that opportunity, no.

3         MR. MEAD:  Thank you, no further questions.

4         MR. KUHAR:  As a housekeeping matter, we move for

5  Exhibit O, I don't think we offered it before, Exhibit O.

6         THE COURT:  That's admitted.

7                    REDIRECT EXAMINATION

8  BY MR. KUHAR:

9  Q.    Now, here's the answer that Mr. Mead was asking you

10  about, I'm going to leave it with you.  Actually, I only have

11  one copy, is the reason I'm up here.  But it says "without

12  waiving defendant's objection, the following have information

13  regarding the decision not to staff Ms. Pickens' position on a

14  long-term substitute basis from approximately November, 2002 to

15  June, 2003."  And then there's a list of people, right?

16  A.    Yes.

17  Q.    If this had said not to staff Ms. Pickens' position with

18  Ms. Wagner, if that had been a typo, would that have been

19  accurate?

20          MR. MEAD:  I'm going to object to that, that's

21   speculation.

22          THE COURT:  What was the question, Mr. Kuhar?

23          MR. KUHAR:  I'm asking him whether if Ms. Wagner's

24   name had been inserted into this sentence, whether it would be

25   correct; in other words, from which one could infer that it was

191

1  a typo?

2        THE COURT:  Can I see it again.  Where are you

3  referring to?

4        MR. KUHAR:  It says regarding the decision not to

5  staff Ms. Pickens' position.  I'm asking him would it be

6  accurate if it said with Ms. Wagner, for a long-term substitute

7  basis?

8        THE COURT:  Would that make it accurate -- I'll let

9  him answer if he knows, if he thinks that would make it

10  accurate.  But he can't speculate on whether it was a typo or

11  not.

12  BY MR. KUHAR:

13  Q.    Would that then be accurate?

14  A.    Yes.

15  Q.    So what reading of this makes it inaccurate; in other

16  words, when you told Mr. Mead that you thought that there was

17  an inaccuracy in this, what about this, what did you see in it

18  that you think is inaccurate?

19  A.    Not to staff the position as a long-term substitute.

20   Q.   Can you elaborate on that?

21   A.   We made the decision before Ms. Pickens vacated her

22   position.  Due to health reasons, sooner than later, to staff

23   that position on a long-term substitute basis.

24   Q.   Was that decision made before Ms. Pickens recommended Ms.

25   Wagner?

192

1   A.   That decision to staff that, yes, before Ms. Wagner --

2   yes, that was before I had any knowledge of Ms. Wagner being

3   recommended and appointed by Ms. Pickens for her position, yes.

4   Q.   Who participated in that decision?

5   A.   I think that all of the principals that were involved in

6   the interview.

7   Q.   I'm sorry, in the interview?

8   A.   Yes.

9   Q.   And ultimately was the position staffed as a long-term

10  leave of absence?

11  A.   Yes.

12  Q.   It had to be, didn't it?

13  A.   Yes.

14  Q.   Does it say anywhere in here, in this interrogatory

15  response, does it say anywhere in here when the decision

16  regarding how to staff it was made?

17  A.   No.

18  Q.   The district hired Jennifer Christie on June 5, '05,

19  correct?

20  A.   Correct.

21  Q.   Is she a racial minority?

22  A.   Yes, African-American.

23  Q.   Were any of the old hiring processes or practices, that

24  is to say hiring practices or processes that predated you, were

25  any of those applied to Ms. Wagner at any time?

193

1  A.  No.

2  Q.  How about to anybody else who successfully got the

3  position she was seeking at any time?

4  A.  No.

5  Q.  Now, about a half-dozen, ten times, Mr. Mead said to you

6  this interview committee was a committee that you picked or

7  hand picked or words to that effect, do you remember that?

8  A.  Yes.

9  Q.  One more time to be clear, what determined who was on

10  that interview committee?

11  A.  The position.

12  Q.  What do you mean?

13  A.  An administrator, a building administrator, that's part

14  of their responsibility, it's in their job description, they

15  are part of the selection process, the interview process, in

16  selecting candidates.

17  Q.  Is that an automatic?

18  A.  It's in the job description.

19  Q.  Did you apply some discretion and say I'll choose these

20   people but not these people?

21   A.   Everybody was on the committee.

22   Q.   Did you exclude anybody from the committee?

23   A.   No.

24   Q.   Did you include anybody on the committee for whom it was

25   not their job description already?

194

1   A.   No.

2   Q.   What are the races of the other four people where you put

3   "no way" by their names?

4   A.   They were Caucasian.

5   Q.   You wrote "Philippines" on top of the back of your

6   evaluation form for Ms. Wagner because she said that during the

7   interview, correct?

8   A.   Uh-huh.

9   Q.   Pardon me.

10   A.   Yes.

11   Q.   Do you recall at what point in the interview she said

12   that?

13   A.   Probably at the beginning, it's at the top of my sheet.

14   Q.   Did you form some impression as to why she was telling

15   you that?

16   A.   I think she wanted us to know.

17   Q.   Do you know why she wanted you to know?

18   A.   Potentially it could be of some benefit.

19   Q.   Is that what you're saying or do you think she had that

20  impression?

21  A.   I think that's what she was saying.

22  Q.   You mean it was a benefit to the students that she was

23  Filipino?

24  A.   Yeah.

25  Q.   Is that what you mean?

195

1  A.    Yeah.

2  Q.    Do you recall who noted grammatical defects committed by

3  Ms. Wagner during her interviews; do you recall who noted that

4  on their forms?

5  A.    Not specifically, but there were more than, I know that,

6  two, three, I don't remember.

7         MR. KUHAR:  Nothing further.

8         THE COURT:  Anything else, Mr. Mead?

9         MR. MEAD:  Just as a housekeeping matter.  I marked

10  the page and referred to it as Exhibit 50, it's out of order,

11  but I just put 50 on it because I didn't know what the next

12  number was.

13         THE COURT:  Are you moving it?

14         MR. MEAD:  I would move it.

15         THE COURT:  It's admitted.

16         MR. MEAD:  I have no further recross.

17         THE COURT:  Thank you, sir.

18         MR. KUHAR:  Your Honor, we call Joanne Darling.

19         THE COURT:  Mr. Kuhar, given the stipulations that

20  we have, are you going to have to call all those other people?

21        MR. KUHAR:  I'm almost positive that two of the

22  people will be unnecessary all together.  With respect to Ms.

23  Darling and Mr. Meader, it would be limited to the alleged

24  remarks.  With respect to Ms. Good, because she has a different

25  prospective than other administrators, I was going to have her

196

1  go through and discuss the extra interview --

2          THE COURT:  Ms. Darling, do you want to come on up

3  here, my clerk is going to swear you in.

4          THE CLERK:  Would you raise your right hand, please.

5          JOANNE DARLING, DEFENSE WITNESS, SWORN

6                  DIRECT EXAMINATION

7  BY MR. KUHAR:

8  Q.   Ms. Darling, good afternoon.

9  A.   Good afternoon.

10  Q.   Are you currently employed?

11  A.   I am not, I'm retired.

12  Q.   Where do you reside?

13  A.   Outside of Cambridge Springs.  Do you need my address?

14  Q.   No.  From where did you retire?

15  A.   From the Crawford Central School District.

16  Q.   At the time you retired, what position did you have?

17  A.   When I retired, I was the principal at Cochranton

18  Elementary.

19  Q.   Did you retire twice?

20  A.   Yes.

21        THE COURT:  What was that question?

22        MR. KUHAR:  Whether she retired twice.

23  BY MR. KUHAR:

24  Q.   Did you retire and then come back into active service and

25  then retire a second time?

197

1   A.   I did.  In 1999 I retired from East End Elementary, I was

2   the principal at East End --

3         THE COURT:  Ma'am, keep your voice up a little bit.

4         THE WITNESS:  I retired in 1999 from East End

5   Elementary.  I was retired for three years, and then I came

6   back into Crawford Central as assistant principal at Cochranton

7   Elementary School for one year.  And then I was at Cochranton

8   Elementary for two years.  And subsequently retired again in

9   June of 2005.

10        THE COURT:  Did you go back to work again or are you

11  retired for good this time?

12        THE WITNESS:  I think it took this time.

13        THE COURT:  All right.  Go ahead.

14  BY MR. KUHAR:

15  Q.   When you were at Cochranton Elementary, that would have

16  been your last two years, correct?

17  A.   Correct.

18  Q.   So '02-'03 -- I'm sorry '03-'04 and '04-'05, or which

19  two?

20   A.   Yes, '03-'04 and '04-'05 I was at Cochranton Elementary.

21   Q.   Okay.  In the second half of the '03-'04 school year, do

22   you recall a time when Kathy Maruska needed to take a health

23   leave of approximately three weeks in duration?

24   A.   Yes, in January.

25   Q.   Were you involved in the decision regarding which

198

1  substitute would fill in for her?

2  A.   I was.

3  Q.   Basically, walk us through that from beginning to end,

4  what you remember of that?

5  A.   Okay.  Kathy Maruska had come in and talked with me and

6  said that she was going to be needing about three weeks, she

7  was going to have, I think it was surgery on her knee.

8  Q.   I'm going to interrupt you occasionally.  When was that?

9  A.   That would have been maybe in December of 2003.

10  Q.   When she came to see you?

11  A.   Yes.

12  Q.   Go ahead.

13  A.   I think like December, to tell me she was going to

14  take -- I believe that she started her leave at the beginning

15  of January and would come back after the holidays.  And she

16  said that she was going to need sometime, about three weeks

17  off, for surgery on her knee, and would be needing a

18  substitute.  She asked me if -- she said should I ask Rowena

19  Wagner.  And I said well, let me think about that, let me work

20   on that because it's more than just a day or so, generally

21   speaking, the principal has input into that.  In our district,

22   this may have been talked about before, we do have a sub

23   calling service.  So when teachers are going to be out, they

24   call for a substitute.  Sometimes, because that process is for

25   the whole district, teachers will say is it okay if I call or

1  would you call someone.  But when we are having something

2  that's more long term, whether it's a week or two weeks or

3  three weeks, then it is customary for the principal to actually

4  do that rather than going through the sub service.  So that you

5  can have somebody with continuity that has not committed to

6  other days.

7  Q.    I see.  Okay.  So she initiated this conversation with

8  you and said what about Ms. Wagner?

9  A.    And said that she was in the building that day, did I

10  want her to ask Rowena if she could come in for her.  I said

11  no, let me take care of that, let me work on that.  At the time

12  there was a substitute who had been in, who had been coming in

13  and working on a daily basis, who had asked me to come in, just

14  to pop in any time she was in the building because she was

15  doing substitute work and was interested in having a job.  And

16  I had actually gone in two or three times to see her in a

17  classroom.  And I did call and ask her if she would be, if she

18  would take that position for the three weeks that Ms. Maruska

19  thought she would be off.  And she was interested in doing

20   that.

21   Q.   Now, before you called and offered her that, you said you

22   had been in her classroom several times?

23   A.   Yes.

24   Q.   Was that formal or informal?

25   A.   It was informal because she was a substitute.  And she

200

1  just said, you know, I'm interested in finding a job in the

2  district, I'd like you to stop in any time I'm in, please come

3  any time I'm in, stop into my classroom.

4  Q.    Had Ms. Wagner made that same offer to you or invitation

5  to you?

6  A.    No, she had not.

7  Q.    What did you think of the performance this -- I'm sorry,

8  did you name that person?

9  A.    I didn't.

10  Q.    Who is it?

11  A.    It was Erin Bourquin.

12  Q.    What did you think of Erin Bourquin's performance when

13  you observed her those approximately three times informally?

14  A.    She was, she was doing an excellent job.  It was a

15  day-to-day sub kind of thing, it was not any long-term thing.

16  But she was incorporating the parts of the balanced literacy,

17  she was working with the shared writing and doing those

18  components.  She seemed to know what she was doing with that

19  whole balanced literacy.  Her lessons in science and social

20  studies were well done as well.  And the obvious things like

21  taking care of the discipline, which wasn't a problem, she

22  seemed to handle herself very well with that.  She had also

23  done her student teaching there prior to my coming.  And so she

24  did have knowledge of some of the children.  So she knew some

25  of the students in the different grade levels that she was

1  subbing.

2  Q.   Okay.  Did you say shared learning and balanced literacy?

3  A.   Shared writing, shared reading, independent reading.  The

4  components of the balanced literacy program which the district

5  was involved in at the time.  They are still.

6  Q.   What is balanced literacy?

7  A.   Well, it is -- it's a program that is or it's the

8  curriculum that is being done now.  Actually, when I retired

9  the first time in '99, it was not really a part of what we were

10  doing.  They were, you know, it's an approach to the whole

11  reading, writing, speaking, listening, where everything is put

12  together.  And it has many components as a part of that.  It is

13  the independent reading, the small group, the shared writing,

14  the shared reading, the listening, those kinds of things.

15  Q.   And just to be clear, that was not prevalent the first

16  time you retired at the district?

17  A.   No, it was not.

18        THE COURT:  Can I ask Ms. Darling a question, this

19  is just once again more informational background on my part.

20  But there has been testimony in the case similar to what you

21  say, that every so many years the perceived appropriate way to

22  teach changes, there are constant changes.  Who are these

23  people that make these decisions as to what the appropriate way

24  to teach kids are and where does it come from and how is it

25  objectively gauged?

202

1         THE WITNESS:  Well, I certainly cannot speak as an

2   expert on that.

3         THE COURT:  I mean it comes from somewhere, I've

4   heard testimony that every 10 years and I'm paraphrasing this,

5   this is my characterization.  There's an eureka moment, where

6   people decide well, this isn't the way we should be doing it

7   anymore; who are these people and where do these directives

8   come from?

9         THE WITNESS:  Well, I think that, that a part of

10  that is we are obviously always looking to improve and to make

11  changes.  I mean, we cannot do the same thing that we've always

12  done.  If you always do what you've always done --

13        THE COURT:  Unless it happens to be working.  And

14  I'm not suggesting one way or the other, but once again is

15  there a central or is there a group, a national group of

16  teachers or educators, where do these directives come from?

17        THE WITNESS:  Well, I think they come from a number

18  of places.  When you talk about is there a group of teachers,

19  there is an organization for social studies, teachers of social

20   studies.  There is one for teachers of reading and English and

21   math and science.  The State Department of Education, the

22   Pennsylvania Department of Education, also has people who are

23   working on these things.  I think that we always take a look

24   at, and I'm sure you probably heard testimony, too, about the

25   assessments and the No Child Left Behind and how do you do

203

1   that.  Do you assess for that, and then you determine from the

2   assessments what you need to provide as curriculum.  So it's

3   the whole professional development thing.

4          THE COURT:  That's helpful, thank you very much.

5   Go ahead.

6   BY MR. KUHAR:

7   Q.    Now, the original question that you were answering I

8   think was, basically, what do you recall of your involvement in

9   the staffing of this leave for Ms. Maruska in the latter half

10  of the '03-'04 school year, right?

11  A.    Yes.

12  Q.    You were telling us about what Ms. Wagner had said, and

13  then how Erin Bourquin had invited you in three times or so?

14  A.    What Ms. Maruska had said to me, Ms. Wagner hadn't said

15  anything to me?

16  Q.    Sorry, thank you for correcting me, about what Ms.

17  Maruska had said to you.  Now you're clarifying Ms. Wagner

18  never said anything to you about the position, right?

19  A.    No, she did not.

file:///A|/WAGDAY3.TXT

20   Q.   She didn't apply for it or put her name in for it or even

21   just express generally I'd like such a thing?

22   A.   No, she did not.

23   Q.   Do you have any sense for whether there were other people

24   who would have liked that assignment, too?

25   A.   Well, nobody came to me and said anything to me about it.

204

1   Q.   Just intuitively, people get paid by the day if they are

2   day-to-day subs?

3   A.   Right.

4   Q.   And how many people were in the building or had been in

5   the building in the recent past at that point who you think

6   would have been receptive to such an assignment?

7   A.   Well, probably because day-to-day subbing is difficult

8   because you're always somebody else every day and you're going

9   in and don't have a chance, probably anybody who is subbing

10  would like the opportunity of a long-term or a longer-term

11  position.  In this particular instance, very few people would

12  have known that this leave was about to happen or this sick

13  time was about to happen, unless Ms. Maruska was telling people

14  because it certainly was not posted anywhere and I wasn't

15  saying anything about it, either.

16  Q.   Is it fair to say while really nobody knew about it, many

17  people would have wanted it?

18  A.   I would say that probably is very accurate.

19  Q.   And nobody expressed interest in it?

20   A.   No.

21   Q.   Was there any kind of a rule or a policy or anything that

22   made it proper for you to give it to Rowena Wagner because Ms.

23   Maruska suggested that or for any other reason?

24   A.   No, there is nothing that would be -- that would be in

25   the realm of the principal's duties, discretion to do that and

205

1  to make that selection.

2  Q.    Okay.  So you told us what Ms. Maruska said, you told us

3  that you actually assigned it to Ms. Bourquin and why, right?

4  A.    Yes.

5  Q.    Do you recall anything else about your exchange with Ms.

6  Maruska?

7  A.    Yes.

8  Q.    Go ahead.

9  A.    When I went back to Ms. Maruska and said that I had asked

10  Erin Bourquin to come in, she was not happy about that.  She

11  had some concerns about some perceived persecution from the

12  teachers in the upper hall.

13  Q.    That sounds kind of formal, try to remember what she

14  said?

15  A.    She said I don't want her in my classroom because she did

16  her student teaching up there in that other hall, and those

17  people, she will make, they will come in and they'll be in my

18  room looking at my stuff and they'll make fun of me and what

19  I'm doing.  And I said, Kathy, they will not.  I said you and I

20   will sit down with Erin and we'll talk about it, and this will

21   not happen.  We in fact did do that, and Kathy did take her

22   leave, she was out I believe three weeks for sure and maybe a

23   couple of days after that.  Subsequent to that, and she did

24   stop in at one point during the time --

25   Q.    Who's she?

206

1    A.    Kathy, stopped in or at least was talking with Erin about

2    some things.  Kathy came into the office and said to me she did

3    a wonderful job.  She said she was excellent with the students

4    and there was no problem and you were right.

5    Q.    She being Erin Bourquin?

6    A.    She being Kathy, who said I was right that there wasn't a

7    problem with Erin, she did an excellent job.  And, you know,

8    the discipline was fine, the work was done.  And she was very

9    pleased with her.

10   Q.    Did you make any reference during that exchange to the

11   lawsuit that Ms. Wagner had filed against the district?

12   A.    To my knowledge, the lawsuit was filed the next year.

13   Q.    So, in terms of yes/no answer to the question?

14   A.    Okay, sorry.

15   Q.    Did you mention the lawsuit in any way during that

16   exchange?

17   A.    I did not.

18   Q.    When did you first become aware of the lawsuit?

19   A.    I first became aware that there was in fact a lawsuit at

20    that time on Saturday, last Saturday, the 16th of June, when

21    you mentioned it to me on the telephone.

22    Q.    Now, let's distinguish between the lawsuit and the EEOC

23    charge?

24    A.    Okay.

25    Q.    When did you first become aware of the EEOC charge -- do

207

1    you know what an EEOC charge is?

2    A.    Is that the human relations -- I don't know, actually.

3    Q.    Well, the EEOC is a federal agency that receives

4    complaints of employment discrimination.  The PHRC is its

5    parallel state partner, if you will, it receives similar

6    complaints?

7    A.    Okay.

8    Q.    So one can file with an EEOC, PHRC charge; in other

9    words, file it with both of them at the same time.  All right,

10   do you understand?

11   A.    Yes.

12   Q.    When did you first become aware that Ms. Wagner had filed

13   an EEOC, PHRC charge?

14   A.    And that charge was filed when?

15   Q.    February of '03?

16   A.    Okay.  The first time I knew anything about that was last

17   Saturday when you mentioned it to me on the phone.

18   Q.    Saturday the 16th?

19   A.    The 16th of June.

20  Q.   Prior to that time you did not know about it?

21  A.   I did not.

22  Q.   Were you in an elementary building in February of '03?

23  A.   I was not.

24  Q.   Where were you?

25  A.   I was at Cochranton Junior-Senior High School as the

208

1  assistant principal.

2  Q.   During the '04 interview process -- well, you

3  participated in that, correct?

4  A.   I did.

5  Q.   I'm not going to ask you a whole lot about that, for

6  reasons that are not important right now.  But you participated

7  in that, correct?

8  A.   I did.

9       MR. MEAD:  Your Honor, I'm going to object to going

10  into the interview process because this opens a whole new door.

11  We stayed away from this deliberately.

12       THE COURT:  Hang on a second.  We're jumping around

13  with dates here like crazy.  When did the matter with Ms.

14  Maruska, when did that occur?

15       THE WITNESS:  That would have been December of 2003,

16  for the time that she was going to take beginning in January of

17  2004, three weeks.

18  BY MR. KUHAR:

19  Q.   Your conversation with Ms. Maruska was in December of '03

20    because she was going to have a health related leave beginning

21    January of '04?

22    A.    Yes, right after the holiday.

23            THE COURT:  But at that time you were at an

24    elementary school, is that right?

25            THE WITNESS:  Beginning in August of '03, not in

209

1  February.

2  BY MR. KUHAR:

3  Q.    And I apologize for the ambiguity.  When the charge was

4  filed with the EEOC, the PHRC charge was filed, I'm asking you

5  to assume that I'm correct when I tell you that was February of

6  '03, which would have been about 11 months before your

7  conversation with Ms. Maruska, where were you at that time?

8  A.    In February of '03 I was at Cochranton Junior-Senior High

9  School as the assistant principal.

10         THE COURT:  All right, I understand that.  You were

11  going to ask her question about the interviews of March of '04.

12  What's the question before I hear the objection.  Actually,

13  he's got to hear the question before he makes the objection.

14  BY MR. KUHAR:

15  Q.    The first question was whether she participated --

16         THE COURT:  We know she did.

17  BY MR. KUHAR:

18  Q.    The second one is whether there was any discussions about

19  the charge during that timeframe because Mr. Heller was

20   cross-examined as if one should infer that would have naturally

21   been discussed.

22          MR. MEAD:  Your Honor, my objection is letting in

23   the interview, we're trying to have the interview reports be as

24   they may --

25          THE COURT:  That's a separate issue.  This whole

210

1  question of -- we've already stipulated what's in the reports

2  is in the reports.  But what is your objection to him asking

3  her about that -- you're going to be able to cross-examine her

4  about that.

5        MR. MEAD:  And that's fine if that's where we go,

6  your Honor.  I'm just saying I thought there was an agreement

7  we were going to leave that alone at this point.  Where we

8  wouldn't go into what happened at the interviews, what was

9  known at the interviews, what people discussed at the

10  interviews, I thought the agreement was the interview reports

11  stand on their own, whatever people voted stands on their own.

12        THE COURT:  But those are reports.  This is

13  something else?

14        MR. KUHAR:  Yes, your Honor.

15        THE COURT:  You can ask the question, it's

16  overruled.

17  BY MR. KUHAR:

18  Q.   During the '04 interview processes, do you know exactly

19  what I mean when I say that?

20   A.   Yes.

21   Q.   Okay.  During that process, did anybody discuss in your

22   presence this EEOC, PHRC charge that Ms. Wagner had filed in

23   February of '03?

24   A.   They did not.

25   Q.   And if they had, that would have meant you became aware

1  of it back then, instead of June 16th?

2  A.   Exactly.

3  Q.   Okay, just to tie it all together.  When you first became

4  aware of the EEOC --

5        THE COURT:  I've got it, move on.

6  BY MR. KUHAR:

7  Q.   So Ms. Maruska needed a leave of absence during the

8  second half of the '04-'05 school year, too, right?

9  A.   Yes.

10  Q.   And you were at the building at that time?

11  A.   I was.

12  Q.   Tell us what you recall of that situation, describing

13  your involvement?

14  A.   Ms. Maruska came to me in, I don't know when, but

15  sometime before she was going to take a leave, and said she was

16  going to be off again for a period of time, and would need a

17  substitute teacher.  And I said, okay, I would take care of

18  that for her.

19  Q.   What is the timeframe, though?

20  A.   Well, the leave was in January -- of '05.

21  Q.   So the conversation was before then?

22  A.   It would have been before that to say she was going to be

23  taking, she was going to be having this surgery, and would need

24  a substitute, and I said okay.  And when we would be starting,

25  when we would be ending, I don't recall the dates.  But it was

212

1  January.

2  Q.   Did she suggest anybody to you?

3  A.   She did not.

4  Q.   Did you reference the lawsuit in any way?

5  A.   I did not.

6  Q.   Now, this was after the lawsuit had been filed, right?

7  A.   Yes.

8  Q.   Of course, you couldn't have referenced the EEOC charge?

9  A.   No, I didn't know about it.

10  Q.   Did you give her any reason why Ms. Wagner could not be

11  used in that position?

12  A.   I didn't know, I never mentioned the name at all.  I just

13  said I will find someone to fill in for you.

14  Q.   It just didn't come you?

15  A.   No, it did not.

16  Q.   Neither of you mentioned Ms. Wagner's name?

17  A.   No.

18  Q.   All right.  Then in between these two situations, I want

19  you to focus on August or September of '05, the beginning of

20  your last year?

21  A.   Yes.

22  Q.   And you were at what school?

23  A.   I was at Cochranton Elementary.

24  Q.   Did you have a conversation with Ms. Wagner in August or

25  September of '04 during which her lawsuit was mentioned by

213

1  either of you?

2  A.   Yes.

3  Q.   Describe that?

4  A.   I don't know what the date was, but the day that the news

5  of the lawsuit that she filed was in the Tribune, I don't know

6  when that was.

7  Q.   Okay.

8  A.   But that day she came in to see me in the morning, she

9  came into the office, into the outside office, where the

10  secretary is, and said can I talk to you for a minute.  And I

11  said sure.  And she said I thought that, you know, I sub here a

12  lot, I thought that you were happy with my work.  And I said

13  well, you know, Rowena, that there are a number of teachers

14  here who would like to have you come in when they're going to

15  be out for a day or so, because you know the students, you know

16  the district, you know the attendance area at Cochranton

17  Elementary.  And they will say that they'd like to have you

18  come in.  So I think that would be accurate, you do a decent

19  job when you're in.  And she said well, then, how come I didn't

20  get a job.

21  Q.   Did she say like when I didn't get a job?

22  A.   Well, I don't recall that.  My understanding would have

23  been --

24      THE COURT:  Tell me, not your understanding, I'm

25  interested in what you remember her saying?

1          THE WITNESS:  Okay.  The answer to that was no, I

2    don't recall that.

3    BY MR. KUHAR:

4    Q.    Thank you.

5    A.    When she said why didn't I get a job, and I kind of

6    looked at her, I said, Rowena, I saw the paper today.  And she

7    said yeah.  And I said I think that you need to talk to Mr.

8    Heller about that.

9    Q.    How did she react?

10   A.    I don't recall, but that was the end of the conversation,

11   I think.

12   Q.    Okay.  That was the end of the conversation?

13   A.    Yes, as far as I can recall.

14         MR. KUHAR:  Thank you, I have no further questions

15   at this time.

16         THE COURT:  All right.  Mr. Mead.

17              CROSS-EXAMINATION

18   BY MR. MEAD:

19   Q.    Ma'am, you know Ms. Wagner, correct?

20   A.   I do.

21   Q.   Ms. Wagner did sub at your school quite frequently,

22   correct?

23   A.   Yes, she did.

24   Q.   And she also subbed for Ms. Maruska quite frequently,

25   correct?

215

1  A.   I would have to look -- I would have to look, I would

2  have to see the records.  She was in the building a fair amount

3  of time, I don't know.  I knew she was in for more than just

4  Ms. Maruska, I know that for sure.

5  Q.   But you knew she substituted for Ms. Maruska, correct?

6  A.   She had been in for her.

7  Q.   The first time Ms. Maruska requested Rowena to sub, you

8  didn't want her to do so, correct?

9  A.   It wasn't that I didn't want, I just thought, I just felt

10  that that decision about filling that long-term position, I

11  should make that decision and not because Ms. Maruska had said

12  to me, she's in the building, shall I ask her.  And I said

13  well, why don't you let me take care of that.

14  Q.   You also knew that the students liked Ms. Wagner because

15  you testified to that earlier, you heard the students liked

16  her?

17  A.   I don't believe I testified to that earlier.

18  Q.   Did you hear she did a good or a bad job while she was

19  there?

20  A.    Well, I was saying that's what the teachers were saying.

21  The teachers who were going to say if they were going to be out

22  next Wednesday, would it be okay if they called Ms. Wagner.

23        THE COURT:  Ms. Darling, just so I have my terms

24  right, I'm not mixing them up we're not using them incorrectly,

25  you used the term for a long-term position?

1        THE WITNESS:  For a long-term substitute position.

2        THE COURT:  That's not a long-term substitute

3    position insofar as she was concerned, it's a different type of

4    position, wasn't it?

5        THE WITNESS:  Yes, you're right.  I'm thinking long

6    term, I'm saying long term --

7        THE COURT:  What do you mean?

8        THE WITNESS:  In terms of more than two or three

9    days.

10       THE COURT:  But less than the 90 days that would be

11   a long-term sub?

12       THE WITNESS:  That would be it, yes.

13       THE COURT:  All right, go ahead.

14   BY MR. MEAD:

15   Q.   Am I correct, Ms. Darling, in your testimony you stated

16   the principal has the discretion who to choose for a three-week

17   absence?

18   A.   Well, the principal certainly has the right to make that

19   determination.

20  Q.   And, in fact, you did so when you selected Erin to

21  substitute?

22  A.   Yes.

23  Q.   That was your call?

24  A.   Yes.

25  Q.   Do you know if Erin had been substituting for Ms. Maruska

1   during that particular school year up to that point?

2   A.   I don't recall that.  I don't know that.  Because --

3   Q.   Go ahead?

4   A.   Because, generally speaking, when the process in Crawford

5   Central, the substitute calling service is with a service.  And

6   the teachers call the substitute calling service and request a

7   substitute.  Many times the principal doesn't even know who's

8   coming in until they see them in the morning.

9   Q.   But you agree it's your choice who you put in there for

10   three weeks?

11   A.   Yes.

12   Q.   At least during the time period you worked there?

13   A.   Yes.

14       THE COURT:  We've covered that, let's go on.

15   BY MR. MEAD:

16   Q.   Sure.  Now, you stated that you read about the lawsuit in

17   the paper, that was the first time you heard about it?

18   A.   The lawsuit from '04 or '05?

19   Q.   Yes.

20  A.   Yes.

21  Q.   The first time you heard about, the lawsuit?

22  A.   Yes.

23  Q.   Did you ever see a copy of the lawsuit?

24  A.   I did not.

25  Q.   Did you read the article in the paper about the lawsuit?

218

1  A.   Yes.

2  Q.   Did the article in the paper reflect anything about the

3  PHRC prior hearings?

4  A.   I have no idea.

5  Q.   Just so I'm clear, if Ms. Maruska said you discussed the

6  lawsuit during one of the conversations with you, she's lying?

7  A.   I had no discussion about the lawsuit with her, either

8  time, either the lawsuit or the earlier one, the EEOC, whatever

9  it is.  Yes, I had no discussion with Ms. Maruska about any

10  lawsuit.

11       MR. MEAD:  That's fine, that's all, your Honor.

12       THE COURT:  Anything else?

13       MR. KUHAR:  No, your Honor.

14       THE COURT:  All right, Ms. Darling, thanks very

15  much.

16       MR. KUHAR:  Your Honor, Mike Dolecki will be our

17  next witness.

18       THE COURT:  How many more witnesses do you have

19  after him?

20          MR. KUHAR:  Kurt Meader is probably going to be it,

21   your Honor.

22          THE COURT:  All right.

23          THE CLERK:  Would you raise your right hand, please.

24           MICHAEL DOLECKI, DEFENSE WITNESS, SWORN

25              DIRECT EXAMINATION

219

1   BY MR. KUHAR:

2   Q.   Good afternoon.

3   A.   Good afternoon.

4   Q.   What's your current position with the Crawford Central

5   School District?

6   A.   Currently I'm the superintendent of schools at Crawford

7   Central.

8   Q.   How long have you held that position?

9   A.   Since November of 2001.

10  Q.   You reside in the Meadville area, I assume?

11  A.   That is correct.

12  Q.   What is your education?

13  A.   I have currently a master's and a letter of eligibility

14  which identifies the certification to become a superintendent

15  of schools.

16  Q.   We would ask you to speak into the mike as directly as

17  possible.

18  A.   Sure.

19  Q.   Okay.  Where is your undergraduate degree?

20   A.   Slippery Rock University.

21   Q.   In?

22   A.   Health and physical education.

23   Q.   And, now, prior to your current position, you've held

24   what position at Crawford Central?

25   A.   Prior to I was a principal, assistant principal at

220

1  Franklin High School, and a principal at Rimersburg-Sligo,

2  Pennsylvania, elementary principal.  And then I was the

3  superintendent of schools at a small school district in

4  Somerset County called Turkey Foot.

5  Q.    Since February of '02 when Mr. Heller was hired, who's

6  been responsible for the interviewing and selection process?

7  A.    Mr. Heller has.

8  Q.    Were you present during the meeting with Mr. Heller and

9  Fred and Bernie Wagner in attendance, in approximately January

10  of '03?

11  A.    Yes, I was.

12  Q.    Where did that take place?

13  A.    It took place in my office at the instructional support

14  center.

15  Q.    And why was that meeting convened?

16  A.    Mr. Wagner was interested in securing or finding out why

17  his wife was not getting a job in the school district.

18  Q.    Did he tell you that?

19  A.    Yes, he did.

20  Q.   And you scheduled the meeting?

21  A.   Mr. Wagner scheduled the meeting with me.

22  Q.   Okay.  What do you recall being said by the participants

23  in that meeting?

24  A.   Well, there were many things.  I think, if I could

25  summarize it, there was a concern that Mr. Wagner's wife was

221

1  not getting a job and wanted to know why.  And that if she

2  didn't get a job, there could be concerns in the future, legal

3  concerns in the future.

4  Q.    And did you do much of the speaking in that conversation?

5  A.    Well, yeah, I did conversing with Mr. Wagner, some with

6  Fred --

7          THE COURT:  You're going to have to be clear because

8  there's two Mr. Wagners there.

9          THE WITNESS:  That's right.

10         THE COURT:  Who were you talking to?

11         THE WITNESS:  I was talking to Bernie Wagner and to

12  Fred Wagner.

13  BY MR. KUHAR:

14  Q.    All right.  Would that be alternatively, you were talking

15  to one then the other?

16  A.    No, I think that it was a respectful conversation from

17  the standpoint when one person talked, the other three

18  listened.

19  Q.    During that conversation, did you hear Mr. Bernie Wagner

20    attribute to George Wright the remark black and brown people

21    aren't as smart or are less intelligent than white people?

22    A.    No, I did not.

23    Q.    Did you hear Charlie Heller agree with a remark like that

24    or make that statement?

25    A.    Absolutely not.

222

1   Q.   If he had, how would you have reacted -- if Mr. Heller

2   had done so, how would you have reacted?

3   A.   I mean, obviously, very disappointed and very concerned,

4   and there is the possibility of disciplinary action would have

5   been taken immediately or in the future.

6   Q.   Have you ever heard Mr. Heller make a remark to the

7   effect of the one I just asked you about?

8   A.   No, I have not.

9   Q.   Did you ever hear Mr. Wright make a remark to that

10  effect?

11  A.   No, I have not.

12  Q.   Would that surprise you if he had made such a remark?

13  A.   Absolutely.

14  Q.   Why?

15  A.   That really, any kind of remark like that is a comment

16  which does not represent a board member or a superintendent or

17  assistant superintendent of schools.

18  Q.   Does the district desire more minority teachers?

19  A.   Yes, it does.

20    Q.    Why?

21    A.    Well, I think that for many reasons.  From the standpoint

22    for role models, that also reflects society.  That it's a good

23    situation for any organization, for any agency to have

24    minorities as part of their employee ranks.

25            MR. KUHAR:  I have no further questions, thank you.

223

1          THE COURT:  All right.  Mr. Mead.

2                    CROSS-EXAMINATION

3   BY MR. MEAD:

4   Q.   Sir, who's in charge of recruiting those minorities for

5   your district?

6   A.   Presently, Mr. Heller.

7   Q.   Were you in charge at one point?

8   A.   Yes, when I was assistant superintendent.

9   Q.   What years were those?

10   A.   Assistant superintendent from 1994, November of 1994

11   until June of 2001.

12   Q.   June of 2001 was the last time you did anything regarding

13   minority recruiting?

14   A.   That was the time I was assistant superintendent.

15   Q.   Was that the last time you had anything to do with

16   minority recruiting?

17   A.   Well, no.  Because now we still, when Mr. Heller does go

18   to a recruiting fair, we discuss what happened, how did things

19   work out, who did he talk to.  We converse with regards to what

20   is done at those fairs.

21   Q.   If I were to ask you what you have done, you would defer

22   back to Mr. Heller, would you agree with that?

23   A.   That is correct.

24         MR. MEAD:  That's all I have.

25         MR. KUHAR:  Nothing further.

224

1          THE COURT:  Mr. Dolecki, thank you very much.  Well,

2    before we get started with another witness, who is this going

3    to be?

4          MR. KUHAR:  Kurt Meader, your Honor.  He's just

5    going to describe the Pickens' situation.  It may go beyond the

6    3:40 you mentioned, but it would be close.

7          THE COURT:  I'm going to break now.  I'm no longer

8    concerned that we're under a time crunch.  Will he be your last

9    witness, in all likelihood?

10          MR. KUHAR:  Yes, your Honor, in all likelihood.

11          THE COURT:  What about you, do you have any

12    rebuttal?

13          MR. MEAD:  I'll think about it, your Honor.  If I

14    did, it will be brief, I wouldn't have any long-winded

15    witnesses.

16          MR. KUHAR:  Your Honor, I'm just reminded that

17    Suzanne Good will testify, she'll be 45 minutes to an hour.

18          THE COURT:  Will she be your last witness?

19          MR. KUHAR:  In all likelihood, yes, your Honor.

20          THE COURT:  All right, we're in recess until 9:00

21   tomorrow.

22

23          (Whereupon, at 3:25 p.m., the Non-Jury Trial was

24   adjourned for the day.)

25                    - - -

1          C E R T I F I C A T E

2

3

4

5        I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12

13   _____

14   Ronald J. Bench

15

16

17

18

19

20

21

22

23

24

25