IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ROWENA WAGNER,
        Plaintiff

    v.                  CIVIL ACTION NO. 04-264 ERIE

CRAWFORD CENTRAL SCHOOL
DISTRICT et al.,
        Defendants


NON-JURY TRIAL - DAY NO. 4


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, June 21, 2007.


APPEARANCES:
        JOHN J. MEAD, Esquire, appearing on behalf of
        the Plaintiff.

        CALEB L. NICHOLS, Esquire, appearing on behalf

of the Plaintiff.

MARK J. KUHAR, Esquire, appearing on behalf of
Defendants Crawford Central School District,
et al.

Ronald J. Bench, RMR - Official Court Reporter

1          I N D E X

2

3     WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE DEFENSE:

5  Kurt Meader          3      16     24        --

6

7  Suzanne Good          25     75     89        --

8

9

10

11     REBUTTAL WITNESSES:

12

13  FOR THE PLAINTIFF:

14  Samuel Byrd          90      --     --        --

15

16  Rowena Wagner          93     97     --        --

17

18

19

20

21                    - - -

22

23

24

25

3

1            P R O C E E D I N G S

2

3            (Whereupon, the Non-Jury Trial proceedings began

4     at 9:00 a.m., on Thursday, June 21, 2007, in Courtroom C.)

5

6            THE COURT:  All right, where were we?

7            MR. MEAD:  Your Honor, as a housekeeping matter, I

8     believe I did not ask for the admission of Exhibits 10 and 41.

9     I don't believe there's any objection by Mr. Kuhar.

10           THE COURT:  Those are admitted.

11           MR. KUHAR:  Your Honor, also by way of housekeeping,

12    there were nine or ten exhibits that were included within the

13    scope of that stipulation.  These would all be interview

14    analysis forms completed by the administrators.

15           THE COURT:  What would their letters be?

16           MR. MEAD:  U, V, X, Y, Z, AA, BB, CC, FF.

17           THE COURT:  Those are admitted.

18           MR. KUHAR:  And then we would call Kurt Meader.

19           THE CLERK:  Mr. Meader, raise your right hand,

20  please.

21            KURT MEADER, DEFENSE WITNESS, SWORN

22                DIRECT EXAMINATION

23  BY MR. KUHAR:

24  Q.   Good morning, Mr. Meader.

25  A.   Good morning.

4

1  Q.   Where do you reside and where do you work?

2  A.   I reside in Conneaut Lake, Pennsylvania, and work in the

3  Crawford Central School District in Meadville.

4  Q.   How long have you worked there?

5  A.   Eight years.

6  Q.   In what capacity?

7  A.   Elementary principal.

8  Q.   At different schools?

9  A.   Yes.

10       THE COURT:  Mr. Meader, you're jumping on him when

11  he's trying to ask a question.  Wait until he finishes the

12  questions so the court reporter can get down everything you

13  say.  Go ahead.

14  BY MR. KUHAR:

15  Q.   I was just asking whether that was all time spent at one

16  time or multiple schools?

17  A.   The first four years I was at Cochranton Elementary.  And

18  the last, most recent four years I've been at East End

19  Elementary.

20   Q.   And what is your education?

21   A.   I have a bachelor's degree in elementary education and a

22   master's degree in educational administration.

23   Q.   And where did you work prior to Crawford Central?

24   A.   I taught in Coatsville, Pennsylvania.  I taught in Casa

25   Grand, Arizona.  And I was an assistant principal in Columbia,

5

1   Missouri, before coming to Crawford Central.

2   Q.   Were you one of the interviewers during the '02 and '04

3   interviews at Crawford Central for elementary positions?

4   A.   Yes.

5   Q.   Now, it's already been established that there were

6   interviews conducted in December of '02, does that sound

7   familiar?

8   A.   Yes.

9   Q.   And these were for how many positions?

10  A.   Four long-term sub positions.

11  Q.   Which were to be begin when?

12  A.   January, '03.

13  Q.   Was one of them Ms. Joye Pickens' position?

14  A.   Yes.

15  Q.   Who decided that interviews would be conducted for those

16  four positions?

17  A.   Mr. Heller had indicated that there would be interviews

18  for those four positions.

19       THE COURT:  Keep your voice up, Mr. Meader.

20          THE WITNESS:  Excuse me.  Mr. Heller had indicated

21    that there would be interviews for those four long-term sub

22    positions.

23    BY MR. KUHAR:

24    Q.    And when did he indicate that?

25    A.    I believe it was at a principal's meeting, it was in

6

1   either late October, early November.

2   Q.   Were you there?

3   A.   Yes.

4   Q.   You heard him say so?

5   A.   Yes.

6   Q.   During the '02 interview process and the '04 interview

7   process, did you hear anyone say anything that you thought

8   indicated a bias towards Filipinos or Asians?

9        THE COURT:  By bias, towards or against?

10        MR. KUHAR:  Thank you for clarifying that, your

11   Honor.

12   BY MR. KUHAR:

13   Q.   Did you hear anything that suggested that they had a bias

14   against people in those categories?

15   A.   No.

16   Q.   Okay.  Now, in '02 during the '02-'03 school year, you

17   were at Cochranton Elementary the whole year, correct?

18   A.   Correct.

19   Q.   Do you recall when you became aware that Ms. Joye Pickens

file:///A|/WAGDAY4.TXT

20   would need a substitute on a long-term basis during that school

21   year?

22   A.   Yes.

23   Q.   When?

24   A.   Shortly before Thanksgiving of '02, she came to me with a

25   letter that she had drafted to send home to parents of her

1  students.  I read the letter.  In the letter she named Rowena

2  Wagner as her sub to fill in for her for the rest of the school

3  year.

4  Q.    Now, I thought your testimony had been that you were

5  aware of four prior to that time?

6  A.    Correct.

7  Q.    Can you explain?

8  A.    Joye Pickens had verbally told myself and others in the

9  district that she was planning to take the second semester from

10  January on, as a medical leave to get hip replacement surgery.

11  Q.    When had she told you that?

12  A.    I think early November.

13  Q.    When did the second semester start in that school year?

14  A.    January, '03.

15  Q.    Now, you said she came to you in November of '02?

16  A.    Correct.

17  Q.    Did circumstances change with respect to the onset of her

18  leave?

19  A.    Right, it was sudden and unexpected, that she would

20   suddenly be gone from November through the remainder of the

21   school year.

22   Q.    Okay.  And she brought you a letter.  Basically, what do

23   you recall of the contents of the letter?

24   A.    The letter explained to the parents that she was going to

25   be off for the remainder of the school, and that she was naming

8

1   Ms. Wagner has her substitute teacher for that period.

2   Q.    From the date you were speaking with her on?

3   A.    The date that the letter was dated on.

4   Q.    Do you recall what the date of that was in relation to

5   when you were talking to her?

6   A.    I don't recall a precise date, I do recall it was right

7   before Thanksgiving.

8   Q.    How did you react to that?

9   A.    I told her immediately not to send that letter home.

10  Q.    Why?

11  A.    Because teachers don't put subs in positions.  And the

12  other thing was I knew we were going to be interviewing for her

13  replacement later.

14  Q.    Later being December?

15  A.    Sometime before January we would be interviewing.

16  Q.    The dates had been set?

17  A.    No.

18  Q.    How did she react to that, Ms. Pickens that is?

19  A.    She was not happy with that.  And she felt that she

20  should be allowed to name who her substitute would be.

21  Q.   That's what she said to you?

22  A.   She did say that, yes.

23  Q.   Do you recall anything else of that exchange between the

24  two of you?

25  A.   No.

9

1  Q.   What happened next relative to the staffing of Joye

2  Pickens' position?

3  A.   I believe until interviews were set up, we hadn't yet set

4  up interview dates or at least Mr. Heller hadn't established

5  the dates of the interview, I should say, I contacted Mr.

6  Heller right after I received the letter that very day.

7  Because I felt that that was wrong what Ms. Pickens had done,

8  and she was not following protocol.  At that time we needed a

9  day-to-day sub until we could find a more permanent

10  replacement.  So Mr. Heller instructed me to make sure that we

11  had a day-to-day sub.  I did ask Ms. Wagner to fill in

12  day-to-day until further notice.

13  Q.   You said that to Ms. Wagner?

14  A.   I don't know I used the word further notice, it was

15  something to that effect, yes.

16  Q.   But you spoke to Ms. Wagner directly?

17  A.   Yes.

18  Q.   Then what happened next?

19  A.   We established dates for interviews, I think we had two

20  different days of interviews in December.

21  Q.    And then what happened after that?

22  A.    I think a few days later Ms. Pickens did come back in my

23  office very briefly, I think she was venting that she seemed --

24  she was determined that she felt she should be the one to name

25  her successor.

10

1  Q.   When you say a few days later, tell us what you mean?

2  A.   Well, she was already off and Ms. Wagner was in the

3  classroom subbing.  And she came in sometime during the school

4  day, caught me in my office for just a few seconds and said I

5  want you to know that I'm not happy, that I feel I should be

6  able to name Ms. Wagner as my substitute.

7  Q.   Did you react?

8  A.   I told her that there would be interviews.  I didn't

9  react emotionally, I didn't discuss it with her.

10  Q.   Was she emotional?

11  A.   Yes, she was angry.  She was not angry at me, I think she

12  was angry at the situation.  I remember she was emotional, I

13  felt she was coming to me to vent, and it was really not

14  discussed.  She did leave after a few seconds of letting me

15  know what was on her mind.

16  Q.   Did anything else happen relative to the filling of Joye

17  Pickens' long-term sub between that conversation you just

18  referenced and the actual interviews?

19  A.   Any conversation between myself and Ms. Pickens?

20  Q.    We should allow the other to finish for this to work.

21  Which happened first, your conversation with Ms. Pickens where

22  she became emotional and vented, or your conversation with Ms.

23  Wagner where you said she could be in there as long as

24  necessary or words to that effect?

25  A.    I talked to Ms. Wagner before, and Ms. Pickens came in to

11

1  show her frustration.

2  Q.    Okay.  You talked to Ms. Pickens, you called Mr. Heller?

3  A.    Right.

4  Q.    You talked to Ms. Pickens --

5  A.    Ms. Wagner.

6  Q.    Ms. Wagner?

7  A.    And then Ms. Pickens came in and showed anger.

8  Q.    Okay.  In that order?

9  A.    Correct.

10  Q.    So between the time that Ms. Pickens came in and showed

11  anger and the actual interviews, did anything else happen or

12  were there any other conversations between you and Ms. Wagner

13  or you and Ms. Pickens?

14  A.    There would have been a conversation between Ms. Wagner

15  and I.  I did observe her and we discussed the observation.

16  Q.    Okay.  I'm going to have you look at Exhibit W, which I

17  think is your evaluation.  It's in Volume II.

18        MR. MEAD:  It was also introduced as Exhibit No. 5.

19  BY MR. KUHAR:

20  Q.   What is Exhibit W, Mr. Meader?

21  A.   It is the observation form which I used to take notes on

22  the social studies lesson that I saw Ms. Wagner do.

23  Q.   Let's back up a little bit.  You did observe her class?

24  A.   Yes.

25  Q.   Why?

12

1  A.   It is not uncommon that when we know we're going to be

2  interviewing people, we try, principals try to get in to

3  observe formally, informally.  We try to observe some of the

4  people that we know are going to be candidates for job

5  interviews.  We do that, we try to, it's difficult with our

6  busy schedule.  When we can, we try to get in and observe.

7  Q.   Do you recall whether the idea to observe her was yours

8  or Mr. Heller's or joint?

9  A.   Mr. Heller encourages us to get in and observe.  I don't

10  recall if that was his idea or mine.

11  Q.   Okay.  So, in fact, you did observe a lesson?

12  A.   Yes.

13  Q.   What do you recall of that situation, what do you recall

14  of the lesson, and what do recall of your perception of it?

15  A.   I recall that the lesson was about she had a globe and

16  she was I think pointing out some things on the globe.  I also

17  recall it was a discussion of ancestors.  I don't recall a

18  whole lot of detail.

19  Q.   Again, I would ask you to look at the commendations and

20  recommendations part of Exhibit W to see if that refreshes your

21  recollection?

22          MR. KUHAR:  While you're doing that, I'll move for

23  Exhibit W, your Honor.

24          THE COURT:  It's admitted.

25  BY MR. KUHAR:

13

1  Q.   Does it add anything to your recollection of what you

2  observed in there?

3  A.   I don't think so.

4  Q.   From a performance standpoint, what do you recall your

5  thoughts were about her performance during that lesson?

6  A.   I was observing her as a substitute teacher.  And I was

7  not as critical, I would hold a substitute teacher to different

8  standards than a full-time employee teacher.

9  Q.   Why?

10  A.   We require different things of a substitute.  It's more

11  basic.  We want them to follow the lesson plan, basically, get

12  through the day.  Follow basic school procedures.  Whereas, a

13  teacher, a full-time teacher has to be very knowledgeable, be

14  able to create lessons, be knowledgeable about the state

15  standards, requirements that they have.  Regulations and

16  procedures and things like that.  They have to be more

17  knowledgeable than a day-to-day sub.

18  Q.   So you were observing her as a day-to-day sub because she

19  was a day-to-day sub?

20   A.   Right.  And she was satisfactory as a day-to-day sub.

21   Q.   Okay.  Did you have a conversation with her about this

22   observation, a report of the classroom visitation?

23   A.   Yes.

24   Q.   When?

25   A.   I always see the teachers as soon as possible, but not

14

1   the same day.  So it would have been the next day or possibly

2   the day after.  Within a day or two after this observation.

3   Q.    Was anyone else present for this conversation?

4   A.    No.

5   Q.    What do you recall of this conversation you had with Ms.

6   Wagner?

7   A.    I reviewed what I saw, I reviewed some of the notes I

8   had.  On the sheet I did put a few suggestions down of how she

9   could improve, make that lesson better.

10  Q.    But, again --

11  A.    But it was not a bad lesson.

12  Q.    I was just going to say the contents of the sheet are on

13  the sheet?

14  A.    Correct.

15  Q.    I'm having you focus on anything you recall that you

16  actually said or things that she said?

17  A.    No, we just went over, I just reviewed the things I had

18  written down and that's all.

19  Q.    Okay.  Now, you did participate in the two interviews?

20   A.   Yes.

21   Q.   And Amy Szalewicz was chosen for the Pickens' long-term

22   sub position?

23   A.   Correct.

24   Q.   When did Amy Szalewicz begin teaching in Ms. Pickens'

25   classroom?

1  A.   In January, I couldn't give you a date, but in January.

2  Q.   And how was that conveyed to Ms. Wagner that it would be

3  someone other than Ms. Wagner who was going to be filling out

4  the rest of that leave?

5  A.   Mr. Heller came down to the school and asked me to be

6  with him when he explained that to Ms. Wagner.  So the three of

7  us were together.  Mr. Heller explained it to her.

8  Q.   Did you do any of the talking?

9  A.   No.  I believe -- I believe we needed her for the

10  remainder of the week.  I believe I spoke to that effect.

11  Until the long-term sub would be filling in.

12  Q.   Is that Amy Szalewicz?

13  A.   Yes.  I think that was the only thing I said during the

14  meeting with Mr. Heller and Ms. Wagner was that we needed her

15  the rest of the week.

16  Q.   Is that what determined when Ms. Szalewicz would come is

17  her availability?

18  A.   I don't know.

19  Q.   Is that what drove how long Ms. Wagner would stay, was

20  basically until Ms. Pickens was available, I'm sorry, Ms.

21  Szalewicz was available?

22  A.    Yes, Ms. Wagner was a day-to-day sub.  Until we

23  interviewed and hired the person to fill the rest of the school

24  year.

25  Q.    Do you recall any conversation that you had with Ms.

16

1  Wagner at any time in which you said something to the effect of

2  I've never seen anything like that happen before?

3  A.    No.  Nothing that I would have said I've never seen.

4  Ms. Wagner did come to me and she said, I guess she was asking

5  questions about why there's an interview, this is prior to the

6  interviews, when she found out there would be interviews.  She

7  was questioning why there were interviews and she did ask why

8  this was different.  And I explained to her that, you know, the

9  administration is relatively new and they can do things, they

10  can do this, something to that effect, in the conversation.

11  Q.    By the administration is new, what did you mean?

12  A.    Well, Mr. Heller had been, I believe he came to Crawford

13  Central in February of '02.  So we're talking just within

14  months after his employment as assistant superintendent.

15  Q.    At the time you were having that conversation in late '02

16  with Ms. Wagner, how long had you been with the district?

17  A.    That would have been during my fourth school year.

18  Q.    Do you recall how many leaves of absence your teachers

19  needed in whatever building you were in during those

20   three-and-a-half years or so?

21   A.   I think there was one prior to this.

22         MR. KUHAR:  I have no further questions.

23              CROSS-EXAMINATION

24   BY MR. MEAD:

25   Q.   Mr. Meader, the time period before when there was a leave

17

1  of absence besides Ms. Pickens, can you tell us who that person

2  was?

3  A.    The teacher's name was Lisa Beck, she was a kindergarten

4  teacher.

5  Q.    Is it correct that Lisa Beck requested Karen Jamieson to

6  replace her?

7  A.    She didn't request her, we did discuss that Ms. Jamieson

8  she felt Ms. Jamieson has some strong points, some good

9  qualities as a substitute teacher.

10  Q.    Am I also correct that Ms. Jamieson did replace Ms. Beck

11  for the entire school year?

12  A.    That is correct.

13  Q.    Did you interview Ms. Jamieson?

14  A.    I didn't formally interview her, no.  I did know her as a

15  day-to-day sub.  I had seen her and I would say I had informal

16  observations of her on a regular basis.

17  Q.    But no formal interview, you'll agree to that?

18  A.    That is correct.

19  Q.    Am I also correct that was a long-term sub job for the

20  school year 2001-2002?

21  A.   Yes.

22  Q.   Now, you stated that --

23       THE COURT:  Excuse me, I want to make sure I

24  understand the timeframe here.

25       THE WITNESS:  Actually, let me retract that.  I

1  don't recall what school year that was.  It was not 2002-2003.

2  BY MR. MEAD:

3  Q.   If she testified it was 2001-2002, would you disagree?

4  A.   No, I have no reason to disagree with that.

5        THE COURT:  I'm still trying to get myself oriented,

6  I apologize.  Did this Jamieson, did Ms. Jamieson's long-term

7  substitute placement occur before or after Mr. Heller arrived

8  at the district?

9        THE WITNESS:  Before he arrived at the district.

10        THE COURT:  Go ahead.

11  BY MR. MEAD:

12  Q.   Mr. Heller arrived at the district in February of 2002,

13  did he not?

14  A.   Right.  Ms. Jamieson was secured as a long-term sub in

15  2001, 2001-2002.

16  Q.   She was secured as a long-term sub in 2001-2002, is what

17  your testimony is?

18  A.   Right, if the date you're giving me is 2001, and if she

19  testified that was the case, I would say that yes, it was 2001.

20   It would have been the fall of 2001 prior Mr. Heller's

21   employment.

22   Q.   But Mr. Heller never requested to observe her or

23   interview her, to your knowledge, correct?

24   A.   He wouldn't have been employed at the time.

25   Q.   How about in February of 2002, he would have been

19

1  employed at that time?

2      MR. KUHAR:  What was the question, if he had been

3  employed?

4  BY MR. MEAD:

5  Q.   We can agree Mr. Heller was employed in February, 2002?

6  A.   Correct.

7  Q.   Can we agree that Ms. Jamieson was teaching as a

8  long-term sub in February, 2002, correct?

9  A.   Correct.

10  Q.   And she had been teaching for probably four months total

11  by that time period, four or five months?

12  A.   Yeah.

13  Q.   She had approximately three more months to go in the

14  school year, correct?

15  A.   Right.

16  Q.   My question to you is do you know if Mr. Heller requested

17  an interview of her or an observation of her during the time

18  period when he arrived in February, 2002, until the end of the

19  school year 2002?

20   A.   Mr. Heller encourages, I said this earlier, Mr. Heller

21   encourages us to observe as many substitutes as we can.  So I

22   may have been asked to observe.  But I don't recall any

23   specific request to observe Ms. Jamieson.

24   Q.   And you certainly didn't conduct any formal interviews,

25   as you testified, of Ms. Jamieson?

20

1  A.    No.

2  Q.    Now, let's go to, you told us you did a visitation or

3  observation of Ms. Wagner, correct?

4  A.    Right.

5  Q.    That was December 3, 2002, correct?

6         THE COURT:  I have 11/26.

7         THE WITNESS:  The date I met with her and discussed

8  it was the 3rd.  I observed her on the 26th of November.

9  BY MR. MEAD:

10  Q.    I stand corrected, you're correct.

11  A.    I believe it was probably, looking at the length of time

12  between the date I observed her and the date I sat down with

13  her, as I said earlier, I try and get in there the next day or

14  two.  But it would appear there might have been a Thanksgiving

15  break during that time period.

16  Q.    At the time period you observed her, it's fair to say

17  that you knew that Ms. Pickens was going to be absent for a

18  long period of time?

19  A.    Right.

20  Q.   It's fair to say that you knew that she could possibly be

21  gone for the entire following semester, correct?

22  A.   At the time I observed her, yes.

23  Q.   At the time you observed Ms. Wagner?

24  A.   Right.

25  Q.   And at the time you observed Ms. Wagner, she had been

21

1   substituting day-to-day for Ms. Pickens for approximately, at

2   least a week or two, correct?

3   A.   Correct.

4   Q.   And it's fair to say at that time period you knew Ms.

5   Wagner was interested in Ms. Pickens long-term substitute job,

6   correct?

7   A.   I can't say that I knew that, no.

8   Q.   Well, Ms. Pickens had gone to you specifically and

9   requested Ms. Wagner, correct?

10  A.   Can you ask the question again, I'm a little confused.

11  Q.   Certainly.  I asked you when you observed Rowena Wagner

12  on November 26, 2002, you knew that it was likely she would be

13  applying to become a long-term sub to replace Ms. Pickens?

14  A.   Yes, I did know that.

15  Q.   And your testimony is here today that you held her to a

16  day-to-day sub standard rather than to a long-term sub

17  standard, even though you knew she was going to be applying for

18  a long-term sub standard?

19  A.   When I observed her, she was not a long-term sub, she was

20  a day-to-day sub.  So yes, I did observe her as a day-to-day

21  sub.

22  Q.    But we can agree you knew she was going to be applying to

23  be a long-term substitute?

24  A.    That is correct.

25  Q.    And we can also agree that she substituted at your school

22

1  approximately 50 times the year before?

2  A.   I couldn't say that, no.

3  Q.   Would you disagree with me that she substituted 50 times

4  at your school the year before?

5  A.   I would have no idea how many days she substituted, but

6  she did substitute there before, yes.

7  Q.   Frequently, can we say frequently, do you agree to that?

8       THE COURT:  This witness doesn't know.

9       THE WITNESS:  I don't know what you mean by

10  frequently.  Frequently could be once a week.

11  BY MR. MEAD:

12  Q.   You know she was at your school before?

13  A.   Yes.

14  Q.   How many times did you observe her prior to November 26th

15  of 2002 during that time period she was at your school?

16  A.   I had not formally observed her.

17  Q.   How many times had you gone into her classroom and done a

18  written evaluation before November of 2002?

19  A.   I had not done a written, first of all, that's not an

20   evaluation.  I did an observation, there is a difference

21   between the two.

22   Q.   All right.  Well, tell me how many written observations

23   did you do of her work prior to November, 2002?

24   A.   None.

25   Q.   So despite the fact that she had been a day-to-day sub

23

1  during the school year 2001-2002, you did not do an observation

2  until after Ms. Pickens had requested her, correct?

3  A.    You're asking if I did an observation after Ms. Pickens

4  requested her, is that what the question was.

5  Q.    Yes, that's the first time you did an observation?

6  A.    Yes.

7  Q.    But your testimony is still you were only observing her

8  as a day-to-day sub, you went a little easier on her, is that

9  your testimony?

10  A.    Right.  Also, I want to add about observations.  There

11  are informal observations.  And I had been in Ms. Wagner's

12  classroom before a number of times.  I believe that a principal

13  should move around the building, look at the classrooms on a

14  day-to-day basis, see what's going on.  Be available for

15  questioning and comments and things like that.  That's the way

16  I practice.  I had been in Ms. Wagner's classroom prior to that

17  observation, that formal observation.  So I would say I had a

18  number of informal observations of her.

19  Q.    Obviously, those were favorable because she kept coming

20  back, correct?

21  A.   As a day-to-day substitute, yes, I think she was

22  favorable, yeah.

23  Q.   And you're also aware of the fact that she had filed a

24  PHRC claim in February of 2003, correct?

25  A.   Yes.

24

1       MR. MEAD:  Thank you, that's all I have.

2       THE COURT:  Anything else?

3       MR. KUHAR:  Briefly, your Honor.

4               REDIRECT EXAMINATION

5  BY MR. KUHAR:

6  Q.    Do long-term substitutes have duties in addition to the

7  duties of day-to-day substitutes?

8  A.    Yes.  A long-term substitute would be creating lesson

9  plans, would be expected to attend faculty meetings, other

10  meetings for special education purposes.  They would be

11  expected to attend district in-service training.  That a

12  day-to-day sub would not be expected to do.

13  Q.    Would they participate in IEP meetings?

14  A.    Yes.

15  Q.    Is it customary for day-to-day subs to do that?

16  A.    Absolutely not.  In fact, that's not a practice, no.

17       MR. KUHAR:  Nothing further.

18       MR. MEAD:  Nothing further, your Honor.

19       THE COURT:  Thank you, Mr. Meader, you're excused.

20          MR. KUHAR:  For housekeeping, after Ms. Good, we

21  have about five pages of a deposition to read in.

22          THE COURT:  Is Ms. Good your last live witness?

23          MR. KUHAR:  Yes, your Honor.  We would call Suzanne

24  Good.

25          THE CLERK:  Raise your right hand, please.

25

1          SUZANNE GOOD, DEFENSE WITNESS, SWORN

2               DIRECT EXAMINATION

3   BY MR. KUHAR:

4   Q.   Good morning, Ms. Good.

5   A.   Good morning.

6   Q.   You hold a position in Crawford Central, right?

7   A.   Yes.

8   Q.   What is it?

9   A.   I'm the director of elementary curriculum, the project

10   director for federal programs and the reading supervisor, K

11   through 6.

12   Q.   All three?

13   A.   Yes.

14   Q.   And you reside in the Meadville area?

15   A.   I reside in Titusville.

16   Q.   How long have you worked at the district?

17   A.   I've worked there eight years.

18   Q.   Have you held all those positions during that time?

19   A.   No, not all of them all the time.  I've been the director

20    of elementary curriculums since 2002, January of 2002.  Prior

21    to that I was a reading supervisor.

22    Q.    What's your education?

23    A.    I have a bachelor of science degree in elementary

24    education from Indiana University --

25          THE COURT:  Slow down, ma'am, you're way too fast.

26

1        THE WITNESS:  I have a bachelor of science degree in

2    elementary education from Indiana University of Pennsylvania.

3    I have a reading certification and a master's in reading and a

4    reading supervision certification from Clarion University.  And

5    I have my superintendent's certification from Westminster

6    College.

7    Q.    Where did you work prior to working at Crawford Central

8    and in what capacity?

9    A.    I worked in the Titusville Area School District.  I was

10   an elementary teacher, I was a reading specialist and I was

11   their reading supervisor during the years I was there.

12   Q.    Which were what years?

13   A.    From 1972 to 1999.

14   Q.    Do you have a role in the hiring of long-term subs and

15   permanent elementary teachers?

16   A.    Yes, that's part of my job responsibilities.

17   Q.    Has your role been the same, if you would look at that

18   role now back to say November of '02, is it basically the same

19   role?

20  A.   Yes.

21  Q.   What is your role?

22  A.   My role is I'm a team player on the team.  I provide

23  recommendations of candidates to interview.  I help develop and

24  revise the questions that we use for the interview process.  I

25  interview the candidates along with other team members.  After

27

1   all the candidates are interviewed, I participate in the

2   discussion, where we find the most outstanding candidates that

3   would fit a position.  And my expertise is in curriculum

4   assessment and instruction.  So that is the perspective from

5   which I come from.

6   Q.   Now, you said you were a member of the interview team?

7   A.   Yes.

8   Q.   I think you may have said that you were a team player,

9   did you --

10   A.   I am a member of the team.

11        THE COURT:  Do you mean a team player in general?

12        THE WITNESS:  Yes.

13   BY MR. KUHAR:

14   Q.   All right.  Are you familiar with what the district

15   expects of its long-term subs and permanent teachers as

16   compared to what it expects from it's day-to-day teachers?

17   A.   Yes.

18   Q.   Day to substitute teachers?

19   A.   Yes.

20  Q.   Describe that, please?

21  A.   A day-to-day substitute isn't expected to make the

22  instructional decisions that a long-term sub and a permanent

23  teacher does.  They are expected to come in and follow the

24  plans that have been designed by the classroom teacher and

25  manage the classroom behavior during the day when the teacher

1  is not there.  They are certified, but they don't have to be

2  interviewed through the competitive interview process.  But

3  they are board approved.  A long-term sub and a permanent

4  teacher are expected to have a thorough knowledge of curriculum

5  assessment and instructional strategies so that they can make

6  the appropriate decisions in planning and preparation, provide

7  a classroom environment that is conducive for all children to

8  learn.  And have a wealth of knowledge of instructional

9  strategies to meet the needs of the children on a regular

10  basis.

11  Q.    Okay.  There's been some testimony about instructional

12  strategies and standards, educational standards.  I'm going to

13  ask you basically who or what drives the changes in those

14  things over time; do you understand my question?

15  A.    Yes, I do.  Actually, over time the decisions are driven

16  based upon federal program money.  Originally, the federal

17  government required, if you accepted federal moneys, then you

18  must meet guidelines and regulations from their Chapter 4,

19  which is the regulations that drive our public schools,

20  establish standards.  And so, ultimately, the changes are made

21  through the standards, the guidelines, out of Chapter 4.

22  Q.    Now, when you say standards, what is a standard, is that

23  what students are supposed to learn?

24  A.    The standards are written in a form that indicates, there

25  are minimum competencies of what students need to know and to

29

1  be able to do.  They are performance based.  So the standards

2  not only have changed the way we address our curriculum, it

3  changes the way we're addressing our assessment as well.

4  Because now our students are assessed in a performance-based

5  manner.

6  Q.    What do you mean when you say assessment, what do you

7  mean when you say performance-based manner?

8  A.    Prior to the changes in Chapter 4, we would take

9  assessments like you and I would take multiple choice, true and

10  false.  Now students are required to show their knowledge in

11  situations where they have to apply what they've learned.  So

12  there's more writing, there's more analytical thinking.  There

13  is more problem solving for students to do in our state

14  assessments.  And, therefore, our formal assessments in the

15  district are performance based as well.

16        THE COURT:  This is just kind of a follow-up to the

17  discussion I was having with a witness I think yesterday.  But

18  it fair to say the approach or the curriculum adapts in

19  response to, for lack of a better term, the changing objectives

20   for test standards that are coming down from on top?

21          THE WITNESS:  Yes.  Assessment does drive

22   instruction.  So we use the assessment to make decisions about

23   what students need.

24          THE COURT:  To succeed?

25          THE WITNESS:  To succeed, right.  And the

30

1   assessments are written around the standards.  So you need to

2   be having your curriculum aligned to the standards so that you

3   are teaching in a way that the students would have the

4   knowledge and be able to perform on the assessment.

5        THE COURT:  So, in other words, just to put a capper

6   on this at least insofar as I'm concerned, the reality of the

7   situation is that every so many years, be it 8, 10 years, these

8   federal standards, in other words, the benchmarks by which

9   children in various grades will be judged or the manner in

10  which they will be judged change?

11       THE WITNESS:  First of all, they're not federal

12  standards, we have state standards that are I guess required by

13  the federal regulations.  It would be fair to say, I guess the

14  constant in education today is change.  It would be fair to say

15  as standards are written, then the department pulls together

16  the committee, who goes back and reviews and revises the

17  standards.  And the assessment has been revised over the years

18  as well.  I had the opportunity to serve on an assessment

19  committee in 1999-2000.  And since then the assessment has

20   changed dramatically.  But it's still standards based.

21        THE COURT:  I guess my last question, this is more

22   of a philosophical discussion than anything else, but let's

23   assume you had one set of standards in 2000.  A group got

24   together and said this is the best way to do it, than in 1995,

25   than in 1990, constantly changing, revolving, if you will.

1   What's the objective criteria in any given year by which that

2   group decides this is the best way to do it?

3        THE WITNESS:  Well, up until 1999 when the standards

4   were still proposed, every school district could set their

5   curriculum with the competencies they felt were necessary.  At

6   that time it became the standards for all 501 school districts.

7   So we were all going in the same direction.  And they are

8   minimum competencies.  We can require more of our students than

9   just the standards as we're writing our curriculum.

10  Accountability is probably the thing that has been the driving

11  force.  The assessments that we're required to do by the state

12  hold us accountable all the same.  I think that's probably the

13  biggest change.

14       THE COURT:  Thank you.  Go ahead, Mr. Kuhar.

15  BY MR. KUHAR:

16  Q.   What we've been talking about, though, are the standards

17  regarding what the students are supposed to learn, the

18  assessments measure whether the standards are being met and the

19  content of the curriculum?

20   A.   Has to be aligned with the assessments and standards.

21   Because the assessment is aligned to the standards.  So,

22   ultimately, it's all aligned to the standards.

23   Q.   But once the curriculum is set with that methodology, is

24   there only one way to teach it or are there multiple ways to

25   convey the curriculum to students?

1    A.    There is multiple ways.  The curriculum is what we want

2    them to be able to know and do.  But the instructional

3    strategies and classroom environment is the way you deliver it,

4    depends upon the teaching styles of the teachers, the

5    initiatives of the district are very important.  And then the

6    needs of the students.

7    Q.    If you could just explain a little bit by what you mean

8    when you say instructional strategies?

9    A.    Okay.  An instructional strategy, I'll talk about the

10    district initiatives that we have and the instructional

11    strategies.

12    Q.    Particularly, any that are relatively new.  Go ahead and

13    give your answer, I'm saying if something you're about to tell

14    us about is old, say it's old, if it's newer, say it's newer,

15    okay?

16    A.    Okay.  We believe in a gradual release approach to

17    instructional strategy.  Which has the teacher modeling and in

18    our balanced literacy program, which we are working towards,

19    the teachers do read aloud --

20          THE COURT:  What do they do?

21          THE WITNESS:  Interactive read alouds.

22          THE COURT:  Read alouds?

23          THE WITNESS:  Right.  Where they model the

24   appropriate thinking, the skill or the strategy for reading

25   that we want the students to know.  Then as the teacher

1   releases to the students more of the accountability for

2   learning, it's a shared reading, where we work together,

3   everybody has the book, everybody reads together.  Then there

4   is an approach that we are working towards for guided reading,

5   small group, direct instruction.  This is when you identify,

6   it's a strategy where you identify the needs of the students

7   and you put them in a fluid, small group, so you're not always

8   in the same small group, you work directly with the children on

9   those strategies.  And the last component of a balanced reading

10  program in a balanced literacy, would be independent practice,

11  where the students practice the skills and the strategies that

12  have been modeled, that they worked with the teacher through

13  guided practice.  And then there's the same four components for

14  writing.  Those are strategies, initiative that we're working

15  towards.

16  BY MR. KUHAR:

17  Q.   That's an example of what instructional -- what was the

18  term?

19  A.   Gradual release.

20  Q.   This is an example of?

21  A.   Balanced literacy.

22  Q.   Instructional strategies?

23  A.   Yes.

24  Q.   This is an example of an instructional strategy?

25  A.   Right.

34

1  Q.   To try to teach --

2          THE COURT:  Mr. Kuhar, I think we're going farther

3  down this road than we need.  Unless it has some particular

4  relevance here.

5          MR. KUHAR:  I agree that we've probably hit the end

6  of the road.  To clarify the relevance, the inference seems to

7  be, the plaintiff is inferring there is not as much content to

8  some of these things as the testimony would suggest that there

9  is.

10         THE COURT:  Content, I don't know what you mean,

11  content to some of these things?

12         MR. KUHAR:  Aspects of the interviews on which she

13  performed poorly.  In other words, the interviews assessment,

14  whether she knew these things Ms. Good has been talking about.

15  This testimony is just to illustrate there is substance to

16  that.  I agree we're at the end of the road for that.

17         THE COURT:  Let's bring the testimony now back to

18  the case.

19  BY MR. KUHAR:

file:///A|/WAGDAY4.TXT

20   Q.   If a person is successful as a day-to-day sub, is that a

21   good indicator whether they'll be a successful long-term sub or

22   a regular teacher?

23   A.   No.

24   Q.   Why?

25   A.   Because the expectations for a day-to-day sub aren't the

35

1   same as those for a long-term sub.  The expectations of a

2   day-to-day sub is that they follow the teacher's lesson plans.

3   The long-term sub has to have the knowledge and the

4   understanding to make those plans, to have an understanding of

5   the assessment process, so that they can identify the needs of

6   the students.  And to be able to create an environment where

7   all kids can learn.

8   Q.    Like a permanent teacher?

9   A.    Yes.

10   Q.    You're familiar with Ms. Wagner, of course?

11   A.    Yes.

12   Q.    When did you first become familiar with her?

13   A.    I knew she was a sub in our district but I never formally

14   had talked to her until our 2002 interviews.

15   Q.    And, generally speaking, why was she not chosen for one

16   of the long-term subs for which the '02 interviews were

17   conducted?

18   A.    Her performance at the interview was very poor.  She

19   didn't have a thorough knowledge that the other candidates had.

file:///A|/WAGDAY4.TXT

20   Q.    Okay.  What about the '04 process, did you participate in

21   that as well?

22   A.    Yes.

23   Q.    Why was she not awarded one of those positions?

24   A.    Again, in her interview the answers, her interview scores

25   were poor.  The answers provided by the other candidates, who

1  were most outstanding, were much more thorough and elaborate.

2  They indicated that they had a thorough knowledge and hers

3  didn't.

4  Q.   I'm not going to actually ask you about your actual

5  interview forms, for reasons that aren't important right now.

6       MR. KUHAR:  Your Honor, just by way of an offer of

7  proof on my own, we are going to gently plow through a little

8  bit of the territory that Mr. Heller has testified to, in that

9  there's an allegation that he has made, he has adopted that

10  biased remark of Mr. Wright.  I need the witness --

11       THE COURT:  Go ahead.

12  BY MR. KUHAR:

13  Q.   Does the district seek minority teachers?

14  A.   Yes.

15  Q.   Why?

16  A.   We feel that it's important to have minority teachers in

17  our district.  They provide a wealth of knowledge to our

18  students and we're looking for good candidates that are

19  minorities.

20  Q.  So they have to be both, if they're of minority or

21  non-minority, they have to be good candidates?

22  A.  They have to be outstanding, they have to demonstrate a

23  thorough knowledge so that they are an outstanding candidate,

24  yes.

25  Q.  Do you know why the district doesn't have more racial

37

1  minorities or foreign-born people on its teaching staff?

2  A.    We haven't had -- there have been few racial minorities

3  in as student teachers.  There are few in our area even in

4  education.

5  Q.    In the field of education?

6  A.    Yes.

7  Q.    Go ahead.

8  A.    I know that we do advertise.  But we have had few

9  applications.

10  Q.    Are you aware of any teacher who has chosen their

11  long-term substitute since Charlie Heller has been assistant

12  superintendent beginning in February of '02?

13  A.    None have.

14        THE COURT:  What was that question again?

15  BY MR. KUHAR:

16  Q.    Whether she's aware of any permanent teachers who have

17  chosen their long-term substitutes since Mr. Heller was here in

18  February of '02?

19  A.    None.

20  Q.   Why doesn't the district permit permanent teachers to

21  choose their long-term subs?

22  A.   It's not a teacher's responsibility to choose a

23  substitute.  It's the responsibility of the administrators.

24  And teachers don't observe their substitutes, and they don't

25  interview.  If a long-term sub was there for three consecutive

38

1   semesters, they could get bidding rights and that could

2   circumvent the interview process completely.

3   Q.   So you're saying if a permanent teacher could choose a

4   long-term sub three times, they would have a contractual right

5   to obtain a permanent position?

6   A.   If they are in a subbing position the beginning of the

7   third semester, they would have the opportunity to have bidding

8   rights during that semester if there is an assignment

9   available.

10   Q.   Without ever having gotten the approval of the

11   administration?

12   A.   Right, they wouldn't have to indicate they were the most

13   outstanding candidate at the time, right.

14   Q.   To the satisfaction of the administration?

15   A.   Right.

16   Q.   When Ms. Pickens -- I'm sorry, when Ms. Wagner was

17   interviewed for Ms. Pickens' position, she was, right?

18   A.   Yes.

19   Q.   There were other positions as well?

20  A.    Yes, there were three other positions.

21  Q.    When was it decided that all four of those positions

22  would be -- there would be interviews for them?

23  A.    It was decided at one of our principal's meetings.  I

24  have a principal, a curriculum principal's meeting monthly with

25  the elementary principals, it would have been in our October or

39

1  November meeting.

2  Q.    Would it have been before or after Ms. Pickens

3  recommended Ms. Wagner?

4  A.    It would have been before.

5  Q.    How do you know?

6  A.    Our meetings are early in the month.  It would have been

7  in the first two weeks of November or in October.

8  Q.    Was that decision made before or after the district

9  learned that Ms. Pickens would actually be leaving in '02; do

10  you understand the question?

11  A.    Yes, I think.  Ask me one more time.

12  Q.    Ms. Pickens ended up leaving her position in November of

13  '02, correct?

14  A.    Earlier, right.

15  Q.    Go ahead.

16  A.    We knew that she was going to be taking some time off

17  during the second semester.

18  Q.    The second semester?

19  A.    Right.

20   Q.   Which began when?

21   A.   January of '03.

22   Q.   Then you learned that she would need time off sooner than

23   that?

24   A.   Yes.

25   Q.   Was the decision to do interviews for the four long-term

40

1   subs made before or after the district learned that Ms. Pickens

2   was actually going to be out beginning in November?

3   A.   It was made before.

4   Q.   Okay.  Taking into account that you've already told us

5   about how long-term subs, the process used to pick long-term

6   subs, briefly walk us through the process that led up to Ms.

7   Szalewicz and the others being chosen for the four positions

8   that we've been talking about?

9   A.   Okay.  Mr. Heller convened a meeting of the elementary

10   principals and myself and asked for recommendations --

11        THE COURT:  Slow down, ma'am.  Slow down a little

12   bit because he has to get down what you're saying.

13        THE WITNESS:  Okay.  Mr. Heller convened a meeting

14   of the elementary principles and myself, to get recommendations

15   for candidates for the interviews.  At that time we all provide

16   input from our observations of student teachers, possibly

17   substitutes.  Even candidates that maybe we have become aware

18   of through recruiting fairs or teachers working in our

19   after-school programs.  That's how the candidates were

20  identified, the 17 candidates that we were going to interview.

21  We used the questions that have been developed in our bank of

22  questions from Crawford Central's interviews, and Mr. Heller

23  introduced an interview analysis form that he brought with him

24  from another districts, that would make our interview process

25  more objective.  He scheduled the interviews, contacted the

41

1  candidates, and we had two interview dates in December.  I was

2  part of the interview team.  During the interview we each asked

3  one question.  It's a very consistent process, every candidate

4  gets asked the same questions.  We each independently fill out

5  the interview analysis form and calculate our scores.  When all

6  the interviews are finished, that is when we have a discussion.

7  At that time we numerically rank the candidates.  But the

8  interview process is only the beginning of what we do.  The

9  discussion is very important.  And we are looking for the most

10  outstanding candidates that would match the positions that were

11  available.  And at that time we had four positions available.

12  BY MR. KUHAR:

13  Q.   Okay.  The people who were chosen for interviews in

14  December of '02 --

15  A.   Yes.

16  Q.   I'm going to focus on that for a second.  Did you say

17  that, basically, they were suggested by one or more members of

18  that interview committee?

19  A.   Yes.

20  Q.    Do you recall how it came to be that Ms. Wagner was

21  included on that list of people to be interviewed?

22  A.    She would have been suggested probably by one of the

23  principals.  I don't actually know.

24  Q.    Okay.  Do you recall whether you suggested any people to

25  be interviewed?

42

1  A.   Yes, I suggested Amy Szalewicz-Lawrence.

2  Q.   Ultimately, Ms. Wagner was not chosen for one of the

3  four, correct?

4  A.   Yes.

5  Q.   Yes, I'm correct she was not chosen?

6  A.   Right, she was not chosen.

7  Q.   Why?

8  A.   Her interview showed that she lacked the knowledge that

9  the other candidates had.  Her scores were very poor.  The

10  other candidates showed that they had a thorough knowledge of

11  the content that was required and the expertise and in

12  preparation and planning.  An understanding of assessment.  And

13  meeting the needs of diverse learners.

14      MR. KUHAR:  I want to clarify this point with your

15  Honor and Mr. Mead, I'm under the impression the stipulation

16  would extend to Ms. Good's review of her interview notes,

17  essentially, that her interview analysis forms that if I were

18  to ask her to go through those forms, her testimony would

19  indicate that those matched her perceptions of Ms. Wagner's

20    performance during that interview.

21           MR. MEAD:  That's fine.

22           MR. KUHAR:  For that reason I won't do it.

23           THE COURT:  All right.

24    BY MR. KUHAR:

25    Q.   Now, the scores assigned to the people, the 3's, 4's,

43

1   5's, those scores?

2   A.   Yes.

3   Q.   And the total assigned to each person, you understand

4   what I'm talking about?

5   A.   Yes.

6   Q.   Were those done as part of a group project or

7   individually?

8   A.   Individually.

9        THE COURT:  Mr. Kuhar, you can move on, we've been

10  over this many, many times.

11       MR. KUHAR:  I'm trying to be very selective, I

12  understand your instruction.

13  BY MR. KUHAR:

14  Q.   At any point in the '02 interview process, I'm going to

15  jump forward to the '04 process briefly, at any point during

16  those two interview processes, did anybody say anything that

17  suggested that they were bias against Asians or Filipino

18  people?

19  A.   No.

20  Q.    How about did anybody say anything in the '04 process

21  that suggested that they were in any way upset or retaliating

22  against Ms. Wagner for having filed her EEOC charge in February

23  of '03?

24  A.    No.

25  Q.    A different form was used in the '04 interviews, correct?

44

1  A.   Yes.

2  Q.   Why?

3  A.   Between the '02 and the '04 the state came out with the

4  PDE 427.  We felt that it was important to ask questions that

5  were around the four domains on PDE 427.  Because this is the

6  form that is used to evaluate new teachers, so that they could

7  have tenure and earn their instructional two certification.  So

8  we created new questions.

9  Q.   I was just going to say who's we that created new

10  questions?

11  A.   The elementary principals, Mr. Heller and myself worked

12  together to create the questions that fell under the four

13  domains.  We created 16 questions, four for preparation and

14  planning; four for classroom environment; four for

15  instructional strategies; and four for professionalism.

16  Q.   Now, the group of people who did that, was that the same

17  group, did those same people interview the candidates in 2004?

18  A.   Yes.

19  Q.   And is that the same group who decided after the

file:///A|/WAGDAY4.TXT

20   interviews which candidates would be recommended for which

21   positions?

22   A.   Yes.

23   Q.   How was it that people ended up on that committee?

24   A.   The committee was comprised of the elementary principals,

25   Mr. Heller and myself.  And he initiated the establishment of

45

1  the committee.

2  Q.   Was that true in '02 as well?

3  A.   Yes.

4  Q.   And did Mr. Heller have any discretion, in terms of

5  putting people on who didn't fall within what you just said or

6  taking people off; do you understand my question?

7  A.   No.

8  Q.   You just told us people were on those interview

9  committees because of the positions they held at the time,

10  right?

11  A.   Yes.

12  Q.   I'm just asking you if that was altered in any way, by

13  Mr. Heller adding people to the committee or taking people off

14  of the committee?

15  A.   No.

16  Q.   Okay.  Do you recall meeting with Ms. Wagner in June of

17  '04?

18  A.   Yes.

19  Q.   Any time prior to that, did Ms. Wagner ever come to you

20  seeking assistance of any kind?

21  A.    No.

22  Q.    What do you recall of that meeting in June of '04 with

23  Ms. Wagner, who was in attendance?

24  A.    Mr. Heller told me that Ms. Wagner had made an

25  appointment with him, he invited me to sit in on the meeting

46

1   because my responsibilities are professional development, and I

2   work with anyone who would like to improve or enhance their

3   professionalism.  And so we met with Ms. Wagner and at the time

4   made some suggestions that would --

5        THE COURT:  What were they, specifically?

6        THE WITNESS:  We offered her, we told her that she

7   should access the Pennsylvania Department of Education's Web

8   site, PDE Web site.  Because that Web site contains a lot of

9   information that would only enhance her knowledge.  We

10  suggested the Pennsylvania academic standards, which you can

11  access very easily there.

12  BY MR. KUHAR:

13  Q.   Are those the standards you were talking about a while

14  ago?

15  A.   Yes.  Okay.  On that Web site are the assessment

16  handbooks for all of the Pennsylvania assessments, the PSSA.

17  That is a very good resource, we told her to do that.  We also

18  told her that you could get the PDE 427, and the PDE 427 is

19  right there where we took our questions.  It defines the

20   competencies and it shows sources of evidence under each

21   domain.  And it's easy to understand, it would give her a

22   guideline of what she could follow-up on.

23   Q.   Is it fair to say that by looking at the 427 form, does

24   that help you anticipate the interview questions?

25   A.   Absolutely.

47

1    Q.    Go ahead.

2    A.    We also talked to her about our Stars program, our

3    after-school program.

4    Q.    When you say you talked to her about it, can you be more

5    specific?

6    A.    We told her about the program and suggested if she was

7    interested in having an opportunity to work there, to get back

8    to us.

9    Q.    Did she ever get back to you?

10    A.    No.

11    Q.    Sitting here today, do you have any reason to think that

12    she did any of the things that were suggested to her during

13    that meeting?

14    A.    I would have no knowledge that she did because I don't

15    know, she had never gotten back to me, so I can't assume that

16    she has.

17    Q.    Understood that she may have done it and you don't know

18    about it.  I'm just asking do you have any knowledge --

19        THE COURT:  She already said she didn't.

20      THE WITNESS:  No, I don't have any knowledge.

21          MR. KUHAR:  Okay.  The only testimony about the

22   Stars program was Mr. Heller's.  Could we have a stipulation

23   that I don't need to bring it in through this witness --

24          THE COURT:  Do you mean what the Stars program is?

25          MR. KUHAR:  Yes.

48

1        THE COURT:  I think I understand what it is.

2        MR. MEAD:  Your Honor, we may have some brief

3   rebuttal testimony about it, but I don't have a problem.  I

4   don't know if he intends to ask her what it is, I think we've

5   heard that, that's cumulative.

6        MR. KUHAR:  Yes.  What I'm trying to do is avoid

7   that --

8        THE COURT:  I don't know how we could have any

9   rebuttal on Stars.  The Stars is what Stars is, isn't it?

10       MR. MEAD:  I agree with you.  We may talk about

11   whether or not she was asked to do it, that type of situation,

12   but not about the program.

13       THE COURT:  Then I know what the program is.

14   BY MR. KUHAR:

15   Q.   During the June '04 meeting that you were describing, do

16   you know what I'm talking about?

17   A.   Yes.

18   Q.   Did Mr. Heller make any reference to obtaining

19   experiences through employment elsewhere?

20  A.  Yes.

21  Q.  What did he say, what do you recall of that?

22  A.  He suggested that she not work exclusively in the

23  Crawford Central School District.  Because it gives you

24  opportunities to enhance your knowledge and expand your

25  background, experiences.

49

1 Q.   Did he say anything that would suggest that she was not

2 welcome to work at your district?

3 A.   No.

4 Q.   Have you ever given that advise to anyone else?

5 A.   Have I?

6 Q.   Yes.

7 A.   Yes, quite often.

8 Q.   Pardon me.

9 A.   Quite often if I'm asked.  Because it does enhance your

10 background knowledge.

11 Q.    And can you approximate how many times you have had these

12 meetings with people where you give them suggestions of this

13 type?

14 A.   Can I say more than 10.

15 Q.   If that's accurate?

16 A.   It would be yes, more than 10.  For candidates who are,

17 I'm talking about people who are looking for a position, a

18 teaching position.

19 Q.    At Crawford Central?

20   A.   Not even at Crawford Central.

21   Q.   Just in general?

22   A.   Right.

23   Q.   Go ahead.

24   A.   There are student teachers.  There are substitutes that

25   have come and just questioned about what they could do to

50

1   enhance their marketability in any position.  Because it's very

2   competitive to get an elementary position.

3   Q.   During your '04 interview of Ms. Wagner, did you note any

4   grammar mistakes on her part?

5   A.   I was aware that there were some grammar mistakes.

6   Q.   How were you aware of them?

7   A.   When, from listening to her comments, her answers to our

8   questions.

9   Q.   During the interview?

10   A.   Yes.

11   Q.   Did you note that on your interview form?

12   A.   No.

13   Q.   Did you note it during the meeting you had with her in

14   June of '04?

15   A.   No.

16   Q.   Why?

17   A.   Because I didn't think that was as significant as some of

18   the other aspects or priorities that we were talking with her.

19   Q.   What was Ms. Wagner's focus during that June meeting or

20   what was the focus of what she was saying to you at the

21   beginning of the meeting when she came in?

22   A.   She asked if there was a chance that she could get a

23   position.  I think her focus was on getting a position.

24   Q.   Did she ask you how can I improve my candidacy?

25   A.   No, she didn't.  She asked what was her chances of

51

1    getting a position.

2    Q.    When people apply, is it fair to say, I'm talking

3    elementary teaching positions unless I would indicate

4    otherwise, is it fair to say that sometimes they have a regular

5    permanent certificate, sometimes they have a an emergency

6    certificate and sometimes they have another state certificate?

7    A.    Yes.

8    Q.    Are there more variations of a certificate that I didn't

9    think of; it is one of those, basically?

10   A.    Basically, yes.

11   Q.    Do you consider -- well, I'm sorry, just one other, is it

12   true that sometimes there are college graduates who have

13   paperwork indicating they're going to get a certificate but

14   don't have one yet?

15   A.    Yes, that's a possibility, too.

16   Q.    Do you consider any one of those to put a candidate in a

17   stronger position than any of the others?

18   A.    No, because they're all capable of getting a certificate

19   or already hold a certificate.  So that it wouldn't be any

20    different.

21    Q.    Ms. Wagner was not interviewed after March of '04, right?

22    A.    Right.

23    Q.    Do you know why?

24    A.    It was a decision of Mr. Heller's, and he asked if we all

25    supported it and we did.

52

1  Q.   Do you know why?

2  A.   Yes, because her interview in 2002 was very poor.  Her

3  interview in 2004 was very poor.  And she hadn't followed up on

4  any suggestions that we had made to enhance her marketability

5  as a viable candidate.

6  Q.   Did you take into account the fact that she had filed a

7  PHRC charge against the district?

8  A.   I didn't even know about it.

9  Q.   What time did you learn about it?

10  A.   When we were working on this case.

11  Q.   Do you remember what stage in the case, if you do?

12  A.   It was just recently.  Because I wasn't part of that.

13  Q.   You weren't part of?

14  A.   That PHRC hearing.

15  Q.   Okay.  You didn't attend?

16  A.   No.

17  Q.   Did you help prepare the response?

18  A.   No.

19  Q.   When you say recently, do you mean in '07?

20  A.   I mean in the last month.

21  Q.   Okay.  Are you aware of any candidate for a long-term sub

22  or permanent position who was interviewed more than twice by

23  the district?

24  A.   No.

25       MR. KUHAR:  Your Honor, I intend to have this

53

1   witness go through Exhibit O, which was that --

2          THE COURT:  Let me just ask a question, if I could.

3   You say you weren't aware of any candidates who were

4   interviewed more than twice, is that right?

5          THE WITNESS:  Right.

6          THE COURT:  Were there candidates that you were

7   aware of, besides the plaintiff, who had interviewed twice but

8   were not interviewed again; do you understand my question?

9          THE WITNESS:  Yes.  I guess I would have to think

10  about that a little.

11         THE COURT:  You said you weren't aware of any

12  candidates, other than the plaintiff, who were interviewed more

13  than twice?

14         THE WITNESS:  Right.

15         THE COURT:  Were there candidates that you're aware

16  of who had, other than the plaintiff, who had been interviewed

17  twice but never interviewed again?

18         THE WITNESS:  Yes.

19         MR. KUHAR:  Can we say more than once that they were

20   interviewed one time or two times but then never again?

21          THE COURT:  Well, direct the question to her.

22          THE WITNESS:  I'm thinking.  I would say yes, there

23   are candidates who have been interviewed twice, who have not

24   been interviewed again.

25   BY MR. KUHAR:

54

1  Q.   Let me ask that issue separately.  Are there people who

2  you interviewed, when I say you, I mean the committee, are

3  there people who were interviewed by the committee that were

4  never asked back again for another interview?

5  A.   Yes.

6  Q.   One, two, can you approximate?

7  A.   Probably -- maybe four, three.  Three or four.

8  Q.   And what would the reason be for them not being brought

9  back for another interview, if you know?

10  A.   It would be that their interview was poor and that if you

11  continue to keep interviewing them, and they continue to get

12  poor interviews scores, you're giving them a false hope of a

13  position.  It is a very competitive process.  And so each time

14  you bring them back, you've added new candidates.  And so that

15  would probably be the reason.

16      THE COURT:  Let's start wrapping up.

17  BY MR. KUHAR:

18  Q.   With respect to the people who came back twice but no

19  further, same analysis?

20   A.   Yes.

21         MR. KUHAR:  The part that we could not stipulate to

22   was testimony about reasons that candidates were chosen for any

23   of the '02 through '07 positions beyond their success in an

24   interview.  That would be the territory that I would want to

25   cover with this witness, which would maybe take 45 minutes to

55

1   an hour.

2          MR. MEAD:  I'd like to make an objection as

3   cumulative.  Mr. Heller testified this was a joint committee

4   that made these decisions to hire these people, he went over

5   each one of them, why they decided to hire them.  And

6   apparently from all the testimony we heard, they're claiming it

7   was a joint decision.  Therefore, it would be cumulative of

8   what Mr. Heller said, that would be my objection.

9          MR. KUHAR:  Your Honor --

10         THE COURT:  Hang on a second.  I'm going to take a

11  recess, then I'll come back and figure out where we're going.

12         (Recess from 10:15 a.m.; until 10:25 a.m.)

13         THE COURT:  Tell me again what it is you propose to

14  do now?

15         MR. KUHAR:  To have Ms. Good explain the reasons

16  that the people were chosen for long-term substitute positions

17  beginning with Ms. Pickens' position in late '02.  Inclusive

18  also of permanent positions through the current date.  And out

19  rationale for doing that is multifaceted, one of them is that

file:///A|/WAGDAY4.TXT

20   during the oral argument on the motion for summary judgment,

21   I'm pretty sure that the court asked us somewhat about this bad

22   apple spoiling the bunch kind of thinking.  And unless we have

23   at least one administrator come in and say what she believed

24   her rationale to be beyond success in the interview, which has

25   been stipulated, and her perspective of what the committee's

56

1  considerations were.

2        THE COURT:  Furthermore, not all the candidates,

3  some candidates who scored lower were actually given positions.

4        MR. KUHAR:  Some who scored lower than others.

5        THE COURT:  You want her to address that as well?

6        MR. KUHAR:  Yes.

7        THE COURT:  Go ahead.

8  BY MR. KUHAR:

9  Q.   Ms. Good, would you turn to Exhibit O, that should be

10  behind tab 15 -- I'm going to ask you questions about

11  Exhibit O.

12        MR. KUHAR:  The witness has indicated that there are

13  some things written on her interview analysis forms that are

14  not just repeats of the interview score, notes she made about

15  the candidate.  So I would ask that she be allowed to refer

16  back, in case of the '02 interviews and decisions, and for the

17  '04s if she deems it necessary to jog her memory.

18        THE COURT:  That's fine.

19  BY MR. KUHAR:

20  Q.   Do you want to write those down.

21      THE COURT:  Why doesn't she just look at the

22  document.  Is this a document with her handwriting, is that

23  what it is?

24      MR. KUHAR:  Yes.  Why don't I pull it out of the

25  binder so she can do that.

57

1  BY MR. KUHAR:

2  Q.   I'm going to be asking questions about O, which is the

3  chronology of hires as I just described.  And then U, which is

4  going to be in front of you, and the next ones are '02 and '04,

5  respectively.  If you want to jog your memory about a

6  candidate, do you understand?

7  A.   Yes.

8       THE COURT:  I'm going to let you go through this

9  notwithstanding the cumulative objection.  But bear in mind

10  you're going down a field that's already been plowed.

11       MR. KUHAR:  I'll take that into account, your Honor.

12       THE COURT:  All right.

13  BY MR. KUHAR:

14  Q.   Ms. Good, I want you to refer to this Exhibit O, which is

15  that list.  I want you to look at January, '03, Amy Szalewicz;

16  do you see that?

17  A.   Yes.

18  Q.   And what we're going to do, I'll just define this once

19  and then go through it.  What I want you to do is tell us about

20  considerations that were taken into account by you and/or the

21  committee regarding reasons why these people were selected for

22  positions that they got, other than the fact they got the score

23  that they were given on their interview or based on their

24  interview; do you understand that?

25  A.  Yes.

58

1  Q.   Okay.  So with respect to Amy Szalewicz, were there other

2  considerations and, if so, what were they, please describe

3  them?

4  A.   Yes, this was a primary position that we were looking to

5  fill.  Amy had experience working at Seton nonpublic school in

6  kindergarten and first grade.  She also at that school had

7  worked with the balanced literacy program, the principal had

8  introduced that.  She had attended workshops I offered at Seton

9  school and had also become involved in study groups in our

10  public schools.  So was thoroughly knowledgeable about balanced

11  literacy and the direction where we were going with our primary

12  grades.

13  Q.   Anything else for her?

14  A.   Not that I can think of at the moment.

15  Q.   Ann McElwain?

16  A.   Ann McElwain was a substitute in our district and came

17  with a background from Germany, as a teaching background there.

18  So she was experienced and had some experience in kindergarten.

19  Q.   And, again, if you choose to look at the interview notes

20   you took, you're allowed to, I'm not going to tell you to do

21   that.  If you need to refer to a specific candidate, go ahead

22   and do that.  Now, Nikki Shearer?

23   A.   Nikki Shearer had student taught in our district.  She

24   had a wealth of knowledge about the balanced literacy.  She

25   understood differentiating instruction.  She exhibited an

59

1    understanding of assessment, formal and informal.

2    Q.    Anything else?

3    A.    No.

4         THE COURT:  Let me just say this.  I will presume

5    that if the witness is done explaining, that if you wanted to

6    add something else, she would, fair enough?

7         MR. KUHAR:  Understood.

8    BY MR. KUHAR:

9    Q.    Robert Bazylak?

10   A.    Bob Bazylak had a dual degree.  He had a degree in

11   psychology from Allegheny.  He also had gone back after working

12   in a management position.  He had been a day-to-day sub in our

13   district, the principals had high recommendations for him.  He

14   also student taught in our district.  He had a good background

15   in meeting the needs of the students, assessment,

16   differentiating instruction.

17   Q.    When you say administrators or principals had high

18   opinions of him, did you say something to that effect?

19   A.    Yes.

20  Q.   Did they come forward and tell you or members of the

21  committee that?

22  A.   During the discussion they mentioned that, yes.

23  Q.   During the discussion, did anybody come forward with any

24  recommendations or compliments about Ms. Wagner?

25  A.   No.

60

1  Q.   What about during the '04 process?

2  A.   No.

3  Q.   Okay.  Please proceed -- if there's more about Mr.

4  Bazylak tell us, if not, move on to other one?

5  A.   No.

6  Q.   So the next then would be Rebecca Kelly in '04?

7  A.   Right, Rebecca Kelly was hired for the elementary gifted

8  position.  She has an early childhood in elementary

9  certification.  But she had worked with our secondary in the

10  gifted program.  She had a lot of knowledge about writing

11  GIEPs, about what was necessary.

12       THE COURT:  What did you call that, a GIUP?

13       THE WITNESS:  GIEPs.  It's a gifted individual

14  education plan, which we are required to write for students who

15  have been identified as gifted.

16  BY MR. KUHAR:

17  Q.   Okay.

18  A.   She has outstanding technology skills, which when you're

19  working in the gifted program is very necessary as well.

20  Q.    Okay.

21  A.    Leslie Jensen is my next one -- just go down the list?

22  Q.    Yes, please.

23  A.    Leslie Jensen was hired as a part-time elementary gifted

24  teacher.  She had a background in music, but she was enrolled

25  in an online program for her master's in gifted education at

61

1   the time.  She also has a strong technology background.  And

2   that made her a very outstanding candidate for the position.

3          THE COURT:  Let me ask you a question here, I guess

4   I'll direct it to both counsel.  First of all, as a factual

5   matter, were some of these individuals that we're talking

6   about, are you in 2002 now?

7          THE WITNESS:  No, I'm in 2004.

8          THE COURT:  Were any of those individuals placed in

9   gifted situations?

10          THE WITNESS:  In 2004?

11          THE COURT:  Yes.

12          THE WITNESS:  Two of the positions were for gifted.

13          THE COURT:  I'm just asking as a clarifying legal

14   matter, are those even appropriate comparators -- let me ask

15   the question this way.  Would the plaintiff, given her

16   background, have been eligible to have been placed in either of

17   those positions?

18          MR. KUHAR:  I asked the same question in

19   preparation.  As a legal matter, yes --

20          THE COURT:  Let me ask the witness.  Really in a

21     non-jury trial my purpose is to keep a low profile, but I am

22     permitted to clarify as necessary.  This is one area that I

23     think it's helpful.  Was the plaintiff in any way precluded, by

24     way of anything in her educational background or lack thereof,

25     from having been appointed to either of those two positions

1  that involve gifted children?  Or otherwise stated, was there

2  some degree or some experience that she was required to have by

3  state or federal law that she did not have that would have been

4  preclusive?

5       THE WITNESS:  Not by state or federal law.  She had

6  an elementary teaching certificate.  That would mean that she

7  had the appropriate certification.  But she didn't have the

8  experiences that the candidates --

9       THE COURT:  That wasn't my question, that was a

10  subjective determination.  I'm saying was there anything

11  disqualifying per se?

12       THE WITNESS:  No.

13       THE COURT:  Go ahead.  Then they're appropriately in

14  the mix.

15  BY MR. KUHAR:

16  Q.   Please, proceed.

17  A.   Amy Szalewicz was hired for a kindergarten position at

18  Second District in 2004.  She had exhibited an excellent

19  experience as a long-term sub.  But she also had a thorough

20  understanding of balanced literacy.

21  Q.   If I could interrupt you.  This is one you've already

22  discussed, right?

23  A.   Right.

24  Q.   In the capacity of the '02 long-term sub, right?

25  A.   Yes.

63

1   Q.   You've already told us those things about her --

2   A.   Then don't say anything more?

3        THE COURT:  Unless there were things, unless there

4   were additional factors in 2004 that did not drive your

5   decision in 2002.  If it's the same, I don't need to hear it

6   twice.

7        THE WITNESS:  It would be the same.

8        THE COURT:  Go ahead.

9   BY MR. KUHAR:

10  Q.   If the performance of the '02 long-term sub was a factor

11  say so, if not -- do you understand?

12  A.   Her performance as a long-term sub was indicating that

13  she was an outstanding candidate.  And this was a full-day

14  kindergarten position.

15  Q.   Please, proceed.

16  A.   Bob Bazylak performed well as a long-term sub.  And the

17  position that he was hired for was a position where he would

18  have the opportunity to loop with the students that he had in

19  the previous year.  Which is a research based educational

20    opportunity that we felt was excellent for, even though he was

21    an outstanding candidate, he was the most outstanding

22    candidate.

23    Q.    What's looping?

24    A.    Looping is when you have the opportunity to have the

25    children from your previous teaching experience.  And it offers

64

1    the opportunity for at least three months of educational

2    advancement.  Because you don't have to begin the school year

3    learning about your children, you already know.

4    Q.    Okay.

5    A.    Erin Bourquin was hired for third grade, Second District

6    position.  She was recommended by her student-teaching

7    experiences.  She had a wonderful student-teaching experience

8    in our district.  She also had done a long-term in a

9    neighboring school district and had done a good job there.  But

10   she has a thorough understanding of the balanced literacy

11   program.  She also understands assessment, how to differentiate

12   instruction.  And is very knowledgeable on technology.

13   Q.    Okay.

14   A.    Lisa Taormina had a degree in child development and went

15   through a program under the University of Pittsburgh, which was

16   intensive.  Where she did a full year of student teaching.

17   When she interviewed with us, she was very knowledgeable of the

18   Pennsylvania academic standards of the assessments, how

19   assessment needs to drive instruction.  And talked about her

20   experiences using anchor papers to model instruction.  So she

21   was aware of the initiatives that our district was working on

22   as well.

23        Mark Weathers had worked in our Stars program.  He had

24   exhibited his ability, his abilities to teach there, as well as

25   a student teacher in two of our buildings.  We had observed

1  that he was outstanding.  He has a wealth of knowledge in

2  meeting individual needs of diverse learners and

3  differentiating instruction.  As well as a thorough

4  understanding of assessment.  And how to analyze the data to

5  make instructional decisions in preparation and planning.

6  Q.   Okay.

7  A.   Chad DuPont had substituted in our district.  Had

8  exemplified an understanding of how to meet the needs of

9  students when he was substituting.  He had children working in

10  small groups, working independently.  He then took a position

11  in North Carolina.  When he came back and interviewed the

12  second time with us, his knowledge of assessment was far

13  greater.  He had a thorough understanding of formal and

14  informal assessment.  He also had experiences with working with

15  diverse learners and after-school programs while he was in

16  North Carolina.  Which made him an outstanding candidate.

17      Marcie Pifer.  Had shown a strong understanding, an

18  in-depth understanding of Pennsylvania's academic standards.

19  The position that she was hired for, was a position that was

20  written into a grant, the accountability block grant.  The

21  position was to be an intervention teacher and work with a

22  segregated subgroups of children.  Children who are minorities,

23  who had an IEP, who were economically deprived.  These children

24  had some educational needs.  And so her position was to provide

25  intervention in math and reading, to enhance their learning.

66

1   She had an understanding of assessment.  Because we had to use

2   the data to identify the students, but also she would use the

3   data to define their learning plans.  And she also had a wealth

4   of knowledge in technology.  Because in the grant we were

5   required to provide documentation that the students were

6   attaining growth academically.  And with children of this, we

7   wrote learning plans that would set goals that we could show

8   that they were meeting.  And Marcie had the technological

9   skills to do individual learning plans, as well as her

10   knowledge of the standards of curriculum, differentiation and

11   assessment.

12   Q.   Okay.

13   A.   Danielle Morris had student taught in our district.  She

14   had a wealth of knowledge of balanced literacy from her

15   experience in our district.  She also had knowledge of

16   responsive classroom, which are instructional strategies in

17   which you employ to encourage children to become community of

18   learners.  And so she was an outstanding candidate for a

19   first-grade classroom.

20        Meghan Porter had experience in preschool.  She also had

21    experience in non-public.  During her entire interview she

22    shared her experiences with centers.  Centers is a way of

23    managing students in independent learning practices.  And it's

24    a way we manage the classroom environment so that we can do

25    direct instruction to small groups.  Meghan understood how to

1   do that.  She shared her experiences and her references

2   supported that.

3       Lori Carr.  She had experiences as a substitute in our

4   district, but she also had experiences in a neighboring school

5   district.

6           THE COURT:  When you say substitute, day-to-day or

7   long-term?

8           THE WITNESS:  Day-to-day.

9           THE COURT:  Continue.

10          THE WITNESS:  And she had experiences in a

11  neighboring school district as a long-term sub.  Working with

12  some special needs children, as well as working in a classroom.

13  She understood differentiation instruction.  She exhibited a

14  thorough knowledge of the Pennsylvania academic standards, how

15  to integrate that into curriculum.  She also understood the

16  position of assessment in making decisions to meet the needs of

17  those children.

18          Cheryl Krachkowski, had worked with Allegheny

19  College as the coordinator of their America Reads Program.  She

20  also had experience as an aide in other school districts.  She

21  is very knowledgeable of technology.  Also, very knowledgeable

22  of the Pennsylvania academic standards and how to incorporate

23  them into lessons.  She was hired as a long-term sub for grade

24  four.

25          Jennifer Stefanucci.  She was hired as a

file:///A|/WAGDAY4.TXT

68

1  kindergarten teacher.  She has an early childhood

2  certification.  The full-day kindergarten position at that time

3  was written in the accountability block grant as well.  And

4  part of the regulations or the requirements were that if we

5  hired new people, that they had to have an early childhood

6  certification.  And so Jennifer not only had that

7  certification, but she also exhibited a wealth of knowledge

8  about the initiatives of balanced literacy, working with

9  children in small groups.  Managing the classroom and

10  environments to meet the needs of all children.

11  BY MR. KUHAR:

12  Q.    Please proceed, now we move up to July of '05, correct?

13  A.    Yes, Jennifer Christie.

14  Q.    Who's a racial minority?

15  A.    Yes, she is.  Jennifer was a student teacher.  It was an

16  experience that we had a collaborative effort with Edinboro

17  University, where the student teachers would be in our

18  building, not for just part of a semester, but for an entire

19  semester.

20          THE COURT:  Jennifer Christie is African-American?

21          THE WITNESS:  Yes.  She was part of that

22  student-teaching collaborative project with Edinboro.  She

23  spent an entire semester in Second District Elementary.  She

24  also had been involved in our Stars program.  During her

25  college experience as a parent liaison.  So we had experience

1   working with her in that capacity as well.  She is extremely

2   knowledgeable of the academic standards, and the assessment

3   procedures and in making decisions, instructional decisions

4   about students.  And so she was hired for the intervention

5   position, which required the same -- qualifications that were

6   required of Marcie Pifer for the same position.  I already

7   talked about Megan Porter.

8   BY MR. KUHAR:

9   Q.   She had previous long-term substitute experience?

10   A.   She had previous a long-term sub position.

11   Q.   Do you know how she did?

12   A.   She did a very nice job.  She was hired in July of '05

13   for a long-term sub position in grade four.  But before the

14   school year began, there was a grade one long-term sub

15   position, which her experiences and her background in early

16   childhood education made her an outstanding candidate for that.

17       Danielle Morris was hired for grade one.  She also had an

18   excellent teaching experience as a long-term sub.

19       Chris Peters was a student teacher, came highly

20  recommended by the classroom teacher and the principal.  I as

21  well observed and he had done a very good job in his

22  student-teaching experience.  And so he was hired based upon

23  his knowledge of the academic standards, the curriculum.  He

24  has a particularly strong knowledge of science.  And in fourth

25  grade that was going to be one of the things that we knew he

70

1  was going to be teaching as well.  And so he was an excellent

2  candidate for the fourth grade position.

3      Norman Carner was hired as a kindergarten teacher in

4  September for that year.  He did interview well.  He has an

5  understanding of balanced literacy.  He also understood how to

6  differentiate and work with small groups of children.

7      Naomi Uy-Moore was hired also in September.  She comes

8  with a wealth of knowledge from having an experience in another

9  state.  She understands the importance of assessment driving

10  instruction.  She understood the use of standards.  She

11  differentiates -- she gave examples of differentiating

12  instruction to meet the needs of a diverse group of learners.

13  Q.  She was Filipino born, Asian?

14  A.  Yes.

15  Q.  Go ahead.

16  A.  Melonie Courson had had prior experience in a nonpublic

17  school.  And had come recommended by one of our principals.

18  She had a thorough knowledge of the academic standards, as well

19  as her understanding of how to work with small groups of

20  children.  How to set up centers so that they could work

21  independently and be able to provide small group instruction.

22  Q.    Normally we don't have the witness talk this long on her

23  own, do you need a glass of water or are you fine?

24  A.    I think I'm okay.  Cheryl Krachkowski had been a

25  long-term substitute in a prior position, a fourth-grade

1  position.  There was a position, a kindergarten position at

2  First District that became available.  She had done a very good

3  job.  But she also had experience working with young children,

4  so there is an understanding of both age levels, as well as her

5  understanding of the standards and working with small groups,

6  differentiation instruction was very important in a

7  kindergarten classroom, made her an outstanding candidate for

8  that.

9      Stacey Thompson.  May I just take a look for one minute.

10  Q.  Please do.

11  A.  I don't have anything here on Stacey because she was

12  interviewed after '04, so we don't have any interview forms in

13  front of us.  But Stacey, she had experiences working with

14  children who had diverse learning needs.  I call them at

15  promise children.  And she --

16        THE COURT:  What do you call them, ma'am?

17        THE WITNESS:  At promise.

18        THE COURT:  Is that what you call them or other

19  people?

20            THE WITNESS:  In our district I guess that's what I

21    call them, you could call them at risk.  These are the children

22    who are at risk of not maybe reaching the academic standards,

23    but I would rather say they are at promise at reaching the

24    academic standards.

25    BY MR. KUHAR:

1  Q.   Just a way of saying it, that sounds more positive?

2  A.   Yes.  So if I say that, that's what I mean.  She has had

3  experience working with children who had some educational

4  difficulties.  And had shared those experiences.  She also had

5  knowledge of creating a classroom of learners, as would be

6  exemplified through the responsive classroom.  Which is what we

7  want to have for our early childhood classrooms.  She also had

8  a thorough knowledge of using assessments for primary, such as

9  running records.  The DRA in a balanced literacy program.

10  Q.   Okay.

11  A.   Cheryl Krachkowski was hired for her first-grade position

12  after having two outstanding opportunities to show what she

13  could do as a long-term, a long-term sub.  She really did have

14  a good experience in the kindergarten position.  So it was

15  evident that she would be an outstanding candidate for a

16  first-grade position.

17       Lauren Mattocks --

18       THE COURT:  Just for the record what exhibit is she

19  working off of?

20          MR. KUHAR:  Exhibit O.

21          THE COURT:  Go ahead.

22          THE WITNESS:  Her hire was last year for this year,

23   this school year.  Lauren came with an experience in early

24   childhood.  She had been a student teacher in our district.

25   She had also worked in our Stars program.  She had worked

73

1  particularly in a summer program, but she did work after school

2  as well during her student teaching experience.  So we were

3  aware of her teaching abilities through that.  She understood

4  differentiating instruction.  She understood the importance of

5  assessment and in making instructional decisions.  She also was

6  knowledgeable in the district initiative of balanced literacy.

7  Q.  Okay.

8  A.  Stacey Thompson was hired after her long-term subbing

9  position in grade one to fill a grade one position in

10  Cochranton.  She did an outstanding job with balanced literacy.

11  She implemented independent work time, which is a centers

12  approach of providing a classroom environment.  So that you

13  could teach small groups in a first grade, during her long-term

14  sub experience with us.  So she exemplified that she had an

15  outstanding knowledge of what we would like to see going on in

16  the classroom.

17      Tara Kelyman was a student teacher in our district.  She

18  had student taught in sixth grade and had done an outstanding

19  job.  She was recommended by the building principal.  I had the

20  opportunity to do an informal observation as well.  She was to

21  be hired as a long-term sub in grade six.

22      Melonie Courson had been hired as a long-term sub in

23  first grade.  She did a very good job.  Participated in all of

24  our professional development, as well as some of the curriculum

25  programs.  Had implemented balanced literacy.  Had also worked

1   at differentiating instruction by working with small groups and

2   centers.  And she was hired for a position at East End.  An

3   early childhood position as well.

4       Rebecca Spadafore was interviewed and was hired as a

5   long-term sub, as a librarian for a teacher who had to take a

6   leave.  She has a wealth of knowledge in literacy.  This is her

7   second -- occupation as well.  She was previously employed in

8   another area, not in education.  She had gone back and gotten

9   her education degree.  Tara Kelyman --

10  Q.   Is that a positive, you mentioned that a few times now,

11  that it was a person's second degree.  Is that a positive and,

12  if so, why?

13  A.   Yes, the three people I mentioned who went back and chose

14  education as their second occupation come to us with an

15  understanding of how to work with people, how important

16  communication is.  They have been instrumental in working as a

17  team.  They have leadership skills for curriculum development,

18  they're also leaders in their building.

19  Q.   Okay.

file:///A|/WAGDAY4.TXT

20   A.    Tara Kelyman worked this year, as I had said, she was

21   hired as a temporary substitute.  Unfortunately, there was a

22   death, so it became a position during the year.  After her

23   interview, she has been formally hired but not for that sixth

24   grade position.  But she also has shown how she has a wealth of

25   knowledge of assessment, using assessment to define the needs

75

1  and the instructional strategies of the children.  She's

2  participated in curriculum meetings.  Assessment scoring

3  meetings and has shown how she is one of the most outstanding

4  candidates that we had.

5        MR. KUHAR:  I have no further questions, thank you.

6                    CROSS-EXAMINATION

7  BY MR. MEAD:

8  Q.    Ma'am, I believe you testified you did not learn about

9  the PHRC complaint until you learned about it rather recently?

10  A.    Yes.

11  Q.    Can we agree that when Ms. Wagner sued the school

12  district, it was a big story in Meadville, was it not?

13  A.    Yes.

14  Q.    It was in the Meadville Tribune, front page of the

15  Meadville Tribune, can you agree?

16  A.    I would assume it was.  I didn't see it in the paper,

17  though.

18  Q.    You didn't read about it anywhere?

19  A.    No.

20  Q.    Did you read about it in the Crawford County addition of

21  the Erie Times News?

22  A.    No.

23  Q.    You just heard about it how?

24  A.    When we were having our preparation for the trial.

25  Q.    When did you hear about the lawsuit?

1        THE COURT:  Let me just clear something up here,

2   because there's two things going on.  There is the PHRC

3   complaint, there is the formal federal complaint, in terms of

4   the lawsuit being thrown around, be careful as to those two

5   things.

6   BY MR. MEAD:

7   Q.   When did you find out about the lawsuit, the federal

8   lawsuit, which is what we're here on today?

9   A.   This lawsuit?

10  Q.   Yes.

11  A.   I guess I would have known about it after the interviews

12  of 2004.

13  Q.   You learned about it after March of 2004, is your

14  testimony?

15  A.   I'm not even sure when the lawsuit was filed.

16  Q.   Maybe you're misunderstanding my question.  I asked when

17  did you find out about the lawsuit and how, the one that was

18  filed federally, not the PHRC complaint, about the federal

19  lawsuit?

20  A.    I learned about it when I was approached for a

21  deposition.  And that's when I learned about the lawsuit.

22  Q.    You were approached for a deposition, that occurred in

23  September of '05, is that correct?

24  A.    Yes.

25  Q.    So your testimony is that from the time the lawsuit, the

1  federal lawsuit was filed and in 2004, September, 2004, until

2  the time of your deposition in September, 2005, you were

3  unaware that Rowena Wagner had filed a federal lawsuit?

4  A.    I learned about it prior to my deposition.  It would have

5  been after the interviews of 2004.

6  Q.    You recall when prior to your deposition, immediately

7  before your deposition, months before your deposition?

8  A.    I would say a couple months before my deposition.

9  Q.    So your testimony, so I'm clear, at the time the lawsuit

10  was filed in September of 2004, you had no clue it had been

11  filed in September of 2004?

12  A.    I wasn't aware that it was filed.

13  Q.    You had no clue it was filed six months down the road

14  from September of 2004, you were unaware a federal lawsuit was

15  filed against the district by Ms. Wagner?

16  A.    It may have been mentioned, but I wasn't involved in any

17  conversation about it.

18  Q.    Would it have interested you to know that a substitute

19  teacher had sued your district, wouldn't that have been

20  something that would have concerned you?

21          MR. KUHAR:  Objection, you are asking her to

22  speculate how she felt if she knew something, she didn't know.

23          THE COURT:  I'm going to sustain that to the form of

24  the question, rephrase it.

25  BY MR. MEAD:

1  Q.    So you say you heard about this prior to your deposition?

2  A.    Yes.

3        MR. KUHAR:  This being the lawsuit?

4  BY MR. MEAD:

5  Q.    Yes, this being the lawsuit.  Did you hear about it

6  before -- let's make sure I understand the testimony.  I

7  believe you said you may have heard about it even before the

8  deposition, but you weren't concerned about it, is that what

9  you said?

10       MR. KUHAR:  She did not say --

11       THE COURT:  Hang on a second, Mr. Kuhar.  Just like

12  a jury, it's up to the jury to determine what she said.  I'll

13  determine what she said.  That's not an appropriate objection,

14  you can sit down.  Go ahead.

15  BY MR. MEAD:

16  Q.    Ma'am, and please correct me, I believe you testified

17  something to the effect that you may have heard about it, but

18  you weren't involved in it?

19  A.    Yes, I wasn't involved in it.

20  Q.   Would you have heard about that before you were notified

21  that you had to take a deposition; and by it, I'm referring

22  only to the federal lawsuit?

23  A.   Yes.  Yes, I did know before I did the deposition that

24  there was a federal lawsuit.

25  Q.   Did you know before you were contacted for the deposition

1  that there was a federal lawsuit?

2  A.   I had heard there was a federal lawsuit, but I hadn't had

3  a conversation with anyone about it.

4  Q.   How did you hear about it?

5  A.   It was mentioned in a meeting that probably we had, a

6  management meeting that there was a lawsuit.  But that would

7  have been all that would have been mentioned.

8  Q.   And who participates in these meetings?

9  A.   The central management team.  Our superintendent, the

10  business manager, myself, the other curriculum director, Mr.

11  Heller.

12  Q.   Now, do you report to Mr. Heller, is he your supervisor?

13  A.   Actually, Mr. Dolecki is my direct supervisor.  But in my

14  job description I also report to Mr. Heller.

15  Q.   And in this meeting that you talked about where the

16  lawsuit was mentioned, you did not ask any questions, you

17  weren't concerned about what this lawsuit was about, is that

18  your testimony?

19  A.   Right, I didn't ask any questions about it, no.

20   Q.    You also mentioned your deposition, you do recall your

21   deposition being taken in September, 2005, correct?

22   A.    Yes.

23   Q.    You were also asked in that deposition whether or not,

24   whether you knew why Rowena Wagner was not invited for an

25   interview in 2005-2006, do you recall that?

1  A.    Yes.

2  Q.    And your answer was "I don't know," is that correct?

3         THE COURT:  I think you should show her the

4  deposition.

5         MR. MEAD:  I'd be happy to do so.

6         THE COURT:  You can just take it up to her if she

7  doesn't have a copy in front of her.

8         MR. MEAD:   I will, your Honor.  I want to make sure

9  I have the right pages.

10  BY MR. MEAD:

11  Q.    Page 41, line 6.

12  "Q.    Right.  Let me step back, then, why she was not

13  interviewed -- extended the opportunity to be interviewed.

14         "MR. KUHAR:  Do you mean for the '05?

15         "MR. NICHOLS:  2005.

16         "MR. KUHAR:  Spring interviews.

17         "MR. NICHOLS: '06.

18  "Q.    Yes.  Would you like to address that, Ms. Good?

19  "A.    She was not part of the pool that we interviewed, I can

20  tell you that.

21  "Q.   That means her application was not selected to be a part

22  of that pool then, right?

23  "A.   Yes.

24  "Q.   She did, in fact, apply, so that means that her

25  application was not selected --

1  "A.   Right.

2  "Q.   To be included in the pool, right?

3       "MR. KUHAR:  To stick with the earlier language, it

4  wasn't identified.  Right, it wasn't identified?

5       "THE WITNESS:  It wasn't identified.

6       "MR. KUHAR:  Just to stick with the terms.

7       "MR. NICHOLS:  It wasn't identified.

8  "Q.   Do you know why it was not selected to be included in

9  the pool, do you know why, you were involved in the process,

10  right?

11  "A.   I was involved in the process for interviewing.

12  "Q.   Do you know why?

13  "A.   Specifically why?

14  "Q.   To the extent if you know, if you don't, you don't know?

15  "A.   I know that Ms. Wagner was given some recommendations to

16  follow, her candidacy was part of the conversation --

17       THE COURT:  Slow that part down a little bit.

18       MR. MEAD:  Your Honor, if I may, let me just double

19  check one thing here, too.  I may be reading a little more than

20  I have to, I want to make sure.

21          THE COURT:  Or that you wanted to.

22          MR. KUHAR:  I think he missed a word or two, your

23  Honor.

24          THE COURT:  You'll have an opportunity to talk to

25  her on redirect is that's what you want to do.

82

1        MR. MEAD:  I'll finish up that part of the

2   statement.

3   "A.    I was part of the conversation with Ms. Wagner and Mr.

4   Heller, I know she didn't contact me."

5   BY MR. MEAD:

6   Q.    Do remember giving those answers?

7   A.    Yes.

8   Q.    Page 54, line 11.

9   "Q.    That's what I'm saying, though, the screening, why she

10  was not invited for an interview.

11       "MR. KUHAR:  Identification.

12  "Q.    Yeah.  Can you think of a reason why she didn't?

13  "A.    I can't tell you that, I don't know."

14  Q.    Do you remember saying that?

15  A.    Read me again what the question was.

16  Q.    It will help you, ma'am, I'll hand you your deposition,

17  why don't you read it yourself.

18       THE COURT:  While she's doing that, looking at that

19  deposition, you can point out to her, Mr. Mead, the relevant

20   portions you want her to read in their entirety.  And while

21   she's doing that, we're going to take a two-minute recess, so

22   everybody can be doing something productive.

23         (Recess from 11:10 a.m.; until 11:20 a.m.)

24           THE COURT:  All right, Mr. Mead.

25   BY MR. MEAD:

83

1  Q.   Ma'am, have you had a chance to read that?

2  A.   Yes, I did.

3  Q.   Was that your answer or was I mistaken?

4  A.   My answer was to -- I had already given the reason why I

5  felt that she had not improved her candidacy.  But the question

6  asked was did I know another reason why the committee, and I

7  don't know any other reason why the committee hadn't identified

8  her.

9  Q.   May I see that.  And we'll agree it says here, yeah, can

10  you think of a reason why she didn't get an interview?  And

11  your answer is "I can't tell you that, I don't know?"

12  A.    I don't know of any other reason.  Had I already

13  explained the reason, that she hadn't followed through.

14  Q.   Speaking of which, let's go back to that meeting in 2004.

15  You earlier had testified today about that, the meeting in

16  2004?

17  A.   Yes.

18  Q.   Basically, what you did is you recommended she look on

19  the Web site, correct?

20   A.   Yes.

21   Q.   And do you know or you don't know whether she has a

22   computer at home?

23   A.   I don't know.

24   Q.   So she very well could have looked at the Web site per

25   your recommendation, correct?

84

1  A.   I'm sorry, what was that again.

2  Q.   She could have looked at the Web site per your

3  recommendation?

4  A.   She could have.

5  Q.   You don't know one way or another, correct?

6  A.   Right.

7  Q.   And you also mentioned the Stars program, correct?

8  A.   Yes.

9  Q.   That's an after-school program?

10  A.   Yes.

11  Q.   And you're aware that Ms. Wagner as four small children?

12  A.   Yes.

13  Q.   Was that ever brought up as a reason why she could not

14  attend after-school programs, to you?

15  A.   No, no one ever brought that up as a reason.

16  Q.   You mentioned one of the women that was hired or the

17  woman who was hired to replace Ms. Pickens -- what was her

18  name?

19  A.   Amy Szalewicz-Lawrence.

20  Q.    And you had been the one who recommended her, correct?

21  A.    Yes.

22  Q.    I'm also correct she finished 10 out of the 17 on the

23  interviews as far as total score?

24  A.    She was.

25  Q.    You can answer that yes or no, as far as the score, she

85

1   was 10 out of 17, correct?

2   A.   Yes.

3   Q.   Am I also correct that another individual by the name of

4   Chad DuPont was hired at the same time?

5   A.   Yes.

6   Q.   He finished number 12 out of 17, correct?

7   A.   Yes.

8   Q.   Based on those scores?

9   A.   Yes.

10   Q.   You say those scores are objective, correct, is that your

11   testimony earlier, you believe these scores are objective?

12   A.   They're as objective as they can be.

13   Q.   Which means there is an element of subjectivity to these,

14   you'd agree with that?

15   A.   Yes.

16   Q.   Now, for example, in your forms, you gave Ms. Wagner in

17   2002 a 3 for experience, correct -- you can look if you'd like,

18   they're in front of you?

19   A.   I believe that's right.  Yes.

20   Q.   And that means satisfactory, adequate for the job applied

21   to, correct?

22   A.   Yes.

23   Q.   If you flip the page, didn't you give Nikki Shearer a 4

24   for experience?

25   A.   Yes.

86

1  Q.   Could you tell me, wasn't Nikki Shearer in school at this

2  time?

3  A.   Nikki Shearer was student teaching at the time, yes.

4  Q.   But you've ranked her higher on experience, based on the

5  fact she was -- did she have her degree at the time, had she

6  graduated at this point?

7  A.   I don't believe so, I believe she was a student teacher

8  at the time.

9       MR. KUHAR:  Your Honor, may I be heard?

10       THE COURT:  Yes.

11       MR. KUHAR:  The stipulation was that those scores

12  reflect the assessments of the people as they perceived the

13  candidates during those interviews.  I thought this is

14  territory we were trying to avoid with the stipulations.

15       THE COURT:  Well, let me ask him that.

16       MR. MEAD:  May I have a little leeway, we spent two

17  hours on this morning.

18       THE COURT:  Go ahead.

19  BY MR. MEAD:

20  Q.    So you admit there's some subjectivity there where you're

21  giving somebody a higher ranking of 4, who never even taught as

22  a substitute?

23  A.    Not taught as a substitute, but she had experiences,

24  which she explained in the initiatives of our district and the

25  philosophy and the understanding of the Pennsylvania academic

87

1    standards.

2    Q.    I didn't ask that, I asked about experience of day-to-day

3    teaching, how many days had she taught on her own?

4    A.    Okay --

5    Q.    Zero?

6    A.    If that's how you're looking at experience, yes.

7    Q.    Zero days, right?

8    A.    Zero days as a substitute teacher.

9    Q.    And Ms. Wagner at the time had probably, approximately

10   200 days of substitute teaching?

11   A.    I couldn't tell you how many days she had.

12   Q.    If you could also look behind tab 18, which is marked as

13   Exhibit R, do you see that?

14   A.    Yes.

15   Q.    Those are all for the elementary interviews?

16   A.    For 2004.

17   Q.    2004, correct.  Meghan Porter, who is number eight down

18   on the list, was selected, correct?

19   A.    Yes.

20  Q.    And am I also correct she ranked number 22 out of all

21  these people who were interviewed?

22  A.    On the scores, yes.

23  Q.    On the test scores that you did?

24  A.    Yes.

25  Q.    For the interviews?

88

1   A.   Yes.

2   Q.   If we counted them up, could you agree with me that 32 of

3   the candidates had higher scores than she did?

4   A.   I would have to -- I mean I would have to count that, I

5   don't know that.

6   Q.   Go ahead.

7        MR. MEAD:  I'll tell you, your Honor, that 32 did.

8        THE COURT:  I will accept that as an accurate

9   proposition.

10  BY MR. MEAD:

11  Q.   So 32 out of the 39 candidates had better interview

12  scores than Megan Porter, correct?

13  A.   Correct.

14  Q.   But Ms. Porter was selected to be a teacher?

15  A.   Yes.

16  Q.   Was she selected for a long-term sub?

17  A.   Yes.

18  Q.   She subsequently became a full-time teacher, correct?

19  A.   Yes.

20          MR. MEAD:  That's all I have, your Honor.

21          THE COURT:  Do you have anything else of this

22   witness?

23          MR. KUHAR:  Briefly, your Honor.

24              REDIRECT EXAMINATION

25   BY MR. KUHAR:

89

1  Q.    Did Ms. Wagner ever tell you that she accessed the PDE

2  Web site as you had suggested?

3  A.    No.

4  Q.    Is there any other reason to think she had?

5  A.    No.

6          MR. KUHAR:  Nothing further, your Honor.

7          THE COURT:  Thank you, ma'am, you're excused.  Is

8  that it?

9          MR. KUHAR:  That's our last live witness.  We have

10  about three or so pages of a deposition to be read in.

11         THE COURT:  Who is it?

12         MR. KUHAR:  The teacher's association, it's actually

13  the teacher's union but they call it an association.  The

14  president, Dan Hootman, he was deposed in '05.

15         THE COURT:  What will he say, in essence?

16         MR. KUHAR:  In essence, that as union president and

17  over 30 years of teaching, he was unaware of any practice

18  whereby teachers could designate their long-term substitutes

19  during the long-term leaves.

20          THE COURT:  Does his deposition appear in the

21   record -- I'm inclined just to read it?

22          MR. KUHAR:  It's Exhibit MM behind tab 39, your

23   Honor.

24          THE COURT:  All right.  I'll take a look at it.

25   Is that it for you?

90

1        MR. KUHAR:  Yes, your Honor, we rest.

2        THE COURT:  All right.

3        MR. MEAD:  Your Honor, if I may, I have very brief

4  rebuttal.

5        THE COURT:  I was going to ask you about that?

6        MR. MEAD:  Not more than a half-hour total, if that.

7        THE COURT:  All right.  You have some rebuttal?

8        MR. MEAD:  Yes, your Honor.  To give a proffer --

9  Mr. Byrd would testify that he did have a meeting with Tammy

10  Foster, that she testified on behalf of the defendants.

11  However, the meeting was concerned about the fact that she was

12  not being hired because of her race, unlike what Ms. Foster

13  said on the stand, she said it was an unrelated issue.  We

14  expect that to be very brief, that is our proffer.

15        THE COURT:  That's all right.  All right, Mr. Byrd,

16  come on up.  You're still under oath.

17    SAMUEL BYRD, PLAINTIFF REBUTTAL WITNESS, PREVIOUSLY SWORN

18            DIRECT EXAMINATION

19  BY MR. MEAD:

20  Q.    Mr. Byrd, you were in the courtroom during the testimony

21  of a woman by the name of Tammy Foster, correct?

22  A.    Yes.

23  Q.    She related some conversations she had with you; do you

24  recall hearing those?

25  A.    Yes.

91

1  Q.   Do you agree with what she testified about?

2  A.   No.

3  Q.   Can you tell me about those conversations; first, when

4  they occurred and second, what they were about?

5  A.   I can't give you a specific date they occurred.

6  Q.   How about a year?

7  A.   I can tell you they occurred the year that I found out

8  after she was hired by Crawford Central as a teacher.

9  Q.   The year before you say?

10  A.   No, the year that she was hired.

11  Q.   In 2004 she was hired, can we agree on that?

12  A.   I wasn't sure of that year.  But whatever year it was,

13  that's the year we had that conversation.

14  Q.   Tell us about those?

15  A.   Prior to the conversation, when I was a school director,

16  I would always keep Tammy apprised of any available positions

17  that came open in the district so that she could make a letter

18  of interest to the assistant super for those positions.

19  Subsequently, at some point, I guess she stopped doing that.

20   When I heard that she had gotten the full-time position, it was

21   by way of her mother and at church -- when I go home from work,

22   her house is between my work and home.  So I would ride by her

23   house on a daily basis.  On a day going home, she was at her

24   mom's outside, I stopped to talk with her.  This conversation

25   took place after I found out that she was hired and I saw the

1  article in the paper that was written by Joel Deangi to the

2  editor about what he thought about our district in terms of

3  hiring minority professional staff.  So I stopped, I talked

4  with Tammy.  And the question I asked her was very simply what

5  had you done between the time you started to apply for

6  positions and the time that you got the position that made you

7  more appealing to Crawford Central that they would hire you now

8  nine years later.  Her response was nothing.  I asked her did

9  you go get more degrees, more certifications, more training.

10  Her response was no.

11  Q.   Had she talked to you before she was hired about any

12  difficulties she was having?

13  A.   When she first began applying for positions at the time I

14  was a sitting director, she would make inquiry as to what steps

15  she could take to secure a position, beyond submitting a letter

16  of interest, that would increase her chances for doing that.

17  Subsequently, I told her that she could file a complaint with

18  the PHRC but I wouldn't -- really recommend that.  I'm kind of

19  on the same level as Mr. Wright, you really don't want to file

20  a suit as a way to get a job.  But if you really want to object

21  to what's going on and how you have been treated, that would be

22  one way to do it.  So I recommended to her to do that.  And she

23  obviously opted not to do that.

24          MR. MEAD:  That's all I have, your Honor.

25          THE COURT:  Do you have anything of this witness?

93

1        MR. KUHAR:  No, your Honor.

2        THE COURT:  All right, thank you very much, Mr.

3   Byrd.

4        MR. MEAD:  I do have the plaintiff again, I

5   anticipate it being brief.

6        ROWENA WAGNER, PLAINTIFF HEREIN, PREVIOUSLY SWORN

7              DIRECT EXAMINATION

8   BY MR. MEAD:

9   Q.   Ms. Wagner, of course you realize you're still under

10  oath?

11  A.   Yes.

12  Q.   There's been testimony regarding the fact that you did

13  not try to improve after you received some suggestions.  Do you

14  have a response to that?

15  A.   Yes.

16  Q.   Would you tell us?

17  A.   I took courses online through OPEN, they call it OPEN,

18  Online Professional Education Network.

19  Q.   By the way, you have a computer at home?

20   A.   Yes.  Which was sponsored by PDE.  And I took courses

21   through WQLN educational network.  And I also attended APL

22   training.

23            THE COURT:  What kind of training?

24            THE WITNESS:  APL training, I testified about that.

25   BY MR. MEAD:

94

1  Q.    What does that stand for?

2  A.    I guess it's the first -- APL stands for the first names

3  of the people that organized the seminar.

4  Q.    Do you recall anything else that you did on the computer?

5  A.    I also checked the PDE Form 427, which was mentioned

6  earlier by Ms. Good.  But I just want to be clear, that

7  meeting, after the interview of March, 2004, the only reason

8  they suggested to check out the Form 427 is because Mr. Heller

9  would not show me my evaluation form.

10  Q.    Now, you heard testimony about the Stars program,

11  correct?

12  A.    Yes.

13  Q.    What is your understanding of the Stars program?

14  A.    The Stars program was not talked about until after the

15  first agreement that was organized by Mr. Kuhar.  And I would

16  have took advantage of that first, because for experience.

17  Second, because it pays $20 an hour, it's more than what I

18  would make as a substitute teacher.

19  Q.    So you're saying that the Stars program was not suggested

20  to you at this meeting in 2004?

21  A.    That's correct.

22  Q.    You said you did not learn about the Stars program until

23  you said, and I believe you mean settlement discussions?

24  A.    That's correct.

25  Q.    So if there was testimony regarding that being a

95

1    suggestion given to you in 2004, that's not correct?

2    A.    That's correct.

3    Q.    And you're saying because you would have been interested

4    in the financial aspects of it as well?

5    A.    Yes, and experience as well.

6    Q.    There's also testimony that you didn't go to talk to a

7    Ms. Braden, do you remember that conversation?

8    A.    Ms. Braden, at the time I was a day-to-day substitute for

9    Ms. Pickens, she worked with me because she was a title one

10   reading teacher at Cochranton Elementary School.  So I worked

11   with her almost everyday during the language arts period.

12   Q.    So you were working with Ms. Braden?

13   A.    That's correct.  And Mr. Heller testified, also, that he

14   suggested to see Ms. Good during the interview, I mean, I'm

15   sorry, the observation review that Mr. Heller and I did in

16   December, it was not suggested.  Because if he had suggested

17   that, it would -- it would be better if he wrote it down on

18   that same piece of paper that he --

19   Q.    Your observation form?

20  A.   Yes, that's what I meant, I'm sorry.

21  Q.   Were you subbing at Mr. Meader's school in 2001-2002?

22  A.   Yes.

23  Q.   How many days did you sub, approximately?

24  A.   Fifty plus.

25       MR. MEAD:  Your Honor, the only thing I was going to

1   do is, there was testimony yesterday about, from one of the

2   witnesses that they were unaware of the PHRC filing.  I do have

3   copies that my clients provided out of the newspaper articles

4   during when she first sued.  My clients did pick them up, I

5   would submit those to show, she said she didn't learn about it

6   until she got ready for this case.  There were mentions of the

7   PHRC in the newspaper articles.  And she testified she read the

8   newspaper article, that's why she was aware of it.

9          THE COURT:  Who testified she read them, your

10  client?

11          MR. MEAD:  Ms. Darling.

12          THE COURT:  Well, you can submit those newspaper

13  articles.

14          MR. MEAD:  I was going to do that, your Honor.  I

15  didn't know whether you wanted the witness to authenticate them

16  and they went and picked them up.

17          THE COURT:  I don't think they need any

18  authentication.  The Meadville Tribune is the Meadville

19  Tribune, I don't think there's any doubt that the articles

20   appeared, is there, Mr. Kuhar?

21          MR. KUHAR:  No, your Honor.

22          MR. MEAD:  That would be our position.  Exhibit No.

23   32, your Honor.

24          MR. KUHAR:  No objection, your Honor.

25          MR. MEAD:  Your Honor, just to complete the

97

1  newspaper situation -- your Honor, and not as a means of

2  self-promotion, I have an Erie Times News article from that

3  same period, and it was a headline, Exhibit 33.

4          THE COURT:  Is that with the disclaimer that you're

5  a shareholder in the paper?

6          MR. MEAD:   I don't know if it's in that one.

7          THE COURT:  All right.

8          MR. MEAD:  We would ask the admission of that as

9  well.

10         THE COURT: It's admitted.

11         MR. MEAD:  We have no further questions of this

12 witness.

13         THE WITNESS:  Mr. Mead, can I say something.  Ms.

14 Darling's testimony yesterday she said that the main purpose I

15 went to see her is because to question her why I'm not getting

16 a job.  So my main purpose for that meeting was to be

17 considered for the fourth-grade teaching position.

18         MR. MEAD:  Thank you.

19         THE COURT:  All right, do you have any cross?

20        MR. KUHAR:  Yes, your Honor.

21                CROSS-EXAMINATION

22   BY MR. KUHAR:

23   Q.   Ms. Wagner, you said you took an APL course, correct?

24   A.   Yes.

25   Q.   Who paid for that?

1  A.   The district.

2  Q.   Isn't it true that you took it because the terms of the

3  January 12, '06 settlement agreement required you to do so?

4  A.   Yes.

5  Q.   That is the one and only settlement agreement, which the

6  court is already familiar, correct?

7  A.   Yes.

8  Q.   Were you aware -- I'm sorry.  Were you present during Mr.

9  Heller's deposition in 2005?

10  A.   Yes.

11  Q.   Were you there and listening when he said during his

12  deposition that he had offered you an opportunity in the Stars

13  program?

14  A.   Could you please tell me when the date was when he

15  suggested the Stars program?

16  Q.   The testimony from Mr. Heller is that he suggested it

17  during the June, '04 meeting with you.  I think you had just

18  testified a minute ago that that did not happen; do I

19  understand it correctly?

20   A.   That's correct.

21   Q.   Now, my question is during his 2005 deposition, which was

22   on --

23   A.   Is it on my deposition?

24   Q.   No.  I don't know whether it is or not.  I'm asking you

25   if you were present when Mr. Heller was deposed in September

1  and October of 2005?

2  A.   I was present.

3  Q.   You were present?

4  A.   Yes.

5  Q.   And during his deposition he claimed to have offered you

6  the Stars position back in '04.  Do you understand what I'm

7  asking?

8  A.   I guess if he claimed it --

9       THE COURT:  Wait a second.  Are you asking her if

10  she remembers him making that statement at the deposition?

11       MR. KUHAR:  Yes.

12       THE COURT:  Well, that wasn't what you were asking

13  her.  Ask her that, so I don't have to ask her.

14       THE WITNESS:  I don't remember.

15  BY MR. KUHAR:

16  Q.   You don't remember whether you heard him say that?

17  A.   No, I don't remember.

18  Q.   Okay.  During the deposition of any of the witnesses in

19  your lawsuit, do you recall any of those witnesses talking

20   about the Stars program in their depositions?

21   A.   I'm not sure if it's Mr. Heller or Ms. Good.

22   Q.   But one of them?

23   A.   Yes.

24   Q.   If I told you that both of them were deposed in '05,

25   would you believe that, does that sound right?

100

1   A.   Yes, I guess.

2   Q.   What is it that you recall one of them saying in their

3   deposition?

4   A.   Could you repeat that, please.

5   Q.   Yes.  I think you said you recall either Mr. Heller or

6   Ms. Good saying something about the Stars program during their

7   2005 deposition, correct?

8   A.   Yes.

9   Q.   But you're unsure which of the two said that, right?

10  A.    That's correct.

11  Q.    Okay.  What do you recall about what it was that was

12  said?

13  A.    I can't really recall every word, but they had offered me

14  the Stars program.

15  Q.    Okay.  So since you heard that said by one of the two of

16  them?

17  A.    Yes.

18  Q.    Have you applied to get into this Stars program?

19  A.    Oh, yes, I did.  I went in -- you're talking about the

20  timeframe after the first agreement, because that's the only

21  time, the first time I heard about the Stars program.

22        THE COURT:  When?

23        THE WITNESS:  The settlement agreement, your Honor.

24        MR. KUHAR:  I think there's some confusion, I'm just

25  going to withdraw the question.

1          THE COURT:  All right.  It's your question to

2    withdraw.  Is that it?

3          MR. KUHAR:  Yes.  Your Honor.

4          THE COURT:  Anything further, Mr. Mead?

5          MR. MEAD:  Nothing further, your Honor.

6          THE COURT:  Thank you, ma'am.

7          MR. MEAD:  We rest.

8          THE COURT:  All right.  We'll come back about 10

9    after 1:00, I'll hear what you have to say by way of wrapping

10   it up.

11         (Luncheon recess from 11:45 a.m.; until 1:10 p.m.)

12         THE COURT:  All right, Mr. Mead.

13         MR. MEAD:  Your Honor, I am aware we are going to be

14   filing proposed findings of fact and conclusions of law, so I

15   don't intend to make it a very long argument.

16         THE COURT:  You don't have to.

17         MR. MEAD:  Let me just hit what I believe we have

18   shown as highlights.  I'd like to start off with the

19   retaliation claim first because I believe that is quite

20   candidly our stronger claim at this point.

21          THE COURT:  Well, let me begin and talk a little bit

22   about the retaliation claim and I'm going to let you talk about

23   it substantively, but I want to return briefly, I know I'll see

24   more about this in your submissions legally, but I want to

25   return more to about this exhaustion or failure to have,

102

1  alleged failure to have exhausted.  You weren't counsel back

2  then when this case first started or for some substantial

3  period thereafter and you, therefore, did not participate in

4  the PHRC matter, is that it?

5      MR. MEAD:  That's correct, your Honor.

6      THE COURT:  Was your client during the period of her

7  filing of the PHRC complaint and thereafter, did she have

8  counsel at the time that she filed the PHRC matter?

9      MR. MEAD:  I believe so, your Honor.

10     THE COURT:  All right.  Would Mr. Nichols be in the

11  best position to give me, if you can, that's fine, I would be

12  interested for the record in a description as to the nature of

13  the PHRC proceedings and/or investigation in this case?

14     MR. MEAD:  Certainly, your Honor, I was not present,

15  I believe Mr. Nichols was present during the PHRC hearings, if

16  you'd like to hear from him.

17     THE COURT:  That would be helpful, I think it would

18  be helpful to get on the record, get somewhat of a record made

19  here.  I'm going to ask you questions --

20          MR. NICHOLS:  Sure.

21          THE COURT:  You drafted the PHRC charge, is that

22  correct?

23          MR. NICHOLS:  No, I did not, judge.

24          THE COURT:  Was that done by your client?

25          MR. NICHOLS:  As I understand it, they were not

1 represented at the PHRC hearing. And I understand from my

2 client, Ms. Wagner, that she was assisted by a non-lawyer.

3        THE COURT: By a non-lawyer?

4        MR. NICHOLS: Yes, your Honor.

5        THE COURT: There was not a lawyer at the PHRC

6 hearing?

7        MR. NICHOLS: No.

8        MR. MEAD: I stand corrected, your Honor, if I

9 misspoke, I thought she was.

10        THE COURT: That's all right, I realize you weren't

11 there. When did you get involved in this case?

12        MR. NICHOLS: Approximately, judge, I got involved

13 in the case the 1st of September, 2004.

14        THE COURT: All right. Just so I'm clear and I want

15 to make sure, either Mr. Mead or yourself can respond if you

16 know, but the only charge I have on the record here is the

17 February 20, 2003 charge filed with the PHRC, is that

18 correct -- is that the only administrative charge that was

19 filed?

20          MR. NICHOLS:  As far as my examination of the

21  record, that is correct, judge.

22          THE COURT:  All right.  In my examination of the

23  record, but once again correct me if I'm wrong, I'm giving

24  everyone an opportunity here to disabuse me of what might be

25  incorrect information.  My examination of the record fails to

104

1   reveal that there was ever an amended order or revised charge

2   filed with the PHRC or EEOC alleging retaliation, is that

3   correct -- to the best of your knowledge?

4           MR. NICHOLS:  To the best of my knowledge that is

5   correct, judge.

6           THE COURT:  All right.  Is that accurate, to the

7   best of your knowledge as well?

8           MR. MEAD:  Yes, your Honor.  My client indicates to

9   the best of her knowledge that is correct.

10          THE COURT:  Then my last couple questions, and then

11  I'll let you get back up.  Actually, Mr. Nichols, you're more

12  than welcome to sit down.  If you need to talk me, you can just

13  spin the microphone around and speak from your seat.  That

14  would be just fine.

15          MR. NICHOLS:  All right.

16          THE COURT:  My last couple questions really involve

17  the nature of the hearing.  Since you weren't there and, Mr.

18  Nichols, you weren't there, I guess the only person who would

19  have been there would be you, Ms. Wagner, is that it?

20          MS. WAGNER:  And my husband.

21          THE COURT:  And your husband.  Could you come up to

22  the mike for a second.  Did the hearing take place on one day?

23          MS. WAGNER:  Yes, sir.

24          THE COURT:  Do you remember the date of the hearing?

25          MS. WAGNER:  No, your Honor, I don't remember the

105

1  date.

2        THE COURT:  All right.  But it looks to me like the

3  actual findings came down in August of 2004, does that sound

4  right, do you know?  Well, actually, it occurs to me the

5  district would have been at the hearing; were you at the

6  hearing, Mr. Kuhar?

7        MR. KUHAR:  I was not, your Honor.  Just to be

8  clear, I know we're calling it a hearing, but it probably was a

9  fact-finding conference.

10        THE COURT:  All right, if I'm using the wrong term,

11  I don't know what it was, but I know that there was a meeting

12  of some sort which eventually produced the PHRC findings, is

13  that right?

14        MR. KUHAR:  I'm under that impression, your Honor.

15  Mr. Heller may have been in attendance.

16        THE COURT:  Mr. Heller, you were in attendance as

17  well.  Who was in attendance besides yourself?

18        MR. HELLER:  Our attorney, Mr. Perhacs.

19        THE COURT:  Do you remember the date of the meeting,

20   roughly?

21          MR. HELLER:  I do not.

22          THE COURT:  All right.  In any event, now let me

23   come back to you, Ms. Wagner.  Did they take testimony or did

24   they ask you questions, was there an investigator, tell me what

25   happened?

106

1          MS. WAGNER:  Mr. Adler asked a bunch of questions to

2   me and to Mr. Heller and Mr. Dolecki.

3          THE COURT:  Mr. Adler being the investigator for the

4   PHRC?

5          MS. WAGNER:  That's correct, your Honor.

6          THE COURT:  Do I take it that those questions were

7   based upon the allegations that you had made in your charge of

8   February 20th of 2003?

9          MS. WAGNER:  That's correct.

10          THE COURT:  Okay.  In other words, he asked you the

11   facts that supported your claim in your charge?

12          MS. WAGNER:  That's correct.

13          THE COURT:  And, then, may I assume that he then

14   asked Mr. Heller what the district's response was?

15          MS. WAGNER:  Yes.

16          THE COURT:  In essence?

17          MS. WAGNER:  Yes.

18          THE COURT:  Did anyone else besides you and Mr.

19   Heller speak or give substantive information at that

20  fact-finding conference?

21        MS. WAGNER:  Mr. Stanton.

22        THE COURT:  Who is he?

23        MS. WAGNER:  Principal, Neason Hill.  I questioned

24  about him hiring an emergency substitute teacher for eight

25  weeks at Neason Hill Elementary School, and he talked about

1  that.

2      THE COURT:  Anything else besides -- so was it

3  primarily you and Mr. Heller giving your version in support of

4  your discrimination claim and the district's response to why

5  they contended they weren't discriminating?

6      MS. WAGNER:  Yes.

7      THE COURT:  Do you know beyond -- did they call it a

8  fact-finding conference?

9      MS. WAGNER:  That's correct, your Honor.

10      THE COURT:  And were you actually put under oath?

11      MS. WAGNER:  No, we were not.

12      THE COURT:  Was there a stenographer there, was

13  there somebody taking it down?

14      MS. WAGNER:  No, sir.

15      THE COURT:  But I assume he was taking notes?

16      MS. WAGNER:  Yes, I guess.

17      THE COURT:  And then it was sometime after you had

18  that fact-finding conference that the actual PHRC report or

19  findings were submitted as a result of that fact-finding

20    conference?

21          MS. WAGNER:  I believe so, your Honor.

22          THE COURT:  Okay.  Do you know, Ms. Wagner, this

23    will also be directed to Mr. Heller, was there any other

24    fact-finding conference or conferences or hearings of any

25    nature, to your knowledge, beyond the one that you just told me

108

1  about?

2        MS. WAGNER:  That's the only one, your Honor.

3        THE COURT:  Okay.  And do you know of your own

4  knowledge or have you heard from anybody that any investigators

5  from the PHRC actually went to the school or went out in the

6  field, so to speak, to talk to anybody about your case?

7        MS. WAGNER:  No, your Honor, I don't know.

8        THE COURT:  You're not aware of that?

9        MS. WAGNER:  No.

10        THE COURT:  How about you, Mr. Heller?

11        MR. HELLER:  Nobody visited the school district as

12  an investigator.

13        THE COURT:  So, in a nutshell, then, just to wrap

14  this up, tell me if this would be accurate.  The nature of the

15  charge, the sole nature of the charge that was submitted to the

16  PHRC would have been the charge that was submitted by you on

17  February 20, 2003, is that right?

18        MS. WAGNER:  That's right.

19        THE COURT:  And, to the best of your knowledge,

20   beyond what you and Mr. Heller have told me concerning the

21   fact-finding conference and what was said at that conference

22   relative to your charge and their response, that was the full

23   nature of the PHRC's investigation, is that correct?

24          MS. WAGNER:  That's right.

25          THE COURT:  Is that your understanding?

109

1        MR. HELLER:  I agree with Ms. Wagner.

2        THE COURT:  Thank you, Ms. Wagner.  Mr. Mead, you

3   can come back up.  Let me return just briefly and once again

4   this is with the caveat, understanding that you're going to

5   have an opportunity to go back and take a closer look at this

6   whole issue legally.  And this is this Robinson case again.

_____

7   It's referencing an earlier Third Circuit case and it says "we

8   identified two circumstances in which events subsequent to a

9   filed complaint may be considered as fairly encompassed within

10   that complaint, either where the incident (1) falls within the

11   scope of a prior EEOC complaint, or (2) falls within the scope

12   of the EEOC investigation which arose out of it."

13        The retaliation aspect of this case, as I went back

14   and I look at the original complaint, is a completely

15   independent and separate issue from the underlying national

16   origin and the race claim here.  I guess I ask rhetorically,

17   and I know that you weren't there so at the time you couldn't

18   have done it, shouldn't under Third Circuit law, wasn't it

19   required to file at least an amended charge with the PHRC here

20  on this retaliation claim?

21          MR. MEAD:  Your Honor, again, I did view the case

22  when you provided it to me.  And, unfortunately, I think

23  neither side had seen that case prior to our submissions to the

24  court as motions in limine.

25          THE COURT:  That's all right.  Now, that having been

1  said, I'm going to let you finish your thought here.  Your

2  claim is, as I understand it, that since March, sometime in

3  2004, when she was told that she no longer would be

4  interviewed, in essence every time a new position comes up,

5  she's being retaliated against because she's not being

6  permitted to interview?

7            MR. MEAD:  Yes, your Honor, we argue it's an ongoing

8  situation of retaliation.  Because there wasn't really a

9  starting or triggering event per se, like she was fired from

10  being a substitute teacher.  There was nothing that triggered a

11  particular need to run to the PHRC again.  That being said, I

12  have to agree with the court in the one sense because the PHRC

13  claim was filed, then she's retaliated against.  So it was not

14  included in the PHRC claim at that point.

15            THE COURT:  Right.  I guess my question, and it's

16  somewhat premature because you haven't had an opportunity to

17  really digest Robinson or for matter to look at other cases
            _____

18  that may have applied it.  But given Robinson's directive, I
            _____

19    mean at least insofar as -- well, given Robinson's directive,

            _____

20    can you think of any way that the facts of this case fit within

21    the two Robinson exceptions?

            _____

22          MR. MEAD:  Your Honor, I don't know off the top of

23    my head.  I do recall reading Robinson in a sense that the

            _____

24    court does have discretion in some instances and I don't know

25    all the instances without going through the case --

111

1          THE COURT:  It's not jurisdictional, that much I

2   know, it's not subject matter jurisdictional.  There is no

3   question about it.  There used to be some dispute about that

4   and the Third Circuit, actually the Third Circuit cleared that

5   up in Robinson.  So it's not a jurisdictional issue.  But you
           _____

6   suggested at the beginning of the case or at some point when we

7   were arguing this, you said I'll just file, I'm putting words

8   in your mouth, but I'm paraphrasing, what would prevent us from

9   filing an amended charge.

10          MR. MEAD:  We could, your Honor.  And it may happen,

11   I don't know.  But that would be my argument.  My argument

12   would be I could go to the PHRC today and say we're being

13   retaliated against today because we're not being interviewed.

14   It's an ongoing situation.

15          THE COURT:  I'm not, because I haven't ruled on

16   this, but the lay of the land being right now that the Supreme

17   Court looks at individual acts of retaliation as discreet acts.

18   Each of which starts a new time period running.  So is this --

19   and I'm not putting words in your mouth, but is it your

20    contention that if you went and filed an EEOC charge, it would

21    be your contention that for any positions that had opened up

22    for a 300-day period, so to speak, before that, you would be

23    claiming for?

24          MR. MEAD:  I think that's correct, your Honor.  I

25    believe we would have the option to do that, if that's the

112

1   route we take, of course, I don't know if we would.  But that

2   would be my argument.  That it has been ongoing.  It hasn't

3   been exhausted, there hasn't been the one triggering event,

4   like a firing, which would say, okay, the 300 days are up.

5        THE COURT:  Then, finally, this will be truly my

6   last question and then I'll let you turn to the merits of the

7   retaliation claim, and then you can swing back on to the other

8   aspect if you want.  But let me just ask Mr. Nichols over here,

9   you were counsel of record, at least by 2004 when the original

10  complaint was filed, I mean the federal complaint?

11       MR. NICHOLS:  As of September 1, 2004, I became

12  counsel, approximately.

13       THE COURT:  Come up to the podium.  I guess to round

14  out the record on this and my background, why didn't you file

15  an amended charge with the PHRC based upon the separate claim

16  of retaliation?

17       MR. NICHOLS:  Well, essentially, the reason was

18  there I did state, enumerated in the original complaint and the

19  amended complaint, a charge of, a claim of retaliation.

20          THE COURT:  That wasn't my question.  My question

21   was why didn't you file a retaliation claim with the EEOC or

22   PHRC?

23          MR. NICHOLS:  Judge, I didn't think that it was

24   required at this point because I felt, essentially, the basis

25   upon which the retaliation claim rested essentially evolved out

1   of the subject matter that was before the PHRC.  And,

2   therefore, when it happened, I didn't think it was necessary.

3   And I in looking, in having to prepare the complaint, had to go

4   back to the PHRC to pre-clear a retaliation charge because,

5   essentially, I think it would have been duplicative.  Because,

6   essentially, the facts, the substance, the gist, upon which

7   that retaliation claim emerged, emerged from what had

8   essentially been the racial and the national origin,

9   discrimination charge that had been discussed before the PHRC.

10          THE COURT:  All right, thank you, you can take a

11   seat.  All right, Mr. Mead, tell me about the merits of your

12   retaliation claim and what you think the facts would show?

13          MR. MEAD:  Your Honor, as the court is well aware,

14   for a prima facie case of retaliation, we have to show that the

15   plaintiff engaged in a protected activity, which I believe

16   we've shown here.  She was interviewing, applying for jobs, as

17   well as working at a job.  The employer took adverse employment

18   action, which we would submit here is the fact that she was no

19   longer interviewed and was not given a job after an interview.

20    And, last, the causal connection between the two.  We believe

21    we've shown both direct and indirect evidence regarding this

22    fact, these facts.  Number one, we did demonstrate the PHRC

23    claim was filed in February, 2003.  After February, 2003, there

24    was one main person at the district who handled the PHRC claim

25    for the district; that was Mr. Heller.  We've also learned

114

1    during the course of this trial that Mr. Heller is the main man

2    when it comes to hiring decisions in the district.  He is the

3    most powerful person.  We heard about it as far as hiring.

4    He's the one who's also handling the PHRC claim, is also well

5    aware of it.

6           So we come to these interviews in 2004.  We heard

7    testimony that at least three of the eight people were aware of

8    the PHRC claim.  All of these people had been handpicked by Mr.

9    Heller to be on this board, for both the interview and for the

10   pre-screening.  Although, we've heard testimony they claimed,

11   few of these witnesses claimed they had not heard of the PHRC

12   claim, I submit that is incredulous.  Because this is not a

13   large community, it's not a large school district.  If somebody

14   files a claim of racial discrimination against the district,

15   I'd be very surprised that the administrators were unaware of

16   it from February, 2003, despite their testimony.  And in any

17   event, we know at least three of these people knew about it at

18   the time of the 2004 interviews.  More significantly, I believe

19   that when Ms. Wagner would come up and they'd be discussing her

20   during the decision-making process, again, I find it

21   incredulous if one of these people, one of three didn't say,

22   well, you know, she's got a PHRC claim against us.  So I would

23   say we can show that her not being given an opportunity to

24   become a full-time employee or a long-term sub after the 2004

25   interviews was evidence of retaliation.

115

1    Then we go up to the lawsuit, which is filed in

2    September of 2004.  Mr. Heller is directly sued.  Again, we

3    have the number one decision-maker, as far as who gets

4    interviewed and who gets hired, being sued directly.

5    Now, after 2004, the district has hired

6    approximately 15 new teachers.  They've interviewed at least 30

7    other people.  The plaintiff here, Ms. Wagner, hasn't received

8    a single interview since 2004.  Despite the fact that the

9    district, through both deposition testimony and every one on

10    the stand, has said over and over again we're looking for

11    minorities.  We need minorities.  They're good role models, we

12    can't find enough of them.  They're not in our area.  We're not

13    paying them enough.  We're really having a tough time getting

14    minorities.

15    They're saying this on the one hand, on the other

16    hand they do have Ms. Wagner, a Filipino, who is substituting,

17    and by all definitions is doing a very, very good job

18    day-to-day subbing, according to all the reviews which are in

19    evidence.  However, they don't even interview her.  Not even at

20   the point of hiring, but they don't even interview her for over

21   three years.  This is despite the fact that at that point she's

22   probably substituted, by 2005, 2006, maybe 400, 500 or 600

23   times.  And as I've asked a few of these witnesses, did you

24   become a better teacher as you got more experience.  I think

25   it's common sense people do.  The more experience you do, the

116

1  better you become.  Yet, she had no opportunity to show that

2  she was a better teacher because she was not getting any

3  interviews after 2004.  And, again, despite the fact that I

4  believe even Mr. Heller described her as a role model.  And

5  this is only the circumstantial evidence, your Honor.

6        We've also had direct evidence of retaliation.  We

7  had the Ms. Darling discussion with Ms. Wagner, in which she

8  told Ms. Wagner straight up, of course there is some dispute on

9  credibility here, I know that there are some disputes.  But she

10  told her straight up, I can't hire you because of the lawsuit.

11  That was her testimony, according to Ms. Wagner.

12        And then we had one unbiased witness in the whole

13  case, Kathleen Maruska.  She has no reason to shade the truth

14  one way or another.  In fact, she still is an employee of the

15  district, she still works there.  She is still going back, has

16  to deal with this day-to-day.  She was a kindergarten teacher.

17  She testified that during one of her conversations with Ms.

18  Darling, in which she asked that Rowena replace her for three

19  weeks, she said no.

20        THE COURT:  Who said no?

21        MR. MEAD:  Ms. Maruska and Ms. Darling are having

22   this conversation.  She says no because of the lawsuit.  Now,

23   why Ms. Maruska would come to the stand and come into this

24   courtroom and lie is beyond me.

25        It was also very interesting I thought during Ms.

1  Darling's testimony that she kept emphasizing Ms. Maruska was

2  very, very protective of her class, she didn't want anybody to

3  go into her space, was very upset that somebody had been in her

4  personal space.  Yet, the second time she requests Ms. Wagner

5  or the second time she goes on a three-week leave, according to

6  Ms. Darling, Ms. Maruska doesn't ask for anybody.  I think the

7  court saw Maruska, she looks like the type of person that would

8  ask for somebody.  She was nervous, according to Ms. Darling,

9  the first time about somebody else stepping in.  But the second

10  time, according to Ms. Darling, she doesn't ask.  That is very

11  convenient because that would make it appear that there's no

12  discussion about a lawsuit the second time they discuss this.

13  But, again, I would just say that Ms. Maruska's testimony must

14  be credited.  She's the only unbiased witness in this case.

15       Now, we also heard from, regarding circumstantial

16  evidence, we've also heard from Mr. Heller, who said he

17  actually told Ms. Wagner, hey, don't put your eggs all in one

18  basket, look elsewhere, go look elsewhere.  This is again in

19  2004 after the PHRC hearing.  He's telling her to go look

20  around.  Also getting back to the three weeks.  I would submit

21  that if Ms. Wagner couldn't even get hired for a three-week

22  period because of an attitude such as this, what chance did she

23  have as a long-term sub, getting hired as a longer sub or as a

24  full-time employee.

25        We also have direct evidence from Mr. Wright, who

118

1    was a decision-maker, as far as being on the board.  Mr.

2    Wright, we read his transcript into evidence from his

3    deposition, it's very short, he's asked do you approve or

4    disapprove of, okay, let me ask you this.  Does the fact that

5    Ms. Wagner filed a lawsuit, does that disqualify her from being

6    further considered for a teaching position?  Answer:  No, I

7    would think, again, I'm not sure that it's helpful.  Question:

8    Would you hold it against her?  Answer:  If I wanted a paid job

9    at the school district, I wouldn't sue them as a place to

10   start.  That's his deposition testimony from September of '05.

11   As you've heard, he is a decision-maker, he's on the board.

12         Now, the district comes in and claims that well, Ms.

13   Wagner wasn't hired for a number of reasons.  One, she did

14   lousy interviews.  Well, I'll talk about the interview process

15   in a second.  Let's just say the interview process at best is

16   flawed.  They don't pick the top candidates from the interview

17   process, I think that's been proven.

18         Second, they testified she didn't try to improve

19   herself by going to the Stars program.  She testified on

20  rebuttal that she was not told about the Stars program.  Again,

21  I realize it's for the court to decide the difference between

22  the testimonies.  It's the court's decision to make on

23  credibility.  But I just want to point out that is her position

24  on that.  She did online work.  She was told to look up stuff

25  on the computer, she testified she did so.  And then, again,

1  they complain well, she didn't come back and tell us how she

2  was doing.  Well, after September of 2004, there's a lawsuit

3  against the administrator, the superintendent and against the

4  school district.  I don't think it was very give and take at

5  that point between the parties.  She did not go back and tell

6  them what she had done.  Or she could have told them what she

7  had done if she had received an interview, but she never had

8  the opportunity.

9      So we submit that's direct evidence there, both the

10  comments of the decision of Ms. Darling, who again was a

11  decision-maker, she was the one who decided who got that

12  three-week substitute job, and Mr. Wright.  So I submit that we

13  have shown evidence of retaliation.

14      Discrimination, I don't think there's any dispute we

15  proved a prima facie case.  So I don't want to go into that.

16      THE COURT:  Go right to the pretext argument?

17      MR. MEAD:  Well, the defendant again claims we did

18  not hire Rowena because she was a poor interview and she did

19  not demonstrate any improvement or any need or desire to

20   improve.  We had rebuttal on the desire to improve, I won't

21   repeat that.  We submit those are pretext.

22          Back when Ms. Pickens' position first opened, there

23   is testimony in the record by Ms. Pickens that, you know, we

24   always picked our substitutes.  It happened at least twice with

25   Ms. Pickens.  And this was the first time she ever knew that

1   whoever she had chosen was not able to complete the job.

2          Not only that, we do have the deposition testimony

3   of Mr. Dolecki, who is the superintendent out there.  He was

4   asked in 2005, I'm reading from page 82, lines 8 through 19,

5   "then I ask you a follow-up question.  I asked, do you know of

6   any instances during your tenure with the school district

7   either AS assistant superintendent or as superintendent where

8   you had a teacher who takes leave, before she takes leave she

9   writes the assistant superintendent, look, I want this

10  substitute to replace me during my absence.  The substitute

11  comes aboard and starts to work, and then two weeks later or so

12  is abruptly dismissed from the position, no longer allowed to

13  continue to substitute for that teacher.  Do you know of any

14  instance where that has happened apart from Mrs. Wagner?

15  Answer:  No."  This is the first time it had happened, we had

16  some testimony about that.

17         We also heard testimony from the district's witness,

18  Karen Jamieson.  She said she was picked as a long-term sub by

19  a Ms. Beck.  She didn't have to interview.  Mr. Heller came

20   aboard during the time period she was serving as a long-term

21   substitute, and she didn't have to get interviewed.

22   Interestingly, Karen Jamieson was ranked by Mr. Heller as a

23   "no way" candidate during the 2002 interviews.  But somehow she

24   was able to be hired later in 2004.  I would also note she is a

25   Caucasian.

121

1          The interview process in 2002.  I submit there's a

2    lot of flaws with this interview process.  Number one, the

3    interviewers are all white employees of the school district,

4    all white administrators.  In 2002 there was only one minority

5    candidate, Ms. Wagner.  Contrary to what we heard today from

6    Ms. Good, this was a very, very subjective test.  The example I

7    used with Ms. Good is that she rated a person who was a student

8    teacher, hadn't even graduated, she gave her a 4 as far as her

9    experience.  At the same time she gave Ms. Wagner, who had

10   probably 120, 150 days of teaching on her own, substitute

11   teaching, a 3.  I submit that is very, very subjective at best.

12          Also, the court has heard me on cross-examination,

13   the best scores were not hired.  I don't want to beat a dead

14   horse.  I would just point out that in 2002, Amy Szalewicz was

15   number 10 out of 17.  The other person, Chad DuPont, was number

16   12 out of 17.  So the fact that she might not have performed as

17   well at her interview is not the main focus, that the district

18   looks at, they look at other things as well.  But they have

19   been claiming that that is the reason that she was not hired.

20    Also, in the 2002 interview, Mr. Heller interviews her, the

21    first thing he writes on his review on the back is the word

22    "Philippines."  Never really quite sure why that mattered to

23    him, he said it was a positive.  Although, he did not describe

24    that as a positive when he was asked whether or not there was

25    anything about Ms. Wagner that stood out.  Now, he says it's a

122

1  positive.  The court can take a look at that, it's says

2  "Philippines," make up your own mind what he was trying to

3  refer to there.

4      Second interview in 2004.  This is after the PHRC,

5  same group.  Again, I submit, despite any testimony you may

6  have heard, they all knew about the PHRC claim.

7      Couple things I'd like to point out there.  Meghan

8  Porter ranked number 22, she was hired.  31 out of 39

9  candidates did better than Meghan Porter.  But she was hired.

10  So, obviously, this score is not what they're looking at.

11  Scores is not the only thing that matters, by their own

12  testimony.  If you look at the very interview reports, you can

13  look at Ms. Good.  Look at her evaluation of Meghan Porter

14  versus my client.  She gave, Ms. Good gave Ms. Porter 14 out of

15  22.  Rowena Wagner 16 out of 22, yet she gets on the stand and

16  says she wasn't hired because she wasn't a good interview.  As

17  Mr. Heller said, they just wanted to give Porter a chance.

18  Well, again, Porter is a white female, we did not have the same

19  opportunity for Ms. Wagner.

20          Pretext, rate of improvement, I've talked about

21    that, she has rebutted that.  She said she was not given the

22    opportunity to do the Stars program.  She did look on the Web

23    site as requested.  However, nobody followed up from the

24    district.  And at the time period after the lawsuit, maybe she

25    should have been more aggressive talking to them, but she

123

1  wasn't.

2        We heard indirectly somebody say that well, other

3  people weren't interviewed after two times that they failed.

4  We didn't really hear any evidence of that, there were no

5  names.  Who were these people, why weren't they brought up

6  before.  Why weren't they identified.  Why wasn't there

7  testimony that other people had tried to get a job twice, but

8  we never interviewed those people again after those two times.

9        The comments that was made by Mr. Wright, brown and

10  black people aren't as smart as white people.  The court is

11  fully aware of that issue.  The court has to make a decision on

12  credibility, who's telling the truth on that one.  The first

13  statement was made by Mr. Wright, and was agreed to by Mr.

14  Heller, according to the plaintiff's testimony.  It's denied,

15  again it's an issue for the court.  But I would look at Bernie

16  Wagner's reaction after this occurred.  He went and he spoke to

17  his brother, and according to his brother's testimony, his

18  brother, who's the treasurer in Crawford County, has been for

19  awhile, testified that yeah, Bernie was upset because of that

20   comment.  I believe he said that was the comment that was made.

21   He didn't hear it directly from Mr. Wright.  But his brother

22   did hear it from Bernie.  I would submit that would be a very

23   unusual statement to make up and then repeat it to your

24   brother.  Also, there was some testimony from Mr. Wagner, there

25   was a lot of discussions going on, he didn't hear the rest of

124

1  the conversation.  He was being candid, I submit he was being

2  candid at that point.  However, he did say when he walked out

3  of the meeting, he had the feeling that no way was Ms. Wagner

4  ever going to be hired.

5      That's basically our case there, your Honor.

6  Damages, the court has talked to me about it, I will not go

7  into that unless the court has specific questions?

8      THE COURT:  No, I don't.  You can include in your

9  proposed conclusions of law or findings of fact, you can say

10  whatever you want about the damage aspect of the case.  But let

11  me ask you this.  Are you seeking, as part of a remedy in this

12  case, are you seeking, in addition to lost wages, are you

13  seeking injunctive relief in the nature of instatement?

14      MR. MEAD:  Yes, we are, your Honor.  I believe that

15  is included in the complaint, the first amended complaint.

16  That she be given the opportunity.  In all fairness, I don't

17  know if it would be a permanent position, but at least a

18  long-term sub position.

19      THE COURT:  All right.  Let me hear from Mr. Kuhar,

20    thank you.

21         MR. KUHAR:  Your Honor, whether the court is

22    analyzing the various non-hire decisions, as alleged or the

23    retaliation claim, assuming that that component would survive

24    an analysis that has already been discussed this afternoon,

25    failure to exhaust.  Whether you look at either of those claims

125

1   or any subparts within those groups, we think the issue is

2   really, as the fact finder, has the district's explanation of

3   its actions that are contested been proven pretextural.  I know

4   we all know that the burden of persuasion never shifts to the

5   defendants.  But I think it's worth noting.

6        Rowena Wagner of course does not state a claim of

7   any kind simply because she's not chosen and she's in the

8   protected class.  Basically, the plaintiff requests the court

9   to find all kinds of horrible things happened without any

10  evidence of them.  Obviously, the court is the fact finder and

11  the adjudicator of disputes in the case.  However, as would be

12  the case in a jury trial, of course, the fact finding has to be

13  done based upon the record.  Again, it's just request after

14  request after request for the court in it's fact finding

15  function to infer things without any evidence whatsoever.  Just

16  because things could have happened, they probably did.  That's

17  the recurring theme that we see in the overall presentation of

18  the case.

19        Now, with respect to the two three-week assignments,

20   which were day-to-day assignments necessitated by Kathy

21   Maruska's absence in the latter half of '03-'04 and '04-'05

22   school years.  We contend that they did not meet a prima facie

23   case with respect to those, in that the plaintiff never

24   expressed any interest in those positions whatsoever.

25        The plaintiff also never directly expressed any

1   interest in the Pickens' position.  However, whether those

2   matters are considered part of the prima facie case or not,

3   there is still an absence of pretext with them.  But we think

4   there is a prima facie case --

5        THE COURT:  Well, how could there not be a prima

6   facie case, at least with respect to the Pickens' position, if

7   she was actually interviewed for the Pickens' position?

8        MR. KUHAR:  You're right.  With respect to -- the

9   person who is performing the position after the interview, she

10  has a prima facie case there.  With respect to, they segregated

11  that into two components, they want relief for both, that's

12  what I meant.

13       THE COURT:  All right.  Go ahead.

14       MR. KUHAR:  Now, of course, if the court would find

15  that there is a prima facie case and would look for a

16  legitimate reason for the Maruska positions, Ms. Darling

17  testified as to why she did it.  There is no built-in

18  assumption that those should have gone to Ms. Wagner.  She

19  testified that, again, she knew about it, nobody applied,

20    including Ms. Wagner, and that many people would have wanted

21    to.  There seems to be this built-in assumption that Ms. Wagner

22    should have been chosen.  She gave legitimate,

23    nondiscriminatory reasons for why she chose the people that she

24    did, with respect to those two three-week assignments.

25          It's also worth noting briefly that no law requires

1    employers, including this one, to hire in any particular

2    manner.  It doesn't require the employers hiring process to be

3    sensible, smart, fair, or even consistent.  We have emphasized

4    the consistency because which we think that as a fact finder

5    one can infer that the consistency shows that we're not of a

6    discriminatory mind set.  However, the law does not even

7    require us to be consistent, even with a given period like Mr.

8    Heller's, having that assistant superintendent position.

9    However, nonetheless, we have credibly explained, through the

10    testimony of Mr. Heller and Suzanne Good and several other

11    witnesses, how they filled those permanent long-term sub

12    positions.  And really there was really no evidence or

13    cross-examination of that process that would raise any

14    questions about it.

15            The questions were all tied to the district

16    pedological objectives and obligations, some of them driven by

17    the PDE.  Which, again, it really has not been disputed.  As

18    well, there has been some attack or some assertions of the

19    notion that the interview scores don't drive the result.  Well,

20   again, whether they say somebody is 25th, 32nd or 33rd, if they

21   still scored better than Ms. Wagner, we don't see how that is

22   probative.

23          Secondly, Mr. Heller and Ms. Good acknowledge that

24   there were other factors considered.  And then we have

25   extensive testimony regarding what those were.  All of those

file:///A|/WAGDAY4.TXT

128

1  attributes beyond the interview performance that made the

2  successful candidates the successful candidates.

3       THE COURT:  Let me interrupt you for just a second,

4  it's a question I intended to ask Mr. Mead and I'll have you

5  respond to it.  There was testimony from your client and once

6  again I'm paraphrasing, but I think the upshot of it was that

7  she claimed that in connection with her brief tenure in Ms.

8  Pickens' classroom, when that came to an end, Mr. Heller said

9  to her something to the effect you're trying to play politics;

10  do you recall that testimony, Mr. Mead?

11       MR. MEAD:  Yes, your Honor.

12       THE COURT:  What inference -- what inference, from

13  the plaintiff's standpoint, are you asking me to draw from that

14  statement?

15       MR. MEAD:  I don't know what inference there was.

16  I believe that's what Mr. Heller said.  Now, Mr. Heller may

17  have meant you're trying to get a job the back door way, I

18  don't know.  But I don't think she was able to explain what he

19  meant, I don't think there was any testimony that she knew what

20    that meant.

21         THE COURT:  All right.  And then, the record will be

22    the record.  I'll go back and obviously when I get a transcript

23    here I'm going to reread it.  What was the factual -- was that

24    testimony refuted?

25         MR. KUHAR:  Your Honor, at this point I honestly

129

1  can't remember what testimony was offered and what response was

2  given.

3      THE COURT:  This was the question about you're

4  trying to play politics.  Does the district have a position as

5  to the factual accuracy of that contention, I guess that's the

6  better way to put it?

7      MR. KUHAR:  Not so much a position, it's just as

8  much whether what Mr. Heller would say, which I'd be happy to

9  have him address that.  Honestly, at this point I can't recall

10  if he was asked about or whether he would use that.

11      THE COURT:  I can't recall, either.  It's either in

12  the record or it's not.

13      MR. KUHAR:  I think part of the reason that I don't

14  remember more clearly is exactly the point your question makes.

15  Which is I didn't see any legally cognizable inference to be

16  drawn from it so, frankly, didn't retain it.

17      THE COURT:  All right.  Go ahead.

18      MR. KUHAR:  Okay.  Again, in short, the plaintiff

19  just does not offer any evidence of pretext with respect to any

20   of the specific positions.  Instead, she offers the testimony

21   of her husband.  Who provides, if you want to call it evidence

22   of general discrimination or animus.  Or I guess maybe

23   institutional animus or something like that.  But, clearly,

24   there is no animus tied to a specific position.

25          Mr. Wagner first testifies that George Wright, who

130

1  frankly is a lifelong civil rights pioneer beginning in the

2  '50s, about 10 years before Congress caught up with him, and

3  who has been the director of human resources for some larger,

4  more progressive companies, where his responsibility was EEO

5  compliance.  Mr. Wagner offers the testimony that, this

6  startling testimony that in one of his last of several

7  encounters with Mr. Wright, Mr. Wright reveals the secret

8  impediment and the explanation as to why Ms. Wagner hasn't been

9  hired all this time.  Keeping in mind there's no evidence

10  whatsoever that Mr. Wright has any ideas what is happening

11  regarding Ms. Wagner's applications.  This consideration as to

12  who has been hired, etc.  And, nonetheless, Mr. Wagner is

13  testifying that he makes this revelation it's because black and

14  brown people are not as smart as whites.

15          We suggest that the credible testimony on that point

16  is Mr. Wright's denial of saying anything like that.  In

17  addition to the evidence I just pointed to regarding his civil

18  rights activities and his credible testimony about his views on

19  those issues, there is absolutely no testimony or other

20  evidence whatsoever that he's predisposed of being bias in any

21  way.

22          Then almost, as if sensing a need to link such a

23  discriminatory animus, a general discriminatory animus to an

24  actual decision-maker, Mr. Wagner comes forward with the

25  testimony regarding Charlie Heller's adoption of that remark.

131

1   Now, this is Charlie Heller supposedly agreed with George

2   Wright's alleged remark in the presence of his boss, the

3   superintendent of a public school district in a racially

4   diverse community.  In fact, we think the credible testimony is

5   Mr. Heller's denial and Mr. Dolecki's denial of that or

6   anything like that was said during that meeting.  And Mr.

7   Dolecki's testimony that Mr. Heller would be disciplined for

8   that is credible as well.

9          And in support of the credibility of Mr. Heller's

10  denial, is the testimony of Tammy Foster, an African-American

11  candidate who was hired in '04 for a permanent position.  And

12  Naomi Uy-Moore, who was hired in '05.  Both of them August.

13  And they testified regarding the district and that Mr. Heller

14  is particularly receptive towards them as candidates for

15  permanent employment.  Ms. Foster described how Mr. Heller

16  initiated the process that Suzanne Good participated in.  Where

17  they took it upon themselves to mentor her, and through the

18  updating of her skills, her knowledge and so forth.  And I know

19  there's no suggestion by the plaintiff that the concepts, the

20   standards, instructional directives and strategies, that is

21   real, that is substantive, it's not things non-educators talk

22   about all the time.  The evidence before the court is extensive

23   and it indicates that those things are real and are of

24   consequence to the district.

25          So we have the testimony of Mr. Heller, Tammy Foster

132

1  and Ms. Good, that they essentially collaboratively worked with

2  Ms. Foster over a long period to get her into a position where

3  she could competitively interview, and know the answers to the

4  questions, know the material, which is the standards in

5  Pennsylvania.  From which the questions were driven.  She

6  interviews, she does well.  Part of that mentoring,

7  self-improvement process was employment with the district.  I

8  don't know the same act or inference is exactly the right

9  terminology or not.  Here we have allegations of discrimination

10  in non-hire decisions against a defendant who decided to hire

11  minorities and offer Stars type employment to Ms. Wagner.  All

12  right.  Now, Heller and Good also testified that they made

13  similar offers of help and Stars employment to several other

14  candidates.

15         Caucasian Karen Jamieson was among them.  It's

16  undisputed that she had a successful long-term substitute

17  experience, as that started before Mr. Heller arrived at the

18  district.  That was the '01-'02 school year.  And then in the

19  '02 interviews, even though she had been a successful long-term

20   sub teacher and was Caucasian, because she didn't interview

21   well during the '02 interviews, she did not get one of the four

22   long-term substitute positions.  She went to another district.

23   She testified how she boned up on the standards, did other

24   remedial type activities, as suggested to her by Heller and

25   Good.  And ultimately was interviewed a second time and did

1  well, and got a position.  And that's the work that was done

2  with Tammy Foster, in terms of she did the work.  But in terms

3  of Ms. Good and Mr. Heller mentoring and coaching her, helping

4  her to develop and gain work regarding what work she should do,

5  that's a pattern that you see through these situations.

6        Except when it comes to Ms. Wagner.  She had not, I

7  don't know exactly why she refused to follow these suggestions.

8  When she hit what she thought was a brick wall, couldn't get a

9  job in '02, couldn't get a job in '04, she had already been

10  mentored to some degree in '02, then she had a meeting with the

11  administrators in June of '04, they made these suggestions,

12  including employment.  And she just wouldn't do it.  There's

13  been no testimony as to why she doesn't or wouldn't.  There's

14  been a little bit of testimony that she did some things online

15  recently, which she never advised the district of.

16        Now, Ms. Naomi Uy-Moore, of course much has been

17  made about that, particularly, in pretrial proceedings and to a

18  degree at trial here.  In fact, it was alleged that the

19  district actually went so far as to go to Maryland to find

20   Naomi Uy-Moore.  Which, of course, was not the testimony.  The

21   testimony was she came knocking at the district, like all other

22   the candidates have.  And she was an incredibly qualified

23   candidate with a master's degree, 18 years of experience, etc.

24   Not surprisingly she did well during the interview and was

25   given a position.

134

1    Her certification issue is a total red herring.  It

2    was not known to the decision-makers at the time.  And, in any

3    event, it has not been shown to have been any kind of factor in

4    the process.

5    Now, I hate to say most telling because I think the

6    denial by Mr. Heller and the testimony of Mr. Dolecki, that Mr.

7    Dolecki did not confirm the racist remark, I think those are

8    telling.  But also incredibly telling on that issue of the

9    charge in which Heller adopted that remark, is the testimony of

10   the plaintiff's brother-in-law, Fred Wagner, Bernie Wagner's

11   brother, the treasurer from Crawford County, a lifelong public

12   servant.  Who did testify that he would remember every racist

13   remark by a public official, but can't remember all the

14   details.  But he remembers them all.  Bernie Wagner testified

15   under plaintiff's counsel's questioning what was his brother's

16   purpose for being there.  It was to be a witness, wasn't it.

17   And Mr. Bernie Wagner said yes, my brother was there to

18   essentially keep me under control.  I'm paraphrasing somewhat,

19   and to be a witness to the event.  And the testimony of that

20   witness, the plaintiff's brother-in-law, that Charlie Heller

21   did not make the remark, nor was it introduced and attributed

22   to Mr. Wright.  And also wasn't just a single remark.  We ask

23   the court to keep in mind that the supposed remark was a part

24   of a series of exchanges.  You need to follow EEO regulations.

25   No, we're not going to.  Part of the university study is

1  proven.  This was not one off-color word that was blurted out

2  at the meeting and somebody might have just missed, this was an

3  entire exchange that supposedly is just missed by the witness

4  of the plaintiff, her brother-in-law.

5        I'd like to talk a little bit about Ms. Maruska's

6  testimony, which you just heard some substantial reliance put

7  on by the plaintiff.  We would ask you to pay particular

8  attention to the cross-examination of Ms. Maruska.  Her

9  testimony was that two of these three-week assignments, was

10  able to remember both of them in an inter-department way.  She

11  said I remember what I did the second time, in about January of

12  '05, because I remember what happened the first time in January

13  of '04.  And what happened was in January of '04, I went to Ms.

14  Darling and recommended Rowena Wagner and was told no, because

15  of the lawsuit.  We all know the lawsuit wasn't filed for

16  approximately four to eight months later.  And then did Ms.

17  Darling make any reference to the lawsuit the second time that

18  she supposedly denied a position to Ms. Wagner.  Even Ms.

19  Maruska said she didn't.  Of course, on those points Ms.

20    Darling said that she never said anything about the subject

21    either time.  Again, she's testified credibly why she filled

22    the position the way that she did.  There is wholly inadequate

23    support of the conclusion in the record on Ms. Maruska's

24    positions.

25          Now, again, in support of her general animus and

136

1   retaliation claim.  Plaintiff attributes to Joanne Darling this

2   comment in the beginning of the '04-'05 school year, relative

3   to the long-term sub position that lasted that whole year.

4   Frankly, Darling's testimony or denial of that remark and her

5   testimony about what she actually did say was frankly far more

6   credible on that point.  Here Ms. Wagner's take on it was

7   essentially that the day my lawsuit hit the paper I went to my

8   building administrator and said I'd like a job in the future.

9   The administrator said nope, we can't because you filed a

10  lawsuit.  Okay.  Ms. Darling's credible testimony that the

11  conversation was actually Ms. Wagner coming to Ms. Darling and

12  saying why didn't you folks hire me.  Meaning in the batch of

13  '04 interviews and hires that led to eight people being hired.

14  To which Darling responded you need to see Mr. Heller about

15  that.  Frankly, that was improper ex-parte contact is what that

16  was.  Ms. Wagner just initiated a lawsuit against the district,

17  represented, essentially said I'm suing you because you didn't

18  hire me out of the '04 interviews, let's talk about that.  Why

19  didn't you hire me.  And, frankly, we think it was perfectly

file:///A|/WAGDAY4.TXT

20   appropriate for Ms. Darling to direct her to Mr. Heller.  We

21   think, frankly, what's happening there is essentially a forging

22   of the facts.

23          We ask the court to recall when the plaintiff was

24   testifying, she said that Dr. Arnold, who was the curriculum

25   director for Crawford Central some unspecified date years ago,

1   but in any event this curriculum director, Dr. Arnold, said to

2   her there were long-term subs that were picked by the permanent

3   teacher who was leaving.  That's how it was done.  I'd ask the

4   court to recall that I presented that PHRC questionnaire.  I

5   said you wrote in your PHRC questionnaire that Dr. Arnold said

6   they can pick whoever they want for a long-term substitute.

7   You wrote that down because that's what he said, isn't it.  And

8   she said yes.  What you see there is what I think you see when

9   it comes to what happened with that Darling conversation at the

10  beginning of '04'-'05.  Ms. Wagner chose to forge the facts, to

11  make it more valuable to her case.  And we think that's the

12  proper inference regarding what happened with her testimony

13  about Ms. Darling in '04-'05.  There was a conversation the

14  word lawsuit was mentioned but was spun to an advantage of Ms.

15  Wagner's case.  And spun to be inaccurate.  Regarding the

16  Pickens' position specifically.

17          In a nutshell it boils down to this.  Ms. Wagner

18  objects and asks the court to find it's illegal that the

19  district decided to change its hiring practice when it comes to

20  long-term subs.  Nothing in any of the law she cited of course

21  justifies that kind of a conclusion.  The testimony, and it's

22  undisputed, is that for the whole time relevant to this

23  lawsuit, Mr. Heller was assistant superintendent, and Mr.

24  Heller developed a way of doing things.  Extensive testimony

25  about why, to be honest, was not even required.  Extensive

138

1    testimony that would suggest there are good reasons for it.

2    Also not required under the law.  But that Mr. Heller knew his

3    way of doing things was consistent in hiring long-term subs and

4    permanent positions.  Her only opposition to that, she liked it

5    better the way before.  She's asking the court to find that

6    somehow it's illegal for the district to improve and change --

7    I'm sorry, change and make more demonstrable and objective the

8    hiring process.  We think it's palpably evident that the

9    evolution of the hiring process was a good thing.  Well, again,

10    makes it as objective as possible.  The only criticism she has

11    of it is that the neighbor who lives about 80 or 100 feet away

12    from me, wasn't able to get me in as a long-term sub because of

13    Mr. Heller's new policy.  There was absolutely no flaw or any

14    discrimination or any pretext established with respect to the

15    Pickens' position we submit.  Now, I know your Honor asked me

16    and Mr. Mead to defer discussion of damages.  Is the flip side

17    of that, I shouldn't talk about mitigation, can I address that

18    briefly --

19            THE COURT:  Go ahead.

20          MR. KUHAR:  With respect to mitigation.  Often times

21   raised and probably rarely established.  We think we have it in

22   the case, your Honor.  We, of course, we know it's decided

23   based upon a submission and review of the record.  However, we

24   think that the stipulation indicates that there were positions

25   she was qualified for at other districts, they paid comparable,

139

1  had comparable benefits to the positions she sought.  In fact,

2  they paid far more for a long-term sub position that she sought

3  at various times.  And, of course, -- I'm sorry, that they were

4  substantially equivalent.

5       Once we do that, we push the burden of persuasion to

6  the plaintiff to establish why she didn't take the jobs.  And

7  there was some testimony about her living in the Crawford

8  Central School District, her children living in the Crawford

9  Central School District, and perhaps some testimony about her

10  not wanting to drive very far.  The testimony is that those

11  three other school districts, the elementary schools are within

12  12, 17, 18 miles of Ms. Wagner's house.  We suggest in this

13  region that is not an unreasonable commute, in relation to our

14  mitigation defense.  That is the only basis that we think has

15  even been averred for not finding in favor of our mitigation

16  defense.  The only one we've noticed.  All right.  Of course,

17  mitigation is only relevant if there's a finding against us.

18       And for the reasons that I mentioned earlier in my

19  closing, we request judgment on behalf of the defendants and

20   costs in our favor.  In any event, if there is a finding of

21   liability, that there be a nominal finding in light of the

22   mitigation defense.

23          THE COURT:  All right, thank you.  Now, you will be

24   ordering a transcript because you're going to need the

25   transcript in order to do this.  It strikes me as equitable

140

1    that those costs be shared by both plaintiff and the

2    defendants, so it doesn't fall squarely on either parties

3    shoulders.

4         Within 20 days of the receipt of the transcript,

5    which will be filed by Ron, I will direct that both parties

6    file their proposed findings of fact and conclusions of law.

7    And then we'll get out an opinion sometime -- the court's

8    findings of fact and conclusions of law at some time

9    thereafter.

10        Now, just one other housekeeping matter.  I should

11   say we will turn to it expeditiously.  This case has been

12   around for a while, we'll try to get something out as quickly

13   as possible.  Now, I think I asked everybody, both sides to

14   make sure you file electronically the exhibits that were

15   previously given to me in binder form.  While that was helpful

16   for me to follow as we go, it's the only way in this new

17   electronic filing age they can formally make it part of the

18   record.  All right, we're adjourned.

19

20        (Whereupon, at 2:09 p.m., the Non-Jury Trial

21   proceedings were concluded.)

22

23                    - - -

24

25

1          C E R T I F I C A T E

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11

12  _____

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25