**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROWENA WAGNER,                    :
    Plaintiff,                    :
                                :     C.A. No.: 04-264
    vs.                    :
                                :     JUDGE McLAUGHLIN
CRAWFORD CENTRAL SCHOOL           :
DISTRICT, et al                   :
    Defendants.                    :

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff hereby files her Proposed Findings of Fact and Conclusions of Law.

**A.      FINDINGS OF FACT**

1.      Plaintiff Rowena Wagner is originally from the Philippines. (Vol. I, p. 59).  She lived in the Philippines for 21 years and then moved to the United States. (Id.) She graduated from Edinboro University of Pennsylvania in May 2000. (Vol. I, p. 63).  She has a Bachelor of Science Degree in Education. (Id.)  She is certified to teach in Elementary K-6.(Vol.I, p. 64).  She did her student teaching and field experience in the Crawford Central School District. (Vol. I, pp. 165,171,176).  Her student training was supervised by Professor John Lovett, a member of Edinboro's Department of Education, with the assistance of Mr. Douglas McCullough at Cochranton Elementary and Ms. Carole Fisher at Cochranton Elementary School. (Id.)

2.      Plaintiff received excellent evaluations for her student teaching performance. (Exhibits 2, 3, and 4). Professor Lovett wrote:"Rowena had an excellent classroom presence. She presented herself well to the students. Although she had a dialect, her speech and grammar were never a

concern. She had a clear, commanding voice, and good classroom control."(Exhibit 2). Carole Fisher wrote that she "highly recommends {Ms. Wagner} for any elementary position".(Exhibit 3). Mr. McCullough, who taught for 36 years, wrote that she will be an excellent teacher in the future. (Exhibit 4).

3.    In August 2001, Plaintiff commenced employment with the Crawford Central School District (the "District") following an interview by Mr. Lascola, then the Superintendent of the School District. (Vol. I, p. 65). Mr. Lascola advised her that she had to first become a daily substitute teacher to become a long term substitute teacher, which was a stepping stone to becoming a permanent teacher. ( Vol. I,  p. 66).

4.    Plaintiff was approved by the Crawford Central School Board (the "Board") as a substitute teacher, and she became a substitute teacher in September 2001. (Vol. I, p. 67).

5.    During school years 2001-2002 and 2002-2003, Plaintiff worked as a substitute teacher throughout the Crawford Central School District approximately 109 days and 106 days, respectively. (Vol. I. p.95).

6.    Several teachers  prepared Summary Reports reflecting the excellence of Plaintiff's performance as a substitute teacher. (Exhibit 30).

7.    By practice, the District customarily filled vacancies of the teaching staff caused by medical, sabbatical and other unexpected leaves on the recommendation of the full-time teacher who was replaced. (Vol. I, pp. 186-87).

8.    Joyce Pickens taught at the District for 35 years. (Vol, p.179).

9.    In November 2002, Ms. Pickens took medical leave from her teaching position at Cochranton Elementary. (Vol. I, p. 184). Ms. Pickens wanted plaintiff to replace her during her leave because she believed Ms. Wagner was a good teacher. (Vol.I, p. 184). Prior to leaving, Ms.

Pickens reached a verbal agreement with Assistant Superintendent Charles Heller that Plaintiff would be used as her substitute until the conclusion of the Fall Semester of 2002 (which ended in January 2003), at which time the position was expected to be put up for bid. (Vol.I, pp.185-186).

10.    Plaintiff began to substitute for Ms. Pickens on or about November 16, 2002. (Vol. I, p. 72).

11.    Plaintiff believed she was doing "very well" as a substitute teacher.(Vol.I, p.73).Yet Mr. Heller accused her of "playing politics."(Vol.I, p. 73). Plaintiff didn't know what he meant, but invited him to watch her teach. (Vol. I, p.74).

12.    On November 22, 2002, Mr. Heller conducted a classroom observation of Plaintiff. (Exhibit 5). Mr. Meader, the Principal, also observed her teach on November 26, 2002. (Exhibit 5). Plaintiff received a satisfactory on her teaching from both Mr. Heller and Mr. Meader. (Exhibit 5)

13.    On December 19, 2002, plaintiff was interviewed by Mr. Heller, Ms. Suzanne Good (the Elementary Curriculum Director), Mr. Stanton (the principal of Neason Hill school), Mr. Meader,  Mr. Karns (the principal of West End School) and Ms. Schoonover (the principal of Second District School). (Vol. I p. 81-83). Plaintiff was interviewing for one of the five long term substitute and /or permanent elementary teaching positions, including Ms. Pickens' position. (Vol. I, p. 83).

14.    The administrators who conducted the interview were all chosen by Mr. Heller to be on the Interview Committee. All the Committee reported to Mr. Heller, and all were Caucasian. ( Vol. I, p. 76; Vol. III, p.152).

15.    Of the seventeen (17) applicants who were considered for five long-term substitute and permanent positions, Plaintiff was the only minority. (Vol. III,   p.76).

16.    On December 20, 2002, Mr. Heller and Mr. Meader told plaintiff that Amy Szalewicz had been chosen to replace Ms. Pickens for the remainder of the semester. (Vol. I, p. 84). Ms. Szalewicz is Caucasian. (Id.)

17.    Four Caucasian individuals were chosen for the other long-term teaching positions- Chad DuPont, Anna McElwain, Nikki Shearer, and Robert Bazylak. (Vol. I, pp. 84-85).

18.    Two of the five people hired (including Ms. Szalewicz) were hired right out of college. (Vol I, p. 114).

19.    The Hiring Committee evaluated 17 candidates for the 5 positions, and ranked them from one to seventeen. However, the top five successful candidates were not chosen on the basis of their scores. To the contrary, Ms. Szalewicz was ranked 10/17, Mr. DuPont was ranked 12/17, and the other three were ranked first, third, and fifth. (Vol. III, pp. 153, 171-172).

20.    The scoring on the interview forms was subjective. (Exhibit N). For example, in 2002, Mr. Heller rated two candidates a "3" (out of five) for experience, yet the two candidates had never taught. Mr. Heller also gave Ms. Wagner a "3" for experience, yet she had taught over one hundred times. (Vol. III, p. 173).

21.    Ms. Good gave Ms. Wagner a "3" for experience in her 2002 interview form,  yet Ms. Good gave a successful Caucasian candidate , Nikki Shearer, a "4" for experience. Ms. Shearer was still a student, and had no teaching experience. (Vol. IV, pp. 85-87).

22.    Mr. Heller testified that the best interview scores were not always chosen, and that the Interview Committee looks at other factors. (Vol. III, p. 157).

23.    On his interview form for Plaintiff, Mr. Heller wrote "Philippines". Mr. Heller never indicated the applicant's national origin on any of the other interview forms. (Exhibit N).

24.     Mr. Heller testified that the fact that Ms. Wagner was from the Philippines was a positive factor and "helps her qualifications". (Vol. III, p. 157-158).

25.     Mr. Heller , however, wrote the words "no way" next to Ms. Wagner's name on his interview sheet. (Vol. III, p. 154). Interestingly, he also wrote "no way" next to Caucasian candidate Karen Jamieson, but she was hired in 2004. (Vol. III, p. 154).

26.     Superintendent Dolecki and Ms. Pickens testified that the School District had never summarily dismissed a substitute teacher and convened an Interviewing Committee to replace the substitute where the substitute, as was true in Plaintiff's case, had been assigned to a position with the expectations and assurance that she would work until the conclusion of the semester. (Vol. I, p. 189; Vol. II, p. 72). Mr. Meader told Plaintiff that it was the first time a long-term substitute teacher had been kicked out of a job. (Vol. I, p. 86).

27.     Two previous times Ms. Pickens had recommended that a substitute teacher replace her, and both times the request had been honored. Both these substitute teachers had been Caucasian. (Vol. I, pp. 187,197). Ms. Pickens was "shocked' that Ms. Wagner was replaced. (Vol. I, pp.188-189).

28.     Karen Jamieson, a Caucasian, had been hired as a long term substitute for 2001-02. (Vol. II, p. 145). She continued to serve as a long-term substitute after Mr. Heller was hired in February 2002. (Vol. II, p. 160).She never had to interview for the job, even after Mr. Heller started. (Id.) Ms. Jameson was hired full-time by the District in March 2004. (Vol. II, p 149-50). She testified that her substitute teaching was a valuable learning experience and helped her become a better teacher. (Vol. II, p. 155).

29.     Plaintiff continued substitute teaching during the 2002-03 school year, and taught a total of 106 days during 2002-03.(Vol. I, p. 95).

30.     The District recommends both full time and long-term substitute teachers to the Board, and the Board has ultimate approval. (Vol. II, p. 68).

31.     George Wright was a member of the School Board in 2002-2003. On January 20, 2003, Bernie Wagner, the husband of Ms. Wagner , had a phone conversation about Ms. Wagner's difficulties in getting a full time teaching job.(Vol. II, p. 40).  During the conversation, Mr. Wright stated that "black and brown people aren't as smart as white people and that's the reason she is not going to get a job." (Vol. II, p. 42).

32.      Mr. Wagner was upset with this comment, and arranged a meeting with Mr. Dolecki and Mr. Heller in late January 2003. (Vol.II, p. 42). Mr. Wagner told his brother, Fred Wagner, about Mr. Wright's comment and asked Fred to accompany him to the meeting. (Vol. II, p. 99). Fred Wagner has been the Crawford County Treasurer for 34 years. (Vol. II, p. 96).

33.     At the meeting, Bernie Wagner told Mr. Heller about the comment of Mr. Wright. Mr. Heller replied, "yes, that's true. There was a study done somewhere, where some college professor or college university did a study."  (Vol.II, p. 43). Fred Wagner did not hear this comment by Mr. Heller, but testified that he was not privy to the entire conversation between Bernie Wagner and Mr. Heller. (Vol. II, p. 102).

34.     Based on the above actions, Ms. Wagner filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on February 20, 2003. (Exhibit B, PP).

35**.**     A fact finding conference was held on the PHRC complaint.  Mr. Heller, Mr. Stanton, Mr. Dolecki, and Mr. Meader attended on behalf of the District. (Vol. I, p. 98). Ms. Wagner and her husband attended on her behalf. (Vol. IV, p.104).

36.    Mr. Heller was the person at the District who was responsible for replying to the PHRC complaint. (Vol. III, p. 159-161; Exhibit 41). He also executed the verification to the Answer to the Complaint on behalf of the District (Vol. III, p. 160).

37.    Mr. Heller was the only administrator named in the PHRC complaint. (Vol. III, p. 162).

38.    The PHRC issued its "Findings of the Investigation" on August 6, 2004. (Exhibit EE).

39    Prior to issuing the findings, the PHRC had no further contact with the District. (Vol. IV, p. 108).

40.    There were no long term substitute or full time teaching jobs that plaintiff was eligible for in 2003-2004. (Exhibit 29).

41.    In March 2004, Mrs. Wagner was eligible to apply for 9 permanent jobs and 3 long-term substitute jobs for 2004-2005. (Vol. I, p. 109; Ex. 29).

42.    Ms. Wagner applied for these jobs and was interviewed in March 2004. (Vol. I, p. 97).

43.    At the time of her March 2004 interview, her PHRC complaint was still pending. (Exhibit EE).

44.    She was interviewed twice the same day by 2 separate committees, each consisting of four people.

45.    The Interview Committee consisted of Mr. Heller, Ms. Good, Mr. Stanton, Mr. Schoonover, Mr. Meader, Ms. Darling, Mr. Dolecki and Mr. Karns. (Vol. I, p. 97).

46.    At least three members of the Interview Committee knew that plaintiff had filed a PHRC Complaint, since these three individuals (Mr.Heller, Mr. Dolecki and Mr. Stanton) had attended the PHRC conference. (Vol. I, p. 97).

47.    Mr. Heller hand-picked the Interview Committee. (Vol. III, p. 164).  The Interview Committee were all Caucasians who reported to Mr. Heller. (Id.).

48.    Again, the people chosen by the District for the teaching positions were not the people with the highest interview scores. (Vol. III, p. 177).

49.    For example, Meghan Porter was ranked 22 out 24 candidates. (Vol. III, pp. 173-74). Mr. Heller never saw Ms. Porter teach before recommending her hiring. However, Ms. Porter, who is Caucasian, was selected to be a long-term substitute and later became a full time teacher. (Vol. IV, p.88).

50.    Of the 12 positions, one minority teacher, Tammy Foster, was hired in 2004. (Vol. II, p. 96).

51.    Again, the scoring on the interview forms which were used in 2004 was subjective. (Ex. Y).

52.    On June 21, 2004, plaintiff met with Mr. Heller about why she was not hired and he told her to look for employment elsewhere.(Vol.I, 101)

53.    Mr. Heller and Ms. Good testified that during the June 21, 2004 meeting, they also told Ms. Wagner several ways to improve her candidacy, including teaching the STARS program, an after school program. (Vol IV, pp. 46-47). Mr. Heller and Ms. Good claimed that Ms. Wagner did not get back to them about their suggestions. (Vol.IV, p. 47 ).

54.    Ms. Wagner testified that she did follow their suggestions, and did do several things to improve her candidacy, including taking courses on the online Professional Education Network, the WQLN Education network, as well as APL training and PDE training. (Vol. IV, pp.93-94).

55.    Ms. Wagner testified that she was never told about the STARS program in the June 21, 2004 meeting, but rather first learned about it in 2006. She testified that she undoubtedly would have done the STARS program if Mr. Heller and Ms. Good had suggested it to her in 2004, since it paid more ($20 an hour) than she was being paid as a substitute teacher. (Vol. IV, p. 94).

56.    In September 2004, Ms. Wagner filed her federal lawsuit. She filed an Amended

Complaint in October 2004, which included a claim of retaliation

57.    Ms. Wagner spoke to Principal Darling at the Cochranton Elementary School in

September or October 2004 (Vol. I, pp. 103-104).  Ms. Wagner had substituted more than 60

times at the school. (Vol. I, pp. 103-104).

58.    When Ms. Wagner asked Principal Darling about an opening for a long-term substitute,

Ms. Darling told Ms. Wagner she "was not eligible to apply for the job because of the lawsuit."

(Vol. I, p.105).

59.    The opening was subsequently filled by Cheryl Krachkowski, who is Caucasian. (Vol. I,

p. 105).

60.    Ms. Kathleen Maruska has been a kindergarten teacher for 27 years. (Vol. I, p. 199).

Plaintiff had substituted for Ms. Maruska several times at Cochranton Elementary School. (Vol.

I, p. 199).

61.    Ms. Maruska was going on a three week leave in 2003-04 and she wanted Ms. Wagner to

be her substitute. (Vol. I, pp. 204-206). Ms. Darling refused.  Id. When Ms. Maruska asked why,

Ms. Darling said "Well, there's that lawsuit, you know." (Vol. I, p. 206). [1]

62.    In 2004-2005, Ms. Maruska again asked Ms. Darling to allow either Ms. Wagner or

another specific teacher to substitute for her when she went on a three week leave. (Vol. I, p.

206-07). Ms. Darling told her she was going to choose another teacher (Kim Adams) to be the

substitute "because [Ms. Adams] was in the building that day." (Vol. I, p. 210).

---

[1]  Depending on the date of this conversation, Ms. Darling may have been referring to the PHRC complaint filed in
February 2003 or the lawsuit filed in September 2004.

63.     While Ms. Maruska was not positive of the exact dates of the above conversations, she was positive that Ms. Darling "referenced the lawsuit, I remember the words", as the reason Ms. Wagner was not allowed to be her substitute. (Vol. I, p. 216,218).

64.     After March 2004, Ms. Wagner continued to substitute teach. She substituted 99.5 days in 2004-2005, 86.5 days in 2005-2006, and 79.5 days in 2006-2007. (Vol. I, p. 95).

65.     Ms. Wagner has continued to apply for all teaching openings up until the present time. (Vol. I, pp. 107-108).

66.     Mr. Heller has interviewed approximately 30 people for the openings for teachers in the 2005-2006 and 2006-2007 school years. (Vol. III, p. 150). In 2005-06, nine new teachers were hired. In 2006-2007, six new teachers were hired. (Vol. I, pp. 109,118-119; Exhibit 29). Ms. Wagner was eligible for all these positions. (Id ).

67.     Despite having substitute taught in the District more than 250 times since March 2004, Ms. Wagner has never been interviewed for any position since March 2004.(Vol. IV, p. 108).

68.     The decision not to interview her after March 2004 "was a decision of Mr. Heller's." (Vol.  IV, p. 51). Thereafter, the decision was allegedly supported by the members of the Hiring Committee, all of whom  were placed on the Committee  by Mr. Heller, and  reported to Mr. Heller. (Vol.II, p. 152).

69.     Even though Ms. Wagner has not received an interview since March 2004, the District and Board has consistently claimed they are aggressively recruiting minority teachers. (Vol. II, pp. 56-57; 59-60; 64-65; 83).

70.     In contrast, Mr. Samuel Byrd, a member of the Board in 1995-2000, testified that he knew of only one hiring of a minority teacher out of approximately 450 teachers. (Vol. II, pp. 6,

8). He testified that the Board was consistently receiving applications from minority candidates who were qualified, but they were not interviewed. (Vol. II, p. 13).

71.    The Board hired a woman from the Philippines, Naomi Uy-Mooore, in August 2005 (after Ms. Wagner's lawsuit was filed). Ms. Uy-Moore, even though she had teaching experience elsewhere, had never taught in the Crawford County School District, nor had the District observed her teaching (Vol. II, p. 162). In fact, she did not have a Pennsylvania teaching certificate when she was hired, and had to get an emergency certificate.( Id. )

72.    In his deposition, Mr. Wright, a prior member of the Board, testified:

> Q.  Does the fact that Ms. Wagner filed a lawsuit, does that disqualify her from being further considered for a teaching position?
>
> A.   No, I would think…again I'm not sure that it's helpful.
>
> Q.  Would you hold it against her?
>
> **A.  If I wanted a paid job at the school district, I wouldn't sue them as a place to start.** (Vol. II, pp. 68-69).

73.    According to Mr. Wright, "in all likelihood" the PHRC lawsuit in February 2003 would have been brought to the Board's attention. (Vol. II, pp. 67).

74.    The federal lawsuit was highly publicized in Crawford County, and Mr. Heller testified that the lawsuit was "very well known."(Exhibit 32,33; Vol. III, p. 179).  Yet Ms. Good, a high-ranking administrator at the District in charge of elementary education, claimed she was unaware of the lawsuit until September 2005, when she was approached for a deposition.(Vol. IV, p. 76).

75.    Ms. Wagner had not been interviewed for a teaching position since March 2004, despite applying for several positions and being considered a "role model" by Mr. Heller. (Vol. II, pp. 81-82).

76.    Ms. Wagner was observed teaching a total of two times in November 2002, interviewed once in December 2002 and interviewed once in March 2004 by the District.

77.    If Ms. Wagner had been hired full time in 2001, she would have earned $36,172.40 in 2001-2002; $40,322.80 in 2002-2003; $44,014.80 in 2004-2005; $49,797.80 in 2005-2006; and $53,216.60 in 2006-2007.(Vol. I, pp.124-125 ).

## B.  CONCLUSIONS OF LAW

## I.  PLAINTIFF'S RETALIATION CLAIM WAS EQUITABLY TOLLED.

78.    Plaintiff filed her claim with the PHRC on February 20, 2003. She did not have the assistance of a lawyer. An examination of the claim shows that it does not contain allegations of retaliation. This is not surprising, since the filing of the PHRC complaint is what triggered the retaliation by the District.

79.    A fact-finding conference with the PHRC was held on an unknown date. It was attended by plaintiff, her husband, Mr. Heller, Mr. Dolecki, Mr. Stanton and the District's Attorney, Mr. Perhacs. (Vol. IV, pp. 104-107). After the conference, the PHRC did not contact the defendants again. (Vol. IV, p.108).

80.    In March 2004, plaintiff was interviewed, but not chosen, for a teaching position. This act is the basis for one of her claims of retaliation.

81.    On August 6, 2004, the PHRC issued its Findings of Investigation. (Exhibit EE).

82.    In September 2004, plaintiff obtained a lawyer and filed the lawsuit.

83.     On October 8, 2004, plaintiff filed her First Amended Complaint. The First Amended Complaint alleged in its first claim, paragraph 26 (H), that the District and the Board unlawfully retaliated against her because she filed the PHRC complaint. The First Amended Complaint also alleged that this was a violation under 42 U.S.C.§ 1983.

84.     The First Amended Complaint did not contain any allegations of retaliation for filing the lawsuit, since at the time, the plaintiff had no evidence that she been retaliated against for filing the lawsuit.

85.     Plaintiff subsequently learned from Ms. Darling that plaintiff could not substitute teach because she had filed her lawsuit. Moreover, Ms. Darling told Ms. Maruska that Ms. Wagner could not replace her for three weeks because of the lawsuit. Finally, Mr. Wright testified at his deposition on September 6, 2005 that filing the lawsuit hurt plaintiff's chances of being hired by the District.

86.     Based in part on the above information, plaintiff filed a motion for Leave to Amend First Amended Complaint on January 5, 2006. This Second Amended complaint contained a Second Claim for Relief entitled "Retaliation", which alleged the defendants retaliated against her for filing the lawsuit and the PHRC Complaint. (paragraphs 36, 37, and 40 of the Second Amended Complaint). Paragraph 40 alleged that the defendant had been denied interviews because of the PHRC Complaint and the federal lawsuit.

87.     In a letter dated December 26, 2005, the Defendants did not object to the filing of this Second Amended Complaint, and stated to the Court that … "there does not appear to be any appreciable prejudice to my Defendants in permitting the Amendment." (Brief in Support of Plaintiff's Motion for Leave to Amend First Amended Complaint, pp. 1-2). The Court, however, denied the Motion to file the Second Amended Complaint.

88.    At the end of discovery, defendants and plaintiff both filed summary judgment motions. Defendants did not raise the issue of failure to exhaust administrative remedies in its motion. Rather, the defendants sought to dismiss the plaintiff's retaliation claim on its merits. (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, pp. 20-21).

89.    This Court also addressed the issue of retaliation in its opinion on the summary judgment motion dated October 27, 2006. (Hearing and Opinion Transcript,  pp. 9-12). In sum, the Court granted some aspects of defendants' motion regarding retaliation and denied other aspects.

90.    On May 23, 2007, defendants, for the first time, raised the issue that the retaliation claim should be dismissed based on the plaintiff's failure to exhaust her administrative remedies. ( Defendant's Motion in Limine, p.7).

91.    The non-jury trial began on June 18, 2007.   Prior to the trial, this Court heard argument regarding the Motion in Limine, but reserved ruling until after trial.

92.    After the evidence at trial was concluded, the Court heard testimony from Attorney Caleb Nichols and Ms. Wagner regarding the PHRC filing. Attorney Nichols, who represented Ms. Wagner after the PHRC claim had been decided, testified that Ms. Wagner did not file an additional  charge with the PHRC for retaliation because he did not believe it was required because the basis  upon which the retaliation claim rested evolved out of the subject matter that was before the PHRC. (Vol. IV, pp. 112-13).

93.    At trial, plaintiff introduced credible evidence, both direct and indirect, to support her retaliation claims, and the defendants presented evidence opposing the retaliation claims.

94.    In Title VII cases, courts are permitted in certain limited circumstances to equitably toll filing requirements, even if there has been complete failure to file, which necessarily precludes

characterizing such requirements as jurisdictional. <u>Robinson v Dalton</u>, 107 F.3d 1018 (3d

Cir. 1997). See also <u>Zipes v Trans World Airlines, Inc</u>, 455 U.S. 385,393 (1982) ("We hold that

filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit

in federal court, but a requirement that, like a statute of limitations, is subject to waiver,

estoppel, and equitable tolling".)

95.     In <u>Shiver v Levin, et. al</u>., 38 F.3d 1380, 1387 (3d Cir. 1994), the Court stated that

equitable tolling of statutes of limitations "may be appropriate: (1) where the defendant has

actively misled the plaintiff respecting the plaintiff's course of action; (2) where the plaintiff in

some extraordinary way has been prevented from asserting his or her rights; or (3) where the

 plaintiff has timely asserted his or her rights in the wrong forum."

96.     In <u>Waiters v Parsons</u> , 729 F.2d 233,237 (3d Cir. 1984), the Court held:

> Where discriminatory actions continue after the filing of an EEOC complaint,
> however, the purposes of the statutory scheme are not furthered by requiring the victim to
> file additional EEOC complaints and restarting the 180 day waiting period. This court has
> recognized this fact in permitting suits based on the new acts that occur during the
> pendency of the case which are fairly within the scope of an EEOC complaint or the
> investigation growing out of that complaint, without requiring the victim to file an
> additional EEOC complaint, and wait another 180 days to sue.(citations omitted) The
> rationale behind these decisions is that once the EEOC has tried to achieve a consensual
> resolution of the complaint, and the discrimination continues, there is minimal likelihood
> that further conciliation will succeed. This slim likelihood of successful conciliation does
> not justify forcing the victim to wait an additional 180 days to file suit. The relevant test
> in determining whether  appellant was required to exhaust her administrative remedies,
> therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the
> scope of the prior EEOC complaint, or the investigation arising therefrom. (citations
> omitted).

97.     In <u>Ostapowicz v Johnson Bronze Co</u>., 541 F.2d 394,398-399 (3d Cir. 1976), the

Court stated that "the parameters of the civil action in the district court are defined by the scope

of the EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination, including new acts which occurred during the pendency of proceedings before

the Commission". In <u>Hicks v ABT Associates, Inc</u>., 572 F.2d 960,965 (3d Cir. 1978), the Court held that if the EEOC investigation is too narrow, a plaintiff should not be barred from raising additional claims in district court.

98.    Using the above case law as a guideline, the Court finds that the plaintiff should not be barred from raising her retaliation claim in federal court.

**A**. First, it is undisputed that the retaliation claims arose only after the PHRC filing on February 20, 2003.[2] Thus, not only were the retaliatory acts occurring **during** the PHRC investigation, but the PHRC filing was the cause of the retaliatory acts. Moreover, the PHRC was aware that plaintiff had not been hired by the district after the PHRC filing, yet the PHRC did not conduct any further investigation regarding her non-hiring after the fact-finding conference. Thus, the retaliation should have been included within the scope of the PHRC investigation, since it was occurring during the investigation.

**B.** Second, Ms. Wagner's failure to file an additional retaliation claim with the PHRC should not be penalized in light of the purpose of the doctrine of exhaustion of administrative remedies. The rationale behind permitting suits that occur during the pendency of the EEOC investigation is that once the EEOC has tried to achieve a consensual resolution of the conflict, and the discrimination continues, there is minimal likelihood that further reconciliation will succeed. <u>Waiters v Parsons</u>, 729 F.2d at 237. Here, where

---

[2]  The Court notes that other Courts of Appeals have adopted a broad <u>per se </u>rule, stating that any complaint of retaliation occurring during the time when prior EEOC complaints are pending necessarily falls within the scope of those complaints. <u>See ,e.g.   Gupta  v East Texas State University </u> 654 F. 2d 411,413-414 (5th Cir. 1981); <u>Kirkland v Buffalo Bd. Of Education</u>, 622 F. 2d 1066 (2nd Cir. 1980); <u>Nichols v. General Motors Co.</u>, 979 F. Supp. 743, 746 (S.D. Ohio 1997)  ("However, it is unnecessary for a plaintiff to exhaust administrative rememdies prior to filing a retaliation claim that grows out of the earlier administrative charge properly before the Court.")

the basis of the new charge is retaliation for filing the prior charge, it is highly

unlikely that the PHRC would have obtained any resolution.

C. Third, the defenses of estoppel and waiver acknowledged in <u>Zipes v. Trans</u>

<u>World Airlines</u> are applicable here. Defendants were well aware of the defense

of exhaustion of administrative remedies, since they raised it in their answer to

the complaint. However, defendants did not raise this issue, either in an

objection to the amended complaints or their summary judgment motion,

until the eve of trial. Such purposeful delay can result in estoppel and /or

waiver. See, <u>e.g.</u> <u>Williams v Runyon,</u> 130 F. 3d 568 (3d Cir. 1997) (The Court

did not permit defendant to raise the defense of exhaustion of administrative

remedies after trial); <u>Brown v Marsh,</u> 777 F.2d 8 (D.C. Cir. 1985) (allowing

defendant to raise defense of lack of exhaustion of administrative remedies so

late in the litigation, even if raised before the trial, would unfairly prejudice

plaintiff).Moreover, defendants were not prejudiced by the plaintiff's lack of

filing. The defendants were aware of Ms. Wagner's retaliation claims, and

fully defended these claims on their merits, both in motions for summary

judgment and at trial. Defendants also told the court that "there does not

appear to be any appreciable prejudice to defendants" in allowing plaintiff to

file its Second Amended Complaint, which alleged retaliation for both the

PHRC complaint and the lawsuit.

D.    The Court further finds that requiring plaintiff to file an additional PHRC

Complaint under these circumstances would not further Title VII's objective of deterring employers from attempting to discourage their employees from exercising their rights under Title VII.

E. Finally, the retaliation claims here are of a continuing nature, in that Ms. Wagner has still not been interviewed or hired as a result of retaliation for filing her PHRC complaint and lawsuit. Thus, plaintiff would still be permitted to file a retaliation claim with the PHRC. It would be a waste of judicial and administrative resources to make Ms. Wagner do so at this time, since the retaliation issue has been litigated on its merits.

99. Therefore, the Court finds that the retaliation claim was equitably tolled.

## II. THE APPLICABLE LEGAL STANDARDS

100. Under Title VII, it is unlawful for an employer to refuse to hire or otherwise discriminate against any individual with respect to his or her compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin. See Weston v. Commonwealth of Pennsylvania, Department of Corrections, 251 F.3d 420, 425 (3rd Cir. 2001). Title VII also prohibits retaliation and coercion directed at persons who have taken steps to oppose an act or practice made an unlawful employment practice under Title VII. Burlington Northern Sante Fe Railway Co. v. White, 126 S.Ct. 2405, 165 L. Ed. 2d (2006).

The PHRA has similar prohibitions against employment discrimination, as well as retaliation. 43 P.S. Section 955(d).

The Third Circuit has consistently applied the same legal standards in analyzing claims brought pursuant to Title VII and the PHRA. <u>Goosby v. Johnson & Johnson Medical, Inc.</u>, 228 F.3d 313, 317, n.3 (3rd Cir. 2000).

101.    With respect to plaintiff's 1981 and 1983 causes of action, the Third Circuit has also applied the Title VII legal standard. See <u>Schurr v. Resorts International Hotel, Inc.</u>, 196 F.3d 486, 499 (3rd Cir. 1999); <u>Stewart v. Rutgers, The State University</u>, 120 F.3d 426, 432 (3rd Cir. 1997).

102.    The Court analyzes plaintiff's claims under the familiar burden-shifting test articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), and further refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981). Under the <u>McDonnell Douglas</u> test and its progeny, the plaintiff has the initial burden of establishing a prima facie case of discrimination, the substance of which will vary depending on the type of claim; if the plaintiff is successful, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 500 (3rd Cir. 1997). If the employer offers a legitimate, non-discriminatory reason for its action, the plaintiff must then demonstrate that the offered reason was merely a pretext for unlawful discrimination. <u>Goosby</u>, 228 F.3d at 319.

**a. <u>Plaintiff has established a prima facie case of racial discrimination</u>**.

103.    In order to establish a prima facie case under Title VII, the plaintiff must show that she (1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) under circumstances giving rise to an inference of discrimination. See <u>Burdine</u>, 450 U.S. at 254.

104.    It is undisputed that plaintiff is a member of a protected class, since she is Asian and from the Philippines.

105.    In evaluating whether a plaintiff is "qualified" for purposes of a prima facie case, the Court relies upon "objective" factors.  Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3rd Cir.) cert. denied, 515 U.S. 1159 (1995).

106.    Here, the Court concludes that plaintiff had the objective experience and education necessary to qualify for the respective positions.  She possessed a Bachelor of Science degree in education and was certified to teach elementary school grades K through 6.  Moreover, she was hired as a substitute teacher by the District in September 2001, and has taught approximately 600 times since then.

107.    The plaintiff has also established that she was subjected to adverse employment actions when she was terminated from her long-term substitute teaching position in December 2002, and when she was not hired in 2004, and not interviewed since March 2004.  Moreover, for the reasons stated in the Findings of Fact, plaintiff has proven an inference of discrimination.

b. **The plaintiff has proven that the District's reasons for not hiring her were a pretext for racial discrimination, or alternatively, retaliation.**

108.    The District argues that it did not hire the plaintiff for the Pickens' position and other available positions based upon the fact that her interview scores in 2002 and 2004 were lower than those of the successful candidates. (Vol. II, p. 177). The District also argues they did not interview her after March 2004 because she did not follow their suggestions to improve her teaching ability.

109.    Having articulated legitimate, non-discriminatory reasons for the failure to hire, the

question becomes whether the plaintiff has pointed to some evidence "from which a fact finder

could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." <u>Brewer v. Quaker State Refining Corp.</u>, 72 F.3d

326, 331 (3rd Cir. 1995).

110.    Plaintiff has presented evidence of pretext as follows:

    (1)    That it was the longstanding practice of the district to fill long-term substitute

teaching position vacancies based upon the recommendation of the teacher who was being

replaced.

    (2)    Ms. Pickens' testimony that her two requests for a specific substitute had been

honored in the past by the District, and that she was "shocked" when she was told Ms. Wagner

would not be substituting for her. Both of Ms. Pickens' prior substitutes were Caucasian.

    (3)    Ms. Wagner was required to interview for the position of long-term substitute, yet

the District did not previously interview all the candidates for such positions. Even though Mr.

Heller testified he changed this policy when he arrived in February 2002, another white

substitute teacher, Karen Jamieson, was permitted to remain as a long-term substitute during the

2001-2002 without an interview.

    (4)    Mr. Dolecki and Mr. Meader testified that to their knowledge, a substitute had

never been replaced in the middle of a long-term substitute assignment.

    (5)    The successful candidates were all Caucasian and were selected by an all-white

interview committee.

(6)    Mr. Heller accused Ms. Wagner of "playing politics" with Ms. Pickens, but didn't explain what he meant.

(7)    The interview scores were subjective. For example, some candidates were given higher (or equal) marks for experience than Ms. Wagner (who had been teaching for a year), even though these candidates had never taught class. The courts have repeatedly noted that a subjective evaluation process intended to recognize merit can often lead to discrimination. See, e.g., Fowle v. C +C Cola, 868 F. 2d 59,64-65 (3d Cir. 1989) ("Subjective evaluations are susceptible to abuse and more likely to mask pretext.")

(8)    While the defendants repeatedly rely on the test scores in claiming that Ms. Wagner was not a victim of discrimination, it is undisputed that the highest test scores were not hired. In 2002, the candidates who scored 1, 3, 5, 10, and 12 (out of 17) were hired. All were Caucasian.

(9)    Mr. Heller wrote "Philippines" on Ms. Wagner's evaluation form. (Exhibit N). No other forms contained the candidate's national origin. While he claimed at trial that this was a positive attribute, he also testified that  Ms. Wagner did not "have anything beyond her interview that weighed in her favor." ( Vol. III, p. 52)

111.    With respect to the 2002 teaching vacancies, and the other vacancies since 2004, plaintiff has presented the following evidence to demonstrate pretext:

(1)    Mr. Wright, who then was a member of the School Board, and a decision maker, commented that "brown and black people were not as smart as white people." and Mr. Heller then agreed with such statement.

(2)    Despite the District and Board's claim of aggressively seeking minorities for teaching positions, Ms. Wagner, a qualified minority teacher with years of experience who was

described by Mr. Heller as a "role model", was not even interviewed after March 2004 for the 30 or more positions that were open.

(3)     Mr. Heller and other witnesses emphasized the value of teaching experience, yet Ms. Wagner, with over 600 days of substitute teaching, has not been interviewed since March 2004.

(4)     As in 2002, the Interview Committee in March 2004 were all Caucasian, and were all selected by, and reported to, Mr. Heller.

(5)     As in 2002, the interview process in 2004 was subjective, and the top candidates were not chosen. For example, Meghan Porter ranked 22 out of 24, yet she received a long-term substitute teaching position, which led to a full-time position.

(6)     While Mr. Heller and Ms. Good claimed  that one of the reasons she was not hired is that she didn't follow their suggestions,  Ms. Wagner testified that she followed their suggestions, but that they never suggested the STARS Program.

112.    The remarks of Mr. Wright and Mr. Heller regarding the intelligience of minorities are evidence of the District's attitudes towards minorities. Mr. Wright had final decision-making authority as a member of the Board, and his comment was made during the time frame in which the plaintiff was seeking a position with the District. Moreover, the comment was  made at a meeting to discuss plaintiff's difficulties in securing a position with the District. Furthermore, Mr. Heller, who decided who was interviewed and hired, agreed with Mr. Wright's comments and mentioned a university study.

113.    After consideration of the above testimony and evidence, we conclude that the plaintiff has proven that her national origin was the reason for her dismissal in December 2002, and her subsequent failure to obtain long-term and/ or permanent employment with the District.

**c. The plaintiff has proven that her failure to obtain long-term and /or permanent employment was a result of retaliation by the District for filing the PHRC complaint and the lawsuit.**

114.     The plaintiff  also presented evidence that she was retaliated against for filing the PHRC claim and the federal lawsuit.  Retaliation claims under Title VII involve the same <u>McDonnell Douglas</u> burden-shifting analysis as outlined above.  <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 187 (3rd Cir. 2003).  To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that the employer took an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse employment action. (<u>Id</u>.)

115.     In addition to the evidence previously described herein, plaintiff presented the following evidence of retaliation at trial:

(1)     After filing her PHRC complaint on February 20, 2003, she was not hired as a long-term substitute or permanent teacher, and never received an interview after March 2004.

(2)     After filing her federal lawsuit on September 16, 2004, she was informed by Joanne Darling, the former principal at Cochranton Elementary,  that she could not be considered for a substitute teaching position because she had filed a  lawsuit.

(3)     Ms. Darling told Kathleen Maruska, the kindergarten teacher who had specifically requested that plaintiff  replace her for three weeks, that plaintiff could not substitute because plaintiff filed a lawsuit against the district. The Court notes that Ms. Maruska is still a kindergarten teacher at the Crawford Central School District, is not a party to the lawsuit, and had no motive whatsoever to testify falsely on this matter.

(4)     Ms. Darling was the decision maker whether to hire plaintiff as a substitute at her school. She also interviewed Ms. Wagner in March 2004.

(5)     Mr. Wright admitted that plaintiff's lawsuit hurt her chances of being hired by the District.

(6)     Despite the defendants' repeated claims that they were actively seeking minorities as teachers, and plaintiff's qualifications for a teaching job, including being a "good role model", plaintiff has not received a single interview for a teaching position since March 2004.

(7)     Mr. Heller was the person responsible at the District for defending the PHRC complaint. He was also named as a defendant in the lawsuit, and attended most of, if not all , the depositions on behalf of the District. (Vol. III, 187).

(8)     At least 3 of the Interviewing Committee who interviewed Ms. Wagner in March 2004 were aware of the PHRC complaint.

(9)     Mr. Heller is also the person who decides who gets interviewed, and he decided, and later told the Interview Committee, that Ms. Wagner was not to be interviewed after March 2004. (Vol IV, p. 51). The Interview Committee agreed with him. The Interview Committee, however, consists of his subordinates, who are chosen by him to be on the committee. Moreover, it seems highly unlikely that the other five members of the Interview Committee were not aware of the PHRC Complaint during and after the March 2004 interviews, considering the size of the District and the administrative positions  of the five other members.

(10)     It is also unlikely that Ms. Good did not learn about the lawsuit until September 2005, considering the publicity and her high-ranking job at the District.

(11)    While Mr. Heller and Ms. Good testified that one of the reasons  they didn't interview Ms. Wagner after March 2004  was because she didn't follow their suggestions to improve ( including the STARS Program), Ms. Wagner testified she did follow the suggestions, but she was never told  about the STARS program. Since the STARS program would have paid Ms.Wagner more money than her substitute teaching job, the Court finds her testimony on this point credible.

116.    In determining causation, courts have generally focused on two factors: (1) the temporal proximity between the protected activity and the alleged discrimination; and (2) the existence of a pattern of antagonism in the intervening period.  Jalil v. Avedel Corp., 873 F.2d 701 (3rd Cir. 1989).  However, timing and proof of antagonism are not the only methods by which a plaintiff can make out a prima facie showing causation.  Abramson v. William Paterson College of New Jersey, 260 F. 3d 265, 289 (3rd Cir. 2001)  (noting that a "broad array" of circumstantial evidence may be used to illustrate a potential causal link between a plaintiff's protected activity and an employer's adverse action.)

117.    Here, there is direct evidence of retaliation, particularly Ms.Darling and Mr. Wright comments that plaintiff would not be considered for a long-term teaching position because she filed the lawsuit.

118.    There is also circumstantial evidence of retaliation. It is undisputed that Mr. Heller was the decision maker as to whether Ms.Wagner would be interviewed after March 2004. However, he was also the District's employee who was most involved with the defending the District against the PHRC complaint and the lawsuit. Frankly, there is no legitimate reason that Ms. Wagner, with her experience, evaluations, and reputation as a role model, would not ever be interviewed after March 2004, unless it was in retaliation for filing her PHRC complaint and the

lawsuit. This is particularly true in view of the District and Board's desire to recruit and hire minority teachers.

119.    The Court therefore concludes that plaintiff has proven that the District retaliated against her for filing her PHRC Complaint and the lawsuit. The retaliation consisted of refusing to hire her in March 2004, and refusing to interview her for open positions after March 2004.

120.    Regarding damages, the Court finds that an award of back pay (including benefits) from the school year 2002-2003 to the present is mandated here, and therefore orders that back pay and benefits in the amount of $ 223,524.40, minus the amount received by plaintiff for substitute teaching, be awarded to plaintiff.

121.    The Court further orders that plaintiff be hired by the District as a full-time elementary teacher when the next appropriate teaching position becomes available.

122.    The Court further orders that defendants shall pay plaintiff's attorney fees and costs. Accordingly, the attorneys for plaintiff shall submit said fees and costs to the Court (as well as the amounts earned by plaintiff as a substitute teacher), within the next 10 days for the Court's review.

Respectfully submitted,

/s/  John J. Mead, Esquire
Counsel for Plaintiff
PA ID 39610
1001 State Street Suite 800
Renaissance Center
Erie,PA 16501
814-459-1726