**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROWENA WAGNER, | ) | Civil Action No. 04-264 ERIE |
| Plaintiff | ) | Judge Sean J. McLaughlin |
| | ) | |
| v. | ) | ELECTRONICALLY FILED |
| | ) | |
| CRAWFORD CENTRAL SCHOOL | ) | |
| DISTRICT, et al. | ) | |
| Defendants | ) | |

## DEFENDANT, CRAWFORD CENTRAL SCHOOL DISTRICT'S AMENDED (POST-TRIAL) FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1.      Michael Dolecki became the District's Superintendent in November 2001. Previously, Dolecki had been the District's Acting Superintendent and Assistant Superintendent.  (Tr. III at 219)[1]

2.      Charles Heller has been the District's Assistant Superintendent since he was hired by the District on February 18, 2002.  (Tr. II at 170)

3.      Kurt Meader has been an elementary principal at different schools within the District at all times relevant to the Complaint.  (Tr. IV at 4)

4.      In November 2002, Meader was the principal of Cochranton Elementary School.  (Tr. III at 8)

5.      Suzanne Good has been the District's Director of Elementary Curriculum since January 2002.  (Tr. IV at 25)

6.      The District employs "regular," a.k.a. "permanent," teachers, long-term substitutes teachers, and day-to-day substitute teachers, among other employees.

---

[1]     References to the transcript of the June 18-21, 2007 trial will be to "Tr." followed by the transcript volume number and appropriate page number.

7.      Substitute teaching assignments that are ninety (90) days or longer in duration are considered "long-term" by the District and the Crawford Central Education Association ("CEA"), the teachers' and professional employees' union.  Substitute assignments of fewer than ninety (90) days are considered "day-to-day" substitute assignments by the District and the CEA.  (Tr. II at 174)

8.      The collective bargaining agreement ("CBA") between the District and the CEA generally governs the District's employment of all types of its teachers.
(Tr. II at 178) (Ex. H)

9.      The CBA requires the District to award vacant regular/permanent teaching positions to current permanent employees, or long-term substitute employees with bidding rights, if any such employees bid on them.  (Tr. II at 178)

10.     An April 7, 1999 stipulated arbitration award between the District and CEA provides long-term substitute teachers bidding rights while they are in their third or subsequent long-term substitute assignments.  Their bidding rights so obtained expire at the end of their long-term substitute assignment.  (Tr. II at 179-180) (Ex. I)[2]

11.     Plaintiff has never obtained bidding rights.  (Tr. II at 189)

12.     The CBA does not dictate how the District is to hire applicants who lack bidding rights for positions that have not been bid on by employees with bidding rights. Instead, the District has exercised its discretion to establish hiring processes, procedures and standards, which it has changed over time.  While Plaintiff complains of several of those changes, they have been applied consistently to her and the candidates the District has chosen at all times relevant to her action.  (Tr. II at 183)

---

[2]     All references to exhibits are to trial exhibits and are designated "(Ex. __)" or "(Jt. __)."

13.     The CBA does not dictate how the District is to choose its day-to-day substitutes for specific assignments.  (Tr. II at 183)

14.     The federal government requires states to adopt written educational "standards," which are minimum competencies a student needs to know and to achieve. The standards and the changes in them have driven the District's curriculum and its assessment methods.  (Tr. IV at 28-29)

15.     The Pennsylvania Department of Education ("PDE") has defined the minimum competencies in the core areas students are expected to achieve, i.e. the PA Standards.  To accomplish those objectives, districts' curriculum and content need to be aligned accordingly.  PA Standards change over time.  (Tr. II at 182-183)

16.     The PA Standards were finalized and made applicable to the District in 1999.  The District then identified instructional strategies to deliver that knowledge to its students.  (Tr. IV at 31-32)

17.     Once the curriculum to be taught was set in the PA Standards, the District adopted its curriculum and assessment to correspond with those standards. Specifically, the District now assesses students in a performance-based manner. (Tr. IV at 28-32)

18.     The District's expectations for day-to-day substitutes are different from its expectations for regular/permanent teachers.  Most notably, day-to-day substitutes are not required to prepare lesson plans, so they need not have knowledge of the PA Standards, current modern learning styles, instructional strategies, forms of assessment and other higher level pedagogical concepts.  (Tr. II at 181-182)

19.    The District does not expect substitutes to develop their own lesson plans, as regular/permanent teachers do.  Substitutes are expected to follow the plans developed by regular/permanent teachers and to manage student behavior during the day when the teacher is not there.  Long-term substitutes and regular/permanent teachers are expected to have a thorough knowledge of curriculum assessment and instructional strategies to enable them to make appropriate decisions regarding planning and preparation and to provide a classroom environment where all children can learn, in accordance with the PA Standards.  (Tr. IV at 27-28)

20.    The District's Administration does not consider a person's success as a day-to-day substitute to be a good indication of how the person will perform as a long-term substitute or regular/permanent teacher because of the different expectations the District has for each type of position.  (Tr. IV at 34-35)

21.    In August 2001, Plaintiff submitted an application to the Crawford Central School District for employment as a day-to-day substitute teacher with the District.

22.    Beginning with the 2002-03 school year, i.e. in approximately August 2002, Plaintiff began applying for regular/permanent teaching positions with the District, as they arose.  (Paragraphs 9 and 15 of the Complaint)

23.    Plaintiff possesses a PDE certificate for elementary education only. (Tr. II at 175)[3]

24.    Anyone certified to teach elementary students by the PDE is "highly qualified" for purposes of the No Child Left Behind Act.  (Tr. I at 146)

---

[3]    All subsequent references to teaching positions herein will be to elementary positions, unless otherwise indicated.

25.     From February 2002 through the date of the trial, Plaintiff applied for approximately 20 regular/permanent teaching positions and 13 long-term substitute positions for which she had the required PDE certification.  (Tr. II at 192-193)

26.     Plaintiff was not chosen by the interview committees for any of the positions for which she was interviewed because the committee concluded that she was not the most qualified for any of the positions, as will be explained further herein. (Tr. II at 194)

27.     Plaintiff has not identified any specific positions which she alleges to have been unlawfully denied because of any of her protected characteristics, other than the November 2002 through June 2003 Pickens long-term substitute position.

28.     At all relevant times (from Pickens' leave of absence in November 2002 through the date of trial), Heller was responsible for facilitating and coordinating the hiring process for the District's elementary teachers.  (Tr. II at 172)

29.     Because the competition for elementary education positions is strong, upon assuming his position with the District, Heller developed a uniform hiring process pursuant to which he receives the names of potential interviewees from the District's elementary school principals and other administrators.  Heller then formed and lead a committee consisting of all of the District's six elementary school principals and the District's director of elementary curriculum.  The committee developed and updated interview questions and interview forms, and conducted the interviews. (Tr. II at 172-173) (Tr. IV at 49-50)

30.     After interviews have been conducted, the interview committee reaches consensus on candidates to be recommended to the School Board for hiring.  Heller

presents the recommended candidates to the Board for review and approval.
(Tr. II at 173-174)

31.     The Board has the ultimate authority to approve or disapprove the hiring of the candidates recommended by the interview committee.  (Tr. I at 43) (Tr. II at 68)

32.     Since Heller has been primarily responsible for the hiring process, he, the committees of administrators who have interviewed candidates, and the District generally, have applied substantially the same processes and standards to Plaintiff and the candidates actually chosen for all positions at issue.  (Tr. II at 183-184)

33.     The District has not filled long-term substitute or regular/permanent positions without interviews since Heller assumed his position on February 18, 2002. (Tr. IV at 37)

34.     When Heller became responsible for hiring food service and custodial employees, he discontinued the District's practice of hiring the most senior substitute in favor of an interview/merit-based approach.  Now, those who are rated highest by the interview committee are hired.  (Tr. II at 176-177)

35.     Prior to November 2002, the District Administration was aware that there were going to be four long-term absences, including one for Joye Pickens, beginning in January 2003.  (Tr. III at 9)

36.     Shortly before Thanksgiving in 2002, Pickens, who was then an elementary teacher under Meader's supervision at Cochranton Elementary School, showed him a letter that she said she had prepared to send home to her students' parents.  The letter indicated that Plaintiff would be her substitute and that her leave

would begin in November 2002, not January 2003, as Pickens had previously told the District.  (Tr. IV at 6-7)

37.    Meader called Heller and advised him that Pickens would need a substitute sooner than expected and that Pickens had showed him the letter. (Tr. III at 8-11)

38.    After discussing the letter and Pickens' situation with Heller, Meader told Pickens not to send the letter home.  (Tr. III at 10) (Tr. IV at 8)

39.    The day after Pickens showed the letter to Meader, she began her sick leave.  (Tr. III at 11)

40.    Several days later, Heller called Pickens at home and explained to her that her attempting to actually choose Plaintiff as her substitute was not appropriate. (Tr. III at 12)

41.    Heller never met with Pickens face-to-face to discuss the issue. (Tr. III at 12)

42.    Pickens declined at trial to say she was aware of a District "practice" of approving the recommendations of regular/permanent teachers for substitutes before Heller formalized the process.  She testified that she "just thought that's the way you do it."  (Tr. I at 187)

43.    After Pickens had been off for several days, she saw Meader in his office and expressed her displeasure that she had not been permitted to simply designate Plaintiff as her long-term substitute.  Meader told Pickens that the District was going to interview for the position.  (Tr. IV at 9-10)

44.    Pickens had hoped Plaintiff would have been her substitute from December 2002 through the end of the first semester in January 2003. (Tr. I at 189-190)

45.    Pickens cannot recall having a specific conversation with Meader about her desire to have Plaintiff substitute for her during her leave of absence, but thinks she must have done so as that is her "practice."  (Tr. I at 188-189)

46.    Since Heller assumed his position in February 2002, no regular teacher has chosen their long-term substitute.  (Tr. III at 13) (Tr. IV at 37)

47.    Daniel Hootman has been CEA President for several years and has held numerous other positions within the CEA during his employment with the District. (Jt. 1 at ¶2)

48.    Hootman is unaware of anything to confirm Plaintiff's claim that District teachers have historically been allowed to designate their long-term substitutes. (Ex. MM)

49.    Because long-term substitutes obtain bidding rights during their third semester of service, allowing teachers to choose their long-term substitutes would result in individuals obtaining permanent employment outside of the District's interview process.  (Tr. IV at 37-38)

50.    Pickens' only knowledge of Plaintiff's teaching capabilities was gained from Plaintiff's day-to-day substituting in Pickens' class, when Pickens was not present. (Tr. I at 180-182)

51.    In forming her opinion of Plaintiff, Pickens relied heavily upon the opinions of her second grade students, who "approved of [Plaintiff]."  (Tr. I at 183)

52.    Of the four teachers who needed long-term substitute replacements beginning in June 2003, only Pickens tried to designate her replacement.  The other three did not even recommend their substitute replacements.  (Tr. III at 13)

53.    Plaintiff is Pickens' neighbor.  (Tr. I at 196)

54.    While the District's Administration did not object to Pickens recommending Plaintiff as her substitute until they could conduct interviews (mid-January 2003), the Administration did not allow Pickens to actually choose her replacement.  (Tr. III at 11)

55.    Heller never told Plaintiff that she was going to be Pickens' replacement through the end of the first semester (mid-January 2003).  (Tr. III at 14)

56.    Nobody told Plaintiff how long the Pickens Position was to last. (Tr. I at 140)

57.    Heller agreed to allow Plaintiff to substitute for Pickens beginning in November 2002 until the interview process was complete and the successful candidates for the long-term substitute positions were chosen, which is what happened. (Tr. III at 14)

58.    Meader designated Plaintiff to be Pickens' substitute while the interview process occurred.  (Tr. IV at 9)

59.    During the October or November principals' meetings, and before Pickens attempted to designate Plaintiff to be her long-term substitute, the administration had decided to interview for all four of the long-term substitute positions that were expected to arise in January 2003.  (Tr. IV at 38-40)

60.    Plaintiff thought Pickens had chosen her to be her substitute from November 2002 through January 2003, an assignment that paid at the day-to-day rate. (Tr. I at 138-140)

61.    At Plaintiff's request, Heller observed Plaintiff's substitute teaching in Pickens' classroom on November 22, 2002.  (Tr. III at 14-15)

62.    During his observation, Heller noted that Plaintiff's assessment of her students' learning and her involvement of her students was less complete than he desired.  Heller also thought 39 minutes was a long time for second graders to be sitting in one place, doing one thing.  (Tr. III at 18)

63.    Overall, Heller considered Plaintiff's performance as a substitute when he observed her as adequate, at best.  (Tr. III at 19)

64.    Heller instructed Meader to observe Plaintiff while she substituted for Pickens.  (Tr. III at 19-20)

65.    On November 26, 2002, Meader observed Plaintiff teaching as a substitute for Pickens.  (Tr. IV at 11-12, 25)

66.    Because Plaintiff was then serving as a substitute, he evaluated her performance accordingly, i.e. he compared her to a lesser standard than he would have used for a regular/permanent teacher.  Meader adjudged Plaintiff to be a "satisfactory" day-to-day substitute.  (Tr. IV at 13)

67.    On December 3, 2002, Meader reviewed his observation report with Plaintiff.  (Tr. IV at 13-14, 20) (Ex. W)

68.    On December 6, 2002, Heller reviewed his observations and impressions with Plaintiff during a 20 minute meeting.  He made several constructive criticisms and

suggested several actions Plaintiff could undertake to improve her teaching

performance.  (Ex. K)

69.     During his December 6, 2002 meeting with Plaintiff, Heller encouraged her

to meet with Ms. Braden, one of the District's Title I reading specialists, to learn some

strategies to improve her reading lessons.  Heller also suggested that Plaintiff meet with

Suzanne Good, Director of Curriculum, who Heller thought could provide Plaintiff with

some resources that would benefit her and give her a more in-depth understanding in a

lot of areas that would be helpful to her.  Heller explained to Plaintiff that he wanted her

to start a dialogue with Good.  (Tr. III at 20-22)

70.     During her meeting with Heller, Plaintiff gave no indication that she

accepted Heller's constructive criticism or suggestions for improvement.  (Tr. III at 22)

71.     After Heller suggested to Plaintiff that she meet with Braden and Good,

Heller told Braden and Good that he had done so and he encouraged them to help

Plaintiff.  (Tr. III at 23)

72.     Heller is under the impression that Plaintiff met with Braden once,

superficially.  She did not meet with Good.  (Tr. III at 23-24, 119) (Tr. IV at 45)

73.     Plaintiff never objected to Heller's classroom evaluation of her.

(Tr. I at 136)

74.     Plaintiff has no reason to think anyone else was observed for longer

periods than was she.  (Tr. I at 136)

75.     Plaintiff attempts to rely upon evaluation forms prepared by

regular/permanent teachers regarding Plaintiff's service as their day-to-day substitute.

76.    Regular/Permanent teachers who evaluated Plaintiff's performance as a substitute did not actually see Plaintiff teaching because they were not present when Plaintiff was substituting for them.  (Tr. I at 143)

77.    Plaintiff does not know how the regular/permanent teachers for whom she substituted rated other day-to-day substitutes.  (Tr. I at 144)

78.    Plaintiff does not know whether the substitute evaluation forms are used by the District in making hiring decisions.  (Tr. I at 145)

79.    The reports on day-to-day substitutes are completed by regular/permanent teachers and have no role in the selection of long-term substitutes or permanent employees.  (Tr. III at 137-138)

80.    To fill the four long-term substitute positions starting in January 2003, including the Pickens position, Heller and Good met with the District's six elementary principals (the 2002 interview committee).  (Tr. III at 24)

81.    The composition of interview committees was determined based solely on who were elementary administrators at a given time when interviews were conducted. (Tr. III at 193-194)

82.    The interview committee developed interview questions and established two interview dates, December 9 and 19, 2002.  (Tr. III at 25) (Ex. L)

83.    Based on his own opinions and observations, and the suggestions of the 2002 interview committee, Heller identified 17 people to be interviewed, including Plaintiff.  (Tr. III at 24-25)

84.    Plaintiff and 16 other candidates were interviewed for the long-term substitute position necessitated by the December 2002 through June 2003 leave of

absence of regular/permanent teacher, Joye Pickens, as well as three other long-term substitute assignments.  (Tr. III at 24-25)

85.     All of the successful candidates for the positions at issue participated in hiring processes comparable to those applied to Plaintiff.  (Tr. III at 25)

86.     The interviews lasted about 30 minutes each.  (Tr. III at 30)

87.     The committee used numerical rating sheets to compare interviewees. (Tr. III at 26)

88.     Each of the interviewees was scored by each member of the committee independently, without discussion among the group.  Those scores were not shared with the other committee members until all of the interviews had been conducted. (Tr. III at 47-48)

89.     Plaintiff was scored lowest among the 17 interviewees and was deemed by the District's interview committee to be less qualified than all of the candidates recommended by the committee for said long-term assignments.  (Tr. II at 194) (Tr. III at 35) (Tr. IV at 35) (Ex. P)

90.     During her 2002 interview, Plaintiff missed many of the concepts about which she was asked, and those she did not miss, she did not explain well.  For example, she could not explain the four instructional processes, i.e. reading, writing, listening and speaking, during her interview.  Heller had explained the four processes to her only several days earlier during their meeting regarding Heller's classroom observation of her.  (Tr. III at 38-40)

91.     In contrast, the successful candidates for the Pickens position and the other January 2003 long-term substitute positions performed much better than Plaintiff

did during their interviews, exhibiting a much greater understanding and knowledge base regarding the questions asked during the interview.  (Tr. III at 43-46)

92.    The parties stipulated that the interview analysis forms, including interview performance scores, accurately reflect the assessments of the members of the interview committee.  (Tr. III at 48)

93.    The only information Plaintiff is aware of regarding how successful candidates performed during their interviews is the information on the interview summaries prepared by the District employees who interviewed them.
(Tr. I at 148, 150-151)

94.    Each of the candidates selected for the four January 2003 positions, including the Pickens position, possessed other qualifications Plaintiff lacked, which were deemed by the interview committee to be desirable and which contributed to the District's hiring decisions at issue.  (Tr. III at 43-46)

95.    The committee concluded that Plaintiff had no such other qualifications that improved her candidacy beyond her interview performance.  (Tr. III at 52)

96.    Through the interview process, the District designated Amy Szalewicz to be Pickens' replacement.  Heller and Meader met with Plaintiff to inform her of that decision.  The District retained Plaintiff as Pickens' day-to-day substitute until Szalewicz became available.  (Tr. IV at 14-15)

97.    Between the December 2002 filling of the four long-term substitute positions and interviews the District conducted in March 2004, the District hired no elementary teachers for long-term substitute or regular/permanent positions.  All such

positions that opened were filled through the exercise of contractual bidding rights.

(Tr. III at 52-54)

98.    In 1999, Joanne Darling retired as the District's principal at East End Elementary.  She remained retired until 2003.  During the 2003-04 and 2004-05 school years, Darling resumed active work for the District.  She became principal of Cochranton Elementary.  (Tr. III at 196-197)

99.    In December 2003, Kathy Maruska told Darling of her need to take an approximately three-week health leave in January 2004.  Maruska asked Darling if Plaintiff could serve as her replacement.  (Tr. III at 197-198)

100.    Maruska and Plaintiff were social friends at the times of Maruska's claimed conversations with Darling.  (Tr. I at 210)

101.    Maruska never observed Plaintiff teach.  (Tr. I at 200)

102.    Maruska testified that she requested Plaintiff or Erin Bourquin for multi-week day-to-day assignments during the 2003-04 and 2004-05 school years.  The first was for a three-week leave of absence in late February or early March of 2004.

(Tr. I at 204-209)

103.    At that time, Erin Bourquin had been doing a lot of day-to-day substituting at Cochranton Elementary and had requested Darling to observe her teaching a class. In Darling's judgment, Bourquin had done an excellent job the several times Darling had previously observed her class.  More specifically, Darling concluded that Bourquin was incorporating balanced literacy and shared writing, which are components of the District's balanced literacy program.  (Tr. III at 199-201)

104.    Darling then advised Maruska that she had asked Erin Bourquin to substitute for her.  Maruska was unhappy about Darling's selection of Bourquin.  Maruska explained that she was worried that if Bourquin was her substitute, some regular/permanent teachers with whom Bourquin had student taught would enter Maruska's room, look at her "stuff" and criticize her.  Darling assured her that would not happen.  After her time off, Maruska told Plaintiff that Bourquin had done an excellent job.  (Tr. III at 205-206)

105.    At an unspecified time during the 2004-05 school year, Maruska testified that she again requested Plaintiff or Erin Bourquin for a three-week day-to-day assignment for a leave of absence.  Darling chose Bourquin, with whom Maruska was satisfied.  (Tr. I at 208-209)

106.    If the District had chosen Plaintiff for either or both of the three-week day-to-day assignments during either of Maruska's absences, she would have earned $70-$90 per day.  Those amounts are less than half of what Plaintiff would have made as a starting regular/permanent teacher in any of the three local districts mentioned in paragraph 208 herein.  (Tr. III at 137)

107.    Plaintiff had never requested Darling to observe her substitute teaching a class.  (Tr. III at 200)

108.    Plaintiff had not expressed interest in being Maruska's substitute for her health-related absence in January 2004.  (Tr. III at 204)

109.    During the conversation between Maruska and Darling regarding Plaintiff's substituting for her 2004-05 leave of absence, Maruska testified that Darling made no retaliatory or discriminatory remarks.  (Tr. I at 209-210)

110.    Darling did not know about Plaintiff's February 2003 PHRC/EEOC charge until June 16, 2007, when she learned of it from Defendant's counsel in preparation for trial.  (Tr. III at 206-207)

111.    While Maruska testified that Darling said, during her December 2003 conversation with Maruska, that Plaintiff could not be Maruska's substitute for the January 2004 assignment because of Plaintiff's lawsuit, Maruska later acknowledged that at the time of the supposed remark, the lawsuit had not yet been filed.  Maruska then testified that she was confused about which leave the retaliatory remark had been made in conjunction with.  However, Maruska's testimony that she specifically refrained from making a recommendation of Plaintiff in conjunction with her second leave, i.e. her leave during the 2004-05 school year, because she had previously been told Plaintiff's not yet filed lawsuit barred her January 2004 substitute service, makes her testimony about Darling's supposed retaliatory remark not credible.  Further, there is no evidence that Darling was a "but for" decision maker regarding the contested positions.
(Tr. I at 216)

112.    During her December 2003 conversation with Maruska, Darling credibly testified that she did not mention Plaintiff's lawsuit which, anecdotally, would not be filed until nine months later.  (Tr. III at 206)

113.    Darling credibly testified that Plaintiff's PHRC/EEOC charge was not discussed during the March 2004 interviews.  (Tr. III at 210-211)

114.    Maruska did not suggest Plaintiff to be her substitute for her January 2005 leave of absence.  Nor was there any discussion between Darling and Maruska about Plaintiff's lawsuit.  (Tr. III at 212)

115.    When Plaintiff's lawsuit appeared in the Meadville Tribune in September 2004, Plaintiff saw Darling in her office.  Plaintiff told Darling that she thought Darling was happy with her work.  Among other things, Darling told Plaintiff that she did a decent job as a substitute, but that lots of people sought employment with the District. Plaintiff asked why she did not get a job following the 2004 interviews.  Darling told her that she saw the paper and that Plaintiff should talk to Heller about that.  (Tr. III at 213)

116.    In August or September 2004, then District Principal, Joann Darling, did not deny employment opportunities to Plaintiff because she had previously filed this action or an EEOC/PHRC charge.  Rather, she responded to Plaintiff asking her why she had not been hired during the 2004 interview process, which had been coordinated by Heller, by referring Plaintiff to Heller.  (Tr. III at 213-214)

117.    The PHRC's investigation was limited to the allegations in Plaintiff's administrative charge, which was not amended at any time.  (Tr. IV at 108)

118.    Plaintiff's only submissions to the PHRC and EEOC were her initial charge and questionnaire responses.  (Exs. B and PP)

119.    The PHRC did not investigate any alleged retaliation for which Plaintiff now seeks relief.  (Ex. EE)

120.    George Wright was a Director of the Crawford Central School District School Board from December 2001 through December 2005.  (Tr. II at 105)

121.    Wright retired from Hamot Health Center in 1979, after approximately five years as its Director of Human Resources.  (Tr. II at 103-104)

122.    Previously, Wright had held several other human resources/personnel positions.  (Tr. II at 104)

123.    In his last four positions, Wright was responsible for assuring his employers' compliance with EEO laws.  (Tr. II at 104-105)

124.    Wright attended DePauw University for his undergraduate studies, graduating in 1954.  (Tr. II at 111)

125.    At DePauw, Wright was a member of the Congress of Racial Equality, an organization that fought for civil rights for minorities.  (Tr. II at 111-112)

126.    Also at DePauw, Wright, as president of the Men's Hall Association social group, organized a "Welcome to DePauw Scholarship" for the first black woman that would attend the university.  (Tr. II at 112-113)

127.    Wright values racial diversity in a school system.  (Tr. II at 117)

128.    Wright openly accepts the concept of equal employment opportunity. (Tr. II at 105)

129.    Wright had a meeting and several phone calls in late 2002 and early 2003 about Plaintiff's efforts to obtain employment with the District.  (Tr. II at 106)

130.    During a meeting with Wright, Bernard Wagner implied that he and his wife were going to file a claim of employment discrimination.  (Tr. II at 108-109)

131.    Wright told the Wagners they certainly had that opportunity.  (Tr. II at 109)

132.    Meadville Area NAACP President, Sam Byrd, consistently recommends that racial minorities not initiate discrimination complaints to obtain employment. (Tr. IV at 92)

133.    Byrd would hire minorities over equally qualified Caucasians simply because of their minority status, to assure the number of minority teachers in the District.  In other words, Byrd is biased in favor of hiring minorities.  (Tr. II at 27)

134.    Sam Byrd, who also is African-American and a prior School Board member, credibly stated that "I know our [District's] administration is committed to hiring the most qualified candidates when a position becomes available."  (Tr. II at 20)

135.    Wright credibly testified that he has never heard nor witnessed anything done by a District Administrator that made him think the Administration would retaliate against somebody who filed an administrative charge of discrimination or a lawsuit. (Tr. II at 109-110)

136.    Wright never had any involvement in the District's decisions to hire teachers except to approve the recommendations of the District's Administration.  He was not a decision maker in the process that led to recommending candidates for hire for any position at issue and there is no record evidence that Wright had any impact on any of the District's hire or non-hire decisions at issue in this case.  (Tr. II at 110)

137.    Wright never told either of the Wagners that he thought white people are more intelligent or smarter than black or brown people.  (Tr. II at 108)

138.    In January 2003, Bernard Wagner met with Dolecki and Heller to discuss Plaintiff's efforts to obtain a teaching position, and a remark that Bernard Wagner claims George Wright made to the effect of black and brown people are not as smart as white people.  (Tr. II at 42, 97-98, 190)

139.    Fred Wagner, Bernard Wagner's brother, attended the meeting to "try to keep everything under control," and to be a witness.  (Tr. II at 97-98)

140.    Fred Wagner has been the elected Treasurer of Crawford County for 34 years.  (Tr. II at 96)

141.    Bernard Wagner testified that during the meeting, Heller agreed with Wright's comment that brown and black people are not as smart as white people, citing a college or university study.  (Tr. II at 43, 45)

142.    Heller credibly denied endorsing any such statement and did not agree with, or offer, the notion that white people are smarter than black or brown people.  (Tr. II at 191)

143.    Dolecki credibly denied hearing Heller or Wright make any remark that suggests a bias against Plaintiff's protected characteristics.  (Tr. III at 221-222)

144.    At trial, Fred Wagner could not remember whether Bernard Wagner attributed the "black and brown people are not as smart as white people" remark to George Wright during the meeting with Dolecki and Heller.  (Tr. II at 99-100)

145.    Fred Wagner has no recollection of Heller confirming or agreeing with such a remark during the meeting.  (Tr. II at 100)

146.    Because Heller was a professional, if he had agreed with a racist remark, Fred Wagner would have been surprised by it.  (Tr. II at 100-101)

147.    At the end of the meeting, during which Bernard Wagner claims Heller stated that black and brown people are not as smart as white people, Bernard Wagner claims to have thanked Dolecki and Heller for their time.  (Tr. II at 46)

148.    There are few racial minorities in the District's geographical region and in the field of education generally.  (Tr. IV at 37)

149.    The District has received few applications from minority candidates.  (Tr. IV at 37)

150.    The District's Administration participated in job fairs with the specific purpose of recruiting minority teachers.  (Tr. II at 13-14)

151.    In approximately 2003, Heller and an African-American District teacher attended a job fair for college students with the specific goal of attracting minority candidates.  Of the several hundred attendees, there were only four or five racial minorities, none of whom were Asian.  None of those African-American students visited the District's booth.  (Tr. III at 5)

152.    The District values minority candidates, but it does not exempt them from the competitive interview process on that basis.  (Tr. IV at 36)

153.    From the time Heller assumed his Assistant Superintendent position, and responsibility for facilitating and coordinating the District's hiring process, two Asian, Filipino-born people have applied for teaching positions at the District.  One was hired (Naomi Uy-Moore) and the other (Plaintiff) was not.  (Tr. II at 195-196)

154.    Naomi Uy-Moore is a Filipino-born Asian person who was hired by the District in August 2005 as an elementary teacher.  (Tr. II at 161, 164)

155.    Uy-Moore applied with the District in the Spring of 2005.  She was relocating to the Meadville area; she was not recruited by the District.  (Tr. II at 162-163)

156.    Prior to being hired by the District, Uy-Moore was a full-time elementary teacher in Maryland for 16 years.  (Tr. II at 163-164)

157.    Uy-Moore has a master's degree in curriculum and instruction. (Tr. II at 164)

158.    Uy-Moore had a lot of experience with "inclusion," the inclusion of special education students into regular education classrooms.  (Tr. III at 123)

22

159.    Uy-Moore was interviewed by 10-12 people prior to her August 2005 hire by the District.  (Tr. II at 164)

160.    Uy-Moore did not consider any aspect of her interview to be irregular or unfair toward her.  (Tr. II at 165)

161.    When Uy-Moore was hired, she did not have a PDE-issued certificate. She obtained one in 2006.  (Tr. II at 167)

162.    At the time she was hired, Uy-Moore incorrectly believed that Pennsylvania would honor her Maryland teaching certificate.  (Tr. II at 167, 169)

163.    At the time the District interviewed Uy-Moore, and when the District hired her, Heller was under the incorrect impression that her Maryland teaching certificate would be valid for one year during which time she would obtain PDE certification pursuant to a reciprocal agreement between Pennsylvania and Maryland.
(Tr. III at 124-127)

164.    Since February 2002, the District hired two African-American people as elementary teachers, and a Hispanic person as a guidance counselor.
(Tr. II at 196-197)

165.    Tammy Foster is an African-American elementary teacher in the District.
(Tr. II at 119-120)

166.    Foster submitted her application for a teaching position in 1994.  She substituted during the 1994-95 school year.  (Tr. II at 120-121)

167.    At the end of the 1994-95 school year, Foster sought and obtained employment in Meadville as a physical therapy aide.  She did so because she disliked the uncertainty of day-to-day substituting.  (Tr. II at 121)

168.    During an unspecified year, Foster had complained to former District School Board member, Samuel Byrd, that she lacked a special education certificate that would have allowed her to apply for a number of learning support teacher positions. (Tr. II at 136)

169.    In 1998, Foster stopped working for personal reasons.  (Tr. II at 122)

170.    In 1999, Foster began working at the District as a part-time aide. (Tr. II at 122)

171.    In approximately 2001, Foster became a full-time aide at the District. (Tr. II at 124)

172.    At the end of the 2002-03 school year, Foster applied for a teaching position with the District.  (Tr. II at 125, 130)

173.    Foster worked as a full-time aide for the District during the 2003-04 school year.  (Tr. II at 130)

174.    Heller did not know that Foster had a teaching certificate at the time she expressed interest about upcoming vacancies in the summer of 2003.  (Tr. III at 88)

175.    During the summer of 2004, upon learning that Foster possessed an elementary teaching certificate, Heller offered Foster a teaching position in the District's "STARS" after-school program, from 2:30 – 5:00 p.m., Monday through Friday. (Tr. II at 127-129)

176.    Foster accepted the STARS after-school teaching position.  Heller then referred Foster to Elementary Curriculum Director Suzanne Good to get some books and magazine articles to read to become more familiar with different teaching styles and strategies, which she did.  (Tr. II at 128-131)

177.    Good had Foster work half of the 2003-04 school year with a math teacher so she would become familiar with the different math strategies.  Then, Foster worked the second half of the school year with a reading teacher.  (Tr. II at 128)

178.    Foster discovered that some of the teaching strategies related to planning and preparation that she had been taught in 1994, in college, had been replaced with newer strategies.  (Tr. II at 131-132)

179.    Foster was interviewed in the spring of 2004.  (Tr. II at 130)

180.    Foster had spent several weeks preparing for the interview by reading appropriate books and speaking with colleagues she had worked with in the STARS program.  (Tr. II at 131)

181.    Foster did not experience any discrimination or unfairness in the interview process.  (Tr. II at 130-131)

182.    Heller offered Foster an elementary position for the 2004-05 school year, which she accepted.  (Tr. II at 132)

183.    After Foster was hired as a regular/permanent teacher, she became friends with Heller who also befriended her children.  (Tr. II at 132-133)

184.    A number of District teachers retired at the end of the 2003-04 school year making available approximately nine permanent positions to begin at the start of the 2004-05 school year.  (Tr. III at 55)

185.    To choose replacements for those employees, the District's Administration again assembled an interview committee consisting of Heller, Good and six elementary principals, as had occurred in December 2002.  First, the group updated the interview questions and interview analysis form, based in large part on the PDE's 427 form, which

it used to evaluate teachers for the award of tenure and the "Instructional II Certificate."
(Tr. III at 55-56)

186.    The PDE revised the 427 form between the 2002 and 2004 interviews.
(Tr. IV at 44)

187.    Heller identified 39 people to be interviewed, including Plaintiff, with input
from the committee.  The interviews were conducted in March 2004.  (Tr. III at 61)

188.    Because of the large number of interviews to be conducted, the
interviewees were interviewed by two different teams of the interview committee.  The
interview teams had their own sets of questions that they asked of each person
interviewed.  (Tr. III at 58-61) (Ex. Q)

189.    As occurred during the December 2002 interviews, the interview
committee members independently scored the interviewees' performance and then
reviewed their ratings as a group.  (Tr. III at 47-48, 62-64)

190.    The parties stipulated that Heller and the other interview committee
members completed interview forms for each candidate and that the scores on those
interview forms were the scores Heller and the others gave each interviewee based on
their perception of the interviewees' qualifications during the interview process.
(Tr. III at 73) (Ex. N)

191.    Plaintiff's score resulted in her being ranked 24th.  The lowest interviewee
ranked 26th.  (Tr. III at 62-63) (Exs. R and S)

192.    During the following five months, the committee met and decided which of
the candidates would be recommended to the Board for each of the approximately nine
vacancies as they arose.  (Tr. III at 67)

193.    The March 2004 interviews led to nine hires through October 2004, as shown on Ex. O.  (Tr. III at 67)

194.    Plaintiff was deemed by the District's interview committee to be less qualified than all of the candidates recommended by the committee for said permanent positions.  (Tr. II at 194) (Tr. III at 66-68; 72) (Tr. IV at 35)

195.    Each of the candidates who interviewed in March 2004, who were hired, interviewed better than Plaintiff and had other qualifications, experience and/or attributes that made them more desirable to the District's interview committee. (Tr. III at 83-99)

196.    Heller testified that during Plaintiff's interview, her answers to questions lacked detail.  She was unable to establish that she had a strong knowledge base in the areas the District had expected, including planning/preparation, classroom environment, instructional delivery and professionalism.  (Tr. III at 72)

197.    In June 2004, Plaintiff requested a meeting with Heller and Good.  Plaintiff began the meeting by asking whether she ever had a chance of getting a job at the District.  Heller said she did, but that there were some things she needed to work on. She did not ask how she could improve her candidacy.  (Tr. III at 100) (Tr. IV at 50-51)

198.    Nonetheless, Heller and Good recommended several specific activities Plaintiff could undertake to improve her candidacy.  (Tr. III at 100-101) (Tr. IV at 47)

199.    Heller and Good suggested to Plaintiff that she familiarize herself with the PDE 427 form, the mandated form used to evaluate people for tenure and for their attainment of their "Level II" instructional certificate.  Heller told Plaintiff to call him back

after she did so, so they could discuss the PDE 427 form and its contents further.
(Tr. III at 100-101)

200.    The PDE's website contains the PA Standards and the handbooks for all of the PDE's assessments, and the 427 form itself, which was the basis for the 2004 interview questions.  (Tr. IV at 46)

201.    Reviewing the 427 form helps a candidate anticipate the interview committee's questions.  (Tr. IV at 46)

202.    Heller also encouraged Plaintiff to become a teacher in the District's STARS program.  (Tr. III at 91, 101, 103) (Tr. IV at 47)

203.    Several of the successful 2004 candidates had enhanced their knowledge and interview performance by participating in the District's STARS after-school tutoring program.  (Tr. III at 85-91)

204.    The STARS program paid teachers approximately $20 per hour, which was the standard hourly rate in the teachers' collective bargaining agreement at the time.  (Tr. III at 101-102)

205.    Heller also told Plaintiff not to "have all of her eggs in one basket," to look at other districts as well, because it would help expand Plaintiff's professional experiences, and allow her to see what other districts were doing.  (Tr. III at 101)
(Tr. IV at 48)

206.    Plaintiff acknowledged that Heller did not suggest she should cease applying at Crawford Central School District.  (Tr. I at 147)

207.    Plaintiff also acknowledged that Heller did not say anything that made her think that she would not be hired by Crawford Central School District.  (Tr. I at 147)

208.    Beginning in August 2001 through the current date, Franklin Area School District hired 44 regular/permanent elementary teachers who did not have bidding rights under that district's collective bargaining agreement with its teachers' union.  Conneaut School District hired several regular/permanent elementary teachers and Penncrest School District hired 15 regular/permanent elementary teachers under the same circumstances during the same period. (Jt. 1 at ¶1a)

209.    The Penncrest, Conneaut Valley and Franklin school districts have elementary schools within 17, 17-18 and 12 miles from Plaintiff's home, respectively. (Tr. III at 136-137)

210.    The wages and benefits these districts provide to their teachers are comparable to those provided by Crawford Central School District.  The positions at these districts were/are superior to the long-term substitute position Plaintiff sought in December 2002, and are substantially equivalent to the permanent employment she seeks with Crawford Central School District.  (Exs. GG, HH, II, JJ, KK and LL) (Jt. 1 ¶1d)

211.    At relevant times, Plaintiff had the qualifications necessary to be considered for these positions.  (Jt. 1 at ¶1c)

212.    Plaintiff never applied for employment with any of the foregoing three school districts.  (Jt. 1 at ¶1b)

213.    In August 2004, Heller saw Plaintiff by chance in the central administration office.  He asked her if she was working on his and Good's suggestions and he asked her when she was going to get back to him and Good about the issues the three had discussed in June.  Plaintiff was evasive.  (Tr. III at 103-104)

214.    Heller and Good have no reason to think Plaintiff undertook any of the suggestions they made to her during their June 2004 meeting.  (Tr. III at 104) (Tr. IV at 47)

215.    Plaintiff did not become involved in the District's STARS program, as Heller and Good had recommended.  (Tr. III at 91)

216.    Plaintiff never contacted Heller or Good for further meetings. (Tr. III at 101)

217.    Because Plaintiff interviewed so poorly relative to the successful candidates, and virtually all other applicants, during the December 2002 and March 2004 interviews, and because the District's Administration had no reason to think Plaintiff had followed Heller's and Good's suggestions to improve her candidacy, the District has not interviewed Plaintiff since March of 2004.  (Tr. III at 119-120) (Tr. IV at 51-52)

218.    At all relevant times, Heller had no reason to think that Plaintiff completed any of the suggestions he made in December 2002, except for having what was reported to him to be a superficial conversation with Braden, and he had no reason to think Plaintiff completed any of the suggestions he and Good made in June 2004. (Tr. III at 118)

219.    The District has not interviewed any teaching applicant more than twice. (Tr. III at 119) (Tr. IV at 52)

220.    All teachers hired after those hired in conjunction with the March 2004 interviews also underwent the same interview process as Plaintiff did in 2004. (Tr. III at 106-107)

221.    All of the candidates who have been selected for long-term substitute and permanent positions since Plaintiff's meeting with Heller and Good in June 2004 were rated as having performed better than Plaintiff during her 2004 interview.
(Tr. III at 109-112; 116) (Ex. O)

222.    All of the District's administrators who participated on the interview committees at issue recorded scores for candidates that accurately reflected how they perceived the candidates' performance.  (Tr. III at 114-115)

223.    The parties stipulated that the interview performances of the candidates who were interviewed after the 2003-04 interviews, as perceived by the District's Administrators conducting the interviews, which were procedurally the same as occurred in 2003-04, were better than Plaintiff's interview performance during her 2004 interview and were scored higher.  (Tr. III at 109-112, 116)

224.    The interview committee does not consider regular PDE certificates to be superior to those issued by other states or to applicants who are entitled to receive PDE certificates, but have not yet received them.  (Tr. III at 140-141) (Tr. IV at 51)

225.    The District's nepotism policy provides that a school board member must be present when a relative of an administrator or board member is interviewed.
(Tr. III at 132-133)

226.    The only violation of the District's nepotism policy that occurred during the relevant period had no effect on Plaintiff because it involved a "special education" position for which Plaintiff did not have a PDE-issued certificate.  (Tr. III at 133-136)

227.    Plaintiff does not know the value of the fringe benefits she would have earned at the District as a long-term substitute or regular/permanent employee. (Tr. I at 154)

228.    Meader participated fully in the 2002 and 2004 interviews.  He heard no statements from anyone involved that suggested anyone had a bias against Plaintiff's protected characteristics.  (Tr. IV at 6)

229.    Karen Jamison is a middle school teacher at the District.  (Tr. II at 143)

230.    Jamison served as a year-long substitute during the 2001-02 school year. Previously, she had served as a day-to-day substitute.  (Tr. II at 144)

231.    During the first half of the 2002-03 school year, Jamison served as a day-to-day substitute.  (Tr. II at 144)

232.    Jamison interviewed for the Pickens Position and three other long-term substitute positions in December 2002.  (Tr. II at 147-148)

233.    Jamison was not awarded any of the long-term substitute positions. (Tr. II at 148)

234.    Heller advised Jamison that she had not been chosen because she had not interviewed as well as the candidates who were selected for the long-term substitute positions.  (Tr. II at 148)

235.    During the 2003-04 school year, Jamison taught at a private school and then at another public school district.  (Tr. II at 149)

236.    Jamison interviewed with the District during the March 2004 interviews. (Tr. II at 149-150)

237.    During her interview, Jamison followed Heller's suggestions and answered the questions in a way that was aligned with current educational philosophy and pedagogy, which resulted in her being seen as a more successful interviewee by the committee.  (Tr. II at 150-151)

238.    Jamison was hired as a regular/permanent elementary teacher by the District at the start of the 2004-05 school year.  (Tr. II at 150-152)

## PROPOSED CONCLUSIONS OF LAW

1.    To the extent any of the foregoing findings of fact may be considered conclusions of law, such findings are incorporated herein.

2.    Plaintiff alleges disparate treatment by Crawford Central School District in its decision to select other candidates for long-term substitute and permanent employment, based upon her Asian race and her country of national origin, the Philippines.  Specifically, Plaintiff seeks relief for the District's non-selection of her for a long-term substitute position for Joye Pickens beginning in November 2002 through the end of the 2002-03 school year, and generally, for approximately nine regular positions filled following the District's March 2004 interviews, and for approximately eight regular positions filled between the foregoing positions and the date of trial.  (Tr. I at 49-50)

3.    Plaintiff also offered the testimony of Kathy Maruska regarding two, three-week day-to-day substitute assignments that were filled by principal Joanne Darling in the latter half of the 2003-04 and 2004-05 school years.

4.    Plaintiff alleges that the District's decisions not to hire her after February 2003 and to not interview her beginning in October 2004 were in retaliation for her having filed her PHRC complaint in February 2003.

5.      A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII.  Unlike the disparate impact theory, proof of the employer's discriminatory motive is critical under this analysis.  Discriminatory intent can either be shown by direct evidence, or through indirect or circumstantial evidence.  See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  If discriminatory intent is shown indirectly, the burden of production can be shifted to the employer once the plaintiff establishes a prima facie case of discrimination.  The employer's burden is to articulate a legitimate, nondiscriminatory reason for the adverse action.  However, the ultimate burden of persuasion on the issue of intent remains with the Title VII plaintiff.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

6.      In the seminal case of McDonnell Douglas, the Supreme Court set forth the by now quite familiar four-prong test for what constitutes a prima facie case:

> (i) that [the complainant] belongs to a racial minority; (ii) that [the complainant] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [the complainant's] qualifications, [the complainant] was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

In St. Marys Honor Center v. Hicks, 509 U.S. 502, 510 (1993), the Supreme Court stated that a plaintiff in a Title VII case always bears the burden of proving whether the defendant intentionally discriminated against the plaintiff.

7.      Under the McDonnell Douglas formula, a plaintiff who proves a prima facie case of discriminatory treatment raises a presumption of intentional discrimination.  The defendant then has the burden of production, not persuasion, to rebut the presumption

of discrimination by articulating a nondiscriminatory reason for its actions.  If the

defendant does articulate a nondiscriminatory reason, the plaintiff must prove intentional

discrimination by demonstrating that the defendant's proffered reason was a pretext,

hiding the real discriminatory motive.

8.    "[T]he elements of the prima facie case and disbelief of the defendant's

proffered reasons are the threshold findings, beyond which the [factfinder] is permitted,

but not required, to draw an inference leading it to conclude that there was intentional

discrimination."  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066-

1067 (3d Cir. 1996).

9.    This is a McDonnell Douglas case.

**BUSINESS JUDGMENT**

10.    On the relevance of "business judgment," see Billet v. CIGNA Corp., 940

F.2d 812, 825 (3d Cir. 1991), where the court stated that "[b]arring discrimination, a

company has the right to make business judgments on employee status, particularly

when the decision involves subjective factors deemed essential to certain positions."

The Billet court noted that "[a] plaintiff has the burden of casting doubt on an employer's

articulated reasons for an employment decision.  Without some evidence to cast this

doubt, this Court will not interfere in an otherwise valid management decision."  The

Billet court cited favorably the First Circuit's decision in Loeb v. Textron, Inc., 600 F.2d

1003, 1012 n. 6 (1st Cir. 1979), where the court stated that "[w]hile an employer's

judgment or course of action may seem poor or erroneous to outsiders, the relevant

question is simply whether the given reason was a pretext for illegal discrimination."

11.    While Plaintiff has presented some evidence that she and several others

not employed in decision making positions at the District consider Plaintiff to have been

an effective day-to-day substitute, and are optimistic about her ability to succeed as a permanent teacher, Plaintiff has failed to demonstrate more than a disagreement with the District's judgment regarding her candidacy relative to the individuals the District chose instead of her.

**PRETEXT**

12.    The Third Circuit described the standards for proof of pretext in <u>Atkinson v. Lafayette College</u>, 460 F.3d 447, 454 (3d Cir. 2006):

> We have recognized two ways in which a plaintiff can prove pretext. First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 762 (3d Cir. 1994). Second, and alternatively, the plaintiff can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. "[T]he nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (citation omitted). The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." Id. at 1109. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Id. (citation omitted).

13.    Plaintiff has not established a prima facie case with respect to the long-term substitute assignment for Joye Pickens that began in December 2002, and the positions filled by the District in conjunction with its March 2004 interviews for permanent candidates, for which she was interviewed.

14.    The District has proffered legitimate non-discriminatory reasons for all of the non-hire decisions complained of by Plaintiff.

15.    More specifically, the District has stated in its answer, memorandum in support of its motion for summary judgment and associated affidavits, and through testimony and evidence offered at trial, that all candidates it preferred to Plaintiff were chosen because of one or more of the following reasons, et al:

     a.    All of the chosen candidates' interview performances were deemed by the interview committee to be better, and were scored higher, than was Plaintiff's.

     b.    Some of the chosen candidates also had more experience than Plaintiff.

     c.    Some of the chosen candidates also had successfully completed long-term assignments at the District prior to the hire Plaintiff complains of, which Plaintiff has not done.

     d.    Some of the chosen candidates also were identified by administrators, through observations and otherwise, as stronger candidates than was Plaintiff.

     e.    Some of the chosen candidates also had unique education and/or training that caused the District to consider them more qualified than Plaintiff.

16.    Additionally, beginning with the hires made after September 2004, the District credibly explained that it no longer considered Plaintiff for vacant positions because of her poor December 2002 and March 2004 interviews and Plaintiff failed to take the actions District administrators had suggested to her on several occasions. Plaintiff has failed to identify any comparators who were interviewed more times than she.

17.    The Court credits the testimony of the District's administrators who testified that each time they selected a candidate other than Plaintiff for each of the

positions at issue, they did so based upon their good faith assessment that Plaintiff was less qualified than the successful candidates.  Plaintiff has offered no evidence that the interview committee viewed her candidacy differently.

18.    Plaintiff has filed to identify any unexplained irregularities in the District's hiring processes that would support a finding of pretext or retaliation.

19.    Therefore, Plaintiff has failed to carry her burden of establishing the necessary pretext regarding any of the positions at issue.  Judgment for Defendants on all claims is, therefore, proper.

20.    Plaintiff has the burden of showing that if she had been selected to participate in the post-2004 interviews, she would have been selected for a position. (Tr. III at 108-109)

21.    Plaintiff has failed to do so.

22.    Plaintiff alleges that the District's decisions not to hire her, made after she filed her administrative charge in February 2003, were unlawful retaliation.

23.    However, Plaintiff acknowledges that she never filed an administrative charge alleging retaliation, and that the PHRC and EEOC did not investigate Plaintiff's claim of retaliation during their investigation of Plaintiff's discrimination complaints.

24.    Plaintiff failed to exhaust her administrative remedies regarding her retaliation claim by not filing a charge with the EEOC and/or PHRC prior to filing her instant lawsuit.  See Robinson v. Dalton, 107 F.3d 1018 (3rd Cir. 1997).

25.    Defendant raised Plaintiff's failure to exhaust administrative remedies as an additional defense in its answer and in its motion in limine.

26.     Pursuant to the third circuit's analysis in <u>Robinson</u>, Plaintiff's retaliation claims must be dismissed for her lack of exhaustion of administrative remedies.

**<u>MITIGATION</u>**

27.     On the question of mitigation that would reduce an award of back pay, see <u>Booker v. Taylor Milk Co.</u>, 64 F.3d 860, 864 (3d Cir. 1995):

> A successful claimant's duty to mitigate damages is found in Title VII:  "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5(g)(1); see <u>Ellis v. Ringgold Sch. Dist.</u>, 832 F.2d 27, 29 (3d Cir. 1987).  Although the statutory duty to mitigate damages is placed on a Title VII plaintiff, the employer has the burden of proving a failure to mitigate.  See <u>Anastasio v. Schering Corp.</u>, 838 F.2d 701, 707-08 (3d Cir. 1988).  To meet its burden, an employer must demonstrate that 1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment.
>
> .  .  .
>
> The duty of a successful Title VII claimant to mitigate damages is not met by using reasonable diligence to obtain any employment.  Rather, the claimant must use reasonable diligence to obtain substantially equivalent employment.  See <u>Ford Motor Co. v. EEOC</u>, 458 U.S. 219, 231-32 (1982).  Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.

28.     The Franklin Area, Penncrest and Conneaut Valley School Districts were employers with whom Plaintiff had an obligation to apply, to satisfy her obligation to mitigate her claimed wage loss.  Plaintiff has not done so.

29.     Plaintiff had the necessary certificate to apply for the numerous elementary positions those districts filled during all times relevant to this action.

30.    Plaintiff has not offered a valid justification for her failure to attempt to mitigate her wage loss by applying for employment at these three districts.

31.    Plaintiff has offered no probative evidence on the value of the fringe benefits she would have earned at Crawford Central School District.

32.    The non-wage fringe benefits offered by the above three districts, and the duties of those teaching positions, are more desirable than, or substantially equivalent to, the positions Plaintiff sought at Crawford Central School District.

33.    Therefore, had Plaintiff prevailed on any of her claims, she would have been limited to a recovery of a nominal award only.

Wherefore, Judgment shall be entered against Plaintiff, Rowena Wagner, in favor of Defendant, Crawford Central School District, with costs taxed to the Plaintiff.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL & SENNETT, P.C.


BY:  /s/ Mark J. Kuhar
    Mark J. Kuhar, Esq.
    120 West Tenth Street
    Erie, Pennsylvania 16501-1461
    Phone:  (814) 459-2800
    Fax:  (814) 453-4530
    E-mail:  mkuhar@kmgslaw.com
    Bar No.:  PA71185

    Attorneys for Defendant,
    Crawford Central School District

# 730217