**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROWENA WAGNER,              )
                                      )
            Plaintiff,           )
                                      )         Civil Action No. 04-264 Erie
                                      )
               v.                )
                                      )
CRAWFORD CENTRAL SCHOOL    )
DISTRICT,                     )
                                      )
            Defendant.        )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

McLAUGHLIN, SEAN J., DISTRICT J.

       Plaintiff, Rowena Wagner, commenced this action against Defendant, Crawford Central

School District and others,[1] in September 2004 alleging discrimination and retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and

the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* (First Amended Complaint ¶¶ 25-

26; 37 [Doc. No. 3].)  Plaintiff also raised claims pursuant to 42 U.S.C. §§ 1981 and 1983.  (First

Amended Complaint ¶¶ 27-36 [Doc. No. 3].)[2]  Plaintiff claims she was wrongfully denied

employment opportunities due to her race (Asian) and national origin (Filipino).  (First Amended

Complaint ¶ 1.)  Plaintiff further claims she was subjected to retaliation following the filing of

her complaint with the Pennsylvania Human Relations Commission.  (Id. at ¶ 26(h).)

---

       [1]Plaintiff also brought suit against the Crawford Central School Board, Michael E.
Dolecki, Superintendent, Charles E. Heller, III, Assistant Superintendent, and the Crawford
Central Education Association. (First Amended Complaint [Doc. No. 3])  On February 13, 2006,
the Crawford Central Education Association was dismissed from the case. (Tr. of Hearing on
Plaintiff's Motion for Leave to Amend First Amended Complaint [Doc. No. 39].)  On October
27, 2006, we partially granted Defendants' motion for summary judgment and the Board,
Dolecki and Heller were dismissed from the case. (Tr. of Hearing on Cross-Motions for
Summary Judgment [Doc. No. 107])

       [2]Plaintiff also raised a state law intentional infliction of emotional distress claim. (First
Amended Complaint ¶ 38 [Doc. No. 3])  We granted Defendants' motion for summary judgment
with respect to this claim.  (Tr. of Hearing on Cross-Motions for Summary Judgment [Doc. No.
107])

A non-jury trial was held from June 18, 2007 through June 21, 2007.  Pursuant to Federal Rule of Civil Procedure 52, set forth below are this Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1.  Plaintiff, Rowena Wagner, was born in Manila, Philippines and became a United States citizen in September 1998.  (Tr. Vol. 1, pp. 59-60.)[3]  She graduated from Edinboro University of Pennsylvania in May 2000 with a Bachelor of Science degree in Education.  (Tr. Vol. 1, p. 63.)  Plaintiff was certified to teach grades kindergarten through sixth by the Pennsylvania Department of Education ("PDE") in 2001.  (Tr. Vol. 1, p. 64.)

2.  Plaintiff performed her student teaching with Defendant, Crawford Central School District (the "District").  (Tr. Vol. 1, pp. 165, 171, 176.)

3.  Michael Dolecki ("Dolecki"), who had previously been the District's Acting Superintendent and Assistant Superintendent, became the District's Superintendent in November 2001.  (Tr. Vol. 3, p. 219.)  (Id.)  Susanne Good ("Good"), has been the District's Director of Elementary Curriculum since January 2002.  (Tr. Vol. 4, p. 25.)  Charles Heller ("Heller"), has been the District's Assistant Superintendent since February 18, 2002 (Tr. Vol. 2, p. 170).  Kurt Meader ("Meader"), was the principal of Cochranton Elementary in November 2002.  (Tr. Vol. 3, p. 8; Tr. Vol. 4, p. 4.)  Joanne Darling ("Darling"), became the principal of Cochranton Elementary in August 2003.  (Tr. Vol. 3, pp. 208-209).  George Wright ("Wright"), was a member of the Crawford Central School Board ("the Board") from December 2001 through December 2005.  (Tr. Vol. 2, p. 105.)  Wright had been the Director of Human Resources at Hamot Health Center in Erie, Pennsylvania and held several human resources/personnel positions prior to that.  (Tr. Vol. 2, 103-105.)

4.  The District employs "regular," a.k.a. "permanent," teachers, long-term substitute teachers, and day-to-day substitute teachers, among other employees.  Substitute teaching

---

[3]References to the trial transcript are indicated by the volume number which corresponds to the day of trial, *i.e.*, Tr. Vol. 1 (6/18/07 [Doc. No. 125]), Tr. Vol. 2 (6/19/07 [Doc. No. 126]), Tr. Vol. 3 (6/20/07 Doc. No. 127]) and Tr. Vol. 4 (6/21/07 [Doc. No. 128]).  References to trial exhibits are as follows: "Tr. Ex. ___."  Plaintiff's trial exhibits are denoted by numbers while Defendant's trial exhibits are denoted by letters.

assignments that are ninety (90) days or longer are considered "long-term" by the District and the Crawford Central Education Association (the "CEA"), the teachers' and professional employees' union. (Tr. Vol. 2, p. 174.) Assignments of less than ninety (90) days are considered "day-to-day" substitute assignments by the District and the CEA. (Tr. Vol. 2, p. 174.)

5. The District's expectations for day-to-day substitutes are different from its expectations for long-term substitutes and permanent teachers. (Tr. Vol. 2, pp. 181-182.) Day-to-day substitute teachers are certified and Board approved, but are not subjected to the interview process. (Tr. Vol. 4, pp. 27-28.) They are expected to manage the classroom and follow the lesson plan devised by the teacher for whom they are substituting. (Tr. Vol. 4, pp. 27-28.) However, they are not required or expected to prepare lesson plans on their own. (Id.) Long-term substitute and permanent teachers however, are expected to have a more thorough knowledge of curriculum and are expected to prepare lesson plans. (Id.)

6. We credit the conclusion of Good that successful performance as a day-to-day substitute is not an accurate predictor as to an individual's ability to perform successfully as a long-term substitute or permanent teacher. (Tr. Vol. 4, p. 34.)

7. Plaintiff first applied for a permanent teaching job with the District in August 2001. (Tr. Vol. 1 p. 65.) She was approved by the Board as a day-to-day substitute teacher and began substitute teaching in October 2001. (Tr. Vol. 1 pp. 67-68; Tr. Ex. 1.)

8. During the 2001-2002 school year, Plaintiff worked as a day-to-day substitute for the District approximately 110 days. (Tr. Vol 1, p. 68).

9. As a day-to-day substitute, Plaintiff was required to complete a form entitled "Summary Report of a Substitute Teacher" summarizing the activities of each class for which she substituted. (Ex. 30.) Various teachers for whom she had substituted wrote notes on the summary reports complimenting her on her performance, but none of the teachers actually observed her while she substituted. (Ex. 30; Tr. Vol. 1, p. 143.)

10. These forms were not utilized in the selection process for long-term substitute or permanent teachers. (Tr. Vol. 3, pp. 137-138.)

11. At all times relevant hereto, a collective bargaining agreement ("CBA") between the District and the CEA required the District to award vacant permanent teaching positions to

current permanent employees, or long-term substitute employees with bidding rights, if any such employees bid on a position. (Tr. Vol. 2, p. 178; Tr. Ex. H.) The CBA did not dictate how the District was to hire day-to-day substitutes or long-term substitutes. (Tr. Vol. 2, p. 183.)

12. A stipulated arbitration award between the District and the CEA provided long-term substitute teachers bidding rights while they were in their third or subsequent long-term substitute assignment. (Tr. Vol. 2, pp. 179-180; Tr. Ex. I.) These bidding rights expired at the end of their long-term substitute assignment. (Id.)

13. Plaintiff never obtained bidding rights pursuant to the CBA. (Tr. Vol. 2, p. 189.)

14. In early November 2002, Joye Pickens, an elementary school teacher with the District for 35 years, informed Meader, the principal of Cochranton Elementary at that time, that she was planning a medical leave of absence beginning in January 2003. (Tr. Vol. 4, p. 7.)

15. Plaintiff began teaching Pickens' class on November 16, 2002 as a day-to-day substitute. (Tr. Vol. 1, pp. 72-73.)

16. On November 22, 2002, Heller conducted a classroom observation of Plaintiff pursuant to her request (Tr. Vol. 1, p. 74; Tr. Vol. 3, p. 15; Tr. Ex. K.) Heller characterized Plaintiff's performance as "adequate at best." (Tr. Vol. 3, p. 19.) Heller subsequently met with Plaintiff and suggested she meet with certain individuals to improve her performance but Plaintiff did not follow through with the suggestions. (Tr. Vol. 3, pp. 21-24.)

17. Meader also performed a classroom observation of Plaintiff on November 26, 2002 and concluded that her performance was "satisfactory;" he also made suggestions for improvement. (Tr. Vol. 1, pp. 79; 81; Tr. Vol 4, p. 11; 13-14; Tr. Ex. W.)

18. Prior to February 2002, a practice had developed whereby the District had relied on the recommendation of the permanent teacher as to who would substitute for him/her in a long-term substitute capacity. (Tr. Vol. 1, pp. 90; 186-187.)

19. In February 2002, however, Heller revamped the process whereby long-term substitutes were selected. (Tr. Vol. 2, pp. 172; 192.) An Interview Committee was established consisting of Heller, the six elementary school principals and the director of elementary curriculum. (Tr. Vol. 2, p. 172.) Interview questions and forms were developed by the Committee under the new system. Tr. Vol. 2, pp. 172-173; Tr. Vol. 4, pp. 49-50.) Each member

of the Committee provided a numerical score, i.e., 1 through 5, relative to the following traits: knowledge of specific job and job related topics; experience; communication ability; interest in position and the organization; overall motivation to succeed; appearance and habits; poise; insight and alertness; and personality. (Tr. Ex. N.) Each interviewer scored every applicant individually with no group input and the individual scores were not shared until after all the interviews had been completed. (Tr. Vol. 3, pp. 47-48.)

20. Candidates ultimately chosen for employment with the District were presented to the Board for approval. (Tr. Vol. 2, pp. 110; 172-173). Neither Wright nor any other member of the Board had any input into which candidates were interviewed, how they were scored or who was ultimately recommended to the Board for approval. (Tr. Vol. 2, pp. 110; 172-173.) The Interview Committee's recommendation as to candidates to be hired were routinely accepted by the Board. (Tr. Vol. 2, p. 110.)

21. Since Heller initiated the previously described interview process for long-term substitute candidates, no person has been hired as a long-term substitute who has not participated in the interview process. (Tr. Vol. 4, p. 13.)

22. In addition to the position created by Pickens' vacancy, the Committee was also aware that three other long-term substitute positions would be available in January 2003 (Tr. Vol. 3, p. 9.) The decision was made to conduct interviews for all four positions. (Tr. Vol. 4, p. 38.)

23. In December 2002 the Committee interviewed 17 candidates for the Pickens' position and three other long-term substitute positions. (Tr. Vol. 3, pp. 24-25.) Plaintiff was the only minority candidate interviewed. (Tr. Vol. 1, p. 83.)

24. Plaintiff was interviewed on December 9, 2002 by Heller, Good, Doug Stanton, the principal of Neason Hill Elementary School, Meader, the principal of Cochranton Elementary School, John Karns, the principal of West End Elementary School and Brenda Schoonover, the principal of Second District Elementary School. (Tr. Vol. 1, p. 81-82; Tr. Vol. 3, p. 25; Tr. Ex. M.)

25. All candidates were interviewed for approximately 30 minutes and each candidate was asked the same questions. (Tr. Vol. 3, p. 25; Tr. Ex. L.)

26. The parties stipulated that the performance scores accurately reflected the

assessments of the members of the interview committee.  (Tr. Vol. 3, pp. 113-115.)

27.  Each candidate was scored by each member of the committee independently without consultation.  The individual scores of each candidate were not shared until all interviews were completed.  (Tr. Vol. 3, pp. 47-48; Tr. Vol. 4, p. 41.)  Thereafter, scores were shared and a discussion ensued regarding the candidates.  (Tr. Vol. 3, p. 48.)  The raw scores were a significant but not an exclusive factor in determining the candidate who would be hired. (Tr. Vol. 3, pp. 50; 52.)

28.  The following is a list of the December 2002 candidates and their respective scores:

| | Applicant | Score |
|---|---|---|
| 1. | Bazylak, Robert | 43.0 |
| 2. | Tworek, Jennifer | 42.8 |
| 3. | Shearer, Nikki | 42.7 |
| 4. | Hughes, Stephanie | 42.0 |
| 5. | McElwain, Anna Marie | 41.7 |
| 6. | Boca, Stacy | 41.3 |
| 7. | Nolan, Amber | 41.2 |
| 8. | Foulk, Alicia | 41.1 |
| 9. | Lawrence, Blair | 40.7 |
| 10. | Szalewicz, Amy | 39.9 |
| 11. | Jamieson, Karen | 39.2 |
| 12. | DuPont, Chad | 38.7 |
| 13. | Weathers, Mark | 38.4 |
| 14. | Bourquin, Erin | 37.1 |
| 15. | Beers, Carolyn | 34.0 |
| 16. | Stearns, David | 30.7 |
| 17. | Wagner, Rowena | 28.0 |

(Tr. Ex. P.)

29.  The four individuals hired for a long-term substitute position were Robert Bazylak (#1); Nikki Shearer (#3); Anna Marie McElwain (#5); and Amy Szalewicz (#10).  (Tr. Ex. P.) All four are Caucasian.  (Tr. Vol. 3, p. 47.)

30.  Heller and Good credibly testified that the successful candidates were selected on the basis of their in-depth understanding of the education process, their ability to effectively communicate that knowledge during the course of their interviews and their experience.  (Tr. Vol 3, pp. 35; 38-41; 43-46; 49-51; Tr. Vol. 4, pp. 42; 58-59; Tr. Ex. N; Tr. Ex. BB.)

31.  Although Stephanie Hughes had the fourth highest raw score, Heller credibly

explained that she was not offered a position due to the fact that she lacked experience in a regular classroom setting. (Tr. Vol. 3, pp. 49-50.)

32.  Given the fact that there was only a 1.2 raw score differential between the score of Stacy Boca (#6) and Amy Szalewicz (#10), Heller credibly testified that the decision was made to offer the position to Amy Szalewicz based upon her strong knowledge base and two years of permanent teaching experience in a private school. (Tr. Vol. 44; 50-51.)

33.  Between December 2002 and March 2004, all long-term substitute and/or regular/permanent positions that became available were filled through the exercise of contractual bidding rights pursuant to the CBA. (Tr. Vol. 3, pp. 53-54.)

34.  Plaintiff continued to teach as a day-to-day substitute during the 2002-2003 school year and taught a total of 106 days for the District. (Tr. Vol. 1, p. 95.)

35.  Bernard Wagner, Plaintiff's husband, arranged a meeting with Wright at Wright's office in early January 2003 to discuss Plaintiff's ongoing efforts to secure a teaching position with the District and to request Wright's help. (Tr. Vol. 2, pp. 38-39; 106-107.)  Wright credibly testified that he informed Plaintiff and her husband that he was not involved in hiring teaching personnel and that Plaintiff had to go through the regular hiring process. (Tr. Vol. 2, pp. 107-108.)

36.  Thereafter, on or about January 20, 2003, Bernard Wagner telephoned Wright at his home in order to follow-up on their meeting. (Tr. Vol. 2, p. 40.)  Wagner testified that during this telephone conversation, Wright stated "Bernie, you just got to understand one thing. [B]lack people and brown people are not as smart as white people and that's the reason, you know, she's not going to get a job." (Tr. Vol. 2, p. 40.)

37.  Wright denied making the remark and testified that he "would never say anything like that" and that such a statement was "contrary to [his] total philosophy." (Tr. Vol. 2, p. 108.)

38.  In this regard, Wright credibly testified that he was actively involved in promoting racial equality in college. (Tr. Vol. 2, pp. 111-113.)  He was a member of the Congress for Racial Equality, which advanced the cause of minorities on campus. (Tr. Vol. 2, pp. 111-112.)  He was also a member of the only integrated service organization on campus, the Men's Hall Association, that supported the active recruitment of African-American students. (Tr. Vol. 2, pp.

112-113).

39. Based upon his long-standing and demonstrated commitment to racial equality, his years of practical experience in the area of human resources/personnel, as well as his demeanor while testifying, we credit Wright's denial that he made the remarks attributed to him by Bernard Wagner.

40. In late January 2003, Bernard Wagner and his brother, Fred, met with Heller and Dolecki for the alleged purpose of advising them as to Wright's discriminatory remark. (Tr. Vol. 2, pp. 42; 97-98; 190.)

41. Bernard Wagner testified that when he informed Heller about Wright's alleged remark, Heller not only stated that he agreed with it, but also cited to a university study as support for the proposition. (Tr. Vol. 2, pp. 43-45.)

42. Heller denied that Wagner attributed the alleged remark to Wright during the meeting. (Tr. Vol. 2, p. 190.) He further testified that he had never read a university study as described by Wagner and never mentioned one during the course of the conversation. (Tr. Vol. 2, p. 191.). Finally, he testified that he would have never expressed such an opinion because he did not believe it. (Tr. Vol. 2, p. 191.)

43. We credit Heller's previously described testimony in all respects.

44. Dolecki credibly testified that he did not hear Bernard Wagner attribute the alleged remark to Wright during the meeting. (Tr. Vol. 3, p. 221.) He further credibly testified that if Heller had made the comments attributed to him by Bernard Wagner at the meeting he would have taken disciplinary action against him. (Tr. Vol. 3, p. 222.)

45. Fred Wagner testified that he could not recall whether his brother mentioned the remark allegedly made by Wright at the meeting and had no recollection of Heller making the remark attributed to him by his brother. (Tr. Vol. 2, pp. 99-100.)

46. In December 2003, Kathleen Maruska ("Maruska"), a kindergarten teacher at Cochranton Elementary School, approached Darling and informed her that she would be gone for three weeks in January 2004 due to knee surgery and requested Plaintiff as her replacement. (Tr. Vol. 3, 197-198.) Maruska testified that she and Plaintiff were friends and socialized. (Tr. Vol. 1, pp. 210-211.)

47. Maruska testified that when she asked Darling if Plaintiff could substitute for her during her anticipated absence, Darling informed her that she could not since "there's that lawsuit, you know." (Tr. Vol. 1, p. 206.)

48. Maruska further testified that she requested Plaintiff a second time but there was no discussion of Plaintiff's lawsuit during the second discussion. (Tr. Vol. 1, pp. 207-208; 210.)

49. Darling testified that she never mentioned Plaintiff's lawsuit in her discussion with Maruska. (Tr. Vol. 3, pp. 217-218).

50. We credit Darling's testimony. First, the lawsuit was not filed until September 16, 2004, approximately 9 months after the meeting wherein Maruska attributes the comment to Darling. Moreover, we credit Darling's testimony that she first learned about the lawsuit when she read it in the paper.

51. We find that Wright was not possessed of any retaliatory animus against Plaintiff because she had filed a lawsuit or an administrative charge.

52. We credit his testimony that he was unaware of any Board member or administrator ever saying or doing anything that would suggest a propensity to retaliate against an individual who had filed a charge of discrimination or a lawsuit. (Tr. Vol. 2, p. 109.)

53. We further find that Wright's testimony that it would be inappropriate to retaliate against someone who filed an administrative charge of discrimination or a lawsuit and that they should not be prejudiced thereby is an accurate reflection of his genuine conviction. (Tr. Vol. 2, pp. 109; 115.)

54. As a result of a number of retirements at the end of the 2003-2004 school year, a number of permanent positions became available for the 2004-2005 school year. (Tr. Vol. 3, p. 55.)

55. An Interview Committee was again formed, which consisted of Heller, Good and the six elementary school principals. (Tr. Vol. 3, p. 55.) The Committee updated the interview questions and interview analysis form based upon the Pennsylvania Department of Education's ("PDE") 427 form, which the PDE utilized for tenure evaluation and Instructional II certification. (Tr. Vol. 3, pp. 55-56; Tr. Ex. Q.) The new form provided for numerical scores of 1 through 4 for the following traits: planning/preparation; classroom environment; instructional delivery;

professionalism; appearance/habits; and poise/personality/communication skills.  (Tr. Ex. T.)

56.  Interviews were conducted in March 2004.  (Tr. Vol. 3, p. 61.)  The only minority candidates that applied were Plaintiff and Tammy Foster, an African American. (Tr. Vol. 1, p. 102.)

57.  Due to the large number of interviews to be conducted, the Committee was divided into two teams and each candidate interviewed with both teams.  (Tr. Vol. 3, pp. 60-61.)

58.  As they had done in connection with the interviews in December 2002 for the long-term substitute positions, the Committee members independently scored each candidate and reviewed the scores as a group only after all the interviews were completed.  (Tr. Vol. 3, pp. 47-48; 62-64.)

59.  Plaintiff's raw score was 136, which placed her 24th out of 26 candidates.  (Tr. Vol. 3, pp. 62-63; Tr. Exs. R and S.)[4]

60.  The parties stipulated that the Interview Committee members completed interview forms for each candidate, and that the scores assigned on the forms were based upon on the Committee members' perception of the interviewees' qualifications during the interview process. (Tr. Vol. 3, pp. 113-115.)

61.  Among the applicants hired for a permanent teaching position was the African American candidate, Tammy Foster, who ranked 17th in raw score.  (Tr. Vol. 2, p. 132; Tr. Vol. 3, p. 68; Tr. Ex. R).

62.  Heller and Good credibly testified that Plaintiff performed poorly during the interviews and failed to demonstrate the requisite knowledge to effectively perform in the position.  (Tr. Vol. 3, p. 72; Tr. Vol. 4, pp. 35-36.)  They further credibly testified that the successful candidates were selected on the basis of their in-depth knowledge of required subject matter, experience and superior performance during the interviews.  (Tr. Vol. 3, pp. 86-99; Tr. Vol. 4, pp. 68.)

63.  Plaintiff met with Heller and Good in June 2004 for the purpose of exploring how she could improve her candidacy.  (Tr. Vol. 3, p. 99.)  During this meeting, Heller suggested that

---

[4]Because multiple individuals received the same raw score, the rankings do not correspond with the number of individuals interviewed.  (Tr. Vol. 3, pp. 62-63.)

Plaintiff familiarize herself with the PDE 427 form, which addressed subject matter that would likely be covered in an interview. (Tr. Vol. 3, p. 100; Tr. Vol. 4, p. 46.) Heller further requested that Plaintiff contact him following her review of the form. (Tr. Vol. 3, pp. 100-101.)

64. In the course of the discussion, Heller also suggested Plaintiff participate in the Stars program in order to gain hands-on experience, as had several of the successful candidates. (Tr. Vol. 3, pp. 88-91; Tr. Vol. 4, p. 101.)[5]

65. Plaintiff never contacted Heller or Good concerning the subject matter of the PDE 427 form. (Tr. Vol. 3, p. 103; Tr. Vol. 4, p. 47.) Nor did she, contrary to their recommendation, participate in the Stars after school program. (Tr. Vol. 3, p. 91.)

66. In September or October 2004, Plaintiff learned that a long-term substitute position would be opening. (Tr. Vol. 1, pp. 103-105.) She testified that when she asked her principal, Darling, to consider her for the position, she was informed that she was not eligible to apply because of the lawsuit. (Tr. Vol. 1, pp. 104-105).

67. Darling testified that Plaintiff approached her on the day Plaintiff's lawsuit was reported in the local newspaper. (Tr. Vol. 3, p. 213.) When Plaintiff inquired as to her employment prospects, Darling, who had seen the newspaper that day, referred her to Heller. (Tr. Vol. 3, p. 213-214.)

68. We do not find that Darling informed Plaintiff that she would not be hired because of her lawsuit. Rather, we find that given the pendency of the lawsuit, Darling referred any inquiries on the part of Plaintiff to Darling's superior, Heller.

69. Heller credibly testified that Plaintiff has not been interviewed by the District since March 2004 based upon her poor performance in two interviews, (i.e., December 2002 and March 2004), as well as her failure to have taken recommended steps to improve her strengths as a candidate. (Tr. Vol. 3, pp. 118-119.) He further credibly testified that he could not recall any candidate for a long-term substitute or permanent teaching position that had been interviewed more than two times. (Tr. Vol. 3, p. 119.)

70. Good credibly testified to the same effect. (Tr. Vol. 4, pp. 51-52.)

---

[5]The Stars program is an after school tutoring program designed to improve the performance of at risk students in reading and math. (Tr. Vol. 3, pp. 90-91.)

71. Naomi Uy-Moore, who was born in the Philippines, interviewed for a permanent teaching position in August 2005 and was subsequently hired by the District. (Tr. Vol. 2, p. 163.)

## CONCLUSIONS OF LAW

1. To the extent any of the Court's findings of fact may be considered conclusions of law, such findings are incorporated herein.

2. Jurisdiction over this case is proper under 28 U.S.C. §§ 1331, 1337 and 1343(4). This Court has supplemental jurisdiction over all related state law claims by virtue of 28 U.S.C. § 1367.

3. Venue is proper in this district under 28 U.S.C. § 1391(b).

4. Title VII and the PHRA prohibit employers from discriminating against employees with respect to the compensation, terms, conditions, or privileges of employment because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a); 43 P.S. § 955(a); Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981); Weston v. Commonwealth of Pennsylvania, Dept. of Corrections, 251 F.3d 420, 425 (3rd Cir. 2001).

5. The Third Circuit has consistently applied the same legal standard in analyzing claims brought pursuant to Title VII and the PHRA. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 n.3 (3rd Cir. 2000); Jones v. School District of Philadelphia, 198 F.3d 403, 409 (3rd Cir. 1999). The Third Circuit has also applied Title VII standards to claims under 42 U.S.C. §§ 1981 and 1983. Schurr v. Resorts International Hotel, Inc., 196 F.3d 486, 499 (3rd Cir. 1999); Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3rd Cir. 1997). Therefore, although we analyze Plaintiff's claim under Title VII only, our analysis is equally applicable to her PHRA claim, as well as her § 1981 and § 1983 claims.

### A.    National origin/race discrimination claim

6. We analyze Plaintiff's claim under the familiar burden-shifting test articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and further refined in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1983). Under McDonnell Douglas and its progeny, the plaintiff has the initial burden of establishing a prima facie case of discrimination, the substance of which will

vary depending on the type of claim; if the plaintiff is successful, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment decision. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 319 (3rd Cir. 2000); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3rd Cir. 1997). If the employer proffers a legitimate, non-discriminatory reason for its action, the plaintiff must then demonstrate that the proffered reason was merely a pretext for unlawful discrimination. Goosby, 228 F.3d at 319, citing Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000); Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 n.4 (3rd Cir. 1999).

7.  In order to establish a prima facie case in a failure-to-hire case under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected; (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3rd Cir. 2003), cert. denied, 541 U.S. 1064 (2004). As an alternative to the fourth element, a plaintiff can show that the position was filled with a person not belonging to the protected category. Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3rd Cir. 1997); Stewart v. Amazing Glazed, LLC, 2007 WL 3334973 at * 7 (W.D.Pa. 2007).

8.  We find that Plaintiff has successfully made out a prima facie case.

9.  Once a plaintiff has established a prima facie case, a defendant must produce evidence that it had a "legitimate, non-discriminatory reason" for its employment decisions. Goosby, 228 F.3d at 319.

10.  As set forth more fully in the Findings of Fact, the District has offered evidence supportive of legitimate non-discriminatory reasons for its failure to hire Plaintiff in December 2002, March 2004 and thereafter.

11.  It is incumbent upon Plaintiff to produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Stanziale v. Jargowsky, 200 F.3d 101, 105 (3rd Cir. 2000); Brewer v.

Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3rd Cir. 1995).

12.  Plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'"  Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3rd Cir. 1992)).  Plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3rd Cir. 1997) (quoting Fuentes, 32 F.2d at 765).  In other words, Plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  Keller, 130 F.3d at 1109.

13.  With respect to the long-term substitute position for Pickens' classroom, Plaintiff claims that the District's failure to follow its practice of filling long-term substitute positions based upon the recommendation of the teacher being replaced is evidence of pretext.

14.  The undisputed evidence at trial demonstrated, however, as discussed more fully in the Findings of Fact, that after Heller instituted the new policy requiring interviews of long-term substitute candidates, all applicants were required to interview for the teaching positions.  No evidence was presented at trial that this change in practice instituted by Heller was motivated by discriminatory animus or applied in a disparate manner.

15.  As discussed more fully in the Findings of Fact, we reject Plaintiff's contention that she has demonstrated that the District's articulated reasons were pretextual by virtue of the discriminatory comments attributed to Wright and Heller by Bernard Wagner.  As previously discussed, we find those comments were not made.

16.  Fundamentally, Plaintiff relies on her own subjective opinion that her performance in the interview process and capabilities were such that she was superior to one or more of the successful candidates.

17.  Plaintiff's subjective opinion as to her qualifications or performance are insufficient to prove pretext.  An employee's judgment as to the importance of specific skills or qualities

identified by an employer as desirable and an employee's view of his or her performance is irrelevant. Simpson, 142 F.3d at 647. "[W]hat matters is the perception of the decision maker," and not that of the employee. Billett v. Cigna Corp., 940 F.2d 812, 825 (3rd Cir. 1991), overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

18. We also find that Plaintiff's claim of disparate treatment or pretext are substantially undercut by virtue of the fact that the District has hired minorities (Naomi Uy-Moore and Tammy Foster) during the relevant time frame.

19. In conclusion, Plaintiff has failed to prove that the District's failure to hire her for any of the positions at issue or to afford her an interview after March 2004 was motivated, in any degree, by racial or national origin animus. Consequently, judgment shall be entered in favor of the District on Plaintiff's substantive discrimination claim.

### B.    § 1983 retaliation claim[6]

20. The First Amendment provides, in relevant part, that: "Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

21. In order to establish a viable claim for retaliation, the Plaintiff must first establish that she engaged in activity that is protected by the First Amendment. San Filippo v. Bongiovanni, 30 F.3d 424, 430 (3rd Cir. 1994), cert. denied, 513 U.S. 1082 (1995).

22. Second, Plaintiff must show that the protected activity was a substantial factor motivating the decision. Id.

23. If Plaintiff satisfies the first two prongs, the District may defeat Plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct. San Filippo, 30 F.3d at 430-31 & n.7.

24. The filing of a PHRC complaint is protected activity under the petition clause of the First Amendment. Anderson v. Davila, 125 F.3d 148, 161 (3rd Cir. 1997) (holding that plaintiff's filing of an EEOC complaint and discrimination lawsuit constituted protected activity under the First Amendment); Hill v. Borough of Kutztown, 455 F.3d 225, 242 (3rd Cir. 2006) (complaints

---

[6]By separate Opinion and Order, Plaintiff's Title VII retaliation claim was dismissed for failure to exhaust administrative remedies.

to the PHRC and EEOC "might well qualify as 'petitioning,' and thus would constitute protected activity.").

25. Similarly, the filing of a lawsuit qualifies as protected activity under the petition clause of the First Amendment. Brennan v. Norton, 350 F.3d 399, 417 (3rd Cir. 2003) (filing a lawsuit implicates the Petition Clause of the First Amendment); Anderson, 125 F.3d at 161 ("The Supreme Court has consistently held that an individual's constitutional right of access to the court is protected by the First Amendment's clause granting the right to petition the government for grievances.") We therefore find Plaintiff has satisfied the first prong.

26. In order to succeed on the second prong, Plaintiff does not have to demonstrate "but-for" causation; rather, she must show only that "the exercise of her First Amendment rights played some substantial role in the relevant decision." Suppan v. Dadonna, 203 F.3d 228, 236 (3rd Cir. 2000). "The causation required to establish a claim under § 1983 is identical to that required under Title VII." Brennan, 350 F.3d at 420. Causation may be established by demonstrating, for example, that the adverse action followed soon after the protected conduct, that inconsistent reasons were given by the employer for the adverse action, or the employer treated other employees differently. Id.; Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3rd Cir. 2000).

27. Here, we find that the District's stated reasons for its employment decisions relative to Plaintiff have remained uniformly consistent. Moreover, we find no evidence of disparate treatment or of a pattern of antagonism reflective of a discriminatory animus.

28. As discussed more fully in the Findings of Fact, we reject Plaintiff's contention that she has established retaliatory animus based on the comments of Darling or Wright.

29. We further find that, as a matter of law, neither Wright in particular, nor the Board in general, was a decisionmaker relative to any employment related decision concerning the Plaintiff at issue in this lawsuit. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 290-91 (4th Cir. 2004); Foster v. New Castle Area School Dist., 98 Fed. Appx. 85, 87-88 (3rd Cir. 2004) (school board member who had the authority to hire not the decisionmaker; assistant superintendent of schools who selected which candidates were interviewed was the actual decisionmaker). Any remark attributed to Wright allegedly reflective of retaliatory animus was a

stray remark by a non-decisionmaker which is insufficient to support an inference of discrimination. <u>Gomez v. Allegheny Health Serv's Inc.</u>, 71 F.3d 1079, 1085 (3rd Cir. 1995), <u>cert. denied</u>, 518 U.S. 1005 (1996).

  30. We find that Plaintiff has failed to prove that the District's failure to hire her in March 2004 and afford her an interview for open positions thereafter was motivated in any degree by retaliatory animus. Judgment will be entered in favor of the District on Plaintiff's retaliation claim.

                  s/ Sean J. McLaughlin
                  United States District Judge

Dated: March 31, 2008
cm:  All parties of record.

17